UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HONORABLE STEPHEN V. WILSON, DISTRICT JUDGE PRESIDING

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, Plaintiff, vs. REGIS POSSINO, et al., Defendants. | ) | No. CR 2013-00048-SVW<br>CR 2013-00062-SVW<br><br>PAGES 1 - 140 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

WEDNESDAY, JANUARY 29, 2014

**EVIDENTIARY HEARING (CONTINUED)**

DEBORAH K. GACKLE, CSR, RPR
United States Courthouse
312 North Spring Street, Room 402A
Los Angeles, California 90012
(213) 620-1149

**APPEARANCES OF COUNSEL:**

**For the Plaintiff:**

ANDRÉ BIROTTE, JR.
UNITED STATES ATTORNEY
BY: ARIEL NEUMAN
BY: JAMES BOWMAN
BY: MARK AVEIS
ASSISTANT UNITED STATES ATTORNEYS
1400 United States Courthouse
312 North Spring Street
Los Angeles, California 90012

ALSO PRESENT: FBI SPECIAL AGENT PERRY WOO

**For the Defendants:**

Jonathan Aminoff
Jennifer J Uyeda
Federal Public Defenders Office
321 East 2nd Street
Los Angeles, CA 90012
213-894-7524

Edward Robinson
Edward Robinson Law Offices
21515 Hawthorne Blvd #665
Torrance, CA 90503
(310) 316-9333

- - - - -

(APPEARANCES CONTINUED):

**For the Defendants:**

Marc S Harris
Scheper Kim and Harris LLP
601 West 5th Street 12th Floor
Los Angeles, CA 90071-2025
213-613-4655
Fax: 213-613-4656
Email: mharris@scheperkim.com

Jason DeBretteville
Stradling Yocca Carlson & Rauth
660 Newport Center Drive Suite 1600
Newport Beach, CA 92660
949-725-4094
Fax: 949-823-5094
Email: jdebretteville@sycr.com

Amy E Jacks
Amy E Jacks Law Offices
315 East 8th Street, Suite 801
Los Angeles, CA 90014
213-489-9025
Fax: 213-489-9027
Email: amyejacks@sbcglobal.net

Richard M Callahan, Jr
Richard M Callahan, Jr Law Offices
225 South Lake Avenue Suite 300
Pasadena, CA 91101
626-202-4060
Fax: 626-794-4676
Email: rmcallahanjr@earthlink.net

(APPEARANCES CONTINUED):

Daniel Saunders
Nathan Joseph Hochman
Bingham McCutchen LLP
The Water Garden North
1601 Cloverfield Blvd Ste 2050
Santa Monica, CA 90404-4082
Phone Number: (310) 255-9025
e-mail: nathan.hochman@bingham.com
daniel.saunders@bingham.com

///

///

**I N D E X**


| GOVERNMENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| TARWATER, JEREMY | 12 | 50(U) | 117 | 126(U) |
| | | 92(H) | | |

**LOS ANGELES, CALIFORNIA; WEDNESDAY, JANUARY 29, 2014;**

**10:50 A.M.**

-- -- --

THE CLERK: Items 2 and 3, CR 13-48-SVW, United States of America versus Regis Possino, et al. and CR 13-62-SVW, United States of America versus Sherman Mazur, et al.

Counsel, please state your appearances.

MR. BOWMAN: Good morning, Your Honor. Jim Bowman on behalf of the United States. Present with me at counsel table is AUSA Mark Aveis and assistant United States attorney Ariel Neuman and FBI case agent Perry Woo. Also, Your Honor, based on the court's comment at the prior December 16th hearing, we have two witnesses here today present: FBI Special Agent Jeremy Tarwater, who is in the audience, and former AUSA and now-magistrate Michael Wilner, who is in one of the witness rooms; and in light of some of the recent filings, including a filing by defendant Mazur, the government would like the opportunity to take Jeremy Tarwater on direct for his testimony.

MS. UYEDA: Good morning, Your Honor. Jennifer Uyeda and Jonathan Aminoff on behalf Regis Possino, who is present and in custody.

MR. HARRIS: Good morning, Your Honor. Marc Harris

and specially appearing Nathan Hochman and Dan Saunders on behalf of Sherman Mazur, in custody.

MR. ROBINSON: Your Honor, Edward Robinson for Grover Nix. Mr. Nix is present, and he is in custody.

MR. DeBRETTEVILLE: Good morning, Your Honor. Jason DeBretteville on behalf of Ari Kaplan, who is present, on bond.

MS. JACKS: Good morning, Your Honor. Amy Jacks for Curtis Platt. He has a waiver on file.

MR. CALLAHAN: Your Honor, good morning. Richard Callahan on behalf of Dwight Brunoehler. He is not present; he lives in Florida. There is a waiver on file. I'm also standing in for Dale Rubin on of behalf Peter Dunn in the Possino case. Mr. Rubin is in trial before Judge Otero. There's also a waiver of appearance for Mr. Dunn.

THE COURT: Okay. The most productive way to begin this process would be to deal with the question of whether Agent Tarwater was intentionally misleading and/or in reckless disregard of the truth when he described the inability of Mendiratta to be a potentially productive source of evidence in the investigation.

The related question is if the finding was that he had been dishonest or misleading to the issuing judge, Judge Fischer, what affect that has on the contours of the affidavit. More specifically, what parts are reinserted in the affidavit and then what would the reconstituted affidavit look like in

terms of whether it would have been misleading to the magistrate -- no -- to Judge Fischer.

I'm not going to get into the second issue at this point, first, because it may be unnecessary, and -- but I do recognize that some of the evidence that does relate to the additional knowledge that Agent Tarwater had at the time of the affidavit, it could be relevant to the primary question of his state of mind at the time he prepared the declaration -- the affidavit.

Now, there is the question of -- obviously, the defense wants to cross-examine Tarwater, I assume. That seems appropriate. The other witness is Judge Wilner. At the relevant times in this case, he was a member of the U.S. attorney's office and the prosecutor in the earlier Mendiratta case.

He appears not to remember what he told Agent Tarwater about Mendiratta or, more specifically, Mendiratta's cooperation in -- let's call it "Mendiratta One," just for sake of reference. But Agent Tarwater does concede in his affidavit for this hearing that he was aware that Mendiratta got a favorable deal. I don't know exactly what that means, but he said he got a favorable deal.

So it is of some significance to address, among other things, this question of what Agent Tarwater knew about the U.S. attorney's position regarding Mendiratta's cooperation in

Mendiratta One, and if he did, how he considered that information in light of the fact that he concedes that he was told by some law enforcement person in the Southern District of New York that they had lost faith or confidence in Mendiratta. So that seems an area worthy of inquiry.

Then there is the issue of why Agent Tarwater described the law enforcement interviews of Mendiratta and Mendiratta's failure to discuss any of the defendants in this case when Agent Tarwater appears to have known that Mendiratta wasn't interviewed in connection with this case, but the interviews occurred with Mendiratta One or some other case; and as I've said, facially the affidavit could have been misleading to Judge Fischer, but that is not the end of the examination. It's whether, first, Agent Tarwater was just unintentionally inarticulate and/or selective, and that's where I want to leave things for purposes of this hearing.

So the first question is do the defendants want to -- or does the government want to examine Judge Wilner?

MR. BOWMAN: Your Honor, given the court's comments, we're willing to not call Judge Wilner.

THE COURT: What about the defense?

MR. AMINOFF: We agree, Your Honor. We don't think his testimony is relevant.

THE COURT: Why don't we tell him that his appearance is not necessary. He is here now?

MR. BOWMAN: He is in a witness room. We will tell him.

THE COURT: Someone tell him that so he doesn't have to waste his time.

Now, there is the late joinder in the motions of the defendant Mazur, and that motion is under seal, correct?

MR. HOCHMAN: The basis for the motion, Your Honor, is under seal because it relates to certain cooperation --

THE COURT: Yes, I know that, but -- so let me approach it this way: Let's leave the issue of Mazur out of the inquiry, at least in stage one of this, because it gets too complicated with procedures. We have to adopt certain procedures for that. So let's turn to the examination of Agent Atwater[sic].

Is he here?

MR. BOWMAN: He is, Your Honor. Your Honor, we would call Special Agent Jeremy Tarwater to the stand.

THE CLERK: Is that his name? Did I say the wrong name? I don't know why I said "Atwater."

MR. BOWMAN: Tarwater.

THE COURT: Please raise your right hand.

(Witness sworn.)

THE WITNESS: I do.

THE CLERK: Please be seated.

State your full name and spell it for the record.

THE WITNESS: Jeremy Tarwater, T-a-r-w-a-t-e-r.

THE COURT: Before you begin, I just want to get some time estimate because I'm in the middle of another trial, and I don't want to limit anyone, but I just want to get some senses of how lengthy your examinations of Agent Tarwater will be.

MR. AVEIS: An hour for direct, please.

THE COURT: An hour. But why direct? Didn't he file a declaration?

MR. AVEIS: He did but on account of the materials that have been filed after the 16th, not necessarily in the Mazur joinder. I appreciate the court's comments about putting them aside. Additional matters have come up, and particularly honing in on the court's comment on the 16th of December about Agent Tarwater's state of mind, we believe would be helpful to the court to elicit some additional questions from him that were somewhat beyond the scope of the direct in the declaration.

THE COURT: I see.

And what about the defense? How do you anticipate the length of your examination?

MS. UYEDA: Your Honor, I had only planned for a 20-to 30-minute cross, but that was based on his affidavit in the declaration that was submitted to the court, not on the hour direct testimony.

THE COURT: Yeah.

What about the other lawyers?

MR. HOCHMAN: Your Honor, probably about 15 to 20 minutes, again, based on the information that we had been provided today.

THE COURT: I see.

MR. HOCHMAN: Also, Special Agent Tarwater would be involved in the Mazur, sort of, part A of the --

THE COURT: I understand that.

I mean, it's hard to understand why he filed an affidavit which should have been complete and then you want an hour to direct -- redirect him.

MR. AVEIS: I'm trying to make a very conservative estimate for purposes of planning. I estimate that, especially on account of the court's comments this morning, can be far less than that, Your Honor.

THE COURT: So let's think of it this way: In the Leon case, the lawyers should come back at two o'clock.

Is the defense lawyer here, too?

(Discussion held off the record)

THE COURT: Have his witnesses here at two o'clock.

MR. KLEIN: Two o'clock.

THE COURT: Thank you.

MR. KLEIN: Thank you.

///

///

**JEREMY TARWATER; GOVERNMENT'S WITNESS, SWORN, TESTIFIED:**

**DIRECT EXAMINATION**

BY MR. AVEIS:

Q. Good morning.

A. Good morning.

Q. Are you presently an agent with the FBI?

A. I am.

Q. What is your current assignment, please?

A. I'm a supervisory Special Agent in the economic crimes unit in Washington, D.C.

Q. Are you a member of the California Bar?

A. I am.

Q. Prior to becoming an FBI agent, how were you employed?

A. As a corporate securities attorney for approximately six years.

Q. For how long all together did you practice law?

A. Approximately six years.

Q. In addition to being a corporate securities attorney, what other areas of emphasis did you engage in?

THE COURT: Haven't I heard this before? I think I heard that he had an unusual background as being a lawyer with a major law firm. I'm sure it didn't come out of nowhere. I'm sure we heard this. Is this in his declaration?

MR. AVEIS: No, it's in the affidavit itself --

THE COURT: Somewhere I read that.

MR. AVEIS: I'm happy to move on.
Q. When you were first sworn with the FBI, what squad were you assigned to?
A. It was white collar II. That is a corporate securities fraud squad in Los Angeles.
Q. When did you first become involved in the investigation that led to the indictments now pending before this court?
A. Approximately April 2010.
Q. How did you first become involved?
A. My then-supervisor, Steven Goldman, informed me that then-assistant United States attorney Wilner had received a phone call and that there was someone who wanted to come in and provide information.
Q. And after Goldman told you of his conversation, did you meet with then-assistant United States attorney Wilner?
A. Sometime thereafter, yes.
Q. And where was that?
A. I believe at the U.S. attorney's office.
Q. You have a rough month and year when that occurred?
A. May 2010.
Q. And did you have more than one meeting with assistant United States attorney Wilner after that time?
A. I did.
Q. Approximately how many?
A. Less than ten, more than three, somewhere in there.

Q. And was assistant United States attorney Bowman involved at that time?
A. No, he was not.
Q. When, if you can recall, did assistant United States attorney Bowman become involved?
A. Late 2010.
Q. During the meeting that you had with assistant United States attorney Wilner, what did you learn --
THE COURT: What was the date of the affidavit again?
MR. AVEIS: March of 2011.
THE COURT: Okay.
BY MR. AVEIS:
Q. What did you learn during the meetings you had with Wilner that commenced in or about May of 2010?
A. Well, this individual came and provided information about his own criminal conduct and also indicated that he had information about Tarun Mendiratta and his involvement in market manipulations schemes. Wilner and I discussed this, and Wilner expressed that he was surprised by that; he was angry by that. He told me he had been involved in prosecuting Mendiratta previously and that he had gotten a good deal, and he thought Mendiratta was honest with him and obviously he wasn't he's.
Q. What was your interpretation of that comment that Wilner had made, that Mendiratta had gotten a good deal?

A. My interpretation is that Wilner had thought at the time that Mendiratta was being truthful and honest and fulfilling his obligations under the plea agreement and that he obviously thought that was not true after what he learned through our proffers.
Q. Did you understand from Wilner's comment, the "good deal" comment, that AUSA Wilner might have made a motion for a downward departure on a account of Mendiratta's cooperation?
A. It wasn't that concrete, but I think that was the implication, that, you know, he had gotten some kind of benefit through the plea deal.
Q. At some point, did you see that plea agreement that was related to what the court has called Mendiratta One?
A. I did. I emailed Wilner and asked him for the plea and information, and I checked the factual basis of that; but I did believe that I saw at the time that it was a cooperation plea.
Q. And what, specifically, did you review that plea agreement for?
A. I wanted to check the prior conduct and see if that was involved with what the new cooperator had told us about Mendiratta.
Q. Were you involved in any way in the prosecution of Mendiratta One?
A. I was not.
THE COURT: Does the plea agreement have a

cooperation --

MR. AVEIS: It does, Your Honor.

THE COURT: It does?

MR. AVEIS: Yes.

THE COURT: Okay.

BY MR. AVEIS:

Q. After you first learned that Mendiratta might be engaged in criminal activity based upon these meetings with Wilner that -- excuse me -- AUSA Wilner that had occurred starting in or about May of 2010, did you take any steps to learn about Mendiratta's prior law enforcement contacts?

A. I did. Wilner -- then-AUSA Wilner indicated he had a complete file on Mendiratta, and he emailed me, I believe, seven proffer statements given by Mendiratta.

Q. Do you know whether FBI indices were checked for additional information that related to Mendiratta?

A. My practice would have been to have an analyst run that; I can't recall the specifics right now, but we would have checked, I hope, to make sure there's no other 302s out there.

Q. And about when did you engage in this investigation through the FBI indices -- however it may have been done -- in seeking out the FBI 302s that you've mentioned?

A. I believe in May 2010.

Q. And did you read the 302s and the -- whatever other information was culled from those indices?

A. I did.
Q. And do you recall the dates of the 302s?
A. My recollection is they range between -- around 2004 to 2008.
Q. And do you remember the jurisdiction from which the 302s emanated?
A. My recollection is that almost all of them were New York 302s, so either SDNY or EDNY -- I believe SDNY -- and there was one Los Angeles FBI interview.
Q. And how would you characterize --
A. Proffer statement, not interview.
Q. We'll talk about the L.A. one in just a minute, but focusing on the New York ones, how would you generally characterize the detail, that is, what Mendiratta had to -- provided to the interviewing agents?
A. My recollection -- and I haven't reviewed these in some time -- is that the early one started fairly detailed and then became less detailed. Some of the later ones were not about securities fraud, as I recall. They were more about gambling and organized crime.
Q. And to the best of your memory, when you reviewed them, do you recall whether any of the interview reports indicated that Mendiratta had mentioned Possino, Nix, Angelastri -- that's A-n-g-e-l-a-s-t-r-i -- in any of those interviews?
A. He did not.

Q. Now, the L.A. interview, FBI interview, 302, do you recall the date of that?
A. I believe is was in 2006.
Q. And do you recall the author of that 302?
A. I recall Special Agent Paul Bertrand's name being on the 302.
THE COURT: So is the testimony that there were 302s that -- I'll ask you -- you interviewed -- you read 302s from the New York office primarily between 2004 and 2008 of Mendiratta, correct?
THE WITNESS: Yes, Your Honor.
THE COURT: And they involved New York activities.
THE WITNESS: The New York ones did, yes, Your Honor.
THE COURT: Yes. And now we're talking about 2006. Was there an interview of Mendiratta in 2006 regarding Los Angeles activities?
THE WITNESS: Yes, Your Honor.
THE COURT: Is that what you're getting to now?
THE WITNESS: Yes, Your Honor.
THE COURT: All right.
BY MR. AVEIS:
Q. As to the interview report from the L.A. office, the 2006 302, how would you characterize the detail that Mendiratta had provided there?
A. It was detailed. I remember it being quite lengthy.

Q. And as to the work that Mendiratta had -- excuse me -- as to the information or contact that Mendiratta had had -- I'm sorry. Let me restate that.

As to the contact that Mendiratta had had with the New-York-based law enforcement officers, do you recall learning anything of whether he had proactively cooperated on their behalf, that is, wore a body wire, made consensual calls and interacted with investigative targets?

A. That did occur to me, and so I called Theodore Cacioppi special Agent in New York at the time, and asked him: You had many proffers with Mendiratta. Did you consider opening him as a source? Did you use him in any way? And he told me, no, they had not; they found him unreliable and untrustworthy.

Q. What else did you learn from your contact with that FBI agent in New York, if anything?

A. Additionally, he noted that Mendiratta was bipolar, or at least that Mendiratta had told him that.

Q. And how, if the at all, did that enter into your thought process in terms of Mendiratta's potential viability if you were to consider him as a source?

A. It was low on the list compared to how truthful he was and how -- whether you could rely on him, whether he would follow directions, his material missions in the past.

THE COURT: What do you mean "low on the list"?

THE WITNESS: I mean, other factors, I thought, were

dispositive of whether he could be a cooperator before I even reached the question of could I use someone who is bipolar, and, in fact, I could use someone who is bipolar, I think, if they were on medication and able to follow directions --

THE COURT: But here's what I'm following so far: That you started working with now-Judge Wilner on the investigation in this case -- called the Possino case -- around April 2010, and you were investigating Mendiratta, and then-assistant United States attorney Wilner gave you this file about Mendiratta, correct?

THE WITNESS: Yes, Your Honor.

THE COURT: You followed through on it, and you had this discussion that you've testified about with agents in New York, correct?

THE WITNESS: Yes, Your Honor.

THE COURT: And you read the 302s, yourself, correct?

THE WITNESS: I did, Your Honor.

THE COURT: Yeah. And you heard negative information, as you described, about Mendiratta, correct?

THE WITNESS: Correct, Your Honor.

THE COURT: Did you share that with Wilner?

THE WITNESS: I don't recall if I shared the conversation with the New York agent with assistant United States attorney Wilner.

THE COURT: But why wouldn't you discuss that with

Wilner?

THE WITNESS: It seemed, without question, that Mendiratta -- I mean Mendiratta was the primary target -- based on the information from the new cooperator, Mendiratta was the primary target. There was no discussion with assistant United States attorney Wilner about approaching Mendiratta to cooperate because he was the main target.

THE COURT: And did -- at the time of the affidavit, was he the main target?

THE WITNESS: At the time of the affidavit, he was -- seems one of the more culpable members, but it was a broad conspiracy --

THE COURT: I know it was, but was he the, in your view at the time, the top guy?

THE WITNESS: No -- Mr. -- defendant Possino was the top guy at that time.

THE COURT: And how would you -- what was your belief at the time of the affidavit about the hierarchy in this conspiracy? Not each person but just the top echelon?

THE WITNESS: Yes, Your Honor. The way I saw it, there was -- the, sort of, hub of the network was defendant Possino and defendant Nix, and they were partners, and they provided all of the instructions out to the different spokes; and Mendiratta had one role to play with them, at least in the time we were reviewing: He would help arrange promotion. So

they were the ones giving instructions to the brokers, the attorneys, the auditors; everything really flowed through them.

THE COURT: And those were the people that you were primarily after.

THE WITNESS: Yes, Your Honor.

THE COURT: Not to the exclusion of others, but they were the kingpins, so to speak?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Go ahead.

MR. AVEIS: Thank you.

Q. Just to close the loop on the 302 from Los Angeles, did that interview report indicate whether Mendiratta had mentioned Possino, Nix or Angelastri?

A. He did not.

THE COURT: 2006 report?

MR. AVEIS: Yes, please.

THE COURT: Why would you have thought that report indicative of what Mendiratta knew about Possino and Nix in 2010? That's four years before.

THE WITNESS: Yes, Your Honor.

THE COURT: In that interview, was he ever asked about Possino and Nix?

THE WITNESS: It's hard to tell if he was asked, but there was no indication he was asked in that interview.

THE COURT: I know, but why would you think that in a

four-year-old interview in a different investigation that the fact that Mendiratta didn't mention Possino or Nix or any of the other conspirators in this case was indicative of his lack of knowledge?

THE WITNESS: Yes, Your Honor. Well, the evaluation of Mendiratta happened over time, and what -- didn't conclude in May 2010. By, I believe, approximately June 2010, the new cooperator was making consensually recorded calls, including with Mendiratta; and Mendiratta mentioned that he had done deals with Possino for over 10 years, done a lot of deals together, multimillion-dollar deals --

THE COURT: That was after you had the wiretap.

THE WITNESS: I know, Your Honor. That was June 2010, and the wiretap was March 2011. So over the next few months, I learned more information about how long Mendiratta had been doing deals with Possino, and then when I looked back at the 302s, it became clear he was doing deals with them at that time, just not mentioning it.

THE COURT: And was this 2006 interview -- I'll call it the Los Angeles interview -- was it an interview to see if Mendiratta could help himself because he was being investigated?

THE WITNESS: I believe they were looking for a full and complete confession of what he had done, who he had done it with, and with an eye toward cooperation. That is how I

understood it.

THE COURT: Is that -- in your view, the interview itself suggested that it was -- just to use a shorthand -- tell us everything you know about your involvement in criminal activity?

THE WITNESS: Well, that's what I understood on or -- Your Honor, but, in addition, you know, I saw trading in a stock we believe had been manipulated before he put in his guilty plea, after he put in his guilty plea; they're planning a new scheme before he got sentenced, after he got sentenced, so it's that whole range of conduct that indicated to me that Mendiratta was not being forthcoming. He was being approached by the people to do a deal, he was not telling the government, even though, supposedly, he was in the stance of being a cooperator.

THE COURT: But you're saying that based upon the 2006 FBI interview, you acquired information that Mendiratta had been involved with Possino and Nix? He said he hadn't been, but when did you get information that he had been?

THE WITNESS: He had consensually monitored calls with my source, and they --

THE COURT: After 2010. That was after the investigation started?

THE WITNESS: It was around June 2010, Your Honor. Shortly after this investigation --

THE COURT: And that's when he started to mention Possino --

THE WITNESS: His long history with Possino, and -- yes, Your Honor.

Q. "Long" meaning it went back to 2006?

A. He said -- I think he said 13, 14 years back. Then going back to the 302s, I realize, well, obviously he did know about them at the time, and he hadn't mentioned it --

THE COURT: But now that you've reread the affidavit that you prepared for Judge Fischer, in the affidavit it's misleading in the sense that you imply -- or it could be inferred that way -- that these interviews occurred in connection with this investigation and not in earlier times between 2004 and 2008.

Why didn't you include in the affidavit the history of the -- of Mendiratta's interviews and make it clear that he hadn't been interviewed in connection with this case, but he had been interviewed in connection with other cases or other investigations?

THE WITNESS: Yes, Your Honor. Well, I certainly never meant to be misleading. In the section about the viability of approaching and interviewing other witnesses, I addressed one of the problems with that, in my view, was a long loyalty between some of the target subjects; and then I gave an example that Possino and Mendiratta had known each other a long

time; Mendiratta had proffered seven times, and he had mentioned them. So it was only in that respect that I brought up he had been -- proffered with the government many times, and he'd never mentioned these relationships. At a higher level I addressed what the problems were with any cooperator in that situation but ...

THE COURT: All right. Go ahead.

BY MR. AVEIS:

Q. Did you consider at some point approaching Mendiratta to serve as a proactive cooperator?

A. It's my practice to evaluate any potential cooperator, so, yes, I did.

Q. And when did you do that? When did you first consider that?

A. You know, it doesn't just start and stop, so I first considered it in May of 2010, and I kept evaluating it as I learned more information as -- my cooperator was recording these calls with Mendiratta, and I learned more. I continued the evaluation but ...

Q. So you were open to the possibility that not only he could be a proactive cooperator, but that if you had initially determined that he wasn't he might later become one; is that right?

A. It's possible. It looked unlikely.

Q. In your view at that time as an agent, was it your view

that it was generally desirable to try to find an insider to proactively cooperate?

A. Absolutely.

Q. And did you make a determination at some point that, in your view, Mendiratta was unsuitable to serve as a proactive cooperator?

A. I did.

Q. What -- on what facts did you base that determination?

A. Well, we discussed some of them, but some of the main facts were that he had signed a cooperation plea agreement, and literally right before and right after that he was engaging in market manipulation, and he continued that and began planning a new market manipulation up to -- he was sentenced, after he surrendered, even from prison with a smuggled cell phone; and in the mean time, I had a very productive cooperator who didn't -- who was trustworthy and honest and appeared to follow directions.

THE COURT: Then why didn't you just simply say in the part of the affidavit dealing with necessity that although Mendiratta had cooperated in the past, he isn't a suitable cooperator because his trustworthiness is totally breached by the fact that after cooperating in a favorable deal, we have information that he's still engaged in the same sort of scheme?

THE WITNESS: Well, I wish I had, Your Honor. I think it would have strengthened my argument that here were the

limitations; here's why another cooperator wouldn't achieve the goals of the investigation. I think that would have strengthened my argument. It didn't occur to me to list someone like that as a more specific example of why it wouldn't work. I tried to address it from a higher level, and it would have been stronger to go through him specifically.

THE COURT: And why wouldn't you think that you had more leverage with Mendiratta because you now had recorded evidence -- did you not -- of his involvement in this case?

THE WITNESS: Yes, Your Honor.

THE COURT: And you knew he received a sentence in Mendiratta One, correct?

THE WITNESS: Yes, Your Honor.

THE COURT: What was the sentence?

THE WITNESS: I believe it was one year.

THE COURT: And now if he was guilty of a similar crime on the heals of this other crime, wouldn't you think that you would have a lot of leverage with him in making him a cooperator?

THE WITNESS: Well, as far as my state of mind at the time, Your Honor, my problem wasn't that I didn't have a good cooperator -- I had a very good cooperator, and we spent nine months making hundreds of recordings -- but the problem that became apparent was that Mr. -- defendant Possino and Nix operated -- they were the hub, and that any cooperator was

going to be limited in getting knowledge of the instructions they were providing and the intent of those individuals. Secondly, any cooperator, like my very productive cooperator, would have policy restrictions. I can't let him investigate a half-million dollars in the scheme, and that would be --

THE COURT: The cooperator you have, that's known now or not?

THE WITNESS: I'm sure it is, Your Honor.

THE COURT: Is that known?

MR. AVEIS: We've produced the 302s that identify him by name.

THE COURT: Who is that?

THE WITNESS: Howard Berger.

THE COURT: Was he indicted in this case?

THE WITNESS: He is not indicted in this case. I understand he's going to be charged with the conduct that he confessed to us earlier.

THE COURT: I see. What was his relationship to Possino and Nix as contrasted to Mendiratta's relationship historically? In other words, how long -- Berger?

THE WITNESS: Yes, Your Honor.

THE COURT: How long had Berger known Possino and Nix?

THE WITNESS: My understanding is that Mendiratta introduce Berger to Possino and Nix. Maybe unbeknownst to

them, he had been involved in a deal with them previously.

THE COURT: Unbeknownst to whom?

THE WITNESS: Possino and Nix. Berger had participated in a deal with them, I believe, in '08, '09, but I don't think the parties had actually met. May they know --

THE COURT: What was Berger's role?

THE WITNESS: He was known to them as a hedge fund manager, so they thought he would put in money to help fund the promotion for the next -- whatever the next company would be, and Mendiratta introduced Berger to them, particularly because he was going away to prison, so he couldn't be the go-between anymore. So I had the cooperators start making calls with them.

THE COURT: And didn't Mendiratta actually have face-to-face conversations with Possino and Nix?

THE WITNESS: At what time frame, Your Honor?

THE COURT: In the time frame prior to the affidavit.

THE WITNESS: I can't -- I assume he did, but I don't have any knowledge of that.

THE COURT: So you didn't know that.

THE WITNESS: I didn't know if he did.

THE COURT: What about Berger?

THE WITNESS: He did. At the government's direction, he started having some in-person meetings, mostly over the phone.

THE COURT: With Possino and Nix?

THE WITNESS: Yes, Your Honor.

THE COURT: And --

THE WITNESS: I believe October 2010 was the first time they met in person.

THE COURT: Was anything said -- October 10 -- I see -- were those conversations, in your view, inculpatory?

THE WITNESS: Yes, absolutely.

THE COURT: With Possino and Nix?

THE WITNESS: Yes, sir.

THE COURT: By October of 2010, you had an informant who was able to get incriminating testimony from Possino and Nix.

THE WITNESS: Yes, even earlier. Around August 2010, when Mendiratta surrendered, he had to put them in touch, and so my cooperator was able to make calls directly to them. In fact, I thought he was in a better position to acquire evidence than Mendiratta, because if you're the money man, you can kind of -- you can demand to know more about what is going on if you're the one who is going to throw in a lot of money. Mendiratta was more of the, I'll promote it, you give me a stock, kind of role. So from approximately August 2010 to March 2011, he was making calls on -- consensually recorded calls with Possino and Nix and some in-person meetings.

THE COURT: And so because Berger was successful,

from your standpoint, was that another reason that you decided not to use Mendiratta?

THE WITNESS: It was, Your Honor. When I -- what I at least tried to do in the affidavit was explain where Berger was successful and where he wasn't and why I thought those same issues would occur with any potential cooperator, the same limitations.

THE COURT: What were the limitations again?

THE WITNESS: Yes, Your Honor. Somewhere that Possino and Nix compartmentalized information, so it was hard to get evidence of the role and intent of the people they give instructions to without being right in the middle. Another was policy limits --

THE COURT: In other words, you were getting good information about Possino and Nix, but your goal was to investigate the players who enabled their scheme to operate.

THE WITNESS: That is exactly right because it became clear it was a large conspiracy, and they had a lot of different people -- and particularly the FBI. If you have brokers or attorneys, those are hard people to replace; it's very disruptive to a criminal enterprise; you can indict those people. And I didn't think we could get that kind of information without -- eventually without getting a wiretap.

THE COURT: Okay. I see. Go ahead.

MR. AVEIS: Thank you.

Q. So you've listed several factors that you considered in deciding whether or not to employ Mendiratta as a proactive cooperator.

Can you think of any others -- or not can you think of now -- did you have in mind at that time any other concerns?

A. You know, not that were dispositive. The primary one is the risk of approaching him and exposing the investigation versus I didn't think he could achieve the goals any better than the current cooperator, and added to that, I didn't think he could follow instructions. I didn't think he was untrustworthy. I had a trustworthy cooperator. There are other factors, but I tried to list the ones that I thought were most dispositive in the affidavit -- at a high level. I didn't necessarily always mention each person's name but ...

Q. And at some point, you were aware that Mendiratta entered prison, correct?

A. Yes, sir.

Q. And do you recall when it was that he surrendered?

A. I think on or about August 30th, 2010.

Q. On or about August 30, 2010?

A. August 30, 2010, yes.

Q. And do you recall when he was released from prison?

A. Not precisely. I have a vague recollection: Eight months or so he did, and then he went to some kind of halfway house.

Q. Okay. Did the fact that --

THE COURT: Was he in prison on the date of the affidavit, March 2011, or was he in a halfway house?

THE WITNESS: I believe he was, Your Honor, but I'm not positive.

THE COURT: Does the government know?

MR. AVEIS: I would have to defer to Mr. Bowman.

MR. BOWMAN: No, Your Honor. I believe he was still in prison at that time.

THE COURT: But he had a short period to serve, and then he would go a halfway house.

MR. BOWMAN: Correct, Your Honor.

THE COURT: Is it a question of months or so?

MR. BOWMAN: Your Honor, that's right. I think it was only a few more months. The basis in the affidavit was not the fact that Mendiratta was in custody and therefore could not be a cooperator. Instead, it was for other reasons that have been discussed. In fact, we've noted in the affidavit that Mendiratta used a smuggled cell phone to continue to participate in the scheme from prison, which was a concern for us.

BY MR. AVEIS:

Q. So was the fact that Mendiratta was unavailable to proactively cooperate in the sense that he couldn't interact due to being imprisoned a factor in your analysis of whether you believed he could be a viable proactive cooperator?

A. Not really. I mean, if someone is valuable, there's things we can do.

Q. Were you familiar with the necessity requirements prior to the execution of the wiretap affidavit in March 2011?

A. Yes.

Q. Did you discuss those necessity requirements with the assigned AUSA?

A. Yes, with Mr. Bowman.

Q. Was he the assigned assistant United States attorney for purposes of seeking the wiretap?

A. Correct.

Q. And did any of those discussions include including or excluding reference in the affidavit to either the fact of AUSA Wilner's 5K motion or the statements that AUSA Wilner had made in that motion that were laudatory in regard to Mr. Mendiratta?

A. One, I didn't know about the laudatory statements, but, no, we never discussed whether to include the 5K or not to include it. We made sure to include that he proffered many times, seven times, but --

THE COURT: Was there ever a discussion about whether you should include the fact that Mendiratta had cooperated in Mendiratta One?

THE WITNESS: I think we thought we dealt with it appropriately by discussing why we thought no cooperator could get more information than our cooperator had, and we still

couldn't achieve the goals of the investigation.

THE COURT: But, I mean, was there a specific conversation about whether the fact that Mendiratta had cooperated successfully in the past should be made known to Judge Fischer?

THE WITNESS: I don't believe either of us thought he had successfully cooperated in the past.

THE COURT: What?

THE WITNESS: I don't believe either of us thought he had successfully cooperated in the past.

THE COURT: I mean, he successfully cooperated in the sense that wasn't his cooperation the basis of those convictions in the earlier case?

THE WITNESS: I suppose that is --

THE COURT: I mean, why would the then-assistant United States attorney Wilner make a motion for a downward departure in a sentence unless he did something valuable?

THE WITNESS: I can only assume he did; we never discussed it, Your Honor.

THE COURT: But why -- was there any discussion between you and any of the assistant United States attorneys you worked with in preparation for the affidavit of whether to include or not the fact that Mendiratta had cooperated in an earlier investigation -- in another investigation?

THE WITNESS: No, none that I recall.

THE COURT: Okay.

BY MR. AVEIS:

Q. Did you make a conscious decision to not have that discussion? In other words, did you have in mind that he had previously proffered with SDNY and New York and that AUSA Wilner had advocated for the 5K that we've discussed? Did you make a conscious decision not to talk about that with assistant United States attorney Bowman?

A. No, it never occurred to me to look back at the 5K or even -- I wasn't even consciously thinking -- now I think, of course, there must have been a 5K, but it was never -- what he had done after was far more relevant to me, and I never discussed it; I never asked for it; Wilner never discussed it we me. It just didn't occur to us to look into that.

Q. In addressing your obligation to ensure compliance with the necessity requirement, was it your view that you had provided a full and complete statement that related to Mendiratta's past?

A. Yeah. The most relevant -- yeah. Nothing cumulative or, you know, secondary but anything of the most relevance, yes.

THE COURT: What was the most significant thing, significant statement you made in the affidavit that, in your mind, informed Judge Fischer that Mendiratta would not be an informant that would obviate the need for a wiretap?

THE WITNESS: Yes, Your Honor. The -- what we tried

to describe in the affidavit was why we didn't think any cooperator could get -- meet the goal of the investigation because of how Possino and Nix ran their network.

THE COURT: Which you described in the affidavit.

THE WITNESS: Yes, Your Honor.

THE COURT: And the way you described it in the affidavit -- if I remember correctly -- was that they gave up some of the profits to insulate themselves.

THE WITNESS: Yes, Your Honor, and in some of the Penal Code section, as well as the necessity section, there was examples of -- you know, "Doug" was some broker, and Mendiratta didn't know who that was; he had no direct access. I didn't believe I could get evidence on what this broker "Doug" was doing, what his role or his knowledge --

THE COURT: What exactly did Mendiratta do in Mendiratta One? In other words, what kind of case was that, and how did he infiltrate?

THE WITNESS: In Mendiratta One, Your Honor -- and I don't know a lot about that case, or don't recall a lot -- I believe he was getting S8 registered stock as a consultant, but he wasn't really providing consulting services, and then he was helping promote --

THE COURT: What is an SA?

THE WITNESS: It's an SEC form.

THE COURT: SA?

THE WITNESS: S8.

THE COURT: S8.

THE WITNESS: Yes, Your Honor.

He was participating in a market manipulation and selling those shares, and because he is not a consultant, really those were -- he was selling unregistered shares, which if you do knowingly is a criminal violation. I don't know whether -- the other contours. I also think he didn't report the income from the sales of shares --

THE COURT: So --

THE REPORTER: Did or did not?

THE WITNESS: Did not.

That's my vague memory, Your Honor.

THE COURT: And so was the -- you didn't have any knowledge of the nature of the conspiracy in Mendiratta One?

THE WITNESS: You know, Your Honor, that is why I looked at the factual basis of the plea and then, in this case, I had the actual prosecutor. So, you know, I thought, Well, if it becomes relevant, I have the best source of information; we can discuss it. But it seemed to be totally different groups, so it didn't seem relevant to the ongoing investigation.

THE COURT: Was it the same sort of modus operandi?

THE WITNESS: In some ways, yes, Your Honor.

THE COURT: Instead of Possino and Nix, there were two other people who were pulling the strings, as the

government alleges.

THE WITNESS: To that I'm not sure, Your Honor.

THE COURT: You really didn't know.

THE WITNESS: I know he was fulfilling the stock-promotion aspect.

THE COURT: What?

THE WITNESS: The stock-promotion aspect of that deal, and that is what he was doing later. I don't know how the rest of that network did or did not operate.

BY MR. AVEIS:

Q. You recall that in the Mendiratta One case, Mendiratta had mentioned that he had used nominees in his family names?

A. I do. I think aunts in India or something to that effect.

Q. And in the case that you were investigating, the present case, that is the case -- excuse me -- the investigation leading to the present cases, did you learn that nominee accounts were similarly being used?

A. For Mendiratta, yes, I did.

Q. And you earlier mentioned a comment to the court about believing that, in effect -- correct me if I'm wrong; I'm not trying to testify -- let me put it different way.

Did you have a concern that whether it was the greatest cooperator in the world you would still be able to infiltrate the criminal enterprise, if you will, given that it was -- appeared to be a closed cell?

A. I think you would have had to be right at the middle, right at Possino and Nix, to really put all the pieces together and to get any evidence of what the brokers knew what was going on -- if they just trade, that doesn't do anything. You need to know what instructions they're given and how that fits in with the whole scheme. I tried. It's not that we -- it's not like I wanted to do a wiretap.

THE COURT: Let's take the lunch recess. I have been at this for a while. Let's come back at five after 1:00.

How much more do you have to go?

MR. AVEIS: Just a few more minutes.

May I ask a question of the court?

THE COURT: Then finish now. I'll give you a few more minutes.

MR. AVEIS: May I get a little guidance from the court? Based on your comments about the Mazur side of things --

THE COURT: I don't know about that yet. I have to wait and see what happens.

MR. AVEIS: Very well.

THE COURT: Finish this part of it.

MR. AVEIS: Sure.

Q. I just want to be clear that based upon your experience, knowledge of securities laws and investigations, did it occur to you at the nascent stage of this investigation that led to

these cases that there was a conspiracy?
A. Yes.
Q. And did it involve multiple players?
A. Yes, once the Berger -- Mr. Berger was cooperating and making calls, it became clear Possino and Nix had a large number of individuals helping with the scheme -- not necessarily each stock deal but at different times, different people coming in and out.
Q. Again, based upon your experience and what you've learned, did you understand that each of the players may have a discrete or separate role?
A. Yes, absolutely.
Q. Can you identify the roles as you understood them to be at the nascent, beginning stage, in about May of 2010?
A. No, I could only identify that Possino/Nix appeared to be giving all the directions but not -- who knew what at that early stage, no.
Q. As the investigation progressed and consensual calls were made by Mr. Berger, your informant, did you then learn of the roles of the various players in the enterprise, in the conspiracy, that is?
A. Some, but there were others that they were obviously not putting them in touch with or even concealing from him, and I was not able to get to those people.
Q. And did that continue to be the case leading up to your

swearing out the affidavit in March of 2011 that you understood there were multiple roles?
A. It did, and it actually appeared to get worse because as he couldn't put in money to help the scheme, there was less incentive for them to tell him about everything going on.
Q. Circling back, then, in respect of providing --
THE COURT: "He" meaning Mr. Berger?
THE WITNESS: Mr. Berger, yes, Your Honor.
BY MR. AVEIS:
Q. In connection with seeking the affidavit from Judge Fischer, did you intend to misstate anything about anything in order to obtain that wiretap order?
A. Absolutely not.
Q. Did you intend to omit any information to obtain that wiretap order?
A. Absolutely not.
Q. And at the time that you sought that order, did you believe you were in compliance with applicable necessity requirements under the wiretap statute?
A. I did.
Q. And did you rely upon the advice of assistant United States attorney Bowman in connection with ensuring requirements with those requirements?
A. I did.
THE COURT: How would that last question affect the

analysis? In other words, if -- I'm not suggesting this, but your last question prompts the issue -- if -- for example, the decision -- the agent raised the question of whether or not he should include Mendiratta's prior cooperation in the affidavit and one of the assistant United States attorneys said, I don't think we have to, how does that affect things?

MR. AVEIS: Well, that would be a difficult situation at the least but --

THE COURT: "Difficult" meaning what? Difficult for whom?

MR. AVEIS: Well, it would be difficult for each, I think. We would be here for this hearing, as well as --

THE COURT: I know, but are you saying there's some kind of qualified immunity?

MR. AVEIS: No, not at all, nor --

THE COURT: Because there is, you know, the good-faith exception. I don't know how it plays into this specific setting, but generally speaking, if an agent relies upon -- well, I don't know. It's generally a judge who he relies upon, not an assistant United States attorney, right?

MR. AVEIS: I --

THE COURT: Doesn't that give him the good-faith platform?

MR. AVEIS: We're not relying --

THE COURT: Why did you ask that question?

MR. AVEIS: It goes to his state of mind. It shows that the totality of the circumstances in vetting the necessity requirements included not only his own diligence but conferring with the AUSA to ensure compliance, not wanting to either misstate or omit information from Judge Fischer.

THE COURT: Let's pick it up at ten after 1:00.

MR. AVEIS: Very well. Thank you.

(Noon Recess)

**LOS ANGELES, CALIFORNIA, WEDNESDAY, JANUARY 29, 2014; 1:15 P.M.**

-- -- --

THE COURT: Had you concluded your --

MR. AVEIS: I have a couple of additional questions. Thank you.

Q. Agent Tarwater, in regard to your prior testimony referencing Mendiratta's cooperation, was it your understanding before you swore out the affidavit in March of 2011 that the cooperation consisted solely of proffers with other agents?

A. Do you mean did he do proactive cooperation?

Q. No.

What was your understanding of the cooperation, if you will?

THE COURT: Mendiratta One, is that --

MR. AVEIS: Correct. I'm sorry. Yes, the -- and not only Mendiratta One, Your Honor, but leading to up that.

THE WITNESS: I didn't have a lot of information on it except that it was regarding a couple other defendants and a prior scheme, and there was some sense that by him pleading, it might have motivated them to plea or something to that extent.

BY MR. AVEIS:

Q. More generally, was this information provided in proffers?

A. Yes, it was.

Q. And what is a proffer, by your understanding?

A. It's a more formal session what -- usually at the U.S. attorney's office, pursuant to a proffer agreement, and you're expected to be fully honest and answer all the questions and provide information on your own, not just to -- specifically every question. You're there to cooperate, be fully honest.

Q. Was your understanding of that full honesty to include not only what you had done but what you were currently doing in the way of criminal conduct?

A. Sure.

Q. And in that same time frame, that is, leading up to the March 2011 affidavit, were you aware of whether Mendiratta had proactively cooperated, that is, been engaged by a law enforcement to make recordings, wear a wire and do things similar to that which Mr. Berger did in this case?

A. I didn't understand that he had. That was the purpose of my call to New York and that had not occurred, to my knowledge.
Q. Did you disclose in the wiretap affidavit the fact of those proffers?
A. I did. I said he proffered at least seven times -- Mendiratta being "he."
Q. Do you recall the paragraph in the affidavit that refers to that?
A. I'd estimate it somewhere around paragraph 127 to 131, somewhere in there, the necessity section.
MR. AVEIS: Your Honor, I have a copy of that handy.
Would the court like that for purposes of this examination?
THE COURT: No, you can just read it.
MR. AVEIS: Very well. May I read 129?
THE COURT: Yes.
MR. AVEIS: "129, many of the target subjects appear to have worked together on manipulation schemes for a long period of time, and I believe would be unlikely to cooperate against each other. For example, Possino and Mendiratta each separately told C.W. 1 that they had been carrying out manipulation deals together for over ten years. Mendiratta has been interviewed by the government at least seven times pursuant to proffer agreements but has not mentioned Possino, Nix, Angelastri or anything about an ongoing market

manipulation scheme with the target subjects during any of those interviews. Further, Mendiratta has continued to participate in the market manipulation conspiracy, even following his recent conviction, through instructions that he apparently provides to Angelastri from a cellular telephone that was smuggled into prison. For these reasons I believe it is unlikely that Mendiratta would agree to cooperate and provide further information against these individuals if he were interviewed by the government further."

Q. Did you believe that you disclosed all that you knew about Mendiratta's cooperation as you've described it in that affidavit?

A. Yes.

Q. And why did you not disclose former AUSA, now-Judge Wilner's conclusions that he may have made in his 5K in respect of his feeling that Mendiratta had been truthful, complete or otherwise the laudatory comments he made? Why did you not disclose those conclusions in the affidavit?

A. Well, first, I hadn't read it. Knowing now what I know then, I would have because it would have strengthened my arguments and conclusions; but at the time, it didn't seem relevant to me what Judge Wilner had written before learning the truth of what Mendiratta was doing, and I didn't think to look back to what he wrote in the position paper before learning the truth of what was going on.

Q. In summary, do you believe that Mendiratta had provided a full picture of his criminal conduct in connection with seeking leniency through Judge Wilner?
A. No, and from talking to Wilner, it didn't sound like he thought he had provided full candor.
MR. AVEIS: Thank you.
I have no further questions, Your Honor.
THE COURT: Okay. Cross-examination.

**CROSS-EXAMINATION**

BY MS. UYEDA:
Q. Good afternoon, Agent Tarwater.
A. Good afternoon.
Q. I want to take you back in time to when you were writing this affidavit back in March 2011, okay?
A. Okay.
Q. You knew a number of things at that time, right?
A. Correct.
Q. You said that you -- when you were applied for the wiretap, you knew that Mendiratta cooperated in a prior case, we're calling "Mendiratta One."
A. I knew that he had signed a cooperation plea. I guess -- when you think in agent terms, "cooperation" is different than maybe what an AUSA thinks when they write a sentencing position, but I didn't understand he had cooperated in being a proactive cooperator of source, but that he had provided

information that they thought was useful, yes.
Q. So he provided information that was useful in these proffer sessions that you spoke of earlier, right?
A. At least the 2006 proffer in Los Angeles.
Q. And there were seven proffer sessions in total.
A. Correct.
Q. The Los Angeles one was in 2006, right?
A. That's my recollection, yes.
Q. And it was approximately -- consisted of 23 pages?
A. I couldn't say, but it was lengthy, so that could be correct.
Q. You knew the type of information that Mendiratta provided in these sessions, didn't you?
A. Back then I -- yeah, I mean -- not it fresh in my mind, but, yes.
Q. Back before you were writing the affidavits, you knew that Mendiratta had provided financial information to the government in these proffer sessions.
A. Certain financial information, yes.
Q. For example, what accounts he controlled?
A. Certain accounts, correct.
Q. His nominee accounts?
A. Correct.
Q. His overseas accounts?
A. Some of them, yeah.

Q. You knew at the time that he provided information about several schemes.
A. Correct.
Q. He explained how the schemes worked?
A. Correct.
Q. About how he concealed proceeds of those schemes?
A. Correct.
Q. How he laundered those proceeds.
A. Correct.
Q. How he used offshore accounts to did so?
A. I think that is correct, yeah.
Q. How he used nominee accounts to do so?
A. Correct.
Q. How he concealed kickbacks.
A. That part I don't recall, but I --
Q. How he characterized money --
A. Oh, correct.
Q. And you knew he provided information about a number of people.
A. Correct.
Q. Including the CEOs of companies?
A. That seems correct, yeah. I don't recall that the details.
Q. Sorry.
His long-term business partner?

A. Who is that?
Q. His long-term business partner in -- one of the CEOs.
A. I don't know if he was a long-term partner. I knew he provided information on certain individuals, yes.
Q. You knew that that information he provided had been corroborated.
A. I didn't know if it had been corroborated -- I wasn't involved in that case, so I didn't know how much they valued it, didn't value it, corroborated it, didn't corroborate it.
Q. So you don't know that his cooperation actually led to other arrests in Los Angeles.
A. I don't recall whether it did or not.
Q. And that led to other indictments in Los Angeles.
A. No, I have an understanding that it might have helped leverage other defendants to plea -- or but that is about what I recall about that.
Q. That would be Stephen Owens you're talking about?
A. I do remember that name, yeah.
Q. And William Woo?
A. I don't recall that name.
Q. But your testimony is that you didn't look any of these things up, right?
A. What do you mean by didn't look at what -- how great his cooperation was?
Q. Right.

A. I guess -- just to understand my state of mind, it didn't matter to me so much what he did back then because he was engaging in a new scheme when he was supposed to be cooperating, and he wasn't telling anyone about that; and regardless, I didn't think he could meet the goals of the investigation because of the reasons I've described. The way it's compartmentalized, the policy restrictions, he just wouldn't be able to achieve -- certainly not any more than Berger, and he wouldn't be a able to achieve the goal. So I didn't spend a whole lot of time going back and seeing what his prior, sort of, selective disclosures amounted to; it didn't seem relevant to the ongoing investigation at that point.
Q. So you didn't find relevant whether information that he provided in proffer sessions to the government was corroborated and actually led to successful prosecutions.
A. What I know is that he left a lot of things out, and that was important to me, whereas I had a cooperator who was upfront and honest about what he was doing. I didn't want to go to Mendiratta and expose our investigation by asking him questions.
Q. But my question is just about the information he provided in the proffer sessions.
You didn't investigate any further where that information -- or whether that information was valuable to the government.

A. I can't recall exactly the discussions I had. I just remember Wilner being upset about it and feeling betrayed about it and that he wasn't honest.
Q. Well, Agent, you're a lawyer, right?
A. I am.
Q. You had access to Pacer.
A. Not at that time, but I did subsequent to that.
Q. You know how to use Pacer.
A. I do.
Q. And you read the 302 of the 2006 proffer in Los Angeles, right?
A. Correct.
Q. And you saw that Mendiratta provided information about Stephen Owens.
A. Yeah, I do recall that.
Q. You didn't bother to see if Stephen Owens was even charged.
A. I have a very vague recollection he was because he was on the same squad; I didn't actually know the connection between how valuable what Mendiratta said or didn't say had to do with that but ...
Q. So you didn't check out anything that Mendiratta said in his proffer statements?
A. No, that's not what I testified to. I checked out that he knew certain things were happening at that time period that he

had not disclosed to the government. I didn't go and look at all the -- how valuable certain things might have been that he did say.

MS. UYEDA: Your Honor, we would just ask that the court take judicial notice of Stephen Owen's indictment, which is at Exhibit 13 of -- actually, the binder of exhibits I have on the clerk's table.

THE COURT: When was he indicted?

MS. UYEDA: He was indicted in 2008.

THE COURT: In this district?

MS. UYEDA: Yes, both Stephen Owens and William Woo.

THE COURT: And?

MS. UYEDA: And William Woo.

THE COURT: Okay. I'll take judicial notice of that.

MS. UYEDA: Thank you, Your Honor.

Q. At the time you applied for the wiretap, you knew that Mendiratta cooperated with the government, right?

A. I knew that he signed a cooperation plea agreement, yes.

Q. And you claim that you don't know that he received -- a five-level 5K for that cooperation.

A. I did not know at the time, no.

Q. And that's because you didn't read the sentencing position paper filed by the government?

A. That's correct.

Q. You didn't ask judge -- now-Judge Wilner about his

sentencing recommendation, right?
A. I did not.
Q. And in your words, it's because you didn't see it relevant?
THE COURT: I'm not hearing you.
BY MS. UYEDA:
Q. Because in your words, you -- it wasn't relevant to you.
A. Well, in light of what he was doing currently and of Wilner's statements to me to the effect that he felt like he had been tricked and betrayed and thought he had been honest and forthright and wasn't, it was certainly less relevant than the 302 themselves and the current information I had. I guess that is how I -- just less relevant than those factors, certainly.
Q. Well, you knew he received sentencing -- received sentencing leniency from the government, right?
A. I did. Judge Wilner said something to the effect that he had gotten a good deal, and, you know, seeing a cooperation plea on a one-year term, I figured he had gotten probably some leniency.
Q. Well, you knew what he pled to, right?
A. I think a 371, some kind of tax evasion, yeah.
Q. And you knew that his sentencing exposure for that was at least a few years.
A. Right. That's what I mean. I thought he got a good deal.

I certainly knew that.
Q. And you certainly knew about the 5K provision in the plea agreement, right?
A. I don't remember looking at that, but I know that generally, so, you know, sure.
Q. Okay. But you didn't bother to ask Judge Wilner about what he meant by a favorable plea disposition and good deal?
A. Not in May of 2010. I mean, Mendiratta was the new primary target, and Wilner expressed that he was upset about what had happened, and we started looking at Mendiratta and what he was doing.
Q. You didn't ask him.
A. No, and he didn't say.
Q. At any time before March 2011.
A. No.
Q. At the time of the wiretap, you knew Mendiratta --
THE COURT: One thing -- let me interrupt for a minute.
MS. UYEDA: Sure.
THE COURT: In case I forget.
Has it been established whether this witness prepared the affidavit himself or with the assistance of another agent or an assistant United States attorney? Is there anything in the record about that?
MS. UYEDA: No, I can establish that.

THE COURT: Might be interesting. Okay.

BY MS. UYEDA:

Q. Agent Tarwater, actually, I have the book of exhibits in front you. If you can refer to Exhibit 1, the last page.

A. One moment. Okay.

Q. This is the affidavit you submitted to Judge Fischer on March 15, 2011; is that right?

A. At least this page is, yeah. I haven't looked through the whole thing but it looks like it, yes.

Q. All of tab one?

A. It looks like that one, yes.

Q. And that's your signature on the last page?

A. It is.

Q. And you wrote this affidavit?

A. I was the primary author, yes.

Q. Were there other authors?

A. Other contributors, yeah.

Q. Like?

A. AUSA Bowman -- there might have been portions where another agent, Charles Keopke, might put have helped pull information, but I would have been the one who wrote it in the affidavit.

THE COURT: Chronologically, the investigation of this case, Mendiratta Two, I'm referring to Possino, Nix -- assistant United States attorney Wilner became magistrate judge

when? Do you remember?

THE WITNESS: I don't recall the exact date, Your Honor. I know --

THE COURT: Does anyone know?

MS. UYEDA: 2011?

THE COURT: What month and year?

MR.MR. AVEIS: Wilner left the U.S. attorney's office -- ceased working on cases in about December of 2010 and left of the office in March or April to become a magistrate judge.

THE COURT: March or April of 2011?

MR. AVEIS: Correct. I believe --

THE COURT: Stopped working on cases December 2010?

MR. AVEIS: Yes.

THE COURT: And Agent Tarwater just said that he worked with assistant United States attorney Bowman on the case.

Which one is Bowman?

Okay. And so -- assistant United States attorney Bowman, were you working with Wilner when he became a judge?

MR. BOWMAN: Your Honor, I was assigned to this investigation in December of 2010.

THE COURT: I see, just as Wilner was leaving the office.

MR. BOWMAN: That is correct.

THE COURT: You hadn't worked on it before?

MR. BOWMAN: No, Your Honor.

THE COURT: And were you -- well, might get into this more, but were you debriefed by Wilner about what the investigation was?

MR. BOWMAN: A little bit, Your Honor, but primarily by Agent Tarwater. There was some transition from former AUSA Wilner in handing off the case.

THE COURT: And did you know that Mendiratta had cooperated in an earlier case?

MR. BOWMAN: Your Honor --

THE COURT: -- at the time the affidavit was prepared?

MR. BOWMAN: What I knew was that he had proffered in the past because I got an email from Agent Tarwater attaching those same proffers; I was not aware of the 5K nor had I read the sentencing position that Judge Wilner had filed. I saw that much later after, I believe, the wiretaps -- maybe have been after the wiretaps were even done, may have been the first time I saw his sentencing position.

THE COURT: I see.

MR. BOWMAN: To be clear, the Mendiratta case itself, Mendiratta One, was not reassigned to me when I came on the investigation of Mendiratta Two. That case was assigned -- because at that point, Mendiratta had been sentenced, was in

prison. There wasn't anything active to do with that case. It was assigned to AUSA Gorvitch because he handled earlier matters related to that case and related defendants.

THE COURT: I see. Okay. Go ahead.

BY MS. UYEDA:

Q. Agent Tarwater, I know you testified that you didn't read the sentencing position paper at the time you applied for the wiretap, but you agree with me that it was actually in existence at the time, though, right?

A. I'm sure it was.

Q. Because it was on filed April 6, 2010.

A. I would assume, based on normal proceed, yes, yes.

Q. Now, you claim in your affidavit that Mendiratta wasn't useable because he was involved in this case, what Judge Wilson is referring to as Mendiratta Two.

THE COURT: Because he was what, involved?

MS. UYEDA: Yes.

THE COURT: "Involved" meaning he was a target?

MS. UYEDA: Yes.

THE COURT: Yeah. Okay.

THE WITNESS: No, I listed several more factors why I didn't think he was useable.

BY MS. UYEDA:

Q. Well, that was one of -- one of the reasons is that he was unlikely to cooperate against the others.

A. That he had shown some loyalty by not mentioning them earlier, correct.
Q. Now, the last proffer with the United States attorney's office in Los Angeles was October 30, 2006.
Is that right?
A. I know it was in 2006; I don't have the month and date. Sorry.
Q. In your affidavit you identify the very first event in this case as August 2009, don't you?
A. No, I believe I mentioned starting with the cooperator in May 2010? I don't know what you mean by "first event," sorry.
Q. Well, SENZ, Sport Endure, is one of the manipulated companies that you were investigating, right?
A. Right.
Q. That is one of the companies that you named in the affidavit.
A. Correct.
Q. And the first date that you identified for the district court for any activity for SENZ is August 2009, isn't it?
A. August 2009? Can you refresh my memory or reference --
Q. Yes. I'll refer court and counsel to tab one, paragraph 30 -- actually, I'm sorry -- 28b. Can you read 28b and let me know when you're finished, please.
A. Okay.
Q. So your memory is refreshed?

A. I see a reference to August 2009.
I'm sorry. What's the --
Q. And that's the first date that you identify for the district court that there was activity in SENZ?
A. Well, actually in 28a, I mention from 2002 to 2009 Scarpello appeared to control the SENZ shell company, so that is a prior date.
THE COURT: What company?
THE WITNESS: Sport Endurance.
THE COURT: What is -- SENZ?
THE WITNESS: Sorry, Your Honor. That the ticker -- it's the way we refer to it in the affidavit: S-E-N-Z, SENZ, is the ticker symbol for Sport Endurance. That was the defined term used throughout --
BY MS. UYEDA:
Q. But you state that in August 2009 is when you see activity?
A. Further activity, yes.
Q. That Scarpello transferred millions of shares of SENZ -- of stock to Possino and Nix?
A. Correct. It's hard to know -- it appears he might have taken activity before that, as shown in 28a, but the transfer of shares I noted was August of 2009.
THE COURT: Incidentally, the person who came to the U.S. attorney's office, that's -- with the information that

started this investigation, that person is known, correct?
THE WITNESS: Yes.
THE COURT: Who is that?
THE WITNESS: Howard Berger.
THE COURT: The same Berger?
THE WITNESS: Yes, Your Honor.
THE COURT: Go ahead.
BY MS. UYEDA:
Q. But according to you, from 2002 to 2009, SENZ, or Sport Endurance, appears to have been largely dormant, right?
A. Correct. I guess my point is some preparations could have been taking place before August 2009.
Q. Of the one that -- the date that you identified for the district court is based on your belief -- right? -- of when the first activity is.
A. No, it's -- one description of one of that, which is transferring millions of shares to entities controlled by Possino and Nix.
Q. That was in August of 2009?
A. Correct.
Q. Because prior to that, SENZ appears to have been largely dormant, according to you.
A. Correct.
Q. So August 2009, that's two-and-a-half years after the 2006 Los Angeles proffer, isn't it?

A. Correct.
Q. And you've no information that Mendiratta was running this scheme, the SENZ scheme, at the time he was meeting with the United States attorney's office in Los Angeles back in 2006.
A. Just this scheme, just this Sport Endurance scheme? No, I don't have any information regarding that particular stock. I guess when you mean "scheme," I look at this as a long-term scheme, but that particular deal, correct.
Q. Or FrogAds for that matter?
A. No, that was a later deal.
Q. Or HFGB?
A. I don't think that ever happened.
Q. Or CMP?
A. No, that was a later deal, as well.
Q. So any of the deals that you mentioned in the affidavit, the first one was Sport Endurance, SENZ?
A. Well, I mentioned Matech, but I don't recall all the detail regarding Matech, and that was a deal that Mendiratta did previously.
Q. But you don't allege that Matech involved any fraud -- do you -- in the affidavit?
A. I don't know if I did.
Q. Reviewing the affidavit would refresh your recollection, perhaps? I'll refer you to paragraph 44, footnote 14.
A. I guess when you say prior deals, I do describe the

cooperator's discussions with Mendiratta and how Mendiratta said, Look, I do -- I've done lots of deals in the past, I've done lots of deals with -- Possino and Mendiratta both describe working together in the past, so I don't know that I don't describe any prior conduct, but certainly the main focus was the scheme that looked to be going on more currently.

Q. And you identified in your affidavit that you want a wiretap to investigate specific deals, right?

A. No. The conspiracy network and the P.C. behind that is that we have information to indicate that are deals upcoming and there will be communications over the target telephones regarding those deals.

Q. And you name those deals in your affidavit, right?

A. Correct.

Q. And SENZ is the first one in time.

A. Of the deals --

Q. That you specifically cite in your affidavit --

A. Yes, that's correct.

Q. Okay. Now, you claim in your affidavit that Mendiratta had been doing manipulation deals with Regis Possino for over ten years.

A. Correct.

Q. And you say that it comes from conversations with the informant, Howard Berger?

A. Well, the best evidence is the recording itself.

Q. The recordings between Howard Berger and Regis Possino, right?
A. Correct.
Q. And Howard Berger and Tarun Mendiratta.
A. Correct.
Q. Now, you talk about this in paragraph 97a of your affidavit; is that right?
A. Sorry. Flipping there right now.
That is one place I talk about it, yes.
Q. And you listened to this call; is that right?
A. I did.
Q. You listened to it at the time it occurred?
A. Shortly thereafter, yes.
Q. And according to you, Possino says that he's been doing deals with Mendiratta since about '97 or '98, right?
A. Well, according to Possino, that was the statement on the call, yeah.
Q. But he also -- you're also aware, then, that he said they took a break in their business relationship.
A. He said they took a break for a short time, and then about three years ago we started up again, which would make it around 2007, based on the date of this call.
Q. That is after the 2006 proffer with the United States attorney's office in Los Angeles.
A. Sure, that means some of the contact was before and some

was after, correct, but it's also -- I mean --
Q. You'd agree with me 2007 is after 2006?
A. Right, but I understood he had signed a cooperation and plea deal --
Q. My question is --
A. -- in August 2009.
Q. My question is 2007 comes after 2006, right?
A. Yes.
Q. And you testified that he -- Mendiratta had done trades prior to pleading guilty.
A. In Matech, correct.
Q. So you are referring to Matech?
A. That is one instance, yeah, but I remember --
THE COURT: Maytag[sic] is Mendiratta One?
MS. UYEDA: No, Your Honor. It is another --
THE COURT: Let's be clear about which transaction -- which time frame we're discussing. Maytag is one of the companies in this indictment?
MS. UYEDA: No, it's not, Your Honor.
THE COURT: Go ahead.
BY MS. UYEDA:
Q. So now you say that Mendiratta was involved Matech, a company called Matech?
A. Are you asking in the affidavit or as far as my state of mind of what I knew at the time?

Q. Well -- you didn't Matech was a manipulated company in the affidavit?

A. I don't think -- I know it's a footnote somewhere; I don't recall how much we discussed it, No, I don't think so.

Q. It wasn't one of the companies you were investigating?

A. No.

Q. As stated in your affidavit.

A. It's during what I felt was the scheme period but not the focus you of the P.C. for Judge Fischer.

Q. In fact, it wasn't mentioned as a manipulated company in the affidavit.

A. I don't believe so, no.

Q. Now, you're bringing up this new scheme Matech, right?

A. I don't know what you mean by bringing it up. There was a company Matech that was, I believe, was manipulated, and I was just providing information about when the trading occurred.

Q. Well, just for Judge Wilson's context, it's not in the affidavit right?

A. Correct.

Q. And it wasn't in your declaration that you submitted to the court back in November of 2013.

THE COURT: I've sort of lost track of this a little bit. Can you help me out.

MS. UYEDA: I'm sorry. I'm trying to do so with the witness, Your Honor.

As an offer of prove, Matech was not included in the affidavit as one of the manipulated companies, but Agent Tarwater has just mentioned on the stand that he was investigating -- or he believed that Mendiratta was involved in another manipulated company called Matech and that he had traded stock before his -- before he pled guilty, and therefore he was involved in some type of manipulation deal -- I believe he is about to say -- with Possino and the others.

THE COURT: So are -- is this all leading up to your position that Agent Tarwater knew prior to signing the affidavit that Mendiratta had been involved in a manipulation with Possino and Nix?

MS. UYEDA: Actually -- sorry, Your Honor. It goes to the opposite, that -- I have a good-faith belief that the witness will testify that the Matech stock was traded after 2006 and so it wouldn't have been something --

THE COURT: I see.

MS. UYEDA: -- to be included in the proffer session because it didn't happen yet, which is the same point for SENZ.

THE COURT: I understand.

BY MS. UYEDA:

Q. So, Agent, you claim that Mendiratta traded Matech stock?

A. Correct.

Q. And that Matech stock was traded between September 2009 and December 2009?

A. Sounds about right.
Q. Actually, technically, Ivano Angelastri traded the Matech stock.
A. He, as well as the Inner-stellar account, which was technically under Mendiratta's wife's name, but he, I believe conducted the trading.
Q. And that was back in 2009?
A. Correct, right.
Q. And the last time Mendiratta proffered with the United States attorney's office in Los Angeles was in 2006.
A. Correct, to my knowledge, yeah, although he was supposedly cooperating pursuant to his plea, but ...
Q. But the last time he proffered was in 2006.
A. With the -- Los Angeles?
Q. Yes?
A. Correct.
Q. Now, Agent, you have -- you've mentioned a number of times that Mendiratta would have a limited capacity to be -- to provide information, valuable information, to the government in this Mendiratta Two case.
A. By virtue of how they compartmentalized their network, there's certain evidence he would not be able to acquire, correct.
Q. And you also compare -- let's go with that first.
And that Mendiratta was basically on the outside or

he was just a spoke of the conspiracy.
A. He was outside of certain relationships, yes. There were others that he could -- if he were actually useable as a cooperator, he could have gotten evidence regarding, I think, some associates, but there are certain ones, as detailed in the P.C. section, where he didn't appear to know the relationship, hadn't been involved in the relationship.
Q. Okay. Well, he was a trusted member of this conspiracy, right?
A. Certainly to some extent, yeah.
Q. Those were your words. That's how you described him in the affidavit.
A. Right.
Q. So Mendiratta had access to some inside information.
A. Sure.
Q. He was -- he did regular calls with Possino and Nix.
A. It appeared that way, yes.
Q. He even called them from prison, right?
A. I don't -- I don't know independently. It appeared he at least called Nix once from prison.
Q. Mendiratta was tasked with promoting the stock.
A. Do you mean a specific stock, or do you just mean his typical role?
Q. He was -- according to you in your affidavit, Mendiratta was tasked with promoting the stock of these manipulated

companies.
A. Like -- well, Sport Endurance?
Q. Yes, start with that.
A. He was tasked with promoting that stock.
Q. Mendiratta was aware of the promotional efforts relating to SENZ.
A. To some extent. Like I told His Honor earlier, some people, like Doug, this broker, he would tell the cooperator, That's -- you know, Regis is dealing with that. I don't know -- you know, I think he is in there doing stuff. He didn't appear to have any access to this person or know who he was, know the instructions. That's one example.
Q. Well, he arranged for the broker, didn't he?
THE COURT: Who is "he"?
BY MS. UYEDA:
Q. Mendiratta arranged for the broker.
A. The broker named Doug?
Q. Yes.
A. That is not my understanding. If he did, he was hiding that from the cooperator because the calls did not indicate that.
MS. UYEDA: Your Honor, may I have just a moment, please?
THE COURT: Yes.
///

BY MS. UYEDA:
Q. Just to be clear, your testimony is that Mendiratta didn't know the name of the broker that was involved.
A. No, he seemed to know there was a broker named Doug who -- and his words are something to the effect, Regis is taking care of that; he's going to buy some stock in the market. But based on the calls, it didn't appear that Mendiratta was a part of those instructions; he didn't know what Doug knew or didn't know. It wouldn't give me evidence on Doug's knowledge and intent.
Q. He knew that Doug was going to be paid $100,000 to buy the stock, right?
A. He knew someone by the first name Doug was buying stock, yeah.
Q. And this was going to be part of the plan to prime the pump.
A. Or put away stock, yeah.
Q. Now, Mendiratta was also aware of the cross-training, wasn't he?
THE COURT: What time frame are we in?
MS. UYEDA: In 2010, Your Honor.
THE COURT: Before the affidavit?
MS. UYEDA: Yes.
THE WITNESS: I would assume he was aware of any cross-training involving Angelastri. I don't know who else you

might be referring to but ...

BY MS. UYEDA:

Q. I'm going to refer your attention to paragraph 33.

A. Okay. I'm there.

Q. Thirty-three b.

A. Thirty-three b? I don't see a 33b.

Q. I'm sorry. Thirty-five b.

A. Okay. That appears to be the conversation we were just -- I was just speaking of as an example.

Q. Okay.

You were also aware that Mendiratta controlled six million shares of SENZ?

A. Directly or indirectly through Angelastri, correct.

Q. And that Mendiratta participated in the sale of stock.

A. Correct.

Q. Now, you talked about how a money guy is important, right?

A. Right.

Q. And how Howard Berger was the money guy.

A. Or a possible money guy, correct.

Q. And the money guy is important because he can ask for more information.

A. Well, if you really need money and they need to know something before they give it, then it's -- you tend to get more information, yes.

Q. So the moneyman has leverage.

A. Depends on how much access to money they have, but, correct.
Q. Well, Mendiratta was responsible for funding this promotion for SENZ, wasn't he?
A. Correct -- or Angelastri, but I assume they're working in tandem, yes.
Q. And that was, as an example, $480,000 to promote the stock.
A. That is what Angelastri said. They often inflate their figures, but he certainly said he laid out money to fund the promotion, yes.
Q. There was a promise of money from Mendiratta -- with Mendiratta.
A. And -- whom? I'm sorry? What is the ...
Q. Mendiratta was a moneyman, too, right?
A. He and Angelastri, correct, yeah.
Q. And together they laundered the proceeds overseas?
A. It appeared that way, yes.
Q. Mendiratta had access to international bank and brokerage accounts, right?
A. Through Angelastri, correct.
Q. Or he was the link to Angelastri.
A. Yes.
THE COURT: I'm losing your words.
MS. UYEDA: He is the link to Ivano Angelastri, one

of the other target subjects.
Q. And you were investigating Angelastri.
A. Correct.
Q. He was one of the target subjects that you named in your affidavit.
A. Yes, ma'am.
THE COURT: Is he a defendant in this case?
THE WITNESS: Yes, Your Honor. He's a fugitive.
THE COURT: Oh.
BY MS. UYEDA:
Q. Agent, you've utilized informants in the past.
A. Correct.
Q. Informants with prior records.
A. Correct.
Q. It's possible for a felon to provide useful information, isn't it?
A. Absolutely.
Q. Possible for a felon to provide you with leads?
A. Yes.
Q. In fact, felons involved in new crimes cooperate with the government.
A. Correct.
Q. Oftentimes because they've been caught?
A. Correct.
Q. They want some leniency?

A. Sure.
Q. Now, at the time you applied for the wiretap, you know from Mendiratta's prior case that he was committing fraud.
A. Correct.
Q. And then he got caught?
A. Correct.
Q. And then he cooperated.
A. To some extent.
Q. Against those he worked with.
A. To some extent, sure.
Q. Including his close friends.
A. I don't know the nature of their relationship, but I'll take your word for it.
Q. Well, Mendiratta called him his close friend.
A. Okay.
Q. And he wanted sentencing leniency.
A. I'm sure he did. I assume that is why he was doing it, yes.
Q. You knew at the time you applied for the wiretap in 2004 -- sorry -- you knew at the time you applied for the wiretap he was committing crimes in 2004.
A. In 2004?
Q. That Mendiratta was committing crimes in 2004.
A. I knew he had told the cooperator in this case that he'd been doing this kind of thing for that length of time, yes.

Q. He got caught by the United States attorney's office in New York, didn't he?
A. I don't recall.
Q. That wasn't the impetus for his proffer sessions?
A. I don't recall. I'm sorry.
Q. Well, in 2006 he was committing crimes.
A. I believe that to be true, yes.
Q. And he got caught by the United States attorney's office in Los Angeles?
A. Correct.
Q. And he cooperated.
A. To some extent, correct.
Q. And in 2009, he got caught by the Internal Revenue Service, right?
A. I can't recall. 2009? I can't recall.
Q. So these are two separate times that at least you can recall that Mendiratta got caught.
A. Just because you proffer doesn't mean you got caught.

THE COURT: You've been doing that quite a bit. It would be in your best interest not to debate the questioner, just answer the question. You'll have a chance when the U.S. attorneys ask you questions. Just try and answer the question, and if there's something you want to say beyond that, at the break, ask the assistant United States attorneys to give you the opportunity.

THE WITNESS: Yes, Your Honor.
BY MS. UYEDA:
Q. So those are two separate times he got caught, at least you're aware of.
A. I assume he got caught, yes.
Q. And he cooperated those two separate times.
A. To some extent. That is my understanding, yes.
Q. And that is two separate times before this case.
A. Correct.
Q. At the time you applied for the wiretap, you had --
THE COURT: Two separate times were 2004 in New York, 2006 here; and what I want to make sure I have in mind is this SENZ situation in 2009.
MS. UYEDA: That's correct.
THE COURT: That's described in his affidavit, correct?
MS. UYEDA: Yes.
THE COURT: So that was something that the witness uncovered after this investigation started in April 2010.
MS. UYEDA: Yes.
THE COURT: And in that -- in the affidavit, the SENZ incident involves -- I keep missing this guy's name --
MS. UYEDA: Mendiratta.
THE COURT: -- Mendiratta and Possino and Nix?
MS. UYEDA: And Angelastri.

THE COURT: Yes. And -- so -- we don't have a jury here, so I can interject. I think your point is twofold: One, it -- the SENZ event occurred after the proffer sessions.

MS. UYEDA: That's correct.

THE COURT: So he would know that there would be no reason for Mendiratta to talk about the SENZ deal.

MS. UYEDA: And that he wasn't being duplicitas with the government by proffering on one hand and committing crime on the other, which is the government's other argument.

THE COURT: Well -- and that -- say that again, the last part -- duplicitous in what way?

MS. UYEDA: The government believes that because he was proffering or under plea agreement and committing crimes at the same time, that he was duplicitous and not trustworthy. So the timeline spells out that: Number one, he wouldn't have been asked in a proffer session nor would he have volunteered information at a proffer session in 2006 because the SENZ deal hadn't started.

THE COURT: That part I'm clear about.

What is the other part of your argument?

MS. UYEDA: The trustworthiness?

THE COURT: Is it that he's demonstrated in the past that he's willing to turn in friends when the gun is to his head?

MS. UYEDA: Yes. When he is confronted -- when he is

caught and confronted, then he cooperates. Very distinct pattern with Mendiratta. And so the government's summary conclusion that he was unlikely to cooperate or it would be unduly risky because he may tip off all these other people is really undermined by the details --

THE COURT: Also, I thought the other point you were attempting to make was that Mendiratta's role was not as limited as the government says it is, that he actually may not have been orchestrating things, but his role wasn't quite as finite as the government's argues --

MS. UYEDA: Yes.

THE COURT: -- that he had contacts with other targets that the government claims it wanted to pursue, not withstanding the fact that they had substantial evidence against Possino and Nix.

MS. UYEDA: That is absolutely my point, Your Honor.

THE COURT: Yeah. Okay.

MS. UYEDA: Your Honor has gotten my two main points. Let me just have a quick moment.

THE COURT: See. I'm doing it not necessarily to agree or disagree but just to make sure I have your arguments in mind.

MS. UYEDA: I don't want to be repetitive if Your Honor understands my point.

Q. Agent Tarwater, you -- by March 2011 you had 300 recorded

calls with Howard Berger, the informant.

THE COURT: When?

BY MS. UYEDA:

Q. By the time of the affidavit, March 2011, you had 300 consensual calls with Howard Berger.

A. Correct.

Q. So you had recordings of Mendiratta?

A. Correct.

Q. You had evidence against him that he was involved in this conspiracy.

A. Correct.

Q. You had leverage against him, right?

A. Yes.

Q. So Mendiratta would have had incentive to cooperate.

A. I assume he would have, yeah.

THE COURT: Let me ask this question. Maybe it was already dealt with. In 2004 is when Mendiratta first becomes subject of target of the U.S. attorney in --

MS. UYEDA: No.

THE COURT: -- New York, and he becomes a cooperator and doesn't get indicted, right.

MS. UYEDA: Correct.

THE COURT: Then in 2006, U.S. attorney in Los Angeles targets him and the U.S. attorney in Los Angeles in 2006 presumably knew about the 2004 Southern District, the

investigation, but still accepts him as a cooperator.

MS. UYEDA: Yes, Your Honor.

THE COURT: And then we go from there to the affidavit, correct? I mean, there's nothing -- there are no more governmental investigations -- or no more government investigators interviewing Mendiratta.

MS. UYEDA: There is one actually, Your Honor, and that's in 2009, January 2009, the IRS interviews him, and he proffers there --

THE COURT: In Los Angeles?

MS. UYEDA: In Los Angeles.

THE COURT: What do they say?

MS. UYEDA: That was based on a tax issue related to, I believe, his 2006 -- the information he provided in 2006; and I believe that was actually part of his plea agreement.

THE COURT: His what?

MS. UYEDA: The factual basis in the plea agreement that he signed.

THE COURT: What happened in that interview? Was that of any consequence, the two IRS 2009?

MS. UYEDA: No, it was specifically related to tax issues, but he had been caught cheating on his taxes, and so he proffered information about that cooperated.

THE COURT: With the IRS?

MS. UYEDA: Yes.

THE COURT: And the IRS pursued that information?
MS. UYEDA: Against him, yes.
THE COURT: Did he cooperate against anyone else in the --
MS. UYEDA: Not for the tax, no, he just turned himself in, and he identified the accounts, the hidden accounts.
THE COURT: I see. Okay.
BY MS. UYEDA:
Q. Agent Tarwater, you considered -- or you didn't consider Mendiratta viable as a cooperator because you had -- based on a conversation you had with a New York agent.
A. That was one factor, but --
Q. One factor. That was with Agent Cacioppi?
A. Yes, ma'am.
Q. Cacioppi told you Mendiratta was completely unreliable and untrustworthy.
A. Words to that effect, yes.
Q. You knew this at the time you applied for the wiretap, right?
A. I did.
Q. You didn't include that in your affidavit, just to be clear.
A. I did not reference that conversation, no.
Q. And you didn't bother to contact any other agent that was

present at the New York proffer sessions with Mendiratta.
A. I believe I did: Agent Sukkakis(phonetic) -- or something to that effect -- and he referred me to Cacioppi as the person with the most knowledge.
Q. So you didn't contact Timothy Bell?
A. No.
Q. Or Agent Thomas Holmes?
A. I don't recall doing so, no.
Q. And you didn't contact any other New York prosecutor at the proffer sessions with Mendiratta.
A. Correct.
Q. There were six of them, right?
A. I'm not sure how many, but I did not attempt to contact anyone there.
Q. And you didn't contact any of the L.A. agents at the proffer sessions.
A. I don't think I talked to Agent Bertrand. Agent Finnigan was temporarily assigned to the case, so we had some discussions, but not -- it never came up that Mendiratta -- what he did do before or didn't do before.
THE COURT: This is 2006, correct? The 2006 interviews?
MS. UYEDA: Yes.
THE COURT: What happened as a result of those interviews was anyone indicted?

MS. UYEDA: Yes, Your Honor. That is the indictment I asked you to take judicial notice of.

THE COURT: Is that the -- what was indictment again?

MS. UYEDA: The Owens and Woo indictment.

THE COURT: Owens and Woo.

MS. UYEDA: Yes. And in Judge Wilner's motion for a 5K, he indicates how that -- how Mendiratta's cooperation assisted in the prosecution of Woo and, Owens but because this witness hasn't read that sentencing position paper, I just would ask the court to take judicial notice also of the sentencing position paper that was filed.

THE COURT: All right. I will.

BY MS. UYEDA:

Q. Agent, there were all these people who were present at both the Los Angeles proffers and the New York proffers.

A. Correct.

Q. And you decided not to make -- contact all of these people.

A. Correct. I contacted one, who referred me to another and spoke to him, correct.

Q. And you decided not to tell the issuing judge that you didn't make these inquiries, right?

A. That I didn't make the inquiries?

Q. Right.

A. Correct, I didn't disclose that I didn't make those

inquiries.
Q. In your affidavit, you also list a number of reasons why you couldn't use a brand-new informant.
A. Correct.
Q. Like he would lack highly specialized knowledge of securities.
A. That is one factor, yes.
Q. A brand-new informant wouldn't know how to manipulate stocks.
A. Some, correct, right.
Q. And he would lack the bone fides with the --
A. Correct.
Q. But at the time you applied for the wiretap, you knew that Mendiratta had already demonstrated that he had a highly specialized knowledge of securities.
A. Yes.
Q. He had demonstrated that he knew how to manipulate stocks.
A. Yes.
Q. And he was a trusted member of the conspiracy.
A. I believe so.
Q. Now, Mendiratta was -- wait. Let's go back.
August 2010 is when Mendiratta self-surrendered to the prison, right?
A. Correct.
Q. And so he was out of custody up until that point.

A. As far as I know, yes, yeah.

Q. So he was available to be interviewed.

THE COURT: What month and year is that?

MS. UYEDA: Prior to August 2010.

THE WITNESS: Yes.

BY MS. UYEDA:

Q. He was available to be interviewed.

A. Yes.

Q. And you could have approached him, right?

A. Sure.

Q. You could have confronted him?

A. Could have, yes.

Q. But you chose not to.

A. Correct.

Q. You're a trained lawyer, right?

A. Yes.

Q. You're a trained agent?

A. Yes.

Q. The lead agent in this case?

A. I was, yes.

Q. You wanted a wiretap?

A. No, actually I didn't.

Q. Well, you believed it was necessary.

A. I did, yeah, I did believe this was necessary.

Q. And you mentioned -- you did mention Mendiratta's prior

cooperation in your affidavit.

A. Right, the prior proffer sessions, correct.

Q. You only said one thing about it, right?

A. I think that's right.

Q. That he was interviewed seven times pursuant to proffer agreements.

A. Correct.

Q. And you put that in the context of loyalty to Nix and Possino, right?

A. That's correct.

Q. And in your mind, that was enough.

A. No, that was just one factor.

Q. But in your mind that was enough to talk about his cooperation, was that one sentence.

A. Oh. You're saying the disclosure?

Q. Yes.

A. No. I wish I had read the 5K because I would have brought that out because I thought it showed how dishonest he was compared to what he made Wilner believe, but I had not read it.

Q. You testified earlier that it was enough to say that he had proffered seven times.

A. I'm sorry. I don't understand the question.

Q. That no other detail was necessary.

A. I don't believe that's what I said. I thought I said he went through a higher level where I didn't think any cooperator

could achieve the goals of the investigation, not that that -- and that included Mendiratta, I mean --

Q. So you left out the fact that Mendiratta received a five-level 5K.

A. Correct, I didn't know that at the time, and I left that out.

Q. And you left out that his cooperation lead to arrest.

A. Correct. It's not in there.

Q. And you left out that his cooperation led to prosecutions.

A. Correct.

Q. So you left out the extent of Mendiratta's cooperation.

A. I think's that fair, yeah.

Q. And then you got your wiretap.

A. I did get the wiretap, yes.

MS. UYEDA: I have no further questions, Your Honor.

THE COURT: Okay.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q. Agent Tarwater, you said that you are familiar with the requirements -- the necessity requirements for a wiretap; is that correct?

A. Correct.

Q. You've been trained on those requirements, correct?

A. Correct.

Q. You have experience with those requirements.

A. Yes, sir.
Q. You take those requirements very seriously, correct?
A. I do.
Q. So you're familiar, then, that the first requirement of a wiretap -- the necessity section of a wiretap is to make a full and complete statement of the facts in connection with the necessity portion of your wiretap affidavit, correct?
A. A full and complete statement of the facts.
Q. Correct. I'm taking it directly from the statute: 18 U.S.C. 2518(1)(c) talks about making a full and complete statement of the facts. You're familiar with that requirement, correct?
A. Yes.
Q. Because you know that your role as the affiant is to provide that full and complete statement of the facts dealing with necessity to the district judge, correct?
A. The more disclosure the better. That's correct.
Q. And you understand that the district judge's rule is to take your facts and make the determination as to whether or not there is necessity for the wiretap, correct?
A. Correct.
Q. You understand that that is not your role.
A. Absolutely not, yeah.
Q. You also understand that the judge -- the district judge is as good as the facts that are presented and the four corners

of the affidavit, correct?
A. Absolutely.
Q. In fact, at the beginning of your affidavit, right on page three, you state in paragraph seven that, "Facts not set forth herein are not being relied on in reaching my conclusion that orders should be issued," correct?
A. Correct.
Q. In fact, you also add, "Nor do I request that this court" -- that would be Judge Fischer -- "rely on any facts not set forth herein in reviewing this application for an order authorizing the interception of wire communications."
Do you recall that?
A. I do.
Q. Now, when it came time to dealing with the necessity section, you've said before that you were -- you did not have a copy of the government's Section 5K1 recommendation in connection with the sentencing position, correct?
A. At the time of the affidavit, correct.
Q. Let's explore for a moment whether or not such a document was available to you at the time.
I believe you said in your direct testimony that Agent -- excuse me -- at the time prosecutor Wilner had a complete file, that he told you he had the complete file, and you asked him for a portion of that file, correct?
A. I didn't limit it. He said, I have the file. I'll send

you the proffers, and he sent me those proffers.
Q. So you could have asked him at that I point for the sentencing position given by the government in connection with the Mendiratta One sentencing, correct?
A. I could have, yeah.
Q. You chose not to.
A. Correct. I asked for the plea and the information.
Q. You knew that the government had written a sentencing position in connection with the Mendiratta One sentencing, correct?
A. I assumed they had.
Q. Well, you're familiar with how the United States attorney's office has dealt with your criminal cases over the scope of your career, correct?
A. Correct.
Q. And you're aware that in every single case, they submit some type of sentencing position to the district court in connection with the sentencing, correct?
A. Yes, I am, yes.
Q. So you knew that there was a sentencing position that Mr. Wilner had submitted in connection with the Mendiratta first sentencing, correct?
A. Correct.
Q. And you also -- since Mendiratta at that point was one of your target subjects, you wanted to get as much information

about Mr. Mendiratta as you could, correct?
A. Correct, tying it to what he was doing now, correct.
Q. You'd want to certainly know his background, correct?
A. Correct.
Q. And that background would be contained in the complete file that Mr. Wilner had, correct?
A. Primarily the 302s, correct, yeah.
Q. Primarily the 302s? You mean, you wouldn't have also assumed that Mr. Wilner would have spoken about the cooperation in the sentence being position?
A. I assume that would have reflected what he learned in the proffers and -- organized for purposes of the sentencing position, but the proffers were the best primary evidence of what he said or didn't say.
Q. The proffers were the best evidence of what Mr. Mendiratta would have said or not said?
A. Correct.
Q. But the evaluation of whether or not Mr. Mendiratta was being credible you knew would be contained in that sentencing position, correct?
A. Correct.
Q. In fact, you said that you used Special Agent Bertrand -- Special Agent Bertrand was the case agent in connection with Mendiratta One, correct?
A. I believe that is accurate, yes.

Q. Special Agent Bertrand worked in your small white-color section of the FBI; is that correct?
A. At one time, yes.
Q. And did you have -- you could have called up Special Agent Bertrand to ask him about the Mendiratta sentencing; isn't that correct?
A. Yes.
Q. In fact, isn't it true that in the Mendiratta sentencing, in the government's sentencing position, FBI Agent Bertrand actually included a declaration that went into that sentencing position for Mendiratta; isn't that correct?
A. I don't know.
MR. HOCHMAN: Your Honor, I draw your attention to what's been marked in the exhibit as Exhibit 17. It's in the book, I believe, before you. It was the public defender's office's book of exhibits.
Q. I think -- Agent Tarwater, do you have that in front of you?
A. Turn to that?
Q. Yeah, Agent -- Exhibit 17, please.
And if you could look at the top part of the document, it says page 36 of 51.
What we're talking about, Your Honor, is the government's sentencing position in Mendiratta One.
And you see the declaration of E. Paul Bertrand

included in the government's sentencing position?
A. I do. Yes, sir.
Q. That is the Special Agent Bertrand we've been talking about?
A. Yes.
THE COURT: Hold on for a second.
Was this Agent Bertrand, at the time you prepared your affidavit, no longer in the L.A. office?
THE WITNESS: I'm trying to remember the timing, Your Honor, but he moved to the Washington D.C. area, Quantico, Virginia, I believe, but I can't recall the dates, but he did leave the office.
THE COURT: But, I mean, was he in the office when you were preparing the affidavit in March of 2011?
THE WITNESS: I don't recall, Your Honor.
THE COURT: I see.
BY MR. HOCHMAN:
Q. He was certainly in the office between April 2010 and March 2011, correct?
A. I don't know, but he was reachable, certainly, wherever he was.
Q. You had access to the FBI's files dealing with Mendiratta One, correct?
A. Correct.
Q. And in those files would be Special Agent Bertrand's

declaration, presumably, dealing with the Mendiratta sentencing, correct?

A. It should be, yeah.

Q. And the sentencing position would be in those files as well, correct?

A. They don't always make, it but it should be, yes.

Q. So you had multiple points of access to the sentencing position had you chosen to look for it, correct?

A. That's correct.

Q. And you had understand that a sentencing position would be an important document to the extent it was evaluating Mendiratta's cooperation, correct?

A. More so if I hadn't been in contact with Wilner, but, yes.

Q. And also it would be important for the district judge, Judge Fischer, to know what the government had evaluated five years worth of Mendiratta sentencing to be, correct?

MR. AVEIS: Your Honor, I would object to the form of that question as a legal conclusion. That would be something that Judge Fischer would have to draw.

THE COURT: What was that again now?

MR. AVEIS: Maybe counsel can restate the question.

THE COURT: All right.

BY MR. HOCHMAN:

Q. You knew Judge Fischer would be interested in knowing the government's evaluation of five years of Mendiratta's

cooperation in determining whether Mendiratta could be a cooperator in your investigation going forward, correct?

MR. AVEIS: I make the same objection.

THE COURT: Overruled.

THE WITNESS: Sorry. Can you repeat it again.

MR. HOCHMAN: Sure.

Q. You, Special Agent Tarwater, knew that Judge Fischer would be interested in knowing the government's evaluation of Mendiratta's cooperation for a five-year period in evaluating whether Mendiratta could be used as a future cooperating witness, correct?

A. Correct.

Q. And you didn't provide that information to Judge Fischer in the affidavit, correct?

A. Correct.

Q. And you did that intentionally, correct?

A. No, it didn't occur to me to include it. I wish I had.

Q. You did it recklessly then?

A. I don't believe I did.

Q. Now, you even knew in the plea agreement -- you said you actually had a copy of the plea agreement, correct?

A. Wilner emailed that to me, yes, sir.

Q. And the plea agreement had provisions in it -- and I can direct your attention to it if you don't remember it -- where it says, "The government will, in connection with the

defendant's sentencing, bring to the court's attention the nature and extent of defendant's cooperation."

Do you recall that?

A. That sounds like the regular language, yes.

Q. So the government in the Mendiratta One sentencing is bringing the -- Mendiratta's cooperation to the attention of Judge Hatter, correct?

A. Correct.

Q. But you are not bringing Mendiratta's cooperation to the attention of Judge Fischer, correct?

A. The outdated cooperation or what --

Q. The outdated cooperation, correct?

THE COURT: "Outdating" meaning --

BY MR. HOCHMAN:

Q. The Mendiratta One cooperation.

A. Well, I discussed the proffer agreements but not the sentencing position, correct.

MR. HOCHMAN: If I can turn to the part of the affidavit now. It's Exhibit 1. I'll direct your attention to pages 91 and 92.

THE COURT: Before you do that, the agent, as I remember it, didn't say -- or did he -- in the affidavit that Mendiratta had cooperated in the past, did he?

MR. HOCHMAN: He didn't. That is the section we're going to right now, Your Honor.

THE COURT: Okay.

BY MR. HOCHMAN:

Q. Let's go to the section dealing with Mendiratta's cooperation. I'll draw your attention to paragraph 129 on page 21.

Do you have had that in front of you?

A. I do.

Q. Again, this paragraph, interestingly, is -- dealing with your first sentence, talks about a loyalty issue as to why you didn't believe that Mendiratta could be used as a cooperating witness because he was too loyal to Passino.

Do you see that?

A. Right. Generally the target subjects, and this was an example of that loyalty, correct.

Q. And this is where you say Possino and Mendiratta each separately told Mr. Berger, the c.w., that they had been carrying out manipulation deals for over ten years.

Do you recall that?

A. Yes, sir.

Q. I think counsel just pointed out to you that that statement is also misleading because it makes it seems like they've been continuing this deals nonstop for a ten-rear period when you knew for a fact that there had been hiatus before 2007; isn't that correct?

A. That's correct. There had been a hiatus.

Q. And you don't reveal that hiatus in connections with this statement to Judge Fischer, correct?
A. No, that is not in here, correct.
Q. And then you said, "Mendiratta has been interviewed by the government at least seven times pursuant to proffer agreements but had not mentioned Possino, Nix, Angelastri or anything about the ongoing market manipulation scheme with the target subjects."
Do you see?
A. I do, yes, sir.
Q. Now, it's interesting, if you look at the -- you don't put down any of the dates of the proffer sessions in that sentence, correct?
A. That's correct.
Q. You don't put down any of the fact that Mr. Mendiratta wasn't asked the questions about Possino, Nix, Angelstari during those proffer sessions in '04 and '06, correct?
A. I don't know if he was asked or not, but that's not dealt with in here, that's correct.
Q. But you actually knew that you should have put that information down for Judge Fischer; isn't that true? You knew you should have put it down.
A. The dates of the proffers?
Q. Correct, that that so Judge Fischer could see there was a five-year history -- actually from '04, '06 and '09 of

cooperation that occurred in evaluating whether or not Mendiratta could be a cooperator in your investigation. You knew you should have put that down, correct?

A. I think dates would have been helpful. In retrospect, that would have been good to include.

Q. And you deliberately omitted them, correct?

A. At the time I didn't think about why that would be the most relevant point of -- just the loyalty of the target subjects.

Q. Well, look at the next page, because at next page there is a footnote, and the footnote doesn't deal with Mendiratta's cooperation, it deals with Possino's potential cooperation, and you put down in your footnote, "Possino was previously interviewed by the FBI in September 2008 in a case entirely unrelated to the conduct at issue in this investigation where Possino claimed to be the victim of a fraud scheme. Possino was not asked about, nor did he disclose, the market manipulation activities related to this investigation."

THE COURT: "This investigation" meaning this indictment?

MR. HOCHMAN: Correct.

Q. So you knew how to put down dates for proffer sessions, how to indicate that a particular person wasn't even asked the question nor volunteered the information in order to be clear with Judge Fischer as to the nature and extent of that

cooperation, correct?
A. Yes, I knew how to put down dates, yes, and further information, correct.
Q. Yet you deliberately failed to do so in connection with Mendiratta and his cooperation, correct?
A. In the context of loyalty, it didn't occur to me to include the dates. Didn't occur to me to describe how long they had known each other, and that it had never come up in those proffers.
Q. Well, do you have some other section of your affidavit where you put down Mendiratta's cooperation that I have missed?
A. I addressed all the potential cooperators and why they can't achieve the goals in the investigation, and that would include Mendiratta.
Q. I'll get there in one second --
THE COURT: By the way, is there any evidence regarding what the relationship was between -- how long the relationship was between Mendiratta and -- who is that guy?
MR. HOCHMAN: Possino?
THE COURT: Lew and the other guy --
MR. HOCHMAN: Mr. Berger?
THE COURT: No, no.
MR. HOCHMAN: You mean Possino, Your Honor?
THE COURT: No. The 2000.
MR. HOCHMAN: Oh, you mean Mr. Woo, the prior --

THE COURT: Woo and --

MR. HOCHMAN: Owens.

THE COURT: Owens, yeah.

BY MR. HOCHMAN:

Q. Is there any mention in your affidavit about Woo -- successful corporation of Mendiratta in the Woo and Owens case?

A. No.

THE COURT: But what I'm interested in is there any evidence in the investigation files as to what kind of relationship Mendiratta had with Woo and --

MR. HOCHMAN: Owens.

THE COURT: -- Owens. In other words, how long did they know each; other close were they? He testified against them. Wouldn't that be of some -- wouldn't that be some indication of his willingness to testify against others that he had longstanding relationships with? I don't know what the record shows.

BY MR. HOCHMAN:

Q. Isn't it true that the record shows -- which is actually one of the -- there's a series, Your Honor, of the 302s that I believe Special Agent Tarwater has talked about.

In the 302s there's three examples, probably the three best examples of closes relationships that Agent Tarwater absolutely would have known because he reviewed the 302s at the time, that show that Mendiratta is happy to talk about close

friends, people he's worked with for years, and even organized crime, Your Honor.

THE COURT: What are you referencing in that regard?

MR. HOCHMAN: Certainly. A gentleman named Altomore, the CEO of Universal Express. That was actually a separate --

THE COURT: What are you reading from?

MR. HOCHMAN: Actually, what I'm reading from, Your Honor, was the public defender's office in their original motion summarized this --

THE COURT: But where is it in the record so we know?

MR. HOCHMAN: It's in Exhibits 2 and 3, I believe? May I have a moment, Your Honor?

Rather than delay this, we'll pull those records and give them to Your Honor, but what it will show is that he was prepared to talk about the CEO, the enterprise that he was involved with, which led to his conviction; Mr. Owens, that we've talked about, and Mr. Woo; people he had done multiple schemes with leading to their convictions; a gentleman named Anthony Intriaeri -- we'll pull all this for you, Your Honor -- and a gentleman named Intrieri, who he described as close friend, Your Honor, and he was happy to provide him up with all the information about Mr. Intrieri in a market manipulation scheme.

Q. And none of that information was provided to Judge Fischer, correct?

A. Correct.
Q. And had that information been provided to Judge Fischer, you agree -- don't you? -- that Judge Fischer would have considered it in light of your statement that Possino and Mendiratta were loyal. In other words, you're talking the statement that they're loyal and they're friends for ten years, but she could have evaluated that against the fact that he had most recently given up close friends, business associates and even the CEO and organized crime figures in concluding whether or not we could actually rely or use Mr. Mendiratta in your ongoing investigation, correct?
A. I believe she would consider anything -- I missed the latter part of your question.
Q. I'll keep going on.
With respect to this notion that you have talked about, about compartmentalizing, I think you said that one of the reasons that you couldn't use Mr. Mendiratta was that the Possino and Nix folks had compartmentalized their information so nobody could get into that unless you had a wiretap; is that the idea?
A. Or into certain parts but not -- correct.
Q. Okay. But the C.W., Mr. Berger, he was an outsider to Possino and Nix that got brought in by Mendiratta, correct?
A. Correct.
Q. Mendiratta -- as we've been discussing -- had known

Possino for over years, correct?
A. Correct.
Q. You actually described him in paragraph 127b on page 90 as trusted member of the conspiracy. That's what you're describing Mr. Mendiratta as, correct?
A. That's correct.
Q. And when you actually list the criteria by which you were evaluating whether or not a cooperating witness would be successful and could be introduced here, you listed all those criteria on page 90 of your affidavit.
Do you see that? It says A, B And C. Those are the criteria you list as to why you -- what would a new C.I., or confidential informant or undercover, would have to -- the criteria that they would have to have in order to be successful and not have to actually get a wiretap.
Do you see that?
A. I do.
Q. Let's go through that very quickly because I want to show you in each instance Mr. Mendiratta -- you can check the box against his name as meeting your very criteria.
You say first, the new person, the new cooperator, has to have the trust of the target subjects. Well, clearly Mr. Mendiratta has the trust of the target subjects. In fact, you describe him as trusted member of the conspiracy.
Do you see that?

A. I do.
Q. Then it says he has to have highly specialized knowledge of securities and the various methods used to manipulate stocks as part of the scheme.
That is Mr. Mendiratta, isn't it?
A. Yeah.
Q. And you said, further down, he has to actually have the bone fides. He has to be someone that they would respect, they would understand, to be accepted into their market manipulation scheme and have common relationships and a shared history.
A. Sure.
Q. Once again, that is Mr. Mendiratta, correct?
A. Yes.
Q. You're not describing -- as we go through this, you're not putting lines here saying Mr. Mendiratta meets these criteria for Judge Fischer, correct?
A. No, I did not do that.
Q. You say, finally, there are certain serious legal and policy constraints because you can't have -- in Mr. Berger's case, give him the authority to invest a half-a-million dollars in illegal scheme, and that those constraints could apply to other people, correct?
A. Yes.
Q. But Mr. Mendiratta at this point is in jail, isn't he?
A. Yes, sir.

Q. Usually, the government says, Well, if they're in jail, which can't use them because they've been divorced and unconnected from the scheme and therefore they all of a sudden pick up the phone and say, Hey, I'm back, they'll say, Look, you're in jail. You must be cooperating, correct?

A. Yeah. That was not an impediment --

Q. And that actually didn't happen with Mr. Mendiratta. He actually had smuggled a cellphone into the prison and kept in communication with the other members of the conspiracy, correct?

A. At least some level, yes.

Q. So he was in a perfect place. Had you revealed all this to Judge Fischer, all his past cooperation about being confronted and then turning on his closest friends, the fact that you could actually do that, and he is in prison; so it wouldn't be -- wouldn't be -- the fact that he couldn't come up with money, for instance, would not be something that the conspirators would worry about because he is in jail.

So he was the perfect person, had you revealed all the facts to Judge Fischer, for her it to say, Hey, wait a minute. Why don't we take you -- why don't you go ahead and pursue Mr. Mendiratta before I authorize the wiretap.

Isn't that correct?

A. I don't believe he is the perfect person, no.

Q. He meets all your criteria.

A. No, he doesn't.

Q. Because you actually don't have -- you actually didn't tell Judge Fischer the "D" criteria. When Judge Wilson asked you the hit-me-with-your-best-shot question --

THE COURT: I --

MR. HOCHMAN: Yes -- which is -- the old hit-me-with-your-best-shot question about tell me what it is about Mr. Mendiratta that you decided wouldn't work, and you came back with, number one, compartmentalization -- it doesn't matter who the person is, they can't break into the conspiracy because Possino and Nix had compartmentalized. Now we look at your criteria laid out in the affidavit. Do you see a "D" here that says compartmentalization on your criteria?

A. Paragraphs 128 to 132 also deal with the issues in bringing someone in, getting information, utilizing them.

Q. This is your criteria in paragraph 127. Do you see at -- any description of compartmentalization your best reason as the criteria for using a CI or UC?

A. In just paragraph 127?

Q. Correct.

A. No, I do not.

MR. HOCHMAN: May I have a moment, Your Honor?

THE COURT: Yes.

MR. HOCHMAN: No further questions at this time, Your Honor.

THE COURT: I have a question, sort of an open-ended question to give you an opportunity to respond.

Why didn't you simply say in the affidavit opportunity, Mendiratta has been used in the past as an informant, but recently I learned that he was dishonest and couldn't be trusted?

THE WITNESS: I should have, Your Honor.

THE COURT: But there seems to be a pattern that the defense maintains you were aware of, of Mendiratta committing a crime, getting caught, talking his way out of it by cooperating, and then the government continuing to use him multiple times knowing what he was; and the question is why on -- in March of 2011 would you think that Mendiratta wouldn't continue to be a cooperator as he had on multiple occasions when he was caught?

THE WITNESS: Your Honor, I didn't need historical information, I needed to be able to direct someone to go acquire information about every person in this network.

THE COURT: Let me ask you this. I don't know this because I haven't been exposed to the body recordings of Berger, but how specific was Berger or how specific was Possino and Nix when they spoke about the fraud? Were they guarded or did they -- describe what they were doing and in words that were understandable.

THE WITNESS: They don't come out say, We're

manipulating stock.

THE COURT: No one says that.

THE WITNESS: Yeah.

THE COURT: Did they use a parlance that was understandable to you?

THE WITNESS: Yes, yes, Your Honor. Over time, yes, Your Honor.

THE COURT: And I agree with you that the fact that there may have been a strong case against Possino and Nix doesn't necessarily forestall the obtaining of a wiretap.

But at the time of the wiretap, April -- March of 2011, would you have recommended an indictment against Possino and Nix based upon what you had obtained from Berger's body recordings?

THE WITNESS: You mean apart from the rest of the network, Your Honor --

THE COURT: Yes, yes.

THE WITNESS: I believe just -- I think we could have indicted Possino and Nix just based on what we had --

THE COURT: And Mendiratta?

THE WITNESS: Yes, Your Honor.

THE COURT: Who else?

THE WITNESS: I don't make charging decisions, but I think --

THE COURT: Of course, at the time you were looking

to see the extent and the fact that some others may have been indicted and not all of the participants doesn't mean you couldn't pursue the totality of the conspirators, but how many others could you have indicted without the wiretap?

THE WITNESS: I think most of the target subjects named in this affidavit. All but two perhaps we could have indicted.

THE COURT: Based upon Berger's recordings.

THE WITNESS: Yes, Your Honor, yes.

THE COURT: And what Berger did was also corroborated your going to the -- I may use the wrong term. Do they still call the pink slips -- the over-the-counter records?

THE WITNESS: Yes, Your Honor. The blue sheet --

THE COURT: Called blue sheets?

THE WITNESS: Yes, Your Honor.

THE COURT: So you could corroborate some of the -- of the information from Berger with the blue sheets.

THE WITNESS: Yes, Your Honor.

THE COURT: You described that in your affidavit.

THE WITNESS: Yes, Your Honor.

THE COURT: Yeah.

In retrospect it would have been very simple just to say Menderosa -- I can't say his name-- Mendiratta cooperated in the past, but based upon recent information from other investigators, he's no longer worthy of belief.

THE WITNESS: Yes, Your Honor, and I wish I had --

THE COURT: All you had to do was just say that, not talk about all these other interviews and all this other stuff.

THE WITNESS: Yes, Your Honor.

THE COURT: All right.

MR. HOCHMAN: Your Honor, I know that you wanted to put the Mazur portion of this to a different time period, but I'm thinking if we sort of sanitize the way the questioning is, it's very, very relevant to the exact question of what is left off of these particular paragraphs we're focusing on. The agent's already on the stand. I think it possibly could make sense to do it now, but if the court --

THE COURT: My concern is I don't know what's sealed and what's not sealed, and you're the person most knowledgeable there.

So do you want to proceed? If you think you can, it's okay with me.

MR. HOCHMAN: Your Honor, again, as long as there's an agreement, as well, with the government that we don't use actual names, that we can keep it in sort of general discussions.

THE COURT: All right. Then use a name; I'll know who your you're referring to. What is the name of this person going to be?

MR. HOCHMAN: We'll be talking about cooperation that

Mr. Mazur gave in 2006, Your Honor. I just won't use specific names; I'll talk in very general terms.

MR. AVEIS: Your Honor, may I complete my redirect in terms of the initial part first?

THE COURT: Yeah.

MR. AVEIS: Very well.

**REDIRECT EXAMINATION**

BY MR. AVEIS:

Q. I'd like to clarify a couple of things that came up during the cross-examination.

First, Mr. Mendiratta did not testify against either Woo or Owens, correct?

A. Not to my knowledge, no.

THE COURT: What did he do? Did he wear a wire that he --

MR. AVEIS: I'll make an offer of proof or the agent can answer.

THE COURT: Do you know what he did?

THE WITNESS: I don't believe he wore a wire, no.

MR. AVEIS: He was simply interviewed. That is described in the sentencing position of the government and --

THE COURT: You dispute that?

MR. HOCHMAN: No, Your Honor, other than Mr. Wilner said that the interviews were turned over to the defense; thereafter, the defendants pled guilty. It's more than just

being interviewed. It's actual interviews that defendants relied on in deciding to plead guilty. So it's a little bit more.

MR. AVEIS: If -- go ahead. I'm sorry.

MS. UYEDA: And that he was going to be a potential witness in the trials against Woo and Owens.

THE COURT: I see.

MR. AVEIS: If I may respond to that? The act that Mendiratta himself engaged in was simply just telling things to the government.

THE COURT: I know, but apparently, unless you dispute it, it's more than that. It's one thing for someone to say, I'll give you information, and I won't agree to testify. That happens sometimes. And then it's another for a witness to say, I'll cooperate, and the government says, Will you be a witness? And the person says, Yes, I will. Usually it's some risk to themselves. And here, apparently, Mendiratta agreed to and agreed to testify, and it was that threat that -- at least the defendants argue -- caused them to -- Owen and Woo -- to plead guilty.

MR. AVEIS: The record of that would be --

THE COURT: Is that what the record shows?

MR. AVEIS: Well, the record would be what AUSA Wilner wrote to Judge Hatter in the 5K position.

THE COURT: That's what Wilner thought.

MR. AVEIS: Yes.

THE COURT: Okay. Go ahead.

BY MR. AVEIS:

Q. So turning to what Mendiratta had actually done himself in regard to the SDNY proffers, was it your understanding that he had merely been interviewed and provided information.

A. That is my understanding, yes.

Q. And had he gone proactive, worn a body wire, made recordings, and infiltrated any kind of organization in a covert way?

A. No.

Q. And in regard to the 2006 interview by Agent Bertrand in Los Angeles in connection with the Woo or Owens matter, had he gone proactive and worked by wearing a body wire, making covert calls or otherwise infiltrating an organization?

A. Not to my understanding, no.

Q. SO is it a fair statement that as to all of what you knew about his so-called cooperation prior to signing the wire affidavit, that consisted of telling things about historical events?

A. Correct.

Q. Did you draw a distinction in your mind between giving proffer statements as one form of cooperation and wearing a body wire, making calls and infiltrating an organization as a proactive cooperator as a different form of cooperation?

A. Absolutely.

THE COURT: What does the record show, if anything, about whether he was ever asked to wear a wire, and did he ever refuse? I mean, the nub of this hearing comes down to essentially this: The witness is saying I just lost interest in Mendiratta when Wilner told me how disappointed he was that he had committed a crime again, and he lost faith in him, or he heard from the U.S. attorney, the FBI in New York, that he wasn't worthy of belief; and the defense position that he told half-truths in the affidavit, omitted relevant information and purposefully ignored what was available to him so that he could maintain these half-truths. In other words, he never looked into the resources that he had, and that's what I'm taking from this in the -- in its essence. That's the way it seems to me. If it isn't, then ask more questions.

MR. AVEIS: If I can turn back to the agent's direct testimony for a minute and ask him to assist the court in going through that.

Q. The evaluation that you engaged in, in determining whether you believed to be Mendiratta -- believe Mendiratta would be a suitable proactive cooperator, was one of those factors that he had, in effect, double-crossed Wilner by engaging in new criminal contradict and at the same time asking for leniency in connection with the Mendiratta One case?

A. Yes.

Q. But there were other factors as well?

A. There were.

Q. Go through those again if you don't mind.

A. Sure. Some of the factors that I used to evaluate Mendiratta, I used to evaluation any potential new cooperator. I had a good cooperator, but the problem I was facing was that Possino, Nix did compartmentalize some of their network, and it was hard to get -- any way of getting a role and knowledge of those persons without the wiretap, Mendiratta wasn't going to be able to achieve those goals. He did have the same policy limitations. Even from prison, he would be expected to put money in through Angelastri. That really wouldn't have saved that. I mean, he is not of any use if he is not contributing, so I do have the same policy considerations. He's also one of the more culpable members of the conspiracy.

So to weigh the risk of approaching him when I have a good cooperator and have him expose the covert investigation when I didn't think he could achieve the goals any more than the cooperator I had already, didn't make sense.

THE COURT: What was the pre-existing relationship between Berger and Possino and Nix? In other words, Berger came to the FBI, but had he been a long-term partner or member of this conspiracy?

THE WITNESS: Berger told us in May 2010 that one of the ways he knew Mendiratta was Mendiratta put him into a deal

in Matech back in 2008, 2009, and later it came to be known that Possino and Nix were involved in that deal. They might have known of him, but they weren't introduced until --

THE COURT: So it doesn't appear that Berger -- or that Berger had a long-time, close relationship with Nix or Possino.

THE WITNESS: Correct, Your Honor.

THE COURT: But Mendiratta did.

THE WITNESS: He did, yes, Your Honor.

THE COURT: So why would you conclude that because Berger was only able to go so far in terms of the so-called compartmentalized aspect of the case, that Mendiratta couldn't do more, given the length and trust they had achieved?

THE WITNESS: Yes, Your Honor.

THE COURT: By the way -- go ahead. Answer.

THE WITNESS: From the consensual calls that the cooperator was doing, Mr. Berger, it came clear that Mendiratta was not involved in, say, the directions given to the Sport Endurance management or this broker named Doug or the transfer agent, John Bugudski(phonetic). He had his role, and he could get some evidence on some people, but he was not involved in every aspect like Possino and Nix were.

THE COURT: But were -- Possino and Nix were communicating with Mendiratta in jail, weren't they?

THE WITNESS: I know of at least one call that I

heard referenced, yes, Your Honor.

THE COURT: But why couldn't Mendiratta be outfitted with the same promise of backing to get into some new deal, like Berger? In other words, Berger was falsely promising that he could deliver $500,000 --

THE WITNESS: Yes, Your Honor.

THE COURT: -- to finance some of this manipulation.

Why wouldn't you try that with Mendiratta?

THE WITNESS: Yes, Your Honor. Part of the reason I think Berger got some information that way is he said, I am new to this group, and if I'm going to put in that kind of money, I want to know how your network operates and who does what. Mendiratta already knew the group. It would be odd for him to say, Oh, before I put in money, introduce me to these people, show me the ropes, tell me what you have done.

THE COURT: But if he knew the group, then what is the significance of this compartmentalized?

THE WITNESS: He only knows certain members of the group.

THE COURT: Who did you want to get, the file clerk? I mean, you knew most of the people, right?

THE WITNESS: No, Your Honor. We wanted -- whoever this broker was named Doug; we wanted the transfer agent, who Mendiratta didn't appear to have interaction with; wanted the auditor, who they seemed to use every time, and Mendiratta had

no interaction with; we wanted the attorneys that were doing all the paperwork and putting their name on the legal opinion. Mendiratta -- that was not connection. So he -- they had a whole operation on how to get things done that Mendiratta -- he would kind of come in at the end --

THE COURT: Did you get the auditor?

THE WITNESS: He is still being investigated.

THE COURT: I mean -- in other words, you expected if you got a wiretap, there would be some conversation whereby Possino or Nix or someone would be telling the auditor how to cook the books.

THE WITNESS: Yes, Your Honor.

THE COURT: I see.

THE WITNESS: And there were some intercepts to that effect.

BY MR. AVEIS:

Q. Putting all together your analysis of Mendiratta and your determination that he was not viable, would it be fair to say comparing him to Berger, you simply didn't trust Mendiratta would follow your orders and not reveal the covert investigation?

MR. HOCHMAN: Objection, Your Honor.

THE WITNESS: Correct.

THE COURT: Leading?

MR. HOCHMAN: Leading, especially on direct, Your

Honor.

THE COURT: It is leading.

MR. AVEIS: I'll rephrase the question.

Q. Were you concerned that Mendiratta was not trustworthy?

A. I was.

Q. And were you concerned that it -- were you to approach him and ask him to wear a wire, he might reveal the covert investigation to individuals whom you believed he had had a history with?

A. Yes. Part of the reason Berger seemed a better cooperator was he came forward and said, Let me tell you about this and this. I didn't have to ask him and possibly expose anything I knew. To go to Mendiratta and say, Hey, tell me about Possino and Nix, he'd know I'm looking at them and maybe cooperate a little, maybe he wouldn't, but I could expose the whole thing. I had a good cooperator collecting evidence. I didn't want to do that.

Q. And did part of your analysis include that you had perceived he had selectively identified criminal compatriates from the past?

A. I did. It appeared that he would talk about what he was being charged with at the time or being looked at at the time and give some information, but I noted other companies he'd bring up in those 302s where he didn't say, And by the way, I'm doing a manipulation with this, or -- you know, part of the

proffer is, Tell us everything you know. Who else is committing crimes.

THE COURT: We've been through this.

MR. AVEIS: Very well. Thank you.

THE COURT: Do you have another question?

MS. UYEDA: Just briefly.

**RECROSS-EXAMINATION**

BY MS. UYEDA:

Q. Agent, you claim that Mendiratta would have risked exposing the investigation; is that right?

A. Correct.

Q. Now, at the time you applied for the wiretap, you had no evidence that Mendiratta had exposed any of the investigations that he was involved until with his proffers.

A. I had no evidence -- I had calls where he talked about not being a rat and selling out his friends, but I think -- to your question, no, I didn't have any evidence.

Q. He proffered against a number of people in the seven proffer sessions, right?

A. Correct.

Q. You have no evidence that he exposed any of those investigations.

A. I don't know either way, correct.

Q. And you have no evidence that he notified the people against whom he gave information.

A. I don't know.
Q. You have no evidence that he revealed his cooperation in those cases.
A. Correct.
Q. You talk about this policy constraint of the government to finance fraud, right, in your affidavit?
A. I didn't put it that way, but, yes, there are policy constraints we have to deal with.
Q. And that is why you couldn't fund Howard Berger the money to invest in one of these deals?
A. You can't measure the harm to third-party innocent victims, correct.
Q. That was the limitation of using Howard Berger at a certain point, according to you in your affidavit?
A. Also that he was being misled as to certain other people involved in the network not being told and not being connected to them, but, yeah, is one of the reasons.
Q. That is one of the reasons you stated in your affidavit, right?
A. Yes, ma'am.
Q. You didn't need to do that with Mendiratta, right? You didn't need to give money to Mendiratta if he were to cooperate.
A. Yeah. He could provide some level of cooperation without giving money, correct.

Q. Mendiratta, in fact, put in his own money into the scheme.
A. Once he's acting as an agent of the government, he puts in his own money; now he is doing it at our direction. It's the same as if the government gave him the money. We're responsible for the harm to the public.
Q. So your position is even after Mendiratta puts in $480,000, he couldn't have been used as an informant after that?
A. No. I just said that is one of the limitations that would be at issue for any potential cooperator as -- at some point, they're going to want you to help, and if you can't, then, you know, diminishing returns on what they're going to tell you.
Q. But in this case, Mendiratta already provided the money.
A. For the Sport Endurance yes, ma'am.
Q. And it didn't have to come from the government, right?
A. Correct.
Q. Now, you define "cooperation" maybe differently than we do.
Is that fair to say?
A. Yes.
Q. Okay. You seem to define cooperation as prospective. That's one of your definitions.
A. I think if you say someone is a successful cooperator, they do more than just tell you what you already know.
Q. And that the -- their ability to wear a wire.

A. That makes them -- yeah, a proactive cooperator, yeah.
Q. But you'd agree with me that there's different ways to cooperate.
A. Yes.
Q. Not just wearing a wire, right?
A. Correct.
Q. You can provide information, right?
A. Correct.
Q. You can provide leads, right?
A. Correct.
Q. You can provide documents?
A. Correct.
Q. You can agree to testify?
A. You can, uh-huh.
Q. And you can actually prepare to potentially testify, right?
A. Correct.
Q. Those are all things under the scope of a 5K.
A. Sure.
Q. And Mendiratta did all of these things, didn't he?
A. To some extent, yeah, I think he did.
Q. But you didn't look into any of these things.
A. Only to a limited extent, correct.
Q. Now, you testified -- or maybe you agreed with counsel that Mendiratta double-crossed Wilner, and that's why he wasn't

trustworthy.
A. One reason, yes.
Q. And just to be clear with the timeline, the last time that he proffered in Los Angeles was 2006, right?
A. That's the last proffer, correct.
Q. Okay. And the SENZ deal -- in your affidavit, the first activity begins in 2009 in August; is that right?
A. That's when Scarpello transferred shares, yes.
Q. And you actually say that Mendiratta -- your first mention of Mendiratta in the SENZ deal is actually in August 2010, isn't it --
A. I know the recordings made at that time.
Q. So that was after his dealings -- Mendiratta's dealings with Wilner.
A. Oh, no. He was -- Wilner was -- that was ongoing while he was supposedly cooperating before he surrendered after his guilty plea, after he entered into the cooperation plea agreement. That was all during that time period.
Q. Well, Mendiratta was cooperating against Owens and Woo; is that right?
A. Correct.
Q. And had they both pled in 2009, right?
A. I don't know the exact dates.
Q. Okay. That's because you didn't look them up on PACER.
A. Or if I did, I don't recall now -- oh, I didn't look them

up on PACER. No, I didn't do that.
Q. Well, Mendiratta was sentenced April 2009, right?
A. August 2009, I thought. Is it April?
Q. April 2009.
A. Okay.
Q. Oh, I'm sorry. April 2010.
A. Sentenced --
Q. Sentenced, sorry, in 2010, right?
A. Correct.
Q. You're not aware that the co-defendants pled in 2009?
A. I don't recall the date right now, no.
Q. Okay. Either way that happened after the 2006 proffer with the Los Angeles U.S. attorney's's office.
A. Yes.

MS. UYEDA: No further questions, Your Honor.

THE COURT: I'm still unclear -- I'm saying this to both parties -- why Wilner soured on Mendiratta. It's not clear to me. In other words, is it because Agent Tarwater told Wilner about his conversation with the FBI agent in New York, or was it something that Wilner found out? In other words, when the investigation first came to you, when Berger first came to the U.S. attorney's office, didn't he mention Mendiratta as being part of the scheme?

THE WITNESS: He did, Your Honor. That's what upset Wilner.

THE COURT: Is that what upset Wilner, that Berger was saying that Mendiratta was involved in another crime on the heels of the Owens's wife's case?

THE WITNESS: Yes, Your Honor, that right before he had signed the plea agreement and after he had signed the plea agreement, Mendiratta had been committing this market manipulation scheme, and Wilner felt, Wait, this is when you're supposed to be cooperating and truthful and that whole time you're doing this behind our back. That is what upset him.

THE COURT: So that is irrespective of what you learned from the FBI agent in New York, or was that just corroborative?

THE WITNESS: Correct, Your Honor. Putting New York agent's aside and the 2006 proffer aside, it's that during the period of cooperation plea up to sentencing and surrender, he was committing crimes that whole time. That's what upset Judge Wilner.

THE COURT: I see.

MR. AVEIS: Your Honor, may I add something?

THE COURT: Yes.

MR. AVEIS: Just for guidance to the court. You certainly call Magistrate Judge Wilner, but his 302 is in the materials. Here's the chronology: April 19, 2010, the Mendiratta One sentencing before Judge Hatter. That's the one in which Judge Wilner had made the laudatory comments in

connection with the 5K. That's April 19.

Within several days thereafter, I believe my office issued a press release. Thereafter, AUSA Wilner got a phone call from a lawyer named John Cline. Mr. Cline represented Berger, and Cline said to Wilner, My guy Berger has some information for you about Wilner and, in effect, an ongoing offense. Wilner found that shocking. That's what he said in his 302.

THE COURT: I see.

MR. AVEIS: And I interviewed him and I watched his reaction; it was quite visceral. He thereafter called Special Agent Goldman, who was Tarwater's supervisor, and said, I just receive information --

THE COURT: All of this is in Wilner's 302?

MR. AVEIS: It is, Your Honor.

THE COURT: Is that in the record?

MR. AVEIS: It is.

THE COURT: What exhibit is that?

MR. AVEIS: Stand by, please.

The government filed it in connection with its response --

MS. UYEDA: Your Honor, it's Exhibit 22 of your binder.

(Recess)

THE COURT: Twenty-two.

So where are we now?

MR. AVEIS: Your Honor was asking the government about Judge Wilner's reaction --

THE COURT: Right. That is in Exhibit 22.

MR. AVEIS: Yes, 22, and also "B" to the government's response to the Mazur -- and I had provided the court with that timeline. It showed the sentencing was April 19th, 2010, and in the wake of press release, Wilner received a phone call from --

THE COURT: Why don't we do this -- we're not going to complete this today -- why don't you, Mr. Hochman, if you want, ask some questions if you think you can, and you can do that now.

MR. AMINOFF: Your Honor, before we get into that, can I just add one thing to the timeline that the government just --

THE COURT: Yes.

MR. AMINOFF: I'd just like to point out that on April 15th, the government did file a response because --

THE COURT: Of what year?

MR. AMINOFF: Of 2010 -- regarding the Mendiratta One case.

The government filed a response to the defense position paper. It's at tab 19 of your binder. On page three and footnote 1, you'll see the government references complaints

that they received about Mendiratta before sentencing about him being involved with several public companies involving criminal schemes. Notwithstanding that, Judge Wilner stood by his 5K motion.

THE COURT: I see.

MR. AVEIS: Emphasis anonymous complaint. That's correct's.

THE COURT: Yes.

MR. AVEIS: I ask a question, please?

In terms of the scope of Mr. Hochman's examination, are we now going to move to the phase involving whether Agent Tarwater ought to have mentioned Mazur as a prospective cooperator; is that the intent?

THE COURT: Yes, I think so.

MR. AVEIS: Are we also going to be getting into the issues they've additionally raised regarding whether the stipulations from Mendiratta's supervised release were a part of a pattern that they've argued --

THE COURT: Part of what?

MR. AVEIS: They've also argued this pattern issue that relates to these two stipulations for Mendiratta's supervised release. It's not something that we had expected we would go into, given what the --

THE COURT: I'm not prepared to address that; I don't know about that. Why don't you just ask -- or actually, we

have to come back again, so he'll be back, so what's the point?

Do you want to do it now, or do you want to wait?

MR. HOCHMAN: Whatever you think --

THE COURT: Let's -- I want to finish up this on trial that I have.

MR. AVEIS: Can I ask one question?

THE COURT: Yes.

MR. AVEIS: We've completed the portion of the examination, unless Mr. Hochman has additional questions about the Mendiratta part --

THE COURT: Right.

MR. AVEIS: -- that relates to Mendiratta. So we would now be moving away from that.

Judge Wilner could shed light on very narrow parts of this, including how he reacted when he learned that Mendiratta was dealing when he had advocated for leniency, and we've ask that he maybe comes down and testify now. May we complete that? That ought to be very brief because it's very narrow.

THE COURT: Is that --

MR. HOCHMAN: I think we have his 302 in the record, Your Honor. It's pretty detailed. We think it's irrelevant, by the way, since -- his memory of what you communicated to Agent Tarwater --

THE COURT: The is the important he link, and --

MR. AVEIS: May I respond to that?

THE COURT: Yes.

MR. AVEIS: It corroborates his state of mind. The agent is the only one thus far testifying that his state of mind was that he believed that he had properly vetted the viability of Mendiratta, and one of those factors included that Mendiratta had double dealt on Judge Wilner. If we now have Judge Wilner -- and you'll see his reaction to how he felt about that and what he was --

THE COURT: Didn't he put that his 302?

MR. AVEIS: Well, it's in the 302, but perhaps as a live witness --

THE COURT: I don't think anyone is questioning Judge Wilner's reaction as expressed in 302.

MR. HOCHMAN: Not as expressed in the 302, but since he admits he didn't communicate the -- doesn't remember --

THE COURT: Unless he can say he had some discussion with this witness, then it's this witness's credibility, Agent Tarwater, as to what interaction he had with then-assistant AUSA Wilner.

MR. AVEIS: He testified that Wilner -- Judge Wilner told him that he was angry. I think there were other words actually used.

THE COURT: Well, then, I think the record is complete on that part.

Let's -- can we resume this -- are the lawyers here

in the criminal case?

MR. AVEIS: For the benefit of the court, Agent Tarwater is currently assigned to FBI the headquarters in Washington. He has relocated family just last weekend. He was actually in the area --

THE COURT: Well, do we need -- shouldn't he be here in case something comes up later on, or do you think he can be dismissed?

MR. HOCHMAN: I think -- let me just -- I think Agent Tarwater -- we need Agent Tarwater for the Mazur portion of this.

THE COURT: How long will the Mazur portion take?

MR. HOCHMAN: I would imagine -- between my questions and any redirect, about an hour, maximum --

THE COURT: And then you think he can be discharged, or do you think you will still need him?

MR. HOCHMAN: Again, some of the subsidiary issues that we've been talking about that we might be able to cover in that hour or we still might need him. We can try and cover them all --

THE COURT: Why don't we do this.

In the criminal case, are the lawyers here?

THE CLERK: Yes, Your Honor.

THE COURT: Mr. Koury, how many more witnesses do you have?

MR. KOURY: Two.

THE COURT: Are they short?

MR. KOURY: One is about 15, 20 minutes; the other one will take probably half an hour.

THE COURT: That completes your case, correct?

MR. KOURY: Correct.

THE COURT: What about the government? They have rebuttal witnesses, or is that your case?

MR. NELSON: We have one possible rebuttal witnesses approximately, 20 minutes.

THE COURT: Let's try and finish the criminal case.

Can you come back -- what do we have in the next -- can I see the book, Paul.

Why don't we come back on Tuesday, the 4TH of February.

MR. HOCHMAN: What time, Your Honor?

THE COURT: I'm pretty flexible. 10:00 o'clock.

MR. HOCHMAN: Whatever time you'd like to start, Your Honor.

THE COURT: 9:30, 10 o'clock.

MR. ROBINSON: Your Honor, Edward Robinson.

I don't anticipate having any questions. I have a change of plea set in San Francisco, and that's the one day the judge can do it. But if I can speak to my client for a second and see if he will agree that someone can stand in for me for

Tuesday, that might accommodate the other parties.

May I have one moment, please?

THE COURT: We can do it Wednesday. Will you be able Wednesday?

MR. ROBINSON: I will be available Wednesday. I've discussed this matter with Mr. Nix. Tuesday works, if someone can stand in for me with your permission, but Wednesday is better for me, as well --

THE COURT: What about Wednesday? Is that okay?

MS. UYEDA: Wednesday is fine with me, Your Honor.

MR. HOCHMAN: If it's -- Thursday is better, but if everybody needs Wednesday, we can --

THE COURT: Let's say Wednesday. 9:30?

MS. UYEDA: That is fine, Your Honor. Thank you.

THE COURT: Try and finish it up then so -- like I said, we're only in one phase of this at this point. Okay. Thank you.

(Proceedings concluded at 3:35 p.m.)

- - - - -

C E R T I F I C A T E

I hereby certify that pursuant to Section 753, Title 18, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: March 24, 2014

/S/_______________________

Deborah K. Gackle
CSR No. 7106

**$**

$100,000 [1] 75/11
$480,000 [2] 77/7 128/7
$500,000 [1] 123/5

**'**

'04 [2] 103/17 103/25
'06 [2] 103/17 103/25
'08 [1] 31/4
'09 [2] 31/4 103/25
'97 [1] 68/15
'98 [1] 68/15

**/**

/S [1] 141/12

**1**

10 [3] 24/10 32/6 139/20
10:00 [1] 139/17
10:50 A.M [1] 6/2
1149 [1] 1/25
117 [1] 5/5
12 [1] 5/5
126 [1] 5/5
127 [3] 48/9 112/16 112/19
127b [1] 109/3
128 [1] 112/14
129 [3] 48/15 48/17 102/4
12th [1] 3/6
13 [2] 26/6 56/6
13-48-SVW [1] 6/5
131 [1] 48/9
132 [1] 112/14
14 [2] 26/6 66/24
140 [1] 1/10
1400 [1] 2/9
15 [3] 12/2 59/7 139/3
15th [1] 134/19
1600 [1] 3/11
1601 [1] 4/5
16th [3] 6/14 11/10 11/13
17 [2] 97/14 97/20
18 [1] 141/4
18 U.S.C [1] 93/10
19 [3] 132/23 133/1 134/24
19th [1] 134/7
1:00 [2] 42/9 46/6
1:15 [1] 46/12

**2**

20 [3] 12/2 139/3 139/10
20-to [1] 11/22
2000 [1] 105/24
2002 [2] 64/5 65/9
2004 [10] 18/3 19/9 26/14 79/20 79/21 79/22 79/23 81/11 84/17 84/25
2006 [35] 19/3 19/14 19/15 19/22 23/15 24/19 25/17 26/5 51/4 51/7 55/10 63/4 63/6 65/24 66/4 68/23 69/2 69/7 71/16 72/10 72/13 80/6 81/12 82/17 84/23 84/25 85/14 85/14 87/21 87/21 117/1 119/12 130/4 131/12 132/14
2007 [4] 68/22 69/2 69/7 102/24
2008 [6] 18/4 19/9 26/14 56/9 104/14 122/1
2009 [28] 63/9 63/19 63/20 64/1 64/5 64/16 64/23 65/9 65/12 65/19 65/24 69/6 71/24 71/25 72/7 80/13 80/15 81/13 85/8 85/8 85/20 122/1 130/7 130/22 131/2 131/3 131/4 131/10
2010 [40] 14/8 14/20 15/6 15/14 17/10 17/23 21/8 23/19 24/7 24/7 24/14 25/22 25/24 27/16 32/4 32/11 32/14 32/22 34/19 34/20 34/21 43/14 58/8 60/8 60/13 60/22 62/11 63/11 75/21 81/19 89/22 90/4 98/18 121/24 130/10 131/6 131/8 132/23 134/7 134/21
2011 [19] 15/10 24/14 32/23 35/2 36/4 44/1 46/20 47/22 50/14 58/14 59/7 60/5 60/11 83/25 84/4 98/14 98/19 113/13 114/12
2013 [1] 70/21
2013-00048-SVW [1] 1/9
2013-00062-SVW [1] 1/9
2014 [4] 1/17 6/1 46/12 141/10
2025 [1] 3/6
2050 [1] 4/5
21 [1] 102/5
213 [1] 1/25
213-489-9025 [1] 3/17
213-489-9027 [1] 3/17
213-613-4655 [1] 3/7
213-613-4656 [1] 3/7
213-894-7524 [1] 2/18
21515 [1] 2/21
22 [3] 133/22 134/4 134/5
225 [1] 3/21
23 [1] 51/9
24 [1] 141/10
2518 [1] 93/10
255-9025 [1] 4/6
28a [2] 64/5 64/22
28b [2] 63/22 63/22
29 [3] 1/17 6/1 46/12
2nd [1] 2/17

**3**

30 [4] 34/20 34/21 63/4 63/22
30-minute [1] 11/22
300 [3] 3/21 83/25 84/4
302 [15] 19/1 19/4 19/6 19/23 23/11 55/10 57/12 132/22 133/8 133/14 136/20 137/9 137/10 137/13 137/14
302s [18] 17/19 17/22 17/24 18/2 18/5 18/8 19/7 19/8 21/16 24/17 26/7 30/10 96/7 96/8 106/20 106/22 106/24 125/24
30th [1] 34/19
310 [2] 2/22 4/6
312 [2] 1/24 2/9
315 [1] 3/16
316-9333 [1] 2/22
321 [1] 2/17
33 [1] 76/3
33b [1] 76/6
36 [1] 97/22
371 [1] 57/22
3:35 [1] 140/19

**4**

402A [1] 1/24
4060 [1] 3/22
4082 [1] 4/5
4094 [1] 3/12
44 [1] 66/24
4655 [1] 3/7
4656 [1] 3/7
4676 [1] 3/22
4TH [1] 139/14

**5**

50 [1] 5/5
5094 [1] 3/12
51 [1] 97/22
5K [16] 36/14 36/17 38/6 38/9 38/11 49/15 56/20 58/2 61/16 88/7 91/17 92/4 118/24 129/18 133/1 135/3
5K1 [1] 94/16
5th [1] 3/6

**6**

601 [1] 3/6
620-1149 [1] 1/25
626-202-4060 [1] 3/22
626-794-4676 [1] 3/22
660 [1] 3/11
665 [1] 2/21

**7**

7106 [1] 141/13
7524 [1] 2/18
753 [1] 141/3

**8**

801 [1] 3/16
8th [1] 3/16

**9**

90 [2] 109/3 109/10
90012 [3] 1/24 2/10 2/18
90014 [1] 3/16
90071-2025 [1] 3/6
9025 [2] 3/17 4/6
9027 [1] 3/17
90404-4082 [1] 4/5
90503 [1] 2/21
91 [1] 101/20
91101 [1] 3/21
92 [2] 5/6 101/20
92660 [1] 3/11
9333 [1] 2/22
949-725-4094 [1] 3/12
949-823-5094 [1] 3/12
97a [1] 68/6
9:30 [2] 139/20 140/13

**A**

A-n-g-e-l-a-s-t-r-i [1] 18/24
A.M [1] 6/2
ability [1] 128/25
able [13] 21/4 32/12 32/16 41/23 43/24 54/8 54/9 72/22 113/17 121/10 122/11 138/18 140/3
about [130] 8/17 8/24 9/21 11/11 11/13 11/19 12/1 12/2 15/14 15/15 15/17 16/20 17/10 17/11 17/20 18/12 18/18 18/19 19/14 21/10 21/13 21/19 22/6 22/18 23/18 23/22 24/15 25/4 26/7 26/21 31/22 32/19 33/15 34/19 34/20 36/16 36/20 37/3 38/7 39/19 41/19 42/16 42/18 43/14 44/5 44/11 48/25 49/10 52/1 52/6 52/18 53/15 53/16 53/17 54/4 54/18 54/21 55/2 55/2 55/13 56/25 58/2 58/6 58/9 58/24 60/8 61/4 68/6 68/9 68/15 68/20 69/16 70/16 71/8 72/1 76/16 82/6 82/19 84/25 85/23 91/3 91/13 93/10 96/1 96/9 97/5 97/23 98/4 102/9 103/7 103/16 104/7 104/17 106/5 106/21 106/25 107/15 107/17 107/22 108/16 108/16 111/13 111/18 112/7 112/8 113/18 113/22 116/3 116/25 119/18 119/19 120/3 125/11 125/13 125/21 126/15 127/5 131/19 133/6 134/3 135/1 135/1 135/25 136/9 137/8 138/14 138/18 139/3 139/7 140/9
above [1] 141/6
above-entitled [1] 141/6
absolutely [11] 28/3 32/8 43/12 44/13 44/16 78/17 83/16 93/23 94/2 106/24 120/1
accepted [1] 110/9
accepts [1] 85/1
access [8] 39/12 55/6 73/14 74/11 77/1 77/19 98/22 99/7
accommodate [1] 140/1
according [6] 65/9 65/22 68/14 68/16 73/24

**A**

according... [1] 127/14
account [4] 11/9 12/14 16/8 72/4
accounts [10] 41/17 51/20 51/21 51/22 51/24 52/10 52/12 77/20 86/6 86/7
accurate [1] 96/25
achieve [9] 29/1 34/8 37/1 54/8 54/9 92/1 105/13 121/10 121/18
achieved [1] 122/13
acquire [3] 32/17 72/22 113/18
acquired [1] 25/17
act [1] 118/8
acting [1] 128/2
active [1] 62/1
activities [3] 19/12 19/16 104/18
activity [9] 17/8 25/5 63/19 64/4 64/17 64/18 64/22 65/15 130/7
actual [3] 40/18 116/20 118/1
actually [42] 31/5 31/14 44/3 53/10 54/15 55/19 56/6 59/3 62/8 63/22 64/5 71/13 72/2 73/3 83/8 85/7 85/15 90/22 97/10 100/21 103/20 103/25 106/19 107/5 107/7 108/10 109/3 109/7 109/15 110/7 111/7 111/8 111/15 112/2 112/2 119/4 129/15 130/9 130/10 135/25 137/22 138/5
add [3] 94/8 132/19 134/15
added [1] 34/9
addition [2] 13/18 25/7
additional [6] 8/6 11/12 11/15 17/16 46/16 136/9
additionally [2] 20/16 135/16
address [3] 8/23 29/5 135/24
addressed [3] 26/23 27/5 105/12
addressing [1] 38/15
admits [1] 137/15
adopt [1] 10/12
advice [1] 44/21
advocated [2] 38/6 136/16
affect [3] 7/23 44/25 45/6
affiant [1] 93/14
affidavit [98] 7/23 7/24 7/25 8/7 8/9 8/19 9/12 11/22 12/10 13/24 15/9 22/8 22/10 22/18 26/9 26/10 26/15 28/19 31/17 33/4 34/13 35/2 35/14 35/17 36/4 36/13 37/22 38/22 39/1 39/4 39/7 44/1 44/10 45/4 46/20 47/22 48/3 48/7 49/12 49/18 50/14 58/22 59/6 59/14 59/22 61/12 62/13 63/8 63/16 64/12 66/15 66/21 66/23 67/7 67/13 67/17 67/19 68/7 69/24 70/2 70/7 70/11 70/18 71/2 71/11 73/12 73/24 75/22 78/5 81/15 81/21 84/4 85/4 86/22 89/2 91/1 93/7 94/1 94/3 94/18 98/8 98/14 100/14 101/19 101/22 105/10 106/5 109/10 112/12 113/3 115/6 115/19 119/19 120/10 127/6 127/14 127/18 130/6
affidavits [1] 51/16
after [35] 11/10 14/14 14/22 16/4 17/7 23/4 24/12 25/9 25/10 25/22 25/22 25/25 28/11 28/13 28/22 38/12 42/9 46/6 61/18 61/19 65/24 68/23 69/1 69/2 69/7 71/15 81/19 82/3 128/6 128/7 130/13 130/16 130/17 131/12 132/5
afternoon [2] 50/11 50/12
again [16] 12/3 15/9 33/8 43/9 68/21 82/10 88/3 99/20 100/5 102/8 110/12 116/18 120/7 121/3 136/1 138/17
against [20] 48/20 49/8 62/25 79/9 83/15 84/9 84/12 86/2 86/3 106/13 106/15 108/7 109/20 114/9 114/12 117/11 118/6 126/18 126/25 130/19
agent [88] 2/12 6/13 6/15 7/17 8/6 8/16 8/19 8/24 9/6 9/9 9/14 10/13 10/17 11/5 11/14 12/6 13/6 13/9 13/13 19/5 20/10 20/15 21/23 27/25 45/3 45/18 46/18 50/11 50/22 55/4 58/22 59/3 59/20 60/15 61/7 61/15 62/6 71/2 71/10 71/22 72/17 78/11 83/25 86/10 86/12 86/14 86/25 87/2 87/7 87/17 87/17 88/14 90/17 90/19 92/19 94/22 96/22 96/23 96/23 97/1 97/4 97/9 97/17 97/20 98/3 98/7 98/25 100/7 101/21 106/21 106/23 117/16 119/12 122/20 123/23 126/9 128/2 131/18 131/19 132/11 133/12 135/11 136/23 137/3 137/17 138/2 138/9 138/10
agent's [3] 116/11 120/16 132/14
agents [4] 18/15 21/13 46/21 87/15
ago [1] 68/21
agree [11] 9/22 49/7 62/8 69/2 83/21 108/3 114/8 118/13 129/2 129/13 139/25
agreed [3] 118/17 118/18 129/24
agreement [18] 16/3 16/12 16/17 16/25 28/10 47/13 56/18 58/3 82/13 85/15 85/17 100/20 100/21 100/23 116/19 130/18 132/5 132/6
agreements [4] 48/24 91/6 101/16 103/5
ahead [10] 23/9 27/7 33/24 62/4 65/7 69/20 111/21 118/4 119/2 122/15
al [3] 1/10 6/6 6/8
all [45] 13/16 18/7 19/20 20/18 22/23 23/9 27/7 42/2 43/16 45/15 47/14 49/10 56/2 59/10 66/17 71/9 83/4 88/12 88/14 88/17 99/22 105/12 107/19 107/21 109/9 111/3 111/12 111/13 111/19 111/25 115/2 115/6 116/2 116/3 116/3 116/5 116/22 119/17 124/2 124/17 129/18 129/20 130/18 133/14 138/20
allege [1] 66/20
alleges [1] 41/1
almost [1] 18/7
already [7] 84/17 89/14 116/11 121/19 123/13 128/13 128/24
also [29] 2/12 6/13 7/11 7/14 12/6 15/16 40/8 68/18 68/18 69/1 72/24 75/18 76/11 83/6 88/10 89/2 93/24 94/8 95/24 96/8 99/14 102/21 112/14 115/10 121/14 127/15 134/5 135/15 135/20
although [2] 28/19 72/11
Altomore [1] 107/4
always [2] 34/14 99/6
am [5] 13/7 13/12 55/5 95/19 123/10
AMERICA [3] 1/7 6/6 6/7
Aminoff [2] 2/16 6/23
among [1] 8/23
amounted [1] 54/11
Amy [3] 3/15 3/15 7/7
amyejacks [1] 3/18
analysis [4] 35/24 45/1 124/17 125/18
analyst [1] 17/17
and/or [2] 7/17 9/15
ANDRÉ [1] 2/6
Angelastri [17] 18/23 23/13 48/25 49/5 72/2 75/25 76/13 77/5 77/9 77/16 77/21 77/22 77/25 78/2 81/25 103/6 121/12
ANGELES [33] 1/16 1/24 2/10 2/18 3/6 3/16 6/1 14/5 18/9 19/16 23/11 24/20 46/12 51/4 51/7 53/11 53/13 55/10 63/4 65/25 66/4 68/24 72/10 72/14 80/9 84/24 84/24 85/10 85/11 88/15 119/13 130/4 131/13
Angelstari [1] 103/16
angry [2] 15/19 137/21
anonymous [1] 135/6
another [13] 11/3 29/1 33/1 33/12 37/24 58/22 59/20 69/15 71/5 88/19 118/14 126/5 132/2
answer [5] 47/14 80/21 80/22 117/17 122/15
Anthony [1] 107/19
anticipate [2] 11/19 139/22
any [59] 9/8 16/22 17/10 18/22 18/24 20/12 24/2 27/5 27/11 29/25 30/3 31/19 33/6 34/4 34/5 34/8 36/12 37/20 37/21 39/1 40/14 42/3 44/14 49/1 53/21 54/8 54/23 58/14 63/19 66/6 66/15 66/20 67/5 74/11 75/24 85/20 86/25 87/9 87/15 91/25 94/9 103/12 103/15 105/16 106/5 106/8 112/17 119/9 121/5 121/8 121/13 121/18 126/13 126/17 126/21 128/10 129/22 138/14 139/22
anymore [1] 31/12
anyone [7] 11/4 54/4 60/4 86/3 87/14 87/25 137/12
anything [15] 20/6 20/15 32/6 38/20 42/4 44/11 44/11 48/25 55/22 58/23 62/1 103/6 108/12 120/2 125/12
apart [1] 114/15
apparent [1] 29/24
apparently [3] 49/5 118/11 118/17
appear [6] 48/17 73/6 74/11 75/7 122/4 123/24
appearance [2] 7/14 9/24
appearances [4] 2/1 3/1 4/1 6/9
appeared [9] 28/16 41/25 43/15 44/3 64/6 73/17 73/19 77/18 125/21
appearing [1] 7/1
appears [6] 8/16 9/9 64/21 65/10 65/21 76/8
applicable [1] 44/18
application [1] 94/10
applied [10] 50/18 56/16 62/7 79/2 79/19 79/20 81/10 86/19 89/13 126/12
apply [1] 110/21
appreciate [1] 11/11
approach [2] 10/10 125/6
approached [2] 25/12 90/9
approaching [5] 22/6 26/22 27/9 34/7 121/16
appropriate [1] 8/12
appropriately [1] 36/24
approximately [8] 13/14 13/17 14/8 14/24 24/7 32/22 51/9 139/10
April [16] 14/8 21/8 60/9 60/11 62/11 81/19 98/18 114/11 131/2 131/3 131/4 131/6 132/23 133/1 134/7 134/19
are [32] 7/24 13/6 13/11 33/20 34/11 45/13 67/10 69/12 69/24 71/9 73/5 75/5 75/20 80/16 81/3 85/4 92/19 93/25 94/5 101/9 107/3 107/6 109/11 110/18 127/7 129/18 134/1 135/11 135/15 137/25 138/22 139/2
area [3] 9/5 98/10 138/5
areas [1] 13/19
argue [1] 118/19
argued [2] 135/18 135/20
argues [1] 83/10
argument [4] 28/25 29/3 82/9 82/20
arguments [2] 49/21 83/21
Ari [1] 7/6
ARIEL [2] 2/7 6/12
around [6] 18/3 21/7 25/24 32/14 48/9 68/21
arrange [1] 22/25
arranged [2] 74/13 74/16
arrest [1] 92/7
arrests [1] 53/11
as [108] 9/12 13/14 13/21 18/19 19/22 20/1 20/1 20/4 20/11 20/20 21/19 27/10 27/16 27/17 27/25 28/5 29/4 29/20 29/20 30/19 31/7 34/2 39/10 39/10 39/20 40/25 43/13 43/18 44/3 45/12 45/12 49/11 60/23 62/15 63/9 64/22 66/7 66/14 69/24 69/24 70/7 70/10 71/1 71/2 72/4 72/4 73/3 73/5 76/9 77/7 83/7 83/8 83/9 83/10 85/1 86/11 87/3 87/24 90/1 90/1 93/14 93/19 93/25 93/25 95/25 96/1 97/14 99/4 99/18 100/10 101/21 102/9 102/10 104/25 106/9 107/20 108/25

**A**

as... [31] 109/3 109/5 109/12 109/20 109/24 110/4 110/14 112/17 113/4 113/14 116/18 116/18 116/19 119/17 119/23 119/24 119/25 121/1 127/15 128/2 128/4 128/7 128/10 128/21 131/23 135/12 137/10 137/13 137/14 137/18 140/8
aside [3] 11/12 132/14 132/14
ask [23] 19/8 42/12 45/25 56/4 56/25 58/6 58/12 76/20 80/22 80/24 84/16 88/10 97/5 113/19 120/15 120/17 125/7 125/12 134/12 135/9 135/25 136/6 136/16
asked [17] 16/14 20/10 23/21 23/23 23/24 38/13 82/16 88/2 94/24 95/2 95/7 103/16 103/18 104/17 104/23 112/3 120/3
asking [4] 54/19 69/24 120/23 134/2
aspect [4] 41/5 41/7 122/12 122/22
assigned [8] 14/3 36/7 36/9 60/21 61/24 62/2 87/18 138/3
assignment [1] 13/8
assist [1] 120/17
assistance [1] 58/22
assistant [24] 2/8 6/12 14/11 14/15 14/21 15/1 15/4 15/7 21/9 21/23 22/5 36/9 37/15 37/21 38/7 44/21 45/5 45/20 58/23 59/25 60/16 60/19 80/24 137/18
assisted [1] 88/8
associates [2] 73/5 108/8
assume [10] 8/11 31/18 37/18 62/12 75/24 77/5 79/17 81/5 84/15 96/11
assumed [2] 95/11 96/9
at [138] 6/11 6/14 8/3 8/6 8/8 8/12 10/11 12/17 12/20 14/18 15/2 16/1 16/12 16/16 20/10 20/16 20/18 22/8 22/10 22/14 22/16 22/18 22/24 24/17 24/17 26/8 27/4 27/9 27/25 28/4 29/20 31/16 31/23 33/4 34/5 34/13 34/15 35/8 38/9 40/17 42/1 42/2 42/9 42/9 42/25 43/7 43/13 43/16 44/17 45/8 45/15 46/6 47/12 48/5 48/23 49/21 50/16 51/4 52/1 53/23 54/12 55/7 55/25 56/1 56/6 56/16 56/21 57/23 58/4 58/10 58/14 58/16 59/8 61/12 61/25 62/7 62/9 66/3 66/7 68/12 69/25 73/19 79/2 79/19 79/20 80/16 80/23 81/3 81/10 82/13 82/17 86/19 87/1 87/9 87/15 88/14 89/13 92/5 94/3 94/18 94/20 94/22 95/2 95/24 97/3 97/21 98/7 103/5 103/11 104/7 104/10 104/10 104/15 106/24 110/24 111/11 112/11 112/16 112/24 114/11 114/25 118/18 120/23 122/25 124/5 125/14 125/22 125/22 125/22 126/12 127/13 128/3 128/10 128/10 130/12 134/24 140/16 140/19
attaching [1] 61/15
attempt [1] 87/13
attempting [1] 83/7
attention [8] 76/3 97/13 100/24 101/1 101/6 101/10 101/19 102/4
attorney [26] 2/6 6/12 13/14 13/18 14/11 14/15 14/22 15/1 15/5 15/8 21/9 21/24 22/6 36/9 37/16 38/8 44/22 45/20 58/23 59/25 60/16 60/19 84/18 84/23 84/24 120/8
attorney's [14] 8/14 8/25 14/18 47/13 60/7 63/3 64/25 66/4 68/24 72/10 80/1 80/8 95/13 131/22
attorney's's [1] 131/13
attorneys [8] 2/8 23/2 33/20 37/21 45/5 80/22 80/24 124/1
Atwater [2] 10/14 10/19
audience [1] 6/16
auditor [3] 123/25 124/6 124/10
auditors [1] 23/2
August [20] 32/14 32/22 34/19 34/20 34/21 63/9 63/19 63/20 64/1 64/16 64/23 65/12 65/19 65/24 69/6 89/22 90/4 130/7 130/10 131/3
aunts [1] 41/13
AUSA [18] 6/12 6/16 16/7 17/9 17/12 36/7 36/13 36/14 38/5 46/4 49/14 50/23 59/19 61/7 62/2 118/23 133/3 137/19
author [2] 19/4 59/15
authority [1] 110/20
authorize [1] 111/22
authorizing [1] 94/11
authors [1] 59/16
available [5] 90/2 90/7 94/20 120/11 140/5
AVEIS [2] 2/8 6/12
Avenue [1] 3/21
aware [13] 8/20 34/15 47/22 61/16 68/18 74/5 75/18 75/24 76/11 81/4 95/16 113/9 131/10
away [3] 31/11 75/17 136/13

**B**

back [28] 12/17 24/16 26/5 26/6 26/7 38/9 42/9 44/6 49/24 50/13 50/14 51/14 51/16 54/2 54/10 66/4 70/21 72/7 89/21 111/4 112/9 120/16 122/1 132/9 136/1 136/1 139/12 139/14
background [3] 13/21 96/3 96/5
backing [1] 123/3
bank [1] 77/19
Bar [1] 13/11
base [1] 28/8
based [20] 6/13 11/22 12/3 17/8 20/5 22/3 25/16 42/16 42/23 43/9 62/12 65/14 68/22 75/6 85/13 86/11 114/13 114/19 115/8 115/24
basically [1] 72/25
basis [6] 10/7 16/15 35/14 37/12 40/17 85/17
be [128] 7/16 7/19 8/4 8/7 10/24 11/5 11/14 12/6 12/14 17/7 21/1 26/11 26/21 27/21 30/1 30/5 30/16 31/9 31/11 35/16 35/25 37/4 38/23 40/20 41/23 41/25 42/1 42/23 43/13 43/15 43/25 45/7 45/11 45/12 47/14 47/16 48/19 51/10 53/17 54/3 54/8 54/9 59/1 61/22 67/6 67/11 69/16 71/18 72/18 72/22 75/2 75/11 75/15 76/1 76/8 80/7 80/20 82/5 83/3 83/23 86/22 90/2 90/7 94/6 94/9 96/5 96/19 98/25 99/3 99/4 99/6 99/10 99/14 99/16 99/18 99/24 100/1 100/8 100/10 102/10 104/2 104/7 104/16 104/24 106/14 106/14 109/8 109/9 109/14 110/8 110/9 111/5 111/16 111/16 111/17 113/6 113/8 113/14 113/17 116/24 116/25 118/5 118/15 118/21 118/23 120/20 120/20 121/10 121/11 122/1 123/2 123/13 124/9 124/10 124/18 128/10 130/3 132/8 135/15 136/1 136/13 136/18 138/6 138/7 138/15 138/18 140/3 140/5
Beach [1] 3/11
became [7] 18/18 24/17 29/24 33/17 43/5 59/25 60/20
because [59] 8/4 10/8 10/11 11/3 22/7 24/21 28/21 29/8 31/10 32/18 32/25 33/17 39/3 40/5 44/3 45/16 49/20 54/2 54/6 55/18 56/22 57/3 57/7 61/15 61/25 62/2 62/11 62/14 62/16 65/21 71/19 74/20 76/20 78/23 80/18 82/12 82/17 83/4 86/11 88/8 91/17 91/18 93/14 102/11 102/21 104/10 106/24 109/18 110/19 111/2 111/18 112/2 112/11 113/20 122/10 130/24 131/18 134/19 136/18
become [5] 14/6 14/9 15/5 27/22 60/9
becomes [3] 40/19 84/17 84/20
becoming [1] 13/13
been [76] 7/22 8/1 9/12 11/10 12/3 12/10 15/20 17/17 17/21 24/16 25/8 25/18 25/19 25/19 26/17 26/18 27/3 29/6 31/1 35/17 38/11 42/8 47/23 48/21 48/23 49/16 53/5 53/7 56/2 57/10 57/10 58/21 59/19 59/21 61/19 61/19 61/25 65/10 65/12 65/21 67/20 68/14 71/11 71/16 73/7 78/23 79/25 80/19 82/16 83/9 85/22 92/23 97/14 98/3 99/13 102/16 102/22 102/23 102/25 103/4 104/4 104/5 108/2 108/25 111/2 113/4 113/20 114/9 115/1 115/22 119/6 121/22 126/3 128/7 132/6 138/18
before [36] 7/13 11/2 13/20 14/7 21/1 23/19 25/8 25/10 28/11 46/20 49/22 49/24 51/16 58/14 61/1 64/22 65/12 68/25 71/6 71/6 75/22 76/23 81/8 87/20 87/20 94/15 97/15 101/21 102/24 111/22 123/14 130/16 132/4 132/24 134/14 135/1
began [1] 28/12
begin [2] 7/15 11/2
beginning [2] 43/14 94/3
begins [1] 130/7
behalf [7] 6/11 6/23 7/2 7/6 7/10 7/12 20/7
behind [2] 67/9 132/9
being [30] 13/18 13/21 16/2 19/5 19/25 24/21 25/12 25/12 25/14 33/12 35/24 41/17 48/6 50/24 55/2 82/7 94/5 96/10 96/19 111/13 118/1 124/7 125/22 125/22 126/16 127/15 127/16 127/16 131/23 135/2
belief [5] 22/17 65/14 71/14 115/25 120/9
believe [53] 11/14 14/18 16/16 17/13 17/23 18/8 19/3 24/7 24/23 25/8 29/15 31/4 32/4 35/3 35/7 37/6 37/9 39/13 39/20 44/18 48/19 49/6 49/10 50/1 60/12 61/18 63/10 70/12 70/15 71/7 72/5 80/7 85/14 85/15 87/2 89/20 90/24 91/19 91/24 94/21 96/25 97/15 98/11 100/19 102/10 106/21 107/11 108/12 111/24 114/18 117/19 120/20 133/2
believed [6] 35/25 71/4 90/23 120/20 125/8 137/4
believes [1] 82/12
believing [1] 41/20
Bell [1] 87/5
benefit [2] 16/10 138/2
Berger [49] 30/13 30/20 30/22 30/25 31/3 31/10 31/22 32/25 33/4 43/4 43/4 43/19 44/7 44/8 47/25 54/9 65/4 65/5 67/24 68/1 68/4 76/18 84/1 84/5 102/16 105/21 108/22 113/21 113/21 115/10 115/17 121/21 121/21 121/24 122/4 122/5 122/11 122/17 123/4 123/4 123/10 124/19 125/10 127/9 127/13 131/21 132/1 133/5 133/5
Berger's [4] 31/6 110/19 114/13 115/8
Bertrand [10] 87/17 96/22 96/23 97/1 97/5 97/9 97/25 98/3 98/7 119/12
Bertrand's [2] 19/5 98/25
best [10] 18/21 40/19 67/25 80/20 96/13 96/15 106/23 112/4 112/7 112/17
betrayed [2] 55/2 57/10
better [6] 32/17 34/8 93/17 125/10 140/8 140/11
between [15] 18/3 19/9 26/14 26/24 31/11 37/21 55/19 68/1 71/24 98/18 105/17 105/18 119/22 121/21 138/13
beyond [2] 11/16 80/23
binder [3] 56/6 133/23 134/24
Bingham [1] 4/4
bingham.com [2] 4/6 4/7
bipolar [3] 20/16 21/2 21/3
BIROTTE [1] 2/6
bit [4] 61/6 70/23 80/19 118/2
blue [3] 115/13 115/14 115/17
Blvd [2] 2/21 4/5
body [6] 20/7 113/20 114/13 119/8 119/14 119/24
bond [1] 7/6

## B

bone [2] 89/11 110/8
book [4] 59/3 97/15 97/16 139/13
books [1] 124/11
both [5] 56/11 67/3 88/15 130/22 131/17
bother [3] 55/16 58/6 86/25
BOWMAN [12] 2/7 6/10 15/1 15/5 35/6 36/8 38/8 44/22 59/19 60/16 60/18 60/20
box [1] 109/19
brand [2] 89/3 89/8
brand-new [2] 89/3 89/8
breached [1] 28/21
break [4] 68/19 68/20 80/24 112/10
brief [1] 136/18
briefly [1] 126/6
bring [2] 101/1 125/24
bringing [5] 70/13 70/14 101/6 101/9 112/15
broad [1] 22/11
broker [10] 39/11 39/13 74/8 74/13 74/16 74/17 75/3 75/4 122/19 123/23
brokerage [1] 77/19
brokers [3] 23/1 33/20 42/3
brought [3] 27/2 91/17 108/23
Brunoehler [1] 7/10
Bugudski [1] 122/20
business [4] 52/25 53/2 68/19 108/8
but [166]
buy [2] 75/6 75/11
buying [1] 75/13

## C

C.I [1] 109/12
c.w [3] 48/21 102/16 108/22
CA [7] 2/18 2/21 3/6 3/11 3/16 3/21 4/5
Cacioppi [4] 20/9 86/14 86/16 87/3
CALIFORNIA [7] 1/2 1/16 1/24 2/10 6/1 13/11 46/12
call [14] 8/18 9/20 10/17 14/12 24/19 48/2 68/10 68/17 68/22 115/12 122/25 132/22 133/4 134/8
Callahan [4] 3/20 3/20 7/9 7/10
called [13] 16/13 20/9 21/7 69/23 71/5 73/18 73/20 79/14 97/4 115/14 119/18 122/11 133/11
calling [1] 50/20
calls [19] 20/7 24/8 25/20 27/18 31/12 32/16 32/23 32/24 43/5 43/18 73/16 74/20 75/7 84/1 84/5 119/15 119/24 122/16 126/15
came [13] 15/15 61/23 64/24 87/19 94/14 112/9 117/9 121/22 122/1 122/17 125/11 131/21 131/22
can [52] 12/14 15/4 32/18 32/19 33/21 34/4 34/4 36/2 37/18 40/20 43/13 48/14 58/25 59/4 63/20 63/22 70/23 76/20 80/16 82/2 99/21 100/5 100/23 101/18 109/19 116/16 116/20 117/17 120/16 129/7 129/9 129/11 129/13 129/14 129/15 134/12 134/12 134/15 136/6 137/16 137/25 138/7 138/15 138/19 139/12 139/13 139/24 139/24 139/25 140/3 140/7 140/12
can't [14] 17/18 30/4 31/18 55/1 80/15 80/15 98/11 105/13 110/19 111/2 112/10 115/23 127/11 128/11
candor [1] 50/5
capacity [1] 72/18
care [1] 75/5
career [1] 95/14
Carlson [1] 3/10
carrying [2] 48/21 102/17
case [62] 6/13 7/13 8/13 8/15 9/9 9/10 9/11 12/17 21/7 21/7 24/3 26/17 29/9 30/14 30/15 37/13 39/16 39/19 40/17 41/11 41/14 41/15 43/25 47/25 50/19 53/8 58/20 59/24 60/17 61/8 61/10 61/22 61/24 62/1 62/3 62/14 63/9 72/20 78/7 79/3 79/24 81/8 87/18 90/19 95/16 96/23 104/14 106/6 110/20 114/9 120/24 122/12 128/13 132/3 134/22 138/1 138/7 138/22 139/5 139/8 139/11
cases [7] 26/18 41/16 43/1 60/8 60/13 95/13 127/3
caught [13] 78/23 79/5 80/1 80/8 80/13 80/17 80/18 81/3 81/5 83/1 85/22 113/10 113/15
caused [1] 118/19
ceased [1] 60/8
cell [3] 28/14 35/18 41/25
cellphone [1] 111/8
cellular [1] 49/5
Center [1] 3/11
CENTRAL [1] 1/2
CEO [3] 107/5 107/15 108/9
CEOs [2] 52/21 53/2
certain [15] 10/8 10/12 51/19 51/21 53/4 55/25 56/2 72/22 73/2 73/5 108/21 110/18 123/18 127/14 127/15
certainly [14] 26/20 54/8 57/11 57/14 58/1 58/2 67/5 73/10 77/10 96/3 98/18 98/20 107/4 132/22
certify [1] 141/3
chance [1] 80/21
change [1] 139/23
characterize [3] 18/10 18/14 19/23
characterized [1] 52/16
charged [3] 30/16 55/17 125/22
charging [1] 114/23
Charles [1] 59/20
cheating [1] 85/22
check [3] 16/19 55/22 109/19
checked [4] 16/15 17/15 17/19 55/24
chose [2] 90/13 95/6
chosen [1] 99/8
Chronologically [1] 59/23
chronology [1] 132/23
CI [1] 112/18
Circling [1] 44/6
circumstances [1] 46/2
cite [1] 67/17
claim [5] 56/19 62/13 67/19 71/22 126/9
claimed [1] 104/16
claims [1] 83/13
clarify [1] 117/9
clear [14] 24/17 26/16 33/18 42/23 43/5 61/22 69/16 75/2 82/19 86/23 104/24 122/17 130/3 131/18
clearly [1] 109/22
clerk [1] 123/20
clerk's [1] 56/7
client [1] 139/24
Cline [3] 133/4 133/4 133/5
close [8] 23/11 79/11 79/14 106/13 106/25 107/20 108/8 122/5
closed [1] 41/25
closes [1] 106/23
closest [1] 111/14
Cloverfield [1] 4/5
CMP [1] 66/13
co [1] 131/10
co-defendants [1] 131/10
Code [2] 39/10 141/4
collar [1] 14/4
collecting [1] 125/16
color [1] 97/1
come [13] 11/12 12/17 13/22 14/12 42/9 105/8 111/16 113/25 124/5 128/15 136/1 139/12 139/14
comes [5] 67/23 69/7 120/4 136/17 138/7
coming [1] 43/8
commenced [1] 15/14
comment [6] 6/14 11/13 15/24 16/6 16/7 41/19
comments [6] 9/19 11/11 12/14 42/16 49/17 132/25
committed [1] 120/7
committing [10] 79/3 79/21 79/23 80/6 82/8 82/13 113/9 126/2 132/6 132/16
common [1] 110/10
communicate [1] 137/15
communicated [1] 136/22
communicating [1] 122/24
communication [1] 111/9
communications [2] 67/11 94/11
companies [9] 52/21 63/13 63/15 69/18 70/5 71/2 74/1 125/23 135/2
company [8] 31/9 64/6 64/8 69/23 70/1 70/10 70/15 71/5
compare [1] 72/24
compared [2] 20/21 91/19
comparing [1] 124/19
compartmentalization [3] 112/9 112/13 112/17
compartmentalize [1] 121/7
compartmentalized [7] 33/10 54/7 72/21 108/18 112/11 122/12 123/17
compartmentalizing [1] 108/16
compatriates [1] 125/19
complaint [1] 135/6
complaints [1] 134/25
complete [16] 12/10 17/13 24/24 38/17 49/16 93/6 93/8 93/10 93/15 94/23 94/23 96/5 117/3 134/11 136/17 137/24
completed [1] 136/8
completely [1] 86/16
completes [1] 139/5
compliance [3] 38/15 44/18 46/4
complicated [1] 10/12
concealed [2] 52/6 52/14
concealing [1] 43/23
concede [1] 8/19
concedes [1] 9/2
concern [3] 35/19 41/22 116/13
concerned [2] 125/4 125/6
concerns [1] 34/5
conclude [2] 24/6 122/10
concluded [2] 46/15 140/19
concluding [1] 108/9
conclusion [3] 83/3 94/5 99/18
conclusions [3] 49/15 49/18 49/21
concrete [1] 16/9
conduct [8] 15/16 16/19 25/11 30/16 47/19 50/2 67/5 104/15
conducted [1] 72/6
Conference [1] 141/8
conferring [1] 46/3
confessed [1] 30/17
confession [1] 24/24
confidence [1] 9/4
confidential [1] 109/13
conformance [1] 141/7
confronted [4] 82/25 83/1 90/11 111/14
connected [1] 127/16
connection [22] 9/10 26/13 26/17 26/18 44/10 44/22 50/2 55/19 93/6 94/17 95/3 95/9 95/18 95/21 96/23 100/25 105/4 119/13 120/24 124/3 133/1 133/20
connections [1] 103/1
conscious [2] 38/3 38/7
consciously [1] 38/10
consensual [4] 20/7 43/18 84/5 122/16
consensually [3] 24/8 25/20 32/23

**C**

consequence [1] 85/20
conservative [1] 12/12
consider [6] 20/11 20/20 27/9 27/13 86/10 108/12
considerations [1] 121/14
considered [5] 9/1 27/16 34/1 86/10 108/4
consisted [3] 46/21 51/9 119/19
conspiracy [18] 22/12 22/19 33/18 40/15 43/1 43/21 49/3 67/9 73/1 73/8 84/10 89/19 109/4 109/24 111/9 112/10 121/15 121/23
conspirators [3] 24/3 111/18 115/3
constraint [1] 127/5
constraints [3] 110/19 110/21 127/8
consultant [2] 39/20 40/5
consulting [1] 39/21
contact [11] 20/2 20/4 20/14 68/25 86/25 87/5 87/9 87/13 87/15 88/17 99/13
contacted [1] 88/19
contacts [2] 17/11 83/12
contained [2] 96/5 96/19
context [3] 70/17 91/8 105/6
continue [3] 35/18 43/25 113/14
continued [6] 1/19 3/1 4/1 27/18 28/12 49/2
continuing [2] 102/22 113/11
contours [2] 7/23 40/8
contradict [1] 120/23
contrasted [1] 30/19
contributing [1] 121/13
contributors [1] 59/17
control [1] 64/6
controlled [3] 51/20 65/17 76/11
conversation [8] 14/14 21/23 37/3 76/8 86/12 86/24 124/9 131/19
conversations [3] 31/15 32/7 67/23
conviction [2] 49/4 107/16
convictions [2] 37/13 107/18
cook [1] 124/11
cooperate [15] 22/7 28/2 35/23 47/16 48/19 49/7 62/25 78/20 83/3 84/14 86/3 118/15 125/14 127/23 129/3
cooperated [19] 20/6 28/20 36/21 37/4 37/7 37/10 37/11 37/23 47/23 50/19 50/24 56/17 61/10 79/7 80/11 81/6 85/23 101/23 115/23
cooperates [1] 83/1
cooperating [12] 28/22 43/4 54/4 72/12 100/10 102/10 109/8 111/5 113/11 130/16 130/19 132/8
cooperation [57] 8/18 8/25 10/8 16/8 16/16 17/1 24/25 28/10 37/12 45/4 46/19 46/21 46/22 46/24 49/11 50/21 50/22 53/10 53/24 56/18 56/20 57/18 69/3 88/7 91/1 91/14 92/7 92/9 92/11 96/9 99/12 100/1 100/9 101/2 101/6 101/9 101/11 101/12 101/15 102/4 104/1 104/12 104/12 105/1 105/5 105/11 111/13 116/25 119/18 119/23 119/25 127/2 127/24 128/17 128/21 130/17 132/15
cooperator [60] 16/20 21/1 22/4 24/8 25/15 27/5 27/10 27/11 27/17 27/21 28/6 28/15 28/21 29/1 29/19 29/22 29/22 29/25 30/3 30/3 30/6 32/16 33/6 34/3 34/9 34/11 35/16 35/25 36/24 36/25 39/2 41/23 50/25 54/17 63/10 73/4 74/8 74/20 79/24 84/20 85/1 86/11 91/25 100/2 104/2 109/21 113/14 119/25 120/21 121/5 121/6 121/17 121/19 122/17 125/10 125/16 128/10 128/23 129/1 135/13
cooperator's [1] 67/1
cooperators [2] 31/12 105/12
copy [3] 48/11 94/16 100/21
corners [1] 93/25
corporate [3] 13/14 13/18 14/4
corporation [1] 106/6
correct [213]
correct's [1] 135/7
correctly [1] 39/7
corroborate [2] 53/9 115/16
corroborated [5] 53/6 53/7 53/9 54/14 115/10
corroborates [1] 137/2
corroborative [1] 132/12
could [55] 8/7 9/12 20/22 21/1 21/2 21/3 24/21 26/11 27/20 33/22 34/8 34/10 35/15 35/25 36/24 39/2 39/13 43/15 51/10 54/5 65/11 73/3 73/4 90/9 90/11 90/12 92/1 95/2 95/5 96/1 97/4 97/21 100/1 100/10 102/10 103/24 104/2 108/7 108/10 108/19 109/9 110/21 111/15 114/18 115/4 115/6 115/16 116/11 120/11 121/18 122/20 123/5 125/15 127/24 136/14
couldn't [14] 31/11 35/23 37/1 44/4 51/10 89/3 108/17 111/16 113/6 115/3 122/12 123/2 127/9 128/7
counsel [7] 2/1 6/9 6/11 63/21 99/21 102/20 129/24
counter [1] 115/12
couple [3] 46/16 47/5 117/9
course [2] 38/11 114/25
court [23] 1/1 11/15 11/23 14/7 16/13 41/19 42/12 42/16 48/12 56/5 63/19 63/21 64/4 65/14 70/21 88/10 94/9 95/17 116/12 120/17 132/21 134/6 138/2
court's [6] 6/14 9/19 11/11 11/13 12/14 101/1
Courthouse [2] 1/23 2/9
cover [2] 138/18 138/19
covert [5] 119/10 119/14 121/17 124/20 125/7
CR [4] 1/9 1/9 6/5 6/7
CR 13-62-SVW [1] 6/7
credibility [1] 137/17
credible [1] 96/19
crime [9] 18/20 29/17 29/17 82/8 107/2 108/9 113/10 120/7 132/2
crimes [8] 13/9 78/20 79/21 79/23 80/6 82/13 126/2 132/16
criminal [15] 15/16 17/8 25/4 33/21 40/7 41/24 47/19 50/2 95/13 120/23 125/19 135/2 138/1 138/22 139/11
criteria [12] 109/7 109/10 109/12 109/14 109/20 110/15 111/25 112/3 112/12 112/13 112/16 112/18
cross [9] 5/3 8/11 11/22 50/8 50/9 75/18 75/25 92/17 117/10
cross-examination [4] 50/8 50/9 92/17 117/10
cross-examine [1] 8/11
cross-training [2] 75/18 75/25
crossed [2] 120/22 129/25
CSR [2] 1/23 141/13
culled [1] 17/25
culpable [2] 22/11 121/15
cumulative [1] 38/19
current [3] 13/8 34/9 57/12
currently [4] 47/18 57/8 67/6 138/3
Curtis [1] 7/8
custody [5] 6/24 7/2 7/4 35/15 89/25

**D**

D.C [2] 13/10 98/10
Dale [1] 7/12
Dan [1] 7/1
Daniel [1] 4/3
daniel.saunders [1] 4/7
date [12] 15/9 19/2 35/1 60/2 63/6 63/18 64/3 64/7 65/13 68/22 131/11 141/10
dates [9] 18/2 98/11 103/12 103/23 104/4 104/22 105/2 105/7 130/23
day [1] 139/23
days [1] 133/2
deal [32] 7/16 8/21 8/22 15/21 15/25 16/6 16/11 25/13 28/22 31/1 31/4 41/8 43/7 57/18 57/25 58/7 66/8 66/10 66/14 66/18 69/4 71/7 82/6 82/17 104/11 112/14 121/25 122/2 123/3 127/8 130/6 130/10
dealing [9] 28/19 74/9 93/15 94/14 98/22 99/1 102/3 102/8 136/16
dealings [2] 130/13 130/13
deals [21] 24/10 24/10 24/11 24/16 24/17 48/22 66/15 66/25 67/2 67/3 67/8 67/10 67/12 67/13 67/16 67/20 68/15 102/17 102/22 104/12 127/10
dealt [5] 36/23 84/17 95/13 103/18 137/6
debate [1] 80/20
DEBORAH [2] 1/23 141/13
DeBretteville [2] 3/10 7/6
debriefed [1] 61/4
December [6] 6/14 11/13 60/8 60/13 60/22 71/25
decided [4] 33/1 88/17 88/21 112/8
deciding [2] 34/2 118/2
decision [3] 38/3 38/7 45/3
decisions [1] 114/23
declaration [9] 8/8 11/8 11/17 11/23 13/23 70/20 97/10 97/25 99/1
defendant [7] 6/19 10/6 22/15 22/21 22/22 29/24 78/7
defendant's [2] 101/1 101/2
defendants [12] 1/11 2/14 3/3 9/8 9/17 47/5 53/15 62/3 117/25 118/1 118/19 131/10
defender's [2] 97/15 107/8
Defenders [1] 2/17
defense [8] 8/11 9/21 11/19 12/18 113/9 117/24 120/9 134/23
defer [1] 35/6
define [2] 128/17 128/21
defined [1] 64/13
definitions [1] 128/22
delay [1] 107/13
deliberately [2] 104/6 105/4
deliver [1] 123/5
demand [1] 32/19
demonstrated [3] 82/22 89/14 89/17
departure [2] 16/8 37/17
Depends [1] 77/1
describe [7] 39/1 66/25 67/3 67/5 105/7 109/24 113/23
described [13] 7/18 9/7 21/19 39/4 39/6 49/11 54/6 73/11 81/15 107/20 109/3 115/19 117/21
describing [2] 109/5 110/14
description [2] 65/16 112/17
desirable [1] 28/1
detail [4] 18/14 19/23 66/18 91/23
detailed [5] 18/17 18/18 19/25 73/5 136/21
details [2] 52/23 83/5
determination [4] 28/4 28/8 93/19 124/18
determined [1] 27/22
determining [2] 100/1 120/19
did [147]
didn't [117] 11/7 13/22 24/2 24/6 26/15 28/16 28/18 29/3 29/21 31/14 31/20 31/21 33/22 34/8 34/9 34/10 34/13 36/16 38/14 39/1 39/12 39/12 40/8 40/14 40/21 41/3 47/4 48/1 49/21 49/23 50/4 50/24 51/13 53/7 53/8 53/9 53/9 53/21 53/23 54/1 54/5 54/10 54/11 54/13 54/18 54/23 55/16 55/19 55/20 55/22 56/1 56/22 56/25 57/3 58/6 58/12 58/13 62/6

## D


didn't... [59] 62/22 70/1 71/19 73/6 74/11 74/13 75/2 75/7 75/8 75/8 80/2 86/10 86/22 86/25 87/5 87/9 87/15 87/20 88/22 88/23 88/25 88/25 90/22 91/25 92/5 94/25 96/14 100/13 100/17 101/22 101/24 102/10 104/7 105/6 105/7 111/7 112/2 113/3 113/16 121/18 121/19 123/24 124/19 125/12 125/16 125/24 126/17 127/7 127/21 127/22 128/15 129/20 129/22 130/24 130/25 131/1 131/22 137/9 137/15
different [11] 22/23 24/1 33/19 40/20 41/21 43/7 43/7 50/22 116/7 119/25 129/2
differently [1] 128/17
difficult [4] 45/7 45/9 45/9 45/11
diligence [1] 46/3
diminishing [1] 128/12
direct [15] 5/3 6/20 11/6 11/7 11/16 11/24 12/11 13/2 39/12 94/21 100/24 101/19 113/17 120/16 124/25
direction [2] 31/23 128/3
directions [5] 20/23 21/4 28/17 43/16 122/18
directly [3] 32/16 76/13 93/9
disagree [1] 83/21
disappointed [1] 120/6
discharged [1] 138/15
disclose [5] 48/3 49/14 49/18 88/25 104/17
disclosed [2] 49/10 56/1
disclosure [2] 91/15 93/17
disclosures [1] 54/11
discrete [1] 43/10
discuss [4] 9/8 21/25 36/6 40/20
discussed [11] 15/18 28/9 35/17 36/17 37/19 38/6 38/13 38/13 70/4 101/16 140/6
discussing [3] 36/24 69/17 108/25
discussion [7] 12/19 21/13 22/5 36/20 37/20 38/4 137/16
discussions [5] 36/12 55/1 67/1 87/19 116/21
dishonest [3] 7/22 91/18 113/5
dismissed [1] 138/8
disposition [1] 58/7
dispositive [3] 21/1 34/6 34/13
dispute [2] 117/22 118/12
disregard [1] 7/18
disruptive [1] 33/21
distinct [1] 83/1
distinction [1] 119/22
district [14] 1/1 1/2 1/5 9/3 56/10 63/18 64/4 65/14 84/25 93/16 93/18 93/24 95/17 99/14
DIVISION [1] 1/3
divorced [1] 111/2
do [99] 8/4 9/17 10/23 11/19 17/15 18/2 18/5 18/21 19/1 19/4 20/5 20/24 25/13 27/13 33/4 34/18 34/22 36/2 39/15 40/7 41/13 42/4 42/7 42/10 46/22 46/22 47/24 48/7 50/1 52/12 53/18 53/23 55/9 55/15 55/20 60/1 62/1 66/20 66/25 67/2 70/24 73/22 73/22 85/12 87/20 87/20 93/3 94/8 94/12 94/13 97/17 98/2 101/3 101/21 102/6 102/7 102/12 102/18 103/9 103/10 105/4 105/10 109/11 109/16 109/17 109/25 110/1 110/17 111/15 112/12 112/16 112/21 115/11 116/2 116/12 116/16 117/14 117/18 121/14 122/13 125/17 126/5 127/21 128/18 128/24 131/1 134/10 134/12 136/2 136/2 136/2 138/6 138/7 138/16 138/21 138/24 139/12 139/24 140/3
document [3] 94/19 97/22 99/11
documents [1] 129/11
does [11] 8/5 8/19 9/18 16/25 17/2 17/3 35/5 45/6 60/4 120/2 123/12
doesn't [13] 10/3 27/15 42/4 45/22 80/18 84/21 104/11 112/1 112/9 114/10 115/2 122/4 137/15
doing [24] 24/16 24/17 39/14 41/8 47/18 49/23 54/18 57/8 58/11 67/20 68/14 74/10 79/17 79/25 80/19 83/20 87/8 96/2 113/23 122/17 124/1 125/25 128/3 132/9
dollar [1] 24/11
dollars [2] 30/5 110/20
don't [92] 8/21 9/22 9/24 10/19 11/4 21/22 31/5 31/18 37/6 37/9 39/19 39/19 40/7 41/8 42/18 45/5 45/17 45/19 52/15 52/22 53/3 53/10 53/12 53/20 56/19 58/4 60/2 63/6 63/9 63/11 66/6 66/12 66/17 66/20 66/22 67/4 67/4 70/3 70/3 70/4 70/12 70/14 73/19 73/19 74/9 75/25 76/6 79/12 80/3 80/5 82/1 83/23 87/8 87/17 91/22 91/24 97/12 98/15 98/20 99/6 100/19 100/24 103/1 103/11 103/15 103/18 106/16 108/3 111/21 111/21 111/24 112/2 113/19 113/25 114/23 116/13 116/19 117/19 121/3 126/23 127/1 130/23 130/25 131/11 134/10 134/11 135/24 135/25 137/12 138/21 139/14 139/22
done [15] 17/21 24/9 24/10 24/24 24/24 38/12 47/18 61/19 67/2 67/3 69/9 107/17 119/4 123/15 124/4
dormant [2] 65/10 65/22
double [3] 120/22 129/25 137/6
double-crossed [2] 120/22 129/25
Doug [10] 39/11 39/13 74/8 74/17 75/4 75/8 75/11 75/13 122/19 123/23
Doug's [1] 75/9
down [12] 103/12 103/15 103/21 103/22 104/3 104/13 104/22 105/2 105/11 110/7 120/4 136/17
downward [2] 16/8 37/16
draw [4] 97/13 99/19 102/4 119/22
Drive [1] 3/11
due [1] 35/24
Dunn [2] 7/12 7/14
duplicitas [1] 82/7
duplicitous [2] 82/11 82/14
during [8] 15/7 15/13 49/1 70/8 103/17 117/9 130/18 132/14
Dwight [1] 7/10


## E


e-mail [1] 4/6
each [12] 22/19 26/25 34/14 43/7 43/10 45/11 48/20 48/20 102/15 105/8 106/13 109/19
earlier [13] 8/14 26/13 30/17 32/14 37/13 37/24 41/19 51/3 61/10 62/2 63/2 74/7 91/20
early [2] 18/17 43/17
earthlink.net [1] 3/23
East [2] 2/17 3/16
echelon [1] 22/19
economic [1] 13/9
EDNY [1] 18/8
Edward [4] 2/20 2/20 7/3 139/21
effect [10] 41/13 41/20 57/9 57/17 75/5 86/18 87/3 120/22 124/15 133/6
efforts [1] 74/5
Eight [1] 34/23
either [8] 18/8 36/13 37/6 37/9 46/4 117/11 126/23 131/12
elicit [1] 11/15
else [5] 20/14 75/25 86/3 114/22 126/1
email [5] 3/8 3/13 3/18 3/23 61/15
emailed [3] 16/14 17/13 100/22
emanated [1] 18/6
emphasis [2] 13/19 135/6
employ [1] 34/2
employed [1] 13/13
enabled [1] 33/16
end [2] 9/13 124/5
ended [1] 113/1
Endurance [8] 64/9 64/13 65/10 66/5 66/16 74/2 122/19 128/14
Endure [1] 63/12
enforcement [5] 9/3 9/7 17/11 20/5 47/24
engage [2] 13/19 17/20
engaged [5] 17/7 28/23 47/23 118/9 120/19
engaging [3] 28/11 54/3 120/22
enough [3] 91/11 91/13 91/20
ensure [2] 38/15 46/4
ensuring [1] 44/22
enter [1] 20/18
entered [2] 34/15 130/17
enterprise [4] 33/21 41/24 43/20 107/15
entirely [1] 104/14
entities [1] 65/17
entitled [1] 141/6
especially [2] 12/13 124/25
essence [1] 120/14
essentially [1] 120/5
establish [1] 58/25
established [1] 58/21
estimate [4] 11/3 12/13 12/13 48/9
et [3] 1/10 6/6 6/7
evaluate [2] 27/11 121/4
evaluated [2] 99/15 108/7
evaluating [5] 27/16 99/11 100/9 104/1 109/8
evaluation [7] 24/5 27/19 96/18 99/25 100/8 120/19 121/5
evasion [1] 57/22
even [17] 21/1 25/14 28/14 32/14 38/10 38/10 43/23 49/3 55/16 61/19 73/18 100/20 104/23 107/1 108/9 121/11 128/6
event [3] 63/8 63/11 82/3
events [1] 119/20
eventually [1] 33/23
ever [5] 23/21 36/20 66/12 120/3 120/3
every [5] 47/16 95/16 113/18 122/22 123/25
everybody [1] 140/12
everything [4] 23/2 25/4 44/5 126/1
evidence [25] 7/19 8/5 29/9 32/17 33/11 39/13 42/3 67/25 72/22 73/4 75/9 83/14 84/9 96/13 96/15 105/16 106/9 122/21 125/16 126/13 126/15 126/17 126/21 126/24 127/2
EVIDENTIARY [1] 1/19
exact [3] 60/2 116/9 130/23
exactly [4] 8/21 33/17 39/15 55/1
examination [13] 9/13 10/13 11/20 13/2 48/13 50/8 50/9 92/17 117/7 117/10 126/7 135/10 136/9
examinations [1] 11/5
examine [2] 8/11 9/18
example [9] 26/25 29/4 45/2 48/20 51/20 74/12 76/9 77/7 102/14
examples [3] 39/11 106/22 106/23
except [1] 47/5
exception [1] 45/17
excluding [1] 36/13
exclusion [1] 23/6
excuse [4] 17/9 20/1 41/15 94/22
execution [1] 36/4
exhibit [9] 56/6 59/4 97/14 97/14 97/20 101/19 133/18 133/22 134/4
exhibits [4] 56/6 59/3 97/16 107/11
existence [1] 62/9
existing [1] 121/20
expected [4] 47/14 121/11 124/8 135/22
experience [3] 42/23 43/9 92/25
explain [1] 33/4
explained [1] 52/4
explore [1] 94/19

**E**

expose [4] 54/19 121/17 125/12 125/15
exposed [3] 113/20 126/13 126/21
exposing [2] 34/7 126/10
exposure [1] 57/23
Express [1] 107/5
expressed [4] 15/19 58/9 137/13 137/14
extent [14] 47/7 73/10 74/7 79/8 79/10 80/12 81/7 92/11 99/11 101/2 104/25 115/1 129/21 129/23
eye [1] 24/25

**F**

face [2] 31/15 31/15
face-to-face [1] 31/15
facially [1] 9/12
facing [1] 121/6
fact [31] 9/2 21/3 24/2 28/22 32/17 34/25 35/15 35/17 35/22 36/13 36/21 37/3 37/23 48/3 70/10 78/20 83/14 92/3 94/3 94/8 96/22 97/8 102/23 103/15 108/7 109/23 111/14 111/16 114/8 115/1 128/1
factor [5] 35/24 86/13 86/14 89/7 91/12
factors [9] 20/25 34/1 34/12 57/13 62/21 120/21 121/1 121/4 137/5
facts [11] 28/8 28/10 93/6 93/8 93/11 93/15 93/19 93/25 94/4 94/9 111/20
factual [3] 16/15 40/17 85/17
failed [1] 105/4
failure [1] 9/8
fair [4] 92/12 119/17 124/18 128/19
fairly [1] 18/17
faith [5] 9/4 45/17 45/22 71/14 120/7
falsely [1] 123/4
familiar [5] 36/3 92/19 93/4 93/11 95/12
family [2] 41/12 138/4
far [8] 12/14 21/5 29/20 38/12 69/24 90/1 122/11 137/3
favorable [4] 8/21 8/22 28/22 58/7
Fax [4] 3/7 3/12 3/17 3/22
FBI [22] 2/12 6/13 6/15 13/6 13/13 14/2 17/15 17/21 17/22 18/9 19/1 20/14 25/17 33/19 97/2 97/9 104/14 120/8 121/22 131/19 132/11 138/3
FBI's [1] 98/22
February [1] 139/15
Federal [1] 2/17
feeling [2] 49/16 55/2
felon [2] 78/15 78/18
felons [1] 78/20
felt [4] 57/9 70/8 132/7 137/7
few [5] 24/14 35/14 42/11 42/13 57/24
fides [2] 89/11 110/8
figured [1] 57/19
figures [2] 77/10 108/9
file [12] 7/8 7/11 11/7 17/13 21/9 94/23 94/23 94/24 94/25 96/6 123/20 134/19
filed [8] 11/10 12/9 56/23 61/17 62/11 88/11 133/20 134/23
files [4] 98/22 98/25 99/4 106/9
filing [1] 6/19
filings [1] 6/18
finally [1] 110/18
finance [2] 123/7 127/6
financial [2] 51/17 51/19
find [2] 28/1 54/13
finding [1] 7/21
fine [2] 140/10 140/14
finish [5] 42/13 42/21 136/4 139/11 140/15
finished [1] 63/23
finite [1] 83/10
Finnigan [1] 87/17
firm [1] 13/22
first [32] 8/4 9/14 9/17 14/2 14/6 14/9 17/7 27/13 27/15 32/4 49/19 61/19 63/8 63/11 63/18 64/3 65/15 66/16 67/15 72/24 75/13 84/17 93/4 95/22 102/9 109/21 117/4 117/11 130/6 130/9 131/21 131/21
Fischer [28] 7/23 8/2 9/13 26/10 37/5 38/23 44/11 46/5 59/6 70/9 94/9 99/15 99/19 99/24 100/7 100/13 101/10 103/2 103/21 103/24 104/25 107/25 108/2 108/3 110/16 111/13 111/20 112/3
fits [1] 42/5
five [8] 42/9 56/20 76/7 92/4 99/15 99/25 100/9 103/25
five-level [2] 56/20 92/4
five-year [2] 100/9 103/25
flexible [1] 139/17
Flipping [1] 68/8
Floor [1] 3/6
Florida [1] 7/11
flowed [1] 23/2
focus [2] 67/5 70/9
focusing [2] 18/13 116/10
folks [1] 108/18
follow [5] 20/22 21/4 28/16 34/10 124/20
followed [1] 21/12
following [2] 21/5 49/4
footnote [6] 66/24 70/3 104/11 104/11 104/13 134/25
foregoing [1] 141/4
forestall [1] 114/10
forget [1] 58/20
form [4] 39/24 99/17 119/23 119/25
formal [1] 47/12
format [1] 141/7
former [3] 6/16 49/14 61/7
forth [2] 94/4 94/10
forthcoming [1] 25/12
forthright [1] 57/11
forward [2] 100/2 125/11
found [3] 20/13 131/20 133/7
four [3] 23/19 24/1 93/25
four-year-old [1] 24/1
frame [5] 31/16 31/17 47/21 69/17 75/20
Francisco [1] 139/23
fraud [7] 14/5 18/19 66/20 79/3 104/16 113/22 127/6
fresh [1] 51/14
friend [2] 79/14 107/21
friends [7] 79/11 82/23 107/1 108/6 108/8 111/14 126/16
FrogAds [1] 66/9
front [3] 59/4 97/17 102/6
fugitive [1] 78/8
fulfilling [2] 16/2 41/4
full [10] 10/25 24/23 38/17 47/17 50/2 50/5 93/5 93/8 93/10 93/15
fully [2] 47/14 47/16
fund [4] 31/7 31/8 77/10 127/9
funding [1] 77/3
further [11] 49/2 49/8 49/9 50/7 54/23 64/18 92/15 105/2 110/7 112/24 131/15
future [1] 100/10

**G**

GACKLE [2] 1/23 141/13
gambling [1] 18/19
Garden [1] 4/4
gave [6] 21/9 26/24 39/7 117/1 126/25 128/4
general [2] 116/20 117/2
generally [7] 18/13 28/1 45/18 45/19 47/9 58/5 102/13
gentleman [3] 107/4 107/18 107/20
get [29] 8/3 11/2 11/4 25/19 32/12 33/11 33/22 36/25 39/2 39/13 42/3 42/15 43/24 44/3 61/3 76/23 84/21 92/14 95/25 105/15 108/19 109/15 121/8 122/21 123/3 123/20 124/4 124/6 134/14
gets [1] 10/11
getting [9] 19/18 30/1 33/14 33/23 39/20 112/15 113/10 121/8 135/15
give [13] 32/21 33/11 42/13 45/22 75/9 76/23 80/24 107/14 110/20 113/2 118/13 125/23 127/22
given [9] 9/19 17/14 41/24 42/5 95/3 108/8 122/13 122/18 135/23
giving [4] 23/1 43/16 119/22 127/25
go [27] 23/9 27/7 29/6 31/11 33/24 35/10 42/10 54/18 56/1 62/4 65/7 69/20 72/24 85/3 89/21 102/3 109/18 110/14 111/21 113/17 118/4 119/2 121/3 122/11 122/15 125/13 135/23
go-between [1] 31/11
goal [3] 33/15 39/2 54/9
goals [8] 29/2 34/8 37/1 54/5 92/1 105/13 121/10 121/18
goes [2] 46/1 71/13
going [30] 8/3 26/6 30/1 30/16 31/11 32/19 32/20 42/3 44/5 49/25 54/10 67/6 75/6 75/11 75/15 76/3 100/2 101/25 108/14 115/11 116/24 118/5 120/17 121/9 123/11 128/11 128/12 134/10 135/11 135/15
Goldman [3] 14/10 14/14 133/12
gone [2] 119/8 119/14
good [27] 6/10 6/22 6/25 7/5 7/7 7/9 13/4 13/5 15/21 15/25 16/6 29/21 29/22 33/14 45/17 45/22 50/11 50/12 57/18 57/25 58/7 71/14 93/25 104/5 121/6 121/17 125/16
good-faith [3] 45/17 45/22 71/14
Gorvitch [1] 62/2
got [19] 8/20 8/22 25/10 25/10 57/25 61/15 79/5 80/1 80/8 80/13 80/17 80/18 81/3 81/5 92/13 108/23 123/10 124/9 133/3
gotten [7] 15/21 15/25 16/10 57/18 57/19 73/4 83/18
government [45] 6/19 9/18 25/13 27/3 35/5 41/1 48/23 49/9 51/17 54/14 54/25 56/1 56/17 56/23 57/16 72/19 78/21 82/8 82/12 83/8 83/13 85/5 95/3 95/8 99/15 100/25 101/5 103/5 111/1 113/11 116/19 117/21 118/10 118/15 127/5 128/2 128/4 128/15 133/20 134/2 134/15 134/19 134/23 134/25 139/7
government's [13] 5/3 13/1 31/23 82/9 83/2 83/10 94/16 97/9 97/24 98/1 99/25 100/8 134/5
governmental [1] 85/5
great [1] 53/23
greatest [1] 41/23
group [4] 123/11 123/13 123/16 123/19
groups [1] 40/20
Grover [1] 7/3
guarded [1] 113/22
guess [6] 50/21 54/1 57/12 65/11 66/7 66/25
guidance [2] 42/15 132/21
guilty [9] 25/9 25/9 29/16 69/10 71/6 117/25 118/2 118/20 130/17
gun [1] 82/23
guy [9] 22/14 22/16 76/16 76/18 76/19 76/20 105/18 105/20 133/5
guy's [1] 81/22

**H**

had [218]
hadn't [8] 25/18 26/8 26/17 49/19 61/1 73/7 82/18 99/13

## H


half [6] 30/5 65/24 110/20 120/10 120/12 139/4
half-a-million [1] 110/20
half-million [1] 30/5
half-truths [2] 120/10 120/12
halfway [3] 34/24 35/2 35/10
hand [2] 10/21 82/8
handing [1] 61/8
handled [1] 62/2
handy [1] 48/11
happen [2] 71/19 111/7
happened [6] 24/6 58/10 66/12 85/19 87/24 131/12
happening [1] 55/25
happens [2] 42/19 118/14
happy [3] 14/1 106/25 107/21
hard [6] 12/9 23/23 33/10 33/20 64/21 121/8
harm [2] 127/11 128/5
Harris [3] 3/5 3/5 6/25
has [22] 7/8 7/23 16/13 48/22 48/24 49/2 58/21 71/3 76/25 83/18 95/13 103/4 106/21 109/22 109/23 110/2 110/7 110/8 113/4 133/5 136/9 138/4
hasn't [1] 88/9
Hatter [3] 101/7 118/24 132/24
have [171]
haven't [4] 13/20 18/16 59/8 113/20
having [2] 31/24 139/22
Hawthorne [1] 2/21
he [480]
he'd [4] 27/4 79/24 125/14 125/23
he'll [1] 136/1
he's [12] 15/23 28/23 30/16 68/14 75/6 78/8 82/22 82/23 107/1 115/25 121/14 128/2
head [1] 82/24
headquarters [1] 138/3
heals [1] 29/17
heard [6] 13/20 13/21 13/23 21/18 120/8 123/1
hearing [7] 1/19 6/14 8/20 9/16 45/12 57/5 120/4
hedge [1] 31/7
heels [1] 132/3
held [2] 12/19 141/6
help [6] 22/25 24/21 31/8 44/4 70/23 128/11
helped [2] 53/14 59/20
helpful [2] 11/14 104/4
helping [2] 39/22 43/6
her [1] 111/20
here [18] 6/15 9/25 10/15 12/18 12/20 28/25 45/12 81/12 82/2 103/3 103/19 109/9 110/15 112/12 118/17 137/25 138/6 138/22
here's [3] 21/5 29/1 132/23
hereby [1] 141/3
herein [2] 94/5 94/10
Hey [3] 111/4 111/20 125/13
HFGB [1] 66/11
hiatus [3] 102/23 102/25 103/1
hidden [1] 86/6
hiding [1] 74/19
hierarchy [1] 22/18
high [1] 34/13
higher [3] 27/4 29/5 91/25
highly [3] 89/5 89/14 110/2
him [64] 9/24 10/2 10/3 11/15 12/11 15/22 16/14 20/10 20/11 20/12 20/13 20/17 20/20 20/22 29/6 29/18 29/18 30/4 30/10 34/7 43/23 44/5 45/22 47/6 54/19 58/12 73/11 79/14 84/9 84/12 84/24 85/1 85/8 86/2 88/20 90/9 90/11 94/24 95/2 97/5 107/21 109/3 109/24 110/20 113/11 120/7 120/11 120/17 121/16 121/17 121/25 122/3 123/13 124/19 125/6 125/7 125/12 128/4 133/9 133/10 135/1 137/21 138/16 138/19
himself [5] 24/21 58/22 86/6 118/9 119/4
his [90] 6/20 8/7 8/19 9/23 9/24 10/4 10/18 11/22 12/20 13/23 14/14 15/16 15/17 16/3 20/23 24/3 25/8 25/9 26/3 28/21 29/9 30/18 37/12 39/14 39/14 41/12 46/1 46/3 49/4 49/15 49/16 50/2 51/22 51/24 52/25 53/2 53/10 53/23 54/10 55/23 56/25 57/23 61/20 71/6 72/12 73/22 74/7 75/5 79/11 79/14 80/4 81/15 82/23 83/9 85/14 85/15 85/16 85/22 91/13 92/7 92/9 96/3 105/5 106/15 107/16 109/20 111/13 111/14 113/10 115/23 119/18 122/20 126/14 126/16 127/2 128/1 128/3 130/13 130/16 131/19 132/22 133/8 133/10 135/3 136/20 136/22 137/2 137/3 137/7 137/9
historical [2] 113/16 119/19
historically [1] 30/20
history [5] 26/3 26/15 103/25 110/10 125/9
hit [2] 112/4 112/7
hit-me-with-your-best-shot [2] 112/4 112/7
Hochman [4] 4/3 7/1 134/11 136/9
Hochman's [1] 135/10
Hold [1] 98/6
Holmes [1] 87/7
honest [8] 15/22 16/2 28/16 47/14 47/16 54/18 55/3 57/10
honesty [1] 47/17
honing [1] 11/13
Honor [148]
HONORABLE [1] 1/5
hope [1] 17/19
hour [7] 11/6 11/7 11/24 12/11 138/14 138/19 139/4
house [3] 34/24 35/2 35/10
how [70] 9/1 11/5 11/19 13/13 13/16 14/9 14/24 18/10 18/13 19/23 20/18 20/21 20/22 22/17 24/15 24/25 30/20 30/22 39/3 39/17 41/8 42/5 42/10 44/25 45/6 45/17 52/4 52/6 52/8 52/10 52/12 52/14 52/16 53/8 53/23 55/8 55/20 56/2 57/13 67/1 70/4 72/21 73/11 76/16 76/18 77/1 87/13 88/7 88/7 89/8 89/17 91/18 95/12 104/22 104/23 105/2 105/7 105/17 106/12 113/21 113/21 115/3 120/6 123/12 124/4 124/10 136/15 137/7 138/12 138/24
Howard [10] 30/13 65/4 67/24 68/1 68/4 76/18 84/1 84/5 127/9 127/13
however [1] 17/21
hub [2] 22/21 29/25
huh [1] 129/14
hundreds [1] 29/23


## I


I'd [3] 48/9 117/9 134/18
I'll [19] 19/8 24/19 32/21 42/13 56/14 63/21 66/24 79/12 94/25 101/19 102/4 105/15 108/14 116/22 117/2 117/16 118/13 118/15 125/3
I'm [51] 7/11 8/3 11/3 12/12 13/9 13/22 13/22 14/1 20/2 21/5 30/8 35/3 41/2 41/20 41/20 45/1 47/2 57/5 59/24 62/10 63/22 64/2 70/24 70/24 76/3 76/4 76/7 77/14 77/24 79/17 80/5 82/19 83/20 87/13 91/22 93/9 98/9 106/8 107/7 111/4 116/8 118/4 120/13 123/11 125/14 125/24 131/6 131/16 131/16 135/24 139/17
I've [6] 9/12 54/6 67/2 67/2 70/22 140/5
idea [1] 108/20
identified [5] 63/18 65/13 67/7 86/6 125/19
identify [5] 30/10 43/13 43/15 63/8 64/3
if [72] 7/21 9/1 15/4 16/19 20/15 20/18 20/19 21/3 21/22 23/23 24/20 27/21 29/16 31/21 32/18 32/19 33/19 36/1 39/7 40/7 40/18 41/20 41/24 42/4 45/1 45/2 45/18 46/24 49/8 53/3 53/7 55/16 59/4 66/22 73/3 74/19 76/22 80/23 83/23 97/21 99/13 100/24 101/18 103/11 103/18 111/1 116/8 116/12 116/16 118/4 118/8 120/2 120/15 120/16 121/3 121/13 123/11 123/16 124/8 127/22 128/4 128/11 128/23 130/25 134/11 134/12 137/6 139/24 139/25 140/6 140/11 140/11
ignored [1] 120/11
II [1] 14/4
illegal [1] 110/21
imagine [1] 138/13
immunity [1] 45/14
impediment [1] 111/6
impetus [1] 80/4
implication [1] 16/10
imply [1] 26/11
important [6] 54/17 76/16 76/20 99/11 99/14 136/24
imprisoned [1] 35/24
in [569]
in-person [2] 31/24 32/24
inability [1] 7/18
inarticulate [1] 9/15
incentive [2] 44/5 84/14
incident [1] 81/22
Incidentally [1] 64/24
include [15] 26/15 36/12 36/17 36/18 36/18 36/21 37/23 45/4 47/17 86/22 100/17 104/5 105/7 105/14 125/18
included [7] 46/3 71/1 71/18 92/2 97/10 98/1 137/5
including [6] 6/18 24/8 36/12 52/21 79/11 136/15
income [1] 40/9
incriminating [1] 32/12
inculpatory [1] 32/7
independently [1] 73/19
India [1] 41/13
indicate [4] 23/12 67/10 74/20 104/23
indicated [4] 15/16 17/12 18/22 25/11
indicates [1] 88/7
indication [2] 23/24 106/15
indicative [2] 23/18 24/3
indices [3] 17/15 17/21 17/25
indict [1] 33/21
indicted [10] 30/14 30/15 56/8 56/9 84/21 87/25 114/19 115/2 115/4 115/7
indictment [7] 56/5 69/18 88/1 88/3 88/4 104/20 114/12
indictments [2] 14/7 53/13
indirectly [1] 76/13
individual [1] 15/15
individuals [5] 30/2 43/6 49/8 53/4 125/8
inferred [1] 26/12
infiltrate [2] 39/17 41/24
infiltrated [1] 119/9
infiltrating [2] 119/15 119/24
inflate [1] 77/9
informant [10] 32/11 38/24 43/19 67/24 84/1 89/3 89/8 109/13 113/5 128/7
informants [2] 78/11 78/13
information [82] 9/2 12/3 14/13 15/15 15/17 16/15 17/16 17/25 20/2 21/19 22/4 24/15 25/17 25/19 27/17 28/23 33/10 33/15 33/23 36/25 40/19 44/14 46/5 47/4 47/9 47/15 49/8 51/1 51/2 51/12 51/17 51/19 52/1 52/18 53/4 53/5 54/13 54/21 54/24 54/24 55/13 57/12 59/21 64/25 66/2 66/6 67/10 70/16 72/19 72/19 73/14 76/21 76/24 78/15 82/17 85/14

**I**

information... [26] 85/23 86/1 95/7 95/25 100/13 103/21 104/24 105/3 107/22 107/24 108/2 108/18 112/15 113/17 113/18 115/17 115/24 118/13 119/6 120/10 123/10 125/23 126/25 129/7 133/6 133/13
informed [2] 14/10 38/23
initial [1] 117/4
initially [1] 27/21
Inner [1] 72/4
Inner-stellar [1] 72/4
innocent [1] 127/11
inquiries [3] 88/22 88/23 89/1
inquiry [2] 9/5 10/11
inside [1] 73/14
insider [1] 28/1
instance [3] 69/13 109/19 111/17
Instead [2] 35/16 40/24
instructions [9] 22/23 23/1 30/1 33/12 34/10 42/5 49/4 74/12 75/8
insulate [1] 39/8
intend [2] 44/11 44/14
intent [4] 30/2 33/11 75/10 135/13
intentionally [2] 7/17 100/16
interact [1] 35/23
interacted [1] 20/8
interaction [3] 123/24 124/1 137/18
interception [1] 94/11
intercepts [1] 124/14
interest [2] 80/20 120/5
interested [3] 99/24 100/8 106/8
interesting [2] 59/1 103/11
interestingly [1] 102/8
interject [1] 82/2
Internal [1] 80/13
international [1] 77/19
interpretation [2] 15/24 16/1
interrupt [1] 58/17
interview [18] 18/9 18/11 18/22 19/1 19/1 19/15 19/22 23/12 23/21 23/24 24/1 24/19 24/20 24/20 25/2 25/17 85/19 119/12
interviewed [15] 9/10 19/8 26/17 26/18 48/23 49/9 90/2 90/7 91/5 103/4 104/14 117/20 118/1 119/6 133/10
interviewing [3] 18/15 26/22 85/6
interviews [12] 9/7 9/11 18/24 26/12 26/16 49/2 85/8 87/22 87/25 116/3 117/24 118/1
into [21] 8/3 20/18 38/14 45/17 49/6 61/3 97/10 108/19 108/21 110/9 111/8 112/10 120/13 121/25 123/3 128/1 129/22 130/17 134/14 135/15 135/23
Intriaeri [1] 107/19
Intrieri [2] 107/20 107/22
introduce [2] 30/25 123/14
introduced [3] 31/10 109/9 122/3
invest [2] 110/20 127/10
investigate [4] 30/4 33/16 54/23 67/8
investigated [2] 24/22 124/7
investigating [6] 21/8 41/14 63/13 70/5 71/4 78/2
investigation [42] 7/20 14/6 17/20 21/7 24/1 25/23 25/25 26/13 29/2 34/7 37/1 37/24 37/24 39/2 40/21 41/15 42/25 43/18 54/6 54/12 54/19 59/23 60/22 61/5 61/24 65/1 81/19 85/1 92/1 100/2 104/2 104/15 104/18 104/19 105/13 106/9 108/11 121/17 124/21 125/8 126/10 131/21
investigations [5] 26/19 42/24 85/5 126/13 126/22
investigative [1] 20/8
investigators [2] 85/6 115/25
involve [1] 43/3
involved [32] 12/7 14/6 14/9 15/1 15/5 15/20 16/20 16/22 19/12 25/18 31/1 53/8 62/14 62/16 62/18 66/20 69/22 71/4 71/7 71/11 73/7 75/3 78/20 84/9 107/16 122/2 122/18 122/21 126/14 127/16 132/2 135/2
involvement [3] 15/17 25/4 29/9
involves [1] 81/22
involving [3] 75/25 135/2 135/11
irrelevant [1] 136/21
irrespective [1] 132/10
IRS [4] 85/8 85/20 85/24 86/1
is [251]
isn't [15] 28/20 63/19 65/25 78/16 97/5 97/8 97/11 102/24 103/21 106/19 110/5 110/24 111/23 120/15 130/11
issue [9] 8/3 9/6 10/10 45/2 85/13 102/9 104/15 128/10 135/20
issued [2] 94/6 133/3
issues [5] 33/6 85/22 112/14 135/16 138/17
issuing [2] 7/22 88/21
it [250]
it's [52] 9/14 12/9 13/24 23/23 25/11 26/10 27/11 27/24 33/20 39/24 42/6 42/6 45/19 47/12 54/7 57/3 64/12 64/21 65/16 69/1 69/19 70/3 70/8 70/17 76/23 78/15 92/8 97/14 101/19 103/11 107/11 116/9 116/17 117/25 118/1 118/2 118/12 118/12 118/14 118/16 128/3 131/17 132/14 133/22 134/24 135/22 136/18 136/21 136/21 137/10 137/17 140/11
Items [1] 6/5
its [2] 120/14 133/20
itself [4] 13/24 25/3 61/22 67/25
Ivano [2] 72/2 77/25

**J**

Jacks [3] 3/15 3/15 7/7
jail [5] 110/24 111/1 111/5 111/18 122/24
JAMES [1] 2/7
JANUARY [4] 1/17 6/1 46/12 85/8
Jason [2] 3/10 7/5
jdebretteville [1] 3/13
Jennifer [2] 2/16 6/22
JEREMY [6] 5/5 6/16 6/20 10/17 11/1 13/1
Jim [1] 6/10
John [2] 122/20 133/4
joinder [2] 10/5 11/11
Jonathan [2] 2/16 6/23
Joseph [1] 4/3
JR [3] 2/6 3/20 3/20
judge [70] 1/5 7/13 7/22 7/22 8/2 8/12 9/13 9/18 9/20 21/6 26/10 37/5 38/23 44/10 45/19 46/5 49/14 49/22 50/3 56/25 56/25 57/17 58/6 59/6 59/25 60/10 60/20 61/17 62/14 70/9 70/17 88/6 88/21 93/16 93/24 93/24 94/9 99/14 99/15 99/19 99/24 100/7 100/13 101/7 101/10 103/2 103/21 103/24 104/25 107/24 108/2 108/3 110/16 111/13 111/20 112/3 112/3 118/24 132/16 132/22 132/24 132/25 134/3 135/3 136/14 137/6 137/7 137/12 137/20 139/24
Judge Wilson [2] 62/14 112/3
Judge Wilson's [1] 70/17
judge's [1] 93/18
judicial [5] 56/5 56/14 88/2 88/10 141/7
June [3] 24/7 24/13 25/24
jurisdiction [1] 18/5
jury [1] 82/1
just [70] 8/18 9/14 11/2 11/4 18/12 22/19 23/11 24/18 25/3 27/15 28/18 38/14 42/4 42/11 42/23 47/15 48/14 54/1 54/7 54/21 55/1 56/4 57/13 60/15 60/23 66/5 66/5 70/16 70/17 71/3 73/1 73/22 74/22 75/2 76/8 76/9 80/18 80/21 80/22 83/19 83/21 86/5 86/22 88/9 91/12 102/20 104/8 112/19 114/18 114/19 115/22 116/2 117/1 117/25 118/9 120/5 126/6 128/9 128/24 129/5 130/3 132/11 132/21 133/12 134/15 134/16 134/18 135/25 138/4 138/9

**K**

Kaplan [1] 7/6
keep [3] 81/22 108/14 116/20
Keopke [1] 59/20
kept [2] 27/16 111/8
kickbacks [1] 52/14
Kim [1] 3/5
kind [13] 16/10 32/18 32/22 33/22 34/24 39/16 45/14 57/22 79/25 106/9 119/9 123/11 124/5
kingpins [1] 23/7
knew [55] 8/24 23/18 29/11 42/3 43/16 49/10 50/16 50/19 50/21 51/12 51/16 52/1 52/18 53/3 53/5 55/25 56/16 56/18 57/15 57/21 57/23 58/1 58/2 58/16 61/14 69/25 71/10 75/8 75/11 75/13 79/19 79/20 79/24 84/25 86/19 89/13 89/17 95/8 95/20 96/19 99/24 100/7 100/20 102/23 103/20 103/21 104/3 104/22 105/2 119/17 121/25 123/13 123/16 123/21 125/13
know [106] 8/21 10/9 10/19 16/10 17/15 22/13 23/25 24/13 25/4 25/7 26/7 27/15 31/5 31/20 31/21 32/19 34/6 35/5 36/16 38/20 39/11 39/12 39/19 40/7 40/16 40/18 41/3 41/4 41/8 42/5 42/18 45/13 45/16 45/17 45/19 49/19 53/3 53/7 53/8 53/10 54/16 55/8 55/19 56/19 56/21 57/18 58/4 58/5 60/3 60/4 61/9 62/6 63/6 63/11 63/23 64/21 66/22 67/4 70/3 70/14 73/6 73/19 74/9 74/10 74/10 74/11 74/12 75/3 75/4 75/8 75/9 75/25 76/22 79/2 79/12 82/5 89/8 90/1 92/5 93/14 96/3 97/12 98/20 99/15 103/18 106/13 106/16 107/10 113/19 116/6 116/13 116/22 117/18 118/11 122/25 123/12 125/14 125/25 126/1 126/23 127/1 128/12 128/24 130/12 130/23 135/25
knowing [4] 49/19 99/24 100/8 113/12
knowingly [1] 40/7
knowledge [16] 8/6 24/4 30/1 31/19 39/14 40/15 42/24 48/2 72/11 75/9 87/4 89/5 89/15 110/2 117/13 121/8
knowledgeable [1] 116/14
known [13] 9/9 26/25 30/6 30/9 30/22 31/7 37/4 65/1 105/8 106/24 108/25 122/1 122/3
knows [1] 123/18
Koury [1] 138/24

**L**

L.A [5] 18/12 19/1 19/22 87/15 98/8
lack [3] 24/3 89/5 89/11
laid [2] 77/10 112/12
Lake [1] 3/21
language [1] 101/4
large [2] 33/18 43/5
largely [2] 65/10 65/21
last [11] 44/25 45/2 59/4 59/12 63/3 72/9 72/13 82/11 130/3 130/5 138/4
late [2] 10/5 15/6
later [8] 18/18 27/22 41/8 61/18 66/10 66/14 122/1 138/7
latter [1] 108/13
laudatory [4] 36/15 36/16 49/17 132/25
laundered [2] 52/8 77/17
law [10] 2/20 3/15 3/20 9/3 9/7 13/16 13/22 17/11 20/5 47/23
laws [1] 42/24

## L


lawyer [5] 12/18 13/21 55/4 90/15 133/4
lawyers [4] 12/1 12/17 137/25 138/22
lead [2] 90/19 92/7
leading [9] 41/16 43/25 47/3 47/21 71/9 107/18 124/24 124/25 125/2
leads [2] 78/18 129/9
learn [6] 15/8 15/13 17/11 20/14 41/16 43/19
learned [10] 16/4 17/7 24/15 27/17 27/18 43/9 96/11 113/5 132/11 136/15
learning [3] 20/5 49/22 49/25
least [17] 10/11 20/17 22/24 33/4 45/8 48/5 48/23 51/4 57/24 59/8 73/20 80/16 81/3 103/5 111/11 118/18 122/25
leave [3] 9/15 10/10 98/12
leaving [1] 60/23
led [7] 14/7 42/25 53/10 53/13 54/15 92/9 107/16
left [9] 54/16 60/7 60/9 92/3 92/5 92/7 92/9 92/11 116/9
legal [3] 99/18 110/18 124/2
length [3] 11/20 79/25 122/13
lengthy [3] 11/5 19/25 51/10
leniency [7] 50/3 57/16 57/20 78/25 79/16 120/23 136/16
Leon [1] 12/17
less [6] 12/15 14/25 18/18 44/4 57/11 57/13
let [11] 10/9 20/3 30/4 41/21 58/17 63/22 83/19 84/16 113/19 125/11 138/9
let's [17] 8/18 10/10 10/13 12/16 42/8 42/9 46/6 69/16 72/24 89/21 94/19 102/3 109/18 136/4 137/25 139/11 140/13
level [8] 27/5 29/5 34/13 56/20 91/25 92/4 111/11 127/24
leverage [5] 29/8 29/18 53/15 76/25 84/12
Lew [1] 105/20
light [5] 6/18 9/2 57/8 108/4 136/14
like [23] 6/19 7/25 29/4 30/3 42/7 48/12 50/4 57/9 59/9 59/11 59/18 74/2 74/7 74/8 89/5 101/4 102/21 117/9 122/22 123/4 134/18 139/18 140/15
limit [2] 11/4 94/25
limitation [1] 127/13
limitations [5] 29/1 33/7 33/8 121/11 128/9
limited [4] 30/1 72/18 83/8 129/23
limits [1] 33/13
lines [1] 110/15
link [3] 77/22 77/25 136/24
list [7] 20/21 20/24 29/3 34/12 89/2 109/7 109/12
listed [3] 34/1 62/21 109/9
listened [2] 68/10 68/12
literally [1] 28/11
little [5] 42/15 61/6 70/22 118/2 125/15
live [1] 137/11
lives [1] 7/11
LLP [2] 3/5 4/4
long [20] 13/16 24/15 26/3 26/5 26/23 26/25 30/20 30/22 48/18 52/25 53/2 53/3 66/7 105/7 105/17 106/12 116/18 121/22 122/5 138/12
long-term [5] 52/25 53/2 53/3 66/7 121/22
long-time [1] 122/5
longer [2] 98/8 115/25
longstanding [1] 106/16
look [18] 7/25 38/9 38/14 49/24 53/21 53/23 56/1 66/7 67/2 97/21 99/8 103/11 104/10 111/4 112/11 129/22 130/24 130/25
looked [7] 24/16 27/24 40/17 59/8 67/6 120/12 125/22
looking [5] 24/23 58/4 58/10 114/25 125/14
looks [2] 59/9 59/11
loop [1] 23/11
LOS [33] 1/16 1/24 2/10 2/18 3/6 3/16 6/1 14/5 18/9 19/16 23/11 24/20 46/12 51/4 51/7 53/11 53/13 55/10 63/4 65/25 66/4 68/24 72/10 72/14 80/9 84/24 84/24 85/10 85/11 88/15 119/13 130/4 131/13
Los Angeles [25] 14/5 18/9 19/16 23/11 24/20 46/12 51/4 51/7 53/11 53/13 55/10 63/4 65/25 66/4 68/24 72/10 72/14 80/9 84/24 84/24 85/10 85/11 119/13 130/4 131/13
losing [1] 77/24
lost [4] 9/4 70/22 120/5 120/7
lot [9] 24/10 29/18 32/20 33/18 39/19 39/19 47/4 54/10 54/16
lots [2] 67/2 67/3
low [2] 20/21 20/24
loyal [3] 102/11 108/5 108/6
loyalty [7] 26/24 63/1 91/8 102/9 102/14 104/8 105/6
lunch [1] 42/8


## M


ma'am [4] 78/6 86/15 127/20 128/14
made [14] 15/25 16/7 20/7 36/14 36/18 37/4 38/22 43/19 49/15 49/17 91/19 119/8 130/12 132/25
magistrate [5] 6/17 8/2 59/25 60/9 132/22
mail [1] 4/6
main [5] 22/7 22/9 28/9 67/5 83/18
maintain [1] 120/12
maintains [1] 113/9
major [1] 13/22
make [25] 12/12 17/19 26/16 28/4 32/16 37/16 38/3 38/7 47/24 68/21 81/12 83/7 83/21 88/17 88/22 88/23 88/25 93/5 93/19 99/6 100/3 114/23 116/11 117/16 121/19
makes [2] 102/21 129/1
making [9] 24/8 29/18 29/23 31/12 32/23 43/5 93/10 119/14 119/24
man [1] 32/18
management [1] 122/19
manager [1] 31/8
manipulate [3] 89/8 89/17 110/3
manipulated [8] 25/8 63/12 70/1 70/10 70/15 71/2 71/5 73/25
manipulating [1] 114/1
manipulation [18] 28/12 28/13 40/4 48/18 48/22 49/1 49/3 67/20 71/7 71/11 102/17 103/7 104/18 107/22 110/9 123/7 125/25 132/7
manipulations [1] 15/18
many [8] 14/24 20/11 27/3 36/18 48/17 87/13 115/3 138/24
Marc [2] 3/5 6/25
March [20] 15/10 24/14 32/23 35/2 36/4 44/1 46/20 47/22 50/14 58/14 59/7 60/9 60/11 83/25 84/4 98/14 98/19 113/13 114/11 141/10
MARK [2] 2/8 6/12
marked [1] 97/14
market [12] 15/18 28/12 28/13 40/4 48/25 49/3 75/6 103/7 104/17 107/22 110/9 132/6
Matech [17] 66/17 66/18 66/20 69/11 69/12 69/22 69/23 70/1 70/13 70/15 71/1 71/5 71/15 71/22 71/24 72/2 122/1
material [1] 20/23
materials [2] 11/9 132/23
matter [6] 54/2 66/9 112/10 119/13 140/6 141/6
matters [2] 11/12 62/3
maximum [1] 138/14
may [33] 8/4 14/20 15/14 17/10 17/21 17/23 24/7 27/16 31/5 42/12 42/15 43/10 43/14 48/15 49/15 58/8 61/19 63/11 74/22 83/4 83/8 107/12 112/22 114/9 115/1 115/11 117/3 118/8 121/24 132/19 136/17 136/25 140/2
maybe [10] 30/25 50/23 61/18 84/16 99/21 125/14 125/15 128/17 129/24 136/17
Maytag [2] 69/14 69/17
Mazur [14] 6/7 6/19 7/2 10/6 10/10 11/11 12/7 42/16 116/7 117/1 134/6 135/12 138/10 138/12
McCutchen [1] 4/4
me [59] 6/11 10/9 14/10 15/20 17/9 17/13 20/1 20/3 20/9 20/12 25/11 29/3 32/21 38/9 38/12 38/14 41/15 41/20 41/21 49/22 54/2 54/17 57/9 58/17 61/23 62/8 63/22 69/2 70/23 75/9 83/19 84/16 87/3 88/19 94/22 95/1 100/17 100/22 105/6 105/7 112/4 112/7 112/7 113/19 116/17 120/6 120/14 123/14 123/15 123/15 125/11 125/13 129/2 131/18 138/9 139/25 140/7 140/8 140/10
mean [33] 12/9 20/24 20/25 22/3 28/15 36/1 37/2 37/11 37/15 46/22 51/14 53/23 57/25 58/8 63/11 66/7 69/1 70/14 73/22 73/22 80/18 85/4 92/2 96/8 98/13 105/23 105/25 114/15 115/2 120/4 121/13 123/21 124/8
meaning [6] 26/5 44/7 45/9 62/18 101/13 104/19
means [2] 8/21 68/25
meant [2] 26/21 58/7
measure [1] 127/11
medication [1] 21/4
meet [3] 14/15 39/2 54/5
meeting [4] 14/21 15/7 66/3 109/20
meetings [4] 15/13 17/8 31/24 32/24
meets [2] 110/15 111/25
member [7] 8/13 13/11 73/8 89/19 109/4 109/24 121/22
members [4] 22/11 111/9 121/15 123/18
memory [5] 18/21 40/13 63/20 63/25 136/22
Menderosa [1] 115/23
Mendiratta [273]
Mendiratta's [29] 8/17 8/25 9/8 16/8 17/11 20/19 26/16 30/19 38/18 45/4 46/19 49/11 72/5 79/3 83/7 88/7 90/25 92/11 99/12 99/25 100/9 101/6 101/9 102/3 104/11 105/11 130/13 135/17 135/21
mention [8] 24/2 26/1 34/14 64/5 90/25 106/5 130/9 131/22
mentioned [19] 17/22 18/23 23/12 24/9 26/8 27/2 27/4 41/12 41/19 48/24 63/10 66/15 66/17 70/10 71/3 72/17 90/25 103/6 135/12
mentioning [2] 24/18 63/1
merely [1] 119/6
met [2] 31/5 32/5
methods [1] 110/3
mharris [1] 3/8
Michael [1] 6/17
middle [3] 11/3 33/12 42/1
might [17] 16/7 17/7 27/22 47/7 53/14 56/2 59/1 59/19 59/20 61/3 64/21 76/1 122/2 125/7 138/18 138/19 140/1
million [3] 30/5 76/12 110/20
millions [2] 64/19 65/17
mind [18] 8/8 11/14 29/20 34/5 38/4 38/23 46/1 51/14 54/1 69/25 81/12 83/22 91/11 91/13 119/22 121/3 137/2 137/4
minute [5] 11/22 18/12 58/18 111/21 120/17
minutes [5] 12/3 42/11 42/14 139/3 139/10
misleading [7] 7/17 7/22 8/1 9/12 26/11 26/21 102/21
misled [1] 127/15
missed [2] 105/11 108/12

M

missing [1] 81/22
missions [1] 20/23
misstate [2] 44/11 46/5
modus [1] 40/22
moment [7] 59/5 74/22 83/19 94/19 107/12 112/22 140/2
money [24] 31/8 32/18 32/20 44/4 52/16 76/16 76/18 76/19 76/20 76/22 77/1 77/10 77/12 111/17 121/12 123/11 123/14 127/9 127/22 127/25 128/1 128/3 128/4 128/13
moneyman [2] 76/25 77/15
Monica [1] 4/5
monitored [1] 25/20
month [4] 14/19 60/6 63/6 90/3
months [5] 24/15 29/23 34/23 35/12 35/14
more [40] 7/24 8/17 14/21 14/25 18/19 22/11 24/15 27/17 27/18 29/4 29/8 32/19 32/21 35/14 36/25 38/12 42/10 42/11 42/14 47/9 47/12 54/8 61/4 62/21 67/6 76/20 76/24 85/5 85/5 93/17 99/13 117/25 118/3 118/12 120/15 121/15 121/18 122/13 128/24 138/24
morning [9] 6/10 6/22 6/25 7/5 7/7 7/9 12/14 13/4 13/5
most [11] 7/15 34/13 38/19 38/20 38/21 87/4 104/8 108/8 115/5 116/14 123/21
mostly [1] 31/24
motion [9] 10/6 10/7 16/7 36/14 36/15 37/16 88/6 107/9 135/4
motions [1] 10/5
motivated [1] 47/7
move [2] 14/1 135/11
moved [1] 98/10
moving [1] 136/13
Mr [46] 7/4 7/9 7/13 7/14 22/15 29/24 35/6 36/8 36/15 43/4 43/19 44/7 44/8 47/25 96/1 96/6 96/15 96/18 102/16 103/15 105/21 105/25 107/16 107/22 108/10 108/17 108/22 109/5 109/19 109/23 110/5 110/12 110/15 110/19 110/24 111/7 111/22 117/1 117/11 117/23 122/17 134/11 135/10 136/9 138/24 140/6
Mr. [5] 95/21 96/9 107/17 112/8 133/4
Mr. Cline [1] 133/4
Mr. Mendiratta [1] 112/8
Mr. Wilner [2] 95/21 96/9
Mr. Woo [1] 107/17
much [7] 42/10 53/8 54/2 61/18 70/4 77/1 95/25
multimillion [1] 24/11
multimillion-dollar [1] 24/11
multiple [6] 43/3 44/2 99/7 107/17 113/12 113/14
must [2] 38/11 111/5
my [46] 14/10 16/1 17/17 18/3 18/7 18/16 25/21 26/23 27/11 27/17 28/25 29/3 29/20 29/21 30/3 30/24 32/16 40/13 48/2 48/2 49/20 51/8 51/14 54/1 54/21 63/20 65/11 69/5 69/7 69/24 72/11 74/19 81/7 83/16 83/18 83/24 94/5 116/13 117/3 117/13 119/7 119/16 133/2 133/5 138/13 139/24

N

name [18] 10/18 10/19 10/25 19/5 30/11 34/14 53/18 53/20 67/13 72/5 75/3 75/13 81/22 109/20 115/23 116/22 116/23 124/2
named [11] 63/15 74/17 75/4 78/4 107/4 107/18 107/20 115/6 122/19 123/23 133/4
names [3] 41/12 116/20 117/2
narrow [2] 136/14 136/18
nascent [2] 42/25 43/14
Nathan [2] 4/3 7/1
nathan.hochman [1] 4/6
nature [4] 40/15 79/12 101/2 104/25
necessarily [5] 11/10 34/14 43/7 83/20 114/10
necessary [4] 9/25 90/23 90/24 91/23
necessity [14] 28/19 36/3 36/6 38/16 39/10 44/18 46/2 48/10 92/20 93/5 93/7 93/16 93/20 94/14
need [11] 38/24 42/4 76/22 76/22 113/16 127/21 127/22 138/6 138/10 138/16 138/19
needed [1] 113/17
needs [1] 140/12
negative [1] 21/18
network [10] 22/21 39/3 41/9 67/9 72/21 113/18 114/16 121/7 123/12 127/16
NEUMAN [2] 2/7 6/13
never [12] 26/21 27/4 36/17 37/18 38/9 38/11 38/12 38/13 38/13 87/19 105/8 120/12
new [42] 9/4 16/20 18/7 18/13 19/9 19/12 19/13 20/5 20/10 20/15 21/13 21/23 22/4 24/7 25/10 28/13 38/5 48/2 54/3 58/8 70/13 78/20 80/2 81/11 84/20 86/12 87/1 87/9 88/15 89/3 89/8 109/12 109/21 109/21 120/8 120/22 121/5 123/3 123/10 131/19 132/11 132/13
New York [1] 38/5
New-York-based [1] 20/5
Newport [2] 3/11 3/11
next [6] 24/14 31/9 31/9 104/10 104/10 139/12
nine [1] 29/22
Nix [54] 7/4 7/4 18/23 22/22 23/13 23/18 23/22 24/2 25/18 29/24 30/19 30/23 30/25 31/3 31/15 32/1 32/9 32/13 32/24 33/10 33/15 39/3 40/24 42/2 43/5 43/15 48/25 59/24 64/20 65/18 71/12 73/16 73/20 81/24 83/15 91/8 103/6 103/16 108/18 108/23 112/11 113/22 114/9 114/13 114/19 121/7 121/21 122/2 122/5 122/22 122/23 124/10 125/14 140/6
no [90] 1/9 8/2 13/24 15/3 17/19 20/12 22/5 22/15 23/24 35/7 36/17 36/24 37/25 38/9 39/12 43/15 43/17 45/15 46/23 48/14 50/4 50/7 53/14 55/24 56/21 58/13 58/15 58/25 61/2 62/21 63/10 65/16 66/2 66/5 66/10 66/14 67/9 69/15 69/19 70/4 70/6 70/12 75/4 82/5 84/19 85/4 85/5 85/21 86/5 86/24 87/6 87/8 90/22 91/12 91/17 91/23 92/15 98/8 100/17 103/3 105/22 105/22 105/24 106/7 110/17 111/24 112/1 112/21 112/24 114/2 115/25 117/13 117/19 117/23 119/11 119/16 123/22 124/1 126/12 126/15 126/17 126/21 126/24 127/2 128/9 130/15 131/1 131/11 131/15 141/13
nobody [1] 108/19
nominee [3] 41/16 51/22 52/12
nominees [1] 41/12
none [2] 37/25 107/24
nonstop [1] 102/22
Noon [1] 46/8
nor [6] 45/15 61/16 82/16 94/8 104/17 104/24
normal [1] 62/12
North [3] 1/24 2/9 4/4
not [158]
noted [4] 20/16 35/17 64/23 125/23
nothing [2] 38/19 85/4
notice [4] 56/5 56/14 88/2 88/10
notified [1] 126/24
notion [1] 108/15
Notwithstanding [1] 135/3
November [1] 70/21
now [54] 6/17 8/10 9/25 10/5 14/7 17/18 19/1 19/14 19/18 21/6 26/9 29/8 29/16 30/6 34/5 38/10 42/13 49/14 49/19 56/25 62/13 63/3 67/19 68/6 68/8 69/22 70/13 72/17 75/18 76/16 79/2 89/21 94/14 96/2 99/20 100/20 101/19 101/25 103/11 112/11 116/12 126/12 128/3 128/17 129/24 130/25 131/11 134/1 134/13 135/11 136/2 136/13 136/17 137/6
now-Judge [3] 21/6 49/14 56/25
now-magistrate [1] 6/17
nowhere [1] 13/22
nub [1] 120/4
number [9] 4/6 43/6 50/16 52/18 72/17 82/15 89/2 112/9 126/18

O

o'clock [5] 12/17 12/20 12/21 139/17 139/20
object [1] 99/17
objection [2] 100/3 124/22
obligation [1] 38/15
obligations [1] 16/3
obtain [2] 44/12 44/14
obtained [1] 114/13
obtaining [1] 114/10
obviate [1] 38/24
obviously [5] 8/10 15/22 16/3 26/7 43/22
occasions [1] 113/14
occur [8] 20/9 29/3 33/6 38/14 42/24 100/17 105/6 105/7
occurred [10] 9/11 14/19 17/9 26/12 38/9 48/2 68/12 70/16 82/3 104/1
October [4] 32/4 32/6 32/11 63/4
odd [1] 123/13
off [4] 12/19 61/8 83/4 116/10
offense [1] 133/7
offer [2] 71/1 117/16
office [25] 2/17 8/14 14/18 19/9 19/22 47/13 60/8 60/9 60/24 63/4 64/25 66/4 68/24 72/10 80/1 80/8 95/13 98/8 98/12 98/13 98/18 107/8 131/13 131/22 133/2
office's [1] 97/16
officers [1] 20/5
Offices [3] 2/20 3/15 3/20
offshore [1] 52/10
often [1] 77/9
Oftentimes [1] 78/23
oh [8] 52/17 78/9 91/15 105/25 123/14 130/15 130/25 131/6
okay [37] 7/15 15/11 17/5 33/24 34/25 38/1 50/8 50/14 50/15 56/14 58/6 59/1 59/5 60/19 62/4 62/20 63/24 67/19 73/8 76/4 76/8 76/10 79/15 83/17 86/8 92/16 102/1 108/22 116/17 119/2 128/21 130/6 130/24 131/5 131/12 140/9 140/16
old [2] 24/1 112/6
omit [2] 44/14 46/5
omitted [2] 104/6 120/10
on [110] 6/10 6/14 6/20 6/23 7/1 7/6 7/6 7/8 7/10 7/11 7/12 7/23 11/9 11/13 11/13 11/22 11/23 12/3 12/14 14/1 16/8 17/13 18/13 19/5 20/6 20/21 20/22 20/24 21/4 21/6 21/12 22/4 23/11 25/6 28/8 29/17 32/19 32/23 34/19 34/20 35/1 39/13 42/4 42/16 44/5 47/4 47/15 48/18 49/25 53/4 55/18 56/7 57/19 59/6 59/12 60/8 60/13 60/16 61/1 61/23 62/11 62/12 65/14 67/6 68/16 68/22 71/3 72/25 75/7 75/9 77/1 82/8 82/9 85/13 85/22 86/11 92/23 94/3 94/5 94/9 98/6 102/4 108/14 109/3 109/10 111/14 112/13 113/13 113/14 114/19 116/10 116/11 118/2 122/21 124/2 124/4 124/25 128/12 130/24 131/1 131/17 132/2 134/18 134/24 136/4 136/14 137/6 137/24 138/7 139/14
once [4] 43/4 73/20 110/12 128/2

## O

one [109] 6/17 8/18 9/1 9/11 10/11 14/21 16/13 16/23 18/9 18/12 18/17 22/11 22/24 26/23 27/22 29/12 29/15 32/20 34/6 36/16 36/22 39/16 39/18 40/15 41/11 45/5 47/1 47/3 50/20 51/7 53/2 57/19 58/17 59/5 59/10 59/11 59/21 60/18 61/23 62/24 62/24 63/12 63/15 63/21 65/13 65/16 65/16 66/16 67/15 68/9 69/13 69/14 69/17 70/5 71/2 74/12 77/25 78/4 82/2 82/8 82/15 85/7 86/13 86/14 88/19 89/7 91/3 91/12 91/14 95/4 95/9 95/24 96/24 97/3 97/24 98/23 101/5 101/15 105/15 106/20 108/16 112/9 114/2 118/12 119/23 120/21 120/24 121/14 121/24 122/25 127/10 127/17 127/18 128/9 128/22 130/2 132/24 132/24 134/15 134/21 136/6 137/3 137/5 139/3 139/4 139/9 139/23 140/2 140/16
one-year [1] 57/19
ones [6] 18/13 18/18 19/13 23/1 34/12 73/5
ongoing [7] 40/21 48/25 54/12 103/7 108/11 130/15 133/6
only [15] 11/21 27/2 27/20 35/14 37/18 43/15 46/3 47/3 47/18 91/3 122/11 123/18 129/23 137/3 140/16
open [2] 27/20 113/1
open-ended [1] 113/1
opening [1] 20/11
operandi [1] 40/22
operate [2] 33/16 41/9
operated [1] 29/25
operates [1] 123/12
operation [1] 124/4
opinion [1] 124/2
opportunity [4] 6/20 80/25 113/2 113/4
opposite [1] 71/14
or [121] 7/17 7/22 8/17 9/4 9/11 9/15 9/18 15/14 17/10 18/8 20/2 20/16 23/13 24/2 24/2 25/6 26/11 26/18 30/7 33/20 34/2 34/4 34/19 34/20 34/24 35/2 35/12 36/12 36/14 36/17 37/23 38/9 38/19 39/14 39/19 40/11 41/9 41/13 43/11 43/23 45/3 46/5 47/7 48/25 49/16 53/12 53/15 54/24 55/20 58/22 58/23 60/9 60/11 63/20 65/9 66/9 66/11 66/13 68/15 69/24 71/4 72/25 73/22 74/11 75/8 75/17 76/13 76/19 77/5 77/22 82/13 83/3 83/21 85/5 86/10 87/2 87/7 87/20 93/19 94/19 96/14 96/16 96/18 101/11 101/22 103/6 103/18 104/1 108/10 108/10 108/21 109/8 109/12 109/13 112/18 113/21 113/22 117/12 117/16 119/13 119/15 120/7 121/22 122/4 122/5 122/19 122/19 124/10 124/10 125/22 125/25 129/24 130/25 131/20 132/11 135/25 136/2 138/7 138/16 138/19 139/8
orchestrating [1] 83/9
order [7] 44/12 44/12 44/15 44/17 94/10 104/24 109/14
orders [2] 94/6 124/20
organization [3] 119/9 119/15 119/24
organized [4] 18/20 96/12 107/1 108/9
original [1] 107/8
Otero [1] 7/13
other [66] 8/12 8/23 9/11 12/1 13/19 17/19 17/24 20/25 24/3 26/18 26/18 26/22 26/25 29/17 30/20 33/14 34/5 34/12 35/16 38/4 39/16 40/8 40/25 45/1 46/21 47/5 48/20 53/11 53/13 53/15 59/16 59/17 78/1 82/9 82/9 82/20 83/4 83/6 83/12 86/25 87/9 91/23 105/8 105/10 105/20 106/12 106/13 108/5 110/22 111/9 115/24 116/3 116/3 117/23 120/12 121/1 121/21 123/4 124/8 125/23 127/15 131/18 131/20 137/21 139/3 140/1
others [9] 23/6 34/4 43/22 62/25 71/8 73/3 106/15 115/1 115/4
otherwise [2] 49/17 119/15
ought [2] 135/12 136/18
our [5] 16/4 36/25 54/19 128/3 132/9
out [30] 10/10 13/22 17/19 17/22 22/23 43/8 44/1 46/20 48/21 54/16 55/22 55/24 70/23 77/10 82/15 89/25 91/18 92/3 92/6 92/7 92/9 92/11 102/17 102/20 112/12 113/10 113/25 126/16 131/20 134/18
outdated [2] 101/11 101/12
Outdating [1] 101/13
outfitted [1] 123/2
outside [2] 72/25 73/2
outsider [1] 108/22
over [13] 24/6 24/10 24/14 31/24 48/22 67/11 67/20 95/13 102/17 109/1 114/6 115/12 117/24
over-the-counter [1] 115/12
Overruled [1] 100/4
overseas [2] 51/24 77/17
Owen [1] 118/19
Owen's [1] 56/5
Owens [17] 53/17 55/14 55/16 56/11 88/4 88/5 88/8 106/2 106/3 106/6 106/11 106/12 107/16 117/12 118/6 119/13 130/19
Owens's [1] 132/3
own [5] 15/16 46/3 47/15 128/1 128/3

## P

P.C [3] 67/9 70/9 73/6
p.m [2] 46/12 140/19
Pacer [4] 55/6 55/8 130/24 131/1
page [12] 59/4 59/8 59/12 94/3 97/22 102/4 104/10 104/10 109/3 109/10 134/24 141/6
pages [3] 1/10 51/9 101/20
paid [1] 75/11
paper [6] 49/24 56/23 62/7 88/9 88/11 134/24
paperwork [1] 124/2
paragraph [12] 48/7 48/9 63/21 66/24 68/6 76/3 94/4 102/4 102/8 109/3 112/16 112/19
paragraphs [2] 112/14 116/10
parlance [1] 114/4
part [24] 12/7 28/19 42/21 52/15 75/7 75/15 82/11 82/19 82/20 85/15 97/21 101/18 108/13 110/4 117/4 123/9 125/10 125/18 125/25 131/23 135/17 135/19 136/10 137/24
participants [1] 115/2
participate [2] 35/19 49/3
participated [2] 31/4 76/14
participating [1] 40/4
particular [4] 66/6 66/8 104/23 116/10
particularly [3] 11/12 31/10 33/19
parties [3] 31/5 131/17 140/1
partner [4] 52/25 53/2 53/3 121/22
partners [1] 22/22
parts [3] 7/24 108/21 136/14
party [1] 127/11
Pasadena [1] 3/21
Passino [1] 102/11
past [16] 20/23 28/20 37/4 37/7 37/10 38/18 61/15 67/2 67/4 78/11 82/22 101/23 111/13 113/4 115/24 125/20
pattern [4] 83/2 113/8 135/18 135/20
Paul [3] 19/5 97/25 139/13
Penal [1] 39/10
pending [1] 14/7
people [23] 23/3 25/13 33/11 33/19 33/20 33/22 40/25 43/8 43/24 52/19 74/8 83/4 88/14 88/18 107/1 107/17 110/22 122/21 123/14 123/21 126/18 126/24 127/15
perceived [1] 125/19
perfect [3] 111/12 111/19 111/24
perhaps [3] 66/24 115/6 137/10
period [9] 35/9 48/19 55/25 70/8 100/9 102/23 116/7 130/18 132/15
permission [1] 140/7
PERRY [2] 2/12 6/13
person [18] 9/3 22/19 31/24 32/5 32/24 64/24 65/1 74/11 87/3 104/23 109/21 111/19 111/24 112/10 113/18 116/14 116/23 118/16
person's [1] 34/14
persons [1] 121/9
Peter [1] 7/12
phase [2] 135/11 140/16
phone [8] 4/6 14/12 28/14 31/25 35/18 111/4 133/3 134/8
phonetic [2] 87/2 122/20
pick [2] 46/6 111/4
picture [1] 50/2
pieces [1] 42/2
pink [1] 115/12
place [3] 65/12 68/9 111/12
Plaintiff [2] 1/8 2/4
plan [1] 75/15
planned [1] 11/21
planning [3] 12/13 25/9 28/12
platform [1] 45/23
Platt [1] 7/8
play [1] 22/24
players [4] 33/16 43/3 43/10 43/20
plays [1] 45/17
plea [33] 16/3 16/11 16/12 16/14 16/16 16/17 16/25 25/9 25/9 28/10 40/17 47/7 50/21 53/15 56/18 57/19 58/2 58/7 69/4 72/12 82/13 85/15 85/17 95/7 100/20 100/21 100/23 130/17 130/17 132/5 132/5 132/15 139/23
plead [2] 118/2 118/20
pleading [2] 47/6 69/10
please [12] 6/9 10/21 10/24 11/6 13/8 23/16 63/23 74/23 97/20 133/19 135/9 140/2
pled [5] 57/21 71/6 117/25 130/22 131/10
point [23] 8/4 16/12 27/9 28/4 34/15 54/12 61/25 65/11 71/19 82/2 83/6 83/16 83/24 89/25 95/2 95/24 104/8 110/24 127/14 128/10 134/18 136/1 140/16
pointed [1] 102/20
points [2] 83/18 99/7
policy [8] 30/4 33/13 54/7 110/19 121/10 121/14 127/5 127/7
portion [6] 93/7 94/24 116/7 136/8 138/10 138/12
portions [1] 59/19
position [32] 8/25 32/17 49/24 50/24 56/22 61/17 61/20 62/7 71/10 88/9 88/11 94/17 95/3 95/9 95/17 95/20 96/10 96/13 96/20 97/9 97/11 97/24 98/1 99/4 99/8 99/10 101/17 117/21 118/24 120/9 128/6 134/24
positive [1] 35/4
possibility [1] 27/20
possible [5] 27/24 76/19 78/15 78/18 139/9
possibly [2] 116/11 125/12
POSSINO [76] 1/10 6/6 6/23 7/13 18/23 21/7 22/15 22/22 23/13 23/18 23/22 24/2 24/10 24/16 25/18 26/2 26/3 26/25 29/24 30/19 30/22 30/25 31/3 31/15 32/1 32/9 32/12 32/24 33/10 33/15 39/3 40/24 42/2 43/5 43/15 48/20 48/24 59/24 64/20 65/18 67/3 67/20 68/1 68/14 68/16 71/8 71/12 73/16 81/24 83/15 91/9 102/15 103/6 103/16 104/13 104/16 104/16 105/19 105/23 108/4 108/18 108/23 109/1 112/11 113/21 114/9 114/12 114/19 121/7 121/21 122/2 122/6 122/22 122/23 124/10 125/13
Possino's [1] 104/12

# P

Possino/Nix [1] 43/15
potential [8] 20/19 27/11 33/6 104/12 105/12 118/5 121/5 128/10
potentially [2] 7/19 129/15
practice [3] 13/16 17/17 27/11
pre [1] 121/20
pre-existing [1] 121/20
precisely [1] 34/23
preparation [1] 37/22
preparations [1] 65/11
prepare [1] 129/15
prepared [7] 8/8 26/10 58/21 61/13 98/7 107/15 135/24
preparing [1] 98/14
present [11] 2/12 6/11 6/15 6/23 7/4 7/6 7/10 41/14 41/16 87/1 88/14
presented [1] 93/25
presently [1] 13/6
PRESIDING [1] 1/5
press [2] 133/3 134/8
presumably [2] 84/25 99/1
pretty [2] 136/21 139/17
previously [5] 15/21 31/1 38/5 66/19 104/13
primarily [5] 19/9 23/4 61/6 96/7 96/8
primary [7] 8/7 22/3 22/5 34/6 58/9 59/15 96/13
prime [1] 75/15
prior [24] 6/14 13/13 16/19 17/11 31/17 36/3 45/4 46/18 47/6 50/19 54/11 64/7 65/21 66/25 67/5 69/10 71/10 78/13 79/3 90/4 90/25 91/2 105/25 119/18
prison [15] 28/14 31/11 34/16 34/22 35/1 35/8 35/19 49/6 62/1 73/18 73/20 89/23 111/8 111/15 121/11
proactive [12] 27/10 27/21 28/5 34/2 35/25 46/22 50/25 119/8 119/14 119/25 120/21 129/1
proactively [4] 20/6 28/2 35/23 47/23
probably [4] 12/2 57/19 106/22 139/4
probably some [1] 57/19
problem [3] 29/21 29/23 121/6
problems [2] 26/23 27/5
procedures [2] 10/12 10/13
proceed [2] 62/12 116/16
proceedings [3] 1/15 140/19 141/5
proceeds [3] 52/6 52/8 77/17
process [2] 7/16 20/19
produced [1] 30/10
productive [4] 7/15 7/19 28/15 30/3
proffer [38] 17/14 18/11 47/11 47/13 48/24 51/3 51/4 51/5 51/18 54/14 54/22 55/10 55/23 63/3 65/25 68/23 71/18 80/4 80/18 82/3 82/16 82/17 87/1 87/10 87/16 91/2 91/5 101/16 103/5 103/12 103/17 104/22 119/23 126/1 126/19 130/5 131/12 132/14
proffered [12] 27/1 27/3 36/18 38/5 48/5 61/14 72/9 72/13 85/23 91/21 126/18 130/4
proffering [2] 82/8 82/13
proffers [18] 16/5 20/11 46/21 47/9 48/4 61/16 85/9 88/15 88/15 95/1 95/1 96/12 96/13 96/15 103/23 105/9 119/5 126/14
profits [1] 39/8
progressed [1] 43/18
promise [2] 77/12 123/3
promising [1] 123/4
promote [3] 32/21 39/22 77/7
promoting [3] 73/21 73/25 74/4
promotion [6] 22/25 31/9 41/5 41/7 77/4 77/11
promotion for [1] 31/9
promotional [1] 74/5
prompts [1] 45/2
proof [1] 117/16
properly [1] 137/4
prosecuting [1] 15/20
prosecution [2] 16/22 88/8
prosecutions [2] 54/15 92/9
prosecutor [4] 8/14 40/18 87/9 94/22
prospective [2] 128/21 135/12
prove [1] 71/1
provide [13] 14/13 47/15 49/8 72/19 78/15 78/18 93/15 100/13 107/21 127/24 129/7 129/9 129/11
provided [26] 12/4 15/15 18/15 19/24 22/23 38/17 47/9 50/1 50/5 50/25 51/2 51/12 51/17 52/1 52/18 53/4 53/5 54/14 54/21 55/13 85/14 107/24 108/2 119/6 128/13 134/6
provides [1] 49/5
providing [4] 30/2 39/21 44/6 70/16
provision [1] 58/2
provisions [1] 100/23
public [5] 2/17 97/15 107/8 128/5 135/2
pull [3] 59/20 107/13 107/19
pulling [1] 40/25
pump [1] 75/16
purpose [1] 48/1
purposefully [1] 120/11
purposes [5] 9/16 12/13 36/10 48/12 96/12
pursuant [6] 47/13 48/24 72/12 91/5 103/5 141/3
pursue [3] 83/13 111/22 115/3
pursued [1] 86/1
put [27] 25/8 25/9 31/8 32/15 41/21 42/2 44/4 59/20 75/17 91/8 103/11 103/15 103/20 103/22 104/3 104/13 104/22 105/2 105/11 116/7 121/11 121/25 123/11 123/14 127/7 128/1 137/9
puts [2] 128/2 128/6
putting [6] 11/11 43/23 110/15 124/2 124/17 132/13

# Q

qualified [1] 45/14
Quantico [1] 98/10
question [37] 7/16 7/21 8/7 8/10 8/24 9/17 21/2 22/2 35/12 42/12 44/25 45/2 45/3 45/25 47/16 54/21 69/5 69/7 80/21 80/22 84/16 91/22 99/18 99/21 104/24 108/13 112/4 112/7 113/1 113/2 113/12 116/9 125/3 126/5 126/17 135/9 136/6
questioner [1] 80/20
questioning [2] 116/8 137/12
questions [15] 11/15 46/16 47/14 50/7 54/20 80/22 92/15 103/16 112/24 120/15 131/15 134/12 136/9 138/13 139/22
quick [1] 83/19
quickly [1] 109/18
quite [4] 19/25 80/19 83/9 133/11

# R

raise [1] 10/21
raised [2] 45/3 135/16
ran [1] 39/3
range [2] 18/3 25/11
rat [1] 126/16
Rather [1] 107/13
Rauth [1] 3/10
reachable [1] 98/20
reached [1] 21/2
reaching [1] 94/5
reacted [1] 136/15
reaction [4] 133/11 134/3 137/7 137/13
read [15] 13/25 17/24 19/8 21/16 48/14 48/15 49/19 55/10 56/22 61/16 62/6 63/22 88/9 91/17 91/19
reading [2] 107/6 107/7
realize [1] 26/7
really [9] 23/2 36/1 39/21 40/6 41/3 42/2 76/22 83/5 121/12
rear [1] 102/22
reason [6] 33/1 82/6 112/17 123/9 125/10 130/2
reasons [8] 35/16 49/6 54/6 62/24 89/2 108/17 127/17 127/18
reassigned [1] 61/23
rebuttal [2] 139/8 139/9
recall [39] 15/4 17/18 18/2 18/19 18/22 19/1 19/4 19/5 20/5 21/22 34/18 34/22 37/25 39/19 41/11 48/7 52/15 52/22 53/12 53/16 53/20 55/1 55/15 60/2 66/17 70/4 80/3 80/5 80/15 80/15 80/17 87/8 94/12 98/11 98/15 101/3 102/18 130/25 131/11
receive [1] 133/13
received [8] 14/11 29/11 56/19 57/15 57/15 92/3 134/8 135/1
recent [3] 6/18 49/4 115/24
recently [2] 108/8 113/5
recess [3] 42/8 46/8 133/24
reckless [1] 7/17
recklessly [1] 100/18
recognize [1] 8/5
recollection [7] 18/3 18/7 18/16 34/23 51/8 55/18 66/23
recommendation [2] 57/1 94/16
recommended [1] 114/12
reconstituted [1] 7/25
record [13] 10/25 12/19 58/24 106/17 106/19 107/10 118/21 118/22 118/23 120/2 133/16 136/20 137/23
recorded [4] 24/8 29/8 32/23 83/25
recording [2] 27/17 67/25
recordings [9] 29/23 47/24 68/1 84/7 113/20 114/14 115/8 119/9 130/12
records [3] 78/13 107/13 115/12
RECROSS [2] 5/3 126/7
RECROSS-EXAMINATION [1] 126/7
redirect [5] 5/3 12/11 117/3 117/7 138/14
refer [5] 59/4 63/21 64/12 66/24 76/3
reference [5] 8/19 36/13 63/20 64/1 86/24
referenced [1] 123/1
references [1] 134/25
referencing [2] 46/19 107/3
referred [2] 87/3 88/19
referring [5] 59/24 62/15 69/12 76/1 116/23
refers [1] 48/7
reflected [1] 96/11
refresh [2] 63/20 66/23
refreshed [1] 63/25
refuse [1] 120/4
regard [5] 36/15 46/18 107/3 119/5 119/12
regarding [10] 8/25 19/15 47/5 66/6 66/18 67/12 73/4 105/17 134/21 135/16
regardless [1] 54/5
REGIS [7] 1/10 6/6 6/23 67/20 68/1 74/9 75/5
registered [1] 39/20
regular [2] 73/16 101/4
regulations [1] 141/7
reinserted [1] 7/24
relate [1] 8/5
related [9] 7/21 16/13 17/16 38/17 62/3 62/3 85/13 85/21 104/18
relates [3] 10/8 135/21 136/12
relating [1] 74/5
relationship [11] 30/18 30/19 68/19 73/6 73/7 79/12 105/17 105/18 106/10 121/20 122/5

## R

relationships [5] 27/4 73/2 106/16 106/23 110/10
release [4] 133/3 134/8 135/17 135/22
released [1] 34/22
relevance [1] 38/20
relevant [17] 8/7 8/13 9/23 38/12 38/19 40/19 40/21 49/22 54/12 54/13 57/4 57/7 57/11 57/13 104/8 116/9 120/10
relied [2] 94/5 118/2
relies [2] 45/18 45/20
relocated [1] 138/4
rely [4] 20/22 44/21 94/9 108/10
relying [1] 45/24
remember [13] 8/16 18/5 19/25 39/7 53/18 55/2 58/4 60/1 69/13 98/9 100/24 101/22 137/15
repeat [1] 100/5
repetitive [1] 83/23
rephrase [1] 125/3
replace [1] 33/20
report [5] 19/22 23/12 23/15 23/17 40/8
reported [1] 141/5
REPORTER'S [1] 1/15
reports [1] 18/22
represented [1] 133/4
request [1] 94/8
requirement [3] 38/16 93/4 93/11
requirements [11] 36/3 36/6 44/19 44/22 44/23 46/3 92/20 92/20 92/23 92/25 93/2
reread [1] 26/9
resources [1] 120/13
respect [5] 27/2 44/6 49/15 108/15 110/8
respond [3] 113/2 118/8 136/25
response [4] 133/21 134/6 134/19 134/23
responsible [2] 77/3 128/5
rest [2] 41/9 114/15
restate [2] 20/3 99/21
restrictions [2] 30/4 54/7
result [1] 87/24
resume [1] 137/25
retrospect [2] 104/4 115/22
returns [1] 128/12
reveal [3] 103/1 124/20 125/7
revealed [3] 111/12 111/19 127/2
Revenue [1] 80/13
review [1] 16/17
reviewed [3] 18/16 18/21 106/24
reviewing [3] 22/25 66/23 94/10
Richard [3] 3/20 3/20 7/9
right [98] 10/21 17/18 19/20 23/9 27/7 27/23 28/11 28/11 33/12 33/17 35/13 42/1 42/2 45/20 50/16 51/3 51/7 53/22 53/25 55/4 55/11 56/17 57/1 57/16 57/21 57/25 58/3 59/7 62/9 63/5 63/13 63/14 65/10 65/14 67/8 67/13 68/2 68/7 68/8 68/10 68/15 69/3 69/7 70/13 70/18 72/1 72/8 73/9 73/13 73/18 75/12 76/16 76/17 77/15 77/20 80/14 84/12 84/21 86/20 87/12 88/12 88/22 88/24 89/10 89/23 90/9 90/15 91/2 91/3 91/4 91/9 94/3 99/22 101/25 102/13 116/5 116/22 123/21 126/10 126/19 127/6 127/19 127/21 128/15 129/5 129/7 129/9 129/16 130/4 130/7 130/20 130/22 131/2 131/8 131/11 132/4 134/4 136/11
risk [3] 34/7 118/17 121/16
risked [1] 126/9
risky [1] 83/4
rmcallahanjr [1] 3/23
Robinson [4] 2/20 2/20 7/3 139/21
role [13] 22/24 31/6 32/22 33/11 39/14 43/11 73/23 83/7 83/9 93/14 93/22 121/8 122/20
roles [3] 43/13 43/20 44/2
room [2] 1/24 10/1
rooms [1] 6/18
ropes [1] 123/15
rough [1] 14/19
RPR [1] 1/23
Rubin [2] 7/12 7/13
rule [1] 93/18
run [1] 17/17
running [1] 66/2

## S

S-E-N-Z [1] 64/12
S8 [3] 39/20 40/1 40/2
SA [2] 39/23 39/25
said [42] 8/22 9/12 10/19 25/18 26/6 26/6 32/6 45/5 48/5 50/18 55/20 55/22 57/17 60/15 67/2 68/18 68/20 77/9 77/10 91/3 91/24 91/24 92/19 94/15 94/21 94/25 96/14 96/16 96/16 96/22 100/20 103/4 108/16 110/7 117/24 123/10 125/11 128/9 133/5 133/7 133/12 140/16
sake [1] 8/18
sale [1] 76/14
sales [1] 40/9
same [16] 28/23 33/5 33/6 40/22 47/21 55/19 61/16 65/5 71/19 82/14 100/3 120/23 121/10 121/14 123/3 128/4
San [1] 139/23
San Francisco [1] 139/23
sanitize [1] 116/8
Santa [1] 4/5
Saunders [2] 4/3 7/1
saved [1] 121/12
saw [6] 16/16 22/20 25/7 55/13 61/17 61/20
say [39] 10/18 28/18 51/10 55/20 56/3 58/13 66/25 67/23 69/22 71/8 80/23 82/10 85/12 91/20 96/14 101/22 102/15 109/21 110/18 111/4 111/4 111/20 113/3 113/25 115/23 115/23 116/2 118/13 118/15 122/18 123/14 124/18 125/13 125/24 128/19 128/23 130/9 137/16 140/13
say he [1] 137/16
saying [7] 25/16 45/13 91/15 110/15 120/5 131/16 132/2
says [11] 68/14 83/8 97/22 100/25 109/11 110/2 111/1 112/13 114/2 118/15 118/16
sbcglobal.net [1] 3/18
Scarpello [3] 64/6 64/19 130/8
scheme [30] 25/10 28/23 30/5 33/16 35/19 42/6 43/6 44/4 47/6 49/1 54/3 66/3 66/3 66/5 66/5 66/7 66/8 67/6 70/8 70/13 103/7 104/16 107/23 110/4 110/10 110/21 111/3 128/1 131/23 132/7
schemes [7] 15/18 48/18 52/2 52/4 52/6 107/18 135/3
Scheper [1] 3/5
scheperkim.com [1] 3/8
scope [4] 11/16 95/14 129/18 135/10
SDNY [4] 18/8 18/8 38/5 119/5
seal [2] 10/6 10/8
sealed [2] 116/13 116/14
seated [1] 10/24
SEC [1] 39/24
second [4] 8/3 98/6 105/15 139/24
secondary [1] 38/20
Secondly [1] 30/3
section [13] 26/21 39/10 39/10 48/10 73/6 93/5 94/15 94/16 97/2 101/24 102/3 105/10 141/3
securities [8] 13/14 13/18 14/4 18/19 42/24 89/6 89/15 110/3
see [40] 11/18 12/5 16/12 16/19 24/20 30/18 32/7 33/24 42/19 55/16 57/3 60/23 61/21 62/4 64/1 64/16 71/17 76/6 83/20 86/8 97/25 98/16 102/12 103/9 103/24 109/11 109/16 109/25 112/12 112/16 115/1 118/7 124/13 132/18 133/9 134/25 135/5 137/7 139/13 139/25
seeing [2] 54/10 57/18
seeking [4] 17/22 36/10 44/10 50/2
seem [4] 40/21 49/21 54/12 128/21
seemed [5] 22/2 40/20 75/4 123/25 125/10
seems [7] 8/11 9/5 22/11 52/22 102/21 113/8 120/14
selective [2] 9/15 54/11
selectively [1] 125/19
self [1] 89/22
self-surrendered [1] 89/22
selling [3] 40/5 40/6 126/16
send [1] 94/25
sense [6] 26/11 35/23 37/12 47/6 116/12 121/19
senses [1] 11/4
sent [1] 95/1
sentence [7] 29/11 29/14 37/17 91/14 96/10 102/9 103/12
sentenced [7] 25/10 25/10 28/13 61/25 131/2 131/7 131/8
sentencing [42] 50/23 56/22 57/1 57/15 57/16 57/23 61/17 61/20 62/7 79/16 88/9 88/11 94/17 95/3 95/4 95/8 95/9 95/17 95/18 95/20 95/22 96/12 96/19 97/5 97/8 97/9 97/10 97/24 98/1 99/2 99/4 99/7 99/10 99/16 101/1 101/5 101/17 117/21 132/15 132/24 134/7 135/1
SENZ [23] 63/12 63/19 64/4 64/6 64/10 64/12 64/19 65/9 65/21 66/3 66/16 67/15 71/19 74/6 76/12 77/4 81/13 81/21 82/3 82/6 82/17 130/6 130/10
separate [7] 43/11 80/16 81/3 81/6 81/8 81/11 107/5
separately [2] 48/21 102/16
September [2] 71/24 104/14
series [1] 106/20
serious [1] 110/18
seriously [1] 93/2
serve [3] 27/10 28/5 35/9
Service [1] 80/14
services [1] 39/21
session [4] 47/12 71/18 82/16 82/17
sessions [16] 51/3 51/5 51/13 51/18 54/14 54/22 80/4 82/3 87/1 87/10 87/16 91/2 103/12 103/17 104/22 126/19
set [3] 94/4 94/10 139/23
setting [1] 45/18
seven [11] 17/14 27/1 36/19 48/5 48/23 51/5 91/5 91/21 94/4 103/5 126/18
several [5] 34/1 52/2 62/21 133/2 135/2
share [1] 21/21
shared [2] 21/22 110/10
shares [8] 40/5 40/6 40/9 64/19 64/23 65/17 76/12 130/8
she [2] 108/7 108/12
shed [1] 136/14
sheet [1] 115/13
sheets [2] 115/14 115/17
shell [1] 64/6
Sherman [2] 6/7 7/2
shocking [1] 133/7
short [3] 35/9 68/20 139/2
shorthand [1] 25/3
Shortly [2] 25/25 68/13
shot [2] 112/4 112/7
should [12] 12/10 12/17 36/21 37/4 45/4 94/6 99/3 99/6 103/20 103/22 104/3 113/7

# S

shouldn't [1] 138/6
show [5] 106/25 107/14 109/18 120/2 123/15
showed [2] 91/18 134/7
shown [2] 63/1 64/22
shows [4] 46/1 106/17 106/19 118/22
sic [2] 10/14 69/14
side [1] 42/16
signature [1] 59/12
signed [7] 28/10 50/21 56/18 69/3 85/18 132/5 132/5
significance [2] 8/23 123/17
significant [2] 38/21 38/22
signing [2] 71/10 119/18
similar [2] 29/16 47/25
similarly [1] 41/17
simple [1] 115/22
simply [5] 28/18 113/3 117/20 118/9 124/19
since [4] 68/15 95/24 136/22 137/14
single [1] 95/16
sir [8] 32/10 34/17 93/1 98/2 100/22 102/19 103/10 110/25
situation [3] 27/6 45/7 81/13
six [4] 13/14 13/17 76/11 87/12
slips [1] 115/12
small [1] 97/1
smuggled [4] 28/14 35/18 49/6 111/8
so [118] 8/23 9/5 9/17 10/3 10/9 10/13 12/16 18/8 19/7 20/9 21/5 22/25 23/7 24/14 25/11 27/2 27/11 27/15 27/20 31/8 31/11 31/12 31/20 32/16 32/22 32/25 33/10 34/1 34/24 35/12 35/22 40/10 40/14 40/18 40/21 51/2 51/10 52/10 52/12 53/8 53/10 54/2 54/9 54/13 55/22 58/5 60/19 63/25 64/6 65/24 66/15 67/4 69/12 69/22 70/4 70/12 70/24 71/9 71/16 71/22 73/14 76/25 80/16 81/3 81/18 82/1 82/2 82/5 82/14 83/2 84/7 84/14 85/22 87/5 87/8 87/18 89/20 89/25 90/2 92/3 92/11 93/4 95/2 95/20 99/7 99/13 101/5 103/24 104/22 105/4 107/10 108/19 111/12 111/15 111/19 115/16 116/16 118/2 119/4 119/17 119/18 120/11 121/14 121/16 122/4 122/10 122/11 122/11 124/3 128/6 130/13 132/10 134/1 135/14 136/1 136/1 136/12 140/15
so-called [2] 119/18 122/11
solely [1] 46/21
some [75] 6/18 8/5 8/23 9/3 9/11 11/2 11/4 11/15 16/10 16/12 18/16 18/18 26/24 27/9 28/4 28/9 28/9 31/24 32/24 34/15 34/24 39/8 39/9 39/11 40/23 43/22 45/13 47/6 51/25 57/19 57/22 61/7 63/1 65/11 68/25 68/25 71/7 73/5 73/10 73/14 74/7 74/7 75/6 78/25 79/8 79/10 80/12 81/7 87/18 89/10 95/17 105/10 106/14 106/14 111/11 115/1 115/16 118/16 121/4 121/7 122/21 122/21 123/3 123/7 123/10 124/9 124/14 125/23 127/24 128/10 129/21 133/5 134/12 137/16 138/17
someone [15] 10/3 14/12 21/2 21/3 29/4 36/1 75/13 110/8 112/15 113/17 118/12 124/10 128/23 139/25 140/6
something [16] 37/17 41/13 47/7 57/17 71/16 75/5 76/23 80/23 81/18 87/2 99/18 111/17 131/20 132/19 135/22 138/7
Sometime [1] 14/16
sometimes [1] 118/14
somewhat [1] 11/16
somewhere [6] 13/25 14/25 33/9 48/9 48/10 70/3
sorry [20] 20/3 47/2 52/24 63/7 63/11 63/22 64/2 64/11 68/8 70/24 71/13 76/7 77/14 79/20 80/5 91/22 100/5 118/4 131/6 131/8
sort [9] 12/7 22/21 28/23 40/22 54/11 70/22 113/1 116/8 116/20
sought [1] 44/17
sound [1] 50/4
sounds [2] 72/1 101/4
source [6] 7/19 20/12 20/20 25/21 40/19 50/25
soured [1] 131/17
South [1] 3/21
Southern [2] 9/3 84/25
speak [2] 23/7 139/24
speaking [2] 45/18 76/9
special [16] 2/12 6/15 10/17 12/6 13/9 19/5 20/10 96/22 96/23 97/1 97/4 98/3 98/25 100/7 106/21 133/11
specialized [3] 89/5 89/15 110/2
specially [1] 7/1
specific [8] 29/4 37/2 45/18 67/8 73/22 113/21 113/21 117/1
specifically [7] 7/24 8/17 16/17 29/6 47/15 67/17 85/21
specifics [1] 17/18
spell [1] 10/25
spells [1] 82/15
spend [1] 54/10
spent [1] 29/22
spoke [4] 51/3 73/1 88/20 113/22
spoken [1] 96/9
spokes [1] 22/23
Sport [9] 63/12 64/9 64/13 65/9 66/5 66/16 74/2 122/18 128/14
Spring [2] 1/24 2/9
squad [3] 14/2 14/5 55/19
stage [4] 10/11 42/25 43/14 43/17
stance [1] 25/14
stand [6] 10/17 71/3 116/11 133/19 139/25 140/7
standing [1] 7/12
standpoint [1] 33/1
start [4] 27/15 31/12 74/3 139/18
started [10] 18/17 21/6 25/23 26/1 31/24 58/10 65/1 68/21 81/19 82/18
starting [2] 17/10 63/10
state [12] 6/9 8/8 10/25 11/14 29/20 46/1 54/1 64/16 69/24 94/4 137/2 137/3
stated [2] 70/7 127/18
statement [13] 18/11 38/17 38/22 68/16 93/6 93/8 93/11 93/15 102/21 103/2 108/4 108/6 119/17
statements [6] 17/14 36/14 36/16 55/23 57/9 119/23
STATES [40] 1/1 1/7 1/23 2/6 2/8 2/9 6/6 6/7 6/11 6/12 14/11 14/15 14/22 15/1 15/4 15/8 21/9 21/24 22/6 36/9 37/16 37/21 38/8 44/22 45/5 45/20 58/23 59/25 60/16 60/19 63/3 66/4 68/23 72/10 80/1 80/8 80/24 95/12 141/4 141/8
statute [2] 44/19 93/9
Ste [1] 4/5
stellar [1] 72/4
stenographically [1] 141/5
STEPHEN [6] 1/5 53/17 55/14 55/16 56/5 56/11
steps [1] 17/10
Steven [1] 14/10
still [10] 28/23 35/7 36/25 41/23 85/1 115/11 124/7 131/16 138/16 138/19
stipulations [2] 135/17 135/21
stock [24] 25/8 32/22 39/20 41/5 41/7 43/7 64/20 66/6 71/6 71/15 71/22 71/24 72/3 73/21 73/22 73/25 74/4 75/6 75/12 75/13 75/17 76/14 77/8 114/1
stock-promotion [2] 41/5 41/7
stocks [3] 89/9 89/17 110/3
stood [1] 135/3
stop [1] 27/15
Stopped [1] 60/13
Stradling [1] 3/10
Street [5] 1/24 2/9 2/17 3/6 3/16
strengthened [3] 28/25 29/3 49/20
strings [1] 40/25
strong [1] 114/9
stronger [1] 29/6
stuff [2] 74/10 116/3
subject [1] 84/18
subjects [12] 26/24 48/17 49/1 78/1 78/4 95/25 102/13 103/8 104/9 109/22 109/23 115/5
submit [1] 95/16
submitted [4] 11/23 59/6 70/20 95/21
subsequent [1] 55/7
subsidiary [1] 138/17
substantial [1] 83/14
successful [7] 32/25 33/5 54/15 106/6 109/9 109/14 128/23
successfully [4] 37/4 37/7 37/10 37/11
successfully cooperated [1] 37/11
such [1] 94/19
sudden [1] 111/3
suggested [1] 25/3
suggesting [1] 45/1
suitable [2] 28/20 120/21
Suite [3] 3/11 3/16 3/21
Sukkakis [1] 87/2
summarized [1] 107/9
summary [2] 50/1 83/2
supervised [2] 135/17 135/22
supervisor [2] 14/10 133/12
supervisory [1] 13/9
suppose [1] 37/14
supposed [2] 54/3 132/8
supposedly [3] 25/14 72/11 130/16
sure [24] 13/22 13/23 17/19 30/8 36/18 41/2 42/22 47/20 58/5 58/19 62/10 68/25 73/15 79/1 79/10 79/17 81/12 83/21 87/13 90/10 100/6 110/11 121/4 129/19
surprised [1] 15/19
surrender [1] 132/15
surrendered [5] 28/14 32/15 34/18 89/22 130/16
SVW [4] 1/9 1/9 6/5 6/7
swearing [1] 44/1
swore [1] 46/20
sworn [3] 10/22 13/1 14/2
sycr.com [1] 3/13
symbol [1] 64/13

# T

T-a-r-w-a-t-e-r [1] 11/1
tab [3] 59/10 63/21 134/24
table [2] 6/11 56/7
take [14] 6/20 17/10 42/8 50/13 56/5 56/14 79/13 88/2 88/10 93/2 93/19 111/21 138/12 139/4
taken [1] 64/22
taking [4] 65/12 75/5 93/9 120/13
talk [12] 18/12 38/7 68/6 68/9 82/6 91/13 106/25 107/15 116/3 117/2 125/21 127/5
talked [6] 76/16 87/17 106/21 107/17 108/15 126/15
talking [9] 19/14 50/4 53/17 97/23 98/3 108/5 113/10 116/25 138/18
talks [2] 93/10 102/9
tandem [1] 77/6
target [20] 22/3 22/5 22/7 22/9 26/24 48/17 49/1 58/9 62/18 67/11 78/1 78/4 84/18 95/25

# T


target... [6] 102/13 103/7 104/8 109/22 109/23 115/5
targets [3] 20/8 83/13 84/24
Tarun [2] 15/17 68/4
TARWATER [41] 5/5 6/16 6/20 7/17 8/6 8/11 8/17 8/19 8/24 9/6 9/9 9/14 10/17 10/20 11/1 11/5 12/6 13/1 46/18 50/11 59/3 60/15 61/7 61/15 62/6 71/3 71/10 83/25 86/10 92/19 97/17 100/7 106/21 106/23 131/18 135/12 136/23 137/18 138/3 138/10 138/10
Tarwater's [2] 11/14 133/12
tasked [3] 73/21 73/25 74/4
tax [4] 57/22 85/13 85/21 86/5
taxes [1] 85/22
technically [2] 72/2 72/5
telephone [1] 49/5
telephones [1] 67/11
tell [16] 9/24 10/1 10/3 23/23 25/3 44/5 74/8 88/21 112/3 112/7 123/15 125/11 125/13 126/1 128/12 128/24
telling [5] 25/13 54/4 118/9 119/19 124/10
temporarily [1] 87/18
ten [7] 14/25 46/6 48/22 67/21 102/17 102/22 108/6
ten-rear [1] 102/22
tend [1] 76/23
term [8] 52/25 53/2 53/3 57/19 64/14 66/7 115/11 121/22
terms [7] 8/1 20/19 50/22 117/2 117/4 122/11 135/10
testified [9] 13/1 21/13 55/24 62/6 69/9 91/20 106/13 129/24 137/20
testify [9] 41/21 71/15 106/15 117/11 118/13 118/18 129/13 129/15 136/17
testifying [1] 137/3
testimony [10] 6/21 9/23 11/24 19/7 32/12 46/18 53/21 75/2 94/21 120/17
than [18] 12/15 14/21 14/25 14/25 32/18 34/9 36/25 50/22 54/8 57/11 57/13 107/13 117/23 117/25 118/12 121/18 128/17 128/24
Thank [11] 12/22 12/23 23/10 33/25 46/7 46/17 50/6 56/15 126/4 140/14 140/17
that [818]
that's [51] 9/15 18/23 23/19 25/6 26/1 30/6 35/13 40/13 51/8 55/24 56/22 56/24 57/25 59/12 64/3 64/25 65/24 67/18 73/11 74/9 74/12 81/14 81/15 82/4 85/8 91/4 91/10 91/24 93/17 99/9 102/25 103/14 103/18 103/19 109/4 109/6 118/25 120/13 120/14 128/22 129/25 130/5 130/8 130/24 131/24 132/16 132/24 133/1 133/7 135/6 139/23
their [14] 20/6 33/16 39/3 68/19 72/21 77/9 79/12 107/8 107/18 108/18 110/9 121/7 124/2 128/25
them [37] 11/12 18/7 18/21 22/24 23/2 24/17 26/8 27/2 28/9 31/1 31/1 31/4 31/7 31/10 31/13 32/15 32/16 43/13 43/23 44/5 47/7 51/25 63/1 73/18 87/12 104/6 106/14 107/14 111/2 112/15 118/19 125/14 127/17 129/1 130/24 130/25 138/20
themselves [3] 39/8 57/12 118/17
then [49] 7/25 9/6 12/10 14/10 14/11 14/15 17/12 18/17 21/9 24/16 26/6 26/24 28/18 34/24 35/10 37/15 39/21 40/17 42/13 43/19 44/6 49/20 51/14 54/2 68/18 68/20 76/23 79/5 79/7 83/1 84/23 85/3 92/13 93/4 100/18 103/4 110/2 111/14 113/11 116/22 118/14 120/15 123/16 128/11 137/17 137/18 137/23 138/15 140/15
then-assistant [5] 14/11 14/15 21/9 37/15 137/18
then-AUSA [1] 17/12
then-supervisor [1] 14/10
Theodore [1] 20/9
there [74] 7/11 8/10 9/6 10/5 14/12 14/25 17/19 18/8 19/7 19/15 19/24 22/5 22/21 23/24 34/11 36/20 37/2 37/20 38/11 39/10 40/24 43/1 43/22 44/2 44/4 45/16 47/6 47/16 48/10 51/5 58/23 59/16 59/19 61/7 62/1 64/4 67/11 68/8 70/14 73/2 73/5 74/10 75/4 76/4 77/12 82/5 85/3 85/4 85/7 85/9 87/12 87/14 88/14 92/8 93/20 95/20 102/23 102/25 103/24 104/10 105/15 105/16 106/5 106/8 110/18 113/8 114/9 116/15 121/1 121/2 124/9 124/14 127/7 137/21
there's [11] 7/14 17/19 36/1 45/13 72/22 80/23 85/4 106/20 106/22 116/18 129/2
thereafter [6] 14/16 68/13 117/25 133/2 133/3 133/11
therefore [3] 35/15 71/6 111/3
these [27] 17/8 18/16 26/12 27/4 27/18 43/1 49/6 49/8 51/2 51/13 51/18 53/21 73/25 80/16 83/4 88/14 88/17 88/22 110/15 116/3 116/10 120/12 123/14 127/10 129/20 129/22 135/21
they [69] 9/4 18/3 18/19 19/12 20/13 20/13 21/4 22/22 22/22 23/1 23/6 24/23 25/21 29/25 30/2 31/5 31/8 32/5 33/11 33/18 39/7 42/4 43/22 48/21 50/23 51/1 53/8 68/18 68/20 72/21 76/22 76/23 77/1 77/9 77/17 78/25 83/14 85/12 95/11 95/16 99/6 102/16 105/8 105/12 106/13 106/13 109/14 110/8 110/8 111/3 112/10 113/22 113/22 113/23 113/23 113/25 114/4 115/11 122/2 122/3 122/13 122/24 123/25 124/3 128/24 130/22 135/1 139/2 139/7
they'll [1] 111/4
they're [8] 25/9 42/5 77/5 108/6 108/6 111/1 128/11 128/12
they've [6] 78/23 102/22 111/2 135/16 135/18 135/20
thing [8] 38/21 58/17 59/9 79/25 91/3 118/12 125/15 134/15
things [19] 8/24 9/16 36/2 42/17 45/6 47/24 50/16 53/22 54/16 55/25 56/2 83/9 117/9 118/9 119/19 124/4 129/18 129/20 129/22
think [72] 9/22 12/16 13/20 16/9 21/3 23/25 26/6 28/25 29/2 29/7 29/17 31/5 33/22 34/4 34/4 34/8 34/9 34/10 34/19 35/13 36/23 38/10 39/1 40/8 41/13 42/1 45/6 45/12 49/23 50/22 52/11 54/5 57/22 62/22 66/12 70/3 70/4 73/4 74/10 82/2 87/17 91/4 91/25 97/17 102/20 104/4 104/7 108/16 113/13 114/18 114/24 115/5 116/11 116/16 121/18 123/10 126/16 128/23 129/21 134/12 135/14 136/3 136/20 136/21 137/12 137/21 137/23 138/7 138/9 138/9 138/15 138/16
think's [1] 92/12
thinking [2] 38/10 116/8
thinks [1] 50/23
third [1] 127/11
third-party [1] 127/11
Thirty [3] 76/5 76/6 76/7
Thirty-five [1] 76/7
Thirty-three [2] 76/5 76/6
this [147]
Thomas [1] 87/7
those [52] 17/25 18/24 23/3 30/2 32/7 33/5 33/20 33/21 36/6 36/12 37/12 40/5 40/6 43/24 44/23 48/4 49/2 49/18 52/6 52/8 57/13 61/16 67/12 67/13 73/11 75/8 79/9 81/3 81/6 87/24 88/25 92/23 92/25 93/2 95/1 98/25 99/4 103/17 105/9 107/13 109/9 109/11 110/21 120/21 121/3 121/9 121/10 125/24 126/21 127/3 129/18 137/5
though [2] 25/14 62/9
thought [24] 15/22 16/1 16/4 20/18 20/25 23/17 31/8 32/17 33/5 34/12 36/23 36/24 37/6 37/9 40/18 50/5 51/1 57/10 57/25 83/6 91/18 91/24 118/25 131/3
threat [1] 118/18
three [8] 14/25 68/21 76/5 76/6 94/4 106/22 106/23 134/24
through [18] 16/4 16/11 17/21 21/12 23/2 29/6 49/4 50/3 59/8 76/13 77/21 91/25 109/18 110/14 120/18 121/3 121/12 126/3
throughout [1] 64/14
throw [1] 32/20
Thursday [1] 140/11
thus [1] 137/3
ticker [2] 64/11 64/13
time [91] 8/6 8/8 10/4 11/3 14/22 15/2 16/1 16/16 18/17 20/10 22/8 22/10 22/14 22/16 22/18 22/25 24/6 24/18 26/8 27/1 27/25 28/15 29/21 31/16 31/17 32/5 34/5 35/8 44/17 47/21 48/19 49/21 50/13 50/16 52/1 54/10 55/7 55/25 56/16 56/21 58/14 58/16 61/12 61/20 62/7 62/9 66/3 67/15 68/12 68/20 69/17 69/25 72/9 72/13 75/20 79/2 79/19 79/20 79/25 81/10 82/14 84/4 86/19 89/13 92/5 94/14 94/18 94/20 94/22 97/3 98/7 104/7 106/25 112/24 114/6 114/11 114/25 116/7 120/23 122/5 123/25 125/22 125/22 126/12 130/3 130/12 130/18 132/8 132/16 139/16 139/18
timeline [4] 82/15 130/3 134/7 134/15
times [19] 8/13 26/13 27/1 27/3 36/19 36/19 43/7 48/5 48/23 72/17 80/16 81/3 81/6 81/8 81/11 91/5 91/21 103/5 113/12
timing [1] 98/9
Timothy [1] 87/5
tip [1] 83/4
Title [1] 141/4
Title 18 [1] 141/4
today [3] 6/15 12/4 134/11
together [8] 13/16 24/11 42/2 48/18 48/22 67/4 77/17 124/17
told [19] 8/16 9/3 14/14 15/20 16/20 20/12 20/17 48/21 74/7 79/24 86/16 94/23 102/16 120/6 120/9 121/24 127/16 131/18 137/21
too [4] 10/11 12/18 77/15 102/11
took [2] 68/19 68/20
top [4] 22/14 22/16 22/19 97/21
Torrance [1] 2/21
total [1] 51/5
totality [2] 46/2 115/3
totally [2] 28/21 40/20
touch [2] 32/15 43/23
toward [1] 24/25
track [1] 70/22
trade [1] 42/4
traded [5] 71/6 71/15 71/22 71/24 72/2
trades [1] 69/9
trading [3] 25/7 70/16 72/6
trained [3] 90/15 90/17 92/23
training [2] 75/18 75/25
transaction [1] 69/16
transcript [3] 1/15 141/5 141/6
transfer [3] 64/22 122/19 123/23
transferred [2] 64/19 130/8
transferring [1] 65/17
transition [1] 61/7
trial [3] 7/13 11/3 136/5
trials [1] 118/6
tricked [1] 57/10
tried [5] 29/5 33/4 34/12 38/25 42/6
true [6] 16/4 80/7 97/8 103/21 106/19 141/4

# T

trust [4] 109/22 109/23 122/13 124/19
trusted [5] 73/8 89/19 109/4 109/24 113/6
trustworthiness [2] 28/21 82/21
trustworthy [5] 28/16 34/11 82/14 125/4 130/1
truth [3] 7/18 49/23 49/25
truthful [4] 16/2 20/21 49/16 132/8
truths [2] 120/10 120/12
try [6] 28/1 80/22 123/8 138/19 139/11 140/15
trying [4] 12/12 41/21 70/24 98/9
Tuesday [3] 139/14 140/1 140/6
turn [5] 10/13 82/23 97/19 101/18 120/16
turned [2] 86/5 117/24
turning [2] 111/14 119/4
Twenty [1] 133/25
Twenty-two [1] 133/25
two [21] 6/15 12/17 12/20 12/21 40/25 59/24 61/24 62/15 65/24 72/20 80/16 81/3 81/6 81/8 81/11 83/18 85/20 115/6 133/25 135/21 139/1
two-and-a-half [1] 65/24
twofold [1] 82/2
tying [1] 96/2
type [3] 51/12 71/7 95/17
typical [1] 73/23

# U

U.S [13] 8/13 8/25 14/18 47/12 60/7 64/25 80/21 84/18 84/23 84/24 120/8 131/13 131/22
U.S.C [1] 93/10
UC [1] 112/18
uh [1] 129/14
uh-huh [1] 129/14
unavailable [1] 35/22
unbeknownst [2] 30/25 31/2
unclear [1] 131/16
unconnected [1] 111/3
uncovered [1] 81/19
under [7] 10/6 10/8 16/3 44/19 72/5 82/13 129/18
undercover [1] 109/13
undermined [1] 83/5
understand [15] 12/8 12/9 16/6 30/16 43/10 48/1 50/24 54/1 71/20 91/22 93/18 93/22 93/24 99/10 110/9
understandable [2] 113/24 114/5
understanding [11] 30/24 46/19 46/24 47/11 47/17 53/14 74/19 81/7 119/5 119/7 119/16
understands [1] 83/24
understood [5] 25/1 25/6 43/13 44/1 69/3
unduly [1] 83/4
unintentionally [1] 9/14
unit [1] 13/10
UNITED [40] 1/1 1/7 1/23 2/6 2/8 2/9 6/5 6/7 6/11 6/12 14/11 14/15 14/22 15/1 15/4 15/7 21/9 21/23 22/5 36/9 37/16 37/21 38/8 44/21 45/5 45/20 58/23 59/25 60/16 60/19 63/3 66/4 68/23 72/9 80/1 80/8 80/24 95/12 141/4 141/8
Universal [1] 107/5
unless [5] 37/17 108/19 118/11 136/9 137/16
unlikely [5] 27/24 48/19 49/7 62/25 83/3
unnecessary [1] 8/4
unregistered [1] 40/6
unrelated [1] 104/15
unreliable [2] 20/13 86/16
unsuitable [1] 28/5
until [3] 89/25 122/3 126/14
untrustworthy [3] 20/13 34/11 86/17
unusual [1] 13/21
up [29] 11/12 27/3 28/13 39/7 43/25 46/6 47/3 47/21 53/22 68/21 70/13 70/14 71/9 87/19 89/25 97/4 105/8 107/21 108/8 111/4 111/16 117/9 125/24 130/24 131/1 132/15 136/4 138/7 140/15
upcoming [1] 67/10
upfront [1] 54/17
upon [10] 17/8 25/16 42/23 43/9 44/21 45/19 45/20 114/13 115/8 115/24
upset [6] 55/2 58/9 131/24 132/1 132/9 132/16
us [9] 16/20 25/4 30/17 35/20 37/6 37/9 38/14 121/24 126/1
use [18] 20/12 21/2 21/3 25/3 33/2 55/8 89/3 108/10 108/17 111/2 113/11 114/4 115/11 116/19 116/22 117/1 121/13 123/25
useable [3] 62/14 62/22 73/3
used [15] 35/18 41/12 41/17 52/10 52/12 64/14 96/22 100/10 102/10 110/3 113/4 121/4 121/5 128/7 137/22
useful [3] 51/1 51/2 78/15
using [2] 112/18 127/13
usually [3] 47/12 111/1 118/16
utilized [1] 78/11
utilizing [1] 112/15
Uyeda [2] 2/16 6/22

# V

vague [3] 34/23 40/13 55/18
valuable [6] 36/1 37/17 54/24 55/20 56/2 72/19
value [1] 53/9
valued [1] 53/8
various [2] 43/20 110/3
versus [3] 6/6 6/7 34/8
very [23] 12/12 28/15 29/22 30/3 33/21 42/20 46/7 48/15 55/18 63/8 83/1 93/2 109/18 109/20 115/22 116/9 116/9 117/2 117/6 126/4 136/14 136/18 136/18
vetted [1] 137/4
vetting [1] 46/2
viability [3] 20/19 26/22 137/5
viable [3] 35/25 86/11 124/18
victim [1] 104/16
victims [1] 127/12
view [8] 22/14 25/2 26/23 27/25 27/25 28/5 32/7 38/16
violation [1] 40/7
Virginia [1] 98/11
virtue [1] 72/21
visceral [1] 133/11
volunteered [2] 82/16 104/24

# W

wait [5] 42/19 89/21 111/20 132/7 136/2
waiver [3] 7/8 7/11 7/14
wake [1] 134/8
want [26] 9/15 9/17 9/18 11/2 11/4 11/4 12/10 42/23 50/13 54/18 67/7 78/25 80/23 81/12 83/23 96/3 109/18 116/16 123/12 123/20 125/16 128/11 134/12 136/2 136/2 136/4
wanted [12] 14/12 16/19 42/7 79/16 83/13 90/21 95/25 116/6 123/22 123/23 123/24 124/1
wanting [1] 46/4
wants [1] 8/11
was [398]
Washington [3] 13/10 98/10 138/4
wasn't [29] 9/10 15/23 16/9 27/22 29/21 33/5 37/12 38/10 39/21 53/7 54/4 55/3 57/7 57/11 62/1 62/13 70/5 70/10 70/20 75/19 77/4 80/4 82/7 83/9 103/16 104/23 120/9 121/9 129/25
waste [1] 10/4
watched [1] 133/10
Water [1] 4/4
way [28] 7/15 10/10 12/16 16/22 20/12 22/20 26/12 39/6 41/21 47/19 54/6 64/12 73/17 77/18 82/11 105/16 113/10 116/8 119/10 120/14 121/8 122/15 123/10 125/24 126/23 127/7 131/12 136/22
ways [3] 40/23 121/25 129/2
we [84] 6/14 9/22 9/22 9/24 10/1 10/12 10/16 11/14 12/3 13/23 17/18 22/25 25/8 28/9 28/22 29/22 33/22 36/2 36/17 36/18 36/23 36/23 36/24 36/25 37/18 38/14 38/25 39/1 40/19 42/6 45/6 45/12 56/4 58/10 64/12 67/10 68/21 70/4 75/20 76/8 82/1 85/3 87/18 107/10 108/10 110/14 111/21 112/11 114/18 114/19 115/6 116/8 116/19 116/20 123/22 123/23 124/1 127/8 128/17 134/1 134/10 134/14 135/11 135/15 135/22 135/22 135/25 136/12 136/17 136/20 136/21 137/6 137/25 138/6 138/10 138/18 138/19 138/19 138/21 139/9 139/12 139/14 140/3 140/12
we'll [4] 18/12 107/13 107/19 116/25
we're [12] 9/20 19/14 45/24 50/20 69/17 97/23 101/24 113/25 116/10 128/4 134/10 140/16
we've [10] 30/10 35/17 38/6 98/3 107/17 108/25 126/3 136/8 136/16 138/18
wear [5] 47/24 117/14 120/3 125/7 128/25
wearing [3] 119/14 119/23 129/5
WEDNESDAY [11] 1/17 6/1 46/12 140/3 140/4 140/5 140/7 140/9 140/10 140/12 140/13
weekend [1] 138/4
weigh [1] 121/16
well [60] 15/15 24/5 25/6 26/7 26/20 28/9 28/24 29/20 39/10 40/18 42/20 45/7 45/11 45/12 45/19 46/7 48/15 49/19 55/4 57/8 57/15 57/21 61/3 62/24 63/12 64/5 66/14 66/17 67/25 68/16 70/1 70/17 72/4 73/8 74/2 74/13 76/22 77/3 79/14 80/6 82/10 90/23 95/12 99/5 101/16 104/10 105/10 109/22 111/1 116/19 117/6 118/23 121/1 126/4 130/19 131/2 137/10 137/23 138/6 140/8
went [4] 26/5 34/24 91/25 97/10
were [98] 11/16 13/13 14/2 14/2 16/22 17/15 18/7 18/18 18/19 19/7 20/20 20/25 21/4 21/8 22/22 22/25 23/1 23/3 23/3 23/7 24/23 27/5 27/20 28/10 28/25 29/25 30/2 32/7 33/8 33/14 34/6 34/12 34/15 36/3 36/15 40/6 40/24 40/25 41/14 41/17 43/18 43/22 43/22 44/2 44/18 47/18 47/22 49/9 50/13 50/18 51/5 51/16 55/25 59/16 60/20 61/3 61/4 61/19 63/13 70/5 73/2 73/3 73/11 76/8 76/11 78/2 81/11 83/6 87/12 88/14 88/14 94/15 96/13 96/15 98/14 106/13 108/5 109/7 113/9 113/22 113/23 113/24 114/25 117/24 121/1 121/2 122/2 122/22 122/23 122/23 124/1 124/14 125/4 125/6 125/6 127/22 135/17 137/21
weren't [2] 122/3 122/24
West [1] 3/6
WESTERN [1] 1/3
what [173]
what's [5] 64/2 97/14 116/13 116/14 136/1
whatever [4] 17/24 31/9 136/3 139/18
when [55] 7/18 9/9 14/2 14/6 14/19 15/4 17/20 18/21 24/16 25/19 26/1 27/13 27/13 32/15 33/3 34/18 34/22 50/13 50/18 50/22 50/23 54/3 56/8 60/1 60/20 61/23 63/23 64/16 65/14 66/7 66/25 70/16 80/21 82/23 82/25 82/25 84/2 84/17 89/22 94/14 98/13

## W


when... [14] 102/23 109/7 112/3 113/15 113/22 120/6 121/16 121/18 130/8 131/21 131/21 132/7 136/15 136/16
where [16] 9/15 14/17 33/4 33/5 54/23 59/19 73/6 91/25 100/24 102/15 104/15 105/11 107/10 125/24 126/15 134/1
whereas [1] 54/17
whereby [1] 124/9
wherever [1] 98/20
whether [36] 7/16 8/1 9/14 17/15 18/22 20/6 20/22 20/22 21/1 23/12 34/2 35/24 36/17 36/20 37/3 37/22 40/8 41/22 45/3 47/22 53/12 54/13 54/24 58/21 93/19 94/19 96/18 100/1 100/10 104/1 108/9 109/8 120/3 120/19 135/11 135/16
which [21] 12/10 18/5 35/19 39/4 40/6 47/25 56/5 60/18 65/16 68/21 69/16 69/17 71/19 72/4 82/9 106/19 107/16 109/7 111/2 112/6 132/25
while [2] 42/9 130/15
white [2] 14/4 97/1
white-color [1] 97/1
who [40] 6/16 6/17 6/23 7/6 14/12 21/2 21/3 24/24 28/15 28/16 30/12 32/12 32/20 33/16 39/12 40/25 43/16 45/19 53/1 54/17 59/21 64/24 65/3 74/11 74/14 75/4 75/25 88/14 88/19 105/18 107/20 112/10 114/22 116/23 123/12 123/20 123/23 123/25 126/1 133/12
whoever [1] 123/22
whole [8] 25/11 42/6 54/10 59/9 124/4 125/15 132/8 132/16
whom [5] 31/2 45/10 77/14 125/8 126/25
why [44] 9/6 9/24 10/19 11/7 12/9 21/25 23/17 23/25 26/15 28/18 29/1 29/4 29/7 33/5 36/24 37/15 37/20 39/1 40/16 45/25 49/14 49/17 62/21 79/17 89/2 102/9 104/7 105/12 109/12 111/21 111/21 113/3 113/12 122/10 123/2 123/8 127/9 129/25 131/17 134/10 134/11 135/25 138/21 139/14
wife's [2] 72/5 132/3
will [17] 10/1 11/5 41/24 46/25 67/11 71/15 88/12 100/25 107/14 118/15 118/16 138/12 138/16 139/4 139/25 140/3 140/5
William [3] 53/19 56/11 56/13
willing [2] 9/20 82/23
willingness [1] 106/15
Wilner [80] 6/17 8/12 9/18 9/20 14/11 14/15 14/22 15/8 15/13 15/18 15/19 15/24 16/1 16/7 16/14 17/9 17/9 17/12 17/12 21/6 21/9 21/21 21/24 22/1 22/6 36/14 37/16 38/6 38/13 49/22 50/3 50/4 55/2 56/25 57/17 58/6 58/9 59/25 60/7 60/20 60/23 61/4 61/8 61/17 91/19 94/22 95/21 96/6 96/9 99/13 100/22 117/23 118/24 118/25 120/6 120/22 129/25 130/14 130/15 131/17 131/19 131/20 131/25 132/1 132/7 132/17 132/22 132/25 133/3 133/5 133/6 133/7 134/8 135/3 136/14 137/6 137/7 137/19 137/20 137/20
Wilner that [1] 17/9
Wilner's [8] 16/6 36/14 49/15 57/9 88/6 133/14 134/3 137/13
WILSON [3] 1/5 62/14 112/3
Wilson's [1] 70/17
wire [13] 20/7 47/24 94/11 117/14 117/19 119/8 119/14 119/18 119/24 120/3 125/7 128/25 129/5
wiretap [39] 24/12 24/14 33/23 36/4 36/10 38/24 42/7 44/12 44/15 44/19 48/3 50/19 56/16 58/16 62/8 67/8 79/2 79/19 79/21 81/10 86/19 89/13 90/21 92/13 92/14 92/20 93/5 93/5 93/7 93/20 108/19 109/15 111/22 114/10 114/11 115/4 121/9 124/9 126/12
wiretaps [2] 61/18 61/19
wish [4] 28/24 91/17 100/17 116/1
Within [1] 133/2
without [7] 22/2 33/12 33/23 33/23 115/4 121/9 127/24
withstanding [1] 83/14
witness [19] 6/17 8/12 10/1 10/22 13/1 58/21 70/25 71/15 81/18 88/9 100/11 102/11 109/8 118/6 118/14 118/16 120/5 137/11 137/17
witness's [1] 137/17
witnesses [7] 5/3 6/15 12/20 26/22 138/24 139/8 139/9
won't [2] 117/1 118/13
WOO [19] 2/12 6/13 53/19 56/11 56/13 88/4 88/5 88/8 105/25 106/1 106/5 106/6 106/10 107/17 117/12 118/6 118/19 119/13 130/19
word [1] 79/13
words [21] 30/20 33/14 38/4 39/16 45/1 57/3 57/7 73/11 75/5 77/24 86/18 106/12 108/5 113/23 120/12 121/21 123/4 124/8 131/18 131/20 137/21
wore [2] 20/7 117/19
work [3] 20/1 29/5 112/8
worked [9] 37/22 48/18 52/4 60/16 61/1 79/9 97/1 107/1 119/14
working [6] 21/6 60/8 60/13 60/20 67/4 77/5
works [1] 140/6
world [1] 41/23
worn [1] 119/8
worry [1] 111/18
worse [1] 44/3
worth [1] 99/16
worthy [3] 9/5 115/25 120/9
would [113] 6/19 7/16 7/25 8/1 10/16 11/14 12/6 17/17 17/18 18/10 18/13 19/23 20/22 22/17 22/25 23/17 23/25 28/25 29/2 29/5 29/18 30/4 30/5 31/8 31/9 33/6 35/6 35/10 37/15 38/23 38/24 41/23 42/1 44/25 45/7 45/11 45/12 48/12 48/19 49/7 49/20 49/20 53/17 56/4 59/21 62/12 66/23 68/21 72/18 72/22 74/8 75/24 80/20 82/5 82/5 82/16 83/3 84/14 84/15 88/10 89/5 89/11 91/17 94/9 96/5 96/9 96/11 96/16 96/19 98/25 99/4 99/10 99/14 99/17 99/18 99/19 99/24 100/7 104/4 104/5 104/7 105/13 106/24 108/3 108/12 109/8 109/12 109/13 109/14 110/8 110/9 111/17 111/18 113/13 114/12 115/22 118/21 118/23 120/20 121/11 122/10 123/13 124/5 124/9 124/10 124/18 124/20 125/21 126/9 128/9 135/23 136/13 138/13
wouldn't [21] 21/25 29/1 29/4 29/7 29/17 54/8 54/9 71/16 75/9 82/15 89/8 96/8 106/14 106/14 111/16 111/16 112/8 113/13 121/12 123/8 125/15
write [1] 50/23
writing [2] 50/13 51/16
written [2] 49/22 95/8
wrong [3] 10/18 41/20 115/11
wrote [4] 49/24 59/14 59/21 118/24


## Y


yeah [42] 11/25 21/18 38/19 38/19 51/14 51/25 52/11 52/22 53/18 55/15 57/22 59/8 59/17 62/20 68/17 69/13 72/11 73/10 75/14 75/17 77/16 83/17 84/15 90/1 90/24 92/12 93/23 95/5 96/7 97/20 99/3 106/3 110/6 111/6 114/3 115/21 117/5 127/17 127/24 129/1 129/1 129/21
year [9] 14/19 24/1 29/15 57/19 60/6 90/3 100/9 103/25 134/20
years [16] 13/15 13/17 23/19 24/10 26/6 48/22 57/24 65/24 67/21 68/21 99/16 99/25 102/17 107/1 108/6 109/1
yes [181]
yet [3] 42/18 71/19 105/4
Yocca [1] 3/10
York [24] 9/4 18/7 18/13 19/9 19/12 19/13 20/5 20/10 20/15 21/14 21/23 38/5 48/2 80/2 81/11 84/20 86/12 87/1 87/9 88/15 120/8 131/19 132/11 132/13
you [578]
you'd [4] 69/2 96/3 129/2 139/18
you'll [3] 80/21 134/25 137/7
you're [29] 19/18 25/16 32/18 32/20 47/13 47/16 53/17 55/4 63/23 68/18 70/13 81/4 90/15 90/17 91/15 93/4 93/11 95/12 95/16 108/5 109/4 110/14 110/14 111/5 116/14 116/23 131/10 132/7 132/9
you've [12] 17/22 21/13 26/9 34/1 43/9 49/11 66/2 72/17 78/11 80/19 92/23 94/15
your [274]
yourself [1] 21/16