UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HONORABLE STEPHEN V. WILSON, DISTRICT JUDGE PRESIDING

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>REGIS POSSINO, et al.,<br>Defendants. | No. CR 2013-00048-SVW<br>CR 2013-00062-SVW<br>PAGES 1 - 229 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

WEDNESDAY, FEBRUARY 5, 2014

**EVIDENTIARY HEARING (CONTINUED)**

DEBORAH K. GACKLE, CSR, RPR
United States Courthouse
312 North Spring Street, Room 402A
Los Angeles, California 90012
(213) 620-1149

**APPEARANCES OF COUNSEL:**

**For the Plaintiff:**

ANDRÉ BIROTTE, JR.
UNITED STATES ATTORNEY
BY: JAMES BOWMAN
BY: MARK AVEIS
ASSISTANT UNITED STATES ATTORNEYS
1400 United States Courthouse
312 North Spring Street
Los Angeles, California 90012

ALSO PRESENT: FBI SPECIAL AGENT PERRY WOO

**For the Defendants:**

Jonathan Aminoff
Jennifer J Uyeda
Federal Public Defenders Office
321 East 2nd Street
Los Angeles, CA 90012
213-894-7524

Edward Robinson
Edward Robinson Law Offices
21515 Hawthorne Blvd #665
Torrance, CA 90503
(310) 316-9333

\- - - - -

(APPEARANCES CONTINUED):

**For the Defendants:**

Marc S Harris
Scheper Kim and Harris LLP
601 West 5th Street 12th Floor
Los Angeles, CA 90071-2025
213-613-4655
Fax: 213-613-4656
Email: mharris@scheperkim.com

Jason DeBretteville
Stradling Yocca Carlson & Rauth
660 Newport Center Drive Suite 1600
Newport Beach, CA 92660
949-725-4094
Fax: 949-823-5094
Email: jdebretteville@sycr.com

Amy E Jacks
Amy E Jacks Law Offices
315 East 8th Street, Suite 801
Los Angeles, CA 90014
213-489-9025
Fax: 213-489-9027
Email: amyejacks@sbcglobal.net

Richard M Callahan, Jr
Richard M Callahan, Jr Law Offices
225 South Lake Avenue Suite 300
Pasadena, CA 91101
626-202-4060
Fax: 626-794-4676
Email: rmcallahanjr@earthlink.net

(APPEARANCES CONTINUED):

Nathan Joseph Hochman
Bingham McCutchen LLP
The Water Garden North
1601 Cloverfield Blvd Ste 2050
Santa Monica, CA 90404-4082
Phone Number: (310) 255-9025
e-mail: nathan.hochman@bingham.com

///

///

**I N D E X**


| GOVERNMENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| TARWATER, JEREMY | -- | -- | 9 | 97 |


**E X H I B I T S**


| GOVERNMENT'S | RECEIVED |
|---|---|
| 19 | 29 |
| Entire volume of exhibits | 50 |

**LOS ANGELES, CALIFORNIA; WEDNESDAY, FEBRUARY 5, 2014; 9:50 A.M.**

- - - - -

THE CLERK: Calling item No. 1, CR 13-48-SVW, United States of America versus Regis Possino, et al., and item No. 2, CR 13-62-SVW, United States of American versus Sherman Mazur, et al.

Counsel, please state your appearances.

MR. BOWMAN: Good morning, Your Honor. Jim Bowman and Mark Aveis on behalf of the United States. Also with us at counsel table is FBI Special Agent Perry Woo. Also I would note, Your Honor, FBI Special Agent -- and also case agent on the case, Jeremy R. Tarwater, is here and on the witness stand to resume testimony.

MS. UYEDA: Good morning, Your Honor. Jennifer Uyeda and Jonathan Aminoff on behalf of Regis Possino, who is present in custody.

MR. HARRIS: Good morning, Your Honor. Marc Harris on behalf of Sherman Mazur, who is present in custody. Also specially appearing for Mr. Mazur is Nathan Hochman.

MR. ROBINSON: Your Honor, Edward Robinson for Colin Nix. Mr. Nix is present in court. He is in custody.

MR. DeBRETTEVILLE: Good morning, Your Honor. Jason DeBretteville for Ari Kaplan, who is present, on bond.

MS. JACKS: Good morning, Your Honor. Amy Jacks for

defendant Curtis Platt. He has a waiver of appearance on file.

MR. CALLAHAN: Your Honor, good morning. Richard Callahan on behalf of Dwight Brunoehler. He is also not present; he has a waiver on file. He lives in Florida.

I'm also specially appearing for Dale Rubin on behalf of Peter Dunn in the Possino case. Mr. Dunn has a waiver on file, and Mr. Rubin continues in his trial before Judge Otero.

THE COURT: Where did we leave off? Were you examining, Mr. Hochman?

MR. HOCHMAN: Yes, Your Honor. I think we left off with my going to examine Special Agent Tarwater on the Mazur portion.

THE COURT: Okay.

MR. BOWMAN: Your Honor, may I be heard briefly?

THE COURT: Yes.

MR. BOWMAN: Your Honor, the government -- two points, if I may: First, the government wanted to briefly reopen with Agent Tarwater related to the Mendiratta matters to introduce one exhibit simply to authenticate one document.

Separately, before the defense cross-examines the agent regarding the Mazur matters, there was an opportunity for direct testimony before Agent Tarwater was cross-examined on the Mendiratta matters, and AUSA Mark Aveis would like to briefly do a direct -- some direct testimony with FBI Special Agent Tarwater about the Mazur matters. He has not submitted a

declaration related to those matters, so we'd like just briefly to have some opportunity to do a direct.

THE COURT: All right. Okay.

MR. AVEIS: Good morning, Your Honor. May it please the court, and good morning, Special Agent Tarwater.

THE WITNESS: Good morning.

THE COURT: All right.

MR. AVEIS: Your Honor, I provided to the parties who have a stake in this matter and to the court clerk -- and I believe she's placed it on your bench -- a binder. It's entitled the "Government's Hearing Exhibits."

I think it's the other one there. It has the blue tabs.

The purpose -- and the witness has a copy, as well.

The purpose of my providing this is to try and distill for the court the large volume of documents filed over the last five months into a single place where the court can go to look at those documents that I believe are most relevant to the hearing. Mr. Hochman will likely be introducing additional documents.

I've conferred with him, and it's our ultimate goal, I believe, to add to this binder whatever documents are received, as well, in connection with this hearing, so the court has, in effect, a virtually stipulated set of exhibits.

So the first document that I'd like to ask the

witness about would be the document that is behind tab 16.

**JEREMY TARWATER; GOVERNMENT'S WITNESS, PREVIOUSLY SWORN, TESTIFIED:**

**REDIRECT EXAMINATION**

BY MR. AVEIS:

Q. So, Agent Tarwater, if you wouldn't mind looking at that document.

Do you have that document in view?

A. I do.

Q. Do you recognize it?

A. I do.

Q. How do you recognize it?

A. I recall receiving this email from Mr. Wilner back at the time.

Q. And did you receive it on or about its date, August 25, 2010?

A. Correct.

Q. Do you recall what -- why he sent that to you, if you know?

A. He was expressing, again, that he was upset with Mendiratta for, in effect, his betrayal and the fabricated story to delay sentencing -- surrender -- sorry -- and just more back and forth about what we now knew Mendiratta was doing at the time.

Q. All right. Very good.

MR. AVEIS: May that be received, please?

THE COURT: Yes.

(Government's Exhibit 16 received in evidence.)

MR. AVEIS: Thank you.

All right. I'd like to move now to the Mazur portion. I would assume for the purposes of this hearing the court has decided that the Mazur joinder, notwithstanding that it was filed after the deadlines for filing, will nonetheless be fair game for examination?

THE COURT: Yes.

MR. AVEIS: All right. Very well.

Q. I'd like to ask you some questions about Sherman Mazur. When did you first learn that Sherman Mazur might be involved in the investigation that led to the current charges?

A. I don't recall the exact date, but sometime, I believe, August to October 2010, when the analyst assigned to the case found a SAR, a Suspicious Activity Report, that indicated that an entity we believed controlled by defendants Possino and Nix, which is SLC Air, had transferred shares of Sport Endurance to London Finance Group, which we believe was controlled by defendants Mazur and Kaplan.

Q. And what is Sport Endurance?

A. That was one of the companies that the investigation had revealed was being manipulated by Possino and his network, and Mendiratta.

Q. Is that referenced in the affidavit as "SENZ," the trading symbol for Sport Endurance?
A. Correct.
Q. And what was the connection of Sport Endurance, or SENZ, to the individuals then under investigation: Mendiratta, Possino and Nix?
A. At that August to October 2010 time frame, that's the most active deal that appeared Possino, Nix, Mendiratta and others were involving in a market manipulation scheme.
Q. Are you familiar with an entity called London Finance Group?
A. I am.
Q. How are you familiar with it in relation to the SAR?
A. Upon seeing the transfer of that entity, the analyst and I did further research, and we found in the databases that Mazur and Kaplan were officers listed with that company, and that they were affiliated with the same address where that company was located.
Q. And so what additional steps, if any, did you take to further identify whether Mazur was connected in any way to Mendiratta, Possino, Nix or others in connection with the SENZ market manipulation matter?
A. We broadened our search and found -- it was either another SAR or a FINRA referral regarding a suspected pump and dump scheme.

THE REPORTER: Regarding a what?

THE WITNESS: A FINRA referral.

BY MR. AVEIS:

Q. F-I-N-R-A?

A. F-I-N-R-A, correct.

Q. What does that stand for?

A. They're the regulatory body that oversees broker-dealers, and they try to flag pump and dump schemes, other anomalies in the market, suspicious trading and the like.

Q. All right. Continue, please.

A. Through that research, I noted that in a prior deal, Matech shares had gone from London Finance Group and Matech to Coverage Capital, which I believed was controlled by Possino and Nix. So now I found two instances where shares had been transferred over.

And then I noted the Sport Endurance shares that London Finance Group received were sold during the August 2010 promotion of Sport Endurance. It was suspicious timing.

Q. Do you know an individual named Stephen Goldman?

A. I do. He was my supervisor at the time.

Q. Did you speak with Goldman about whether there was any information he might have to better establish whether there was a connection between Mazur, on the one hand, and any of the individuals that you've discussed who were identified in the first wiretap affidavit?

A. I did. The discovery was surprising because we had not yet come across Mazur in this scheme, the Possino-Nix-Mendiratta scheme. And I had some recollection in my mind that Supervisor Goldman had information about Possino and Mazur, I think it had come up before.

So I went to talk to him about this discovery, and we had a series of conversations in this time period where he provided information on Possino and Mazur.

Q. Before you tell the court and the parties what you learned from Goldman about that, let's refine the time period again.

Can you give us a better handle on that, whether by month and year, you can recall that occurred?

A. My best recollection would be August 2010 to October 2010, probably somewhere in there.

Q. So at least six or so months prior to the wire affidavit?

A. Correct.

Q. All right. So, then, what did Goldman tell you about that?

A. First, he told me that our very squad -- and he had been in the bureau 14-plus years and a supervisor for, I think, four years of that time, something along those lines -- he told me that our squad had, in fact, investigated Possino and Mazur back in the early 2000 to 2003/2004 period for similar schemes, market manipulation schemes; that he understood they had a break in their partnership. He couldn't remember all the

details of that. He said, obviously, We'll have to pull the files.

He related to me that Mazur had been convicted of bankruptcy fraud by our office, the Los Angeles FBI office, and the U.S. Attorney's office here; had fought that all the way up to the eve of trial and then pled. That was in the early, mid '90s.

He further told me that, in his view, in his 14-plus years, and the view of others, in the area of market manipulation, Mazur was probably the No. 1 target in our district as far as his culpability. And he told me that, in fact, Mazur had come in to the Los Angeles office at one point. He told me that Mazur was interviewed by Paul Bertrand, who was also a supervisor, and that during that period, Goldman and Bertrand talked about this development on a daily basis.

He said they both concluded that Mazur had come in sort of fishing for information, seeing if the FBI was looking at him, seeing what they knew. They didn't find him reliable. There was a short period of contact, and then they ceased all contact because they didn't trust him.

I don't know if it was right then or a little bit later Goldman also told me that for the final straw of that was that Mazur had tried to bribe Bertrand with Laker's tickets, and Goldman further told me he didn't believe that interview led to anything of substance.

Q. Are you familiar with the term "trolling"?
A. Yes.
Q. How are you familiar with that term?
A. Trolling for information, fishing for information. I equate them.
Q. Do you recall whether Goldman mentioned that, as well as fishing?
A. It was words to those effect: Fishing for information; trolling -- not the exact words, but certainly that sentiment was conveyed to me.
Q. And you mentioned Paul Bertrand. He was similarly an agent in the FBI L.A. office?
A. Yeah. I believe he was a supervisor at that point, correct.
Q. And after you had that discussion with Supervisor Goldman, did you endeavor to gather any files or FBI materials that related to Mazur?
A. As was my practice in this case, I engaged the analysts to start running databases and finding what they could about the prior case, anything in our databases really, regarding Mazur.
I also directed my cooperator at the time, Howard Berger, who we've discussed, to -- and just a step back. Berger had been introduced to the Matech deal by Mendiratta, that was one of the deals they did, so I tried to have Berger ask questions to Possino and Nix, Mendiratta, around -- about

the Matech deal and see if they ever mentioned Mazur and how he was involved, et cetera. They denied having any interaction with him at all.

So that was not fruitful. I could not get any more --

THE COURT: I'm not understanding what he is saying. Ask it again.

MR. AVEIS: Sure.

Q. Let's talk about --

THE COURT: He wants to talk about this Maytag[sic] deal, which isn't part of this indictment, correct?

MR. AVEIS: It's not. But let me circle back, if I may, Your Honor.

So let's talk about Matech.

Q. You mentioned Matech at the last hearing.

A. Yes, sir.

Q. And, if you wouldn't mind, what was the time period for the Matech stock manipulation scheme?

A. That stock was manipulated several times: '07, '08, '09. So it was -- was sort of a recycled deal then.

Q. Let's talk about the latest time period, '09.

Do you recall the time frame during 2009 when Matech was being manipulated?

A. It went from '09 into early 2010, from what I recall. Again, when Berger first came in, he said, Mendiratta brought

me into the Matech manipulation, I participated in that deal.

It became evident that Possino and Nix were involved with Mendiratta in the Matech deal. Now, I -- through that -- at least through that FINRA referral, I knew FINRA believed Mazur was involved in that deal. I couldn't tell if they all happened to come in the deal from different points or they were doing it together.

Q. Let's talk about the '09 Matech manipulation a little bit more.

Do you recall when that commenced in '09, by month?

A. It's hard to say when it started. I remember seeing trading July '09.

Q. Do you recall the date that Mendiratta signed his plea agreement in Mendiratta One?

A. Not the exact date, but it was July '09, I believe.

Q. So to the best of your recollection, was the execution of the Mendiratta One plea agreement by Mendiratta and the commencement of the '09 Matech stock manipulation that involved Mendiratta somewhat consistent?

MR. HOCHMAN: Your Honor, objection. If we're going back into the Mendiratta testimony, I thought he only was reopening to introduce an exhibit, not to replay the whole Mendiratta testimony again.

THE COURT: I'll allow him to do that because it will make the cross-examination more meaningful, but Mendiratta

entered into his plea agreement in July of '09. My understanding from this witness is that Berger, the confidential informant, was involved in the Maytag manipulation. He was brought into it by Mendiratta, and now you're turning to whether Berger had any contact with Mazur?

MR. AVEIS: Correct.

THE COURT: And one thing that I'm not clear about it, it may have come up before but I can't remember: How is it that Berger came into focus in the first place?

MR. AVEIS: Sure. Would the court like me to recap?

THE COURT: Sure.

MR. AVEIS: Let me provide a timeline from the court's perspective, from your left to right, if I may, Mendiratta pleaded guilty pursuant to his plea agreement on July 13th, and it filed July 24, 2009. There were several continuances for the sentencing, that was Mendiratta One.

On August 19th, before Judge Hatter, August 19, 2010, almost a year later, Mendiratta was sentenced before Judge Hatter. That's the same sentencing which former AUSA, now Judge Wilner advocated for the five-level, 5K --

THE COURT: August of 2010 was his sentencing?

MR. AVEIS: I'm sorry. Did I say August? I meant April 19th, 2010. April 19th, 2010.

THE COURT: Was the sentencing.

MR. AVEIS: In Mendiratta One, correct, Your Honor,

and that's the case before Judge Hatter. That is the '09, 7/15 case. And that -- again, that's the one where Judge Wilner had advocated for the 5K.

Within a day or so after that, our office issued a press release about that matter, and on or about April 27, pursuant to a note that we found Judge Wilner created, he received a phone call from a San Francisco lawyer named John Cline, C-l-i-n-e. Mr. Cline told Judge -- AUSA Wilner that he represented Howard Berger, our same Berger, and that Berger was at that time engaged in yet another stock manipulation deal with Mendiratta.

That's what spawned Judge Wilner reaching out to the FBI, to Goldman, who in turn reached out to Tarwater, and they had a series of meetings that ended up tasking Berger as an informant.

THE COURT: And what was Berger's history of involvement with Mendiratta and any of the other principals prior to the Maytag deal?

MR. AVEIS: I'm happy to ask Agent Tarwater to answer that question, because I think he can flesh out far better. We're in an area now that we request leave to provide more depth about.

THE COURT: Okay.

THE WITNESS: Yes, Your Honor. Berger told us -- this was in May 2010 when he now came in to try to start his

cooperation -- that he first was involved with Mendiratta in 2007 for a deal called Quest, Quest Minerals and Mining, and that he understood Mendiratta did a market manipulation in that stock at that time period.

And then in the '08 period, he was approached by the Matech deal, and Mendiratta asked him to participate in that deal. He understood that some of the stock he bought was from Possino, but they didn't have much direct interaction, if any.

And then fast forwarding to April 2010, Mendiratta approached Berger about numerous other deals which also led to the talk about the Sport Endurance deal.

BY MR. AVEIS:

Q. So can you, if you wouldn't mind again, list those deals, Quest Minerals, 2007?

A. Quest Minerals and Mining; beginning sometime in '08, discussion about the Matech deal, and Berger, in fact, did get involved in the Matech deal; and then April 2010, Mendiratta approached him about doing some additional deals which then included Sport Endurance. By June 2010, that was the mail deal they were discussing, but April 2010 they began those discussions again.

THE COURT: And this is at a time when Mendiratta is preparing to serve his sentence?

THE WITNESS: Yes, Your Honor. He had pled July '09; April 2010 was the sentencing; some delays in the surrender

date until August 2010.

MR. AVEIS: Your Honor, if I may --

MR. HOCHMAN: Your Honor, since we're proffering, I think we also need to know about Mr. Berger a bit. Mr. Berger is not just some random individual that came off of the --

THE COURT: Well, why don't you ask him those questions.

MR. HOCHMAN: Certainly.

MR. AVEIS: If I may, one of the issues that's been raised relates to the postponement of Mendiratta's surrender. The prior questioning did not focus on the back story there.

Shall I get into that now?

THE COURT: Why Mendiratta's sentence was delayed? According to memo you showed me, there was some health reasons or some such thing?

MR. AVEIS: Well, the story that Mendiratta provided -- if I can make an offer of proof?

THE COURT: Yes.

MR. AVEIS: The story that Mendiratta wrote in his sentencing -- excuse me -- in his postponement application, which was an ex parte application filed on his behalf by the same lawyer who represented him at the sentencing, Mr. Weichert was that Mendiratta needed treatment. This is an open courtroom, so I'm sort of reluctant to go into the details, if that's okay. It's certainly in our briefs, Your Honor.

THE COURT: Yes.

MR. AVEIS: The parallel story that was unfolding in Mendiratta's discussions with Berger while Berger was making consensual, covert recordings, was that Mendiratta needed to buy additional time, remain out of custody to complete a stock manipulation deal sentence. And that's on recordings, and Agent Tarwater's mentioned that repeatedly in the affidavit.

The pleading that was filed before Judge Hatter to obtain that postponement was one the government did not oppose, and ultimately, it led to the postponement of surrender until the end of August of 2010.

THE COURT: All right.

Let me ask you this question before I forget: Here it is, as you just testified, that Berger and Mendiratta had a long-standing relationship, at least three, four or five years.

THE WITNESS: Yes, Your Honor.

THE COURT: And they had done deals together. One of the reasons you offer in your declaration, I believe, for not believing that Mendiratta would testify against Possino or Possino against Mendiratta, was because of their long-term relationship and the fact that they had done deals -- manipulation deals together.

But here it is that Berger, who had been doing deals with Mendiratta, knew him for some time, seemed very willing to step in and cooperate.

THE WITNESS: Yes, Your Honor.

THE COURT: Why wouldn't that be some signal to you that if Mendiratta was given the opportunity, he would too?

THE WITNESS: I think two things, Your Honor: First, Mendiratta, despite knowing Possino since '97, '98, and doing multimillion dollar deals -- according to their own statements -- Mendiratta had given up lots of people in those seven proffers, those cooperation proffers, but not Possino, name after name after name. That appeared to be a relationship he valued more, and he wasn't giving that name up.

And, second, when --

THE COURT: One thing that is unclear, because I did read the 302s since the last hearing, the seven 302s, and because of the inartful way the FBI writes its 302s -- and they have forever -- no one knows what the question is; all you have is a narrative. You have sort of the question, but you never have the question, answer, question, answer. So it's impossible for me to tell from reading those 302s what the question was.

In other words, was he asked about Possino? Was he asked about Nix? Was he specifically asked about these people? How much did the agent know when he conducted these interviews, and was Mendiratta just being responsive to the names put before him or the deals put before him, or was he asked a casual question: Tell me everything you know that you've done

that's of an incriminating nature, you know, since you were baptized.

THE WITNESS: Yes, Your Honor, I agree it's hard to tell what the questions asked, although from the context, my reading of the proffers, he was -- mentioned people all over the place --

THE COURT: He was. He was nailing everybody.

THE WITNESS: But not Possino.

THE COURT: But -- I don't know. Maybe he was asked about these people and not Possino and -- did the FBI know there was a Possino-Mendiratta connection back then?

THE WITNESS: I don't know if they did, Your Honor.

THE COURT: I don't know. It's hard to tell.

THE WITNESS: Los Angeles office did. I don't know if the New York office did.

THE COURT: All I can tell you is that when Mendiratta had a chance to sing his favorite aria, he did it with gusto.

THE WITNESS: I guess the second part of the answer, when Berger came in, he upfront said, I did this with Mendiratta; you should know about it. I didn't ask -- we didn't know that he had any connection to Mendiratta. That was sort of the difference, as well, Your Honor.

THE COURT: Okay.

MR. AVEIS: To be clear, the government totally

agrees with the court: We don't take the position that he was asked -- it's certainly an issue raised by the defense.

THE COURT: I don't know. You can't tell. The FBI never gives these 302s to the person interviewed to initial them and say, This is a correct statement. That's what they've been doing for other -- other agencies do that. The IRS, for example, makes witnesses file affidavits on -- under penalty of perjury. We don't know.

MR. AVEIS: We can only go back to what the court noticed, that he was rather loquacious.

Q. If you don't mind getting to Berger and why did Berger come in from the cold, if you will.

A. Berger had been caught by the SEC in a separate scheme, cherry-picking scheme, the fund manager; and noticing the press release on Mendiratta, his counsel apparently advised him to come in and get the best deal he could by cooperating.

Q. You've now described the chronology that commenced with July 2009, Mendiratta guilty plea, and moved us through to the sentencing, and now we were up to around August or September, and we were talking about Mazur and the information you had gained about that.

Your Honor, shall I move on to, at this point, the Mazur material?

THE COURT: Yes.

MR. AVEIS: Let's talk about.

Q. One thing you had mentioned is that you had used an analyst to pull material.
A. Correct.
Q. Please describe that, if you don't mind.
A. The process -- my level was that I was sort of the repository for all information. Two different analysts would help do checks, they flag anything of import, bring it to my attention. Another agent assisting a forensic accountant, a full team, and my job was to direct them, review what they brought to me, discuss what the U.S. Attorney's office -- and make decisions from there.
Q. Did you trust that they would make a thorough assessment of the available materials and present them to you?
A. Yes.
Q. At some point, I would assume you started having conversations with Assistant United States Attorney Bowman on how to treat Mazur in the initial wiretap affidavit?
A. Correct.
Q. Fast forward from August or September, when you learned this material and discussed the matter with Goldman about Mazur, to when that first occurred.
Do you recall when you had your first discussion with AUSA Bowman about how to treat Mazur in the initial wiretap?
A. Not the exact dates. I know January to February and right up to filing we were in daily communication all day, all night

on it. So it would have been in that time period, January to February most likely.

Q. And just for purposes of putting that particular testimony in context, January, February, and the wiretap, again, was March of 2011; is that right?

A. Yes, sir.

Q. All right. So did you have a particular methodology for ensuring that whatever concerned you or whatever information you had that was relevant to the wiretap would be raised or flagged for AUSA Bowman?

A. Correct. At this point we're working on the draft, and he has the draft I have the draft. Look, my view was he should know everything I knew, and so any decision would be jointly. I wasn't going to take something out without him weighing in on it.

I would -- when I sent him the draft, I would bracket, or italicize, or track change -- I would try to highlight areas where we needed further discussion. So often it would say, you know, Sherman Mazur, is he really a target subject of this point? Question mark. It's in brackets. That kind of thing. There's placeholders of language that I would include. We talked about it, figure out how to flesh it out, whether we needed it, et cetera.

Q. So in terms of these placeholders, was it your intention -- I don't mean to -- I'm not trying to lead you

here. What was your intention in creating those placeholders?

A. The primary intention was that it didn't get lost in the mix. I wanted to make sure we talked about it, thought about it. So they weren't always meant -- I might come up with a rough, small disclosure. It was -- This is something we have to talk about, you know.

MR. AVEIS: So if I may ask the court to please have the binder handy. And the witness and the court, the parties can turn to what we've marked as Exhibit 19.

Q. Do you have that in front of you, Agent Tarwater?

A. I do.

Q. Do you recognize that?

A. I do.

Q. And how do you recognize it?

A. It's an email from myself to Mr. Bowman, February 19th, 2011.

Q. The next page, and the next page after that, do you equally recognize those?

A. I do. These are the draft language for the affidavit.

Q. All right.

MR. AVEIS: And may these three pages please be received as marked? Thank you.

THE COURT: Yes -- just one moment.

BY MR. AVEIS:

Q. Let's look at the first --

THE COURT: Just one moment.

MR. AVEIS: I'm sorry.

THE COURT: Okay.

(Government's Exhibit 19 received in evidence.)

BY MR. AVEIS:

Q. All right. So, if you wouldn't mind, let's talk about the first one.

MR. AVEIS: Your Honor, the numbers in the lower right-hand corner are the USAO discovery numbers.

THE COURT: Well, is this Exhibit 21?

MR. AVEIS: This is 19, please. Collectively, these three pages are 19.

Q. The first of the three which has the last three numbers in the lower right-hand corner, 758, is it fair that this is consistent with the email exchanges you had with AUSA Bowman prefatory to the final wire affidavit?

A. Correct.

Q. And in the subject it says what?

A. "Wire affidavit Op Ticktock draft, 2/19/2011."

Q. What is "Op Ticktock"?

A. That was our shorthand description, Operation Ticktock.

Q. Okay. And above that, under "Subject" it says?

A. "Necessity."

Q. Do you have an independent memory of the purpose of sending these documents to AUSA Bowman?

A. Yes. It was to prepare the affidavit, to provide back and forth my language, his edits, discuss areas where we needed more, discuss different areas to address. This is us working on the affidavit.

Q. If you wouldn't mind turning -- I'd like to skip the middle page, and turn to the page that ends at the lower right-hand corner, 760.

Do you recognize that one, right?

A. I do.

Q. Okay. So in the wiretap affidavit, do you recall there is a section called "Purpose of the Affidavit"?

A. I do.

Q. And if you'll look at the proposed paragraph five here, can you tell the court why you wrote that?

A. Sure. This -- to follow up on what we were speaking about was, my bracketing this language, because it was really time to drill down with Bowman on who should be named as a target subject. And so I list some notes, some questions to make sure these are areas we make sure to address, and I believe we did on the phone afterwards.

Q. In the italicized sections --

THE COURT: Just a point regarding Mendiratta's history: Is it known whether Mendiratta had been a target of the investigations that he cooperated in, in the seven 302s?

MR. AVEIS: As an offer of proof --

THE COURT: I don't know.

MR. AVEIS: If I could make an offer of proof about that?

THE COURT: Sure.

MR. AVEIS: The SDNY 302s begin in 2004. I believe the first one was in April 2000 -- if the court wouldn't mind, I have the 302s from SDNY in the binder behind tab two.

So that was introduced by Possino in his motion, so that is before the court. If the court will -- narrow this, please -- in the lower left-hand corner, it says, "Investigation on April 19, 2004," that is the date of the first of at least seven 302s that are at issue in this case. April 19, 2004.

The question is what spawned that. If the court wouldn't mind turning to tab one, this was also identified by Possino in his motion.

This is the SEC complaint against Mendiratta and others that was filed March 24th, 2004 in Southern District of New York. This relates to this Universal Express stock manipulation matter. And the record appears to show that within fairly short order after March 24th, the court can see at the very top the docket entry, March 24, Mendiratta is in the door at the Southern District being debriefed about that complaint.

THE COURT: I mean, is it that Mendiratta voluntarily

went to the U.S. attorney or the FBI in New York following the SEC complaint, or was he a target or what?

MR. AVEIS: He'd been sued by the SEC.

THE COURT: Civilly?

MR. AVEIS: Correct. But I don't know whether there was a parallel criminal investigation.

THE COURT: I see. Okay.

MR. AVEIS: All right. The SEC, if the court wouldn't mind, behind tab two, the very top of the 302, the court will note it lists the cast of characters present for that interview. It says it was an interview at the USAO pursuant to a proffer agreement, identifies the agent, and it also says an SEC staff attorney, Hugh Beck -- H-u-g-h B-e-c-k -- Hugh Beck was present.

Again, Your Honor, we don't intend to offer any evidence about any more than the inference that can be drawn that the proximity of the complaint to the interview indicates that Mendiratta and the content, of course, the court's read the 302 which shows that the debriefing was largely in relation to Universal Express.

THE COURT: All right.

BY MR. AVEIS:

Q. So if you wouldn't mind, Agent Tarwater, returning to Exhibit 19, the third page. The court was inquiring about Mendiratta and the targeting in regard to the 302s.

There's an entry on this document that says, "Sherman Mazur," and then under that it has in italics, "enough to list Mazur?"

What were you intending to -- what did you mean by that?

A. I was flagging this for Bowman so that when I sent the draft, and he received it, and he had the opportunity to call me about it, that this would be a topic of discussion. Because I didn't believe we had enough to list Mazur, and I wanted it make sure we talked about it, he had all the facts, and we came to the same conclusion.

Q. So to the best of your memory, did you reach a conclusion before that March wiretap about whether to include Mazur as a target?

A. We did. We discussed how little we knew about his role, his knowledge, how little we knew about he fit in with the participants. I relayed what I had learned from Supervisor Goldman about Mazur's past. And we came to the conclusion that he -- we do not have P.C. to believe he was committing the target offenses.

Q. Probable cause?

A. Correct, yes, sorry, probable cause.

Q. All right. If you wouldn't mind, turn to the page that precedes that. It has 759 in the lower right-hand corner.

Do you recognize this page?

A. I do.

Q. I want you to look at the bottom. It has a page No. 119.

Are you familiar with the content of the wire affidavit and, in particular, the page range that relates to necessity?

A. I am.

Q. Does this generally fall in that range?

A. It does.

Q. And what was your intention in preparing this page?

A. Well, in going back through the draft, as was my habit, I came across the disclosure regarding Possino having been previously interviewed. And knowing that Mazur had been previously interviewed, I dropped in a disclosure around the same level of detail above so that I could discuss it with Mr. Bowman, discuss if we needed more, discuss his thoughts on this area.

Q. So was this -- let's focus, in particular, on the first full paragraph that starts with the word "Similarly."

You've mentioned the phrase or the word "placeholder." I don't know if it's a phrase or a word, but "placeholder." Was your intention to draw Mr. Bowman's attention to that for further discussion?

A. It was.

Q. Did you -- do you remember what you guys discussed about that?

A. In general terms, yes.
Q. What do you remember?
A. The discussion began with the -- whether we thought he could be called a target subject and his -- how limited our knowledge was on his role, that we didn't really know how he fit in except an entity he helped control had sold, received and sold stock.

We determined he could not be named as a target subject at this point. And that given how little we knew about his role or his involvement, not to mention what we'd understood regarding his prior investigation and his culpability, or perceived culpability in the district, going through a prior contact with law enforcement, it didn't really -- it was premature and it didn't really make sense to get into it here.
Q. But is it accurate, to put another way, you just didn't know whether or to what extent he might have fit in to the SENZ or other deals at that point?
A. Correct.
Q. Skip a couple of paragraphs, if you don't mind. There is a bracketed paragraph that says, "Note prior interviews of Mendiratta and conclusion not helpful."

What did you mean by that?

MR. HOCHMAN: I'm sorry, where are we looking at?

MR. AVEIS: Sure.

Q. On the third -- excuse me -- the middle page of 19, lower right-hand corner, No. 759. The paragraph that's sort of floating in the middle that has a bracket that says, "Note prior interviews."

A. Also said -- it's sort of a reminder to myself and to Mr. Bowman to yet again go over the --

MR. AVEIS: Hold on just a second. I want to make sure Mr. Hochman is with us.

Go ahead, please.

THE WITNESS: It's a reminder to myself and for Mr. Bowman to, once again, go through that subject area and figure out what else, if anything, we needed to add in that respect.

BY MR. AVEIS:

Q. And do you recall --

THE COURT: "Subject area" meaning necessity, is that what you --

MR. AVEIS: I'm sorry, please?

THE COURT: It says "Subject Matter: Area."

What is he talking about?

BY MR. AVEIS:

Q. Go ahead, Agent Tarwater, please.

A. Regarding the prior interviews of Mendiratta, whether in this area of necessity, let's talk again about what additional, if anything, we needed to add regarding an interview.

THE COURT: So essentially, are we getting to a point where the subject of whether to use Mendiratta as a cooperator was discussed with Bowman?

MR. AVEIS: If I could make an offer of proof about that?

THE COURT: Yes.

MR. AVEIS: That had passed. The decision about whether Mendiratta would be a suitable cooperator was made at or about the time of May, June of 2010, after it was clear that at the time that he had received the 5K before Judge Hatter, he was concurrently, unbeknownst to everyone, involved in the SENZ, the Sport Endurance new deal that he had angled to obtain the postponement of his surrender under the ruse of the medical condition, but in reality to buy additional time to complete the SENZ deal.

And based upon that and other factors, as Agent Tarwater testified, Agent Tarwater and AUSA Bowman determined -- excuse me -- and Wilner determined that Mendiratta was a totally unsuitable proactive cooperator. The other fact that we've introduced, of course, is that there would have been dueling cooperators. Berger was already deeply involved in making consensuals.

THE COURT: But what I need some clarity on is did Tarwater actually discuss using Mendiratta as an informant with Bowman?

MR. AVEIS: Please, go ahead.

THE WITNESS: Your Honor, it was beyond anyone's comprehension to use Mendiratta as a --

THE COURT: I know, but I don't know why you just don't answer the question. I mean, the question is not about beyond comprehension, but did you have a discussion with Bowman about using Mendiratta as an informant?

THE WITNESS: No.

THE COURT: Did you have a discussion with Judge Wilner as regarding Mendiratta as an informant?

THE WITNESS: Based on his statements to me that Mendiratta couldn't be trusted, it seemed obvious that that was a nonstarter. So we didn't go into it explicitly --

THE COURT: Well, so the answer is, there wasn't a specific conversation where you and Wilner discussed should we or shouldn't we use Mendiratta as an informant, but you gleaned from Wilner's negativity about Mendiratta that Mendiratta would not be acceptable.

THE WITNESS: That is exactly right, Your Honor.

THE COURT: Okay.

MR. AVEIS: If I could just have a moment, please.

Your Honor, may I supplement my offer of proof? It may relate to the inquiry -- it does relate to the court's inquiry about whether there was a discussion with former AUSA Wilner about whether Mendiratta could be tasked as a

proactive cooperator.

THE COURT: All right.

MR. AVEIS: If the court wouldn't mind looking behind Exhibit 13. For the record, this is the 302 of Judge Wilner.

So if the court wouldn't mind noticing, in the lower right-hand corner, we have similar multidigit numbers. The one that ends in "567" --

THE COURT: Why was -- why was this 302 prepared?

MR. AVEIS: In preparation for the hearing --

THE COURT: This one?

MR. AVEIS: Yes.

THE COURT: Oh, I see.

MR. AVEIS: We, meaning the -- my office, as well as Ms. Uyeda and Mr. Aminoff from the public defender's, interviewed Judge Wilner in his chambers.

THE COURT: I see. So what should I be looking for?

MR. AVEIS: Sure. Lower right-hand corner, ending in 567, this is the third of four pages of Judge Wilner's 302. Your Honor, the first paragraph, it starts, "Judge Wilner was asked the question if Mendiratta was proffering during that time frame, and Judge Wilner submitted the 5K regarding Mendiratta's substantial cooperation, why wouldn't Judge Wilner contact Weichert" -- that's Mendiratta's then-lawyer -- "and him to bring Mendiratta in to the USAO to confront him about Mendiratta's current alleged criminal activity --"

And then continuing the court can read that.

THE COURT: Who's this CHS again?

MR. AVEIS: Oh, that would be Berger.

THE COURT: Oh, okay.

MR. AVEIS: And then finally, Your Honor, at the bottom of that same page, "Judge Wilner did not want to confront Mendiratta regarding his ongoing activity."

And continuing to the top of the next page, please.

THE COURT: I see. I'm interpreting this 302 to be the -- is this the sort of comment that you heard Wilner make in your presence about Mendiratta prior to the affidavit?

THE WITNESS: Some of these explicitly and some, as you've noted, Your Honor, were inferred to me by the way he was speaking about Mendiratta, the sense of betrayal, he was a target we need to go get. They felt betrayed that he was angry.

THE COURT: All right.

MR. AVEIS: If I could just have a moment, please.

I think I'll be stepping into a line of fire if I do this, but Judge Wilner, of course, can testify if the court wishes. We're happy to submit it on his 302.

THE COURT: I don't have a need for him to testify unless there's some dispute about what he said, and apparently both sides were present during this interview.

MR. AVEIS: Correct. Very well.

Q. So continuing on regarding the analysis of Exhibit 19, and, in particular, the first full paragraph.

Did have a discussion with AUSA Bowman about whether to include information about Mazur in the necessity section?

A. Yes.

Q. What was that discussion?

A. As I testified before, it began at the higher level of his role, what we knew about him, primarily through Supervisor Goldman, but also the 302s that I had read. And this particular disclosure was designed to track the kind of disclosure provided for the Possino interview, and it was determined that it was premature to get into law enforcement contacts given how little we knew about Mazur's role or knowledge or any -- or his level of culpability. We surmised he had some based on prior activities, but that is not enough.

Q. So why did you conclude not to include information about Mazur in the necessity section of the ultimate final wiretap in March?

A. Because that analysis didn't change between the time of this draft and March. We didn't learn anything new despite trying to, through the cooperator, that would change that analysis.

MR. AVEIS: But that is what I was driving at. Thank you. Sorry. It was a bad question.

THE COURT: Is it true that the only person

specifically described in the affidavit regarding the necessity issue is Mendiratta? In other words, is it correct that in your affidavit of the wiretap, you make some general statement about the reasons why informants wouldn't be helpful, do you?

THE WITNESS: Informants in addition to Berger?

THE COURT: Yes.

THE WITNESS: Yes, Your Honor.

THE COURT: And then -- but, then, there were other subjects and persons that you knew of who knew something about the scheme, correct? I mean, you describe all these other people that were involved in your affidavit, subjects and maybe others.

THE WITNESS: Yes, Your Honor.

THE COURT: That's correct?

THE WITNESS: Yes, Your Honor.

THE COURT: So why is it that you only decided to describe the insufficiency of Mendiratta and not describe why any other person would not be a suitable cooperator?

THE WITNESS: You mean in specific terms, Your Honor?

THE COURT: In the declaration.

In other words, why -- in that paragraph where you talk about Mendiratta being interviewed seven times and so forth, you never describe the other possible informants, subjects and nonsubjects, who could have been cooperators, and you don't describe, as you did with Mendiratta, why they

wouldn't be suitable.

So the question is, why did you took the -- why did you make the effort to describe why Mendiratta wouldn't be suitable and not do something similar to others, or, conversely, why did you say anything about Mendiratta at all?

THE WITNESS: Yes, Your Honor. Well, Mendiratta deserved particular attention because we wanted the court to know we thought he had cooperated in the past, through these proffers --

THE COURT REPORTER: I can't quite hear you.

THE WITNESS: I'm sorry.

But Mendiratta had cooperated in the past, through seven proffers, but that he couldn't be trusted. I mean, he was differently situated than other target subjects who didn't have that kind of history, and we dealt with them at a higher, more collective level, rather than specifically.

THE COURT: All right.

MR. AVEIS: If I can pursue that, please. If the court wouldn't mind looking behind tab 18.

For the record, tab 18 represents pages 84 through 93 of the actual wiretap affidavit, the final version. And I've extracted these pages, excerpted that part of the affidavit to draw attention on the very thing the court just inquired about. This is the meat of the disclosure about using other informants and the risks involved. If the court wouldn't mind looking at

the bottom of the page that has 252 at the lower right-hand corner.

THE COURT: 252?

MR. AVEIS: Right, at the lower right-hand corner. That is the discovery number, 252. This is page 91 of the affidavit, paragraph 130.

THE COURT: Okay.

MR. AVEIS: If I may inquire about that.

Q. Agent Tarwater, looking at paragraph 130 on Exhibit 18, what was your goal for writing that paragraph, where it specifically mentions "Mazur, Kaplan, and others"?

A. We're trying to address why we believe those kind of techniques would not work -- not reasonably likely to achieve the goals, and we gave some examples of the types of people, but that we thought the risks outweighed the benefits.

Q. All right. So if you wouldn't mind, return to Exhibit 19?

MR. HOCHMAN: Excuse me, Your Honor. The objection is just clarification on what he means by the word "techniques."

THE COURT: Well, why don't you make a note of that and ask him.

MR. HOCHMAN: Certainly.

MR. AVEIS: I'll follow up. I can probably be of help about that.

Q. So when you mean "techniques," what specifically do you

mean?

A. Sure. When you're viewing necessity, I want to make sure I've either employed every possible technique, they're too dangerous to employ or I think they're reasonably unlikely to succeed if tried. So this would be the technique of approaching to attempt an interview. That normal investigative technique.

Q. While we're on the same page, why don't you list some of the other techniques that you believed were important to address.

THE COURT: Aren't they in the affidavit?

MR. AVEIS: They are. I'm just trying to --

THE COURT: Especially in the garbage cans, surveillance, you know, whatever law enforcement people do.

MR. AVEIS: Very well. So back to the -- I was just trying to flesh that out. Very well.

Back to the final request about Exhibit 19.

THE COURT: Oh, getting public records, bank records, stock, electronic board stock trading sheets. He said all that in the declaration.

MR. AVEIS: Yes, Your Honor.

Q. So back to 19, my final question is: Is it a fair statement that you discussed the content of this page with AUSA Bowman to assure yourself and satisfy yourself that you'd complied with applicable wiretap law?

A. I discussed the content of every page with Mr. Bowman.
Q. With that goal in mind?
A. Correct, absolutely.
Q. And in ultimately not including reference to Mazur, as it's shown on this particular exhibit, was your intention to omit that to mislead Judge Fischer in any way?
A. No. Absolutely not.
Q. Was your intention to provide a half truth or half the story in regard to what Mazur may have done?
A. No.
Q. So let's move on to Exhibit 20. This is a multipage exhibit. If you wouldn't mind looking at the first page.
Do you recognize that?
A. Yes, sir.
Q. How do you recognize that?
A. That's an email that I sent to Mr. Bowman on February 25th, 2011, and copying Charles Koepke, he's a special agent on the squad assisting in the investigation.
Q. And what was your purpose in sending this email?
A. From the way this is framed, I believe probably Mr. Bowman was actively in the document making changes or edits, and it asked me a series of questions, and this was my attempt to answer those questions.
Q. Turning to the next couple of pages, in summary, was this your memo to AUSA Bowman to respond to issues that related to

finalizing the wiretap affidavit?

A. Correct. This is me aggregating. When I got the questions, some of them were answered by one of the analysts, some of them were answered by Agent Koepke, and some I answered, and then I aggregated it here for Mr. Bowman.

Q. So if you wouldn't mind, there's a section on the first page which sends in 762 called "Denial of Access."

Do you see that?

A. I do.

Q. What was the purpose of communicating that information to AUSA Bowman?

A. This specifically had to do with the source, Howard Berger, and basically roadblocks we've come across. Ways he tried to get access to additional members of the conspiracy but couldn't, areas where Possino and Nix or others purposely kept him away from other people they were using, and I was providing for Bowman language to that effect.

Q. So you earlier said that a key purpose of sending these documents was to provide to AUSA Bowman everything you knew?

A. Everything, yes.

Q. Was this consistent with that intention?

A. Yes, sir.

Q. If you wouldn't mind looking at the top of the page that has "Denial of Access." It says, "Mendiratta, he shows up more."

Do you see that?

A. Yes, I do.

Q. And if it's okay with the court, may the witness read that into the record?

THE COURT: I've read it.

MR. AVEIS: Very well.

Q. Your earlier testimony, I believe, was that you'd spoken to the case agent in New York who had interviewed Mendiratta in several other proffers.

What was that guy's name?

A. That proffered with him, yes, Agent Cacioppi. I could try to spell it. C-a-c-i-o-p-p-i, is my recollection. Theodore.

Q. And did you write this particular paragraph to memorialize a conversation you had with him that he had said that Mendiratta was -- could not be used as a cooperator and -- because not reliable?

A. I think I'd already disclosed this to Bowman, but it's just a reminder, again, let's not lose track of it, here is another factor. Again, I want him to know everything, and forget the best disclosures.

Q. All right. If you wouldn't mind turning to Exhibit 21, please. This is single-page exhibit.

Do you recognize that?

A. I do.

Q. How do you recognize it?

A. It's an email I sent to Mr. Bowman February 25th, 2011, and the subject is "Mendiratta 302s."

Q. And why did you send those 302s of Mendiratta to AUSA Bowman?

A. Because we didn't just check once and stop. I want to have double- and triple-checked things. So we reran, and it appears that I found some proffers we had not -- I didn't if Bowman had seen them before. I wanted to make sure he had.

Q. I'd like you to look at the top where it says "Attachments" and it has a string of numbers.

And several of the numbers begin with usually three numbers, like 281 or 318.

Let's start with 318. Do you recognize 318?

A. Yes, sir. Those are --

Q. Why is that significant?

A. Because there's the FBI classifications that indicates what kind of investigation it was.

Q. And what is a 318?

A. Well, a 318(c), which appears to be most of the New York ones, is a market manipulation investigation.

Q. What is a 281(a)?

A. I'm less familiar. I think it's an organized crime investigation of some kind.

Q. All right. So let's move on.

At some point, did you and AUSA Bowman consider

whether Mazur would be a suitable proactive cooperator?
A. Well, in part that analysis started when I spoke to Supervisor Goldman.
Q. Okay. But more specifically, at some point did you share those thoughts or other thoughts that related to that with AUSA Bowman?
A. Yes.
Q. And what was that discussion, or discussions?
A. We went back over the view that he had not been reliable and trustworthy. The indication that he was viewed as a very -- really, if he became part of this investigation, that he would be probably the No. 1 target. That he appeared to already be implicated, so it wouldn't likely be someone you could just approach. We don't generally try to cooperate the highest person down. Those are some of the reasons.
Q. Did you reach a conclusion after discussing the matter with AUSA Bowman that was any different from a conclusion you'd earlier reached in connection with, as you've mentioned, talking with Supervisor Goldman?
A. No. And, again, all that was premature because we had no idea what his role really was here. So if he had no real access, he couldn't be a cooperator. But we still went through the steps of if you gained access, what's the view, you know.
Q. Can you summarize the conclusions that you and AUSA Bowman reached about whether Mazur would be a suitable proactive

cooperator?

A. The short summary is we did not view he would be a suitable cooperator.

Q. For what reasons?

A. Again, the -- he was considered unreliable and untrustworthy. He would be -- he had no access, so I guess all that is academic at this point, but unreliable, untrustworthy. When he came in, he appeared to be fishing for information. That he was viewed as a very culpable individual in the area of market manipulation. He had been convicted before without apparently attempting to cooperate. Primarily what I learned from Supervisor Goldman and then the 302s that at that point had been provided to me by the analyst.

MR. AVEIS: Let's shift gears, if we may, Your Honor. I just have a couple more questions, please.

Q. How many individuals who were in some way involved in the market manipulation scheme, or schemes, that you learned about through Berger, and leading up to the wire, were ultimately identified solely by the wire?

A. How many outside of Berger's cooperation?

Q. Yes. I'm sorry. I misspoke. Yes.

A. On the order of 30, a little less than 30, I think, that we believe we had probable cause to believe were committing the target offenses.

Q. And how many defendants were indicted ultimately based

primarily, if not exclusively, on the wires?

A. I believe approximately seven indicted and others otherwise charged.

Q. How many of them have pleaded guilty?

A. Of the indicted individuals?

Q. Yes.

A. I believe seven.

MR. AVEIS: If I could just have a moment, please.

Your Honor, I've identified 21 exhibits on the government's exhibit list that's part of this book. The cross-reference column shows that nearly all of them were originally introduced by the opposing parties. I would ask that the entirely of this volume be received.

THE COURT: It's received.

(Entire Volume received in evidence.)

MR. AVEIS: Thank you.

No further questions.

MR. AMINOFF: Your Honor, just for the record, we object to Judge Wilner's 302 coming in on the record.

THE COURT: Who?

MR. AMINOFF: Judge Wilner's 302.

THE COURT: On what ground?

MR. AMINOFF: On relevance, Your Honor.

THE COURT: I think it's relevant.

MR. AMINOFF: Just to the extent that he says he

doesn't recall any conversations with Tarwater.

THE COURT: Well, I mean, the whole of the interview is considered. If there's a foundational basis, I would entertain that, but there isn't. So I think that the exhibit is relevant.

MR. AVEIS: Very well. Thank you.

THE COURT: Cross-examination.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q. Agent Tarwater, you signed your affidavit in March 2011, correct?

A. Yes, sir.

Q. The affidavit's 111 pages long?

A. I believe that's correct, yes, sir.

Q. When did you first decide you needed a wiretap in this case?

A. When did I first decide I needed a wiretap?

Q. Yes.

A. I personally, probably late December. I thought that's where this was going to go, I hoped not.

Q. And that's when you started writing up your affidavit?

A. Vaguely, that sounds correct, yes, sir.

Q. And this was the first wiretap that you were the affiant for; is that correct?

A. That's correct.

Q. Now, I'd like to talk -- we talked before about your failure to include Mr. Mendiratta's past extensive cooperation with the FBI and U.S. Attorney's office in the affidavit. Let's switch to Sherman Mazur's cooperation with the FBI in this affidavit.

I think the court pointed out or asked you the question, in the entire affidavit, all 111 pages of it, do you include any of Sherman Mazur's past cooperation with the FBI?

A. No.

Q. And on March 2011, when you submitted this affidavit to Judge Fischer, I think you said you knew about Sherman Mazur's cooperation with the FBI in 2006, correct?

A. I said I knew he'd been interviewed, and I knew what I had been told by my supervisor.

Q. So the answer is correct, you knew Sherman Mazur cooperated with the FBI in 2006 at the time you wrote your affidavit, correct?

A. I didn't view it as cooperation based on what I knew then.

Q. And why didn't you view it as cooperation?

A. Well, I had been told that he came in and was fishing for information, that they decided he couldn't be utilized because he was not reliable and trustworthy, and that it didn't really lead to anything of significance.

Q. So let's say reliability and trustworthiness, is there anything in the 302s of Mr. Mazur's 2006 cooperation that you

reviewed that said he was unreliable or untrustworthy?
A. Yeah.
Q. Were any words in any of those 302s that you reviewed, were the words "unreliable" or "untrustworthy" were used?
A. Well, I inferred it from my reading of the 302s. It was not stated explicitly that I recall, no.
Q. So the answer is no, there is no mention of the words "unreliable" or "untrustworthy" in any of the 302s you read, correct?
A. Correct.
Q. And with respect to -- you also said that Mr. Mazur was "trolling" or "fishing" for information. Did you read in any of those 302s dealing with Mr. Mazur's 2006 cooperation the fact that Mr. Mazur is "trolling" or "fishing" for information? Did you read those words in any of the 302s?
A. 302s are facts provided by the witness, not the thoughts of the agents.
Q. Let me ask the question again: Did you read in any of the 302s the fact that some agent noted in the 302 that Mr. Mazur was "fishing" or "trolling" for information?
A. No, sir.
Q. No, sir, did not appear, correct?
A. Correct. The 302s recording Mazur's interviews did not mention those, "trolling" or "fishing."
Q. Now, when Mr. Mazur was interviewed in August of 2006, he

voluntarily came in to the FBI field office in Los Angeles, correct?

A. That's my impression, yes.

Q. That is not just your impression, that' what you read in the 302, correct?

A. But the 302 is not always the whole story, but that's what it looked like from the 302, yes, sir.

Q. And he -- and the FBI field office that he met you in Los Angeles, that is your field office, correct?

A. Yes, sir.

Q. One in Westwood I think?

A. That's right.

Q. And he met with Special Agent Paul Bertrand at that time; is that correct?

A. Correct.

Q. And special Agent Paul Bertrand, by the way, is the same guy who interviews Mendiratta in 2006, correct?

A. That's correct.

Q. And Mr. Bertrand was in your group at that time; is that correct?

A. No, sir.

Q. Mr. Bertrand was not in your group?

A. No, he was not on my squad, no.

Q. Was he in the squad and were you in the squad the same time Mr. Bertrand was in the squad in 2006?

A. I was not in the squad in 2006.

Q. Obviously. But it's the same office, you just joined that office later in time; is that correct?

A. He was in a different portion of the L.A. field office, yes.

Q. And it's all in the Westwood building, correct?

A. It's not all, but we were in the same facility.

Q. Now, when Mr. Mazur came in, he had not come in with a lawyer in August of 2006 to speak to Special Agent Bertrand, correct?

A. No, I do not believe a lawyer was there for him, no.

Q. Mr. Mazur came in by himself?

A. That is my recollection, yes, sir.

Q. And he did not come in as part of a proffer or cooperation agreement, correct?

MR. AVEIS: Your Honor, I'm going to object. There's no foundation, speculation. The witness was not present during any of the --

THE COURT: Well, I mean, it's really a question of what he knew prior to filing the affidavit. So what he has learned since is not relevant. The time frame is important. I mean, if he had nothing to do with these interviews, but he knew of them, then it's relevant because I'm trying to gauge his mental state.

MR. AVEIS: Sure. I don't dispute the relevancy.

It's just that the question was did he know whether he had a lawyer.

THE COURT: Well, I don't know. And I guess all these questions are did he know at the time he prepared the affidavit.

BY MR. HOCHMAN:

Q. Yes. All the questions I'm going to be asking you, at the time that you prepared the affidavit, and I believe you said you reviewed the FBI 302s, those are the interview reports concerning Mr. Mazur's cooperation in 2006, correct?

A. His interviews in 2006, I do recall reading them.

Q. So I'm dealing with your knowledge as of March 2011 about what you recall in those -- or what you knew at the time about what happened in those interview reports, correct?

A. Yes, sir.

Q. Because you weren't present in 2006 when Mr. Mazur came into the FBI to cooperate, correct?

A. That's correct.

Q. So your only knowledge of it is reading these interview reports and then talking to people that were involved in the interviews, correct?

A. I think that's fair, yes, sir.

THE COURT: Was Goldman involved in the interviews?

BY MR. HOCHMAN:

Q. Was Mr. Goldman involved in the interviews?

A. My understanding is he was speaking to Bertrand contemporaneously. I don't believe he was present in the interviews.
Q. And the reason you know he wasn't present is he's not on any of the 302s dealing with any of the interviews of Mr. Mazur, correct?
A. Yeah, not to my recollection, no, he's not.
Q. Do you know who Special Agent Heather Campbell is?
A. Vaguely, yes, sir.
Q. Is she also an agent that was working with Special Agent Bertrand who was present in the interviews?
A. She's at a different office, but they appeared to be working in some way on this together. I don't know in what fashion. I know the names are both on, I think, at least one of the 302s.
Q. And do you know IRS Special Agent Walter Finnegan?
A. Yes.
Q. How do you know him?
A. He was originally going to be involved in this present investigation.
Q. And he was also present when Mr. Mazur's being interviewed in 2006, correct?
A. I know he had some involvement. I'm sorry, I don't know remember when he was where.
Q. So let's go back to what the questions I was asking you

before. You knew from reviewing the 302s that Mr. Mazur did not come in to see the FBI in August of 2006 because it was part of a proffer cooperation agreement, correct?

A. I do not recall reading -- normally that would be stated in the 302. I did not see a reference to a proffer agreement.

Q. And you also know if there's no indication of 302s, that Mr. Mazur himself, in August of 2006, was under investigation by the FBI, correct?

A. I know our office was not investigating him. I don't recall him being under investigation at that time.

Q. And you also recall that Mr. Mazur was not facing any criminal charges or any criminal sentencing when he saw Mr. Bertrand in August of 2006, correct?

A. Not by the FBI. I wouldn't have information elsewhere.

Q. Now, when Mr. Mazur showed up to meet with Mr. Bertrand in August of 2006, he handed Mr. Bertrand a confidential memo; isn't that correct?

A. There's a -- I know at some point I saw a reference to him handing the FBI a document. I don't know how to characterize it.

Q. In that confidential memo, and then the discussion he had with Mr. Bertrand, concerned a $25 million pump and dump securities fraud scheme that Mr. Mazur had been approached by a former associate to invest in, correct?

A. To take part in, to participate in the scheme, yes.

Q. As an investor.

A. No. As a co-conspirator.

Q. As a co-conspirator.

And so rather than be a co-conspirator in this scheme, Mr. Mazur instead chose to bring it directly to the FBI; is that correct?

MR. AVEIS: I'm going to object to the form of the question. It calls for speculation as to what was on Mr. Mazur's mind.

THE COURT: Well, it's argumentative, but you can ask in a different way.

MR. HOCHMAN: Surely.

Q. Mr. Mazur, instead of participating in this scheme, Mr. Mazur brought this scheme to the attention of Special Agent Bertrand in August of 2006, correct?

A. All I know at the time is what was in the 302s or that I've been told. That's all I know about circumstances. I'm sorry.

Q. And you knew, based on your review of the 302, it was in March '11, March 2011, that Mr. Mazur brought this information, that being the $25 million pump and dump scheme, to Mr. -- to Special Agent Bertrand's attention in August of 2006, correct?

A. It appears that way from the 302.

Q. And you knew that, correct?

A. Correct.

Q. And with respect, then, to the pump and dump scheme itself, Mr. Mazur had been approached by a former associate to invest in that scheme; is that correct?

A. It's whatever the 302 said. I think it's something along those lines.

Q. And so, in other words, the scheme is actually occurring at the point in which Mr. Mazur brings it to the FBI's attention; isn't that correct?

A. That seemed to be Mazur's impression. I have no idea if that's the case or not.

Q. Well, from your review of the 302s, the scheme hadn't completed at that time, correct?

A. All I can say is that's what Mazur had said. I have no idea if the scheme had -- what was happening or if it was a scheme. I don't know. All I know is what I read in the 302.

Q. Well, the point is, is that it wasn't -- Mr. Mazur was not presenting historical information, he was presenting proactive information about a $25 million pump and dump scheme that was in the process of going on at the time he met with Special Agent Bertrand, correct?

MR. AVEIS: Your Honor, I'm sorry. If I can just clarify. The questioning is what the witness knows from what the witness read having -- it already having been established the witness had no percipient knowledge of what Mr. Mazur --

THE COURT: I don't know if it's what he knew from

reading the 302, if he read the 302.

MR. AVEIS: Right. Very well.

THE WITNESS: Sorry. I lost track of the question, Mr. Hochman.

BY MR. HOCHMAN:

Q. Well, we talked when we were dealing with Mr. Mendiratta about historical or proactive cooperation, and Mr. Aveis made a huge issue about the fact that Mr. Mendiratta's only providing historical cooperation. But here we have an instance, do we not, of Mr. Mazur coming to the FBI in a proactive way in order to provide information about a scheme that was ongoing. Isn't that what you read in the 302s?

A. More important to me is what I was told, which was that he actually came in to fish for information, his information didn't go anywhere --

THE COURT: I have to interrupt.

You know, style is only part of the analysis, but you never answer a question. You know, you're a lawyer, an FBI agent, and historically lawyers make terrible witnesses, but just answer the question.

THE WITNESS: I'm sorry.

THE COURT: I mean, you don't have to explain, because your lawyer will ask you on redirect, if necessary, to explain. Just answer -- listen to the question and answer it.

THE WITNESS: Yes, Your Honor. Sorry.

MR. HOCHMAN: Your Honor, may I repeat the question?

THE COURT: Yes.

BY MR. HOCHMAN:

Q. So isn't it true that Mr. Mazur came in proactively to Special Agent Bertrand to talk about a $25 million pump and dump scheme that was ongoing at the time he came in in August of 2006, isn't that what you read in the 302s?

A. Yes.

Q. And you knew that as of March 2011, correct?

A. Correct.

Q. Now, the information that you read in those 302s is that Mr. Mazur not only provided information about a former associate of his, but also about two convicted felons who had been convicted for securities fraud, but were involved in this scheme; is that correct?

A. That's correct.

Q. Now, the FBI wanted to test Mr. Mazur's cooperation, isn't that right, in August of 2006?

A. Are you speaking just what I knew from the 302s?

Q. Yes.

A. I did not read from the 302s that they were trying to test him. I didn't glean that.

Q. Well, didn't they ask Mr. Mazur on August 29 and August the 30th of 2006 to make consensually monitored phone calls with his former associate that Mr. Mazur claimed was involved

in trying to get to be part of this $25 million pump and dump scheme?

A. As of March 2011, I had not reviewed anything besides those 302s, and they did not mention the recordings.

Q. Well, didn't you actually have in the FBI's files that was provided to the defense in discovery the actual transcripts from those recordings dated August 29th and August 30th, 2006? Those are in the FBI's files, aren't they?

A. Yes.

Q. And you said you had two analysts actually pulling everything about everybody into this scheme, correct?

A. That's correct.

Q. And in part of what they would have pulled, that you would have had available to review, is the actual transcripts of the phone calls that Mr. Mazur made on behalf of the government, the FBI, in the end of August 2006, correct?

A. I had not seen that as of March 2011.

Q. You had not seen it. Does that mean that you didn't look at the information that the analyst had pulled for you?

A. There was a summary of hits, and then I would go look in a binder for what had been pulled. And as of March 2011, the recording was not mentioned in that summary of hits.

Q. And didn't you see in the -- I'll look for it very quickly -- well, did you talk to the agent? You say you talked to AUSA -- excuse me -- Special Agent Goldman. Didn't he tell

you that Mr. Mazur had made monitored recordings with respect to the target -- one of the targets of the investigation?

A. I don't recall him telling me that at the time, no.

MR. HOCHMAN: Your Honor, may I have one moment?

THE COURT: Yes.

BY MR. HOCHMAN:

Q. And just so I'm clear, if you could see Exhibit 32, I believe you have that in front of you. Exhibit 32 --

A. Is that a loose one, Mr. Hochman?

Q. Yes, it is. It's one of the loose exhibits.

Exhibit 32 is the transcript of the recordings that were made by Mr. Mazur to -- we'll identify him as the former associate in connection with Mr. Mazur's cooperation.

Do you see that?

A. Yes, sir.

Q. And this document is from the FBI's files, isn't it?

A. Yes, it is.

Q. This is a document that you would have had your analyst pull as part of reviewing Mazur's prior cooperation to the FBI in 2006, correct?

A. I asked them to pull everything, yes.

Q. And this would have been one of the documents they would have pulled.

A. I do not see this, though, before March 2011. So I don't know when it was pulled.

Q. Did you tell the analyst not to show you any particular document, particularly monitored -- excuse me -- transcripts of monitored phone calls of one of the identified individuals in your investigation?
A. No, absolutely not. Every hit.
Q. Well, you knew from reading the 302s that Mr. Mazur had spoken to this former associate and that that -- and in the process of speaking to him, that the former associate had corroborated the fact that there was an overstatement of the financial -- excuse me -- overstatement in the financial statements that were used in the pump and dump scheme; isn't that correct?
A. I can't recall. That might have been in the 302s, that sounds familiar.
Q. It actually isn't just a overstatement, it was a $39 million overstatement, between $82 million it was listed on the financial statement for this pump and dump scheme, and what Mr. Mazur got the person to say on tape, the target, which was it was only $43 million worth of assets that should have been noted on the financial statement, correct?
You're aware of that, aren't you? When I say you're aware, you're aware of it as of March of 2011, correct?
A. No, because I was not aware of the recording.
Q. Put aside the recording, you're aware that the FBI had corroborated the fact that Mr. Mazur was right when he said

that the target was involved in a pump and dump scheme and overstated the financials, correct?

A. As of March 2011, no, because I hadn't seen the rest of the file.

Q. Thank you. If you could turn to Exhibit 35. And Exhibit 35 is the FBI's file, the FBI 302 file dealing with Mr. Mazur's cooperation, correct?

A. It's certainly an FBI file. It looks like it's regarding Switzer as the primary subject.

Q. But you see Mr. Mazur on the first page is identified as the one who came in and provided the information to the FBI.

Do you see that?

And if you need to actually look --

A. I see that here. Yes, sir.

Q. Very good. And if you could turn to page -- what's been marked on the bottom as page 687, which is also page 45 in the middle, if you see that.

Do you see that?

A. Yeah, I'm there.

Q. Now, do you see references there that on August -- on Tuesday, August 29th, in the presence of Special Agent Walter Finnegan, Mazur attempted to make an on-air recorded telephone call with this former associate via telephone numbers that had been blacked out. The associate wasn't available on August 29th, and then they made -- not in Mr. Finnegan's

presence -- another phone call that lasted 40 minutes, and then another phone call shortly thereafter.

Do you see that?

A. I do, yes, sir.

Q. And it talks about an audio cassette containing the attempts that were made on August 29th and August 30th.

Do you see that?

A. I do.

Q. So you were aware that Mr. Mazur had made consensual monitored phone calls at the behest of the FBI in late August of 2006 when you were writing your affidavit in March of 2011, correct?

A. I was not.

Q. So you are saying not only did you not review the transcripts that were in the FBI's file, but you didn't actually review the 302s as well?

A. The part of the file that had been pulled for me would be interviews of Mr. Mazur, and the rest of this file I did not know at the time, I had not reviewed it.

Q. But the rest of this file is dealing with Mr. Mazur and all of his cooperation. Wouldn't that have been what the analyst would have pulled for you? Now, it would have been sometime before the affidavit was filed in March 2011; isn't that correct?

A. That would certainly be part of their job, yes, sir.

Q. You just didn't review it?

A. I reviewed what was pulled for me, yes.

Q. Sir, again, I'm trying to get the -- understand the disconnect here. They're pulling everything, and obviously, we don't have -- I don't have access to the FBI file, so I got this from the government, and they got it from the FBI.

A. Yes, sir.

Q. And you're saying that even though this is the FBI's files, and even though the analyst supposedly pulled everything, and even though you wanted to know everything about Mr. Mazur, you just didn't review this; is that what you're saying? By March 2011.

A. Right, these had not been identified to me.

THE COURT: This being Exhibit 35?

MR. HOCHMAN: Yes.

Q. Or at least this part of Exhibit 35 dealing with the monitored phone calls.

Do you see that?

But you said before you were aware, and this is in parts -- another part of Exhibit 35, about the fact that the FBI -- let me ask you this: Would you consider doing a consensually-monitored phone call proactive cooperation?

A. Yes.

Q. So coming into the FBI voluntarily, that's proactive, No. 1, correct? Making --

A. Sure.

Q. Correct?

A. Yes.

Q. Making consensually-monitored phone calls at the FBI's behest is proactive, No. 2, correct?

A. Yes.

Q. And being available to speak to an Assistant United States Attorney, that would be a proactive thing, No. 3, correct?

A. Sure.

Q. And you know that Mr. Mazur not only spoke to Special Agent Bertrand of the FBI, correct?

A. Correct.

Q. Not only spoke to Special Agent Walter Finnegan of the IRS, correct?

A. I don't recall the nature of that, but you want me to refresh my memory?

Q. Well, we just -- I just showed you part of the 302 where Mr. Finnegan was actually involved in the very phone calls. Do you recall generally Mr. Finnegan was involved with this, correct?

A. Not as of March 2011, no, sir.

Q. Well, then Mr. Mazur also spoke to Assistant United States Attorney Adam Braun in connection with this information, correct?

A. I know I've seen the name; I don't know what the time

frame was of when that came about.
Q. Well, in 2006, correct? After Mr. Mazur began cooperating.
A. I don't recall when I learned of that. I see that in the file here now, yes.
Q. And you said that one of the things you absolutely pulled, and made sure you looked at, was Sherman Mazur's interview that was done with the FBI, correct?
A. Those I know I saw before March 2011, yes, sir.
Q. Are you 100 percent sure that you saw Sherman Mazur's interview before you wrote your affidavit in March 2011?
A. I think I did, yeah.
Q. Are you as sure of that as everything else that you've testified in the last days on the stand?
A. I wouldn't know how to measure that. I don't -- I guess I don't understand the question.
Q. Well, let's see if we can get there then. Turn to Government's Exhibit 19. And if I could direct your attention to the second page of that exhibit, where it has the number "759" at the bottom.
A. Okay. I'm there.
Q. Do you see that?
And then when we were talking about this before, this is the paragraph we're on, it's the first full paragraph from the top.

THE COURT: Just one second. 759?

MR. HOCHMAN: Yeah, this is second page of Exhibit 19. And this is, Your Honor, the -- this contains the necessity paragraph on Mazur that he actually put in.

THE COURT: I'm looking at the wrong --

MR. HOCHMAN: I'm sorry. This is the -- I'm sorry -- government's exhibit, that's the blue tab. Sorry, Your Honor. Blue tab, document 19, page two.

THE COURT: Okay.

BY MR. HOCHMAN:

Q. Okay. So if we can -- if we look at that second para -- well, first full paragraph, it says, "Similarly, Mazur's also been previously interviewed by the FBI."

Do you see that?

A. Yes, sir.

Q. Let me break down that photograph. So you knew that that had happened. You'd been previously interviewed by the FBI at the time of March 2011, correct?

A. Yes, sir.

Q. And you don't put, in this paragraph at least, any dates of the interview. Well, it's in 2006, correct?

A. Correct.

Q. And you don't put to AUSA Bowman that it was in connection with the $25 million pump and dump scheme, correct?

A. Not in that paragraph, no, sir.

Q. And you say, "And during such interviews, Mazur did not disclose his involvement with or knowledge of target subjects."

Do you recall saying that?

A. That's what it says, yes.

Q. And you were providing that information to AUSA Bowman, correct?

A. Along with orally providing information, yes, sir.

Q. And you believe that you were being truthful with AUSA Bowman; isn't that correct?

A. I always try to be truthful with him, yes.

Q. Well, isn't it a fact that this statement that Mr. Mazur did not disclose his involvement or knowledge of target subjects is false?

A. He did say in the 302 that he had worked with Regis Possino at one point.

Q. Ah, back to the 302 of Mazur that you actually did review, that you now recall -- you knew that back in March 2011, correct? That Mr. Mazur had actually said in 2006 that he had worked with Regis Possino, correct?

A. Correct.

Q. In fact, in Mr. Mazur's interview in 2006, he says, "Mazur had met the former associate that we've been talking about through Regis Possino. When Possino left Mazur's company, the former associate left, too. The former associate was an analyst at Bear Stearns and the former associate analyzed deals

for Mazur, Possino paid the former associate for work he performed for Mazur."

So you knew that when you wrote these words to AUSA Bowman that Mazur had been previously interviewed with the FBI and did not disclose his involvement with, or knowledge of, the target subject -- and Mr. Possino is a target subject -- that that statement was false?

A. It was not well put, yeah.

Q. I'm not using the word "well put, and I'm not asking if you agree with the word "well put." I'm asking you to use the word "false." You knew that that statement was false, correct?

A. Yeah, I don't think it's accurate.

Q. Which is another way to say false, correct?

A. Correct.

Q. And the other stuff that you knew, that you didn't even tell AUSA Bowman in this paragraph, was that Mr. Mazur -- as a result of Mr. Mazur's cooperation, the FBI went out and interviewed one of the convicted felons; isn't that correct?

A. I learned that later, yes.

Q. You didn't know that as part of this packet of 302s that you reviewed on March 2011? Did you know it back then?

A. No.

Q. And you would agree that in this packet of 302s -- and we can go through Exhibit 35 and I can show you -- there was an interview, it's right here in the packet, that says that two

FBI agents went out and spoke to one of the convicted felons and asked that convicted felons about Mr. -- convicted felon questions about Mr. Mazur's information, correct?

A. Regarding that subject area, yes, yes.

Q. Okay. And so you know that that happened. The only question is, did you know it happened as of March 2011? And did you know one way or the other did it happen on March 2011?

A. I did not know that as of March 2011.

Q. So that is just one more thing that the analyst pulled for you that you didn't review by March 2011; is that correct?

A. I don't know when it got pulled. If it had been pulled then, I would have reviewed it.

Q. If it's part of the FBI's files --

THE COURT: One thing I just want to mention, you can pick up on it if you want to, I am not certain that I understand what the witness's view of Mazur's connection to the investigation was in April of 2011 when he prepared his affidavit.

In other words, there was some testimony just this morning about whether Mazur should be a subject or a target, or one of the other, and then I guess it was decided that he wouldn't be in this wiretap application, but then the witness -- this Agent Tarwater said at some other point that he thought Mazur was the No. 1 guy, or sort of the head guy, and I'm not understanding how that all fits together.

Do you know what I'm getting at?

MR. HOCHMAN: Let me see if I can do my best to put it together for you, Your Honor.

Q. Let's start with what you knew about Mazur in connection -- at the time of March 2011, all right? In your affidavit in paragraph 56, Your Honor, and this is in Exhibit -- Government's Exhibit 17 --

THE COURT: That's the April --

MR. HOCHMAN: That's the March 2011 affidavit. The wiretap affidavit we're talking about.

THE COURT: That was in March of 2011.

MR. HOCHMAN: Yes, it was, Your Honor. March 2011.

THE COURT: Okay. Yeah.

BY MR. HOCHMAN:

Q. So in that affidavit, on paragraph 56, Special Agent Tarwater writes about the Mazur/Possino connection. In fact, he writes -- if I could just summarize it here --

THE COURT: Just one second. We'll pull it out.

MR. HOCHMAN: It's Government's Exhibit 17, Your Honor, in the blue tabs.

THE COURT: Now, I have the affidavit here. What paragraph?

MR. HOCHMAN: Oh. Paragraph 56 on page 36, Your Honor.

THE COURT: Just one second.

I remember reading that. What's the point of it?

MR. HOCHMAN: The point, Your Honor, is that -- there two points, and I'll deal with -- one point is whether or not Mazur was target No. 1. We'll deal with that in a second.

But the second is that they did believe that Mazur had an in, a longstanding relationship with Mr. Possino. In fact, he describes him as Mr. Possino's business partner. And, in fact, Possino had invested through his company, London Finance Group, in the Sport Endurance or SENZ campaign, Your Honor.

THE COURT: I understood that, and this was the paragraph where I believe Mendiratta was starting to feel like he and Berger were double-crossed because Mazur was selling the stock when he shouldn't have. That is why the price of the SENZ wasn't maintaining itself.

MR. HOCHMAN: Yes -- sorry --

THE COURT: Then initially Mendiratta says, No, I don't think it's him, and then he changes his mind, at least as this declaration recites, and he says, Yeah, I think it may be Mazur who is not playing ball.

MR. HOCHMAN: Right. The way I use this, Your Honor, is in deciding whether or not Mazur could be used as a potential cooperator, obviously if Mazur had no connection with Possino, had no connection with the scheme, and was some fresh person being introduced from the outside, the likelihood of any

reasonable chance of success would have been zero or close to zero.

But when Special Agent Tarwater describes Mazur as a Possino business associate who's already invested in one of the schemes, so unlike Mr. Berger, who is being asked to invest, but because of policy constraints he can't invest, he has Mr. Mazur right here, and he knows about it, who is already invested, has the confidence of Mr. Possino, who he has identified as the No. 1 person of the scheme at that point, and would be able to infiltrate that scheme if used as a cooperator.

And, Your Honor, in paragraph -- and I'll direct your attention to paragraph 127, on page 90. It's 127(a), (b) and (c). It actually starts on page 89, Your Honor, and goes into page 90.

Because this is the section, Your Honor, dealing with necessity where Special Agent Tarwater is talking about one of the traditional investigative techniques, that is, using another confidential informant in his investigation. And what he says is -- he makes a proposition, a conclusion to Judge Fischer, Judge Fischer, we can't do it. And the reason we can't bring in another cooperator are several reasons.

And he goes ahead and says, One of the reasons, Your Honor, is that the new cooperator wouldn't have the trust of the target subjects, but what he leaves out is that Mr. Mazur

already has the trust of the target subject, Mr. Possino and Mr. Nix.

Q. Isn't that correct, that you left out to Judge Fischer any mention that Mr. -- in response to -- in this paragraph 127(a) on page 90, when you're talking about "It would be very unlikely for a new C.I. or U.C. to gain the trust of the target subjects," you don't tell Judge Fischer right then and there that Mr. Mazur already has their trust, correct?

A. That is not in that paragraph, correct.

Q. And then you see --

THE COURT: One second. Since you said that you had knowledge that Mazur -- is that how you say his name, Mazur?

MR. HOCHMAN: Mazur, Your Honor.

THE COURT: -- Mazur had cooperated before but not to the extent that apparently the FBI files may have revealed, why didn't you put a separate paragraph in the affidavit, as you did with Mendiratta, and explain why Mazur wouldn't be a suitable cooperator?

THE WITNESS: Because of how little we knew about his role with the group, this was something we discussed, and it seemed premature to get into addressing that.

THE COURT: And how little you knew with the group that were the subjects of targets of this indictment?

THE WITNESS: Yes, Your Honor.

THE COURT: So that was why you distinguished

Mendiratta from -- Mazur?

MR. HOCHMAN: Mazur.

THE COURT: -- Mazur in describing why Mendiratta wouldn't be a good cooperator, but you didn't do the same for Mazur?

THE WITNESS: Yes, Your Honor. The investigation had shown how clearly integrated Mendiratta was to certain parts of the network, the Possino/Nix network. All we had to date here with Mazur was that he sold some stock, and we surmised to help them hide who was selling the stock --

THE COURT: But there was one other thing you knew, and that was that he had been involved, apparently, with Possino in the past.

THE WITNESS: Yes, Your Honor.

THE COURT: So, I mean, Possino was one of your top dogs, right?

THE WITNESS: Yes, Your Honor.

THE COURT: So, I mean, why would you not explain to the issuing judge why you couldn't effectively use Mazur as you attempted to do with your explanation about Mendiratta?

THE WITNESS: Based on what I had been informed of, it didn't seem that that would be a very viable technique.

BY MR. HOCHMAN:

Q. But you didn't give Judge Fischer the facts so that she could make an independent determination herself, correct?

A. Regarding the Mazur history, no, sir. At this point, no, sir.

Q. At any point. At any point in your 111-page affidavit did you give Judge Fischer the facts so she could make an independent determination as to whether or not Mazur could be a useful cooperator?

A. In specific terms --

MR. AVEIS: I'll object to the form. It's overbroad. It's also vague. Misstates the affidavit as well.

THE COURT: What was the question again?

BY MR. HOCHMAN:

Q. At any point in the 111 pages of the affidavit, did you provide Judge Fischer with the facts of Mazur's cooperation so that she could make an independent determination as to whether or not this traditional investigative technique should be used first before she authorized a wiretap.

A. I wouldn't have termed it "cooperation." I did not include the prior interviews, no, sir.

Q. But when you say it's not cooperation, Mazur voluntarily comes into the FBI, hands them a memo of a $25 million pump and dump scheme, does consensual monitored recordings, and the FBI is able to corroborate the information.

Do you not consider that cooperation?

A. That's what complainants do every day. That doesn't make them cooperators, it means they're providing hopefully useful

information for the FBI.

Q. What more would someone have to do, in your mind, to provide cooperation other than voluntarily come into the FBI, provide them information about a $25 million pump and dump scheme, give consensually monitored phone calls that corroborate that information, and provide -- and then speak to the FBI, the IRS and the U.S. Attorney's office about that information, without a proffer agreement, without a cooperation agreement, and without even a lawyer? What more do you have to do, in your mind, to become a cooperator?

A. If I'd known he would make the calling, then at that time, the recording, then I think I'd have to refer to him as a cooperator at that time, if I had known that.

Q. Then please do me a favor and explain to Judge Wilson how it is that the FBI files have the transcript of that phone call, that the FBI files repeatedly mention that phone call, but you did not have these FBI's files as of March 2011. Please explain that to Judge Wilson.

A. Sure. It's a rolling process. The analysts are pulling database hits on probably a hundred people at this point. They give me a summary of the hits. I periodically review that. I notice that there was a -- in corroborating what Goldman told me, I noticed a reference to a Switzer serial, I know to go to the binder, I know to analyze what's put there, I review it. I keep looking at the summary. Nothing in there about

recordings, all the way up to March 2011.

Q. So -- and just so I'm clear of the time, you start pulling information about Mazur in August of 2010, correct?

A. Somewhere around there, yes, sir.

Q. So you're saying is in six months of your two analysts working on this, they couldn't find the -- all of the information that is in the 302s here and the transcript of the recording; is that what you're saying?

A. Well, you have to set priorities. And given how little access we appeared to have, there was other people prioritized higher.

THE COURT: Just let me make sure I follow this line of questioning.

The agent has said he looked at the 302 interview of Mazur.

MR. HOCHMAN: Right.

THE COURT: And my understanding is that that interview did not reference consensual phone calls, or did it? Did it?

MR. HOCHMAN: The interview itself, Your Honor, I'll look at the interview -- hold on one moment. Okay. Let me make sure I'm dealing with the same interview that the agent is dealing with, Your Honor.

THE COURT: I'm focused on the agent's testimony where he said that he did read the interview of Mazur when he

walked in to the FBI agent without a lawyer and talked about this $25 million pump and dump scheme.

In that interview, was there any reference to either Mazur saying he would make consensual phone calls or the FBI asking him to make the phone calls? Was there anything in there about that?

THE WITNESS: No, Your Honor.

THE COURT: There wasn't.

So what has happened is that the agent's position is that, yes, as you point out, Mr. Hochman, that there were consensual calls, they were in the files of the FBI. Your position is that a reasonable investigation would have turned these calls up and the transcripts of these calls, correct?

MR. HOCHMAN: Yes, Your Honor.

THE COURT: And that either the witness is in reckless disregard, or more so, in not pursuing it, correct?

MR. HOCHMAN: Yes, Your Honor.

THE COURT: And his position is that he delegated to these -- I don't what you call it, FBI specialists?

THE WITNESS: Analyst.

THE COURT: -- analyst to make searches, and the searches that were made were given to the agent. He looked at them, and for some reason, in none of the searches, did the consensual phone call transcripts turn up. That's where we are now.

MR. HOCHMAN: And I think, Your Honor, if I can highlight this with Exhibit 35. Because Exhibit 35 is the collection of the FBI 302s dealing with Mr. Mazur.

THE COURT: Okay.

MR. HOCHMAN: We have from this agent information that is included beyond just the Sherman Mazur interview, and I'll point the court to various parts of it. So -- and let's --

Q. Agent Tarwater.

A. Yes, sir.

Q. With respect to Exhibit 35, these are the 302s, the collection of 302s dealing with the Mazur 2006 cooperation, correct?

MR. AVEIS: Your Honor, if I may, I'm not trying to be obstreperous, but this is a document that is approximately 40 to 50 pages long. It's not just 302s. The court wouldn't mind looking at the top of the first page. It says "Document Type E.C.," electric communication. That is not a 302, that is a writing that is created when the bureau is summarizing a matter or intending to communicate within the bureau certain events or actions.

THE COURT: I don't think that makes much difference to your question, does it?

MR. HOCHMAN: It doesn't.

MR. AVEIS: What I'm driving at --

THE COURT: All right.

MR. AVEIS: I would just ask that Mr. Hochman be required to clarify which --

THE COURT: All right.

MR. AVEIS: -- within this exhibit, this first person --

THE COURT: Go ahead.

MR. HOCHMAN: Certainly.

Q. This is the FBI's file in connection with the Mazur cooperation in 2006, correct?

A. To the best if my knowledge, yes.

Q. And you reviewed this file prior to March 2011, correct?

A. Not correct. No, sir.

Q. Okay. Tell the judge -- and if we need to go through it, let's go through it, because you've identified facts in this file that you reviewed before March 2011, correct?

THE COURT: Wait a second. "Facts in this file," Exhibit 35 --

MR. HOCHMAN: Right.

THE COURT: -- that were not --

MR. HOCHMAN: That he knew as of March 2011.

THE COURT: And your position is that he had to have looked at this Exhibit 35 in order to know of the facts that you ascribed to him in the affidavit?

MR. HOCHMAN: Correct, Your Honor.

THE COURT: That's the subject.

MR. HOCHMAN: Correct, Your Honor.

THE COURT: Go ahead.

BY MR. HOCHMAN:

Q. So can you identify which one of these documents in Exhibit 35 you looked at as of March 2011?

A. Okay.

Q. We can start on what's -- and we use the references on the bottom right-hand corner, they start at 646.

Do you see that? On the first page.

I just want to make sure we're all on the same -- you see on the bottom of the first page, bottom right-hand corner, there's a designation that ends in the No. 646.

Do you see that?

A. I do. I do.

Q. Okay. So as you're going through this, if you could designate -- and let's just start with the first document. The first document is apparently the opening document to the file. It goes from pages 646 to 649. It has the information that Mr. Mazur provided initially, including the memo that laid out the $25 million pump and dump scheme. And it provides all the identifying information, Mr. Mazur, his former associate, and the two convicted felons.

Do you see that?

A. I do.

Q. Did you review this document as of March 2011?
A. No.
Q. That is the opening document in the file, correct?
THE WITNESS: Would it help to explain how the process worked at all, Your Honor?
THE COURT: Just answer his questions, because you're going to have a chance to do that with further questions from the --
BY MR. HOCHMAN:
Q. Is that the opening document in the file?
A. Yes, and that's what it looks like.
Q. And then if I can take you -- there's a series of documents that follow it that look like follow-up investigation being done by the agents.
Do you see that?
A. I do.
Q. Did you review those documents as of March 2011?
A. No.
Q. Now, I'll turn your attention to page 657 where it talks about an AUSA Adam Braun providing information in connection with one of the convicted felons.
Do you see that?
A. I do.
Q. Did you review any of that information in connection -- or prior to your finishing the affidavit in March 2011?

A. No.

Q. As it keeps going, you'll see that the agents actually ask a probation officer if they can go ahead and speak with one of the convicted felons who is on supervised release.

Did you ever review that document?

A. I'm sorry. Where are you, sir?

Q. Sure. This would be on page -- excuse me -- actually, before we get to that document, if you could turn to No. 674. This is another recap of the cooperation.

Do you see that?

A. It looks like a lead to another office, and an E.C., yes, sir.

Q. Okay. And you see on page 675 -- and I'll focus on the middle -- it talks about where it starts, "The agreement," and it's referencing the agreement that Mr. Mazur had given the FBI, "The agreement suggests that they are trying to raise $25 million from a public offering of stock."

Do you see that?

A. Sorry. One moment, please.

Q. Page 675, in the middle, in the paragraph that starts "Details" --

A. I see that.

Q. -- and then it goes down.

It says, "Based on this information, FBI L.A. opened the captioned investigation." And then it says, "A recorded

telephone conversation of Switzer confirmed Mazur's allegation. During the call, Switzer admitted net assets of the company as overstated by approximately 39 million, stated to be 82 million, and actual is 43 million."

Do you see that?

A. I do.

Q. Now, if you remember our conversation that we had a few minutes ago, I actually asked you that question. I asked you if you knew, without referencing a call, without referencing anything else, if you knew as of March 2011 that the information that Mazur had provided had been corroborated in the sense that the financial statement had been overstated by $39 million, and you said you knew that as of March 2011.

Do you recall that?

A. No, I don't recall that.

Q. Well, we'll get the transcript where you actually said that that was correct.

A. Okay.

Q. But the only way you would have that information was from reviewing 302s that had that information -- or FBI files that had that information in it, correct?

A. I don't recall having corroboration as of March 2011.

Q. And then when it keeps going, if you can go to page 677, that's where the FBI is asking a probation officer in Memphis, Tennessee if it can speak with the -- one of the convicted

felons who is still under supervised release in connection with this whole investigation, and it lays out the investigation.

Did you see that document in the FBI's files before March 2011?

A. No, sir.

Q. Then if you go to page 682, it talks about a Sherman Mazur interview, and that happened approximately -- it says document date at the top on October 26, 2006. This is sort of a follow-on interview; isn't that correct?

A. I believe I had seen this document as of March 2011.

Q. So this is the document, this two-paged document, Sherman Mazur interview, it's actually -- it looks like it's -- there's actually -- if you can keep going, there's actually another interview right after it. Did you see that Sherman Mazur interview?

Now I'm referring to documents 684 to 686. Did you see that interview as of March 2011?

A. Yes, I believe those are the two 302s I had read as of that point.

Q. Well, keep going, if you could, because there's another interview of Sherman Mazur on 687 -- 687 -- yeah, 687. There's another interview of Sherman Mazur.

Did you see that document by March 2011?

A. I see document documenting the fact that the recordings and putting it in evidence. Not an interview of Mazur, per se,

but ...

Q. Okay. Did you see that document from the FBI's files as of March 2011?

A. No. Just the two 302s of the interviews of Mazur.

Q. And did you see -- if you continue on, you'll see interviews of both the former associate and the interview of the convicted felon in part corroborating the information that Mr. Mazur provided.

Did you review those documents as of March 2011?

A. No, sir.

Q. So is it -- so if I understand what you're saying, the only documents in Exhibit 35 from the FBI files that you reviewed are an interview of Mazur on 8/25/2006 and another interview of Mazur on 10/26/2006; is that correct?

A. That's correct.

THE COURT: Does the FBI maintain its records in a format where someone like Mazur would have a separate file? In other words, you would actually, I guess in the old days, pick up a file, and it would have Mazur and all his history, and interviews, and so forth. Is it the same now? Are things indexed according to a particular person, or are they indexed according to an investigation? How does it work?

THE WITNESS: In theory, you should be able to run it either way, Your Honor, and so it depends on how the analyst ran the search.

THE COURT: But, I mean, these FBI -- I forget. What did you call them? The analysts. I mean, how do they do it? I mean, do they -- all this must be electronic now. Don't they just punch in -- what's his name, first name?

MR. HOCHMAN: Mazur.

THE COURT: What is the first name? What's his first name? What's his first name?

MR. HOCHMAN: Sherman Mazur.

THE COURT: Sherman. Well, type in Sherman Mazur and everything pops out, or how do they gather all this information about Mazur?

THE WITNESS: Yes, Your Honor. The information was voluminous, so they ran filters. So financial information, criminal history. And then the next priority would be 302s of that person, times that they were interviewed. That was generally thought to be the most probative.

THE COURT: So your position here, in a nutshell, is that you didn't know about the fact that Mazur's information had, to some extent, been corroborated; you didn't know that he had made consensual phone calls; and even though these files contained that information, which you're not disputing, your position is that those were things that you delegated to the analysts, they didn't provide that to you, and so that's why you didn't focus on it?

THE WITNESS: Yes, Your Honor. And it's sort of a

priority list. So information kept rolling in. The 302s where Mazur was interviewed would be high on the list. I had seen those. Once all of those are done for everyone, they'll keep running further checks on what they thought would be less relevant --

THE COURT: But had you known in March of 2011 what is now before you now in Exhibit 35, would you have said something in the affidavit about why Mazur wouldn't be -- Mazur wouldn't be a suitable cooperator?

THE WITNESS: I think it would have strengthened the conclusion, yes, Your Honor. It would have been worth adding, I think.

THE COURT: Yeah. Okay.

MR. HOCHMAN: May I address that, Your Honor?

THE COURT: Yeah.

BY MR. HOCHMAN:

Q. Are you saying that it would strengthen the conclusion for Judge Fischer to tell Judge Fischer that Mazur had voluntarily come into the FBI, provided information about a $25 million ongoing pump and dump scheme, made consensually monitored phone calls that corroborated that information, that then led the FBI to go out and interview the former associate and convicted felon who further corroborated that information, that that somehow would convince or could have convinced Judge Fischer that he would have been a bad cooperator?

A. Well, you'd have to give her the other pertinent information.

Q. Okay. Again, you didn't provide her this information or any other information about Mazur's cooperation in the four corners of your affidavit, correct?

A. Right.

Q. But let's deal with some of that information.

THE COURT: Let's do this: It's about three after 12:00. Let's take an hour break --

MR. HOCHMAN: Very good, Your Honor.

THE COURT: -- for lunch and come back at one o'clock.

(Noon recess)

///

///

**LOS ANGELES, CALIFORNIA; WEDNESDAY, FEBRUARY 5, 2014 1:10 p.m.**

- - - - -

THE COURT: All right.

MR. HOCHMAN: Thank you, Your Honor.

**RECROSS-EXAMINATION (RESUMED)**

BY MR. HOCHMAN:

Q. Agent Tarwater, over the break, I had a chance to look at Exhibit 35 a little bit closely, and I want to ask you a couple more questions about, if I might.

A. Okay.

Q. You see in the first page of Exhibit 35, it has something called "Case I.D." Do you see that? In the upper left-hand corner?

A. Yes, I do.

Q. And that is the case I.D. that is a unique number that would be given to this investigation involving Mazur's cooperation, correct?

A. Correct.

MR. HOCHMAN: All right. We'll have a -- I've got a stipulation, Your Honor, where I'll offer a proffer that that blacked-out number is the same blacked-out number on every document in Exhibit 35 that deals with this case. It's been blacked out for discovery reasons, but the government is willing to agree that it is the same number on every document

referencing case I.D. in this exhibit.

THE COURT: Okay.

BY MR. HOCHMAN:

Q. Now, you see the thing that's next to it? It says "Serial Number"?

A. Yes.

Q. And you see on the first page it says "What"?

A. Right.

Q. That's the first document that's entered into this particular case file, correct?

A. Correct.

Q. And then there are some document types are called "E.C."

Do you see where it says "Document Type: E.C."?

A. Yes.

Q. And does that stand for electronic communication?

A. It does.

Q. That's an internal communication amongst the FBI agents with respect to this file, correct?

A. Typically, yes.

Q. And that's different than a 302, correct?

A. Correct.

Q. And a 302 is actually the interview report of a particular individual that they're interviewing, correct?

A. Something of evidentiary value, typically -- yeah, an interview would be a good example.

Q. Okay. And what you said is that you did review all the Sherman Mazur 30202s, correct? You did review reports of Sherman Mazur in connection with his cooperation; is that right?

A. The analyst identified where Mazur had been himself interviewed in a 30202, correct.

Q. Okay. And if I can turn your attention to page 682, in the bottom right-hand corner of this Exhibit 35. And you see at the top it says, "Sherman" -- the topic is "Sherman Mazur called the interviewing agent," that's in the 302 is the document type. It references this case, which is the same case I.D., correct?

A. Mine is blacked out, but I assume it is, yes.

Q. Okay. And then it has serial No. 21, correct?

A. Correct.

Q. So you know when you're reading this document that there are 20 different entries in the file that precede this document, correct?

A. Correct.

Q. And then you would -- and then so you would read this first one which says is that Sherman Mazur called the interviewing agent, and this goes from 682 to 683.

Do you see that?

A. Yes.

Q. Then go to 684. Now we're at serial No. 22.

Do you see that?

A. I do.

Q. And this says, "Sherman Mazur was interviewed at the FBI Los Angeles office," also a 302.

Do you see that?

A. Yes.

Q. And that goes on to 684, 685 and 686.

Do you see that?

A. I do.

Q. And the next 302 is "Sherman Mazur provided the following info to FBI agents," and that is just a one-page document, correct?

A. Yes.

Q. So those are the three Sherman Mazur 302s that you would have reviewed as of March 2011, correct?

A. No, that's not correct.

Q. I'm a little confused. You said you that you reviewed all the Sherman Mazur 302s by March 2011. We just went through three Sherman Mazur identified 302s in the FBI file, but now you're saying that you didn't review all three of them; is that correct?

A. What I'm saying is I was provided the 302s where he was interviewed and provided information. This 302 appears to document putting the recording in the file, not -- I can only presume the analyst made a judgment this was not Mazur

providing information at an interview, this was noting the recording going in the file, but --

Q. So even though the topic of this is "Sherman Mazur provided the following info to FBI agents," you're saying this is not a 302 of Sherman Mazur providing info to FBI agents?

A. I'm just saying I hadn't reviewed this before March 2011.

Q. Isn't it possible that you actually did review this document before March 2011 because it would have been part of the Sherman Mazur 302s where it's identified he provided information to the FBI? Isn't that possible?

A. No, I don't think I did.

Q. Are you a hundred percent sure that you did not review this particular -- this third one which is the -- identified as Exhibit 687? Are you a hundred percent sure you never saw this document as of March 2011?

A. Yes.

Q. Now, with respect to the situation -- and, by the way, even though that document and the ones we just identified were serial numbers 21, 22 and 23, are you also saying you didn't ask to see exhibit -- serial numbers 1 to 20 in making the evaluation of Sherman Mazur's cooperation by March 2011; is that correct?

A. Correct.

Q. Now, you want to be thorough in your investigation, correct?

A. Yes.

Q. You want to -- you wouldn't just rely on hearsay statements, you want to get to the source, correct?

A. Correct.

Q. And so when you were speak before about speaking with your supervisor Special Agent Mr. Goldman about Mr. Mazur, you knew that Mr. Goldman had never personally interviewed Sherman Mazur, correct?

A. Correct.

Q. You knew that Mr. Goldman had never followed up on any -- personally followed up on any of the Sherman Mazur information that he provided in 2006, correct?

A. I don't know whether he followed up or not. I don't know what you mean by "followed up."

Q. Well, he never actually conducted any of the interviews of the former associate of Mr. Mazur, of the convicted felons, he didn't personally conduct those interviews. You knew that, correct?

A. When I look at this file now, that is apparent, yes.

Q. Did Mr. Goldman tell you that he had personally participated in following up on any of the Sherman Mazur cooperation?

A. Only to the extent he spoke to Bertrand, from what I know.

Q. And speaking to Bertrand, the hearsay statement. You understand that, correct?

A. Yeah.

Q. Because if you want to get to the source, and as you just said a moment ago, to be thorough, you should have spoken -- you would have spoken to Special Agent Bertrand to see whether or not Mazur's cooperation was reliable and trustworthy, correct?

A. That would have been another source.

Q. And you didn't speak to Special Agent Bertrand, correct?

A. No, I did not.

Q. And he was just a phone call away, or actually in your office, depending on what time it was between April 2010 and March 2011, correct?

A. He was reachable, I'm sure, yes.

Q. And you could have reached him at that time and asked him about the reliability and trustworthiness of Mazur's cooperation, correct?

A. Yes.

Q. The other person that we talked about is Special Agent Finnigan, Walter Finnigan from the IRS. You were actually working with him in connection with your investigation, correct?

A. It was contemplated he might join; I don't think he ever did.

Q. Did you ever ask Special Agent Finnigan, who actually was in the Mazur cooperation session, about whether he thought

Mr. Mazur was trustworthy or reliable?

A. No, I never asked that question, no.

Q. And now he is obviously very available to ask that question, correct?

A. For some period, yes.

Q. And he would have been the direct source of that information, correct? Not a hearsay statement of somebody else who heard it from somebody else, correct?

A. I can't recall which parts he had direct information regarding, but I can look back, if you'd like.

Q. Well, and, again, the -- I think the upshot was he's got -- Agent Finnigan was available, Agent Bertrand was available. They were the direct source, I think they dealt directly with Mr. Mazur, and you never contacted either one of them and could have, correct?

A. I contacted them, but not regarding the subject matter, no.

Q. So you deliberately chose not to deal with the sources of this information, correct?

A. I didn't make a conscious choice to avoid them, but I did not reach out to them.

Q. Now, with respect to Mr. Goldman, Mr. Goldman said that Mr. -- it was his understanding that Mr. Mazur was untrustworthy and unreliable; is that correct?

A. Correct.

Q. Did you ask Mr. Goldman on what he based that?
A. He told me what he based it on.
Q. What did he base it on?
A. That in his daily communications with Bertrand, right during this time period, this 2006 time period, that they were both of the shared view, based on what was transpiring, that Mazur was really there with an ulterior motive to fish for information, that he was -- they thought he was unreliable. And that some point, maybe in that same conversation, maybe a little later, he said the last straw on the fact that we'd never use him as a cooperator was he tried to bribe Mr. Bertrand, Agent Bertrand, with Laker tickets.
Q. All right. Let's -- we'll focus on the last part and work our way backwards.

Are you aware of any documentation in any FBI file that documents that last statement, that any cooperator, or someone working with the FBI, tried to bribe an FBI agent with Laker tickets?
A. I've not seen that, no.
Q. And based on your training and experience, that type of bribe, if it actually occurred, would show up in some FBI file, particularly dealing with Mr. Mazur, correct?
A. I would hope it would be documented somewhere, yeah.
Q. Not hope. Based on your training and experience, you know it would be documented in some part of an FBI file if an actual

cooperator bribed an FBI agent, correct?
A. I can't speak for them, but I think it should be, yeah.
Q. Now let's go back, and to know was he documented.
And when Mr. Goldman, Agent Goldman presented this to you, did you ask Agent Goldman, Look, can you show me where this is documented in the file where Mr. Mazur is bribing -- trying to bribe an FBI agent? Did you ask Mr. Goldman that -- or Agent Goldman that?
A. No. He had told me. I don't recall all the facts. We'll have to pull the file. He didn't say if that was documented or that wasn't documented, and I didn't ask, Well, was that a documented incident?
Q. Okay. Now, Agent Goldman gives you his conclusion, his hearsay conclusion, that based on his conversations with Agent Bertrand, they collectively, I guess, believe that Mr. Mazur was not trustworthy or reliable.
On what specific facts did Agent Goldman give you to back up that conclusion that Mr. Mazur was not reliable or trustworthy during that cooperation period?
A. Sure. There's a series of conversations, and Agent Goldman described for me how our very squad had investigated Mazur and Possino in 2000 and 2003, '4, somewhere in there, for participating in market manipulation schemes.
So when Mazur comes in and he's, you know, trying to portray this picture that someone came to him out of nowhere to

help in the scheme, it seemed apparent to them that he came to you because you do these schemes together, and now, for whatever reason, which we don't know, you want to get Switzer in some kind of trouble and fish for information.

Q. Well, if Agent Goldman is dealing with Agent Bertrand very closely here in the 2006 period, Agent Goldman clearly knew -- or Agent Goldman knew that Mr. Mazur made consensual monitored recordings, correct?

A. I don't know what he knew. He didn't tell me that at the time.

Q. So Agent Goldman hid that piece of information from you?

MR. AVEIS: Objection, calls for speculation. No foundation. It's argumentative.

THE COURT: Well, I mean, I can filter all this. Just takes up time.

MR. AVEIS: Fair enough.

THE COURT: Okay.

THE WITNESS: I think he was upfront, but he didn't remember all the details. No, he did not tell me that at that time.

BY MR. HOCHMAN:

Q. But isn't that -- wouldn't you consider that to be a particularly important piece of information that a cooperator came in, provided information that was then corroborated in a consensually monitored phone call? Wouldn't you consider that

a particularly important piece of information?

A. It's pertinent, yes.

Q. And it also would be pertinent for Judge Fischer. Wouldn't it be pertinent for Judge Fischer to know that a particular person came in, cooperated with the FBI, and their information was corroborated, correct? That would be -- you knew that when you -- that this would be pertinent for Judge Fischer, correct?

A. You mean if you already knew all that information at the time or what's the context of your --

Q. Sure. Let me back the question up.

It's basically -- well, we've already told -- you've already said that you provided none of Mr. Mazur's cooperation to Judge Fischer, correct?

A. Correct, we did not disclose these interviews.

Q. Right. And you knew that these interviews, these cooperation interviews, would be important for Judge Fischer to have in evaluating the necessity of this wiretap, correct?

MR. AVEIS: Referring to the first wiretap affidavit?

MR. HOCHMAN: Yes.

THE COURT: It's the only one that I am focused on; isn't that right? That's the only one --

MR. HOCHMAN: That's correct.

THE COURT: -- concerned?

THE WITNESS: Are you asking me to put myself in her

shoes or what's --

BY MR. HOCHMAN:

Q. No. I'm asking from your stand of knowledge. You're writing out the affidavit, and you knew at that time, as you're writing out the affidavit, that the information about Mazur's cooperation, his efforts of cooperation back in 2006 with the FBI, and in particular that voluntary cooperation where he came in x provided information about a pump and dump scheme, that that information would be important for Judge Fischer to have in evaluating, one way or the other, the necessities -- the necessity requirements for a wiretap, correct?

A. I don't know how to answer that yes or no. It's more complicated.

Q. Well, part of what you are trying to explain to Judge Fischer in the necessity section is that, Judge, we've tried all these traditional techniques, including using cooperators, and we don't believe that we can get anywhere using just these traditional techniques, so we need or there's necessity for a wiretap, correct?

A. Correct.

Q. And one of the things that you knew Judge Fischer would deem important or pertinent is whether or not a particular individual had actually provided cooperation to the FBI in evaluating whether that person could provide cooperation in your investigation, correct?

A. I didn't view him as providing cooperation with what I knew at that time.
Q. I'll use the word "assistance," because I don't want to go back --
A. Okay.
Q. You knew that Judge Fischer would want to know, and believed to be pertinent to know, whether someone had provided assistance to the FBI in the past in evaluating whether or not they could be a cooperator in your investigation, correct?
A. Depending on all the rest of the circumstances, yes.
Q. Okay. But, again, the rest of the circumstances -- we didn't even get to the rest of the circumstances unless you start out by telling Judge Fischer that there had been prior cooperation, correct?
A. Correct.
Q. So you knew that Judge Fischer -- well, one of the facts that Judge Fischer would view as pertinent to her inquiry as to whether or not there's necessity for a wiretap is if someone had given assistance to the FBI in the past, correct?
A. I don't know what she would view as pertinent or not. I'm giving my opinion, but I don't --
Q. What is your opinion? What's your opinion as to whether or not Judge Fischer would view this as pertinent?
A. To whether maybe there could be a cooperator?
Q. Right. Whether for Judge Fischer to evaluate the facts as

to whether or not Mazur could be a cooperator, would it have been pertinent, based on your knowledge, for Judge Fischer to have those facts in deciding whether or not there was necessity for the wiretap?

A. I didn't think it would obviate necessity once we described all the circumstances, but it seemed premature given his limited role in what we knew at the time.

Q. But, again, you took that decision away from Judge Fischer, correct?

A. We did not include in the affidavit.

Q. And you know that it would have been a fact that she would have wanted to consider, correct?

A. I don't know what she would want to consider. I just know I want to give her the best information I can, the strongest possible alternative techniques we could use, that's my focus. Not every possible thing, every possible fact, but the strongest possible alternatives so she could evaluate those.

Q. And wouldn't it be true in evaluating whether or not someone could be a cooperator, one of the strong facts to have is whether or not they've given past cooperation or assistance to the FBI; isn't that true?

A. Depending on the circumstances, yes, absolutely.

Q. Well, what circumstances -- I'll back up.

Let me go back to Mr. Goldman.

So Mr. Goldman doesn't provide you with any specific

facts of the cooperation that Mr. Mazur had rendered in 2006 to show that it was unreliable or untrustworthy, correct?

A. Well, he did. He said that his understanding was that he wasn't upfront about his relationships and things going on, and I thought that was corroborated by the 302s I read.

Q. Okay. What in the 302s corroborated any of the conclusions that Mr. -- Agent Goldman is giving you that Mr. Mazur is being unreliable or untrustworthy?

A. Well, he's omitting very material things such as he participates in these schemes; that he had done these schemes with Possino for a long time; that he had done these deals with Switzer on and off. That's my impression from that, yes.

Q. That is your impression, but you don't have actual facts in front of you, for instance, that Mr. Mazur had done these schemes before. Where in this 302 is there any evidence that Mr. Mazur had done these schemes before?

You talked about a prior bankruptcy fraud conviction in the early '90s, but where in these 302s is there any evidence that Mr. Mazur had done any schemes in the past?

A. That's the point, he wasn't disclosing them. There was other evidence that he had been, and he was not forthcoming about that.

Q. Where is that evidence? Where is that evidence as of 2006, because that's what you're evaluating, is in 2006, supposedly he is being unreliable and untrustworthy. Where is

evidence that establishes that?

A. In the same discussions Agent Goldman me our very squad investigated Possino and Mazur for market manipulation schemes around 2000 to 2004, so that predates '06.

Q. And at that moment in time, did you ask your analyst to pull the 2003, 2004 files of Mr. Mazur?

A. I asked my analyst to do what I want him to do, which is criminal history, financial checks. Give me interviews where Mazur provided statements as the first priority, and then we acquire other documents as a second priority.

Q. Okay. Let me ask the question again.

When did you ask your agents to pull the 2003, 2004 investigation files of Mazur that Agent Goldman talked to you and told you about?

A. It would have been right around the time that I spoke to Agent Goldman.

Q. And where are they?

A. Well, some of them in the 302s I read, and some of them are Exhibit 35.

Q. There's nothing --

MR. HOCHMAN: Your Honor, I'll proffer --

THE WITNESS: Oh, I'm sorry.

MR. HOCHMAN: There's absolutely in Exhibit 35 that talks about a 2003, 2004 investigation of Mr. Mazur with anybody else.

THE WITNESS: I'm sorry. I misunderstood your question. I think they are provided in discovery. There's additional FBI file documents regarding the 2000, 2004. We also talked about it in the Mazur wiretap application.

BY MR. HOCHMAN:

Q. So you had that information as of March 2011 and you looked at it?

A. No. But I certainly had it before whatever it was, June 2011.

Q. So, again, dealing with the March 2011 situation, you were relying on Agent Goldman to basically provide you this information as to his conclusion without looking at the actual files; is that correct?

A. No. He gave me some indication of what should be there, and obviously I needed to go -- we needed to go find the rest. He didn't pretend to remember every fact about it.

Q. Well, let me ask you about a statement you gave to Agent Goldman. Trolling and fishing, what was the example that Agent Goldman gave you where Mr. Mazur was trolling and fishing during August 2006 cooperation?

A. It was -- he was surmising that he was looking at whether FBI was investigating him.

Q. And didn't you want to then go back to the files to see if Agent Goldman is telling you the truth?

A. Yeah, that's exactly what I was doing by asking the

analyst to start pulling all this.

Q. Exactly. And you had those files by March 2011, correct?

A. I had two 302s of interviews of Mazur.

Q. Over a six-month period all you got was two 302s of Mazur?

A. I don't know what the time period was when the searches were initiated.

Q. You said it was August 2010. We're talking about March 2011. That's actually seven months.

A. I said between August and October.

Q. All right. So it would be somewhere between five and seven months all you got was two Mazur 302s of the entire file; is that correct?

A. As to this particular subject area, sure. There's a lot mor in the file, I was getting tons of files.

Q. If you can go back to Exhibit 19.

A. Of which binder you say?

Q. In the government binder with the blue tabs. And you could go to the second page.

I don't think I understand your explanation, the judge asked you this question as well, and I don't think I -- if you could repeat your explanation.

Because as I understand it, as of February 19, 2011, you believed it was important to inform Judge Fischer about Sherman Mazur's cooperation with the FBI in the past, correct?

A. This reflects that I feel it's important to make sure

AUSA Bowman is aware of all the facts I'm aware of.
Q. Right. But you're writing this because you believe that it may go in your affidavit to Judge Fischer, correct?
A. Sure, I want to discuss it, yes.
Q. And you let -- as we discussed before, the first sentence is actually false, because as you knew, Mazur actually did disclose his involvement and knowledge of Regis Possino in his interview.
A. My idea of what knowledge is knowledge of what he is doing, what he does, criminal activities he does, but I can see how you're reading it differently.
Q. And the second sentence is "Other circumstances Mazur provided inaccurate or incomplete information regarding his past involvement in stock promotions and market manipulations."
What specifically are you referring to here?
A. For example, his reference in the 302 to being -- that Possino worked for him at some point is incomplete. It's not just he worked for me, it's we engaged in criminal activity. Not that I'd expect him to confess that, but that was some of the incomplete nature.
Q. Well, again, he's coming in voluntarily. Do you know if Special Agent Bertrand asked him follow-up questions about Regis Possino?
A. No, I don't know.
Q. And, again, you could have called Agent Bertrand and asked

him if he asked those questions, but you chose not to, correct?

A. I did not contact him, no, about this.

Q. Correct.

A. Correct, yeah.

Q. Now, explain to Judge Wilson how -- why you took this paragraph out of the final affidavit that goes to Judge Fischer so that Judge Fischer doesn't even know that Sherman Mazur provided any cooperation to the FBI in the past in evaluating the necessity section of your affidavit.

A. Well, like I testified before, I had discussions with Mr. Bowman, and that began with the overall question of do we have P.C. to believe -- probable cause to believe Mazur committed these crimes.

We concluded we had very little information about how he was interacting with these people. All we knew is a company that he co-controlled we thought sold shares, and we determined no, he can't be called a target subject. We just know too little about his relationship with this group. Looking back --

Q. Agent Tarwater, what you just described to me answered a question I didn't ask. I didn't ask you why you didn't consider Sherman Mazur to be a target subject. What I asked you is that why you didn't provide information about cooperation, his prior cooperation to Judge Fischer on the issue of cooperators, as to whether or not Sherman Mazur could be a cooperator. Not whether or not he could be a target

subject, but whether or not he could be a cooperator.

Why didn't you provide this information on that subject to Judge Fischer?

A. That's what I'm trying to answer. That was part of what informed the decision on what to do with this paragraph. Sorry. That's the only way I know how to answer that question. It's -- the context is --

Q. So the reason you didn't tell --

THE COURT: Let me just interject here, because I'm going to have to make the final fact finding here.

MR. HOCHMAN: Sure.

THE COURT: But -- now, I'm not suggesting that the questions are not informative, but ultimately, the positions are pretty well established, I mean, least as I see them. The agent is saying, essentially, internally, I reached the conclusion that Mazur and Mendiratta were not reliable, and so I just sort of said why -- it's not necessary to tell Judge Fischer about them. I've decided they're not helpful, they're not necessary.

So for reasons that I truly believed, in accepting his position that Mendiratta was, you know, a double-crosser, and Mazur had -- it's a little less clear to me about Mazur, but his position seems to be that Goldman told me that Mazur was not reliable, and I had no contrary evidence. So I sort of became, you know, judge and jury about whether to put the

information in the necessity part of the affidavit.

But I really believed that we wouldn't be able to pierce the scheme without the wiretap. I really believed they couldn't do the job, and because I really had that belief, then you can accept that I didn't intentionally omit what appears to be matters he should have described.

And you're positing that he should have told Judge Fischer, that he knew that if Judge Fischer heard that Mazur had been a willing cooperator in the past, that if Mendiratta had been helpful to the prosecutor in the past, and had been so successful that the government moved to get him a light sentence, that that would have been relevant, and that he was so gunned up to get this wiretap that he sort of intentionally didn't put it in the affidavit, and --

MR. HOCHMAN: Or recklessly.

THE COURT: -- or recklessly, and that -- the difference between intention and reckless is something we have to talk about at a later time, but the -- or that he put just enough in the affidavit to, sort of, cover himself in case this day came. In other words, where's the paragraph about Mendiratta?

Right?

MR. HOCHMAN: Right.

THE COURT: And so he doesn't ignore Mendiratta. He's saying something in his mind made him talk about

Mendiratta, but all the salient facts weren't revealed.

With Mazur, it's less clear to me why he didn't at least describe why Mazur had been a cooperator and unsuccessful. The best I can get is that Mazur was suspicioned to be a major player, and he felt that using Mazur would blow up the scheme if Mazur didn't cooperate. Mazur's cooperation was four years ago, or five years ago, and maybe the world had changed. So that's sort of where I'm at. In other words, you know, we wouldn't have had this hearing if I didn't think these things should have been in the affidavit.

MR. HOCHMAN: Right, Your Honor.

THE COURT: And it's clear to me that some of these things should have been in the affidavit, and -- but the way the cases hold is that the analysis for having the hearing is different than the kind of burden you have to meet now. It's your burden.

MR. HOCHMAN: Certainly.

THE COURT: Yeah. And so you have to convince me it's more likely true than not that this wasn't an oversight, it wasn't sloppy, it wasn't negligent, it was purposeful or the equivalent of being purposeful.

I mean, the way I view intentional and reckless disregard -- maybe I'm wrong on this -- but the way I think of it is, if there's a -- a wastebasket in this room, and I look at it and I see cocaine in the wastebasket, well, then I know

there's cocaine in it. I mean, I can't say that there wasn't cocaine; otherwise, I'd be intentionally lying.

But let's say that I observed some -- I'm in a bad example -- some three or four people sniff the wastebasket and walk away kind of giddy, okay -- I said this is a bad example -- and then I said, I'm not going to look in that wastebasket because I don't want to know there's cocaine in there.

In other words, I'm not negligent. I'm being -- I'm willfully disregarding trying to find out what is available, and it seems to me that you're trying to -- you're arguing both, but I think that the easier approach is reckless disregard, right?

MR. HOCHMAN: That's correct, Your Honor.

THE COURT: So, you know, where are we?

MR. HOCHMAN: Your Honor, I would add that the standard is not whether or not Judge Fischer would have not gone forward with the affidavit -- excuse me -- with the wiretap if she had known this information. The standard from the Ninth Circuit cases is could, could Judge Fischer, in hearing the information that's been omitted, paused, and said, I'm not going to sign on to this affidavit because I have additional questions.

THE COURT: Let's -- we got a little diverted here, because I don't want to get into a --

MR. HOCHMAN: Certainly.

THE COURT: -- discussion. Because I'll save that for the argument, but that's the Galipo case. Is that the case?

MR. HOCHMAN: Yes.

THE COURT: Okay.

MR. HOCHMAN: Your Honor, I can finish my examination rather quickly.

THE COURT: Yeah, hopefully we can.

BY MR. HOCHMAN:

Q. Can you turn to -- in the government's binder, Exhibit 17. That's the affidavit we've been discussing.

A. Okay.

Q. And go to page 91, which is -- and paragraph 30 -- excuse me -- 130.

THE COURT: The affidavit in this case, right?

MR. HOCHMAN: Yes.

THE WITNESS: Okay.

BY MR. HOCHMAN:

Q. And I direct your attention because this is -- I think Judge Wilson also directed your attention to this paragraph, because this is the only paragraph that even gets close to dealing with Mazur in the necessity section.

Do you see that?

A. I see that he is mentioned at 130. He's mentioned

elsewhere but ...

Q. Well, let's focus on this part because this deals with the -- whether or not you would have put in cooperation, as we'll see in a moment, because you do with Mr. Possino.

You see in this paragraph, you started out with your conclusion: "I believe that the risk of approaching any of the target subjects where they're identified individuals who potentially may be participating in the market manipulation scheme such as Mazur, Kaplan and others outweigh the potential benefits of such interviews."

Do you see that?

A. Yes, sir.

Q. That is the conclusion that you were offering to Judge Fischer, correct, your conclusion?

A. Correct.

Q. And if you look right after that, you didn't see any facts supporting that conclusion as they pertain to Mr. Mazur, correct?

A. Particular to him, no. Not in that paragraph, no.

Q. Or any paragraph dealing with Mr. Mazur.

Do you see that?

A. Regarding that conclusion right there?

Q. That conclusion right there.

A. No, no facts particular to him right there.

Q. And in order to get a risk ben -- in order for Judge

Fischer to do a risk-benefit analysis as to whether or not approaching, in this case, Mr. Mazur would -- the benefit of approaching Mr. Mazur would outweigh the risk of approaching Mr. Mazur, you understood that Judge Fischer needed facts to make that determination, correct?

A. Facts to make the determination. I think more facts could be helpful, sure.

Q. How about any facts? She needed facts to make that risk benefit determination, correct?

A. Correct.

Q. And you chose not to provide her with any facts, correct?

A. Regarding the Mazur prior interviews, correct.

Q. And if you go to the next line, it says, "If the government attempted to interview one of the target subjects about the scheme, and that individual declined to cooperate with the government's investigation, I believe the individual would likely alert the other target subjects regarding the government's inquiry which would seriously compromise the entire investigation."

Do you see that?

A. I do.

Q. Again, that is a conclusion that you have given Judge Fischer, correct?

A. Yes.

Q. And you provide no facts of any example where a target

subject or, for that matter, an identified individual in the past had engaged in cooperation with the FBI and then provided that information to target subjects -- excuse me -- or other people involved in the investigation, correct?

A. I'm sorry. Can you restate --

Q. Once again, you provided conclusion to Judge Fischer about this issue of not going to one of these people because they would likely alert the other people in the investigation, but you provide no facts for Judge Fischer to evaluate your conclusion with, correct?

A. Well, some of these seem self-evident, but that is inherently a risk.

THE COURT: But it's a risk in any investigation.

THE WITNESS: Yes, Your Honor, yes.

THE COURT: The question is why would it be a risk in this investigation as opposed to approaching someone to be a cooperator in any investigation?

What was it about this investigation that led you to think the risk of approaching someone who was involved would be the kind of risk that would upend the investigation?

THE WITNESS: I think you're exactly right, Your Honor. That's an inherent risk in really any investigation.

THE COURT: There's nothing special about this.

THE WITNESS: You know, in the prior paragraph we mentioned certain special loyalties, but in some ways this

is -- this is always an inherent risk of approaching a target, yeah.

THE COURT: Now, there is this footnote. Mr. Hochman asked were there any facts that you gave to support your conclusion in paragraph 130, but in the end of paragraph 130 is footnote 41, and that footnote seems to be in apposite to what is in 130. I don't understand the relationship between that footnote and 130.

What were you trying to say?

THE WITNESS: Your Honor, that sentence that said if we attempted to interview a target subject and they declined, they might alert. My intent there was --

THE COURT: Footnote 41.

THE WITNESS: Yes, Your Honor.

-- to mention that, in fact, one of the target subjects, which Possino is a target subject, had been interviewed, but that was really my intent there.

THE COURT: But, I mean, how does that relate to your concern about asking someone to cooperate, principally Mazur, or Mendiratta? And that footnote, it seems like there's a disconnect. I don't understand.

If you said, Well, we had broached the subject with Possino five years ago, and we got information that he was telling others about it, then I could see the footnote being relevant. I just don't understand why the footnote is there.

THE WITNESS: Yes, Your Honor. I think it's more habit that if I mention a scenario about interviewing a target subject, that I'll note one had been interviewed before. It probably doesn't really relate to the necessity analysis, but it's a habit of saying, by the way, a target subject had been interviewed.

THE COURT: But here you thought enough of it to put in footnote 41 mentioning that Possino had been interviewed uneventfully, and you don't even mention that Mazur had been interviewed anywhere.

THE WITNESS: And that is the area where in drafts Bowman and I had discussed do we need something similar here, and we had ultimately decided it was premature to mention a law enforcement contact, considering Mazur's role, his history, his lack of access, et cetera.

BY MR. HOCHMAN:

Q. Just --

THE COURT: Don't lose sight of the question I asked before. I still, somewhere before you finish, I want to know what the status of Mazur was at the time of this affidavit. In other words, who do they think Mazur was, aside from his being with that London group that sold a million shares of SENZ?

In other words, that's all they seem to know. Because he said Mazur wasn't a subject, but it has to do with what he said before about you don't offer cooperation to those

at the top to get those at the bottom.

Well, my question is, if Mazur wasn't a target or a subject, and he wasn't at the top, then why not go to him and work your way up, as opposed to not going to Possino or Nix?

BY MR. HOCHMAN:

Q. Agent Tarwater, at the time you did your affidavit in March of 2011, you didn't even have enough probable cause to label Mr. Mazur as a target subject, correct?

A. Correct.

Q. So when you said before that you had had a discussion with Agent Goldman that Mr. Mazur could be someone at the top, that was based on speculation, not evidence, correct?

A. If Mazur hadn't become part of this investigation, then he would be the No. 1 target. He was not yet, we weren't sure of his status, how he fit in.

THE COURT: Why would he be the No. 1 target?

THE WITNESS: Because of his known history in the district, Your Honor.

THE COURT: I see. So you're saying that Mazur was known to be involved in these kinds of schemes, but he had not been caught up to this time.

THE WITNESS: Yes, Your Honor.

THE COURT: And so when you saw that he was connected to the -- was it London something or other?

THE WITNESS: London Finance Group.

THE COURT: -- London Finance Group, and they sold a million shares of SENZ, that was a red flag to you.

THE WITNESS: And confusing because we thought they had broken apart, hadn't worked together --

THE COURT: Who had broken apart?

THE WITNESS: Possino and Mazur, long ago. There was a confusing development.

THE COURT: So you didn't know where things were, but you felt that -- so why didn't you -- tell me: Why didn't you go to Mazur and use him as an undercover person? I mean, he really, at a minimum, tried to cooperate before. You -- I'm getting back to what Mr. Hochman said. The only thing I can take away from your testimony is that Goldman sort of poured water on the idea.

THE WITNESS: That's --

THE COURT: That's about it.

THE WITNESS: That's somewhat true, yes, Your Honor.

THE COURT: I mean, that's it. I mean, there's nothing else. I'm not concluding that that's inadequate, but that is your position. You've said nothing else that would allow me to consider in addition to Goldman.

THE WITNESS: May I?

THE COURT: Yes.

THE WITNESS: Yes, Your Honor.

Additional factors were that we didn't get access to

people, we were still evaluating that. But I've been told he wasn't trustworthy, and that if he did become part of this investigation, being viewed as a No. 1 target, we don't tend to cooperate down.

THE COURT: So essentially, you had a suspicion that Mazur is involved, and you didn't know how, but what was the necessity -- I don't want to use that word because that's a term of art.

What was the immediacy of getting the wiretap at this point in March of 2011? I mean, this investigation had been ongoing for some time. Was there anything that triggered your getting the wiretap at this time, as opposed to a month later, two months later?

THE WITNESS: Yes, Your Honor. A couple things, Your Honor: One, they were about to begin -- "they" being Possino, Nix and their network -- a new manipulation of a new stock, and so we were -- but we were hitting the wall with the cooperator. We were getting to the point where we didn't feel we could get any more there, and we thought at this point we'd exhausted any other reasonable avenues, and that's -- this was the way we'd have to go.

THE COURT: But in your affidavit, among other reasons why you didn't seek a cooperator, was that you said something about Possino and Nix. I think the word you used was "compartmentalizing" your information, correct?

THE WITNESS: Yes, Your Honor.

THE COURT: In other words, all the hands didn't know the story.

THE WITNESS: Yes, Your Honor.

THE COURT: So -- but if Mazur was involved, as you suspicioned, then he would know the whole story. He was of that caliber, or that relationship, we would know the whole story.

THE WITNESS: If I may, Your Honor, I didn't believe that would be true.

THE COURT: Why is that?

THE WITNESS: And, in fact, it wasn't true as we saw on later wiretap intercepts.

THE COURT: But you're thinking Mazur is the major penny stock schemer in Los Angeles for awhile. So why wouldn't someone of that experience be trusted with someone like Possino and Nix?

THE WITNESS: Yes, Your Honor. Certainly he would have some level of trust. Based on my training, experience, Possino and Nix are not going to give him firsthand access to all the brokers, attorneys -- if they give away that access, those people just go work for Mazur, and so they protect their networks.

I didn't think -- I thought they could do deals together, and Mazur could get access to certain individuals,

but not to their whole supporting network in their conspiracy.

THE COURT: So maybe this is beyond what we've gotten into, but the impression I'm getting -- and it's just an impression -- is that you have these -- this group of stock manipulators, and they're somewhat fungible in their roles.

In other words, on one day one of them could be the guy who gets the company, takes it public, and then starts, you know, pulling the strings, getting the price up, getting people to cross, buy and sell.

Another day, that same person may not be in another scheme, may not be the person who starts it going and controls it, but he may be called in to, let's say, buy a lot of stock on the promise that he'll be allowed to sell that stock at an appointed time for a profit. In other words, their roles are different, or are their roles distinct?

THE WITNESS: Your Honor, some people have --

THE COURT: Mendiratta, for example, to me, only seems to be a guy who knows how to move a stock. He is a P.R. kind of guy. That seems to be his stroke, and -- but he seemed very trusting. I mean, he seemed -- in fact, you described him in the declaration, and you used that word, I think you brought that out last time, that Mendiratta was a trusted associate or confident of Possino and Nix, correct?

THE WITNESS: Yes, Your Honor.

THE COURT: So why wouldn't he know what was going

on? I mean, who the brokers were, who he -- go ahead.

THE WITNESS: I guess, Your Honor --

THE COURT: Why would it be so hard to find the brokers? Why couldn't you find that out through records? I mean, once you're on to the stock, and you see how the stock is being bought and sold, wouldn't you know which brokers are involved?

THE WITNESS: It's not so much just identifying the brokers, Your Honor. It's getting evidence regarding their knowledge of the scheme, such that they're someone you can indict and eventually convict.

Mendiratta might -- he knew some -- they don't want to let him know that his whole network. Some people have a role and that's their role all the time, and some people, as you said, move around. But there's some people who are more valuable, like transfer agents, attorneys, brokers, and you don't want to share those because someone else takes them, and they use them, and they don't work for you anymore. Stock promoters, you know, they kind of work for everybody.

THE COURT: Why wouldn't they work for you? I mean, if you got another penny stock, and you got everything lined up, so what? Why wouldn't they do it? I mean, I don't know, it doesn't seem logical that they wouldn't. If you brought them a stock, and you said, you know, Let's roll up our sleeves and jack this thing up and then unload it. Then there's money

for everybody, why not?

THE WITNESS: One example, Your Honor, is a broker, if I'm doing a deal and someone else also has a relationship with that broker, they're going to help me short it and disrupt your deal and I make money off your deal. You wanted that broker to be loyal to you and not used by others because they'll use them again --

THE COURT: So I'm sort of getting a more generic reason for not using a cooperator, and that seems to be that in your evaluation of the case, there wouldn't be a cooperator who could get you to the people you were looking for: Lawyers, auditors, accountants, transfer agents.

THE WITNESS: Yes, Your Honor.

THE COURT: So that -- so then it isn't a question of Mazur or Mendiratta, it's anybody.

THE WITNESS: And that's what I try to say in paragraph 131, Your Honor --

THE COURT: Well, then that is your position.

THE WITNESS: I hope that wasn't true, but with Berger it became evident to me anyone would have this same problem, yes.

THE COURT: And but why would that be? I don't know a lot about Berger. I mean, I know that he came to the government following a civil complaint against -- who was it? Who was --

MR. HOCHMAN: Berger came to the government, Your Honor, because the SEC had gone after Berger for cherry picking stocks as a hedge fund owner -- hedge fund manager.

THE COURT: I see.

MR. HOCHMAN: And after the SEC goes after him, the interesting thing is -- quick on Berger, Your Honor -- Berger comes in in April of 2010, that's when he calls up -- well, his lawyer calls up Wilner. He says, I heard about Mendiratta. My client, Berger, Mr. Mendiratta are doing business. You should know about it. They set up the meeting with Mr. Tarwater.

Interestingly about Berger is they make Berger sound like he just came in like this voluntary citizen, it couldn't be farther from the truth. As Agent Tarwater told you, in 2008, Mr. Berger is doing one sort of pump and dump scheme. In 2009, he is doing another pump and dump scheme. And in 2010, he finally comes in because the SEC already has him, and he needs to cut a deal.

THE COURT: I mean, that cuts two ways. Because the obvious response is here's Berger, he's done a lot of pump and dump schemes, he's pretty sophisticated, and he can't find out who the agents and bankers and auditors are. And so if someone with Berger's background can't, why would someone else?

MR. HOCHMAN: And that leads us to the next -- the answer to your question. Berger got involved with the Possino, Nix people in approximately 2010, maybe late 2009, 2010.

Mendiratta goes back to Possino to the 1990s. They have a break where they didn't deal with each other from the middle of the 1990s, they didn't deal with each other for awhile, they start up again in 2007.

But Mendiratta is a trusted member of the conspiracy, as Agent Tarwater notes --

THE COURT: But here's what --

MR. HOCHMAN: That's why we --

THE COURT: I have to make it clear that I'm not drawing any conclusions --

MR. HOCHMAN: Certainly.

THE COURT: -- I'm trying to find things out.

But the -- Mendiratta, as described, doesn't seem to be, you know, entrepreneurial in the sense that he gets the company, takes it public, orchestrates the scheme. His forte seems to be pushing the stock once the stock is public.

Am I wrong about that?

MR. HOCHMAN: It's beyond that, Your Honor.

THE COURT: Then let's develop it.

MR. HOCHMAN: Sure.

Q. Agent Tarwater, could you tell Judge Wilson all the different types of things that Mendiratta did in connection with the scheme beyond just promotion of it?

THE COURT: Which scheme?

MR. HOCHMAN: This is the SENZ scheme. We can use

the SENZ scheme as the example.

THE COURT: But, I mean, it has to be at the time -- what he knew at the time of the affidavit.

MR. HOCHMAN: Oh, sure. This is actually being described by Agent Mendiratta in his affidavit. I mean, let's go through the various things that we have here.

Q. We have Mendiratta is promoting the stock; is that correct?

A. Correct.

Q. Mendiratta with Angelastri, another target subject, puts in approximately $480,000 to promote the stock, correct?

A. That's how he promotes it. He hires other people to promote it, correct.

Q. Okay. Mendiratta goes ahead and helps launder the funds, launder the proceeds of the scheme, correct, with Angelastri?

THE COURT: I remember reading that. It was an offshore bank account.

MR. HOCHMAN: Yes.

THE WITNESS: Correct.

BY MR. HOCHMAN:

Q. And with Angelastri he uses those internationals bank accounts to do that money laundering, correct?

A. Correct.

MR. HOCHMAN: So, Your Honor, Mendiratta has two different functions. It's not just -- well, three actually.

He puts the money into the scheme to help promote it, and help, you know, promote -- sort of do the pump part of the scheme.

When the funds come out, Your Honor, he is working with Angelastri sort of on the back end to route those funds overseas and deal with, you know, the target subjects' proceeds of their crime, if you want to look at it like that.

THE COURT: By the way, the lawyer in this affidavit -- Leo something? What was his name? Leo? Was it Leo?

THE WITNESS: Moriarty.

THE COURT: Leo Moriarty, yeah.

Was he the lawyer who prepared the S-1, took the company public?

THE WITNESS: Well, Joseph Scarpello -- who is a disbarred attorney, to my understanding -- prepared it, and then Moriarty would put his name on it because Scarpello is disbarred.

THE COURT: So, I mean, in terms of who you wanted to get, and who you wanted to know about, at the time of this affidavit, you knew that Moriarty was the person who filed the S-1.

THE WITNESS: Yeah, that's true, Your Honor.

THE COURT: And you knew the S-1 was phony.

THE WITNESS: I knew it was a step in the fraudulent scheme, yeah.

THE COURT: Yeah. So you knew the name of the lawyer who was either duped or part of the scheme.

THE WITNESS: Yes, Your Honor.

THE COURT: So you didn't need a water truck to find that out.

THE WITNESS: But I had no evidence of his knowledge of the scheme or -- I had no inculpatory evidence except that he put his name on it. Mendiratta had no access that I could see. My cooperator never got access to him. I wasn't getting there.

THE COURT: I see. All right.

BY MR. HOCHMAN:

Q. Just so I understand -- clean a few things up: With respect to Mr. Mazur, again, you believed him to -- this is sort of the tension, I guess, in what you're saying the judge is focusing on. On the one hand, you believe he's the worst person out there, the No. 1 person in the scheme, correct?

THE COURT: Who is that?

MR. HOCHMAN: Mazur.

THE COURT: Mazur.

BY MR. HOCHMAN:

Q. On the one hand, you believe Mazur is No. 1 in the scheme, correct?

A. I don't know that he is in the scheme yet. I believe if my investigation broadened and included him, he would be No. 1.

Q. And that's just because of speculation because back in 2003 or '4, the FBI was investigating him for being involved in these type of schemes; is that the idea?

A. I believe it's more than speculation.

Q. Well, again, I'm trying to understand how you come to this conclusion about Mazur being such a bad person, such that you can't even go to him. You have an investigation in 2003, 2004 about Mazur involved in securities schemes, correct?

A. Yes.

Q. Then Mazur comes in, and the FBI accepts his cooperation.

You don't have to accept cooperation, correct?

A. No, we're not forced to accept cooperation.

Q. You accept his cooperation in 2006, and he provides you information about a pump and dump scheme that ends up being corroborated in various parts.

THE COURT: What happened to that scheme? Was there evidence of an indictment?

MR. HOCHMAN: One of the convicted felons, Your Honor, got -- had went through a supervised release revocation proceeding. Another convicted felon eventually, from 2006 and 2011, the same entity that Mazur provided the FBI with information in 2006, was actually continued to be used all the way through 2011, and up in Sacramento they got him for securities fraud. And in 2013, he got 121-month sentence.

THE COURT: Well, at the time of this affidavit in

March of 2011, there had been some productive result from what Mazur said.

MR. HOCHMAN: Yes, Your Honor. There had been a supervised release revocation of one of the convicted felons.

Q. And so, back to there. So in assessing why you think Mazur is No. 1 in 2011, all you have is 2003, '04 investigation, then a 2006 cooperation period where you said he wasn't under investigation, and now we're in 2011, and he is No. 1.

Is that the chronology?

A. No.

Q. What am I missing in the chronology?

A. 2000 to 2004 he had been investigated; he had been mentioned in numerous other cases around the country; he had been mentioned in numerous FINRA referrals regarding pump and dump schemes. There was a lot of documents regarding his alleged market manipulation.

Q. None of which show up in your affidavit, correct?

A. In the March 2011, no, sir.

Q. None of which are those allegations are even provided to the defense in discovery; is that correct?

A. I assume they are because I provide them all to the U.S. Attorney's office.

MR. HOCHMAN: Your Honor, I have not gone through the 450,000 pages to know one way or the other if that's been

provided. I'll get back to you, I'll take a look for it, but going on with this.

Q. So, again, so what, in particular -- I mean, do you have in mind some allegation that actually resulted in provable crimes against Mr. Mazur before March 2011?

A. The 2000, 2004 case, the opinion of my supervisor --

Q. Let me just go back. Mr. Mazur was never charged with any crimes in the 2000 and 2004 investigation, correct?

A. No, not to my knowledge, no.

Q. Mr. Mazur was never arrested under the probable cause standard for any allegations of criminal conduct dealing with that 2000 to 2004 time period, correct?

A. No, he wasn't.

Q. And in 2006, you said he wasn't even under investigation, correct?

A. Not by FBI, to my knowledge, no. I can't speak to other agencies.

Q. All right. I think have exhausted that enough.

And then with respect to the footnote that the judge talked about. This is now back on paragraph 130, when we're dealing with whether or not if you went to somebody, they would alert other target subjects.

I think you said before that you had no evidence that Mendiratta, in any of his cooperation, had ever alerted a target subject and told them that they were under

investigation, correct? You said that last week.
A. I've reviewed those again. Do you want me to speak to that?
Q. Well, to the extent -- let me -- you answered the question.
THE COURT: Did you have information in March of 2011 that Mendiratta had ever leaked information to a confederate that he was a cooperator?
THE WITNESS: No, Your Honor.
BY MR. HOCHMAN:
Q. And you similarly did not have information of Mr. Mazur, that he ever leaked information about his 2006 cooperation to any of the people he provided information against, correct?
A. Correct.
MR. HOCHMAN: May I have one moment, Your Honor?
Q. I want to actually get the words out of your mouth rather than my just proffer on this.
In dealing with Mr. Berger, Mr. Berger exhausted his cooperation, according to you, between the time he started in about 2010 to the time the approximate was ending in March 2011; is that correct?
A. I don't know what you mean by "exhausted." We kept trying to use him throughout. I mean, we never just stopped.
Q. Certainly, but you told Judge Fischer you weren't going to be able to get additional information about people from

Mr. Berger, and you gave a variety of reasons why that was happening in March of 2011, correct?

A. No, sir. What I said is that it had become apparent at that point that Berger, Mendiratta -- Berger and other possible cooperators weren't going to be able to learn the information about the knowledge and role of some of these brokers, some of these attorneys, that they couldn't get there because they couldn't get that way in the conspiracy. It was all at the center, Possino and Nix provide the instructions. We weren't getting that kind of evidence, it didn't look like we would get it, to that effect.

Q. And one of the reasons that you decide is that there were certain policy limits, correct, that Mr. Berger actually couldn't give money into the scheme because there was an FBI policy saying he couldn't do that, correct?

A. That's an additional reason, yes.

Q. But you also knew that Mr. Mazur had actually given money into the scheme by March 2011, correct?

A. No, I didn't know that.

Q. You said --

A. I knew he got shares and sold them. That doesn't mean he gave them money.

Q. Well, then he had least had participated in the scheme in a way beyond what would Mr. Berger could participate, correct?

A. No. I actually think Berger's participation had been more

valuable because he was able to get into some of the planning sessions. That's far more evidence than I had, because Mazur sold shares, or Kaplan, I don't even know who sold them.

Q. And just so I'm absolutely clear: The information about Mr. Mazur's cooperation, and by his cooperation I mean his past cooperation in 2006, in evaluating whether or not Mr. Mazur could be a cooperator in March of 2011, you would agree with me that Judge Fischer needed to have those facts in order to conduct that analysis, correct?

A. I think in the full context, it wouldn't have changed the necessity evaluation.

Q. I didn't ask that question. I asked the question that Judge Fischer, you knew that Judge Fischer needed to have the facts of Mazur's cooperation in order to evaluate whether or not he could be a cooperator in your investigation in March 2011, correct?

A. With the other facts, no, it didn't occur to me that that would be necessary, no. I can't answer yes or no. I'm trying the best I can to answer your question, Mr. Hochman.

Q. So you think that Judge Fischer can make this decision in a vacuum?

A. No. That is why I provided this large affidavit.

Q. But the large affidavit had no facts about Mr. Mazur's cooperation. So explain to Judge Wilson how Judge Fischer was going to evaluate Mazur's cooperation without any facts about

his prior cooperation.

A. Because there is at least five paragraphs talking about why no cooperator would be able to get -- satisfy the goals of the investigation. Didn't matter who they were.

Q. Again, that is your conclusion, not the underlying facts as it pertains to Mazur, correct?

A. As to him specifically, no, no.

MR. HOCHMAN: No further questions.

THE COURT: Let me ask you this: One thing about the affidavit that no one has -- no one, I don't think, has raised. The affidavit discusses the closeness with which the leaders, Possino and Nix, kept their master plan secret. But at the same time, in the affidavit, I thought Berger said that he was at a meeting where on a chalkboard they put down five or seven companies that they were going to -- at least he thought they were the next targets.

So how do you explain that? In other words, on the one hand, the -- the affidavit suggests that Nix and Possino were guarded about sharing their confederates, transfer agents, lawyers, auditors, things like that. On the other hand, Berger claims to have seen, in their offices, on a board, five or so companies that were next in line for schemes.

THE WITNESS: Yes, Your Honor.

THE COURT: So how confidential is that?

THE WITNESS: It wasn't so much the deals that are

doing, Your Honor. It was acquiring evidence of the knowledge and role of those other plaintiffs --

THE COURT: I know, but isn't that some indication that they weren't that secretive because why wouldn't someone else in that business say, Well, I didn't think of going after this company. Maybe I should go after that company.

THE WITNESS: Yes, Your Honor.

THE COURT: And use that as a manipulator. I don't know. Just struck me as being odd that they would actually put names of companies they were going to manipulate on a board for Berger to see.

So your position seems to be that, on the one hand, in the affidavit, you seem to say that Berger can't get any further, because in order for Berger to get further, we would have to actually deliver on the $500,000, you know, to pay into the -- to get into the game, right?

THE WITNESS: That and the way the Possino, Nix conspiracy worked, how they compartmentalize.

THE COURT: Well, forget that for the moment. He would have to get into it, and that because the government couldn't ethically front him that money, he reached the point where he had to put up or shut up. He couldn't put up, so his usefulness was over.

Where is the section of the affidavit where that's discussed? I want to see that again. Can you point me to it?

MR. HOCHMAN: I'm sorry. The section of the affidavit --

THE COURT: Where he talks about the fact that -- that Berger can't go any further because Berger can't supply the $500,000.

MR. HOCHMAN: Paragraphs 123, 124 -- actually, it's 123 on page 85 of Exhibit 17, talking about limits on government's ability to achieve the goals of the investigation through C.W. 1 --

THE COURT: 123?

MR. HOCHMAN: Yeah. Paragraph 123 on page 85 --

THE WITNESS: And 125.

THE COURT: Okay.

MR. HOCHMAN: And then, yes, it carries on to 125.

THE COURT: Okay.

BY MR. HOCHMAN:

Q. Agent Tarwater, would you agree with me the following proposition: That if a cooperator who is an identified individual in your investigation had previously come into the FBI voluntarily, without an agreement, provided information about a large pump and dump scheme to the FBI, made consensual monitored phone calls that corroborated that information, led the FBI to interview people that further corroborated that information, that that information that I've just described would be pertinent for Judge Fischer to consider in evaluating

whether or not that cooperator should be used and is a cooperator in your investigation? Would you agree with that?

A. Just that hypothetical, no other facts?

Q. Yes.

A. I think it could be pertinent. It could be, yes.

MR. HOCHMAN: No further questions.

THE COURT: Anything further?

MS. UYEDA: I have no questions, Your Honor.

MR. AVEIS: No, thank you.

THE COURT: All right. Thank you.

Okay. What else is on the agenda for the hearing? Is that -- are there other witnesses or --

MR. HOCHMAN: Yeah. Your Honor, Mr. DeBretteville actually would like to call Agent -- how do you pronounce it? -- Cacioppi dealing with the minimization issue. I think it will be relatively brief testimony.

THE COURT: Okay.

MR. HOCHMAN: But I think it makes sense to get it done now.

THE COURT: All right.

MS. UYEDA: And, Your Honor, just as a technical matter, we would move to admit Exhibits 1 through 21 in the record.

THE COURT: Received.

(Government's Exhibits 1 through 21 received in

evidence.)

MS. UYEDA: Into evidence. I'm sorry.

THE COURT: Yes.

MR. HOCHMAN: And I would move to admit Exhibit 32 and 35 into the record as well.

(Government's Exhibits 32 and 35 received in evidence.)

MR. AVEIS: As to the exhibits identified by Mr. Hochman, I'd like to parse them. He identified just the 302s for the witness that the witness had seen. The balance of the documents had not been seen; therefore, can't go to the witness's state of mind insofar as what he knew before the wiretap application --

THE COURT: I think they all can be received, and you can argue from the record, but I think they have some circumstantial relevance.

MR. AVEIS: Very well.

MR. BOWMAN: Your Honor, before, if I may, before we move to the minimization, a question: Does the court intend to hear argument today to resolve the matter of the Franks challenge or did you intend to have additional briefing?

THE COURT: Well, I'd like to -- what I'd like to do is hear some argument to see. Because sometimes you may have thoughts and theories that you haven't outlined fully. So I'd like to hear what you have to say, and then I'd like to think

about it.

MR. BOWMAN: Would it make sense to do that before the minimization testimony so --

THE COURT: Yeah. Maybe we should leave the minimization if it gets another thing --

MR. BOWMAN: I just figured while the agent's testimony was still fresh in people's minds.

THE COURT: Yeah. All right. Let's do that.

So -- all right. You're the moving party, so let me hear your argument.

MS. UYEDA: Thank you, Your Honor.

In the first phase that you kind of termed as phase one, in determining whether there was intentional -- intentional omission or reckless -- omission made in reckless disregard, I think there are really two points that I wanted to make.

In terms of the intentionality, I think what we're talking about is that Agent Tarwater purposely ignored the admitted information to maintain the half truths that supported his conclusions of why he needed the wiretap. It's very interesting because Agent Tarwater calls Mazur and Mendiratta as the No. 1e target when explaining why he is not going to approach them as a cooperator --

THE COURT: Didn't he call Mendiratta the No. 1 target too?

MS. UYEDA: He did, Your Honor, yes. Because Howard Berger brought Mendiratta to the government's attention, or to Tarwater's attention first, before Possino or Nix. That was the testimony, I believe, the last hearing.

So they called them target No. 1 so we don't flip the top, but at the same time, then, Tarwater doesn't investigate everything about this target No. 1, including prior contacts, prior cooperation, interview people who were present at those proffers, follows up on whether Mendiratta's information that he provided to the government back in 2006 resulted in successful prosecutions of other people in the district.

And so I think that, you know, the government can't really have that argument both ways. This wasn't an ancillary character.

THE COURT: This wasn't what?

MS. UYEDA: An ancillary character. He was a key character, he was a target subject.

And, of course, they had all the resources available to him because this was an L.A. investigation, Mendiratta cooperated in Mendiratta one, as we call it, with Los Angeles, locks as well as New York. So it certainly -- this information was certainly out there, and he just was selective about what he wanted to know.

And I think that came across, he knew about Mendiratta's prior cooperation by reading the 302s, and that he

had signed a 5K plea agreement, and that he had gotten a lenient sentence. But at the same time, he didn't choose to read the sentencing position paper, he didn't choose to see how substantial or how valuable Mendiratta's cooperation was.

And so that's really the selectiveness, that --

THE COURT: I don't quite see the selectiveness that way, because I think that Agent Tarwater did concede that he knew those things. And he says, you know, notwithstanding all of that, Wilner was so discouraged with Mendiratta, and my colleagues in New York were so discouraged, and I said to myself internally, he is of no use, and I was remiss in not just saying he had been a cooperator in the past, and he wouldn't be useful now.

What I want you to comment on is why that conclusion might be shaken by what he did put in the affidavit about Mendiratta. In other words, unlike Mazur, he didn't leave him out. He put something in.

MS. UYEDA: Right.

THE COURT: And he talked about these seven 302s, and at first I thought that those seven 302s might be misleading in the sense that the reader could conclude that they were in connection with this investigation, but I've rejected that because, given the tenor of the affidavit as a whole, it's clear, notwithstanding the way it was put in that paragraph, that the agent is saying, I can't go to anyone.

In other words, so he is really telling the reader, we haven't gone to anybody because of fear about exposing the investigation. So I think, on a whole, it's inartful, but it doesn't seem as though the agent tried to lead the court into thinking that these interviews were in connection with this investigation.

But the part of it that does trouble me is he says nothing helpful came out in those interviews about this case, but he knew that this case wasn't even on the drawing board then, and that how could these interviews of Mendiratta back then have shed any light on a scheme that hadn't even been hatched?

But then the agent comes back and he, as a rejoinder, but -- now I lost my thought. He said -- just give me a second here. I just lost it. It's like that thing on the computer, you know, when you Google something, it's going, going, going, I'm just hoping that it lands somewhere. There's a light on, but nothing is happening.

MS. UYEDA: Take your time, Your Honor.

THE COURT: Let me think now.

He comes back and he said -- he did have a rejoinder. He said I internalized Mendiratta wouldn't be of any help, and I've just lost it. I'm sorry to say. It may come back to me when I turn off on Fourth Street -- I won't be of any help.

MS. UYEDA: You asked me a number of questions, Your

Honor. So I'll try and answer each of those, and then perhaps it will trigger something. But in terms of he was very selective in what he chose to say because he only said that Mendiratta proffered seven times before. And that wasn't to say that Mendiratta actually cooperated, because I read that to be that he unsuccessfully --

THE COURT: That's where I would be -- you got me back to the point.

So the agent is selective. He makes it seem, arguably, that Mendiratta couldn't -- didn't provide anything helpful about this case, and how could he because this case wasn't even conceived then. So why wasn't that misleading to the judge?

MS. UYEDA: I think it was misleading, Your Honor, and if Tarwater had provided the nature, extent and the reward of Mendiratta's prior cooperation in the affidavit, it undermines each of those conclusions and actually makes those reasons very misleading. For example, that he proffered seven times and didn't mention his relationship with Possino.

Well, earlier in the affidavit, as you said that this case hadn't hatched, it wasn't on the drawing board, it wasn't concurrent with the 2006 proffers. So the dates would be very relevant to this, and what he was talking about in those proffers. And so I think that's what I'm talking about selective and what he chooses to say, he just says that in

seven proffer sessions he didn't mention Possino.

THE COURT: But then -- and maybe this is what I was thinking of -- that Tarwater does say that Possino and Nix were interviewed separately, or maybe not interviewed, but spoken to the confidential informant, and each of them separately mentioned that they had known the other and done some deals with them for ten years.

So from that -- now I finally got triggered here -- from that Tarwater says, Well, look, you know, they knew each other for all this time, and Mendiratta never mentioned Possino --

MS. UYEDA: Right.

THE COURT: -- in these interviews. And your point is that we don't know whether at that point they were in a hiatus, what question they were asked, and, most certainly, this case wasn't around.

MS. UYEDA: Right.

THE COURT: So -- and so the thing that struck me as being peculiar is, and I asked -- I remember I asked him the last time, why did he go to such pains to talk about these interviews when all he had to say was, you know, Mendiratta had been used as an informant before, he was successful, but since then we've learned that he won't be successful or is no longer reliable because he's involved in the same scheme again after he got a break, and I spoke to my colleagues in the FBI in

New York and they say he is not worthy of being used.

So the question is, why didn't he just say that? Why go into this stuff about -- then he says something else. He says, paragraph 120 -- then he says -- what paragraph is it?

MS. UYEDA: 127?

MR. BOWMAN: I believe it's 129, Your Honor.

MR. HOCHMAN: 129, Your Honor.

THE COURT: 129. Okay. 129. Yeah.

Now, it just occurs to me here, if you look at paragraph 129 -- and I didn't, frankly, see this before now -- if you look at 129, I'm reading from it, "Mendiratta," quote, "has been interviewed by the government at least seven times pursuant to proffer agreements but has not mentioned Possino, Nix, Angelastri" --

MS. UYEDA: Angelastri.

THE COURT: -- "Angelastri or anything about an ongoing, the "ongoing" is the word I didn't see before. In other words, it would be a better argument if the "ongoing" wasn't in there, if he just said "market manipulation." Then the argument could be, well, they're talking about the past, and, yes, we were not talking about this investigation, but we were talking about people in the same scheme, and he should have mentioned Nix or Possino.

But the thing that I just noticed now, he talks about they have not talked about an "ongoing market manipulation."

"Ongoing" would seem to imply this investigation.

MS. UYEDA: Right, Your Honor, but in other places in the affidavit, as well as on the stand, we established that there was no ongoing market manipulation. In fact, in that same --

THE COURT: What do you mean there was no -- I thought this case is about an on -- I'll get you -- give you a chance to respond.

What does "ongoing" mean?

MS. UYEDA: I don't know, Your Honor. I mean, in terms --

THE COURT: Maybe "ongoing" means that something is happening now that these interviews should have revealed.

MS. UYEDA: Right --

THE COURT: But there was nothing going on when these interviews happened. In other words, the word "ongoing" in the terms of -- in terms of tense is not historic.

MS. UYEDA: That's correct, Your Honor. That is our position. In the affidavit, the first date that they talk about, this market manipulation scheme that Agent Tarwater wants to investigate begins in August of 2009 with SENZ, and that is the transferring of shares. And it's not even clear that Mendiratta is actually part of that. He, I believe, comes in later in the date, and I can bring that date up for you.

But also on the stand, Agent Tarwater admitted that,

and in the ten-year quote that they rely on that they had this ongoing relationship in for the last ten years, we've been doing deals for ten years, there was also a statement that Tarwater admitted that there was a break in the relationship for the last several years. So that would be 2007 and on.

THE COURT: I know all that, but why isn't Tarwater's explanation -- again, we're talking now about whether he had the state of mind to lie, or mislead, or deceive. And so he is telling the judge that, you know, Mendiratta is still part of the scheme, even after he got that favorable plea bargain, and he's even carrying it out from prison, and that's why I don't think he would agree to cooperate.

So why isn't that another reason? In other words, aside from whether Mendiratta could deliver these other targets, he is basically saying I don't think Mendiratta is going to cooperate because he is in prison. Why would a guy cooperate when he is serving a prison sentence, reduced sentence for stock fraud, and he has got a favorable deal, and he is in the middle of another stock fraud from his prison cell? Wouldn't a guy like that say, I can't afford to cooperate?

MS. UYEDA: Well, I think there's two reasons for that, and two that you identified in the last hearing. And one is they know who they're dealing with, Mendiratta. You know, based on his -- all of the prior 302s, he is the person who

commits crimes, who gets caught, and he cooperates, and he did that three separate times, Los Angeles, New York and Los Angeles.

And, as Your Honor said, by this point they have 300 consensual calls, they have evidence of his state of mind, and they have the leverage against him, is I believe the term that you used. And so there's nothing -- in fact, actually his history in the pattern of him committing crimes, getting caught, and cooperating --

THE COURT: And that's omitted.

MS. UYEDA: And that's omitted, yes, Your Honor.

THE COURT: Even what is omitted is even the fact that he has cooperated in the past.

MS. UYEDA: Yes. And so the way -- I read this initially and said, Oh, he proffered seven times. It didn't look like anything came of those proffer agreements, that he was rewarded for those proffer sessions, that he provided any substantial assistance to the government, and the type of person that he was and the type of information that he provided.

So I think that the government -- and to answer your question, instead of being full and complete, he used this fact to his advantage in supporting the conclusion that he wanted to assert. And in that sense, he was acting like an advocate, like a lawyer, and not as an agent who's supposed to provide a

full and complete statement of the facts necessary for the court to determine whether or not a wiretap should be issued.

THE COURT: Well, that's, you know, frankly your best argument. Because, like I said, he only chose one person out of all these people to even talk about, and that was Mendiratta. And there must have been something going on in his mind about why he chose Mendiratta. It doesn't even mention that Mendiratta agreed to cooperate. So something was going on in his mind that said I better say something about Mendiratta. And then he starts to talk about Mendiratta, but he doesn't give us the whole story.

MS. UYEDA: Right.

THE COURT: And you're saying that he didn't because he knew the whole story might foreclose a warrant.

MS. UYEDA: That's --

THE COURT: And he says, But, look, if I -- and you can address this -- he says, But, look, you're making a lot of hay out of the fact that I didn't concede that I knew that Mendiratta had cooperated in the past, but if I had said that, then I would have said in the same breath, But Mendiratta, you know, is part of the same scheme, the agent in New York said he is unreliable, Wilner is bent out of shape about him, doesn't want to use him. So if I mentioned that he hadn't cooperated, I would have said these things, so how was that intending to deceive the judge?

MS. UYEDA: Well, if Tarwater's -- if we're to believe Tarwater that all of this information would have just strengthened his position, then why didn't he just put it in? He is asking the court to issue a wiretap, which is a very invasive listening device. And if all of these facts, you know, were going to support his conclusion, then I don't see a reason why he left them out.

You know, my position is, it may be just fear that, you know, these facts might alert Judge Fischer or the issuing judge to say, Look, you need to go back and explore this possibility first about flipping Tarun Mendiratta.

THE COURT: Why did he put paragraph 130 -- 129 in the affidavit? Why is he talking about Mendiratta, nobody else? Was it because -- maybe it's because it was Mendiratta -- it was Berger who first mentioned Mendiratta? Was that it?

MS. UYEDA: Possibly.

THE COURT: Maybe that's why -- maybe I'm trying to think of an innocent reason why he did that. He's mentioning Mendiratta because Berger said Mendiratta is the one who led me by the hand to get into this thing, and so maybe the answer to my suspicion is that he chose to describe Mendiratta and not others because Berger mentioned Mendiratta as being his segue into the scheme.

MS. UYEDA: Your Honor, you know, we had Agent

Tarwater here, and I know Your Honor asked that question a number of times to Agent Tarwater, and I don't believe that we really got an answer to that question. So I can't -- I don't -- I can't really speculate as to why he wouldn't do that.

But it's clear from the prior 73 pages or so of the affidavit of the probable cause that he really talks about Mendiratta and how of a bad person he is by including all these footnotes about his prior prosecution, and his prior sentence, and his prior conduct in prison. And so it doesn't make sense to me, then, that he would just have one paragraph of very select three sentences about why Mendiratta could not be a cooperator in this case when he clearly knew about Mendiratta, his past involvement, his past cooperation, and his past ability to uncover evidence.

THE COURT: But how do you deal with -- maybe you have and I just missed it -- the essential thrust of the government's position that the reason Tarwater was not misleading was that had he included Mendiratta's past cooperation, he would have at the same time included the government's view that he couldn't be helpful for these reasons.

And if the issuing judge saw that, why wouldn't she think, well, that is okay, that's a good reason, the guy is committing another crime, he is in the jail cell, other agents

think he is not worthy?

I mean, in other words, what was he hiding? All he had to do was put that in there, and probably the judge would have said okay.

MS. UYEDA: Well, I think those are two different inquiries. The latter inquiry, Your Honor, I think you wanted to reserve that for phase two, which is what is actually inserted into the affidavit, and then what the standard is in terms of whether a reasonable judge could have found differently.

THE COURT: No. I think that's -- maybe we ought to talk about that a little bit. My impression is that I have to now examine whether Atwater[sic] misled the judge. In other words, not whether he just was in reckless disregard of what to put in the affidavit or not, or -- it's whether his state of mind was to deceive the judge.

You seem to want to parse it two elements, I think it's one question. Was he omitting what should have been in the affidavit -- and I'm agreeing with you, these things should have been in the affidavit, some of them, maybe most of them, but the question is, did he omit these things because he wanted to mislead the judge?

MS. UYEDA: Your Honor, in terms of evaluating omissions, I agree with Your Honor, there is one type that is the omission that's made intentionally designed to mislead.

But there's also omissions made with the reckless disregard of the truth, and actually the case law talks about that you can infer -- is it the fact -- the quote is, if the person withholds a fact in his can that any reasonable person would have known was the kind of thing that judge would wish to know, then you can -- then there is a reckless disregard from the truth. So you can infer --

THE COURT: Where did you take that from?

MS. UYEDA: That's from Rajaratnam, from the Second Circuit, Your Honor, that talks specifically --

THE COURT: What is the case?

MS. UYEDA: Rajaratnam, R-a- --

THE COURT: Oh, oh, oh. That's the recent insider trading case with the hedge fund guy.

MS. UYEDA: Yes, Your Honor.

THE COURT: Right.

MS. UYEDA: And that is in the Second Circuit.

But you can infer reckless disregard of the truth where the omitted information was clearly critical to either a probable cause or a necessity determination.

So then we look, okay, well, are these facts clearly critical? Are they the type of information that a judge would wish to know? And I think that is the -- that could be another type of omission, and here we have, you know, the starting point is that Tarwater --

THE COURT: Let's assume it was the type of omission that the judge would want to know. That isn't the inquiry. Let's say he omitted what the judge would want to know, and I'm agreeing with you in large measure that the judge would want to know the things that you argue should have been included. The question is, did he do that with an intent to mislead the judge into thinking that there was necessity? That's the --

MS. UYEDA: Well, it seems like from this test it doesn't go back to Tarwater's intent of what he thought, just that these facts were so critical that a reasonable person would want -- would think that a judge would want to know that you can just infer reckless disregard of the truth.

So Tarwater in that sense doesn't have to intentionally mislead or be reckless about it, but that because the information is clearly critical, and because the information is something a judge would wish to know, then you can infer reckless disregard --

THE COURT: Let me ask you a -- an important question: Let's assume that I conclude that Tarwater was truthful, that he -- his explanation was truthful, he didn't intend to mislead the judge. But you argue that even though you have made that conclusion, you can't ignore the circumstantial evidence in this case. And so even if you think subjectively that Tarwater was truthful, the conclusion can't rely on that, it has to rely on an objective view of the

circumstantial evidence.

MS. UYEDA: Yes, Your Honor.

THE COURT: That's important, isn't it.

MS. UYEDA: Yes --

THE COURT: You're saying you take that from this -- I can't pronounce the guy's name.

MS. UYEDA: Rajaratnam, Your Honor, in the Second Circuit.

THE COURT: Rajaratnam.

MS. UYEDA: It's also in our supplemental reply brief.

THE COURT: Yeah.

MS. UYEDA: Those two quotes.

But, Your Honor, even if Agent Tarwater didn't believe it was important, if a reasonable person would have known that this is important for a judge to know, then you can infer that reckless disregard.

THE COURT: So you're saying the test is more objective than subjective?

MS. UYEDA: Yes, for this reckless disregard of the truth test, yes.

THE COURT: I see. Well, okay. That's --

MS. UYEDA: And I think in this case, there is a good record that Mendiratta's prior extensive, successful, rewarded cooperation are facts that a reasonable person would think that

a judge would wish to know in determining whether or not the traditional technique of using an informant would be --

THE COURT: I agree with that.

MS. UYEDA: Okay.

THE COURT: I agree in large part with that.

So maybe we hear from Mr. Hochman.

MR. BOWMAN: Your Honor, would it make sense to bifurcate?

THE COURT: No. I want to hear the whole thing. Their best shot and your response.

We'll take a short recess. We've been at this awhile.

(Recess)

THE COURT: Before you begin, Mr. Hochman --

MR. HOCHMAN: Yes.

THE COURT: Ms. Uyeda, one thing you didn't comment on, and maybe you can now, is what is the effect or the impact, if any, on the affidavit from the communications between Agent Tarwater and -- was it Bowman? Exhibit 19. In other words, what do you make of that?

In the -- in Exhibit 19, this is when Tarwater sends a draft of February 19, 2011, to Bowman. The subject is "Necessity." And then he -- what is the significance in the Exhibit 19 of the capitalization of a name? Is that just a style, every name is capitalized? Does that mean anything

else?

MR. BOWMAN: Your Honor, if it's a draft of the affidavit, the affidavit capitalized the names of the target subjects as of the time of that draft.

THE COURT: Okay. Ultimately, Mazur wasn't.

So what I'm asking you about, particular, is at page two, that would be Bates stamp 427759. In the middle of the page -- yeah, above "Grand Jury Subpoenas."

Do you see that?

And then it says, bracket, "Note prior interviews of Mendiratta, and conclusion not helpful. Anything about Mazur interview," then another bracket, "Possino protecting Mazur, partners with Nix, loyalty." Then another bracket, "Some wouldn't know what other co-conspirators doing. Compartmentalized," bracket, "Rick Bailey example," bracket, "TM went to prison without naming unknown individuals."

What are you -- what are you -- what is the relevance, one way or the other, of these notes that Tarwater is sending to Assistant United States Attorney Bowman?

MS. UYEDA: I think it shows that they -- that Tarwater clearly knows about these interviews with Mendiratta, and that he is considering whether it should go in the affidavit. But I think what ultimately -- and you can compare that with what actually happens in the affidavit and what he includes is that he includes only the helpful information to

him but not any of the other information.

So he includes all the bad things about Mendiratta, but none of the good things about any of that cooperation. And so he selectively chooses, and that's where it's intentional, because he chooses only to provide certain facts to the judge, and those are facts that paint Mendiratta in a bad light.

THE COURT: Okay.

All right. Do you want to argue now?

MR. HOCHMAN: Yes, Your Honor.

And just to amplify that particular set of notes, just because it's in front of the court, where it says, "Note prior interviews of Mendiratta, and conclusion not helpful."

"Conclusion not helpful," I think that's saying right there, between Tarwater and Bowman, that the conclusion that one can draw from the Mendiratta interviews of all that cooperation that they're not going to be telling Judge Fischer about is not going to be helpful to the cause of getting their wiretap, Your Honor.

"Conclusion not helpful" --

THE COURT: I mean, you could interpret it that way because, clearly, Mendiratta was very helpful.

MR. HOCHMAN: Exactly, Your Honor.

And I think what Ms. Uyeda said is absolutely right. What we have here is that Special Agent Tarwater is giving Judge Fischer half the facts, and even the misleading half of

the facts. Anything that could be hurtful to Mendiratta, the fact that he is a convicted felon, the fact that he gave proffer sessions and was still involved in the activity, was put in. Everything that could possibly be helpful, which is all that cooperation, Your Honor, from 2004, from 2006, talking about the hiatus in the ten-year period, which explains why he is not going to be loyal to Possino, and why he didn't have information on the proffer sessions about ongoing schemes. All that stuff, Your Honor, is missing.

In fact, when I initially read this affidavit, and I hadn't seen all the stuff that Ms. Uyeda put in her motion, I thought, wow, Mr. Mendiratta obviously was a bad cooperator. He gave seven proffer sessions, he's loyal to Possino, he never gave Possino up, he is committing the schemes. Why would there be any issue?

And then I read all the stuff that Ms. Uyeda dug up by getting the files, seven different cooperation proffer sessions which had a pattern to it, and Ms. Uyeda talked about that pattern.

In 2004 he gets caught by New York. He comes in, and he gives up everything, Your Honor. Those 302s, the first four or five 302s are very detailed. He's giving up everybody in that Universal Express scheme.

Then what happens in 2006, he is in Los Angeles. They catch him again. What does he do? He tells them in 2006

about the American Fire Retardant scheme. Now, the interesting thing about that, Your Honor, is that that scheme was being played out while he is giving his cooperation in 2004 to New York.

So his pattern with the government is to cooperate when he gets caught, still commit a scheme. But then when he gets caught again, two years later, the government accepts the cooperation because he's given up the next scheme.

And so then what happens in 2009, he meets with the IRS in the beginning of the year, he tells them again when he is confronted with his tax situation, You got me again.

So now you fast forward to 2010, and the government is complaining that Mr. Wilner feels double-crossed. And, therefore, because he's double-crossed, we shouldn't have to reveal to Judge Fischer any of the facts, but the reality is, if they had told Judge Fischer the pattern of how Mendiratta works, that he gets caught and he gives up close friends, people have been business partners with for years --

THE COURT: What if Wilner had actually told Agent Atwater, "Let's not put that the affidavit," then the -- wouldn't the agent be able to say, "I wasn't misleading"?

MR. HOCHMAN: No. The agent would be able to say that he heard -- the agent has his own independent obligations to provide a full and complete statement of the facts.

THE COURT: That's not the facts anyway. There is no

evidence --

MR. HOCHMAN: Exactly --

THE COURT: -- that -- what's his name --

MR. HOCHMAN: And, Your Honor, I sort of want to go back to the 20,000-foot level for a brief moment to tell you why we're looking at this particular section.

Wiretaps, unlike search warrants or any other investigative device the government has, have the highest congressional scrutiny attached to that. And Agent Tarwater is both a lawyer and an agent, and someone with training and experience in this field, told you he knew about that.

Congress has basically said that "the necessity required to exist in order to limit the use of wiretaps which are highly intrusive."

And what they basically say is that the -- unlike, for instance, a search warrant, Your Honor, in the necessity part of a wiretap, it's congressional, it says it right there in the statute, this is full and complete statement of facts.

And I think what you have here, Your Honor, is that even though Agent Tarwater knows this, and recall I asked him about that paragraph seven of his affidavit where he said in paragraph seven, Look, the only facts I'm relying on are the facts in this affidavit.

And, more importantly, as he says in paragraph seven -- I'll just pull that out very quickly, Your Honor --

it's on page -- it's the third page of the affidavit, and he says, "Nor do I request that this court, Judge Fischer, rely on any facts not set forth herein in reviewing this application for an order authorizing the interception of wire communications."

THE COURT: I mean, that is kind of pitter-patter of language in all these affidavits. I mean, even if he didn't say that, the only thing the judge can't consider is what's in the four corners in the affidavit.

MR. HOCHMAN: Correct. And agent Tarwater conceded, Your Honor, what his role was and what the judge's role was. His role was to provide the full and complete statement of the facts to the judge, and the judge is the one that needs to weigh whether or not there's enough evidence to show that I'm not going to go forward on the wiretap wants because I think maybe the cooperator could be successful, or at least inquire further of the government, Look, you provide this information. Tell me your reasons why you think this particular cooperator is not going to be successful.

Your Honor asked the question about Mendiratta, why he is mentioned and nobody else. I would suggest, Your Honor, that potentially the reason is this: With Mendiratta, he does have some baggage. He has the fact that even though he signed a cooperation deal, pled guilty, was sentenced, he was still doing the crime at the same time. Mazur doesn't have that

baggage, Your Honor. He didn't have that baggage at all.

So, again --

THE COURT: What was -- at the -- in March of 2011, the government's knowledge about Mazur was that he was involved in many of these kinds of frauds, but not prosecuted, and that the fact that he sold or -- sold a large amount -- he sold or bought?

MR. HOCHMAN: He received a million shares, Your Honor.

THE COURT: He bought a million shares in this SENZ stock, was a red flag to them, but they didn't know enough about his relationship to the scheme to name him -- make him a target. But so your argument is that they should have used him?

MR. HOCHMAN: Actually, my argument is -- my No. 1 argument, Your Honor, is they should have told Judge Fischer the facts and let her decide.

THE COURT: Well, then --

MR. HOCHMAN: And, by the way, Your Honor, you know where I get that thought from is from the words of a very wise judge who said the following: "The requirement that the affidavit" -- this is in the context of a search warrant.

"The requirement that the affidavit recite the facts relied on by the affiant to support the conclusion," in this case it was probable cause exists, "is simply part of a larger

principal, that the official charge with acting on the affidavit," in this case Judge Fischer, "must be able to judge for himself," or in that case herself, "the persuasiveness of these facts, as well as to make an independent determination that they establish," in that case, probable cause, but in our case necessity.

Those wise words were, of course, written by yourself, Your Honor, in the district court opinion in the *United States v. Underwood*, where you basically granted a motion to suppress a situation that bears a lot of striking similarities this case.

Because, again --

THE COURT: I guess it's time to retire when your own words are thrown back at you, it's time to give it up, right?

MR. HOCHMAN: Your Honor --

THE COURT: Come full circle.

MR. HOCHMAN: -- we would think when you're right once, you should be right again, Your Honor. And we think that you made the right decision in Underwood because, again, in Underwood --

THE COURT: Underwood was a kind of -- I remember the case. It was a rather unique kind of case. I don't think -- I mean, the proposition is well known, so it's nothing startling about that, but the -- let's sort of -- I recognize that wiretaps are a special breed and that -- but tell me, let's get

into the bowels of your arguments about Mazur.

MR. HOCHMAN: Sure. Your Honor, I've given you Exhibit 31 before you. That's another -- hopefully it was placed before you. It is an exhibit that has red on it, as well as --

THE COURT: Okay. I have it.

MR. HOCHMAN: In some ways, the bowels of my -- or the guts of my argument is contained in Exhibit 31. Because what I've done, Your Honor, is taken in black the words directly from the affidavit, and in red, I put down the other facts that have been developed, both in the pleadings and in these hearings, that were omitted.

And if you read those together, and you put that with the standard that Ms. Uyeda told you, you know, a standard that basically says, you know, when you're reckless omissions are done, if you withhold a fact that any reasonable person would have known was the kind of thing the judge would wish to know, or was clearly critical, you can absolutely infer recklessness here.

So, for instance, in paragraph 127, when Special Agent Tarwater is describing the criteria for a successful undercover or cooperating informant, I actually put out in red the information that should have been presented to Judge Fischer about both Mr. Mendiratta and Mr. Mazur.

And if you present that information in connection

with the conclusions, and I mean conclusions, that he is presenting to Judge Fischer, you would see that the conclusions are not supported by the facts, and, therefore, Judge Fischer could, and that is the key standard, could have decided that the necessity requirement had not been met.

And so I give examples about, you know, the first one dealing with trust. Obviously, Mendiratta and Mazur had the trust of the target subjects.

I deal with the next one on highly specialized knowledge of securities --

THE COURT: How did you conclude that Mazur had the trust of them? I mean, Mendiratta, the government has admitted that, but what about Mazur?

MR. HOCHMAN: Sure. I quoted Agent Tarwater, paragraph 56, he describes Mazur as Possino's business partner.

THE COURT: I see.

MR. HOCHMAN: Your Honor, I quoted actually my little red thing here, the paragraphs dealing with Mr. Mazur. You know, with highly specialized knowledge, Mendiratta and Mazur both possess that.

When you deal with -- the next paragraph, when you deal with someone who needed to establish the bona fides to the target subjects. Obviously, Mazur and Mendiratta had established their bona fides with the target subjects over the years.

When you talk about common relationships and shared history, they actually had better common relationships and more shared history than Mr. Berger did.

And then finally, when you talk about facing the limitations, I point out that while Berger couldn't have put in the $500,000, Mendiratta and Mazur had already provided funding, or at least obtained the shares in the SENZ scheme, unlike Mr. Berger.

So the limitations -- if Judge Fischer had been told these facts, she would have, at a minimum, paused and said, Look, you know, tell me some more. If you think that these facts are not -- or justify your conclusions that we can't use Mendiratta or Mazur, I got to know more.

And then I go on to paragraph 129 and I deal with -- directly with the -- you know, first, the misleading statement about Possino and Mendiratta each separately telling Berger that they had carried out manipulation deals together for over years.

And then I put in the fact, "However, Possino told Berger that Possino and Mendiratta had a break in their business relationship and started getting involved in deals again from 2007 onwards."

So when you're dealing in this case with the loyalty situation, it's not a ten-year uninterrupted situation, it's a situation that has a break.

But, more importantly, I then add, when the affidavit talks about the seven proffers, I put in the seven proffers, and I actually put in details about that pattern that we were talking about before Your Honor when Mr. Mendiratta is caught, and he then goes ahead and gives it up, indeed, and provides all the information. And if Judge Fischer had these facts that go on forever, for a long time, Judge Fischer would have paused.

And then I add, Your Honor, what was in Mr. Wilner's recommendation. Because I think what we can absolutely say is that Mr. -- excuse me -- Agent Tarwater was reckless in not getting the sentencing position that he knew existed, that he knew the government had written, that he knew contained a favorable deal, that dealt with the 5K factors when it was in both the FBI's files and the U.S. Attorney's files.

And had he gotten that, Your Honor, he would have had to have told Judge Fischer the conclusions. Now, he could have explained them away, but he'd have to say that in April 2010, here's what the government knew: The government knew that Mr. Mendiratta was involved in a scheme in 2004, gave it up.

In 2006, he gave up a scheme that he was committing back in 2004, and he gave that up. Then in 2009, he gives up the IRS.

And then here's that little point that my co-counsel brought up to you, it's a small point but important here, in

Wilner's statement in the reply, he says to Judge Hatter, "Judge Hatter, we have received these anonymous tips that Mendiratta is still in business. They're uncorroborated right now, but we have received them."

And, Your Honor, notwithstanding all that, and even knowing Mendiratta may be in business --

THE COURT: I lost that.

MR. HOCHMAN: Sorry.

THE COURT: Judge Hatter raised a point with the government that he had been --

MR. HOCHMAN: No. What happened, Your Honor, is that in Mendiratta's sentencing before Judge Hatter, Mendiratta tried to minimize his role in the offense. The response back by the government is, no, here's his whole role in the offense, and by the way, Judge Hatter, in the footnote, we've received anonymous tips that Mendiratta is still in business, and still engaged in manipulated schemes, although we haven't corroborated it yet.

Notwithstanding that, however, Judge Hatter, we're willing to stand by our recommendations that Mr. Mendiratta has been truthful, reliable, trustworthy, credible, that he provided wholehearted cooperation, that he explained his role in the criminal conduct and the role of others. That when presented with proof of his conduct, he provided detailed information about a scheme that was of clear assistance to the

government.

Now, if Judge Fischer had been told all these facts, Your Honor, she might have paused, she could have paused, which is the standard, and said, Okay. It sounds like he's been given some great cooperation. If you don't think we should use him, I need you to give me another affidavit where we have -- lists all your reasons why we shouldn't use Mr. Mendiratta.

I'm not going to allow Judge Fischer saying this. You need to sort of net out the cooperation in your own mind, and then just give me your conclusion.

Your Honor, it's almost like a tax return. In a tax return, the IRS does not allow you to net out your income and deductions and put one number down. You got to put down your income, you got to put down your deductions, so the IRS can evaluate if the last number makes sense.

What Agent Tarwater did is he did the net out to the judge. He just became convinced that he couldn't use either person, so he decided to put half the story in on Mendiratta and none of the story in with Mr. Mazur.

THE COURT: If he did that, as you term it "netting out," but he didn't do that with the intent to deceive her.

MR. HOCHMAN: Well, let's use both standards, Your Honor. With the intent to deceive her. What is he say -- he has admitted -- he admitted, Your Honor -- I pulled out the section from the transcript of the first hearing. I asked him,

"You, Special Agent Tarwater, you knew that Judge Fischer would be interested in knowing the government's evaluation of Mendiratta's cooperation for a five-year period in evaluating whether Mendiratta could be used as a future cooperating witness, correct?

"Correct."

So is he intending to deceive?

THE COURT: What does "deceive" mean here? Does it mean deceive about -- well, it's about necessity. Deceive about necessity.

MR. HOCHMAN: Exactly, Your Honor. What we're saying is that he intentionally left out information that he had and didn't give Judge Fischer the ability to evaluate that information. He did it intentionally, Your Honor. He had the information; he didn't give it to Judge Fischer.

And he has admitted that he knows he has to give a full and complete statement of the facts and necessity to Judge Fischer. He has admitted he cannot net it out, and that's in the record.

And he does the same thing with Mazur, only worse, Your Honor. With Mazur he doesn't have that baggage. He completely nets it out. You'd have no idea from reading this affidavit that Mazur came in, in 2006, voluntarily, without a lawyer or an agreement, provided information of a $25 million pump and dump scheme, did consensually monitored phone calls

that corroborated it, and had the FBI follow up on the information and further corroborate it.

Imagine if you were Judge Fischer reading that, which is actually continuing on in this thing, I put it in in paragraph 130. And then the government makes the conclusion we can't use Mazur, or it would be too risky, the risk benefits, the risk of using Mazur would outweigh the benefits that we could get from him.

THE COURT: What about the very broad argument that Atwater made about the fact that there was a fear, a general fear, that using any cooperator would upset the whole scheme?

MR. HOCHMAN: Well, again, what the cases make clear, Your Honor, is you can't just give your conclusion, and you can't give a conclusion, by the way, Your Honor, that would be true in every single case. The *Ippolito* case, for instance -- if I could just pull out *Ippolito* very quickly --

THE COURT: The agent did say that that sort of analysis is true in every case.

MR. HOCHMAN: Right. So actually it's the *Blackman* case, the Ninth Circuit *Blackman* case. It says, "The government may not cast its investigative net so far and so wide as to manufacture necessity in all circumstances."

*Ippolito* says, and *Ippolito* dealt with this exact issue of the government not using a cooperator that the court viewed as potentially fruitful. And it says, in *Ippolito*,

"Although the government need not pursue every alternative means of investigation, neither should it be able to ignore avenues of investigation that appear both fruitful and cost-effective. It is not unreasonable to expect the government to utilize those methods that appear to be potentially productive." And that is the standard, Your Honor.

And here, again, the evaluation of the cooperators is not upon Agent Tarwater to make; that's for Judge Fischer. And Agent Tarwater admitted and conceded repeatedly that Judge Fischer can only do that if he provides Judge Fischer with the facts.

And he intentionally did not provide the Judge Fischer with half the story on Mendiratta, and he absolutely intentionally did not provide the Mazur story, or, at a minimum, recklessly. In fact, he went so far as to write it down in a communication with Mr. Bowman.

That's Exhibit 19, the top part of it, where he describes, at least, the fact that there is some cooperation, although he lies about it, in saying that Mr. Mazur did not provide any information or knowledge about one of the target subjects, and we know that is not true, and he also describes it being inaccurate, but the point is, he left it out.

And, remember, he is willing to put in the Possino footnote that Your Honor has focused on where he says that Possino actually was -- you know, gave information to the FBI

on a certain date, September 2008, about an unrelated scheme, and was neither asked nor volunteered information about the target subjects.

He puts that in about Possino, doesn't put that in for Mendiratta, where that information would have been obviously very helpful, and completely leaves off the information, the cooperation information concerning Mazur.

And remember, Your Honor, the hypothetical that I asked. The hypothetical was similar to the one with Mendiratta, if you -- in evaluating cooperation, do you think it's important or pertinent for Judge Fischer to know if a cooperator had voluntarily come in, made consensual recordings, had been corroborated, et cetera, et cetera, he eventually said, "Yes, correct."

So he absolutely knows what he should have done, and he intentionally -- well, the minimum, recklessly decided not to do it. This whole thing about --

THE COURT: Let's give the government a chance to argue, and then we'll have time for you and your colleagues to respond.

MR. HOCHMAN: Thank you very much.

MR. BOWMAN: Your Honor, I've been informed that the Elmo is not working, but I've brought binders for just a few slides.

THE COURT: Well, we have somebody here, a technician

here.

MR. BOWMAN: Thank you, Your Honor.

THE COURT: Maybe he can --

MR. BOWMAN: The binder for the court that would make things easier.

THE COURT: Yeah, maybe he can help us out.

Does it look fixable?

(Recess)

THE COURT: Okay. Mr. Bowman.

MR. BOWMAN: May I proceed, Your Honor?

THE COURT: Yes, please.

MR. BOWMAN: Your Honor, I'd like start with the applicable standard for recklessness under *Franks* with focusing on the, in particular, the standards articulated in the Second Circuit decision in *Rajaratnam* in which it's particularly important because the -- in that case, the district court found that the agent was reckless in omitting information about an SEC investigation, and the Second Circuit reversed that specific finding, finding that the district court improperly conflated the standard for materiality with the mental state needed for the first prong of the *Franks* challenge, which is recklessness.

THE COURT: I pulled up that case when it was mentioned before, and I haven't fully digested it, but I do see where there is a reference at page 154, headnote 13, that

addresses your argument, and it appears that your argument is supported by the language in the case.

MR. BOWMAN: And, Your Honor, if I could beg your intelligence to go through just a few key portion of that decision which I think are important in assessing the question the court raised earlier, which is really what is recklessness, what are we looking. Because this really is, I think, one of the most thorough analyses, particularly in this context, in a wiretap necessity showing for the standard of necessity.

The defense in -- defense counsel for Mr. Possino said, It's not a subjective test, it's an objective test, that what Agent Tarwater did was unreasonable. A reasonable person wouldn't have done that.

That is not enough to meet the first prong, that is the exact opposite of what the Supreme Court held in *Franks.* Looking at the slide I have on the screen, which is the first piece of paper at the third tab of the binder, Supreme Court in *Franks* held that misstatements or omissions caused by negligence or innocent mistakes do not warrant suppression.

And above that, quoting from Rajaratnam, the inquiry looks to the mental states of the government officials. It is subjective test rather than an objective test.

Your Honor, in their paper that they filed, they said the same thing again, "Recklessness may be inferred where the omitted information was clearly critical to the probable cause

determination."

THE COURT: I think what they're meaning is that the best way to determine whether someone was subjectively misleading is to assess the objective circumstantial evidence. So in other words, it isn't an objective test in the sense that there's a disconnect between subjective and objective states of mind, but the objective can influence the subjective.

MR. BOWMAN: Your Honor, the objective can be evidence of the subjective.

THE COURT: Yes.

MR. BOWMAN: But it can't be drawn solely from the objective, from -- and I would note that the quote was taken out of context. The Second Circuit said reckless disregard of a *Franks* inquiry can sometimes be inferred, but such an inference is not automatically drawn simply because a reasonable person would have included the omitted information. And that inference is particularly inappropriate where the government comes forward with evidence indicating that the omission resulted from nothing more than negligence, or that it was the result of a considered and reasonable judgment that the information was not necessary to the wiretap.

There have been many arguments from defense counsel of what Agent Tarwater should have done, could have looked into, should have known, and these conflate the standard inappropriately, particularly here is the appropriate standard.

"The reviewing court must be presented with credible and probative evidence that the omission of information in the wiretap was designed to mislead or was made in reckless disregard of whether it would" --

THE COURT: That's what the defense -- would you get that?

That's what the defense argument is.

MR. BOWMAN: Right, Your Honor.

THE COURT: That there's credible and probative evidence that the omissions were designed to mislead, and so I think that's what their argument is.

MR. BOWMAN: Your Honor, Mr. Hochman put in front of you a document which really goes to materiality and showed why they think that the information could have possibly gotten Judge Fischer to reach a different conclusion, and he cited *Ippolito*. *Ippolito* actually did not deal with the standard for recklessness because the government conceded it was a misstatement instead that dealt with materiality.

And then putting that document in front of you and saying this could have changed Judge Fischer's analysis, and, therefore, was reckless, conflates the standard. It is essentially saying it is material; therefore, it was reckless.

THE COURT: But my inclination is that the omissions that the defense argues from are material, and that they could have affected Judge Fischer's decision.

So the real question for me is -- and I think I can consider the materiality and nature of the omissions, among other things, in deciding what Tarwater's subjective view was.

MR. BOWMAN: I think they can be considered, Your Honor. My point is that they're not dispositive which is --

THE COURT: Well, I agree with you.

MR. BOWMAN: Instead, Your Honor, in the Ninth Circuit, the accused has to entertain serious doubts as to the truth of his or her statements. The defense has also put a lot of weight into what Agent Tarwater did not look into, did not investigate. But proof of a failure to investigate the veracity of allegations does not establish reckless disregard for the truth.

THE COURT: I don't think it's so much what he should have investigated. I think it's more of what he knew and didn't include. I mean, they're not saying, at least I haven't heard it, that he was deficient because he didn't investigate certain things, one exception being that Exhibit 35.

In other words, the defense did argue that he was deficient in only looking at the 302s and not the entire file. He offered an explanation about that.

MR. BOWMAN: Your Honor, I think -- I agree. I think that the important point is what he knew and did not know. In fact, defense counsel even said that there has to be information that you knew that you end up omitting. So let's

look at what Agent Tarwater knew about Tarun Mendiratta when he filed the wiretap.

He knew that Mendiratta had proffered seven times. He knew that Mendiratta had not mentioned Angelastri or Possino in the proffers, and we can discuss, because I know the court had questions about that. He knew Mendiratta had gotten a good deal. He knew that he had cooperated -- or he committed crimes while under a cooperation plea, that he continued to commit crimes postsentencing. That he delayed surrender under false pretenses to continue crimes. That Wilner was angry at Mendiratta, and that SDNY did not find him credible.

What he didn't know, and this is his testimony, was that Mendiratta had gotten a substantial 5K. He didn't see the 5K, that was his testimony. They've said he should have looked. There was a lot of testimony or it was available to you, you could have asked Wilner for it, you didn't.

They've also said Wilner has said in the 5K Mendiratta provided wholehearted cooperation, that Mendiratta's cooperation led to the convictions of Owens and Woo. Agent Tarwater did not know that, that is his testimony.

Their focus is not his failure to disclose things on the left-hand side, it's the things on the right-hand side of this column that they feel he did not adequately disclose.

And, Your Honor, the court's question --

THE COURT: Well, they could also argue that even if

he didn't know those things, he recklessly disregarded learning them. For example, he didn't want to attend the sentencing because if -- he thought that if he attended, he would have to concede that he heard the government praise Mendiratta's cooperation. I'm just -- I'm throwing that out to you.

MR. BOWMAN: Sure. And then my response, Your Honor, would be where is the evidence of that? We haven't seen that from his testimony.

THE COURT: Well, that's the argument.

MR. BOWMAN: Right. And, in fact, he wasn't on the prior Mendiratta case. There's no evidence that he deliberately avoided knowledge of anything, there's no testimony about that. They tried to draw the inference because they believe this information was so critical, but there's no evidence that he put his head in the sand and tried deliberately to not know any of this information.

And, Your Honor, I would posit that that -- that we're right back to failure to investigate. This is information that they think he should have gotten, that they've argued over and over, he had a duty to go out and find.

THE COURT: They're not just saying he was a subpar investigator, the argument is that -- that either he knew, and is not telling the truth about the things you have in column -- in the right-hand column, or that he didn't want to know. In other words, he shielded himself so that he wouldn't actually

know even though he had a belief that probing further would undercut his conclusion. I mean, that's sort of the argument.

MR. BOWMAN: I understand that, Your Honor. I would say that there's actually no evidence whatsoever other than, again, what they purport to be the importance of the information that that is what Agent Tarwater did.

And recklessness is a high standard. There is a reason why the remedy for a reckless omission of material information is the same from a deliberate falsehood to the judge. It's suppression, and that's because the remedy is so severe. It would be suppression of a wiretap that thus far has led to nine convictions, and a negative credibility finding against this agent in his career.

And we don't question that that would be the appropriate remedy if this was an intentional deception as to a material matter, that harsh remedy should apply, but that is so different from what happened here. There is no evidence that Agent Tarwater was trying to deceive anybody that he was --

THE COURT: I can't agree with that. I mean, there is some evidence that he was. The question is, how do you weigh the scale? Has the government -- has the defense met its burden? I mean, I think that's much too broad a conclusion. I mean, I think there is evidence in this case where you could conclude that he was deceptive. Maybe you don't have to make that conclusion, but there certainly was evidence. I don't

think the defense is arguing in a vacuum.

MR. BOWMAN: Your Honor, let me say -- let's take an example, let's say the 5K. They say that he should have known the 5K because of the obvious importance of wanting to know about the five years of prior cooperation that Tarun Mendiratta had provided, and instead, Agent Tarwater deceptively listed proffers instead of cooperation.

Well, what did he know? What he knew was that seven -- six of those seven proffers were with SDNY, and SDNY's conclusion --

THE COURT: But here's -- let me just interject for a moment. On your chart, I don't know, should we mark this as your argument, which you are mentioned this, so mark it -- call it Court Exhibit A or --

MR. BOWMAN: Yes, Your Honor.

THE COURT: You say what Tarwater knew, and unless I read this incorrectly, you don't include the fact that Tarwater knew the most probative thing, that Mendiratta had cooperated in the past. Forget that he had gotten a substantial 5K reduction or whatever, the most basic point is lacking from your chart here.

He knew that Mendiratta had testified that he generally had testified successfully and that there was a plea agreement. He said he read the plea agreement. And the plea agreement, while it didn't have the description that the

government's sentencing memorandum did, it nevertheless talked about cooperation.

So he knew that Mendiratta had a plea agreement for cooperation, he had cooperated, and I think he said he generally knew that he thought he had gotten a pretty good deal. He didn't know the details of it, and didn't attend the sentencing. I think that's a fair summary of what the facts are.

MR. BOWMAN: Your Honor, let me address those, because you said -- well, first let me clarify.

He had not testified. I believe the court meant interviewed subject to a proffer. There's no record that Mendiratta ever testified on behalf of anybody or --

THE COURT: I see. I didn't mean testify. I meant I thought he said when he testified -- I mean, Tarwater testified that he knew that Mendiratta had a cooperation plea bargain, and that he had generally, you know, gotten a deal. He thought it was a good deal, and he says he didn't know about the details of the recommendation, and that's not in your chart.

MR. BOWMAN: Your Honor, let me explain what the cooperation consisted of, because that cooperation consisted of seven proffers in all, six with SDNY, and SDNY's conclusion regarding those proffers was that they were not useful. That is what Agent -- AUSA Wilner said to the court in the sentencing position. If this will focus.

It says, "The New York prosecutors do not believe Mendiratta's actions qualify his substantial assistance under the Federal Sentencing Guidelines, and have not asked government counsel in the California case to request the departure from the court on those grounds."

In the email that Agent Tarwater sent to me, which is our Exhibit 20 -- and I'll try to focus, Your Honor -- "Mendiratta, he shows up more in particular N.Y. cases. I sent you the 302s already. I spoke to the case agent in N.Y. on what appeared to be the most recent one. Sounded like they proffered him a bunch of times and decided he couldn't be used as a cooperator because he is not credible."

That is the SDNY proffers, Your Honor. So the notion that those were productive and led to prosecutions of other people, that was not the opinion of the people in SDNY.

Now let's turn to the cooperation in Central District of California. That consisted of two proffers, and that was it. He was subject to a cooperation plea deal, but what Agent Tarwater knew was that during the time period, in fact, during the entire time period that Mendiratta was signed up under that cooperation plea deal, he was committing new crimes behind AUSA Wilner's back.

There is a -- when you sign a cooperation plea, there is an obligation you don't commit new crimes. Mendiratta broke that. There is an expectation that you stop committing new

crimes, and this is a reasonable expectation. Mendiratta broke that.

From July 2009 to December 2009, Mendiratta was engaged in new criminal conduct regarding Maytech. Agent Tarwater knew that at the time he did the affidavit.

In early April 2010, before his sentencing, Mendiratta approached Berger, before his sentencing, while he's still seeking leniency from AUSA Wilner and the court as a cooperator, he approached Berger to start a new manipulation deal. After he sentenced, when Wilner recommends a 5K, Mendiratta doesn't stop. He essentially continues, and Agent Tarwater knew that.

That was the cooperation. This is what he knew of that cooperation. He did not know of the people who were indicted as a result of it, but that was what he understood as far as the cooperation.

And, Your Honor, I know that the court has also said, Well, why do you read into the fact that he supposedly didn't mention these other folks? Why would you think that he wasn't asked maybe, or the time period doesn't match up?

So this is -- I made an error, as we've seen many errors I've made in this case already, but here's another one. I say SDNY investigation at the top, this is really meant to be SDNY and California. The timeline is from 1997 to 1998, Mendiratta starts doing multimillion dollar deals with Possino.

And he gave a series of proffers from '04 to '09, seven in all.

It is true that there was a hiatus, we've heard a lot of testimony about the hiatus, and maybe Mendiratta wasn't asked about Possino during that time period. But I would note, Your Honor, that while he is ostensibly cooperating, he didn't volunteer Possino either.

If he is doing multimillion dollar deals with him, he certainly knows that Possino is a significant target. He names 30 other people, you know, Johnny Two Guns, and Cheech, and these other people, but he holds back Possino. He keeps that one back.

He also knows, by the time of 2007, he is doing the Quest deal, and that involved Ivano Angelastri, another target subject. 2008, 2009 he is doing deals again with -- or actually I believe the testimony was 2007, he is back doing deals with Possino.

Now, there's two proffers that take place after that, and he doesn't mention Possino, and he doesn't mention Angelastri. And, in fact, that January 2009 proffer, the whole focus of that proffer was tax purposes and overseas accounts. And at that time he is dealing with Swiss investment banker, Ivano Angelastri, who launders money for him overseas accounts. He doesn't identify those accounts, and he doesn't identify Ivano Angelastri.

And Agent Tarwater drew --

THE COURT: Doesn't?

MR. BOWMAN: He doesn't.

And the conclusion that Agent Tarwater drew from that was that the fact that he rats out his friends' prior proffers is a significant fact showing his loyalty to Possino and Angelastri. Because he'll rat out those other 30 people, but the person he is not disclosing are the people we're looking at now, when he had a chance to.

And, in fact --

THE COURT: Well, the only one that I know of that he had a relationship going back to the 2004 period was Possino, not any of the other defendants.

MR. BOWMAN: Your Honor, I believe there was testimony about his relationship with Angelastri, going back to the Quest deal, which the time period was '06, '07. But certainly by '09, when he's asked about his overseas accounts, the whole role for Mr. Angelastri is to launder money in overseas accounts.

But even then, Your Honor, okay, so give him credit for that one too. He is under a cooperation deal, doesn't mention any of these people. Not only does he not mention them voluntarily, or offer them up, he doesn't mention them when they come to him and say, Let's do a new deal called Sport Endurance.

Right before his sentencing, when he is asking us for

a 5K, he says, Sure, I'll that. Great. Sign me up. And he goes to prison rather than offering them up. Do you think if he came to us and said, You know what, I just got approached by Regis Possino, and, by the way, Ivano Angelastri --

THE COURT: Did Agent Tarwater know that? Did he know that pending his sentence or reporting for custody, that he was considering more deals?

MR. BOWMAN: Yes, Your Honor. In the timeline I showed you before, Mendiratta approached Berger before his sentencing, and approached him about a new deal.

THE COURT: That's right.

MR. BOWMAN: And that deal turned out to be Sport Endurance. So rather than -- if, look, if he had come to us before his sentencing and told AUSA Wilner, Rather than go to prison, I'm going to give you Regis Possino and Ivano Angelastri, this case is totally different. It's night and different, but that's not what he did.

He held them back, and actually, later in the case, on the wiretap, Mendiratta says, If an FBI agent rolls up on you, you man up and don't be a rat. He was telling Regis Possino to tell that to Colin Nix. Well, that's what he did, he went to prison rather than out these guys, and that is in Tarwater's head at the time that he is writing this affidavit.

THE COURT: But how do you meet the argument by the defense that Mendiratta had a pattern of repeating his crimes,

same type of crime, getting caught, laying out some of his confederates, doing the crime again? I mean, how do you meet that argument?

MR. BOWMAN: I'd say a few things, Your Honor. He had a pattern of laying out confederates but not these guys. He actually had a pattern of not laying out these guys.

THE COURT: But he was laying out the people that he was dealing with.

MR. BOWMAN: Possibly. But, look, Your Honor --

THE COURT: Let's not gloss over that. In other words, the people he was laying out in those 302s were the people that he was doing deals with then. At no time during the time frame of the s302 was this SENZ deal on the table. As a matter of fact, there's not even any clear evidence that he was doing anything with Possino in that time frame.

MR. BOWMAN: Your Honor, if I understand the court's point, it's if you confront him with the things he's doing and the people he is going them with, he'll then agree that he is doing that with them.

THE COURT: Well, I mean, that's apparently what he did in the past. So it doesn't necessarily mean that he would do it now. Maybe his relationship with Possino is different, and he wouldn't call him out, and he would be willing to call out some others. I don't know, but the argument is still available.

MR. BOWMAN: Your Honor, I'd say it's a possibility, but can we say it's unreasonable to think that he may not? Can you say that that is a risk that Agent Tarwater has to take? That if he takes that risk and guesses wrong, at the beginning of a covert investigation, he's just burned Berger, and let's say Mendiratta decides no, I'm not going to cooperate.

THE COURT: But, I mean, this may not be relevant, but this wasn't sort of the beginning of an investigation. Even Tarwater conceded that by the time of the wiretap application, the body recordings of Berger were enough to indict the people you indicted.

MR. BOWMAN: Well, that is actually, Your Honor, I would offer an adjustment to that, because I thought his testimony was some of the people we indicted we would have had probable cause, but there were seven people who were indicted only because of the wiretap. And there were 30 target subjects identified, some of whom are still under information, only because of the wiretap.

And the goal here wasn't to just go nab Possino and Nix for the SENZ deal. If that was what we were going to do, then, you're right, we could have done that. But the goal here was to try to get the entire network, Your Honor. And the cases speak to that, the Ninth Circuit cases, *Canales Gomez* speaks to that, that just because you have a potentially helpful cooperator, doesn't mean you can't get a wiretap.

THE COURT: I know, but that is sort of intention, to some degree, with other cases that talk about the fact that you can't establish necessity just by including the standard language that contacting some potential cooperators could endanger the whole investigation.

MR. BOWMAN: Yes, Your Honor, but that doesn't mean that statement isn't true either. I mean, look, I'll tell you, there was a huge risk that if you approach Mendiratta, and he decides to tell them, then all you just got was people on the SENZ deal. In fact, Sherman Mazur wouldn't be in this courtroom today if that was all we did, because we didn't know about his connection.

Ari Kaplan --

THE COURT: So what is your explanation in one word? I'll give you sort of a Jeopardy type of question here.

MR. BOWMAN: I'll try, Your Honor.

THE COURT: One word, what is your explanation for Tarwater not simply saying, Mendiratta cooperated in the past, but he won't -- he is not reliable now? What's your one-word answer for his failure to do that?

MR. BOWMAN: I only get one word, Your Honor?

THE COURT: One word. I mean, you know, you can pick a -- you should have a word. I can think of a lot of -- I can think of one word.

MR. BOWMAN: I won't say reckless.

THE COURT: So you wouldn't say reckless.

MR. BOWMAN: No, Your Honor.

THE COURT: So that is not what you're saying. Tell me what you would say.

MR. BOWMAN: I'll use the word that the court used earlier, Your Honor, "inarticulate." The court --

THE COURT: "Inarticulate"?

MR. BOWMAN: The court used the word "inarticulate" because, look, what I just explained was what Agent Tarwater knew, what he knew about what --

THE COURT: Inarticulate. He is inarticulate, I agree, but what about just careless, negligent?

MR. BOWMAN: Your Honor, I actually think inarticulate would be more accurate, and here's why --

THE COURT: In other words, you don't think -- negligent means just something you overlooked. You really can't say that because in that Exhibit 19, he is thinking about all of this.

MR. BOWMAN: Sure.

THE COURT: And you really can't say it's negligent. It's on his radar. So you have to say -- you can't say he is negligent, he has to be something else. So maybe he is inarticulate.

MR. BOWMAN: Actually, what he disclosed, I thought --

THE COURT: That is Exhibit 19.

MR. BOWMAN: That's correct, Your Honor. I'm looking at the portion that the court thinks that -- are inconsistent with what he ended up putting in the affidavit ultimately.

"Note Prior interviews of Mendiratta."

He did put in the prior interviews of Mendiratta.

"Conclusion: Not helpful" --

THE COURT: I don't know what that means.

MR. BOWMAN: "Note prior interviews of Mendiratta," meaning let's disclose the seven prior interviews subject to proffer. He did disclose that.

And "Conclusion: Not helpful."

THE COURT: Conclusion is not helpful from those prior interviews, the seven interviews, and, you know, the positions are clear. There, the government says that they weren't helpful, according to the Southern District of New York investigators, and the defense says that they were helpful. In other words, he laid out all these people. So why weren't they helpful?

MR. BOWMAN: Your Honor, it's -- the defense clearly disagrees with the Southern District of New York, that the question is, should Agent Tarwater necessarily have felt that the people who did those investigations, and sat in on those proffers, and decided not to sign up Mendiratta as a cooperator, and told AUSA Wilner not to recommend a 5K based on

anything Wilner -- Mendiratta had done, that he's supposed to second guess what they say too, and if he doesn't, that he is being intentionally deceptive to the court, and he's trying to deceive Judge Fischer to get necessity for a wiretap, that is his clever plan? That can't be the case, Your Honor.

He also noted Tarun Mendiratta went to prison without naming these folks. That's not something I came up with for argument, that was in his mind at the time in terms of him assessing.

THE COURT: Naming what folks?

MR. BOWMAN: Sorry. "T.M. went to prison without naming." That is a shorthand there for I believe what I just said. Tarun Mendiratta went to prison without naming the target subjects. So it's not something that's --

THE COURT: I don't understand this reference.

MR. BOWMAN: Sure.

THE COURT: This Exhibit 19 is prior to March of 2011, correct?

MR. BOWMAN: Yes, Your Honor.

THE COURT: And so is the reference to the fact that Mendiratta was doing another deal pending sentencing?

MR. BOWMAN: Yes. And went to prison without naming his confederates.

THE COURT: Did Tarwater testify to that?

MR. BOWMAN: I don't know if he mentioned the

reference to T.M. and what it meant to went to prison without naming. We could recall --

THE COURT: I don't know why -- well, that's a very unclear paragraph.

MR. BOWMAN: I understand, Your Honor. And I think the reason it's unclear is it was simply meant not to be a statement to the court but --

THE COURT: But it was to you.

MR. BOWMAN: It was to me, yeah.

THE COURT: Yeah. So what did you do when you got that?

MR. BOWMAN: Well, Your Honor, I'm not sworn and -- but the court's point in referencing this document right here was that it's somehow at odds with the disclosure he made. I would say it's not, at least with regard to Mendiratta, and we can address Mazur in a second.

THE COURT: All right.

MR. BOWMAN: "Note prior interviews."

So when the court is asking, Well, why didn't he just say "cooperation," and instead say "proffers," because that's what he understood the cooperation to consist of was the prior proffers?

And then the court also asked, They might not say you lost faith in him because he committed new crimes. Well, he did say that. Mendiratta has continued to participate in the

market manipulation conspiracy even following his recent conviction.

So, again, I say could he have been more explicit? Yes. Does that potentially apply to me since I also worked on this affidavit? Unfortunately so, but is that intent to deceive Judge Fischer about something that he knew would have been a fruitful way to accomplish the goals of the investigation and decided not to tell her? Your Honor, in this record, I don't believe that's been shown, particularly given the severity of the remedy that would flow from such a finding.

Now, I can address if the court has other questions.

THE COURT: No, I think you've put forth your position clearly.

MR. BOWMAN: Thank you, Your Honor.

THE COURT: So what about Mazur?

MR. BOWMAN: Your Honor, it seems a large portion of the Mazur argument consisted of how significant they believed his prior cooperation was in assistance. And I think it would be a different situation if Tarwater was aware of all the different things Mr. Hochman went through today in that document, but he wasn't. He was aware that on two occasions, Mr. Mazur was interviewed, and identified folks who might be involved in a particular scheme.

Certainly, it would have been easier to disclose that. The question, I guess, is did he take it out after

initially including it? Well, first, the fact that he initially included it I think shows --

THE COURT: Well, turn back to 19 again.

MR. BOWMAN: Sure, Your Honor, sure. I lost it, Your Honor. Give me just a moment. I apologize. Here we go.

So that's his first cut at what to disclose regarding Sherman Mazur when Mazur is listed as a target subject.

THE COURT: And then, down in the bracketed part, there's the bracket which says, "Possino protecting Mazur, partners with Nix, loyalty."

The way I read that is that there was some concern that Mazur and Possino had loyalty to each other and had been partners in the past, and using Mazur as a cooperator would get to Possino; is that the way you read it?

MR. BOWMAN: Your Honor, my reading of that, which is based on earlier in the affidavit, which is the source, Berger, repeatedly asks Possino, "Hey, is Mazur involved in this?"

And Possino keeps saying, "No, no, he's not involved."

THE COURT: I see.

MR. BOWMAN: And so I believe --

THE COURT: I see. I see. You're right.

MR. BOWMAN: That's what the reference is, Your Honor.

THE COURT: I see. I think you're right.

So the basis for prior interviews of -- no -- of Mazur, where is -- oh, yeah. The statement that Mazur provided inaccurate or incomplete information regarding his past involvement, is based upon Tarwater's conversation with Agent Goldman?

MR. BOWMAN: I believe so, yes, Your Honor, that was his testimony.

So you have to look at what Agent Tarwater and his mindset. First of all, he is sending this to an AUSA, including it in an initial draft, which would be a puzzling thing to do unless the AUSA also was going to try to omit it.

He -- ultimately it was taken out, and that, Agent Tarwater testified, was due to the result of taking out Mazur as a target subject, that there was not probable cause, that Mazur was involved enough. And, therefore, not knowing what his connection was to these particular target subjects, it's not clear he could get you into this group.

Now, there's a number of people where we don't know what their connection is to the target subjects, and we don't go through an analysis of, well, this person has been interviewed by FBI, but we have no idea what the relationship is to the group.

And obviously can be said, Well, couldn't you have just left it in so Judge Fischer knows? There is any number of things that we could have put in, you can always put more in.

As I stand here now, years later, arguing over this, I wish this was in here. But I can -- I believe the testimony was from Agent Tarwater that the reason for taking it out had nothing to do with trying to deceive Judge Fischer.

THE COURT: All right. I think I have it.

Does the defense wish to say anything in response?

MS. UYEDA: Your Honor, there are number of things I disagree with the government, but I just have three things that I wanted to alert the court to.

In terms of evaluating whether this was an intentional or reckless omission, I spoke a lot about the reckless omission, but I wanted to turn the court's attention to *United States v. Stanert*, S-t-a-n-e-r-t, and I believe it's in the Ninth Circuit, 762 F.2d 775.

And the quote from there is: "The Fourth Amendment mandates that a defendant be permitted to challenge a warrant affidavit valid on its face when it contains deliberate or reckless omissions of fact that tend to mislead."

So I cited in my supplemental reply the reckless disregard type of omission, the intent to mislead omission, but there also seems to be this deliberate or reckless omission of facts that tend to mislead. So it's not -- I believe we meet all three of those types of omissions here, but I just wanted to give the court another test laid out by the Ninth Circuit.

In terms of -- I mean, I think that Tarwater wasn't

necessarily inarticulate. I mean, he articulated pretty selectively the facts that he wanted to convey about Mendiratta, and those facts misled the judge in evaluating whether he was a viable cooperator.

I don't think he was sloppy, because based on the exhibits that the government and defense counselor showed, there seem to have been a lot of thought in terms of what to include, what not to include, that there were drafts going back and forth.

THE COURT: But how do you argue from these drafts that go back and forth? Couldn't that be -- couldn't those drafts be considered as part of a good faith effort on the part of Tarwater to run it by the Assistant U.S. Attorney?

In other words, he is sort of fronting these things, he is thinking about these things, and doesn't that bode towards a mindset that is not trying to hide the truth but trying to determine what should be included?

MS. UYEDA: I think it would be a stronger argument if those drafts also included the good information about Mendiratta's cooperation, about how it led to successful prosecutions about -- I mean, Tarwater admitted this on the stand at the last hearing, that he knew that the information that Mendiratta provided led to successful prosecutions of at least Woo and Owens, or he knew one but not the other.

And so that information was in there, and then having

the discussion about whether to leave it out or not, then maybe, Your Honor. But it appears that even Tarwater selectively told Bowman in the these little notes only the bad facts about Mendiratta.

I wanted to point out, Your Honor, that Tarwater doesn't have to be evil in this for our motion to be granted. I think his selectiveness throughout in his wording in the affidavit, in his wording in his declaration that he recalls, he does not recall reading this sentencing position paper; therefore, he doesn't know the 5K, but that he knew about his cooperation on the stand. I think that selectiveness shows deceptiveness.

And then the -- actually I have two points: I wanted to just point out that, you know, Tarwater says that, Well, generally, you can't foot people in these cases because you know they'll risk the investigation, and I wanted to point the court to *Blackman* because you can't just rule out the traditional technique of informants in all cases because there is an inherent risk or an inherent limitation of that technique. There still has to be a very specific and full and complete statement of why that tool can be used.

And in here, in our case, the generic reasons why they couldn't use him turned out not to be true. I mean, Mendiratta didn't reveal the investigation in any of the prior proffer sessions that he participated in. He was in a

prosecution as a trusted co-conspirator, and he had that inherent knowledge. So in terms of that, I don't think that that argument really is a basis for explaining why Tarwater didn't include that information.

And lastly, Your Honor, you know, it could have made a difference and it would have made a difference. There were 300 consensual calls with Howard Berger against the target subjects. And they indicted most of the target subjects, that's what Tarwater testified to. And I included in our exhibits, I believe, 7 through 13. It lays out all of the calls and how it proves each element of the case of the majority of the overt acts in the indictment and most of the charges in the indictment.

What they were looking for here, according to Tarwater in his affidavit, is that they were looking for ancillary people. They were looking for brokers, auditors, attorneys, accounts, the international accounts, the overseas accounts. And Mendiratta could have provided all this information because he was a known cooperator, he was a known self-interested person, he was a money man. So he had kind of the leverage to ask for the information to be included, and, as the government says, he was a trusted conspirator, trusted member of the conspiracy.

They weren't looking for Mazur and Kaplan, that is not the purpose of the affidavit. They may have fallen into

this kind of wide net that they cast, but they were looking for these other people, and that's what they say they can't get through, you know, Howard Berger, and they can't get allegedly through Tarun Mendiratta, so they have to go to a wiretap.

So unless the court has any other questions, those are the points I wanted to make.

THE COURT: Thank you.

MS. UYEDA: Thank you, Your Honor.

MR. HOCHMAN: Your Honor, counsel makes a very good point: We're not dealing with a drug case, Your Honor, where the transactions have no paper record, and the only way to really find out about them is either through cooperators or wiretaps.

As the court has pointed out, when dealing with the lawyers, the brokers, the auditors, the people on the S-1, the names are all there. They had them; they're in the affidavit. So this isn't like a situation where you don't know the players. You absolutely know each and every one of the players, and these types of securities manipulation cases have been made for decades without wiretaps.

But when you're going to go ahead and use the wiretap vehicle, the one that Congress says you got to dot the I's and cross the T's for, what it absolutely says is that you have to inform the judge of the facts.

Mr. Bowman gives you the impression that the defense

argument is that Agent Tarwater had to use Mendiratta or he had to use Mazur as part of his investigation. That is not our argument. Our argument is he absolutely has to tell Judge Fischer about all the prior cooperation, and all the potential of using these people, and let Judge Fischer, not Agent Tarwater, not Mr. Bowman, make the final call. And he intentionally decided not to do that.

Now, and that's what the information that he had all the cooperation with Mendiratta, and certainly the cooperation with Mazur. But let's look at the argument that Mr. Bowman talks about with reckless. He's saying that Agent Tarwater doesn't have to go ahead and follow up on the stuff that is right in front of him.

Now, imagine Your Honor denies our motion to suppress. What informa -- what message does that send to the government? It says to the agents, hide the ball. So in other words, if you're the agent that is going to be preparing the affidavit, don't talk to the agent who did the Mendiratta investigation in Los Angeles, don't talk to the AUSA who then went ahead and filed the 5K1.1 pleading with Judge Hatter. It has all the good stuff about Mendiratta.

Don't talk to them, and don't look in your own files, don't ask the U.S. Attorney's Office to open their files up to you, files that are right there. Better to just keep yourself blind because the court will say, Look, if you didn't look at

it, then you can't be held liable for it. That is almost a definition of reckless disregard for the truth.

And the same thing with Mazur, again, he is talking to the very supervisory special agent that talked to the agent that had the interviews with Mazur. He's also talking -- he had an IRS guy on his own team for the investigation, yet he didn't choose to talk to the source agent from the FBI.

THE COURT: Who was that IRS?

MR. HOCHMAN: Walter Finnigan, Your Honor.

THE COURT: Wasn't that interview regarding Mazur's task investigation?

MR. HOCHMAN: No, Your Honor. The Mazur -- at the same interview, that first interview that Mr. Bertrand from the FBI was there, also Mr. Finnigan is there from the IRS.

THE COURT: But were they talking about stocks or taxes?

MR. HOCHMAN: Stocks, Your Honor. The $25 million pump and dump scheme. Mr. Finnigan just happened to be there.

THE COURT: I've gotten something twisted. Was it Mazur who was -- or was it Mendiratta? Who is -- who got involved in it? It was Mendiratta, the tax.

MR. HOCHMAN: Yes. Mendiratta pled guilty --

THE COURT: That was in the middle of all his stocks, if he had a tax problem.

MR. HOCHMAN: Right. And the crossover, Your Honor,

is that Mr. Finnigan is involved in all three situations. He is involved with Mr. Mazur's cooperation in 2006; he's involved with Mendiratta's cooperation in 2009; and then he begins the investigation with Agent Tarwater.

So he has the very agent that he can say, Tell me about Mazur's cooperation, and he would have learned instantly about the phone calls because Mr. Finnigan, Agent Finnigan, was there when the phone calls occurred.

But he doesn't ask Finnigan; he doesn't ask Bertrand. And we went through the file, Exhibit 35, and I showed that it says "Case File" and it has serial numbers 21 and 22, which he looked at, but he says he didn't look at all the stuff that preceded it.

THE COURT: Why -- if -- why couldn't Tarwater be believed when he said that he asked his analyst to research Mazur and he received these summaries which didn't include much of what's in Exhibit 35? So, in other words, would you say he was purposeful or negligent in accepting the summaries?

MR. HOCHMAN: Your Honor, what I would say, apparently, according to him, is there are three Mazur 302s s that we talked about. He says he saw two out of the three.

Now, you ask yourself, Judge, why is he holding back on saying he saw the third Mazur 302, because in that 302 it references the audio recordings. And, obviously, if he read the audio recordings, he would then be disbelieved and not

credible when he said he didn't know that Mazur gave consensual recorded proactive cooperation that corroborated his information.

THE COURT: So you're saying that he's not to be believed when he said he never saw the information in Exhibit 35 beyond the 302s because he's not telling the truth about relying on the summaries?

MR. HOCHMAN: What I'm saying, Your Honor, is that he admits he saw two -- not summaries, but the two 302s themselves that were in Exhibit 35. He -- not the summary of them, the actual 302s, he saw those. And when I asked him, You got the Sherman Mazur 302s? Yes. And those are the 302s where it says, Sherman Mazur provided information to the FBI. Yes.

But when I showed him the third 302, he is saying. I didn't see that one, and I'm saying that is not credible. I'm also saying that it becomes then reckless when he sees that --

THE COURT: What was the -- were they all in the same 302 format?

MR. HOCHMAN: Yes, Your Honor.

Well, we could pull out Exhibit 35 very quickly.

THE COURT: I saw it.

And what is there in that third 302 that you think is so important?

MR. HOCHMAN: One of the things that Agent Tarwater said as to why he didn't provide the cooperation or -- excuse

me -- one of the things he conceded that Judge Fischer would wanted to have known, that he knew Judge Fischer would have wanted to know, is a cooperator that comes in voluntarily, which he didn't provide, but then does consensually monitored phone calls that corroborate the information.

Because, obviously, if you provide that information to Judge Fischer, Judge Fischer might think, Wow, if we can use -- if Mazur is willing to do that voluntarily in 2006, we can bring him in now, in 2011, and see if he'll make consensually monitored phone calls as well.

Then Agent Tarwater says, Well, I didn't know, even though the transcripts are in the IRS's file. Even though littered throughout Exhibit 35 is references to the transcripts in the internal communications of the FBI, he says, I didn't read the internal communications, I didn't read the file. This file exists, I just didn't read it. I had analysts pull it for five to seven months.

THE COURT: At the third meet up, the third 302 contained the reference that Mazur had agreed to make consensual recordings?

MR. HOCHMAN: Yes. The third 302 titled "Sherman Mazur provided the following info to FBI agents," says on Tuesday, August 29th, 2006, in the presence of Agent Finnigan, Mazur attempted to make an audio recorded telephone call with the close associate that we've talked about.

He then goes on to make another phone call the next day, on August 30 -- excuse me -- he made three phone calls on August 30th, and he references that.

THE COURT: What about the argument that the -- Mazur was a suspect as being a real ringleader for this type of fraud for a long time, and that the government strategically didn't want to make him a cooperator because that would perhaps ruin any chance they had to pursue him as a major figure in this type of fraud?

MR. HOCHMAN: If the --

THE COURT: Wouldn't that excuse their not look for Mazur?

MR. HOCHMAN: If the government wanted to make that argument to Judge Fischer, it very well could have. Judge Fischer might have said, Well, what facts do you have to believe that Mazur really is this big person?

And maybe they come back and say, Well, from 2000 to 2004, he is under investigation.

And maybe Judge Fischer says, That's not good enough. You know, it's now 2011. How do you know that he can't be used or he is the big guy in this thing if you don't even have probable cause after 300 phone calls to believe he is involved with the scheme more than giving the -- receiving the million dollars worth of SENZ shares?

And so -- well, the point of what I've just

discussed, Your Honor, is what Judge Fischer was entitled to know that Agent Tarwater intentionally kept from her.

Because I think what we're dealing with here in this necessity, deliberate or reckless situation is the following, Your Honor: Did Agent Tarwater deliberately keep fact from Judge Fischer that tended to mislead her? Or did Agent Tarwater recklessly keep facts from Judge Fischer that tended to mislead her?

THE COURT: But that's not the way the government frames the issue.

MR. HOCHMAN: Oh, I know it's not, but that is the *U.S. v. Stanert*, the cite that --

THE COURT: But, you know, *Stanert*, that's -- I wouldn't say it's old law, but I was relying on *Stanert* when I was an Assistant U.S. Attorney. That case must be from about 1970 something or other --

MR. HOCHMAN: 1985, Your Honor.

THE COURT: Yeah. And the case that's most relevant is the -- is *Franks* itself.

MR. HOCHMAN: True.

THE COURT: In other words, this is one of those situations where you don't have to read a book, it's a commentary on the Bible. This is the Bible. *Franks* is the Bible.

MR. HOCHMAN: *Franks* is the Bible, Your Honor.

But I might add, there is a more recent Ninth Circuit case called *Lombardi v. City of El Cajon.* The cite is 117 F.3d 1117, 1997. This was a Section 1983 case, Your Honor, that dealt with the *Franks* standard, and the Ninth Circuit reversed a finding, and it agreed with the plaintiff in that case, that the intent to mislead requirement was inconsistent with *Stanert* and was not an element that needed to be shown, which in that case dealt with the qualified immunity.

So it actually dealt with the government's argument about whether or not intent to mislead was part of the *Stanert* equation, and it said no. It actually reversed the finding of the district court in that case.

So, again, let me give you, the court, I was thinking as I was listening of an example, there would never be deliberate or reckless. Let's say we use Mr. Mazur. Let's say Mazur's cooperation was in the state of Montana, three years before, 2008. And let's say he worked with the Montana local authorities, and he provided a lot of cooperation that led to successful prosecutions, and he mentioned Mr. Possino, Angelastri and everybody else in that.

And let's say that the federal government had no contact with that, the FBI had no contact with that. And we find that out, and obviously Judge Fischer is not informed of it either. I would say that in that example, Agent Tarwater certainly didn't intentionally leave that information out.

Even though that information might tend to mislead, he didn't intentionally leave it out because he didn't know of it.

And then the question is reckless. Was he reckless in not finding out about it? Well, there's no way, reasonably, he could have found out about what went on in the state of Montana if it stayed in their own files and never migrated beyond the state of Montana.

But we're dealing with here is stuff he absolutely knew about Mendiratta's cooperation and Mazur's cooperation. And on the reckless part, the reckless part dealing with the 5K motion on Mendiratta's side, and with the rest of the file the audio recordings and the rest of the cooperation on the Mazur side, that is sitting in his actual FBI files in the Los Angeles FBI office. You can't find it. It is also sitting in the U.S. Attorney's Office, at least for the 5K1.1. It's not some isolated place in the state of Montana.

So we would say that Agent Tarwater both intentionally, with respect to the information he knew about, and certainly recklessly with respect to the rest of the information, did not provide that to Agent -- excuse me -- Judge Fischer, and it certainly tended to mislead Judge Fischer in evaluating whether or not cooperators could be used in lieu of a wiretap.

THE COURT: All right. Thank you.

You want to make a short?

MR. BOWMAN: Very short, Your Honor.

THE COURT: Go ahead.

MR. BOWMAN: Two quick points, Your Honor -- three quick points, but I swear they're quick.

But the first is Mr. Hochman just articulated the standard as intentionally omitted a fact or information which tended to mislead, as opposed to intentionally or recklessly tried to mislead, and I would say that that's rejected in *U.S. v. Rajaratnam* where the court said, "Every decision not to include information in the affidavit is intentional insofar as it is made knowingly. This type of intentional omission is all that *Franks* requires" --

THE COURT: Slow down.

MR. BOWMAN: I'll start again.

"Every decision not to include information in the affidavit is intentional insofar as it's made knowingly. If this type of intentional omission is all that *Franks* requires, the *Franks* intent prerequisite would be satisfied in almost every case. Rather, *Franks* protects against omissions that are designed to mislead or that are made in reckless disregard of whether they would mislead the magistrate."

THE COURT: That's it. I mean, you've put the ball right on the rim. I mean, that's both sides are arguing the same thing, just from different standpoints. I just have to go think about it. I mean, there's no mystery about this. I

mean, that's -- that's it.

MR. BOWMAN: Yes, Your Honor.

And with regard to the 302 -- the third 302, I believe -- and it will be the testimony itself, but my recollection of the testimony was that Agent Tarwater explained that he didn't see it and gave his explanation for why, that the analyst didn't include it, possibly because the instructions he had given were for -- to pull Mazur or other target subjects or other individuals involved 302s where they give statements, and in that one instead it was noting -- that 302 instead noted that he had made a call, but it was not in the same lines of exposition in terms of the other two 302s.

THE COURT: I remember that.

Now, on this minimization deal, what was the schedule? What did you want to do?

MR. DeBRETTEVILLE: Your Honor, we'll have two declarations filed by the government, one by Agent Choate, one by Agent Koepke. I would propose simply questioning one of those two agents, Agent Koepke.

THE COURT: How long do you --

MR. DeBRETTEVILLE: I'd need a maximum half an hour.

THE COURT: Well, then, it's too late now after this. We'll have to do this another day. I'll have to reschedule that because we're all tired.

MR. DeBRETTEVILLE: I agree, Your Honor.

THE COURT: So let's call it a day.

And I'm going think about this in the next day or so, and then if I need some briefing, posthearing briefing, I'll notify you. Otherwise, I'll just rule. And we'll deal with the minimization at some other time.

MR. DeBRETTEVILLE: Thank you, Your Honor.

MR. BOWMAN: Thank you, Your Honor.

MR. HOCHMAN: Thank you, Your Honor.

THE COURT: What about -- let me ask you this: What about tomorrow? Can you do the minimization tomorrow?

MR. DeBRETTEVILLE: That works for me.

THE COURT: I just have a hearing tomorrow, and I'll have time, if it isn't too lengthy. What about -- when is the hearing tomorrow, Paul?

THE CLERK: Not till 11:00, Your Honor.

THE COURT: How about -- do you want to do it at 1:30?

MR. BOWMAN: Your Honor, would it be possible to do next week? I don't know if --

THE COURT: Next week I have a trial, jury trial.

MR. BOWMAN: Or possibly on Friday morning?

THE COURT: Friday morning, no.

MR. HOCHMAN: For a half an hour, we can be here tomorrow, Your Honor.

THE COURT: Well, why can't we find a half hour

tomorrow sometime?

MR. DeBRETTEVILLE: That works for me, Your Honor.

THE COURT: Figure out some time.

Yeah. Can you do it in the morning? Like how about ten o'clock?

MR. BOWMAN: Yes, sir.

THE COURT: Okay.

MR. HARRIS: Thank you, Your Honor.

MS. UYEDA: Thank you, Your Honor.

- - - - -

**$**

$25 [14] 60/22 61/21 62/18 64/5 65/1 73/24 82/20 83/4 85/2 88/21 90/17 95/19 183/24 218/17
$25 million [1] 90/17
$39 [2] 67/16 91/13
$39 million [1] 67/16
$43 [1] 67/19
$480,000 [1] 137/11
$500,000 [3] 147/15 148/5 179/6
$82 [1] 67/16

**'**

'04 [2] 141/6 199/1
'06 [2] 113/4 200/15
'07 [2] 16/19 200/15
'08 [3] 16/19 20/5 20/15
'09 [13] 16/19 16/21 16/24 17/8 17/10 17/12 17/15 17/18 18/1 19/1 20/24 199/1 200/16
'11 [1] 61/20
'4 [2] 106/22 140/2
'90s [2] 14/7 112/18
'97 [1] 23/5
'98 [1] 23/5

**1**

10/26/2006 [1] 93/14
100 [1] 72/10
111 [3] 53/13 54/7 82/12
111-page [1] 82/3
1117 [1] 224/3
1149 [1] 1/25
117 F.3d 1117 [1] 224/3
119 [1] 34/2
11:00 [1] 228/15
120 [1] 157/4
121-month [1] 140/24
123 [4] 148/6 148/7 148/10 148/11
124 [1] 148/6
125 [2] 148/12 148/14
127 [5] 79/13 79/13 80/4 157/5 177/20
129 [8] 157/6 157/7 157/8 157/8 157/10 157/11 162/12 179/14
12:00 [1] 96/9
12th [1] 3/6
13 [3] 39/4 187/25 215/10
13-48-SVW [1] 6/4
13-62-SVW [1] 6/6
130 [11] 44/6 44/9 122/15 122/25 126/5 126/5 126/7 126/8 142/20 162/12 184/5
131 [1] 134/17
13th [1] 18/15
14-plus [2] 13/20 14/8
1400 [1] 2/8
15 [1] 19/1
154 [1] 187/25
16 [2] 9/1 10/3
1600 [1] 3/11
1601 [1] 4/5
17 [4] 77/7 77/19 122/11 148/7
18 [3] 43/19 43/20 44/9
19 [28] 5/13 18/17 28/9 29/4 29/11 29/12 31/11 31/13 32/24 36/1 41/1 44/16 45/17 45/22 72/18 73/3 73/8 115/15 115/22 168/19 168/21 168/22 168/24 185/17 205/17 206/1 207/17 210/3
1970 [1] 223/16
1983 [1] 224/3
1985 [1] 223/17
1990s [2] 136/1 136/3
1997 [2] 198/24 224/3
1998 [1] 198/24
19th [4] 18/17 18/23 18/23 28/15
1:30 [1] 228/17
1e [1] 151/22

**2**

2/19/2011 [1] 29/19
20 [4] 46/11 99/17 101/20 197/7
20,000-foot [1] 173/5
2000 [10] 13/23 31/6 106/22 113/4 114/3 141/13 142/6 142/8 142/12 222/17
2003 [7] 106/22 113/6 113/12 113/24 140/2 140/7 141/6
2003/2004 [1] 13/23
2004 [22] 13/23 31/5 31/11 31/13 31/18 113/4 113/6 113/12 113/24 114/3 140/7 141/13 142/6 142/8 142/12 171/5 171/20 172/3 180/20 180/22 200/11 222/18
2006 [60] 54/12 54/16 54/25 55/13 55/25 56/17 56/25 57/1 57/9 58/10 58/11 58/16 59/22 60/2 60/7 60/13 60/16 61/15 61/22 64/7 64/18 64/24 65/7 65/16 66/20 69/11 72/2 73/21 74/18 74/21 86/12 87/10 92/8 93/13 93/14 102/12 105/5 107/6 109/6 112/1 112/24 112/24 114/20 140/13 140/20 140/22 141/7 142/14 143/12 145/6 152/10 155/22 171/5 171/24 171/25 180/21 183/23 219/2 221/8 221/23
2007 [7] 20/2 20/14 136/4 159/5 179/22 199/12 199/15
2008 [4] 135/14 186/1 199/14 224/17
2009 [13] 16/22 18/15 25/18 135/15 135/25 158/21 172/9 180/22 198/3 198/3 199/14 199/19 219/3
2010 [31] 9/16 10/16 11/7 12/17 13/13 13/13 16/24 18/17 18/21 18/23 18/23 19/25 20/9 20/17 20/19 20/20 20/25 21/1 22/11 37/9 84/3 103/11 115/7 135/7 135/15 135/25 135/25 143/20 172/12 180/18 198/6
2011 [86] 27/5 28/16 29/19 46/17 49/1 53/10 54/10 58/12 61/20 64/9 65/3 65/17 65/21 66/24 67/22 68/3 69/11 69/23 70/12 71/21 72/9 72/11 73/18 74/17 75/21 76/6 76/7 76/8 76/10 76/17 77/5 77/9 77/11 77/12 83/17 84/1 87/12 87/16 87/21 88/6 89/1 89/17 89/25 91/10 91/13 91/22 92/4 92/10 92/17 92/23 93/3 93/9 95/6 100/15 100/18 101/6 101/8 101/15 101/21 103/12 114/6 114/9 114/10 115/2 115/8 115/22 128/7 130/10 140/21 140/23 141/1 141/6 141/8 141/19 142/5 143/6 143/21 144/2 144/18 145/7 145/16 168/22 175/3 207/18 221/9 222/20
2013 [1] 140/24
2013-00048-SVW [1] 1/9
2013-00062-SVW [1] 1/9
2014 [2] 1/17 6/1
2014 1:10 p.m [1] 97/1
2025 [1] 3/6
2050 [1] 4/5
21 [8] 29/10 48/21 52/9 99/14 101/19 149/22 149/25 219/11
213 [1] 1/25
213-489-9025 [1] 3/17
213-489-9027 [1] 3/17
213-613-4655 [1] 3/7
213-613-4656 [1] 3/7
213-894-7524 [1] 2/17
21515 [1] 2/20
22 [3] 99/25 101/19 219/11
225 [1] 3/21
229 [1] 1/10
23 [1] 101/19
24 [2] 18/15 31/22
24th [2] 31/18 31/21
25 [1] 9/15
252 [3] 44/1 44/3 44/5
255-9025 [1] 4/6
25th [2] 46/17 49/1
26 [1] 92/8
27 [1] 19/5
281 [2] 49/12 49/21
29 [2] 5/13 64/23
29th [5] 65/7 68/21 68/25 69/6 221/23
2nd [1] 2/16

**3**

30 [7] 51/22 51/22 122/14 199/9 200/6 203/16 222/2
300 [4] 3/21 160/4 215/7 222/22
302 [45] 32/9 32/19 39/4 39/8 39/18 40/9 40/21 52/19 52/21 55/19 56/5 56/6 56/7 60/5 61/19 61/23 62/4 62/15 63/1 63/1 68/6 71/17 74/14 74/16 84/14 86/18 98/20 98/22 99/10 100/4 100/10 100/23 101/5 112/15 116/16 219/23 219/23 220/14 220/18 220/22 221/18 221/21 227/3 227/3 227/11
30202 [1] 99/6
30202s [1] 99/2
302s [81] 23/13 23/13 23/14 23/18 25/4 30/24 31/5 31/7 31/12 32/25 41/9 49/2 49/3 51/12 54/25 55/3 55/5 55/8 55/13 55/15 55/16 55/19 55/23 58/9 59/5 59/15 60/1 60/6 61/16 62/11 63/12 64/7 64/11 64/19 64/21 65/4 67/6 67/13 69/16 75/20 75/23 84/7 86/3 86/11 86/12 86/16 91/20 92/18 93/4 94/14 95/1 100/14 100/18 100/19 100/22 101/9 112/5 112/6 112/18 113/18 115/3 115/4 115/11 150/10 152/25 153/19 153/20 159/25 171/21 171/22 191/20 197/9 202/11 219/20 220/6 220/9 220/11 220/12 220/12 227/9 227/12
30th [4] 64/24 65/7 69/6 222/3
31 [2] 177/3 177/8
310 [2] 2/21 4/6
312 [2] 1/24 2/9
315 [1] 3/16
316-9333 [1] 2/21
318 [5] 49/12 49/13 49/13 49/18 49/19
32 [5] 66/7 66/8 66/11 150/4 150/6
321 [1] 2/16
35 [29] 68/5 68/6 70/14 70/16 70/20 75/24 86/2 86/2 86/11 87/18 87/23 88/6 93/12 95/7 97/9 97/12 97/23 99/8 113/19 113/23 150/5 150/6 191/18 219/10 219/17 220/6 220/10 220/20 221/13
36 [1] 77/23
39 [1] 91/3

**4**

40 [2] 69/1 86/16
402A [1] 1/24
4060 [1] 3/22
4082 [1] 4/5
4094 [1] 3/12
41 [3] 126/6 126/13 127/8
427759 [1] 169/7
43 [1] 91/4
45 [1] 68/16
450,000 [1] 141/25
4655 [1] 3/7
4656 [1] 3/7
4676 [1] 3/22

**5**

50 [2] 5/14 86/16
5094 [1] 3/12
56 [4] 77/6 77/15 77/23 178/15
567 [2] 39/7 39/18
5K [17] 18/20 19/3 37/10 39/21 153/1 180/14

**5**

5K... [11] 192/13 192/14 192/17 195/3 195/4 195/19 198/10 201/1 206/25 214/10 225/10
5K1.1 [2] 217/20 225/15
5th [1] 3/6

**6**

601 [1] 3/6
620-1149 [1] 1/25
626-202-4060 [1] 3/22
626-794-4676 [1] 3/22
646 [3] 88/9 88/13 88/19
649 [1] 88/19
657 [1] 89/19
660 [1] 3/11
665 [1] 2/20
674 [1] 90/8
675 [2] 90/13 90/20
677 [1] 91/23
682 [3] 92/6 99/7 99/22
683 [1] 99/22
684 [3] 92/16 99/25 100/7
685 [1] 100/7
686 [2] 92/16 100/7
687 [5] 68/16 92/21 92/21 92/21 101/14

**7**

7/15 [1] 19/1
73 [1] 163/6
7524 [1] 2/17
758 [1] 29/14
759 [4] 33/24 36/2 72/20 73/1
760 [1] 30/7
762 [2] 47/7 212/14
775 [1] 212/14

**8**

8/25/2006 [1] 93/13
801 [1] 3/16
82 million [1] 91/4
84 [1] 43/20
85 [2] 148/7 148/11
89 [1] 79/14
8th [1] 3/16

**9**

90 [3] 79/13 79/15 80/5
90012 [3] 1/24 2/9 2/17
90014 [1] 3/16
90071-2025 [1] 3/6
9025 [2] 3/17 4/6
9027 [1] 3/17
90404-4082 [1] 4/5
90503 [1] 2/20
91 [2] 44/5 122/14
91101 [1] 3/21
92660 [1] 3/11
93 [1] 43/20
9333 [1] 2/21
949-725-4094 [1] 3/12
949-823-5094 [1] 3/12
97 [1] 5/5
9:50 [1] 6/1

**A**

A.M [1] 6/1
ability [3] 148/8 163/15 183/13
able [12] 79/10 82/22 93/23 119/2 143/25 144/5 145/1 146/3 172/21 172/22 176/2 185/2
about [325]
above [4] 29/22 34/14 169/8 188/20
absolutely [16] 46/3 46/7 67/5 72/6 111/22 113/23 145/4 170/23 177/18 180/10 185/13 186/15 216/18 216/23 217/3 225/8
academic [1] 51/7
accept [4] 119/5 140/11 140/12 140/13
acceptable [1] 38/18
accepting [2] 118/20 219/18
accepts [2] 140/10 172/7
access [15] 47/7 47/14 47/24 50/22 50/23 51/6 70/5 84/10 127/15 129/25 131/20 131/21 131/25 139/8 139/9
accomplish [1] 209/7
according [8] 21/14 23/6 93/21 93/22 143/19 206/16 215/14 219/20
account [1] 137/17
accountant [1] 26/8
accountants [1] 134/12
accounts [9] 137/22 199/20 199/22 199/23 200/16 200/18 215/17 215/17 215/18
accurate [3] 35/16 75/12 205/14
accused [1] 191/8
achieve [2] 44/13 148/8
acquire [1] 113/10
acquiring [1] 147/1
across [4] 13/2 34/11 47/13 152/24
acting [2] 160/24 176/1
actions [2] 86/21 197/2
active [1] 11/8
actively [1] 46/21
activities [2] 41/15 116/10
activity [5] 10/17 39/25 40/7 116/18 171/3
acts [1] 215/12
actual [9] 43/21 65/6 65/14 91/4 105/25 112/13 114/12 220/11 225/13
actually [72] 37/24 62/6 63/14 65/5 65/10 67/15 68/13 69/16 71/18 73/4 74/16 74/18 79/14 90/2 90/7 91/8 91/16 92/12 92/13 92/13 93/18 98/22 101/7 102/15 103/10 103/19 103/24 105/21 109/23 115/8 116/6 116/6 137/4 137/25 140/22 142/4 143/16 144/13 144/17 144/25 147/9 147/15 148/6 149/14 155/5 155/17 158/23 160/7 164/7 165/2 169/24 172/19 175/15 177/22 178/17 179/2 180/3 184/4 184/19 185/25 190/16 193/25 194/4 199/15 201/18 202/6 203/12 205/13 205/24 214/13 224/9 224/11
Adam [2] 71/23 89/20
add [7] 8/22 36/12 36/25 121/16 180/1 180/9 224/1
adding [1] 95/11
addition [2] 42/5 129/21
additional [13] 8/19 11/19 20/18 22/5 36/24 37/14 47/14 114/3 121/23 129/25 143/25 144/16 150/21
address [10] 11/17 30/3 30/19 44/12 45/10 95/14 161/17 196/9 208/16 209/11
addresses [1] 188/1
addressing [1] 80/21
adequately [1] 192/23
adjustment [1] 203/13
admit [2] 149/22 150/4
admits [1] 220/9
admitted [11] 91/2 151/19 158/25 159/4 178/12 182/24 182/24 183/16 183/18 185/9 213/21
advantage [1] 160/23
advised [1] 25/15
advocate [1] 160/24
advocated [2] 18/20 19/3
affected [1] 190/25
affiant [2] 53/23 175/24
affidavit [126] 11/1 12/25 13/15 22/7 26/17 28/19 29/16 29/19 30/1 30/4 30/10 30/11 34/4 40/11 42/1 42/3 42/11 43/21 43/22 44/6 45/11 47/1 53/10 53/21 54/3 54/5 54/7 54/10 54/17 57/20 58/5 58/8 69/11 69/23 72/11 76/18 77/6 77/9 77/10 77/15 77/21 80/16 82/3 82/9 82/12 87/24 89/25 95/8 96/5 108/19 109/4 109/5 111/10 116/3 117/6 117/9 119/1 119/14 119/19 120/10 120/13 121/18 121/22 122/12 122/16 127/20 128/6 130/22 137/3 137/5 138/8 138/20 140/25 141/18 145/22 145/23 146/10 146/11 146/13 146/18 147/13 147/24 148/2 153/15 153/23 155/16 155/20 158/3 158/19 162/13 163/7 164/8 164/15 164/19 164/20 168/18 169/3 169/3 169/23 169/24 171/10 172/20 173/21 173/23 174/1 174/9 175/22 175/23 176/2 177/10 180/1 182/6 183/23 198/5 201/23 206/4 209/5 210/16 212/17 214/8 215/15 215/25 216/16 217/18 226/10 226/16
affidavit's [1] 53/13
affidavits [2] 25/7 174/7
affiliated [1] 11/17
afford [1] 159/20
after [25] 10/8 15/15 19/4 23/9 23/9 28/17 31/21 37/9 50/16 72/2 92/14 96/8 123/16 135/2 135/5 135/5 147/5 147/6 156/24 159/10 198/10 199/17 209/25 222/22 227/22
afterwards [1] 30/20
again [61] 9/20 13/10 16/7 16/25 17/23 19/2 20/13 20/21 27/4 32/15 36/6 36/11 36/24 40/2 48/18 48/19 50/20 51/5 55/18 70/3 82/10 96/3 104/11 110/11 111/8 113/11 114/10 116/21 116/25 124/22 125/6 134/7 136/4 139/14 140/5 142/3 143/2 146/5 147/25 156/24 159/7 171/25 172/7 172/10 172/11 175/2 176/12 176/18 176/19 179/22 184/12 185/7 188/24 194/5 199/14 202/2 209/3 210/3 218/3 224/13 226/14
against [10] 22/19 22/20 31/17 134/24 142/5 143/13 160/6 194/13 215/7 226/19
agencies [2] 25/6 142/17
agenda [1] 149/11
agent [185] 2/11 6/11 6/12 6/12 7/11 7/18 7/21 7/22 7/25 8/5 9/6 15/12 19/19 22/7 23/22 26/8 28/10 32/12 32/23 36/22 37/16 37/17 44/9 46/18 47/4 48/8 48/11 53/10 55/19 56/13 56/16 57/9 59/8 59/10 59/10 59/16 61/14 61/22 62/20 63/19 64/5 65/24 65/25 68/21 71/11 71/13 76/23 77/15 79/3 79/17 84/14 84/22 85/1 85/22 86/5 86/9 97/8 99/10 99/22 102/6 103/4 103/8 103/18 103/24 104/12 104/12 105/12 105/17 106/1 106/4 106/5 106/7 106/8 106/13 106/14 106/17 106/20 107/5 107/5 107/6 107/7 107/11 112/7 113/2 113/13 113/16 114/11 114/17 114/18 114/24 116/22 116/25 117/19 118/15 128/6 128/11 135/13 136/6 136/21 137/5 148/17 149/14 151/18 151/21 153/7 153/25 154/4 154/13 155/9 158/20 158/25 160/25 161/21 162/25 163/2 167/14 168/18 170/24 172/19 172/21 172/22 172/23 173/9 173/10 173/20 174/10 177/21 178/14 180/11 182/16 183/1 184/17 185/8 185/9 187/17 188/12 189/23 191/10 192/1 192/19 194/6 194/13 194/18 195/6 196/24 197/6 197/9 197/18 198/4 198/11 199/25 200/3 201/5 201/19 203/3 205/9 206/22 211/4 211/8 211/12 212/3 217/1 217/5 217/11 217/17 217/18 218/4 218/4 218/7 219/4 219/5 219/7 220/24 221/11 221/23 223/2 223/5 223/6 224/24 225/17 225/20 227/5 227/17 227/18 227/19
agent's [3] 84/24 85/9 151/6
agents [17] 55/17 76/1 89/14 90/2 98/17 100/11 101/4 101/5 113/12 133/16 134/12

## A


agents... [6] 135/21 146/19 163/25 217/16 221/22 227/19
aggregated [1] 47/5
aggregating [1] 47/2
ago [6] 91/8 103/3 120/7 120/7 126/23 129/6
agree [17] 24/3 75/10 75/23 97/25 145/7 148/17 149/2 159/12 164/24 168/3 168/5 191/6 191/22 194/19 202/18 205/12 227/25
agreed [3] 161/8 221/19 224/5
agreeing [2] 164/19 166/4
agreement [20] 17/14 17/17 18/1 18/14 32/12 57/15 60/3 60/5 83/8 83/9 90/14 90/15 90/16 148/20 153/1 183/24 195/24 195/24 195/25 196/3
agreements [2] 157/13 160/16
agrees [1] 25/1
Ah [1] 74/16
ahead [14] 36/9 36/22 38/1 79/23 87/7 88/3 90/3 133/1 137/14 180/5 216/21 217/12 217/20 226/2
air [2] 10/19 68/22
al [3] 1/10 6/5 6/7
alert [6] 124/17 125/8 126/12 142/22 162/9 212/9
alerted [1] 142/24
all [150] 8/3 8/7 9/25 10/5 10/11 12/10 13/17 13/25 14/5 14/19 16/3 17/5 22/12 23/15 24/5 24/16 26/6 26/25 26/25 27/7 28/20 29/6 32/8 32/21 33/10 33/23 39/2 40/17 42/10 43/5 43/17 44/16 45/19 48/21 49/24 50/20 51/6 52/11 54/7 57/6 57/7 58/3 58/7 61/16 61/17 62/13 62/15 69/21 76/25 77/5 81/8 84/1 84/6 87/1 87/4 88/11 88/21 89/5 93/19 94/3 94/10 95/3 97/4 97/20 99/1 100/17 100/20 105/13 106/9 107/14 107/19 108/9 109/16 110/10 111/6 115/1 115/4 115/10 115/11 116/1 117/15 120/1 127/23 131/2 131/21 133/14 136/21 139/11 140/22 141/6 141/22 142/18 144/8 149/10 149/20 150/14 151/8 151/9 152/18 153/8 156/10 156/21 159/6 159/25 161/5 162/2 162/5 163/8 164/2 170/2 170/8 170/15 171/5 171/8 171/11 171/16 174/7 175/1 180/6 181/5 182/2 182/7 184/22 196/22 199/1 204/9 204/11 205/18 206/18 208/17 209/19 211/9 212/5 212/23 214/18 215/10 215/18 216/16 217/4 217/4 217/8 217/21 218/23 219/1 219/12 220/17 225/24 226/11 226/17 227/24
allegation [2] 91/1 142/4
allegations [3] 141/20 142/11 191/12
alleged [2] 39/25 141/17
allegedly [1] 216/3
allow [4] 17/24 129/21 182/8 182/12
allowed [1] 132/13
almost [4] 18/18 182/11 218/1 226/18
along [3] 13/21 62/4 74/7
already [15] 37/21 48/17 50/13 62/23 79/4 79/7 80/1 80/8 108/9 108/12 108/13 135/16 179/6 197/9 198/22
also [53] 2/11 6/10 6/11 6/12 6/19 7/3 7/5 14/14 14/22 15/21 20/10 21/4 31/15 32/13 36/5 41/9 55/11 59/10 59/21 60/6 60/11 64/13 68/16 71/22 73/12 82/9 100/4 101/19 108/3 114/4 122/21 134/3 144/17 158/25 159/3 165/1 167/10 185/21 191/9 192/17 192/25 198/17 199/12 207/6 208/23 209/4 211/11 212/21 213/19 218/5 218/14 220/16 225/14
alternative [2] 111/15 185/1
alternatives [1] 111/17
although [4] 24/4 181/17 185/1 185/19
always [5] 28/4 56/6 74/10 126/1 211/25
am [6] 11/12 34/6 76/15 108/21 136/17 141/12
Amendment [1] 212/15
AMERICA [2] 1/7 6/5
American [2] 6/6 172/1
Aminoff [3] 2/15 6/16 39/14
among [2] 130/22 191/2
amongst [1] 98/17
amount [1] 175/6
amplify [1] 170/10
Amy [3] 3/15 3/15 6/25
amyejacks [1] 3/18
analyses [1] 188/8
analysis [12] 41/1 41/19 41/22 50/2 63/17 120/14 124/1 127/4 145/9 184/18 190/20 211/20
analyst [21] 10/16 11/14 26/2 51/13 65/19 66/18 67/1 69/22 70/9 74/25 76/9 85/20 85/21 93/24 99/5 100/25 113/5 113/7 115/1 219/15 227/7
analysts [9] 15/18 26/6 47/3 65/10 83/19 84/5 94/2 94/23 221/16
analyze [1] 83/24
analyzed [1] 74/25
ancillary [3] 152/13 152/16 215/16
ANDRÉ [1] 2/6
Angelastri [18] 137/10 137/15 137/21 138/4 157/14 157/15 157/16 192/4 199/13 199/19 199/22 199/24 200/6 200/14 200/17 201/4 201/16 224/20
ANGELES [21] 1/16 1/24 2/9 2/17 3/6 3/16 6/1 14/4 14/12 24/14 56/1 56/9 97/1 100/4 131/15 152/20 160/2 160/3 171/24 217/19 225/14
angled [1] 37/12
angry [2] 40/16 192/10
anomalies [1] 12/8
anonymous [2] 181/2 181/16
another [39] 11/23 19/10 26/8 35/16 48/19 69/1 69/2 70/20 75/13 79/19 79/22 90/9 90/11 92/13 92/20 92/22 93/13 103/7 132/10 132/10 133/21 135/15 137/10 140/20 151/5 159/13 159/19 163/25 165/23 169/12 169/13 177/3 182/6 198/22 199/13 207/21 212/24 222/1 227/23
answer [25] 19/19 23/17 23/17 24/19 38/5 38/14 46/23 54/15 55/7 63/18 63/20 63/24 63/24 89/6 109/12 118/4 118/6 135/24 145/18 145/19 155/1 160/21 162/21 163/3 204/20
answered [5] 47/3 47/4 47/5 117/19 143/4
any [97] 11/19 11/20 12/21 12/23 15/16 16/2 16/4 18/5 19/17 20/8 24/22 27/13 32/15 32/16 41/14 42/18 46/6 50/17 53/1 54/8 55/3 55/3 55/8 55/12 55/15 55/18 57/18 59/5 59/5 60/11 60/12 67/1 73/20 78/25 80/3 82/3 82/3 82/12 85/3 89/24 96/4 102/10 102/11 102/15 102/21 105/15 105/15 105/16 111/25 112/6 112/15 112/18 112/19 117/8 123/6 123/16 123/20 124/8 124/11 124/25 125/13 125/17 125/22 126/4 130/19 130/19 136/10 142/7 142/11 142/24 143/13 145/25 147/13 148/4 154/11 154/22 154/24 160/17 165/4 168/18 170/1 170/3 171/15 172/15 173/7 174/3 177/16 184/11 185/20 193/16 200/12 200/21 202/14 211/24 214/24 216/5 222/8
anybody [5] 113/25 134/15 154/2 194/18 196/13
anymore [1] 133/18
anyone [2] 134/20 153/25
anyone's [1] 38/2
anything [24] 14/25 15/20 26/7 36/12 36/25 41/20 43/5 54/23 54/25 65/3 85/5 91/10 130/11 149/7 155/10 157/16 160/16 168/25 169/11 171/1 193/12 202/15 207/1 212/6
anyway [1] 172/25
anywhere [3] 63/15 109/17 127/10
apart [2] 129/4 129/5
apologize [1] 210/5
apparent [3] 102/19 107/1 144/3
apparently [8] 25/15 40/23 51/11 80/15 81/12 88/18 202/20 219/20
appear [3] 55/22 185/3 185/5
appearance [1] 7/1
appearances [4] 2/1 3/1 4/1 6/8
appeared [7] 11/8 23/9 50/12 51/8 59/12 84/10 197/10
appearing [2] 6/20 7/5
appears [8] 31/20 49/7 49/19 61/23 100/23 119/5 188/1 214/2
applicable [2] 45/25 187/13
application [7] 21/20 21/21 76/22 114/4 150/13 174/3 203/10
apply [2] 194/16 209/4
appointed [1] 132/14
apposite [1] 126/6
approach [4] 50/14 121/12 151/23 204/8
approached [10] 20/5 20/10 20/18 60/23 62/2 198/7 198/9 201/3 201/9 201/10
approaching [8] 45/6 123/6 124/2 124/3 124/3 125/16 125/19 126/1
appropriate [2] 189/25 194/15
approximate [1] 143/20
approximately [6] 52/2 86/15 91/3 92/7 135/25 137/11
April [16] 18/23 18/23 19/5 20/9 20/17 20/20 20/25 31/6 31/11 31/13 76/17 77/8 103/11 135/7 180/18 198/6
are [102] 8/18 8/22 11/10 11/13 15/1 15/3 28/19 29/9 29/12 30/19 31/12 34/3 35/24 37/1 45/12 49/14 50/15 55/16 58/4 58/9 59/14 64/19 65/8 69/14 72/10 72/13 79/22 83/19 85/24 86/11 90/6 90/16 92/18 93/13 93/20 93/21 95/3 95/17 98/12 98/12 99/17 100/14 101/12 101/14 101/19 105/15 108/25 109/14 113/17 113/19 114/2 116/15 118/13 118/14 121/15 131/20 132/14 132/15 133/6 133/15 135/9 135/21 141/20 141/20 141/22 146/25 149/12 151/15 164/5 165/21 165/22 167/25 169/17 169/17 170/6 171/22 173/14 173/22 176/14 176/25 177/15 178/3 179/12 188/5 188/7 190/24 195/13 196/8 200/7 203/17 206/3 206/15 212/7 216/6 216/16 217/24 219/20 220/12 221/12 226/19 226/20 226/23
area [11] 14/9 19/21 34/16 36/11 36/16 36/19 36/24 51/9 76/4 115/13 127/11
areas [5] 27/18 30/2 30/3 30/19 47/15
aren't [3] 45/11 65/8 67/21
arguably [1] 155/10
argue [8] 150/15 166/5 166/21 170/8 186/19 191/19 192/25 213/10
argued [1] 193/20
argues [1] 190/24
arguing [4] 121/11 195/1 212/1 226/23
argument [35] 122/3 150/20 150/23 151/10 152/13 157/18 157/20 161/4 175/13 175/15 175/16 177/8 184/9 188/1 188/1 190/7 190/11 193/9 193/22 194/2 195/13 201/24 202/3 202/24 207/8 209/17 213/18 215/3 217/1 217/3 217/3 217/10 222/4 222/14 224/9
argumentative [2] 61/10 107/13
arguments [2] 177/1 189/22
Ari [2] 6/24 204/13

A

aria [1] 24/17
around [9] 15/25 25/19 34/13 84/4 113/4 113/15 133/15 141/14 156/16
arrested [1] 142/10
art [1] 130/8
articulated [3] 187/14 213/1 226/5
as [205] 8/14 8/23 11/1 14/11 14/11 15/6 15/6 15/18 19/14 22/14 24/23 28/9 28/22 30/17 30/25 33/13 34/10 35/8 37/2 37/16 37/24 38/3 38/7 38/10 38/10 38/16 38/25 39/13 39/13 40/12 41/7 42/25 46/4 48/15 50/10 50/18 51/9 54/18 54/19 57/14 58/12 61/1 61/2 61/3 61/8 64/9 65/3 65/17 65/21 66/12 66/19 67/22 68/3 68/9 68/10 68/16 69/16 71/21 72/13 72/13 75/16 75/20 76/6 76/8 78/7 78/18 78/22 79/3 79/9 79/10 80/16 81/19 82/5 82/9 82/14 83/12 83/17 85/10 87/21 88/6 88/16 89/1 89/17 90/2 91/2 91/10 91/13 91/22 92/10 92/17 92/18 93/2 93/9 100/15 101/13 101/15 103/2 105/11 109/4 110/1 110/17 110/17 110/20 110/22 110/23 110/25 112/9 112/23 113/9 113/10 114/6 114/12 115/13 115/20 115/22 115/22 116/5 116/6 117/24 118/14 123/3 123/9 123/17 124/1 125/16 128/4 128/8 129/10 130/3 130/12 131/5 131/12 133/14 135/3 135/13 136/6 136/13 137/1 146/6 146/7 147/8 147/9 149/21 150/5 150/8 150/12 151/12 151/22 151/23 152/20 152/21 152/21 153/23 154/4 154/13 155/20 156/18 156/22 158/3 158/3 160/4 160/25 162/23 163/4 169/4 173/24 176/4 176/4 177/4 177/5 178/15 182/20 183/4 184/22 184/25 185/15 191/8 194/15 195/12 197/12 198/8 198/15 198/15 198/16 198/21 202/13 206/24 210/7 210/13 211/14 212/1 213/12 215/1 215/21 216/14 217/2 220/25 221/10 222/5 222/8 224/14 226/6 226/7 226/10 226/16
ascribed [1] 87/24
aside [3] 67/24 127/21 159/14
ask [41] 8/25 10/12 15/25 16/7 19/19 21/6 22/13 24/21 28/7 44/21 52/12 55/18 61/10 63/23 64/23 70/21 87/2 90/2 97/9 101/20 103/24 104/3 105/1 106/5 106/7 106/11 113/5 113/11 113/12 114/17 117/20 117/20 145/12 146/9 166/18 215/21 217/23 219/9 219/9 219/22 228/9
asked [45] 20/6 23/20 23/21 23/21 23/24 24/4 24/9 25/2 39/20 46/22 54/6 66/21 76/2 79/5 91/8 91/8 103/14 104/2 113/7 115/20 116/22 116/25 117/1 117/21 126/4 127/18 145/12 154/25 156/15 156/19 156/19 163/1 173/20 174/20 182/25 186/2 186/9 192/16 197/3 198/20 199/4 200/16 208/23 219/15 220/11
asking [14] 58/7 59/25 75/9 75/10 85/5 91/24 108/25 109/3 114/25 126/19 162/4 169/6 200/25 208/19
asks [1] 210/17
assert [1] 160/24
assess [1] 189/4
assessing [3] 141/5 188/5 207/9
assessment [1] 26/12
assets [2] 67/19 91/2
assigned [1] 10/16
assistance [8] 110/3 110/8 110/19 111/20 160/18 181/25 197/2 209/18
ASSISTANT [7] 2/8 26/16 71/7 71/22 169/19 213/13 223/15
assisting [2] 26/8 46/18
associate [21] 60/24 62/2 64/13 64/25 66/13 67/7 67/8 68/23 68/24 74/22 74/24 74/24 74/25 75/1 79/4 88/22 93/6 95/22 102/16 132/22 221/25
assume [6] 10/6 26/15 99/13 141/22 166/1 166/19
assure [1] 45/24
at [203] 6/10 8/18 9/6 9/13 9/24 11/7 12/20 13/15 14/12 14/18 15/13 15/21 16/3 16/15 17/4 19/10 20/4 20/22 21/22 22/15 25/22 26/15 27/11 28/25 30/6 30/13 31/12 31/12 31/22 31/23 32/11 34/2 35/9 35/18 35/24 37/8 37/10 40/5 41/7 41/23 43/5 43/15 43/25 44/1 44/4 44/9 46/12 47/23 49/9 49/25 50/4 51/7 51/12 54/16 56/13 56/19 58/4 58/7 58/13 59/12 59/14 60/10 60/18 61/16 62/7 62/12 62/19 64/6 65/19 66/3 69/10 69/19 70/16 71/4 72/7 72/20 73/5 73/11 73/17 73/20 74/15 74/25 76/23 77/1 77/5 78/18 79/9 82/1 82/3 82/3 82/12 83/11 83/13 83/20 83/25 84/14 84/21 85/22 86/17 86/25 87/23 88/6 88/9 89/5 92/8 96/11 97/8 99/9 99/25 100/3 101/1 102/19 103/14 107/9 107/19 108/9 109/4 110/2 111/7 113/5 114/7 114/12 114/21 116/17 119/18 120/2 120/8 120/25 122/25 127/20 128/1 128/1 128/3 128/6 128/11 129/11 130/9 130/12 130/19 132/13 137/2 137/3 138/6 138/19 140/25 144/3 144/8 146/2 146/12 146/14 146/15 152/6 152/8 153/2 153/20 156/14 157/9 157/11 157/12 163/20 168/11 169/6 173/6 174/16 174/25 175/1 175/3 176/14 179/7 179/10 185/14 185/18 187/25 188/16 188/17 191/16 191/20 192/1 192/10 198/5 198/23 199/21 200/7 201/23 202/12 203/4 206/3 207/8 208/14 208/15 210/6 211/8 213/22 213/23 217/10 217/25 218/12 219/12 219/12 221/18 225/15 228/5 228/16
attached [1] 173/9
Attachments [1] 49/10
attempt [2] 45/6 46/22
attempted [5] 68/22 81/20 124/14 126/11 221/24
attempting [1] 51/11
attempts [1] 69/6
attend [2] 193/2 196/6
attended [1] 193/3
attention [16] 26/8 34/22 43/7 43/23 61/14 61/22 62/8 72/18 79/13 89/19 99/7 122/20 122/21 152/2 152/3 212/12
attorney [10] 2/6 26/16 32/1 32/13 71/8 71/23 138/15 169/19 213/13 223/15
Attorney's [8] 14/5 26/10 54/3 83/7 141/23 180/15 217/23 225/15
attorneys [5] 2/8 131/21 133/16 144/7 215/17
Atwater [3] 164/13 172/20 184/10
audio [5] 69/5 219/24 219/25 221/24 225/12
auditors [5] 134/12 135/21 146/20 215/16 216/15
August [42] 9/15 10/16 11/7 12/17 13/13 18/17 18/17 18/21 18/22 21/1 22/11 25/19 26/19 55/25 57/9 60/2 60/7 60/13 60/16 61/15 61/22 64/6 64/18 64/23 64/23 65/7 65/7 65/16 68/20 68/21 68/25 69/6 69/6 69/10 84/3 114/20 115/7 115/9 158/21 221/23 222/2 222/3
August 29th [1] 68/25
AUSA [35] 7/23 18/19 19/8 26/23 27/10 29/15 29/25 37/17 38/25 41/3 45/24 46/25 47/11 47/19 49/4 49/25 50/5 50/17 50/24 65/25 73/23 74/5 74/8 75/4 75/16 89/20 116/1 196/24 197/21 198/8 201/14 206/25 211/9 211/11 217/19
AUSA Bowman [5] 45/24 49/4 75/4 75/16 116/1
AUSA Wilner [1] 38/25
authenticate [1] 7/19
authorities [1] 224/18
authorized [1] 82/16
authorizing [1] 174/4
automatically [1] 189/15
available [11] 26/13 65/14 68/24 71/7 104/3 104/12 104/13 121/10 152/18 192/15 202/25
AVEIS [4] 2/7 6/10 7/23 63/7
Avenue [1] 3/21
avenues [2] 130/20 185/3
avoid [1] 104/20
avoided [1] 193/12
aware [12] 67/21 67/22 67/22 67/23 67/24 69/9 70/19 105/15 116/1 116/1 209/19 209/21
away [7] 47/16 103/10 111/8 121/5 129/13 131/21 180/18
awhile [3] 131/15 136/3 168/12

B

B-e-c-k [1] 32/14
back [64] 9/13 9/23 13/23 15/22 16/12 17/21 21/11 24/11 25/9 30/1 34/10 45/15 45/17 45/22 50/9 59/25 74/16 74/17 75/21 96/11 104/10 106/3 106/18 108/11 109/6 110/4 111/23 111/24 114/23 115/15 117/18 129/12 136/1 138/4 140/1 141/5 142/1 142/7 142/20 152/10 154/10 154/13 154/21 154/23 155/8 162/10 166/9 173/5 176/14 180/22 181/13 193/18 197/22 199/10 199/11 199/15 200/11 200/14 201/18 210/3 213/8 213/11 219/22 222/17
background [1] 135/22
backwards [1] 105/14
bad [10] 41/24 95/25 121/3 121/5 140/6 163/8 170/2 170/6 171/12 214/3
baggage [4] 174/23 175/1 175/1 183/21
Bailey [1] 169/15
balance [1] 150/10
ball [3] 78/20 217/16 226/22
bank [3] 45/18 137/17 137/21
banker [1] 199/21
bankers [1] 135/21
bankruptcy [2] 14/4 112/17
baptized [1] 24/2
bargain [2] 159/10 196/16
base [1] 105/3
based [22] 37/16 38/11 41/15 51/25 54/18 61/19 81/21 90/24 105/1 105/2 105/6 105/20 105/24 106/14 111/2 128/12 131/19 159/25 206/25 210/16 211/4 213/5
basic [1] 195/20
basically [8] 47/13 108/12 114/11 159/15 173/12 173/15 176/9 177/15
basis [4] 14/15 53/3 211/1 215/3
Bates [1] 169/7
be [248]
Beach [1] 3/11
Bear [1] 74/25
bears [1] 176/10
became [5] 17/2 50/11 118/25 134/20 182/17
because [140] 13/1 14/20 17/24 19/20 22/20 23/12 23/14 30/16 33/8 41/19 43/7 48/16 49/5 49/16 50/20 54/21 57/23 58/16 60/2 63/23 67/23 68/3 78/13 79/6 79/16 80/19 86/2 87/15 89/6 92/20 101/8 103/2 107/2 110/3 112/24 115/22 116/2 116/6 118/9 119/4 121/7 121/22 121/25 122/2 122/20 122/22 123/2 123/4 125/7 127/24 128/17 129/3 130/7 133/17 134/6 135/2 135/16

## B


because... [83] 135/18 138/16 140/1 140/1 141/22 144/7 144/14 145/1 145/2 146/2 147/4 147/14 147/20 148/4 150/23 151/21 152/1 152/19 153/7 153/23 154/2 155/3 155/5 155/11 156/24 159/16 161/4 161/13 162/14 162/14 162/20 162/23 164/21 166/14 166/15 170/5 170/11 170/21 172/8 172/14 174/15 176/12 176/19 177/8 180/10 187/16 188/7 189/15 190/17 191/17 192/5 193/3 193/13 194/10 195/4 196/10 196/21 197/12 200/6 203/13 203/16 203/18 203/24 204/11 205/9 205/17 208/20 208/24 213/5 214/15 214/17 214/18 215/19 217/25 219/7 219/23 220/6 221/6 222/7 223/3 225/2 227/7 227/24
Beck [2] 32/13 32/14
become [4] 83/10 128/13 130/2 144/3
becomes [1] 220/16
been [115] 12/14 13/19 14/3 15/23 21/9 22/23 25/6 25/13 27/1 30/23 32/3 34/11 34/12 37/21 42/24 50/9 51/10 51/13 54/13 54/14 54/20 60/23 61/17 62/2 62/23 64/14 65/21 66/22 67/13 67/19 68/15 68/24 69/17 69/21 69/22 70/13 73/13 73/17 74/22 75/4 76/11 79/1 81/12 81/21 91/11 91/12 94/19 95/11 95/25 97/23 99/5 101/8 103/7 104/6 110/13 111/2 111/11 112/21 113/15 119/9 119/10 119/10 119/12 120/3 120/10 120/13 121/21 122/12 126/16 127/3 127/5 127/8 127/9 128/21 130/1 130/10 141/1 141/3 141/13 141/13 141/15 141/25 144/25 150/11 153/12 154/11 156/22 157/12 159/2 161/6 164/18 164/20 166/5 168/11 172/18 177/11 177/23 178/5 179/9 181/10 181/21 182/2 182/4 186/5 186/13 186/22 189/22 209/3 209/7 209/9 209/24 210/12 211/20 213/7 216/20
before [71] 7/7 7/20 7/22 13/5 13/9 18/8 18/17 18/18 19/1 22/8 22/13 23/24 23/24 31/9 33/13 37/10 41/7 49/8 51/10 54/1 60/1 66/24 69/23 70/19 72/9 72/11 72/23 80/14 82/16 87/16 90/8 92/3 95/7 101/6 101/8 102/5 112/15 112/16 114/8 116/5 117/10 127/3 127/19 127/19 127/25 128/10 129/11 142/5 142/23 150/12 150/18 150/18 151/2 152/3 155/4 156/22 157/10 157/17 168/14 177/3 177/4 180/4 181/12 187/24 198/6 198/7 200/25 201/9 201/9 201/14 224/17
beg [1] 188/3
began [5] 20/20 35/3 41/7 72/2 117/11
begin [4] 31/5 49/11 130/15 168/14
beginning [4] 20/15 172/10 203/4 203/8
begins [2] 158/21 219/3
behalf [8] 6/10 6/16 6/19 7/3 7/5 21/21 65/15 196/13
behest [2] 69/10 71/5
behind [6] 9/1 31/7 32/9 39/3 43/19 197/21
being [38] 10/24 16/23 23/23 31/23 42/22 59/21 60/10 61/21 70/14 71/7 74/8 78/25 79/5 89/14 112/8 112/25 116/16 120/21 121/9 126/24 127/21 130/3 130/15 133/6 137/4 140/2 140/6 140/14 147/9 156/19 157/1 160/22 162/23 172/2 185/22 191/18 207/3 222/5
belief [2] 119/4 194/1
believe [65] 8/10 8/18 8/22 10/15 10/20 14/24 15/13 17/15 22/18 30/19 31/5 33/9 33/19 44/12 46/20 48/7 51/23 51/23 52/2 52/7 53/14 57/11 58/8 59/2 66/8 74/8 78/5 78/12 92/10 92/18 106/15 109/17 116/2 117/12 117/12 123/6 124/16 131/9 139/16 139/22 139/24 140/4 152/4 157/6 158/23 160/6 162/2 163/2 167/15 193/14 196/11 197/1 199/15 200/13 207/12 209/9 210/21 211/6 212/2 212/13 212/22 215/10 222/16 222/22 227/4
believed [13] 10/18 12/13 17/4 45/9 110/7 115/23 118/20 119/2 119/3 139/14 209/17 219/15 220/5
believing [1] 22/19
ben [1] 123/25
bench [1] 8/10
benefit [3] 124/1 124/2 124/9
benefits [4] 44/15 123/10 184/6 184/7
bent [1] 161/22
Berger [74] 15/22 15/23 15/24 16/25 18/2 18/5 18/9 19/9 19/9 19/9 19/14 19/24 20/10 20/16 21/4 21/4 22/3 22/3 22/14 22/23 24/20 25/11 25/11 25/13 37/21 40/3 42/5 47/13 51/18 78/13 79/5 134/20 134/23 135/1 135/2 135/6 135/6 135/9 135/11 135/11 135/14 135/19 135/24 143/18 143/18 144/1 144/4 144/4 144/13 144/24 146/13 146/20 147/11 147/13 147/14 148/4 148/4 152/2 162/15 162/20 162/23 179/3 179/5 179/8 179/16 179/20 198/7 198/9 201/9 203/5 203/10 210/16 215/7 216/3
Berger's [4] 19/16 51/20 135/22 144/25
Bertrand [34] 14/13 14/15 14/23 15/11 56/13 56/16 56/19 56/22 56/25 57/9 59/1 59/11 60/13 60/15 60/16 60/22 61/15 62/20 64/5 71/11 102/23 102/24 103/4 103/8 104/12 105/4 105/12 105/12 106/15 107/5 116/22 116/25 218/13 219/9
Bertrand's [1] 61/22
besides [1] 65/3
best [13] 13/13 17/16 25/16 33/12 48/20 77/2 87/11 111/14 120/4 145/19 161/3 168/10 189/3
betrayal [2] 9/21 40/14
betrayed [1] 40/15
better [7] 12/22 13/11 19/20 157/18 161/9 179/2 217/24
between [12] 12/23 41/19 67/16 103/11 115/9 115/10 119/17 126/7 143/19 168/18 170/14 189/6
beyond [9] 38/2 38/6 86/6 132/2 136/18 136/23 144/24 220/6 225/7
Bible [4] 223/23 223/23 223/24 223/25
bifurcate [1] 168/8
big [2] 222/16 222/21
binder [11] 8/10 8/22 28/8 31/7 65/21 83/24 115/16 115/17 122/11 187/4 188/17
binders [1] 186/23
Bingham [1] 4/4
bingham.com [1] 4/6
BIROTTE [1] 2/6
bit [5] 14/21 17/8 21/4 97/9 164/12
black [1] 177/9
blacked [5] 68/24 97/22 97/22 97/24 99/13
blacked-out [2] 97/22 97/22
Blackman [3] 184/19 184/20 214/17
blind [1] 217/25
blow [1] 120/5
blue [5] 8/12 73/7 73/8 77/20 115/17
Blvd [2] 2/20 4/5
board [5] 45/19 146/21 147/10 154/9 155/21
bode [1] 213/15
body [2] 12/7 203/10
bona [2] 178/22 178/24
bond [1] 6/24
book [2] 52/10 223/22
both [16] 14/16 40/24 59/14 93/6 105/6 121/12 152/13 173/10 177/11 177/24 178/20 180/15 182/22 185/3 225/17 226/23
bottom [10] 34/2 40/6 44/1 68/16 72/20 88/9 88/12 88/12 99/8 128/1
bought [4] 20/7 133/6 175/7 175/10
bowels [2] 177/1 177/7
BOWMAN [53] 2/7 6/9 26/16 26/23 27/10 28/15 29/15 29/25 30/17 33/6 34/15 36/6 36/11 37/3 37/17 37/25 38/6 41/3 45/24 46/1 46/16 46/20 46/25 47/5 47/11 47/17 47/19 48/17 49/1 49/4 49/8 49/25 50/6 50/17 50/24 73/23 74/5 74/9 75/4 75/16 116/1 117/11 127/12 168/19 168/22 169/19 170/14 185/16 187/9 214/3 216/25 217/6 217/10
Bowman's [1] 34/21
bracket [8] 27/17 36/3 169/10 169/12 169/13 169/15 169/15 210/9
bracketed [2] 35/21 210/8
bracketing [1] 30/16
brackets [1] 27/20
Braun [2] 71/23 89/20
break [9] 13/25 73/16 96/9 97/8 136/2 156/25 159/4 179/20 179/25
breath [1] 161/20
breed [1] 176/25
bribe [5] 14/23 105/11 105/17 105/21 106/7
bribed [1] 106/1
bribing [1] 106/6
brief [3] 149/16 167/11 173/5
briefing [3] 150/21 228/3 228/3
briefly [4] 7/14 7/17 7/24 8/1
briefs [1] 21/25
bring [6] 26/7 39/24 61/5 79/22 158/24 221/9
brings [1] 62/7
broached [1] 126/22
broad [2] 184/9 194/22
broadened [2] 11/23 139/25
broke [2] 197/24 198/1
broken [2] 129/4 129/5
broker [4] 12/7 134/2 134/4 134/6
broker-dealers [1] 12/7
brokers [9] 131/21 133/1 133/4 133/6 133/9 133/16 144/6 215/16 216/15
brought [10] 16/25 18/4 26/10 61/14 61/20 132/21 133/23 152/2 180/25 186/23
Brunoehler [1] 7/3
building [1] 57/6
bunch [1] 197/11
burden [3] 120/15 120/16 194/22
bureau [3] 13/20 86/19 86/20
burned [1] 203/5
business [10] 78/7 79/4 135/9 147/5 172/18 178/15 179/21 181/3 181/6 181/16
but [263]
buy [4] 22/5 37/14 132/9 132/12


## C


C-a-c-i-o-p-p-i [1] 48/12
C-l-i-n-e [1] 19/8
C.I [1] 80/6
C.W [1] 148/9
CA [7] 2/17 2/20 3/6 3/11 3/16 3/21 4/5
Cacioppi [2] 48/11 149/15
Cajon [1] 224/2
caliber [1] 131/7
CALIFORNIA [9] 1/2 1/16 1/24 2/9 6/1 97/1 197/4 197/17 198/24
call [26] 19/7 33/7 68/23 69/1 69/2 70/22 83/16 83/16 85/19 85/24 91/2 91/9 94/2 103/10 107/25 149/14 151/24 152/20 195/13 202/23 202/23 217/6 221/24 222/1 227/11 228/1
Callahan [3] 3/20 3/20 7/3
called [15] 11/10 20/2 30/11 35/4 47/7 97/13 98/12 99/10 99/21 116/25 117/17 132/12

## C

called... [3] 152/5 200/23 224/2
calling [2] 6/4 83/11
calls [32] 61/8 64/24 65/15 67/3 69/10 70/17 71/4 71/18 83/5 84/18 85/4 85/5 85/11 85/13 85/13 94/20 95/21 107/12 135/7 135/8 148/22 151/21 160/5 183/25 215/7 215/11 219/7 219/8 221/5 221/10 222/2 222/22
came [34] 16/25 18/9 19/25 21/5 24/20 33/10 33/18 34/11 51/8 54/20 56/1 57/8 57/12 58/16 63/14 64/4 64/6 68/11 72/1 106/25 107/1 107/24 108/5 109/7 119/20 134/23 135/1 135/12 152/24 154/8 160/16 183/23 201/3 207/7
campaign [1] 78/9
Campbell [1] 59/8
can [99] 8/17 13/11 13/12 19/20 20/13 21/17 24/16 25/9 28/9 30/14 31/21 32/16 40/1 40/20 43/18 44/23 50/24 61/10 62/13 62/21 72/17 73/11 75/24 75/24 76/14 77/2 86/1 88/5 88/8 89/12 90/3 91/23 91/25 92/13 99/7 100/24 104/10 106/5 107/14 109/17 111/14 115/15 116/10 119/5 120/4 122/7 122/9 122/11 125/5 129/12 133/10 136/25 145/19 145/20 147/25 150/14 150/15 158/24 161/17 165/2 165/4 165/6 165/7 165/18 166/12 166/17 167/16 168/17 169/23 170/15 177/18 180/10 182/14 185/10 187/3 187/6 189/7 189/8 189/14 191/1 191/4 192/5 203/2 203/2 204/22 204/23 204/23 208/16 209/11 211/23 211/25 212/2 214/21 219/5 221/7 221/9 228/10 228/23 229/4
can't [49] 18/8 25/3 43/10 67/13 79/6 79/21 79/22 104/9 106/2 117/17 121/1 135/20 135/22 140/7 142/16 145/18 147/13 148/4 148/4 150/11 152/12 153/25 159/20 163/3 163/4 166/22 166/24 167/6 174/8 179/12 184/6 184/13 184/14 189/11 194/19 203/25 204/3 205/17 205/20 205/21 207/5 214/15 214/17 216/2 216/3 218/1 222/20 225/14 228/25
Canales [1] 203/23
cannot [1] 183/18
cans [1] 45/13
Capital [1] 12/13
capitalization [1] 168/24
capitalized [2] 168/25 169/3
captioned [1] 90/25
career [1] 194/13
careless [1] 205/12
Carlson [1] 3/10
carried [1] 179/17
carries [1] 148/14
carrying [1] 159/11
case [76] 6/12 6/13 7/6 10/16 15/18 15/20 19/1 19/2 31/12 48/8 53/16 62/10 97/13 97/16 97/23 98/1 98/10 99/11 99/11 119/19 122/3 122/4 122/16 124/2 134/10 142/6 154/8 154/9 155/11 155/11 155/21 156/16 158/7 163/13 165/2 165/11 165/14 166/23 167/23 175/25 176/2 176/3 176/5 176/6 176/11 176/22 176/22 179/23 184/15 184/15 184/18 184/20 184/20 187/16 187/23 188/2 193/11 194/23 197/4 197/9 198/22 201/16 201/18 207/5 214/22 215/11 216/10 219/11 223/15 223/18 224/2 224/3 224/6 224/8 224/12 226/19
cases [11] 120/14 121/20 141/14 184/12 197/8 203/23 203/23 204/2 214/15 214/18 216/19
cassette [1] 69/5
cast [3] 32/10 184/21 216/1
casual [1] 23/25
catch [1] 171/25
caught [10] 25/13 128/21 160/1 160/9 171/20 172/6 172/7 172/17 180/4 202/1
cause [15] 33/21 33/22 51/23 117/12 128/7 142/10 163/7 165/20 170/17 175/25 176/5 188/25 203/15 211/14 222/22
caused [1] 188/18
ceased [1] 14/19
cell [2] 159/20 163/25
center [2] 3/11 144/9
CENTRAL [2] 1/2 197/16
certain [9] 76/15 81/7 86/20 125/25 131/25 144/13 170/5 186/1 191/18
certainly [25] 15/9 21/8 21/25 25/2 44/22 68/8 69/25 87/8 114/8 120/17 122/1 131/18 136/11 143/24 152/21 152/22 156/15 194/25 199/8 200/16 209/24 217/9 224/25 225/19 225/21
cetera [5] 16/2 27/23 127/15 186/13 186/13
chalkboard [1] 146/14
challenge [3] 150/21 187/21 212/16
chambers [1] 39/15
chance [8] 24/17 79/1 89/7 97/8 158/8 186/18 200/8 222/8
change [3] 27/17 41/19 41/21
changed [3] 120/8 145/10 190/20
changes [2] 46/21 78/18
character [3] 152/14 152/16 152/17
characterize [1] 60/19
characters [1] 32/10
charge [1] 176/1
charged [2] 52/3 142/7
charges [3] 10/14 60/12 215/13
Charles [1] 46/17
chart [3] 195/12 195/21 196/19
check [1] 49/5
checked [1] 49/6
checks [3] 26/7 95/4 113/8
Cheech [1] 199/9
cherry [2] 25/14 135/2
cherry-picking [1] 25/14
Choate [1] 227/17
choice [1] 104/20
choose [3] 153/2 153/3 218/7
chooses [3] 155/25 170/4 170/5
chose [8] 61/5 104/18 117/1 124/11 155/3 161/4 161/7 162/22
chronology [3] 25/17 141/10 141/12
CHS [1] 40/2
circle [2] 16/12 176/16
Circuit [14] 121/20 165/10 165/17 167/8 184/20 187/15 187/18 189/13 191/8 203/23 212/14 212/24 224/1 224/4
circumstances [9] 61/17 110/10 110/11 110/12 111/6 111/22 111/23 116/12 184/22
circumstantial [4] 150/16 166/23 167/1 189/4
cite [2] 223/12 224/2
cited [2] 190/15 212/19
citizen [1] 135/12
City [1] 224/2
civil [1] 134/24
Civilly [1] 32/4
claimed [1] 64/25
claims [1] 146/21
clarification [1] 44/18
clarify [3] 62/22 87/3 196/10
clarity [1] 37/23
classifications [1] 49/16
clean [1] 139/13
clear [18] 18/7 24/25 37/9 66/7 84/2 118/22 120/2 120/12 136/9 145/4 153/24 158/22 163/6 181/25 184/12 202/14 206/15 211/17
clearly [12] 81/7 107/6 163/13 165/19 165/21 166/15 169/21 170/21 177/18 188/25 206/20 209/13
clerk [1] 8/9
clever [1] 207/5
client [1] 135/9
Cline [2] 19/8 19/8
close [4] 79/1 122/22 172/17 221/25
closely [2] 97/9 107/6
closeness [1] 146/11
Cloverfield [1] 4/5
co [7] 61/2 61/3 61/4 117/16 169/14 180/24 215/1
co-conspirator [4] 61/2 61/3 61/4 215/1
co-conspirators [1] 169/14
co-controlled [1] 117/16
co-counsel [1] 180/24
cocaine [4] 120/25 121/1 121/2 121/7
cold [1] 25/12
Colin [2] 6/21 201/21
colleagues [3] 153/10 156/25 186/19
collection [2] 86/3 86/12
collective [1] 43/16
collectively [2] 29/11 106/15
column [4] 52/11 192/23 193/23 193/24
come [25] 13/2 13/5 14/12 14/16 17/6 18/8 25/12 25/16 28/4 47/13 57/8 57/14 60/2 83/3 95/19 96/11 138/3 140/5 148/19 154/23 176/16 186/12 200/23 201/13 222/17
comes [11] 82/20 106/24 135/7 135/16 140/10 154/13 154/21 158/23 171/20 189/18 221/3
coming [4] 52/19 63/10 70/24 116/21
commenced [2] 17/10 25/17
commencement [1] 17/18
comment [3] 40/10 153/14 168/16
commentary [1] 223/23
commit [3] 172/6 192/8 197/24
commits [1] 160/1
committed [3] 117/13 192/7 208/24
committing [8] 33/19 51/23 160/8 163/25 171/14 180/21 197/21 197/25
common [2] 179/1 179/2
communicate [1] 86/20
communicating [1] 47/10
communication [5] 26/25 86/18 98/15 98/17 185/16
communications [5] 105/4 168/18 174/5 221/14 221/15
companies [4] 10/23 146/15 146/22 147/10
company [11] 11/16 11/17 74/23 78/8 91/2 117/15 132/7 136/15 138/13 147/6 147/6
compare [1] 169/23
compartmentalize [1] 147/18
Compartmentalized [1] 169/15
compartmentalizing [1] 130/25
complainants [1] 82/24
complaining [1] 172/13
complaint [5] 31/17 31/24 32/2 32/17 134/24
complete [9] 22/5 37/14 160/22 161/1 172/24 173/18 174/12 183/17 214/21
completed [1] 62/12
completely [2] 183/22 186/6
complicated [1] 109/13
complied [1] 45/25
comprehension [2] 38/3 38/6
compromise [1] 124/18
computer [1] 154/15
concede [3] 153/7 161/18 193/4
conceded [5] 174/10 185/9 190/17 203/9 221/1
conceived [1] 155/12

## C


concern [2] 126/19 210/11
concerned [3] 27/8 60/22 108/24
concerning [2] 58/10 186/7
conclude [5] 41/16 153/21 166/19 178/11 194/24
concluded [2] 14/16 117/14
concluding [1] 129/19
conclusion [51] 33/11 33/12 33/18 35/22 50/16 50/17 79/20 95/11 95/17 106/13 106/14 106/18 114/12 118/16 123/6 123/13 123/14 123/17 123/22 123/23 124/22 125/6 125/10 126/5 140/6 146/5 153/14 160/23 162/6 166/22 166/24 169/11 170/12 170/13 170/14 170/19 175/24 182/10 184/5 184/13 184/14 190/15 194/2 194/22 194/25 195/10 196/22 200/3 206/7 206/12 206/13
conclusions [10] 50/24 112/7 136/10 151/20 155/17 178/1 178/1 178/2 179/12 180/17
concurrent [1] 155/22
concurrently [1] 37/11
condition [1] 37/14
conduct [7] 102/17 142/11 145/9 163/10 181/23 181/24 198/4
conducted [2] 23/22 102/15
confederate [1] 143/7
confederates [4] 146/19 202/2 202/5 207/23
conferred [1] 8/21
confess [1] 116/19
confidence [1] 79/8
confident [1] 132/23
confidential [6] 18/3 60/16 60/21 79/19 146/24 156/5
confirmed [1] 91/1
conflate [1] 189/24
conflated [1] 187/20
conflates [1] 190/21
confront [3] 39/24 40/7 202/17
confronted [1] 172/11
confused [1] 100/17
confusing [2] 129/3 129/7
Congress [2] 173/12 216/22
congressional [2] 173/9 173/17
connected [2] 11/20 128/23
connection [28] 8/23 11/4 11/21 12/23 24/11 24/22 50/18 66/13 71/23 73/23 76/16 77/5 77/16 78/23 78/24 87/9 89/20 89/24 92/1 99/3 103/20 136/22 153/22 154/5 177/25 204/12 211/16 211/19
conscious [1] 104/20
consensual [15] 22/4 69/9 82/21 84/18 85/4 85/11 85/24 94/20 107/7 148/21 160/5 186/12 215/7 220/1 221/20
consensually [9] 64/24 70/22 71/4 83/5 95/20 107/25 183/25 221/4 221/10
consensually-monitored [2] 70/22 71/4
consensuals [1] 37/22
consider [12] 49/25 70/21 82/23 107/22 107/25 111/12 111/13 117/21 129/21 148/25 174/8 191/2
considered [5] 51/5 53/3 189/20 191/4 213/12
considering [3] 127/14 169/22 201/7
consist [1] 208/21
consisted [4] 196/21 196/21 197/17 209/17
consistent [3] 17/19 29/15 47/21
conspiracy [7] 47/14 132/1 136/5 144/8 147/18 209/1 215/23
conspirator [5] 61/2 61/3 61/4 215/1 215/22
conspirators [1] 169/14
constraints [1] 79/6
contact [9] 14/19 14/20 18/5 35/13 39/23 117/2 127/14 224/22 224/22
contacted [2] 104/14 104/16
contacting [1] 204/4
contacts [2] 41/13 152/7
contained [4] 94/21 177/8 180/13 221/19
containing [1] 69/5
contains [2] 73/3 212/17
contemplated [1] 103/22
contemporaneously [1] 59/2
content [4] 32/18 34/3 45/23 46/1
context [8] 24/4 27/4 108/10 118/7 145/10 175/22 188/8 189/13
continuances [1] 18/16
continue [3] 12/10 93/5 192/10
continued [6] 1/19 3/1 4/1 140/22 192/8 208/25
continues [2] 7/7 198/11
continuing [4] 40/1 40/8 41/1 184/4
contrary [1] 118/24
control [1] 35/6
controlled [4] 10/18 10/20 12/13 117/16
controls [1] 132/11
conversation [6] 38/15 48/14 91/1 91/7 105/9 211/4
conversations [5] 13/7 26/16 53/1 106/14 106/20
conversely [1] 43/5
convey [1] 213/2
conveyed [1] 15/10
convict [1] 133/11
convicted [19] 14/3 51/10 64/13 64/14 75/18 76/1 76/2 76/2 88/23 89/21 90/4 91/25 93/7 95/22 102/16 140/18 140/20 141/4 171/2
conviction [2] 112/17 209/2
convictions [2] 192/19 194/12
convince [2] 95/24 120/18
convinced [2] 95/24 182/17
cooperate [16] 22/25 50/14 51/11 58/17 120/6 124/15 126/19 129/11 130/4 159/12 159/16 159/17 159/21 161/8 172/5 203/6
cooperated [15] 30/24 43/8 43/12 54/16 80/14 108/5 152/20 155/5 160/13 161/19 161/23 192/7 195/18 196/4 204/18
cooperates [1] 160/1
cooperating [6] 25/16 72/3 160/9 177/22 183/4 199/5
cooperation [135] 20/1 23/8 39/22 51/20 54/2 54/4 54/8 54/12 54/18 54/19 54/25 55/13 57/14 58/10 60/3 63/7 63/9 64/17 66/13 66/19 68/7 69/21 70/22 75/17 82/13 82/17 82/19 82/23 83/3 83/8 86/12 87/10 90/9 96/4 97/18 99/3 101/21 102/22 103/5 103/16 103/25 106/19 108/13 108/17 109/6 109/6 109/7 109/23 109/24 110/1 110/14 111/20 112/1 114/20 115/24 117/8 117/23 117/23 120/6 123/3 125/2 127/25 140/10 140/11 140/12 140/13 141/7 142/24 143/12 143/19 145/5 145/5 145/6 145/14 145/24 145/25 146/1 152/8 152/25 153/4 155/16 163/14 163/20 167/25 170/3 170/16 171/5 171/17 172/3 172/8 174/24 181/22 182/5 182/9 183/3 185/18 186/7 186/10 192/8 192/18 192/19 193/5 195/5 195/7 196/2 196/4 196/16 196/21 196/21 197/16 197/18 197/21 197/23 198/13 198/14 198/16 200/20 208/20 208/21 209/18 213/20 214/11 217/4 217/9 217/9 219/2 219/3 219/6 220/2 220/25 224/16 224/18 225/9 225/9 225/12
cooperator [66] 15/21 37/2 37/8 37/19 39/1 41/21 42/18 48/15 50/1 50/22 51/1 51/3 78/23 79/11 79/22 79/24 80/18 81/4 82/6 83/10 83/13 95/9 95/25 105/11 105/16 106/1 107/23 110/9 110/24 111/1 111/19 117/25 118/1 119/9 120/3 125/17 130/17 130/23 134/9 134/10 139/9 143/8 145/7 145/15 146/3 148/18 149/1 149/2 151/23 153/12 163/13 171/12 174/16 174/18 184/11 184/24 186/12 197/12 198/9 203/25 206/25 210/13 213/4 215/19 221/3 222/7
cooperators [10] 37/21 42/24 82/25 109/16 117/24 144/5 185/7 204/4 216/12 225/22
copy [1] 8/14
copying [1] 46/17
corner [14] 29/9 29/14 30/7 31/10 33/24 36/2 39/6 39/17 44/2 44/4 88/9 88/12 97/14 99/8
corners [2] 96/5 174/9
correct [251]
corroborate [4] 82/22 83/6 184/2 221/5
corroborated [17] 67/9 67/25 91/11 94/19 95/21 95/23 107/24 108/6 112/5 112/6 140/15 148/22 148/23 181/18 184/1 186/13 220/2
corroborating [2] 83/22 93/7
corroboration [1] 91/22
cost [1] 185/4
cost-effective [1] 185/4
could [101] 15/19 16/4 25/16 31/2 34/14 35/4 35/8 37/4 38/21 38/25 40/18 42/24 48/11 48/15 50/14 52/8 66/7 68/5 68/15 72/18 77/17 78/22 81/25 82/4 82/5 82/14 88/16 90/8 92/20 95/24 103/14 104/15 109/24 110/9 110/24 111/1 111/15 111/17 111/19 115/18 115/21 116/25 117/24 117/25 118/1 121/20 121/20 124/6 126/24 128/11 130/18 131/24 131/25 132/6 134/11 136/21 139/8 144/24 145/7 145/15 149/5 149/5 153/21 154/10 155/11 157/20 159/14 163/12 164/9 165/23 170/20 171/1 171/4 174/16 178/4 178/4 180/17 182/3 183/4 184/8 184/16 188/3 189/23 190/14 190/20 190/24 192/16 192/25 194/23 203/21 204/4 208/2 209/3 211/17 211/25 215/5 215/18 220/20 222/14 225/5 225/22
couldn't [28] 13/25 17/5 38/12 43/13 47/15 50/22 54/21 81/19 84/6 119/4 133/4 135/12 144/7 144/8 144/14 144/15 147/21 147/22 155/10 163/21 179/5 182/17 197/11 211/23 213/11 213/11 214/23 219/14
counsel [10] 2/1 6/8 6/11 25/15 180/24 188/10 189/22 191/24 197/4 216/9
counselor [1] 213/6
country [1] 141/14
couple [5] 35/20 46/24 51/15 97/9 130/14
course [5] 32/18 37/20 40/20 152/18 176/7
court [75] 1/1 6/22 8/5 8/9 8/16 8/17 8/24 10/7 13/9 18/10 25/1 25/9 28/7 28/8 30/14 31/6 31/9 31/9 31/14 31/21 32/8 32/10 32/24 39/3 39/5 40/1 40/20 43/7 43/19 43/23 43/25 48/3 54/6 86/7 86/16 150/19 154/4 161/2 162/4 170/11 174/2 176/8 184/24 187/4 187/16 187/19 188/6 188/15 188/17 190/1 192/5 195/14 196/11 196/24 197/5 198/8 198/17 205/5 205/6 205/8 206/3 207/3 208/7 208/19 208/23 209/11 212/9 212/24 214/17 216/5 216/14 217/25 224/12 224/13 226/9
court's [7] 18/13 32/18 38/23 192/24 202/16 208/13 212/12
Courthouse [2] 1/23 2/8
courtroom [2] 21/24 204/11
cover [1] 119/19
Coverage [1] 12/13
covert [2] 22/4 203/5
CR [4] 1/9 1/9 6/4 6/6
created [2] 19/6 86/19
creating [1] 28/1
credibility [1] 194/12

## C


credible [7] 181/21 190/1 190/9 192/11 197/12 220/1 220/15
credit [1] 200/19
crime [6] 49/22 138/6 163/25 174/25 202/1 202/2
crimes [13] 117/13 142/5 142/8 160/1 160/8 192/7 192/9 192/10 197/21 197/24 198/1 201/25 208/24
criminal [11] 32/6 39/25 60/12 60/12 94/14 113/8 116/10 116/18 142/11 181/23 198/4
criteria [1] 177/21
critical [7] 165/19 165/22 166/10 166/15 177/18 188/25 193/14
cross [9] 5/3 7/20 7/22 17/25 52/11 53/7 53/8 132/9 216/23
cross-examination [3] 17/25 53/7 53/8
cross-examined [1] 7/22
cross-examines [1] 7/20
cross-reference [1] 52/11
crossed [3] 78/13 172/13 172/14
crosser [1] 118/21
crossover [1] 218/25
CSR [1] 1/23
culpability [4] 14/11 35/12 35/12 41/14
culpable [1] 51/9
current [2] 10/14 39/25
Curtis [1] 7/1
custody [5] 6/17 6/19 6/22 22/5 201/6
cut [2] 135/17 210/6
cuts [1] 135/18


## D


daily [3] 14/15 26/25 105/4
Dale [1] 7/5
dangerous [1] 45/4
database [1] 83/20
databases [3] 11/15 15/19 15/20
date [12] 9/15 10/15 17/13 17/15 21/1 31/11 81/8 92/8 158/19 158/24 158/24 186/1
dated [1] 65/7
dates [3] 26/24 73/20 155/22
day [10] 19/4 26/25 82/24 119/20 132/6 132/10 222/2 227/23 228/1 228/2
days [2] 72/14 93/18
deadlines [1] 10/8
deal [62] 11/8 12/11 15/23 16/1 16/11 16/20 17/1 17/3 17/5 17/6 19/10 19/18 20/2 20/6 20/7 20/11 20/16 20/17 20/19 22/6 25/16 37/12 37/15 78/3 78/4 96/7 104/18 134/3 134/5 134/5 135/17 136/2 136/3 138/5 159/18 163/16 174/24 178/9 178/21 178/22 179/14 180/14 190/16 192/7 196/6 196/17 196/18 197/18 197/21 198/10 199/13 200/15 200/20 200/23 201/10 201/12 202/13 203/20 204/10 207/21 227/14 228/4
dealers [1] 12/7
dealing [32] 55/13 58/12 59/5 63/6 68/6 69/20 70/16 79/16 84/22 84/23 86/3 86/12 105/22 107/5 114/10 122/23 123/20 142/11 142/21 143/18 149/15 159/24 178/7 178/18 179/23 199/21 202/8 216/10 216/14 223/3 225/8 225/10
deals [27] 15/24 20/10 20/13 20/18 22/17 22/21 22/22 22/23 23/6 23/24 35/18 74/25 97/23 112/11 123/2 131/24 146/25 156/6 159/3 179/17 179/21 198/25 199/7 199/14 199/16 201/7 202/12
dealt [8] 43/15 104/13 180/14 184/23 190/18 224/4 224/8 224/9
DEBORAH [1] 1/23
DeBretteville [3] 3/10 6/24 149/13
debriefed [1] 31/23
debriefing [1] 32/19
decades [1] 216/20
deceive [13] 159/8 161/25 164/16 182/21 182/23 183/7 183/8 183/9 183/9 194/18 207/4 209/6 212/4
December [2] 53/19 198/3
deception [1] 194/15
deceptive [2] 194/24 207/3
deceptively [1] 195/6
deceptiveness [1] 214/12
decide [4] 53/15 53/17 144/12 175/17
decided [13] 10/7 42/16 54/21 76/21 118/18 127/13 178/4 182/18 186/16 197/11 206/24 209/8 217/7
decides [2] 203/6 204/9
deciding [3] 78/22 111/3 191/3
decision [11] 27/13 37/7 111/8 118/5 145/20 176/19 187/15 188/5 190/25 226/9 226/15
decisions [1] 26/11
declaration [7] 8/1 22/18 42/20 45/20 78/19 132/21 214/8
declarations [1] 227/17
declined [2] 124/15 126/11
deductions [2] 182/13 182/14
deem [1] 109/22
deeply [1] 37/21
defendant [2] 7/1 212/16
defendants [7] 1/11 2/13 3/3 10/18 10/21 51/25 200/12
defender's [1] 39/14
Defenders [1] 2/16
defense [21] 7/20 25/2 65/6 141/21 188/10 188/10 189/22 190/5 190/7 190/24 191/9 191/19 191/24 194/21 195/1 201/25 206/17 206/20 212/6 213/6 216/25
deficient [2] 191/17 191/20
definition [1] 218/2
degree [1] 204/2
delay [1] 9/22
delayed [2] 21/13 192/9
delays [1] 20/25
delegated [2] 85/18 94/22
deliberate [5] 194/9 212/17 212/21 223/4 224/15
deliberately [4] 104/18 193/12 193/16 223/5
deliver [2] 147/15 159/14
Denial [2] 47/7 47/24
denied [1] 16/2
denies [1] 217/14
departure [1] 197/5
depending [3] 103/11 110/10 111/22
depends [1] 93/24
depth [1] 19/22
describe [9] 26/4 42/10 42/17 42/17 42/23 42/25 43/3 120/3 162/22
described [10] 25/17 42/1 106/21 111/6 117/19 119/6 132/20 136/13 137/5 148/24
describes [5] 78/7 79/3 178/15 185/18 185/21
describing [2] 81/3 177/21
description [2] 29/21 195/25
deserved [1] 43/7
designate [1] 88/17
designation [1] 88/13
designed [5] 41/10 164/25 190/3 190/10 226/20
despite [2] 23/5 41/20
detail [1] 34/14
detailed [2] 171/22 181/24
details [7] 14/1 21/24 90/21 107/19 180/3 196/6 196/19
determination [9] 81/25 82/5 82/14 124/5 124/6 124/9 165/20 176/4 189/1
determine [3] 161/2 189/3 213/17
determined [5] 35/8 37/18 37/18 41/13 117/16
determining [2] 151/13 168/1
develop [1] 136/19
developed [1] 177/11
development [2] 14/15 129/7
device [2] 162/5 173/8
did [183] 7/8 9/15 10/13 11/15 11/19 12/21 13/1 13/17 15/16 15/24 18/22 20/3 20/16 21/11 22/9 23/12 23/22 24/10 24/12 24/14 24/15 24/17 24/20 25/11 26/12 27/7 30/19 33/4 33/12 33/15 34/24 35/23 37/23 38/6 38/9 40/6 41/3 41/16 42/25 43/2 43/2 43/5 48/13 49/3 49/25 50/4 50/16 51/2 53/15 53/17 55/12 55/15 55/18 55/22 55/23 57/14 58/1 58/4 60/1 60/5 64/21 65/4 65/24 67/1 69/14 69/18 72/12 74/1 74/12 74/14 74/16 75/5 75/21 76/6 76/7 76/7 76/8 78/5 80/17 82/3 82/12 82/17 83/17 84/18 84/18 84/19 84/25 85/23 89/1 89/17 89/24 90/5 92/3 92/14 92/16 92/23 93/2 93/5 93/9 94/2 99/1 99/2 101/7 101/11 101/12 102/20 103/9 103/23 103/24 104/20 105/1 105/3 106/5 106/7 106/17 107/19 108/15 111/10 112/3 113/5 113/12 116/6 117/2 128/6 130/2 136/22 143/6 143/11 150/21 152/1 153/7 153/15 154/21 156/20 160/1 162/12 162/19 164/21 165/8 166/6 178/11 179/3 182/16 182/16 182/20 183/14 183/25 184/17 185/12 185/14 185/19 188/12 190/16 191/10 191/10 191/19 191/23 192/11 192/20 192/23 194/6 195/8 196/1 198/5 198/14 201/5 201/5 201/17 201/21 202/21 204/11 206/6 206/11 206/23 207/24 208/10 208/25 209/25 217/18 223/5 223/6 225/20 227/15
didn't [150] 14/18 14/20 14/24 20/8 24/21 24/22 28/2 33/9 35/5 35/13 35/14 35/16 38/13 41/19 41/20 43/14 49/5 49/7 54/18 54/19 54/22 63/15 64/22 64/23 65/5 65/18 65/23 65/25 69/15 70/1 70/11 75/15 75/20 76/10 80/16 81/4 81/22 81/24 94/18 94/19 94/23 94/24 96/3 100/20 101/19 102/17 103/8 104/20 106/10 106/11 107/9 107/18 110/1 110/12 111/5 114/16 114/23 117/20 117/20 117/20 117/22 118/2 118/8 119/5 119/14 120/2 120/6 120/9 123/16 128/7 129/8 129/9 129/9 129/25 130/6 130/18 130/23 131/2 131/9 131/24 136/2 136/3 139/4 144/10 144/19 145/12 145/17 146/4 147/5 151/24 153/2 153/3 153/16 155/10 155/19 156/1 157/2 157/10 157/17 160/15 161/13 161/18 162/3 166/20 167/14 168/16 171/7 174/7 175/1 175/11 182/21 183/13 183/15 191/16 191/17 192/12 192/13 192/16 193/1 193/2 193/24 195/25 196/6 196/6 196/14 196/18 198/18 199/5 204/11 208/19 214/24 215/4 217/25 218/7 219/12 219/16 220/1 220/15 220/25 221/4 221/11 221/14 221/15 221/16 222/6 224/25 225/1 225/2 227/6 227/7
difference [5] 24/23 86/22 119/17 215/6 215/6
different [23] 17/6 26/6 30/3 50/17 57/4 59/12 61/11 98/20 99/17 120/15 132/15 136/22 137/25 164/5 171/17 190/15 194/17 201/16 201/17 202/22 209/19 209/20 226/24
differently [3] 43/14 116/11 164/10
digested [1] 187/24
direct [13] 5/3 7/22 7/24 7/24 8/2 20/8 26/9 72/18 79/12 104/6 104/9 104/13 122/20
directed [2] 15/21 122/21
directly [4] 61/5 104/14 177/10 179/15

## D

disagree [1] 212/8
disagrees [1] 206/21
disbarred [2] 138/15 138/17
disbelieved [1] 219/25
disclose [11] 74/2 74/12 75/5 108/15 116/7 192/21 192/23 206/10 206/11 209/24 210/6
disclosed [2] 48/17 205/24
disclosing [2] 112/20 200/7
disclosure [7] 28/5 34/11 34/13 41/10 41/11 43/24 208/14
disclosures [1] 48/20
disconnect [3] 70/4 126/21 189/6
discouraged [2] 153/9 153/10
discovery [8] 13/1 13/6 29/9 44/5 65/6 97/24 114/2 141/21
discuss [9] 26/10 30/2 30/3 34/14 34/15 34/15 37/24 116/4 192/5
discussed [14] 12/24 15/22 26/20 33/15 34/24 37/3 38/15 45/23 46/1 80/20 116/5 127/12 147/25 223/1
discusses [1] 146/11
discussing [3] 20/20 50/16 122/12
discussion [17] 15/15 20/16 26/22 27/18 33/8 34/22 35/3 38/6 38/9 38/24 41/3 41/6 50/8 60/21 122/2 128/10 214/1
discussions [5] 20/21 22/3 50/8 113/2 117/10
dispositive [1] 191/5
dispute [2] 40/23 57/25
disputing [1] 94/21
disregard [18] 85/16 120/23 121/13 151/15 164/14 165/1 165/6 165/18 166/12 166/17 167/17 167/20 189/13 190/4 191/12 212/20 218/2 226/20
disregarded [1] 193/1
disregarding [1] 121/10
disrupt [1] 134/4
distill [1] 8/16
distinct [1] 132/15
distinguished [1] 80/25
district [16] 1/1 1/2 1/5 14/11 31/18 31/23 35/12 128/18 152/11 176/8 187/16 187/19 197/16 206/16 206/21 224/12
diverted [1] 121/24
DIVISION [1] 1/3
do [187] 7/24 8/2 9/8 9/9 9/10 9/11 9/12 9/18 12/19 12/20 15/6 16/22 17/10 17/13 17/24 25/6 26/7 26/22 28/10 28/11 28/12 28/13 28/14 28/17 28/19 29/24 30/8 30/9 30/10 30/12 33/19 33/25 34/1 34/24 35/2 36/15 40/19 42/4 43/4 44/25 45/14 46/13 46/15 47/8 47/9 47/12 48/1 48/2 48/23 48/24 48/25 49/13 54/7 57/11 57/22 58/11 59/8 59/16 59/18 60/4 63/9 66/14 66/24 68/12 68/18 68/20 69/3 69/4 69/7 69/8 70/18 71/18 72/22 73/14 74/3 77/1 77/2 79/21 81/4 81/20 82/23 82/24 83/2 83/9 83/10 83/14 88/10 88/14 88/15 88/15 88/24 88/25 89/7 89/15 89/16 89/22 89/23 90/10 90/18 91/5 91/6 91/14 94/2 94/2 94/3 94/10 96/8 97/13 97/15 98/13 99/23 100/1 100/2 100/5 100/8 100/9 107/2 113/7 113/7 116/21 117/11 118/5 119/4 122/24 123/4 123/11 123/21 124/1 124/20 124/21 127/12 127/21 127/24 131/24 133/22 137/22 138/2 142/3 143/2 144/15 146/17 149/14 150/22 151/2 151/8 158/6 163/4 163/16 164/3 166/6 168/20 169/9 170/8 171/25 174/2 182/21 185/10 186/10 186/17 187/24 188/19 194/20 197/1 198/18 200/23 201/2 201/24 202/2 202/22 203/20 204/20 208/10 211/11 212/4 213/10 217/7 221/8 222/15 222/20 227/15 227/20 227/23 228/10 228/16 228/16 228/18 229/4
docket [1] 31/22
document [47] 7/19 8/25 9/1 9/7 9/8 33/1 46/21 60/19 66/16 66/18 67/2 73/8 86/15 86/17 88/17 88/18 88/18 89/1 89/3 89/10 90/5 90/8 92/3 92/7 92/10 92/11 92/11 92/23 92/24 93/2 97/23 97/25 98/9 98/12 98/13 99/11 99/16 99/18 100/11 100/24 101/8 101/15 101/18 190/13 190/19 208/13 209/21
documentation [1] 105/15
documented [7] 105/23 105/25 106/3 106/6 106/10 106/11 106/12
documenting [1] 92/24
documents [18] 8/16 8/18 8/20 8/22 29/25 47/19 66/22 88/5 89/13 89/17 92/16 93/9 93/12 105/16 113/10 114/3 141/16 150/11
does [33] 12/6 34/7 34/8 38/23 65/18 82/21 86/23 93/16 93/22 98/15 98/16 116/10 116/10 126/18 150/19 154/7 156/3 158/9 168/25 171/25 174/22 182/12 183/8 183/8 183/20 187/7 191/12 200/21 209/4 212/6 214/9 217/15 221/4
doesn't [41] 53/1 82/24 86/24 111/25 117/7 119/24 127/4 133/23 136/13 144/21 152/6 154/4 161/7 161/10 161/22 163/10 166/9 166/13 174/25 183/21 186/4 198/11 198/20 199/18 199/18 199/23 199/23 200/1 200/2 200/20 200/22 202/21 203/25 204/6 207/2 213/15 214/6 214/10 217/12 219/9 219/9
dogs [1] 81/16
doing [28] 9/23 17/7 20/18 22/23 23/5 25/6 70/21 114/25 116/10 134/3 135/9 135/14 135/15 147/1 159/3 169/14 174/25 198/25 199/7 199/12 199/14 199/15 202/2 202/12 202/15 202/17 202/19 207/21
dollar [3] 23/6 198/25 199/7
dollars [1] 222/24
don't [133] 10/15 14/21 21/6 24/9 24/12 24/13 24/14 25/1 25/3 25/8 25/11 26/4 27/25 31/1 32/5 32/15 34/20 35/20 38/4 38/5 40/22 42/25 44/20 45/8 50/14 57/25 58/3 59/2 59/13 59/23 60/9 60/19 62/15 62/25 63/22 66/3 66/24 70/5 70/5 71/15 71/25 72/4 72/15 72/16 73/20 73/23 75/12 76/11 78/18 80/7 85/19 86/22 91/15 91/22 94/3 101/11 102/13 102/13 103/22 106/9 107/3 107/9 109/12 109/17 110/3 110/20 110/21 111/13 112/13 115/5 115/19 115/20 116/24 121/7 121/25 126/7 126/21 126/25 127/9 127/18 127/25 130/3 130/7 133/12 133/17 133/18 133/22 134/22 139/24 140/11 143/22 145/3 146/10 147/8 152/5 153/6 156/14 158/10 159/11 159/15 162/6 163/2 163/4 176/22 182/5 191/14 194/14 194/24 194/25 195/12 195/17 197/24 201/20 202/24 205/15 206/8 207/15 207/25 208/3 209/9 211/18 211/19 213/5 215/2 216/17 217/18 217/19 217/22 217/22 217/23 222/21 223/22 228/19
done [22] 22/17 22/21 23/25 46/9 72/8 89/14 95/3 112/10 112/11 112/14 112/16 112/19 135/19 149/19 156/6 177/9 177/16 186/15 188/13 189/23 203/21 207/1
door [1] 31/23
dot [1] 216/22
double [5] 49/6 78/13 118/21 172/13 172/14
double-crossed [3] 78/13 172/13 172/14
double-crosser [1] 118/21
doubts [1] 191/8
down [13] 30/17 50/15 73/16 90/23 130/4 146/14 177/10 182/13 182/13 182/14 185/16 210/8 226/13
draft [13] 27/11 27/12 27/12 27/16 28/19 29/19 33/7 34/10 41/20 168/22 169/2 169/4 211/10
drafts [5] 127/11 213/8 213/10 213/12 213/19
draw [4] 34/21 43/23 170/15 193/13
drawing [3] 136/10 154/9 155/21
drawn [3] 32/16 189/11 189/15
drew [2] 199/25 200/3
drill [1] 30/17
Drive [1] 3/11
driving [2] 41/23 86/25
dropped [1] 34/13
drug [1] 216/10
due [1] 211/13
dueling [1] 37/21
dug [1] 171/16
dump [26] 11/24 12/8 60/22 61/21 62/1 62/18 64/6 65/1 67/11 67/17 68/1 73/24 82/21 83/4 85/2 88/21 95/20 109/8 135/14 135/15 135/20 140/14 141/16 148/21 183/25 218/18
Dunn [2] 7/6 7/6
duped [1] 139/2
during [15] 12/17 14/14 16/22 39/20 40/24 57/17 74/1 91/2 105/5 106/19 114/20 197/19 197/19 199/4 202/12
duty [1] 193/20
Dwight [1] 7/3

## E

e-mail [1] 4/6
E.C [4] 86/18 90/11 98/12 98/13
each [10] 136/2 136/3 155/1 155/17 156/5 156/9 179/16 210/12 215/11 216/18
earlier [7] 47/18 48/7 50/18 155/20 188/6 205/6 210/16
early [5] 13/23 14/6 16/24 112/18 198/6
earthlink.net [1] 3/23
easier [3] 121/12 187/5 209/24
East [2] 2/16 3/16
edits [2] 30/2 46/21
Edward [3] 2/19 2/19 6/21
effect [6] 8/24 9/21 15/8 47/17 144/11 168/17
effective [1] 185/4
effectively [1] 81/19
effort [2] 43/3 213/12
efforts [1] 109/6
either [14] 11/23 45/3 85/3 85/15 93/24 104/14 139/2 165/19 182/17 193/22 199/6 204/7 216/12 224/24
El [1] 224/2
electric [1] 86/18
electronic [3] 45/19 94/3 98/15
element [2] 215/11 224/7
elements [1] 164/17
Elmo [1] 186/23
else [19] 36/12 72/13 91/10 104/7 104/8 113/25 129/19 129/20 133/17 134/3 135/22 147/5 149/11 157/3 162/14 169/1 174/21 205/22 224/20
elsewhere [2] 60/14 123/1
email [11] 3/8 3/13 3/18 3/23 9/13 28/15 29/15 46/16 46/19 49/1 197/6
employ [1] 45/4
employed [1] 45/3
end [5] 22/11 65/16 126/5 138/4 191/25
endanger [1] 204/5
endeavor [1] 15/16
ended [2] 19/14 206/4
ending [2] 39/17 143/20
ends [4] 30/6 39/7 88/13 140/14
Endurance [12] 10/19 10/22 11/2 11/4 12/16 12/18 20/11 20/19 37/12 78/9 200/24 201/13
enforcement [4] 35/13 41/12 45/14 127/14

## E


engaged [6] 15/18 19/10 116/18 125/2 181/17 198/4
enough [14] 33/2 33/9 41/15 107/16 119/19 127/7 128/7 142/18 174/14 175/11 188/14 203/10 211/15 222/19
ensuring [1] 27/8
entered [2] 18/1 98/9
entertain [2] 53/4 191/8
entire [8] 5/14 52/15 54/7 115/11 124/19 191/20 197/20 203/22
entirely [1] 52/13
entitled [2] 8/11 223/1
entity [5] 10/18 11/10 11/14 35/6 140/21
entrepreneurial [1] 136/14
entries [1] 99/17
entry [2] 31/22 33/1
equally [1] 28/18
equate [1] 15/5
equation [1] 224/11
equivalent [1] 120/21
error [1] 198/21
errors [1] 198/22
Especially [1] 45/13
essential [1] 163/17
essentially [5] 37/1 118/15 130/5 190/22 198/11
establish [5] 12/22 176/5 178/22 191/12 204/3
established [4] 62/23 118/14 158/3 178/24
establishes [1] 113/1
et [8] 1/10 6/5 6/7 16/2 27/23 127/15 186/13 186/13
et cetera [4] 16/2 27/23 127/15 186/13
ethically [1] 147/21
evaluate [7] 110/25 111/17 125/9 145/14 145/25 182/15 183/13
evaluating [16] 108/18 109/10 109/24 110/8 111/18 112/24 117/8 130/1 145/6 148/25 164/23 183/3 186/10 212/10 213/3 225/22
evaluation [5] 101/21 134/10 145/11 183/2 185/7
eve [1] 14/6
even [47] 70/8 70/9 70/10 75/15 83/9 94/20 101/3 101/18 110/12 117/7 122/22 127/9 128/7 140/7 141/20 142/14 145/3 154/9 154/11 155/12 158/22 159/10 159/11 160/12 160/12 161/5 161/7 166/21 166/23 167/14 170/25 173/20 174/7 174/23 181/5 191/24 192/25 194/1 200/19 202/14 203/9 209/1 214/2 221/11 221/12 222/21 225/1
events [1] 86/21
eventually [3] 133/11 140/20 186/13
ever [8] 16/1 90/5 103/22 103/24 142/24 143/7 143/12 196/13
every [17] 45/3 46/1 67/5 82/24 97/22 97/25 111/16 111/16 114/16 168/25 184/15 184/18 185/1 216/18 226/9 226/15 226/19
everybody [6] 24/7 65/11 133/19 134/1 171/22 224/20
everyone [2] 37/11 95/3
everything [16] 23/25 27/13 47/19 47/20 48/19 65/11 66/21 70/4 70/10 70/10 72/13 94/10 133/21 152/7 171/4 171/21
evidence [44] 10/3 29/4 32/16 52/15 92/25 112/15 112/19 112/21 112/23 112/23 113/1 118/24 128/12 133/9 139/6 139/7 140/17 142/23 144/10 145/2 147/1 150/1 150/2 150/7 160/5 163/15 166/23 167/1 173/1 174/14 189/4 189/9 189/18 190/2 190/10 193/7 193/11 193/15 194/4 194/17 194/20 194/23 194/25 202/14
evident [3] 17/2 125/11 134/20
evidentiary [2] 1/19 98/24
evil [1] 214/6
ex [1] 21/21
exact [6] 10/15 15/9 17/15 26/24 184/23 188/15
exactly [7] 38/19 114/25 115/2 125/21 170/22 173/2 183/11
examination [7] 9/4 10/9 17/25 53/7 53/8 97/6 122/7
examine [2] 7/11 164/13
examined [1] 7/22
examines [1] 7/20
examining [1] 7/9
example [16] 25/7 98/25 114/18 116/16 121/4 121/6 124/25 132/17 134/2 137/1 155/18 169/15 193/2 195/3 224/14 224/24
examples [2] 44/14 178/6
except [2] 35/6 139/7
exception [1] 191/18
excerpted [1] 43/22
exchanges [1] 29/15
exclusively [1] 52/1
excuse [16] 21/20 36/1 37/18 44/17 65/25 67/2 67/10 90/7 121/18 122/14 125/3 180/11 220/25 222/2 222/11 225/20
execution [1] 17/16
exhausted [4] 130/19 142/18 143/18 143/22
exhibit [76] 7/19 10/3 17/22 28/9 29/4 29/10 32/24 39/4 41/1 44/9 44/16 45/17 46/5 46/11 46/12 48/21 48/22 52/10 53/4 66/7 66/8 66/11 68/5 68/5 70/14 70/16 70/20 72/18 72/19 73/3 73/7 75/24 77/7 77/7 77/19 86/2 86/2 86/11 87/5 87/18 87/23 88/6 93/12 95/7 97/9 97/12 97/23 98/1 99/8 101/14 101/20 113/19 113/23 115/15 122/11 148/7 150/4 168/19 168/21 168/24 177/3 177/4 177/8 185/17 191/18 195/14 197/7 205/17 206/1 207/17 219/10 219/17 220/6 220/10 220/20 221/13
Exhibit 19 [2] 41/1 73/3
Exhibit 35 [1] 220/6
Exhibit A [1] 195/14
exhibits [11] 5/14 8/11 8/24 52/9 66/10 149/22 149/25 150/6 150/8 213/6 215/10
exist [1] 173/13
existed [1] 180/12
exists [2] 175/25 221/16
expect [2] 116/19 185/4
expectation [2] 197/25 198/1
experience [5] 105/20 105/24 131/16 131/19 173/11
explain [12] 63/22 63/24 80/17 81/18 83/14 83/18 89/4 109/14 117/5 145/24 146/17 196/20
explained [4] 180/18 181/22 205/9 227/5
explaining [2] 151/22 215/3
explains [1] 171/6
explanation [9] 81/20 115/19 115/21 159/7 166/20 191/21 204/14 204/17 227/6
explicit [1] 209/3
explicitly [3] 38/13 40/12 55/6
explore [1] 162/10
exposing [1] 154/2
exposition [1] 227/12
Express [3] 31/19 32/20 171/23
expressing [1] 9/20
extensive [2] 54/2 167/24
extent [7] 35/17 52/25 80/15 94/19 102/23 143/4 155/15
extracted [1] 43/22


## F


F-I-N-R-A [2] 12/4 12/5
F.2d [1] 212/14
F.3d [1] 224/3
fabricated [1] 9/21
face [1] 212/17
facility [1] 57/7
facing [2] 60/11 179/4
fact [61] 13/22 14/12 20/16 22/21 37/20 55/14 55/19 63/8 67/9 67/25 70/20 74/11 74/21 77/16 78/7 78/8 92/24 94/18 105/10 111/11 111/16 114/16 118/10 126/15 131/12 132/20 148/3 158/4 160/7 160/12 160/22 161/18 165/3 165/4 171/2 171/2 171/10 174/23 175/6 177/16 179/19 184/10 185/15 185/18 191/24 193/10 195/17 197/19 198/18 199/19 200/4 200/5 200/9 202/14 204/2 204/10 207/20 210/1 212/18 223/5 226/6
factor [1] 48/19
factors [3] 37/16 129/25 180/14
facts [73] 33/10 55/16 81/24 82/4 82/13 87/15 87/17 87/23 106/9 106/17 110/16 110/25 111/3 111/19 112/1 112/13 116/1 120/1 123/16 123/24 124/4 124/6 124/6 124/8 124/8 124/11 124/25 125/9 126/4 145/8 145/14 145/17 145/23 145/25 146/5 149/3 161/1 162/5 162/9 165/21 166/10 167/25 170/5 170/6 170/25 171/1 172/15 172/24 172/25 173/18 173/22 173/23 174/3 174/13 175/17 175/23 176/4 177/11 178/3 179/10 179/12 180/6 182/2 183/17 185/11 196/7 212/22 213/2 213/3 214/4 216/24 222/15 223/7
failure [5] 54/2 191/11 192/21 193/18 204/20
fair [6] 10/9 29/14 45/22 58/22 107/16 196/7
fairly [1] 31/21
faith [2] 208/24 213/12
fall [1] 34/7
fallen [1] 215/25
false [7] 74/13 75/7 75/11 75/11 75/13 116/6 192/9
falsehood [1] 194/9
familiar [7] 11/10 11/13 15/1 15/3 34/3 49/22 67/14
far [7] 14/11 19/20 145/2 184/21 185/15 194/11 198/16
farther [1] 135/13
fashion [1] 59/14
fast [3] 20/9 26/19 172/12
favor [1] 83/14
favorable [3] 159/10 159/18 180/14
favorite [1] 24/17
Fax [4] 3/7 3/12 3/17 3/22
FBI [117] 2/11 6/11 6/12 7/24 14/4 14/17 15/12 15/16 19/13 23/14 24/10 25/3 32/1 49/16 54/3 54/4 54/8 54/12 54/16 56/1 56/8 58/9 58/17 60/2 60/8 60/14 60/19 61/6 63/10 63/18 64/17 65/16 66/19 67/24 68/6 68/8 68/11 69/10 70/5 70/6 70/21 70/24 71/11 72/8 73/13 73/17 75/5 75/17 76/1 80/15 82/20 82/21 83/1 83/3 83/7 83/15 83/16 85/1 85/4 85/11 85/19 86/3 90/16 90/24 91/20 91/24 93/12 93/16 94/1 95/19 95/21 98/17 100/3 100/11 100/19 101/4 101/5 101/10 105/15 105/17 105/17 105/21 105/25 106/1 106/7 108/5 109/7 109/23 110/8 110/19 111/21 114/3 114/22 115/24 117/8 125/2 140/2 140/10 140/21 142/16 144/14 148/20 148/21 148/23 156/25 184/1 185/25 201/19 211/21 218/7 218/14 220/13 221/14 221/22 224/22 225/13 225/14
FBI's [14] 62/7 65/5 65/8 66/16 68/6 69/15 70/8 71/4 76/13 83/17 87/9 92/3 93/2 180/15
fear [4] 154/2 162/8 184/10 184/11
FEBRUARY [11] 1/17 6/1 26/24 27/2 27/4

## F

FEBRUARY... [6] 28/15 46/17 49/1 97/1 115/22 168/22
February 25th [1] 46/17
federal [3] 2/16 197/3 224/21
feel [4] 78/12 115/25 130/18 192/23
feels [1] 172/13
felon [5] 76/2 93/7 95/23 140/20 171/2
felons [11] 64/13 75/18 76/1 76/2 88/23 89/21 90/4 92/1 102/16 140/18 141/4
felt [4] 40/15 120/5 129/9 206/22
few [5] 91/7 139/13 186/23 188/4 202/4
fides [2] 178/22 178/24
field [5] 56/1 56/8 56/9 57/4 173/11
figure [4] 27/22 36/12 222/8 229/3
figured [1] 151/6
file [45] 7/1 7/4 7/7 25/7 68/4 68/6 68/6 68/8 69/15 69/17 69/18 69/20 70/5 72/5 87/9 87/12 87/16 87/17 88/18 89/3 89/10 93/17 93/19 98/10 98/18 99/17 100/19 100/24 101/2 102/19 105/15 105/21 105/25 106/6 106/10 114/3 115/11 115/14 191/20 219/10 219/11 221/12 221/15 221/16 225/11
filed [12] 8/16 10/8 18/15 21/21 22/8 31/18 69/23 138/20 188/23 192/2 217/20 227/17
files [31] 14/2 15/16 65/5 65/8 66/16 70/9 76/13 80/15 83/15 83/16 83/17 85/11 91/20 92/3 93/2 93/12 94/20 113/6 113/13 114/13 114/23 115/2 115/14 171/17 180/15 180/15 217/22 217/23 217/24 225/6 225/13
filing [3] 10/8 26/25 57/20
filter [1] 107/14
filters [1] 94/13
final [9] 14/22 29/16 41/17 43/21 45/17 45/22 117/6 118/10 217/6
finalizing [1] 47/1
finally [4] 40/5 135/16 156/8 179/4
Finance [7] 10/20 11/10 12/12 12/17 78/9 128/25 129/1
financial [7] 67/10 67/10 67/17 67/20 91/12 94/13 113/8
financials [1] 68/2
find [15] 14/18 84/6 114/15 121/10 133/3 133/4 135/20 136/12 139/4 192/11 193/20 216/12 224/23 225/14 228/25
finding [9] 15/19 118/10 187/19 187/19 194/12 209/10 224/5 224/11 225/4
finish [2] 122/7 127/19
finishing [1] 89/25
Finnegan [5] 59/16 68/22 71/13 71/18 71/19
Finnegan's [1] 68/25
Finnigan [12] 103/19 103/19 103/24 104/12 218/9 218/14 218/18 219/1 219/7 219/7 219/9 221/23
FINRA [5] 11/24 12/2 17/4 17/4 141/15
fire [2] 40/19 172/1
first [64] 7/17 8/25 10/13 12/25 13/19 16/25 18/9 20/1 23/4 26/21 26/22 28/25 29/7 29/13 31/6 31/12 34/17 39/19 41/2 46/12 47/6 53/15 53/17 53/23 68/10 72/24 73/12 82/16 86/17 87/6 88/10 88/12 88/17 88/18 94/4 94/6 94/6 94/7 97/12 98/7 98/9 99/21 108/19 113/9 116/5 151/12 152/3 153/20 158/19 162/11 162/15 171/21 178/6 179/15 182/25 187/21 188/14 188/16 196/10 210/1 210/6 211/9 218/13 226/5
first person [1] 87/6
firsthand [1] 131/20
Fischer [99] 46/6 54/11 79/21 79/21 80/3 80/7 81/24 82/4 82/13 95/18 95/18 95/24 108/3 108/4 108/8 108/14 108/17 109/9 109/15 109/21 110/6 110/13 110/16 110/17 110/23 110/25 111/2 111/9 115/23 116/3 117/6 117/7 117/23 118/3 118/18 119/8 119/8 121/17 121/20 123/14 124/1 124/4 124/23 125/6 125/9 143/24 145/8 145/13 145/13 145/20 145/24 148/25 162/9 170/16 170/25 172/15 172/16 174/2 175/16 176/2 177/24 178/2 178/3 179/9 180/6 180/7 180/17 182/2 182/8 183/1 183/13 183/15 183/18 184/3 185/8 185/10 185/10 185/13 186/11 190/15 207/4 209/6 211/24 212/4 217/4 217/5 221/1 221/2 221/7 221/7 222/14 222/15 222/19 223/1 223/6 223/7 224/23 225/21 225/21
Fischer's [2] 190/20 190/25
fish [3] 63/14 105/7 107/4
fishing [12] 14/17 15/4 15/7 15/8 51/8 54/20 55/12 55/14 55/20 55/24 114/18 114/19
fit [4] 33/16 35/6 35/17 128/15
fits [1] 76/25
five [14] 8/17 18/20 22/15 30/13 115/10 120/7 126/23 146/2 146/14 146/21 171/22 183/3 195/5 221/17
five-level [1] 18/20
five-year [1] 183/3
fixable [1] 187/7
flag [4] 12/8 26/7 129/2 175/11
flagged [1] 27/10
flagging [1] 33/6
flesh [3] 19/20 27/22 45/16
flip [1] 152/5
flipping [1] 162/11
floating [1] 36/3
Floor [1] 3/6
Florida [1] 7/4
flow [1] 209/10
focus [12] 18/9 21/11 34/17 90/13 94/24 105/13 111/15 123/2 192/21 196/25 197/7 199/20
focused [3] 84/24 108/21 185/24
focusing [2] 139/16 187/13
folks [4] 198/19 207/7 207/10 209/22
follow [9] 30/15 44/23 84/12 89/13 89/13 92/9 116/22 184/1 217/12
follow-on [1] 92/9
follow-up [2] 89/13 116/22
followed [4] 102/10 102/11 102/13 102/14
following [10] 32/1 100/10 101/4 102/21 134/24 148/17 175/21 209/1 221/22 223/4
follows [1] 152/9
foot [2] 173/5 214/15
footnote [12] 126/3 126/6 126/6 126/8 126/13 126/20 126/24 126/25 127/8 142/19 181/15 185/24
footnotes [1] 163/9
for awhile [1] 131/15
for other [1] 25/6
forced [1] 140/12
foreclose [1] 161/14
forensic [1] 26/8
forever [2] 23/15 180/7
forget [5] 22/13 48/20 94/1 147/19 195/19
form [2] 61/7 82/8
format [2] 93/17 220/18
former [19] 18/19 38/24 60/24 62/2 64/12 64/25 66/12 67/7 67/8 68/23 74/22 74/24 74/24 74/25 75/1 88/22 93/6 95/22 102/16
forte [1] 136/15
forth [8] 9/23 30/2 42/23 93/20 174/3 209/12 213/9 213/11
forthcoming [1] 112/21
forward [5] 26/19 121/18 172/12 174/15 189/18
forwarding [1] 20/9
fought [1] 14/5
found [9] 10/17 11/15 11/23 12/14 19/6 49/7 164/9 187/16 225/5
foundation [2] 57/17 107/13
foundational [1] 53/3
four [8] 13/20 22/15 39/18 96/4 120/7 121/4 171/21 174/9
Fourth [2] 154/24 212/15
frame [7] 11/7 16/22 39/21 57/21 72/1 202/13 202/15
framed [1] 46/20
frames [1] 223/10
Francisco [1] 19/7
frankly [2] 157/10 161/3
Franks [14] 150/20 187/13 187/21 188/15 188/18 189/14 223/19 223/23 223/25 224/4 226/12 226/17 226/18 226/19
fraud [9] 14/4 60/23 64/14 112/17 140/24 159/18 159/19 222/5 222/9
frauds [1] 175/5
fraudulent [1] 138/24
fresh [2] 78/24 151/7
Friday [2] 228/21 228/22
friends [1] 172/17
friends' [1] 200/4
front [8] 28/10 66/8 112/14 147/21 170/11 190/12 190/19 217/13
fronting [1] 213/14
fruitful [4] 16/4 184/25 185/3 209/7
full [14] 26/9 34/18 41/2 72/24 73/12 145/10 160/22 161/1 172/24 173/18 174/12 176/16 183/17 214/20
fully [2] 150/24 187/24
functions [1] 137/25
fund [4] 25/14 135/3 135/3 165/14
funding [1] 179/7
funds [3] 137/14 138/3 138/4
fungible [1] 132/5
further [20] 11/15 11/20 14/8 14/24 27/18 34/22 52/17 89/7 95/4 95/23 146/8 147/14 147/14 148/4 148/23 149/6 149/7 174/17 184/2 194/1
future [1] 183/4

## G

GACKLE [1] 1/23
gain [1] 80/6
gained [2] 25/21 50/23
Galipo [1] 122/3
game [2] 10/9 147/16
garbage [1] 45/13
Garden [1] 4/4
gather [2] 15/16 94/10
gauge [1] 57/23
gave [17] 44/14 114/14 114/17 114/19 126/4 144/1 144/22 171/2 171/13 171/14 180/20 180/21 180/22 185/25 199/1 220/1 227/6
gears [1] 51/14
general [3] 35/1 42/3 184/10
generally [8] 34/7 50/14 71/19 94/16 195/23 196/5 196/17 214/15
generic [2] 134/8 214/22
get [58] 16/4 20/16 21/12 25/16 28/2 35/15 40/15 41/12 47/14 65/1 70/3 72/17 80/21 90/8 91/16 102/3 103/2 107/3 109/17 110/12 119/11 119/13 120/4 121/25 123/25 128/1 129/25 130/18 131/25 134/11 138/19 142/1 143/16 143/25 144/7 144/8 144/10 145/1 146/3 147/13 147/14 147/16 147/20 149/18 158/7 162/21 175/20 176/25 184/8 190/5 203/22 203/25 204/21 207/4 210/13 211/17 216/2 216/3
gets [9] 122/22 132/7 136/14 151/5 160/1

## G


gets... [4] 171/20 172/6 172/7 172/17
getting [22] 25/11 37/1 45/18 77/1 115/14 129/12 130/9 130/12 130/18 132/3 132/8 132/8 133/9 134/8 139/9 144/10 160/8 170/17 171/17 179/21 180/12 202/1
giddy [1] 121/5
give [32] 13/11 81/24 82/4 83/5 83/21 96/1 106/17 111/14 113/8 131/20 131/21 144/14 154/14 158/7 161/11 176/14 178/6 182/6 182/10 183/13 183/15 183/16 184/13 184/14 186/18 200/19 201/15 204/15 210/5 212/24 224/13 227/10
given [19] 23/3 23/7 35/9 41/13 84/9 85/22 90/15 97/17 110/19 111/6 111/20 124/22 144/17 153/23 172/8 177/2 182/5 209/9 227/8
gives [7] 25/4 106/13 171/21 172/17 180/5 180/22 216/25
giving [7] 23/10 110/21 112/7 170/24 171/22 172/3 222/23
glean [1] 64/22
gleaned [1] 38/16
gloss [1] 202/10
go [69] 8/17 21/24 25/9 36/6 36/9 36/11 36/22 38/1 38/13 40/15 53/20 59/25 63/15 65/20 75/24 83/23 87/7 87/14 87/15 88/3 90/3 91/23 92/6 95/22 99/25 106/3 110/3 111/24 114/15 114/15 114/23 115/15 115/18 116/3 122/14 124/13 128/3 129/10 130/21 131/22 133/1 137/6 140/7 142/7 147/6 148/4 150/11 153/25 156/20 157/3 162/10 166/9 169/22 173/4 174/15 179/14 180/7 188/4 193/20 201/14 203/19 210/5 211/20 213/11 216/4 216/21 217/12 226/2 226/24
goal [5] 8/21 44/10 46/2 203/19 203/21
goals [4] 44/14 146/3 148/8 209/7
goes [14] 79/14 79/23 88/19 90/23 99/22 100/7 117/6 135/5 136/1 137/14 180/5 190/13 201/2 222/1
going [61] 7/11 17/20 27/14 34/10 35/12 53/20 57/16 58/7 59/19 61/7 62/19 88/16 89/7 90/2 91/23 92/13 92/20 101/2 112/4 118/10 121/6 121/22 125/7 128/4 131/20 132/11 132/25 134/4 142/2 143/24 144/5 145/25 146/15 147/5 147/10 151/22 154/16 154/16 154/16 158/15 159/16 161/6 161/8 162/6 170/16 170/17 171/7 174/15 174/19 182/8 200/11 200/14 201/15 202/18 203/6 203/20 211/11 213/8 216/21 217/17 228/2
Goldman [55] 12/19 12/21 13/4 13/10 13/17 14/14 14/22 14/24 15/6 15/15 19/13 26/20 33/18 41/9 50/3 50/19 51/12 58/23 58/25 65/25 83/22 102/6 102/7 102/10 102/20 104/22 104/22 105/1 106/4 106/4 106/5 106/7 106/8 106/13 106/17 106/21 107/5 107/6 107/7 107/11 111/24 111/25 112/7 113/2 113/13 113/16 114/11 114/18 114/19 114/24 118/23 128/11 129/13 129/21 211/5
Gomez [1] 203/23
gone [5] 12/12 121/18 135/2 141/24 154/2
good [25] 6/9 6/15 6/18 6/23 6/25 7/2 8/4 8/5 8/6 9/25 68/15 81/4 96/10 98/25 163/24 167/23 170/3 192/6 196/5 196/18 213/12 213/19 216/9 217/21 222/19
Google [1] 154/16
got [35] 47/2 67/18 70/5 70/6 76/11 97/20 104/12 115/4 115/11 121/24 126/23 133/21 133/21 135/24 139/9 140/19 140/23 140/24 144/21 155/7 156/8 156/25 159/10 159/18 163/3 172/11 179/13 182/13 182/14 201/3 204/9 208/10 216/22 218/20 220/11
gotten [11] 132/2 153/1 180/16 190/14 192/6 192/13 193/19 195/19 196/5 196/17 218/19
government [52] 7/16 7/17 22/9 24/25 65/15 70/6 97/24 115/17 119/11 124/14 134/24 135/1 147/20 152/10 152/12 157/12 160/18 160/21 172/5 172/7 172/12 173/8 174/17 178/12 180/13 180/19 180/19 181/10 181/14 182/1 184/5 184/21 184/24 185/1 185/5 186/18 188/21 189/18 190/17 193/4 194/21 197/4 206/15 212/8 213/6 215/22 217/16 222/6 222/13 223/9 224/21 227/17
government's [24] 5/3 5/11 8/11 9/2 10/3 29/4 52/10 72/18 73/7 77/7 77/19 122/11 124/16 124/18 148/8 149/25 150/6 152/2 163/18 163/21 175/4 183/2 196/1 224/9
Grand [1] 169/8
granted [2] 176/9 214/6
great [2] 182/5 201/1
ground [1] 52/22
grounds [1] 197/5
group [16] 10/20 11/11 12/12 12/17 56/19 56/22 78/9 80/20 80/22 117/18 127/22 128/25 129/1 132/4 211/17 211/22
guarded [1] 146/19
guess [12] 24/19 51/6 58/3 72/15 76/21 93/18 106/15 133/2 139/15 176/13 207/2 209/25
guesses [1] 203/4
Guidelines [1] 197/3
guilty [5] 18/14 25/18 52/4 174/24 218/22
gunned [1] 119/13
Guns [1] 199/9
gusto [1] 24/18
guts [1] 177/8
guy [12] 56/17 76/24 76/24 132/7 132/18 132/19 159/16 159/20 163/24 165/14 218/6 222/21
guy's [2] 48/10 167/6
guys [4] 34/24 201/22 202/5 202/6


## H


H-u-g-h [1] 32/13
habit [3] 34/10 127/2 127/5
had [287]
hadn't [9] 62/11 68/3 101/6 128/13 129/4 154/11 155/21 161/23 171/11
half [10] 46/8 46/8 151/19 170/25 170/25 182/18 185/13 227/21 228/23 228/25
hand [24] 12/23 29/9 29/14 30/7 31/10 33/24 36/2 39/6 39/17 44/1 44/4 88/9 88/12 97/13 99/8 139/16 139/22 146/18 146/20 147/12 162/21 192/22 192/22 193/24
handed [1] 60/16
handing [1] 60/19
handle [1] 13/11
hands [2] 82/20 131/2
handy [1] 28/8
happen [1] 76/7
happened [12] 17/6 58/14 73/17 76/5 76/6 85/9 92/7 140/16 158/16 181/11 194/17 218/18
happening [4] 62/14 144/2 154/18 158/13
happens [3] 169/24 171/24 172/9
happy [2] 19/19 40/21
hard [4] 17/11 24/3 24/13 133/3
Harris [3] 3/5 3/5 6/18
harsh [1] 194/16
has [74] 7/1 7/4 7/6 7/25 8/12 8/14 8/24 10/7 27/12 29/13 33/2 33/24 34/2 36/3 44/1 47/24 49/10 57/20 72/19 79/6 79/8 79/8 80/1 80/8 84/14 85/9 88/19 97/12 99/14 127/24 134/3 135/16 137/2 137/24 146/10 146/10 157/12 157/13 159/18 160/13 166/25 172/23 173/8 173/12 174/23 177/4 178/12 179/25 181/20 182/24 183/16 183/16 183/18 185/24 191/8 191/9 191/24 192/17 194/11 194/21 194/21 198/17 203/3 205/22 208/25 209/11 211/20 214/20 216/5 216/14 217/3 217/21 219/5 219/11
hatched [2] 154/12 155/21
Hatter [12] 18/17 18/19 19/1 22/8 37/10 181/1 181/2 181/9 181/12 181/15 181/19 217/20
have [275]
haven't [6] 150/24 154/2 181/17 187/24 191/16 193/7
having [8] 16/2 26/15 34/11 62/23 62/23 91/22 120/14 213/25
Hawthorne [1] 2/20
hay [1] 161/18
he [790]
he'd [3] 32/3 54/13 180/18
he'll [4] 132/13 200/6 202/18 221/9
he's [32] 46/17 59/4 59/7 104/11 106/24 112/9 116/21 119/25 122/25 135/19 135/20 139/16 156/24 159/11 162/19 171/13 171/22 172/8 172/14 182/4 198/7 200/16 202/17 203/5 207/1 207/3 210/18 217/11 218/5 219/2 220/4 220/6
head [3] 76/24 193/15 201/23
headnote [1] 187/25
health [1] 21/14
hear [7] 43/10 150/20 150/23 150/25 151/10 168/6 168/9
heard [9] 7/14 40/10 104/8 119/8 135/8 172/23 191/17 193/4 199/2
hearing [18] 1/19 8/11 8/19 8/23 10/6 16/15 23/13 39/9 120/9 120/14 121/21 149/11 152/4 159/23 182/25 213/22 228/12 228/14
hearings [1] 177/12
hearsay [4] 102/2 102/24 104/7 106/14
Heather [1] 59/8
hedge [3] 135/3 135/3 165/14
held [4] 188/15 188/18 201/18 218/1
help [11] 26/7 44/24 81/9 89/4 107/1 134/4 138/1 138/1 154/22 154/24 187/6
helped [1] 35/6
helpful [24] 35/22 42/4 118/18 119/10 124/7 154/8 155/11 163/21 169/11 169/25 170/12 170/13 170/17 170/19 170/21 171/4 186/6 203/25 206/7 206/12 206/13 206/16 206/17 206/19
helps [1] 137/14
her [15] 96/1 96/3 108/25 110/17 111/14 124/11 171/11 175/17 182/21 182/23 191/9 209/8 223/2 223/6 223/8
here [59] 6/13 14/5 22/13 22/23 28/1 30/13 35/15 47/5 48/18 50/21 63/9 68/14 70/4 72/5 75/25 77/17 77/21 79/7 81/8 84/7 94/17 107/6 116/15 118/9 118/10 121/24 127/7 127/12 137/6 154/15 156/8 157/9 163/1 165/24 170/24 173/19 177/19 178/18 180/25 183/8 185/7 186/25 187/1 189/25 194/17 195/21 203/19 203/21 204/15 208/13 210/5 212/1 212/2 212/23 214/22 215/14 223/3 225/8 228/23
here's [8] 135/19 136/7 180/19 180/24 181/14 195/11 198/22 205/14
herein [1] 174/3
herself [2] 81/25 176/3
Hey [1] 210/17
hiatus [4] 156/15 171/6 199/2 199/3
hid [1] 107/11
hide [3] 81/10 213/16 217/16
hiding [1] 164/2
high [2] 95/2 194/7
higher [3] 41/7 43/15 84/11

# H


highest [2] 50/15 173/8
highlight [2] 27/18 86/2
highly [3] 173/14 178/9 178/19
him [109] 8/21 13/6 14/18 14/18 14/20 16/3 17/24 20/6 20/18 21/6 21/22 22/24 23/24 23/24 25/15 27/14 27/16 39/24 39/24 40/22 41/8 44/21 47/16 48/11 48/14 48/19 57/11 59/18 60/9 60/10 60/18 64/22 66/3 66/12 67/8 74/10 78/7 78/18 83/12 85/5 87/24 103/14 103/14 103/20 105/11 106/25 110/1 113/7 114/22 116/17 116/19 116/22 117/1 117/2 119/11 119/25 123/19 123/24 128/3 129/10 131/20 132/20 133/13 135/5 135/16 139/9 139/14 139/25 140/2 140/7 140/23 143/23 146/7 147/21 152/19 153/16 156/19 160/6 160/8 161/22 161/23 170/1 171/25 173/20 175/12 175/12 175/14 182/6 182/25 184/8 192/11 197/11 199/7 199/22 200/19 200/23 201/10 202/17 202/23 207/8 208/24 214/23 217/13 219/20 220/11 220/14 221/9 222/7 222/8
himself [6] 57/12 60/7 99/5 119/19 176/3 193/25
hires [1] 137/12
his [187] 7/7 9/21 10/24 14/8 14/8 14/11 17/13 18/1 18/14 18/21 19/25 20/23 21/19 21/20 21/21 24/17 25/15 30/2 31/8 31/16 33/15 33/16 34/15 35/4 35/5 35/10 35/10 35/11 35/11 37/13 38/11 39/15 40/7 40/21 41/7 41/14 50/21 57/24 58/11 63/14 64/13 64/25 69/21 74/2 74/12 75/5 76/17 78/8 78/18 79/19 80/12 80/19 85/18 88/22 89/6 93/19 94/4 94/6 94/7 99/3 104/23 105/4 106/13 106/13 106/14 109/6 111/7 112/3 112/4 114/12 116/7 116/7 116/13 116/16 117/18 117/23 118/21 118/23 119/25 127/14 127/14 127/21 128/15 128/17 132/19 133/13 135/7 136/15 137/5 138/8 138/16 139/6 139/8 140/10 140/13 141/16 142/24 143/12 143/18 145/5 145/5 146/1 147/22 151/20 155/19 159/19 159/25 160/5 160/7 160/23 161/6 161/9 162/3 162/6 162/23 163/9 163/9 163/10 163/14 163/14 163/14 164/15 165/4 166/20 172/3 172/5 172/11 172/23 173/3 173/21 174/11 174/12 175/12 181/13 181/14 181/22 181/24 191/9 192/12 192/14 192/20 192/21 193/8 193/15 194/2 194/13 197/2 198/6 198/7 200/4 200/5 200/14 200/16 200/25 201/6 201/9 201/14 201/25 202/1 202/22 203/13 204/12 204/20 205/21 207/5 207/8 207/23 209/1 209/18 210/6 211/3 211/7 211/8 211/16 214/7 214/7 214/8 214/8 214/10 215/15 217/2 218/6 218/23 219/15 220/2 225/13 227/6
historic [1] 158/17
historical [3] 62/17 63/7 63/9
historically [1] 63/19
history [12] 19/16 30/23 43/15 82/1 93/19 94/14 113/8 127/14 128/17 160/8 179/2 179/3
hit [1] 67/5
hits [4] 65/20 65/22 83/20 83/21
hitting [1] 130/17
Hochman [18] 4/3 6/20 7/9 8/19 36/8 63/4 66/9 85/10 87/2 126/3 129/12 145/19 150/9 168/6 168/14 190/12 209/20 226/5
hold [3] 36/7 84/21 120/14
holding [1] 219/22
holds [1] 199/10
Honor [287]
HONORABLE [1] 1/5
hope [3] 105/23 105/24 134/19
hoped [1] 53/20
hopefully [3] 82/25 122/9 177/3
hoping [1] 154/17
hour [4] 96/9 227/21 228/23 228/25
how [76] 9/12 11/13 15/3 16/1 18/8 23/22 26/17 26/23 27/22 28/14 33/15 33/16 35/4 35/5 35/9 41/13 46/15 48/25 51/16 51/20 51/25 52/4 59/18 60/19 72/15 76/25 80/12 80/19 80/22 81/7 83/14 84/9 89/4 93/22 93/24 94/2 94/10 106/21 109/12 116/11 117/5 117/14 118/6 124/8 126/18 128/15 130/6 132/18 133/5 137/12 140/5 145/24 146/17 146/24 147/18 149/14 153/3 153/4 154/10 155/11 161/24 163/8 163/16 172/16 178/11 194/20 201/24 202/2 209/17 213/10 213/20 215/11 222/20 227/20 228/16 229/4
Howard [6] 15/21 19/9 47/12 152/1 215/7 216/3
however [2] 179/19 181/19
huge [2] 63/8 204/8
Hugh [2] 32/13 32/14
hundred [3] 83/20 101/12 101/14
hurtful [1] 171/1
hypothetical [3] 149/3 186/8 186/9


# I


I'd [20] 8/25 10/5 10/12 30/5 48/17 49/9 54/1 83/11 83/12 116/19 121/2 150/9 150/22 150/22 150/24 150/25 187/12 202/4 203/1 227/21
I'll [33] 17/24 40/19 44/23 65/23 78/3 79/12 82/8 84/20 86/7 89/19 90/13 97/21 110/3 111/23 113/21 122/2 127/3 142/1 142/1 155/1 158/7 173/25 197/7 201/1 204/7 204/15 204/16 205/5 226/14 227/23 228/3 228/4 228/12
I'm [97] 7/5 16/6 18/7 18/22 19/19 21/24 27/25 29/2 35/24 36/18 40/9 43/11 45/12 49/22 51/21 57/16 57/23 58/7 58/12 59/23 61/7 61/17 62/21 63/21 66/7 68/19 70/3 72/21 73/5 73/6 73/6 75/9 75/9 75/10 76/25 77/1 84/2 84/22 84/24 86/14 86/25 90/6 92/16 100/17 100/22 101/6 103/13 109/3 110/20 113/22 114/1 116/1 118/4 118/9 118/12 120/8 120/23 121/3 121/6 121/9 121/9 121/9 121/22 125/5 129/11 129/19 132/3 134/3 134/8 136/9 136/12 140/5 145/4 145/18 148/1 150/2 154/17 154/23 155/24 157/11 162/18 164/19 166/3 169/6 173/22 174/14 182/8 193/5 193/5 201/15 203/6 206/2 208/12 220/8 220/15 220/15 228/2
I's [1] 216/22
I've [22] 8/21 43/21 45/3 48/5 52/9 61/17 71/25 97/20 105/19 118/18 130/1 143/2 148/24 153/22 154/23 177/2 177/9 186/22 186/23 198/22 218/19 222/25
I.D [4] 97/13 97/16 98/1 99/12
idea [8] 50/21 62/9 62/14 116/9 129/14 140/3 183/22 211/21
identified [22] 12/24 31/15 51/19 52/9 67/3 68/10 70/13 79/9 87/15 99/5 100/19 101/9 101/13 101/18 123/7 125/1 148/18 150/8 150/9 159/23 203/17 209/22
identifies [1] 32/12
identify [5] 11/20 66/12 88/5 199/23 199/23
identifying [2] 88/22 133/8
if [232]
ignore [3] 119/24 166/22 185/2
ignored [1] 151/18
imagine [2] 184/3 217/14
immediacy [1] 130/9
immunity [1] 224/8
impact [1] 168/17
implicated [1] 50/13
imply [1] 158/1
import [1] 26/7
importance [2] 194/5 195/4
important [20] 45/9 57/21 63/13 107/23 108/1 108/17 109/9 109/22 115/23 115/25 166/18 167/3 167/15 167/16 180/25 186/11 187/16 188/5 191/23 220/23
importantly [2] 173/24 180/1
impossible [1] 23/18
impression [9] 56/3 56/4 62/9 112/12 112/13 132/3 132/4 164/12 216/25
improperly [1] 187/19
in [975]
inaccurate [3] 116/13 185/22 211/3
inadequate [1] 129/19
inappropriate [1] 189/17
inappropriately [1] 189/25
inartful [2] 23/14 154/3
inarticulate [8] 205/6 205/7 205/8 205/11 205/11 205/14 205/23 213/1
incident [1] 106/12
inclination [1] 190/23
include [17] 27/22 33/13 41/4 41/16 54/2 54/8 82/18 111/10 191/16 195/17 213/8 213/8 215/4 219/16 226/10 226/15 227/7
included [12] 20/19 86/6 139/25 163/19 163/20 166/5 189/16 210/2 213/17 213/19 215/9 215/21
includes [3] 169/25 169/25 170/2
including [8] 46/4 88/20 109/16 152/7 163/8 204/3 210/1 211/10
income [2] 182/12 182/14
incomplete [4] 116/13 116/17 116/20 211/3
inconsistent [2] 206/3 224/6
incorrectly [1] 195/17
incriminating [1] 24/1
inculpatory [1] 139/7
indeed [1] 180/5
independent [6] 29/24 81/25 82/5 82/14 172/23 176/4
indexed [2] 93/21 93/21
indicated [1] 10/17
indicates [2] 32/17 49/16
indicating [1] 189/18
indication [4] 50/10 60/6 114/14 147/3
indict [2] 133/11 203/11
indicted [8] 51/25 52/2 52/5 198/15 203/11 203/14 203/15 215/8
indictment [5] 16/11 80/23 140/17 215/12 215/13
individual [9] 12/19 21/5 51/9 98/23 109/23 124/15 124/16 125/1 148/19
individuals [9] 11/5 12/24 51/16 52/5 67/3 123/7 131/25 169/16 227/9
infer [7] 165/3 165/7 165/18 166/12 166/17 167/17 177/18
inference [4] 32/16 189/15 189/17 193/13
inferred [4] 40/13 55/5 188/24 189/14
infiltrate [1] 79/10
influence [1] 189/7
info [4] 100/11 101/4 101/5 221/22
inform [2] 115/23 216/24
informa [1] 217/15
informant [11] 18/3 19/15 37/24 38/7 38/10 38/16 79/19 156/5 156/22 168/2 177/22
informants [5] 42/4 42/5 42/23 43/24 214/18
information [170] 12/22 13/4 13/8 14/17 15/4 15/4 15/8 25/20 26/6 27/8 41/4 41/16 47/10 51/8 54/21 55/12 55/14 55/20 60/14 61/20 62/17 62/18 63/11 63/14 63/14 64/11 64/12 65/19 68/11 71/23 74/5 74/7 76/3

## I


information... [137] 82/22 83/1 83/4 83/6 83/8 84/3 84/7 86/5 88/19 88/22 89/20 89/24 90/24 91/11 91/19 91/20 91/21 93/7 94/10 94/12 94/13 94/18 94/21 95/1 95/19 95/21 95/23 96/2 96/3 96/4 96/7 100/23 101/1 101/10 102/11 104/7 104/9 104/19 105/8 107/4 107/11 107/23 107/24 108/1 108/6 108/9 109/5 109/8 109/9 111/14 114/6 114/12 116/13 117/14 117/22 118/2 119/1 121/19 121/21 125/3 126/23 130/25 140/14 140/22 143/6 143/7 143/11 143/12 143/13 143/25 144/5 145/4 148/20 148/22 148/24 148/24 151/19 152/9 152/21 160/19 162/2 165/19 165/22 166/15 166/16 169/25 170/1 171/8 174/17 177/23 177/25 180/6 181/25 183/12 183/14 183/15 183/24 184/2 185/20 185/25 186/2 186/5 186/7 186/7 187/17 188/25 189/16 189/21 190/2 190/14 191/25 193/14 193/16 193/19 194/6 194/9 203/17 211/3 213/19 213/22 213/25 215/4 215/19 215/21 217/8 220/3 220/5 220/13 221/5 221/6 224/25 225/1 225/18 225/20 226/6 226/10 226/15
informative [1] 118/13
informed [4] 81/21 118/5 186/22 224/23
inherent [5] 125/22 126/1 214/19 214/19 215/2
inherently [1] 125/12
initial [4] 25/4 26/17 26/23 211/10
initially [6] 78/17 88/20 160/15 171/10 210/1 210/2
initiated [1] 115/6
innocent [2] 162/19 188/19
inquire [2] 44/8 174/16
inquired [1] 43/23
inquiries [1] 164/6
inquiring [1] 32/24
inquiry [8] 38/23 38/24 110/17 124/18 164/6 166/2 188/20 189/14
inserted [1] 164/8
insider [1] 165/13
insofar [3] 150/12 226/10 226/16
instance [5] 63/9 112/14 173/16 177/20 184/15
instances [1] 12/14
instantly [1] 219/6
instead [10] 61/5 61/13 160/22 190/18 191/7 195/6 195/7 208/20 227/10 227/11
instructions [2] 144/9 227/8
insufficiency [1] 42/17
integrated [1] 81/7
intelligence [1] 188/4
intend [4] 32/15 150/19 150/21 166/21
intending [4] 33/4 86/20 161/24 183/7
intent [11] 126/12 126/17 166/6 166/9 182/21 182/23 209/5 212/20 224/6 224/10 226/18
intention [10] 27/25 28/1 28/2 34/9 34/21 46/5 46/8 47/21 119/17 204/1
intentional [10] 120/22 151/13 151/14 170/4 194/15 212/11 226/10 226/11 226/16 226/17
intentionality [1] 151/17
intentionally [18] 119/5 119/13 121/2 164/25 166/14 183/12 183/14 185/12 185/14 186/16 207/3 217/7 223/2 224/25 225/2 225/18 226/6 226/7
interacting [1] 117/15
interaction [2] 16/2 20/8
interception [1] 174/4
intercepts [1] 131/13
interested [2] 183/2 215/20
interesting [3] 135/6 151/21 172/1
Interestingly [1] 135/11
interject [2] 118/9 195/11
internal [3] 98/17 221/14 221/15
internalized [1] 154/22
internally [2] 118/15 153/11
international [1] 215/17
internationals [1] 137/21
interpret [1] 170/20
interpreting [1] 40/9
interrupt [1] 63/16
interview [50] 14/24 32/11 32/11 32/17 36/25 40/24 41/11 45/6 53/2 58/9 58/14 58/19 72/7 72/11 73/21 74/21 75/25 84/14 84/18 84/20 84/21 84/22 84/25 85/3 86/6 92/7 92/9 92/12 92/14 92/15 92/17 92/21 92/22 92/25 93/6 93/13 93/14 95/22 98/22 98/25 101/1 116/8 124/14 126/11 148/23 152/8 169/12 218/10 218/13 218/13
interviewed [31] 14/13 25/4 34/12 34/13 39/15 42/22 48/8 54/13 55/25 59/21 73/13 73/17 75/4 75/18 94/15 95/2 99/6 100/3 100/23 102/7 126/17 127/3 127/6 127/8 127/10 156/4 156/4 157/12 196/12 209/22 211/21
interviewing [4] 98/23 99/10 99/22 127/2
interviews [49] 23/22 35/21 36/4 36/23 55/23 56/17 57/22 58/11 58/21 58/23 58/25 59/3 59/5 59/11 69/18 74/1 82/18 93/4 93/6 93/20 102/15 102/17 108/15 108/16 108/17 113/8 115/3 123/10 124/12 154/5 154/8 154/10 156/13 156/21 158/13 158/16 169/10 169/21 170/12 170/15 206/5 206/6 206/9 206/10 206/14 206/14 208/18 211/1 218/5
into [48] 8/17 16/24 17/1 17/21 18/1 18/4 18/9 21/12 21/24 35/15 38/13 40/19 41/12 48/4 58/17 65/11 70/24 79/14 80/21 82/20 83/3 95/19 98/9 121/25 132/3 138/1 144/14 144/18 145/1 147/15 147/16 147/20 148/19 150/2 150/5 154/4 157/3 162/21 162/24 164/8 166/7 177/1 189/24 191/10 191/10 198/18 211/17 215/25
introduce [2] 7/19 17/22
introduced [5] 15/23 31/8 37/20 52/12 78/25
introducing [1] 8/19
intrusive [1] 173/14
invasive [1] 162/5
invest [4] 60/24 62/3 79/5 79/6
invested [3] 78/8 79/4 79/8
investigate [6] 152/6 158/21 191/11 191/11 191/17 193/18
investigated [5] 13/22 106/21 113/3 141/13 191/15
investigating [3] 60/9 114/22 140/2
investigation [79] 10/14 10/23 11/5 31/11 32/6 35/11 46/18 49/17 49/20 49/23 50/11 59/20 60/7 60/10 66/2 67/4 76/17 79/19 81/6 85/12 89/13 90/25 92/2 92/2 93/22 97/17 101/24 103/20 109/25 110/9 113/13 113/24 124/16 124/19 125/4 125/8 125/13 125/16 125/17 125/18 125/20 125/22 128/13 130/3 130/10 139/25 140/7 141/7 141/8 142/8 142/14 143/1 145/15 146/4 148/8 148/19 149/2 152/19 153/22 154/3 154/6 157/21 158/1 185/2 185/3 187/18 198/23 203/5 203/8 204/5 209/8 214/16 214/24 217/2 217/19 218/6 218/11 219/4 222/18
investigations [2] 30/24 206/23
investigative [5] 45/6 79/18 82/15 173/8 184/21
investigator [1] 193/22
investigators [1] 206/17
investment [1] 199/21
investor [1] 61/1
involved [48] 10/13 16/2 17/2 17/5 17/18 18/3 20/1 20/17 37/11 37/22 42/11 43/25 51/16 58/20 58/23 58/25 59/19 64/14 64/25 68/1 71/18 71/19 81/12 125/4 125/19 128/20 130/6 131/5 133/7 135/24 140/2 140/8 156/24 171/3 175/4 179/21 180/20 199/13 209/23 210/17 210/19 211/15 218/21 219/1 219/2 219/2 222/22 227/9
involvement [10] 19/17 35/10 59/23 74/2 74/12 75/5 116/7 116/14 163/14 211/4
involving [2] 11/9 97/17
Ippolito [7] 184/15 184/16 184/23 184/23 184/25 190/16 190/16
IRS [12] 25/6 59/16 71/14 83/7 103/19 172/10 180/23 182/12 182/14 218/6 218/8 218/14
IRS's [1] 221/12
is [652]
isn't [32] 16/11 53/4 60/17 62/8 63/11 64/4 64/7 64/17 66/16 67/11 67/15 69/23 74/9 74/11 75/18 80/3 92/9 101/7 101/10 107/22 108/22 111/21 134/14 147/3 159/6 159/13 166/2 167/3 189/5 204/7 216/17 228/13
isolated [1] 225/16
issue [11] 25/2 31/12 42/2 63/8 117/24 125/7 149/15 162/4 171/15 184/24 223/10
issued [2] 19/4 161/2
issues [2] 21/9 46/25
issuing [3] 81/19 162/9 163/23
it [513]
it's [137] 8/10 8/12 8/21 16/12 17/11 21/25 23/17 24/3 24/13 25/2 27/20 28/15 34/20 36/5 36/10 46/5 48/3 48/17 49/1 49/22 52/14 52/24 57/2 57/6 57/7 57/19 57/23 58/1 61/10 62/4 62/4 62/25 66/10 68/8 68/8 72/24 73/21 75/12 75/25 76/13 77/19 78/18 79/13 82/8 82/9 82/19 83/19 86/16 90/15 92/12 92/12 94/25 96/8 97/23 101/9 107/13 108/2 108/12 108/21 109/12 115/25 116/17 116/18 118/7 118/17 118/22 120/2 120/12 120/15 120/19 125/13 127/1 127/5 132/3 133/8 133/9 134/15 136/18 137/25 140/4 148/6 151/20 153/23 154/3 154/15 154/16 157/6 158/22 162/14 163/6 164/15 164/18 167/10 169/2 170/4 170/11 173/17 174/1 174/1 176/13 176/14 176/23 179/24 179/24 180/25 182/11 183/9 184/19 186/11 187/15 188/11 188/11 191/14 191/15 192/22 194/10 201/16 202/17 203/1 203/2 205/20 205/21 206/20 207/14 208/6 208/14 208/15 211/16 212/13 212/22 222/20 223/11 223/14 223/22 225/15 226/16 227/22
italicize [1] 27/17
italicized [1] 30/21
italics [1] 33/2
item [2] 6/4 6/5
its [6] 9/15 23/14 93/16 184/21 194/21 212/17
itself [5] 62/2 78/15 84/20 223/19 227/4
Ivano [5] 199/13 199/22 199/24 201/4 201/15


## J


jack [1] 133/25
Jacks [3] 3/15 3/15 6/25
jail [1] 163/25
JAMES [1] 2/7
January [4] 26/24 27/1 27/4 199/19
Jason [2] 3/10 6/23
jdebretteville [1] 3/13
Jennifer [2] 2/15 6/15
Jeopardy [1] 204/15

# J

JEREMY [3] 5/5 6/13 9/2
Jim [1] 6/9
job [3] 26/9 69/25 119/4
John [1] 19/7
Johnny [1] 199/9
join [1] 103/22
joinder [1] 10/7
joined [1] 57/2
jointly [1] 27/13
Jonathan [2] 2/15 6/16
Joseph [2] 4/3 138/14
JR [3] 2/6 3/20 3/20
judge [177] 1/5 7/7 18/17 18/18 18/20 19/1 19/2 19/6 19/8 19/12 22/8 37/10 38/9 39/4 39/15 39/18 39/19 39/21 39/22 40/6 40/20 46/6 52/19 52/21 54/11 79/20 79/21 80/3 80/7 81/19 81/24 82/4 82/13 83/14 83/18 87/14 95/18 95/18 95/24 108/3 108/4 108/7 108/14 108/17 109/9 109/14 109/15 109/21 110/6 110/13 110/16 110/17 110/23 110/25 111/2 111/8 115/20 115/23 116/3 117/5 117/6 117/7 117/23 118/3 118/17 118/25 119/7 119/8 121/17 121/20 122/21 123/13 123/25 124/4 124/22 125/6 125/9 136/21 139/15 142/19 143/24 145/8 145/13 145/13 145/20 145/24 145/24 148/25 155/13 159/9 161/25 162/9 162/10 163/23 164/3 164/9 164/13 164/16 164/22 165/5 165/22 166/2 166/3 166/4 166/6 166/11 166/16 166/21 167/16 168/1 170/5 170/16 170/25 172/15 172/16 174/2 174/8 174/13 174/13 175/16 175/21 176/2 176/2 177/17 177/23 178/2 178/3 179/9 180/6 180/7 180/17 181/1 181/2 181/9 181/12 181/15 181/19 182/2 182/8 182/17 183/1 183/13 183/15 183/17 184/3 185/8 185/10 185/10 185/12 186/11 190/15 190/20 190/25 194/10 207/4 209/6 211/24 212/4 213/3 216/24 217/3 217/5 217/20 219/22 221/1 221/2 221/7 221/7 222/14 222/14 222/19 223/1 223/6 223/7 224/23 225/21 225/21
Judge Fischer [1] 185/10
Judge Wilson [6] 83/14 83/18 117/5 122/21 136/21 145/24
judge's [1] 174/11
judgment [2] 100/25 189/20
July [8] 17/12 17/15 18/1 18/15 18/15 20/24 25/18 198/3
June [3] 20/19 37/9 114/8
jury [3] 118/25 169/8 228/20
just [150] 8/1 9/22 15/22 21/5 22/14 23/23 27/3 28/23 29/1 30/22 35/16 36/7 38/4 38/21 40/18 43/23 44/18 45/12 45/15 48/18 49/5 50/14 51/15 52/8 52/18 52/25 56/4 57/2 58/1 62/21 63/20 63/24 64/19 66/7 67/15 70/1 70/11 71/17 71/17 73/1 76/9 76/14 76/19 77/17 77/18 77/25 84/2 84/12 86/6 86/16 87/2 88/11 88/17 89/6 93/4 94/4 100/11 100/18 101/6 101/18 102/2 103/2 103/10 107/15 109/17 111/13 116/18 117/17 117/19 118/9 118/17 119/18 126/25 127/17 131/22 132/3 133/8 135/12 136/23 137/25 139/13 140/1 142/7 143/17 143/23 145/4 147/9 148/24 149/3 149/21 150/9 151/6 152/22 153/12 154/14 154/15 154/17 154/23 155/25 157/2 157/9 157/19 157/24 162/2 162/3 162/8 163/11 163/17 164/14 166/9 166/12 168/24 170/10 170/11 173/25 182/10 182/17 184/13 184/16 186/23 188/4 193/5 193/21 195/11 201/3 203/5 203/19 203/24 204/3 204/9 205/9 205/12 205/16 207/12 208/19 210/5 211/24 212/8 212/23 214/14 214/17 217/24 218/18 221/16 222/25 226/5 226/24 226/24 228/4 228/12
justify [1] 179/12

# K

Kaplan [8] 6/24 10/21 11/16 44/11 123/9 145/3 204/13 215/24
keep [7] 83/25 92/13 92/20 95/3 217/24 223/5 223/7
keeps [4] 90/2 91/23 199/10 210/18
kept [5] 47/15 95/1 143/22 146/12 223/2
key [4] 47/18 152/16 178/4 188/4
Kim [1] 3/5
kind [21] 27/21 41/10 43/15 44/12 49/17 49/23 107/4 120/15 121/5 125/20 132/19 133/19 144/10 151/12 165/5 174/6 176/21 176/22 177/17 215/20 216/1
kinds [2] 128/20 175/5
knew [112] 9/23 14/18 17/4 22/24 27/13 33/15 33/16 35/9 41/8 41/13 42/9 42/9 47/19 54/11 54/13 54/13 54/15 54/18 57/20 57/23 58/13 60/1 61/19 61/24 62/25 64/9 64/19 67/6 73/16 74/17 75/3 75/11 75/15 77/4 80/19 80/22 81/11 87/21 91/9 91/10 91/13 102/6 102/10 102/17 107/6 107/7 107/9 108/7 108/9 108/16 109/4 109/21 110/2 110/6 110/16 111/7 116/6 117/15 119/8 133/12 137/3 138/20 138/23 138/24 139/1 144/17 144/21 145/13 150/12 152/24 153/8 154/9 156/9 161/14 161/18 163/13 173/11 180/12 180/13 180/13 180/19 180/19 183/1 191/15 191/23 191/25 192/1 192/3 192/4 192/6 192/7 193/22 195/8 195/16 195/18 195/22 196/3 196/5 196/16 197/19 198/5 198/12 198/13 205/10 205/10 209/6 213/22 213/24 214/10 221/2 225/9 225/18
know [223] 9/19 12/19 14/21 21/4 23/22 23/25 24/1 24/9 24/10 24/12 24/13 24/14 24/21 24/22 25/3 25/8 26/24 27/13 27/19 28/6 31/1 32/5 34/20 35/5 35/17 38/4 38/4 43/8 45/14 48/19 50/23 58/1 58/3 58/4 59/4 59/8 59/13 59/14 59/16 59/18 59/23 59/23 60/6 60/9 60/18 60/19 61/16 61/17 62/15 62/15 62/25 63/17 63/18 66/25 69/19 70/10 71/10 71/25 71/25 72/9 72/15 75/20 75/21 76/5 76/6 76/7 76/8 76/11 77/1 83/23 83/24 87/23 94/18 94/19 99/16 102/13 102/13 102/23 105/24 106/3 106/24 107/3 107/9 108/4 109/12 110/6 110/7 110/20 111/11 111/13 111/13 115/5 116/21 116/24 117/7 117/17 118/6 118/21 118/25 120/9 120/25 121/7 121/15 125/24 127/19 127/23 129/8 130/6 131/2 131/6 131/7 132/8 132/25 133/6 133/13 133/19 133/22 133/24 134/22 134/23 135/10 136/14 138/2 138/5 138/19 139/24 141/25 143/22 144/19 145/3 147/3 147/9 147/15 152/12 152/23 153/8 154/16 156/9 156/14 156/21 158/10 159/6 159/9 159/24 159/24 161/3 161/21 162/6 162/8 162/9 162/25 163/1 165/5 165/23 165/24 166/2 166/3 166/5 166/11 166/16 167/16 168/1 169/14 175/11 175/19 177/14 177/15 177/17 178/6 178/19 179/11 179/13 179/15 185/21 185/25 186/11 191/23 192/5 192/12 192/20 193/1 193/16 193/24 194/1 195/4 195/8 195/12 196/6 196/17 196/18 198/14 198/17 199/9 200/10 201/3 201/5 201/6 202/24 204/1 204/11 204/22 206/8 206/14 207/25 208/3 211/18 214/10 214/14 214/16 215/5 216/3 216/17 216/18 220/1 221/3 221/11 222/20 222/20 223/2 223/11 223/13 225/2 228/19
knowing [5] 23/5 34/12 181/6 183/2 211/15
knowingly [2] 226/11 226/16
knowledge [28] 33/16 35/5 41/14 58/12 58/19 62/24 74/2 74/12 75/5 80/12 87/11 109/3 111/2 116/7 116/9 116/9 133/10 139/6 142/9 142/16 144/6 147/1 175/4 178/10 178/19 185/20 193/12 215/2
known [17] 30/23 83/11 83/13 95/6 121/19 128/17 128/20 156/6 165/5 167/16 176/23 177/17 189/24 195/3 215/19 215/19 221/2
knows [11] 23/15 62/22 79/7 132/18 169/21 173/20 183/16 186/15 199/8 199/12 211/24
Koepke [4] 46/17 47/4 227/18 227/19

# L

L.A [4] 15/12 57/4 90/24 152/19
label [1] 128/8
lack [1] 127/15
lacking [1] 195/20
laid [3] 88/20 206/18 212/24
Lake [1] 3/21
Laker [2] 105/12 105/18
Laker's [1] 14/23
lands [1] 154/17
language [8] 27/21 28/19 30/2 30/16 47/17 174/7 188/2 204/4
large [8] 8/16 145/22 145/23 148/21 166/4 168/5 175/6 209/16
largely [1] 32/19
larger [1] 175/25
last [17] 8/17 16/15 23/13 29/13 72/14 105/10 105/13 105/16 132/22 143/1 152/4 156/20 159/2 159/5 159/23 182/15 213/22
lasted [1] 69/1
lastly [1] 215/5
late [4] 53/19 69/10 135/25 227/22
later [13] 14/22 18/18 57/3 75/19 105/10 119/18 130/12 130/13 131/13 158/24 172/7 201/18 212/1
latest [1] 16/21
latter [1] 164/6
launder [3] 137/14 137/15 200/17
laundering [1] 137/22
launders [1] 199/22
law [10] 2/19 3/15 3/20 35/13 41/12 45/14 45/25 127/13 165/2 223/14
lawyer [17] 19/7 21/22 39/23 57/9 57/11 58/2 63/18 63/23 83/9 85/1 135/8 138/7 138/12 139/1 160/25 173/10 183/24
lawyers [4] 63/19 134/11 146/20 216/15
laying [5] 202/1 202/5 202/6 202/7 202/11
lays [2] 92/2 215/10
lead [4] 27/25 54/23 90/11 154/4
leaders [1] 146/11
leading [1] 51/18
leads [1] 135/23
leaked [2] 143/7 143/12
learn [3] 10/13 41/20 144/5
learned [10] 13/9 26/19 33/17 51/11 51/17 57/21 72/4 75/19 156/23 219/6
learning [1] 193/1
least [21] 13/15 17/4 22/15 31/12 59/14 70/16 73/20 78/18 118/14 120/3 144/23 146/2 146/15 157/12 174/16 179/7 185/18 191/16 208/15 213/24 225/15
leave [7] 7/8 19/21 151/4 153/16 214/1 224/25 225/2
leaves [2] 79/25 186/6
led [14] 10/14 14/25 20/10 22/10 95/21 125/18 148/22 162/20 192/19 194/12 197/14 213/20 213/23 224/18
left [12] 7/10 18/13 31/10 74/23 74/24 80/3 97/13 162/7 183/12 185/22 192/22 211/24

## L


left-hand [3] 31/10 97/13 192/22
lengthy [1] 228/13
leniency [1] 198/8
lenient [1] 153/2
Leo [4] 138/8 138/8 138/9 138/11
less [5] 49/22 51/22 95/4 118/22 120/2
let [31] 16/12 18/12 22/13 55/18 70/21 73/16 77/2 84/12 84/21 108/11 111/24 113/11 114/17 116/5 118/9 133/13 142/7 143/4 146/9 151/9 154/20 166/18 175/17 195/2 195/11 196/9 196/10 196/20 217/5 224/13 228/9
let's [58] 13/10 16/9 16/14 16/21 17/8 25/25 28/25 29/6 34/17 36/24 46/11 48/18 49/13 49/24 51/14 54/4 54/24 59/25 72/17 77/4 86/8 87/15 88/17 96/7 96/8 96/9 105/13 106/3 121/3 121/24 123/2 132/12 133/24 136/19 137/5 151/8 166/1 166/3 166/19 172/20 176/24 176/25 182/22 186/18 191/25 195/2 195/3 197/16 200/23 202/10 203/5 206/10 217/10 224/15 224/15 224/17 224/21 228/1
level [8] 18/20 26/5 34/14 41/7 41/14 43/16 131/19 173/5
leverage [2] 160/6 215/21
liable [1] 218/1
lie [1] 159/8
lies [1] 185/19
lieu [1] 225/22
light [4] 119/11 154/11 154/17 170/6
like [48] 7/23 8/1 8/25 10/5 10/12 12/9 18/10 30/5 49/9 49/12 54/1 56/7 68/8 78/12 89/11 89/13 90/11 92/12 93/17 104/10 117/10 126/20 131/16 133/16 135/12 135/12 138/6 144/10 146/20 149/14 150/9 150/22 150/22 150/25 150/25 154/15 159/20 160/16 160/24 160/25 161/4 166/8 182/4 182/11 187/12 197/10 216/17 229/4
likelihood [1] 78/25
likely [7] 8/19 27/2 44/13 50/13 120/19 124/17 125/8
limit [1] 173/13
limitation [1] 214/19
limitations [2] 179/5 179/9
limited [2] 35/4 111/7
limits [2] 144/13 148/7
line [4] 40/19 84/12 124/13 146/22
lined [1] 133/21
lines [3] 13/21 62/5 227/12
list [8] 20/13 30/18 33/2 33/9 45/8 52/10 95/1 95/2
listed [4] 11/16 67/16 195/6 210/7
listen [1] 63/24
listening [2] 162/5 224/14
lists [2] 32/10 182/7
littered [1] 221/13
little [21] 14/21 17/8 33/15 33/16 35/9 41/13 51/22 80/19 80/22 84/9 97/9 100/17 105/10 117/14 117/18 118/22 121/24 164/12 178/17 180/24 214/3
lives [1] 7/4
LLP [2] 3/5 4/4
local [1] 224/17
located [1] 11/18
locks [1] 152/21
logical [1] 133/23
Lombardi [1] 224/2
London [9] 10/20 11/10 12/12 12/17 78/8 127/22 128/24 128/25 129/1
long [9] 22/15 22/20 53/13 86/16 112/11 129/6 180/7 222/6 227/20
long-standing [1] 22/15
long-term [1] 22/20
longer [1] 156/23
longstanding [1] 78/6
look [48] 8/18 27/12 28/25 30/13 34/2 49/9 65/18 65/20 65/23 68/13 73/11 84/21 89/13 97/8 102/19 104/10 106/5 120/24 121/6 123/16 138/6 142/1 144/10 156/9 157/9 157/11 160/16 161/16 161/17 162/10 165/21 173/22 174/17 179/11 187/7 191/10 192/1 201/13 202/9 204/7 205/9 211/8 217/10 217/22 217/25 217/25 219/12 222/11
looked [10] 56/7 72/7 84/14 85/22 87/23 88/6 114/7 189/23 192/15 219/12
looking [28] 9/6 14/17 35/24 39/3 39/16 43/19 43/25 44/9 46/12 47/23 73/5 83/25 86/17 114/12 114/21 117/18 134/11 173/6 188/7 188/16 191/20 200/7 206/2 215/14 215/15 215/16 215/24 216/1
looks [5] 68/8 89/11 90/11 92/12 188/21
loose [2] 66/9 66/10
loquacious [1] 25/10
LOS [21] 1/16 1/24 2/9 2/17 3/6 3/16 6/1 14/4 14/12 24/14 56/1 56/9 97/1 100/4 131/15 152/20 160/2 160/3 171/24 217/19 225/14
Los Angeles [12] 14/4 24/14 56/1 56/9 97/1 100/4 131/15 160/2 160/3 171/24 217/19 225/14
lose [2] 48/18 127/18
lost [8] 28/2 63/3 154/14 154/15 154/23 181/7 208/24 210/4
lot [14] 115/13 132/12 134/23 135/19 141/16 161/17 176/10 191/9 192/15 199/2 204/23 212/11 213/7 224/18
lots [1] 23/7
lower [10] 29/8 29/14 30/6 31/10 33/24 36/1 39/5 39/17 44/1 44/4
loyal [3] 134/6 171/7 171/13
loyalties [1] 125/25
loyalty [5] 169/13 179/23 200/5 210/10 210/12
lunch [1] 96/11
lying [1] 121/2


## M


made [35] 37/8 63/7 65/15 66/1 66/12 68/25 69/6 69/9 72/7 85/22 94/20 95/20 100/25 107/7 119/25 148/21 151/14 164/25 165/1 166/22 176/19 184/10 186/12 190/3 198/21 198/22 208/14 215/5 215/6 216/20 222/2 226/11 226/16 226/20 227/11
magistrate [1] 226/21
mail [2] 4/6 20/19
maintain [2] 93/16 151/19
maintaining [1] 78/15
major [3] 120/5 131/14 222/8
majority [1] 215/12
make [62] 17/25 21/17 26/11 26/12 28/3 30/18 30/19 31/2 33/10 35/14 36/7 37/4 40/10 42/3 43/3 44/20 45/2 49/8 63/19 64/24 68/22 81/25 82/4 82/14 82/24 83/11 84/12 84/22 85/4 85/5 85/21 88/11 104/20 115/25 118/10 124/5 124/6 124/8 134/5 135/11 136/9 145/20 151/2 151/16 163/10 168/7 168/20 175/12 176/4 184/12 185/8 187/4 194/24 216/6 217/6 221/9 221/19 221/24 222/1 222/7 222/13 225/25
makes [9] 25/7 79/20 86/22 149/18 155/9 155/17 182/15 184/5 216/9
making [7] 22/3 37/22 46/21 70/25 71/4 101/20 161/17
man [2] 201/20 215/20
manager [2] 25/14 135/3
mandates [1] 212/16
manipulate [1] 147/10
manipulated [4] 10/24 16/19 16/23 181/17
manipulation [30] 11/9 11/22 13/24 14/10 16/18 17/1 17/8 17/18 18/4 19/10 20/3 22/6 22/22 31/20 49/20 51/10 51/17 106/23 113/3 123/8 130/16 141/17 157/19 157/25 158/4 158/20 179/17 198/9 209/1 216/19
manipulations [1] 116/14
manipulator [1] 147/8
manipulators [1] 132/5
manufacture [1] 184/22
many [7] 51/16 51/20 51/25 52/4 175/5 189/22 198/21
Marc [2] 3/5 6/18
March [79] 27/5 31/18 31/21 31/22 33/13 41/18 41/20 53/10 54/10 58/12 61/20 61/20 64/9 65/3 65/17 65/21 66/24 67/22 68/3 69/11 69/23 70/12 71/21 72/9 72/11 73/18 74/17 75/21 76/6 76/7 76/8 76/10 77/5 77/9 77/11 77/12 83/17 84/1 87/12 87/16 87/21 88/6 89/1 89/17 89/25 91/10 91/13 91/22 92/4 92/10 92/17 92/23 93/3 93/9 95/6 100/15 100/18 101/6 101/8 101/15 101/21 103/12 114/6 114/10 115/2 115/7 128/7 130/10 141/1 141/19 142/5 143/6 143/20 144/2 144/18 145/7 145/15 175/3 207/17
mark [6] 2/7 6/10 7/23 27/20 195/12 195/13
marked [3] 28/9 28/22 68/16
market [19] 11/9 11/22 12/9 13/24 14/9 20/3 49/20 51/10 51/17 106/23 113/3 116/14 123/8 141/17 157/19 157/25 158/4 158/20 209/1
master [1] 146/12
match [1] 198/20
Matech [15] 12/12 12/12 15/23 16/1 16/14 16/15 16/18 16/22 17/1 17/3 17/8 17/18 20/6 20/16 20/17
material [8] 25/23 26/2 26/20 112/9 190/22 190/24 194/8 194/16
materiality [4] 187/20 190/13 190/18 191/2
materials [2] 15/16 26/13
matter [15] 8/9 11/22 19/5 26/20 31/20 36/19 50/16 86/20 104/16 125/1 146/4 149/22 150/20 194/16 202/14
matters [6] 7/18 7/21 7/23 7/25 8/1 119/6
maximum [1] 227/21
may [44] 7/14 7/17 8/4 10/1 16/13 18/8 18/13 19/25 21/2 21/9 28/7 28/21 37/9 38/22 38/23 44/8 46/9 48/3 51/14 64/1 66/4 78/19 80/15 86/14 95/14 116/3 123/8 129/22 131/9 132/10 132/11 132/12 143/15 150/18 150/23 154/23 162/8 181/6 184/21 187/10 188/24 203/2 203/7 215/25
maybe [34] 24/9 42/11 105/9 105/9 110/24 120/7 120/23 132/2 135/25 147/6 151/4 156/2 156/4 158/12 162/14 162/18 162/18 162/21 163/16 164/11 164/20 168/6 168/17 174/16 187/3 187/6 194/24 198/20 199/3 202/22 205/22 214/2 222/17 222/19
Maytag [3] 16/10 18/3 19/18
Maytech [1] 198/4
Mazur [332]
Mazur's [46] 33/18 41/13 54/4 54/8 54/11 54/25 55/13 55/23 58/10 59/21 61/9 62/9 64/17 66/13 66/19 68/6 72/7 72/10 73/12 74/21 74/23 75/17 76/3 76/16 82/13 91/1 94/18 96/4 97/17 101/21 103/5 103/15 108/13 109/5 115/24 120/6 127/14 145/5 145/14 145/23 145/25 218/10 219/2 219/6 224/16 225/9
Mazur/Possino [1] 77/16

## M

McCutchen [1] 4/4
me [126] 13/19 13/21 14/3 14/8 14/11 14/13 14/22 14/24 15/10 16/12 17/1 18/10 18/12 21/14 21/20 22/13 23/18 23/25 26/10 33/8 36/1 37/18 38/11 40/13 44/17 46/22 47/2 51/13 55/18 63/13 65/25 66/3 67/2 67/10 69/17 70/2 70/13 70/21 71/15 73/16 77/2 83/14 83/21 83/23 84/12 84/21 90/7 105/2 106/5 106/9 106/21 107/9 107/19 108/11 108/25 111/24 113/2 113/8 113/11 114/14 114/17 116/18 117/19 118/9 118/22 118/23 120/2 120/12 120/18 121/11 121/18 122/15 125/3 129/9 129/21 132/17 134/4 134/20 142/7 143/2 143/4 145/7 145/17 146/9 147/9 147/25 148/17 151/9 154/7 154/14 154/20 154/23 154/25 155/7 156/18 157/9 162/20 163/11 166/18 172/11 174/18 176/25 179/11 180/11 182/6 182/10 191/1 195/2 195/11 196/9 196/10 196/20 197/6 201/1 205/4 208/9 209/4 210/5 219/5 221/1 222/2 224/13 225/20 228/9 228/11 229/2
mean [82] 27/25 31/25 33/4 35/23 38/5 42/10 42/19 43/13 44/25 45/1 53/2 57/19 57/22 63/22 65/18 81/15 81/18 94/1 94/2 94/3 102/14 107/14 108/9 118/14 120/22 121/1 126/18 129/10 129/18 129/18 130/10 132/20 133/1 133/5 133/20 133/22 134/23 135/18 137/2 137/5 138/18 142/3 143/22 143/23 144/21 145/5 158/6 158/9 158/10 164/2 168/25 170/20 174/6 174/7 176/23 178/1 178/12 183/8 183/9 191/16 194/2 194/19 194/22 194/23 196/14 196/15 202/2 202/20 202/21 203/7 203/25 204/6 204/7 204/22 212/25 213/1 213/21 214/23 226/22 226/23 226/25 227/1
meaning [4] 36/16 39/13 189/2 206/10
meaningful [1] 17/25
means [6] 44/18 82/25 158/12 185/2 205/16 206/8
meant [7] 18/22 28/4 196/11 196/14 198/23 208/1 208/6
measure [2] 72/15 166/4
meat [1] 43/24
medical [1] 37/13
meet [7] 60/15 120/15 188/14 201/24 202/2 212/22 221/18
meeting [2] 135/10 146/14
meetings [1] 19/14
meets [1] 172/9
member [2] 136/5 215/23
members [1] 47/14
memo [6] 21/14 46/25 60/16 60/21 82/20 88/20
memorandum [1] 196/1
memorialize [1] 48/13
memory [3] 29/24 33/12 71/16
Memphis [1] 91/24
Mendiratta [249]
Mendiratta's [24] 21/10 21/13 22/3 30/22 39/22 39/23 39/25 54/2 63/8 152/9 152/25 153/4 155/16 163/19 167/24 181/12 183/3 192/18 193/4 197/2 213/20 219/3 225/9 225/11
mental [3] 57/24 187/20 188/21
mention [20] 35/10 55/7 55/24 65/4 76/14 80/4 83/16 126/15 127/2 127/9 127/13 155/19 156/1 161/7 198/19 199/18 199/18 200/21 200/21 200/22
mentioned [28] 15/6 15/11 16/1 16/15 22/7 24/5 26/1 34/19 50/18 65/22 122/25 122/25 125/25 141/14 141/15 156/6 156/10 157/13 157/23 161/23 162/15 162/23 174/21 187/24 192/4 195/13 207/25 224/19
mentioning [2] 127/8 162/19
mentions [1] 44/11
message [1] 217/15
met [6] 56/8 56/13 62/19 74/22 178/5 194/21
methodology [1] 27/7
methods [1] 185/5
mharris [1] 3/8
mid [1] 14/6
middle [10] 30/6 36/1 36/3 68/17 90/14 90/20 136/2 159/19 169/7 218/23
might [20] 10/13 12/22 28/4 35/17 67/13 97/10 103/22 126/12 133/12 153/15 153/20 161/14 162/9 182/3 208/23 209/22 221/7 222/15 224/1 225/1
migrated [1] 225/6
million [26] 60/22 61/21 62/18 64/5 65/1 67/16 67/16 67/19 73/24 82/20 83/4 85/2 88/21 90/17 91/3 91/4 91/4 91/13 95/19 127/22 129/2 175/8 175/10 183/24 218/17 222/23
mind [40] 9/6 13/4 16/17 20/13 25/11 26/4 29/6 30/5 31/6 31/15 32/9 32/23 33/23 35/20 39/3 39/5 43/19 43/25 44/16 46/2 46/12 47/6 47/23 48/21 61/9 78/18 83/2 83/10 86/17 119/25 142/4 150/12 159/8 160/5 161/7 161/9 164/16 182/9 189/7 207/8
minds [1] 151/7
mindset [2] 211/9 213/16
Mine [1] 99/13
Minerals [3] 20/2 20/14 20/15
minimization [7] 149/15 150/19 151/3 151/5 227/14 228/5 228/10
minimize [1] 181/13
minimum [4] 129/11 179/10 185/15 186/16
Mining [2] 20/2 20/15
minutes [2] 69/1 91/8
mislead [22] 46/6 159/8 164/22 164/25 166/6 166/14 166/21 190/3 190/10 212/18 212/20 212/22 223/6 223/8 224/6 224/10 225/1 225/21 226/7 226/8 226/20 226/21
misleading [9] 153/20 155/12 155/14 155/18 163/19 170/25 172/21 179/15 189/4
misled [2] 164/13 213/3
missed [1] 163/17
missing [2] 141/12 171/9
misspoke [1] 51/21
misstatement [1] 190/18
misstatements [1] 188/18
Misstates [1] 82/9
mistakes [1] 188/19
misunderstood [1] 114/1
mix [1] 28/3
moment [16] 28/23 29/1 38/21 40/18 52/8 66/4 84/21 90/19 103/3 113/5 123/4 143/15 147/19 173/5 195/12 210/5
money [11] 133/25 134/5 137/22 138/1 144/14 144/17 144/22 147/21 199/22 200/17 215/20
Monica [1] 4/5
monitored [17] 64/24 66/1 67/2 67/3 69/10 70/17 70/22 71/4 82/21 83/5 95/20 107/7 107/25 148/22 183/25 221/4 221/10
Montana [5] 224/16 224/17 225/6 225/7 225/16
month [5] 13/12 17/10 115/4 130/12 140/24
months [7] 8/17 13/15 84/5 115/8 115/11 130/13 221/17
mor [1] 115/14
more [44] 9/23 16/5 17/9 17/25 19/21 23/10 30/3 32/16 34/15 43/16 47/25 50/4 51/15 63/13 76/9 83/2 83/9 85/16 97/10 109/12 120/19 124/6 127/1 130/19 133/15 134/8 140/4 144/25 145/2 167/18 173/24 179/3 179/11 179/13 180/1 189/19 191/15 197/8 201/7 205/14 209/3 211/25 222/23 224/1
Moriarty [4] 138/10 138/11 138/16 138/20
morning [13] 6/9 6/15 6/18 6/23 6/25 7/2 8/4 8/5 8/6 76/20 228/21 228/22 229/4
most [14] 8/18 11/7 27/2 49/19 94/16 156/15 164/20 188/8 195/18 195/20 197/10 215/8 215/12 223/18
motion [7] 31/8 31/16 171/11 176/10 214/6 217/14 225/11
motive [1] 105/7
mouth [1] 143/16
move [9] 10/5 25/22 46/11 49/24 132/18 133/15 149/22 150/4 150/19
moved [2] 25/18 119/11
moving [1] 151/9
Mr [47] 6/20 6/22 7/6 21/4 21/4 39/14 55/25 58/25 59/21 60/11 60/15 60/15 61/21 62/24 64/23 65/15 66/1 66/9 69/20 76/2 79/5 80/4 93/8 104/14 104/22 104/23 106/6 106/7 112/1 112/7 112/16 112/19 123/17 126/3 129/12 135/9 135/14 144/24 145/19 179/3 180/11 181/20 187/9 217/10 218/13 218/14 218/18
Mr. [167] 7/7 7/9 8/19 9/13 19/8 21/22 28/15 34/15 34/21 36/6 36/8 36/11 46/1 46/16 46/20 47/5 49/1 54/2 54/25 55/11 55/13 55/14 55/19 56/19 56/22 56/25 57/8 57/12 58/10 58/16 59/6 60/1 60/7 60/13 60/16 60/22 60/23 61/5 61/9 61/13 61/14 61/20 62/2 62/7 62/16 63/4 63/6 63/7 63/8 63/10 64/4 64/12 64/17 64/25 66/12 66/13 67/6 67/18 67/25 68/6 68/10 68/25 69/9 69/18 70/11 71/10 71/18 71/19 71/22 72/2 74/11 74/18 74/21 75/6 75/16 75/17 76/3 78/6 78/7 79/7 79/8 79/25 80/1 80/2 80/8 85/10 86/3 87/2 88/20 88/22 90/15 102/6 102/6 102/7 102/10 102/16 102/20 104/1 104/22 104/23 105/1 105/12 105/22 106/4 106/15 106/18 107/7 108/13 111/24 111/25 112/8 112/14 113/6 113/24 114/19 117/11 123/4 123/20 124/2 124/3 124/4 128/8 128/11 135/10 139/14 142/5 142/7 142/10 143/11 143/18 143/18 144/1 144/13 144/17 145/5 145/6 145/23 149/13 150/9 168/6 168/14 171/12 172/13 177/24 177/24 178/18 179/8 180/4 180/9 180/20 182/7 182/19 185/16 185/19 188/10 190/12 200/17 209/20 209/22 216/25 217/6 219/1 219/2 219/7 224/15 224/19 226/5
Mr. Angelastri [1] 200/17
Mr. Aveis [1] 63/7
Mr. Berger [5] 143/18 143/18 144/1 144/13 179/8
Mr. Bertrand [7] 56/19 56/22 56/25 60/13 60/16 60/22 105/12
Mr. Bowman [13] 28/15 34/15 36/6 36/11 46/1 46/16 46/20 47/5 49/1 117/11 185/16 216/25 217/6
Mr. Bowman's [1] 34/21
Mr. Cline [1] 19/8
Mr. DeBretteville [1] 149/13
Mr. Finnegan [2] 71/18 71/19
Mr. Finnegan's [1] 68/25
Mr. Finnigan [2] 219/1 219/7
Mr. Goldman [9] 102/6 102/7 102/10 102/20 104/22 105/1 106/4 111/24 111/25
Mr. Hochman [12] 7/9 8/19 36/8 63/4 85/10 87/2 150/9 168/6 168/14 190/12 209/20 226/5
Mr. Mazur [74] 55/11 55/14 55/19 57/8

## M

Mr. Mazur... [70] 57/12 58/16 59/6 60/1 60/7 60/23 61/5 61/13 61/14 61/20 62/2 62/7 62/16 63/10 64/4 64/12 64/25 66/12 67/6 67/18 67/25 68/10 69/9 69/18 70/11 71/10 71/22 72/2 74/11 74/18 75/16 79/7 79/25 80/8 86/3 88/20 88/22 90/15 102/6 102/16 104/1 104/23 105/22 106/15 106/18 107/7 112/8 112/14 113/6 113/24 114/19 123/20 124/2 124/3 124/4 128/8 128/11 139/14 142/5 142/7 142/10 143/11 144/17 145/6 177/24 178/18 182/19 185/19 209/22 224/15
Mr. Mazur's [14] 54/25 55/13 58/10 61/9 64/17 66/13 68/6 74/21 75/17 76/3 108/13 145/5 145/23 219/2
Mr. Mendiratta [6] 63/6 171/12 177/24 180/4 180/20 182/7
Mr. Mendiratta's [2] 54/2 63/8
Mr. Nix [1] 80/2
Mr. Possino [7] 75/6 78/6 79/8 80/1 123/4 188/10 224/19
Mr. Possino's [1] 78/7
Mr. Rubin [1] 7/7
Mr. Tarwater [1] 135/10
Mr. Weichert [1] 21/22
Mr. Wilner [2] 9/13 172/13
Mr. Wilner's [1] 180/9
Ms [1] 39/14
Ms. [6] 168/16 170/23 171/11 171/16 171/18 177/14
Ms. Uyeda [6] 168/16 170/23 171/11 171/16 171/18 177/14
much [9] 20/8 23/22 86/22 133/8 146/25 186/21 191/14 194/22 219/16
multidigit [1] 39/6
multimillion [3] 23/6 198/25 199/7
multipage [1] 46/11
must [5] 94/3 161/6 176/2 190/1 223/15
my [68] 7/11 8/15 12/20 13/4 13/13 15/18 15/21 18/1 24/4 26/5 26/7 26/9 27/12 30/2 30/16 34/10 38/22 39/13 45/22 46/22 48/12 54/14 55/5 56/3 56/23 57/13 59/1 59/7 71/16 77/2 84/17 87/11 110/21 111/15 112/12 113/7 116/9 122/7 126/12 126/17 128/2 131/19 135/8 138/15 139/9 139/25 142/6 142/9 142/16 143/17 153/9 154/14 156/25 162/8 162/22 164/12 175/15 175/15 177/7 177/8 178/17 180/24 190/23 191/5 193/6 210/15 212/19 227/4
myself [5] 28/15 36/5 36/10 108/25 153/11
mystery [1] 226/25

## N

N.Y [2] 197/8 197/9
nab [1] 203/19
nailing [1] 24/7
name [21] 23/9 23/9 23/9 23/10 48/10 71/25 80/12 94/4 94/4 94/6 94/7 94/7 138/8 138/16 139/1 139/8 167/6 168/24 168/25 173/3 175/12
named [4] 12/19 19/7 30/17 35/8
names [6] 23/23 59/14 147/10 169/3 199/8 216/16
naming [7] 169/16 207/7 207/10 207/12 207/13 207/22 208/2
narrative [1] 23/16
narrow [1] 31/9
Nathan [2] 4/3 6/20
nathan.hochman [1] 4/6
nature [5] 24/1 71/15 116/20 155/15 191/2
nearly [1] 52/11
necessarily [3] 202/21 206/22 213/1
necessary [6] 63/23 118/17 118/19 145/18 161/1 189/21
necessities [1] 109/10
necessity [39] 29/23 34/5 36/16 36/24 41/4 41/17 42/1 45/2 73/4 79/17 108/18 109/11 109/15 109/18 110/18 111/3 111/5 117/9 119/1 122/23 127/4 130/7 145/11 165/20 166/7 168/23 173/12 173/16 176/6 178/5 183/9 183/10 183/17 184/22 188/9 188/9 204/3 207/4 223/4
need [15] 21/4 37/23 40/15 40/22 68/13 87/14 109/18 127/12 139/4 162/10 182/6 182/9 185/1 227/21 228/3
needed [20] 21/23 22/4 27/18 27/23 30/2 34/15 36/12 36/25 53/15 53/17 114/15 114/15 124/4 124/8 145/8 145/13 151/20 178/22 187/21 224/7
needs [2] 135/17 174/13
negative [1] 194/12
negativity [1] 38/17
negligence [2] 188/19 189/19
negligent [7] 120/20 121/9 205/12 205/16 205/20 205/22 219/18
neither [2] 185/2 186/2
net [7] 91/2 182/9 182/12 182/16 183/18 184/21 216/1
nets [1] 183/22
netting [1] 182/20
network [7] 10/24 81/8 81/8 130/16 132/1 133/13 203/22
networks [1] 131/23
never [20] 23/16 25/4 42/23 63/18 101/14 102/7 102/10 102/15 104/2 104/14 105/11 139/9 142/7 142/10 143/23 156/10 171/13 220/5 224/14 225/6
nevertheless [1] 196/1
new [29] 24/15 31/19 32/1 37/12 41/20 48/8 49/19 79/24 80/6 130/16 130/16 152/21 153/10 157/1 160/2 161/21 171/20 172/4 197/1 197/21 197/24 197/25 198/4 198/9 200/23 201/10 206/16 206/21 208/24
New York [3] 49/19 157/1 172/4
Newport [2] 3/11 3/11
next [18] 28/17 28/17 40/8 46/24 94/14 98/4 100/10 124/13 135/23 146/16 146/22 172/8 178/9 178/21 222/1 228/2 228/19 228/20
night [2] 26/25 201/16
nine [1] 194/12
Ninth [8] 121/20 184/20 191/7 203/23 212/14 212/24 224/1 224/4
Nix [33] 6/22 6/22 10/18 11/6 11/8 11/21 12/14 13/3 15/25 17/2 23/21 47/15 80/2 81/8 128/4 130/16 130/24 131/17 131/20 132/23 135/25 144/9 146/12 146/18 147/17 152/3 156/3 157/14 157/23 169/13 201/21 203/20 210/10
no [139] 1/9 6/4 6/5 23/15 38/8 46/7 46/10 50/20 50/20 50/21 51/6 52/17 54/9 55/6 55/7 55/7 55/21 55/22 56/21 56/23 56/23 57/11 57/11 57/17 59/7 60/6 61/2 62/9 62/13 62/24 66/3 67/5 67/23 68/3 71/21 73/25 75/22 78/17 78/23 78/24 82/1 82/1 82/18 85/7 87/13 89/2 89/18 90/1 91/15 92/5 93/4 93/10 100/16 101/11 103/9 104/2 104/2 104/17 105/19 106/9 107/12 107/19 109/3 109/12 114/8 114/14 116/24 117/2 117/17 118/24 123/19 123/19 123/24 123/24 124/25 125/9 139/6 139/7 139/8 140/12 141/11 141/19 142/9 142/9 142/13 142/16 142/23 143/9 144/3 144/19 144/25 145/17 145/18 145/18 145/22 145/23 146/3 146/7 146/7 146/8 146/10 146/10 149/3 149/6 149/8 149/9 153/11 156/23 158/4 158/6 164/11 168/9 172/22 172/25 181/11 181/14 183/22 193/11 193/12 193/14 194/4 194/17 196/12 202/12 203/6 205/2 209/12 210/18 210/18 211/1 211/21 216/11 218/12 224/11 224/21 224/22 225/4 226/25 228/22
No. [27] 14/10 34/2 36/2 50/12 70/25 71/5 71/8 76/24 78/4 79/9 88/13 90/8 99/14 99/25 128/14 128/16 130/3 139/17 139/22 139/25 141/6 141/9 151/22 151/24 152/5 152/7 175/15
No. 1 [18] 14/10 50/12 70/25 76/24 78/4 79/9 128/14 128/16 130/3 139/17 139/22 139/25 141/6 141/9 151/24 152/5 152/7 175/15
No. 119 [1] 34/2
No. 1e [1] 151/22
No. 2 [1] 71/5
No. 21 [1] 99/14
No. 22 [1] 99/25
No. 3 [1] 71/8
No. 646 [1] 88/13
No. 674 [1] 90/8
No. 759 [1] 36/2
nobody [2] 162/13 174/21
none [6] 85/23 108/13 141/18 141/20 170/3 182/19
nonetheless [1] 10/8
nonstarter [1] 38/13
nonsubjects [1] 42/24
Noon [1] 96/13
nor [2] 174/2 186/2
normal [1] 45/6
normally [1] 60/4
North [3] 1/24 2/9 4/4
not [353]
note [14] 6/12 19/6 32/10 35/21 36/3 44/20 127/3 169/10 170/11 189/12 199/4 206/5 206/9 208/18
noted [7] 12/11 12/16 40/13 55/19 67/20 207/6 227/11
notes [5] 30/18 136/6 169/18 170/10 214/3
nothing [13] 57/22 83/25 113/20 125/23 129/19 129/20 154/8 154/18 158/15 160/7 176/23 189/19 212/4
notice [1] 83/22
noticed [3] 25/10 83/23 157/24
noticing [2] 25/14 39/5
notify [1] 228/4
noting [2] 101/1 227/10
notion [1] 197/13
notwithstanding [5] 10/7 153/8 153/24 181/5 181/19
now [80] 9/23 10/5 12/14 17/3 18/4 18/19 19/21 19/25 21/12 25/17 25/19 54/1 55/25 57/8 60/15 64/11 64/17 68/20 69/22 72/5 74/17 77/21 85/25 89/19 91/7 92/16 93/20 94/3 95/7 95/7 98/4 99/25 100/19 101/17 101/24 102/19 104/3 104/22 106/3 106/13 107/2 117/5 118/12 120/15 126/3 141/8 142/20 149/19 153/13 154/14 154/20 156/8 157/9 157/10 157/24 158/13 159/7 164/13 168/17 170/8 172/1 172/12 180/17 181/4 182/2 197/16 199/17 200/8 202/22 204/19 209/11 211/18 212/1 217/8 217/14 219/22 221/9 222/20 227/14 227/22
nowhere [1] 106/25
number [15] 4/6 44/5 72/19 97/16 97/22 97/22 97/25 98/5 154/25 163/2 182/13 182/15 211/18 211/24 212/7
numbers [11] 29/8 29/9 29/13 39/6 49/10 49/11 49/12 68/23 101/19 101/20 219/11
numerous [3] 20/10 141/14 141/15
nutshell [1] 94/17

## O


object [4] 52/19 57/16 61/7 82/8
objection [3] 17/20 44/17 107/12
objective [10] 166/25 167/19 188/11 188/22 189/4 189/5 189/6 189/7 189/8 189/12
obligation [1] 197/24
obligations [1] 172/23
observed [1] 121/3
obstreperous [1] 86/15
obtain [2] 22/9 37/12
obtained [1] 179/7
obviate [1] 111/5
obvious [3] 38/12 135/19 195/4
obviously [14] 14/1 57/2 70/4 78/23 104/3 114/15 171/12 178/7 178/23 186/6 211/23 219/24 221/6 224/23
occasions [1] 209/21
occur [1] 145/17
occurred [4] 13/12 26/21 105/21 219/8
occurring [1] 62/6
occurs [1] 157/9
October [5] 10/16 11/7 13/13 92/8 115/9
odd [1] 147/9
odds [1] 208/14
off [7] 7/8 7/10 21/5 112/12 134/5 154/24 186/6
offense [2] 181/13 181/14
offenses [2] 33/20 51/24
offer [11] 21/17 22/18 30/25 31/2 32/15 37/4 38/22 97/21 127/25 200/22 203/13
offered [1] 191/21
offering [3] 90/17 123/13 201/2
office [28] 2/16 14/4 14/4 14/5 14/12 15/12 19/4 24/14 24/15 26/10 39/13 54/3 56/1 56/8 56/9 57/2 57/3 57/4 59/12 60/9 83/7 90/11 100/4 103/11 141/23 217/23 225/14 225/15
officer [2] 90/3 91/24
officers [1] 11/16
offices [4] 2/19 3/15 3/20 146/21
official [1] 176/1
officials [1] 188/21
offshore [1] 137/17
often [1] 27/18
oh [13] 39/12 40/3 40/4 45/18 77/23 113/22 137/4 160/15 165/13 165/13 165/13 211/2 223/11
okay [62] 7/13 8/3 19/23 21/25 24/24 29/3 29/22 30/10 32/7 38/20 40/4 44/7 48/3 50/4 72/21 73/9 73/11 76/5 77/13 84/21 86/4 87/14 88/7 88/16 90/13 91/18 93/2 95/13 96/3 97/11 98/2 99/1 99/7 99/14 106/13 107/17 110/5 110/11 112/6 113/11 121/5 122/6 122/13 122/18 137/14 148/13 148/15 149/11 149/17 157/8 163/24 164/4 165/21 167/22 168/4 169/5 170/7 177/6 182/4 187/9 200/19 229/7
old [2] 93/18 223/14
omission [15] 151/14 151/14 164/25 165/24 166/1 189/19 190/2 194/8 212/11 212/12 212/20 212/20 212/21 226/11 226/17
omissions [10] 164/24 165/1 177/15 188/18 190/10 190/23 191/2 212/18 212/23 226/19
omit [4] 46/6 119/5 164/21 211/11
omitted [10] 121/21 160/10 160/11 160/12 165/19 166/3 177/12 188/25 189/16 226/6
omitting [4] 112/9 164/18 187/17 191/25
on [265]
on-air [1] 68/22
once [8] 36/11 49/5 95/3 111/5 125/6 133/5 136/16 176/18
one [134] 7/19 7/19 8/12 10/23 12/23 14/12 15/24 17/14 17/17 18/7 18/16 18/25 19/2 21/9 22/9 22/17 23/12 23/15 26/1 28/23 29/1 29/7 30/8 31/6 31/15 39/6 39/10 47/3 56/11 59/14 66/2 66/4 66/9 66/10 66/22 67/3 68/11 72/6 73/1 74/15 75/18 76/1 76/7 76/9 76/14 76/21 77/18 77/25 78/3 79/4 79/17 79/23 80/11 81/11 81/15 84/21 88/5 89/21 90/3 90/19 91/25 96/12 99/21 100/11 101/13 104/14 108/21 108/22 109/10 109/21 110/16 111/19 124/14 125/7 126/15 127/3 130/15 132/6 132/6 134/2 135/14 139/16 139/22 140/18 141/4 141/25 143/15 144/12 146/9 146/10 146/10 146/18 147/12 151/13 152/20 159/23 161/4 162/20 163/11 164/18 164/24 168/16 169/18 170/15 174/13 178/6 178/9 182/13 185/20 186/9 188/7 191/18 197/10 198/22 199/11 200/10 200/20 204/14 204/17 204/19 204/21 204/22 204/24 213/24 216/18 216/22 220/15 220/24 221/1 223/21 227/10 227/17 227/17 227/18
one o'clock [1] 96/12
one-page [1] 100/11
one-word [1] 204/19
ones [2] 49/20 101/18
ongoing [16] 40/7 63/11 64/6 95/20 130/11 157/17 157/17 157/18 157/25 158/1 158/4 158/9 158/12 158/16 159/2 171/8
only [39] 17/21 25/9 41/25 42/16 58/19 63/8 63/17 64/12 67/19 69/14 71/10 71/13 76/5 91/19 93/12 100/24 102/23 108/21 108/22 118/6 122/22 129/12 132/17 155/3 161/4 169/25 170/5 173/22 174/8 183/20 185/10 191/20 200/10 200/21 203/16 203/17 204/21 214/3 216/11
onwards [1] 179/22
Op [2] 29/19 29/20
open [2] 21/23 217/23
opened [1] 90/24
opening [3] 88/18 89/3 89/10
Operation [1] 29/21
opinion [6] 110/21 110/22 110/22 142/6 176/8 197/15
opportunity [4] 7/21 8/2 23/3 33/7
oppose [1] 22/9
opposed [4] 125/16 128/4 130/12 226/7
opposing [1] 52/12
opposite [1] 188/15
or [233]
orally [1] 74/7
orchestrates [1] 136/15
order [11] 31/21 51/22 63/10 87/23 123/25 123/25 145/8 145/14 147/14 173/13 174/4
organized [1] 49/22
originally [2] 52/12 59/19
ostensibly [1] 199/5
Otero [1] 7/7
other [115] 8/12 12/8 19/17 20/10 23/20 25/6 25/6 35/18 37/16 37/20 42/2 42/8 42/10 42/18 42/21 42/23 43/14 43/24 45/9 47/16 48/9 50/5 62/6 75/15 76/7 76/19 76/21 76/23 81/11 83/3 84/10 93/18 96/1 96/4 103/18 109/10 112/21 113/10 116/12 119/20 120/8 121/9 124/17 125/3 125/8 127/21 127/23 128/24 130/20 130/22 131/2 132/6 132/14 136/2 136/3 137/12 141/14 141/25 142/16 142/22 144/4 145/17 146/17 146/20 147/2 149/3 149/12 152/11 153/16 154/1 156/6 156/10 157/18 158/2 158/16 159/13 159/14 163/25 164/2 164/13 168/19 169/14 169/18 170/1 173/7 177/10 189/5 191/3 191/19 193/25 194/4 197/14 198/19 199/9 199/10 200/6 200/12 202/10 204/2 205/15 206/18 209/11 210/12 213/14 213/24 216/2 216/5 217/16 219/17 223/16 223/21 227/8 227/9 227/12 228/5
others [15] 11/8 11/21 14/9 31/18 42/12 43/4 44/11 47/15 52/2 123/9 126/24 134/6 162/25 181/23 202/24
otherwise [3] 52/3 121/2 228/4
ought [1] 164/11
our [29] 8/21 11/23 13/19 13/22 14/4 14/10 15/20 19/4 19/9 21/25 29/21 35/4 60/9 91/7 105/14 106/21 113/2 133/24 158/18 167/10 176/5 181/20 197/7 214/6 214/22 215/9 217/2 217/3 217/14
out [101] 19/12 19/13 19/20 22/5 27/14 27/22 27/22 36/12 45/16 54/6 68/24 75/17 76/1 77/18 79/25 80/3 85/10 88/20 92/2 94/10 95/22 97/22 97/22 97/24 99/13 104/21 106/25 109/4 109/5 110/13 117/6 121/10 123/5 132/22 133/4 135/20 136/12 138/3 139/5 139/17 143/16 152/22 153/17 154/8 159/11 161/4 161/18 161/22 162/7 172/3 173/25 177/22 179/5 179/17 182/9 182/12 182/16 182/21 182/24 183/12 183/18 183/22 184/16 185/22 187/6 189/13 193/5 193/20 200/4 200/6 201/12 201/22 202/1 202/5 202/6 202/7 202/11 202/23 202/24 206/18 209/25 211/12 211/13 212/3 212/24 214/1 214/5 214/14 214/17 214/23 215/10 216/12 216/14 219/21 220/20 224/23 224/25 225/2 225/4 225/5 229/3
outlined [1] 150/24
outside [2] 51/20 78/25
outweigh [3] 123/9 124/3 184/7
outweighed [1] 44/15
over [14] 8/16 12/15 24/5 36/6 50/9 97/8 115/4 147/23 178/24 179/17 193/20 193/20 202/10 212/1
overall [1] 117/11
overbroad [1] 82/8
overlooked [1] 205/16
overseas [6] 138/5 199/20 199/22 200/16 200/18 215/17
oversees [1] 12/7
oversight [1] 120/19
overstated [3] 68/2 91/3 91/12
overstatement [4] 67/9 67/10 67/15 67/16
overt [1] 215/12
Owens [2] 192/19 213/24
own [7] 23/6 172/23 176/13 182/9 217/22 218/6 225/6
owner [1] 135/3


## P


P.C [2] 33/19 117/12
p.m [1] 97/1
P.R [1] 132/18
packet [3] 75/20 75/23 75/25
page [57] 28/17 28/17 30/6 30/6 32/24 33/23 33/25 34/2 34/4 34/9 36/1 40/6 40/8 44/1 44/5 45/8 45/23 46/1 46/12 47/7 47/23 48/22 68/10 68/15 68/16 68/16 72/19 73/2 73/8 77/23 79/13 79/14 79/15 80/5 82/3 86/17 88/10 88/12 89/19 90/7 90/13 90/20 91/23 92/6 97/12 98/7 99/7 100/11 115/18 122/14 148/7 148/11 169/6 169/8 174/1 174/1 187/25
page 90 [1] 79/15
paged [1] 92/11
pages [14] 1/10 28/21 29/12 39/18 43/20 43/22 46/24 53/13 54/7 82/12 86/16 88/19 141/25 163/6
paid [1] 75/1
pains [1] 156/20
paint [1] 170/6
paper [5] 153/3 188/17 188/23 214/9 216/11

## P


para [1] 73/11
paragraph [59] 30/13 34/18 35/21 36/2 39/19 41/2 42/21 44/6 44/9 44/10 48/13 72/24 72/24 73/4 73/12 73/20 73/25 75/16 77/6 77/15 77/22 77/23 78/12 79/12 79/13 80/4 80/9 80/16 90/20 117/6 118/5 119/20 122/14 122/21 122/22 123/5 123/19 123/20 125/24 126/5 126/5 134/17 142/20 148/11 153/24 157/4 157/4 157/10 162/12 163/11 173/21 173/22 173/24 177/20 178/15 178/21 179/14 184/5 208/4
paragraphs [4] 35/20 146/2 148/6 178/18
parallel [2] 22/2 32/6
parse [2] 150/9 164/17
part [47] 16/11 24/19 43/22 50/2 50/11 52/10 57/14 60/3 60/25 63/17 65/1 65/13 66/19 69/17 69/25 70/16 70/20 71/17 75/20 76/13 93/7 101/8 105/13 105/25 109/14 118/4 119/1 123/2 128/13 130/2 138/2 139/2 154/7 158/23 159/9 161/21 168/5 173/17 175/25 185/17 210/8 213/12 213/12 217/2 224/10 225/10 225/10
parte [1] 21/21
participants [1] 33/17
participate [4] 20/6 60/25 144/24 208/25
participated [4] 17/1 102/21 144/23 214/25
participates [1] 112/10
participating [3] 61/13 106/23 123/8
participation [1] 144/25
particular [29] 27/3 27/7 34/4 34/17 41/2 41/10 43/7 46/5 48/13 67/1 93/21 98/10 98/22 101/13 108/5 109/7 109/22 115/13 123/19 123/24 142/3 169/6 170/10 173/6 174/18 187/14 197/8 209/23 211/16
particularly [9] 67/2 105/22 107/23 108/1 187/15 188/8 189/17 189/25 209/9
parties [4] 8/8 13/9 28/8 52/12
partner [2] 78/7 178/15
partners [4] 169/13 172/18 210/10 210/13
partnership [1] 13/25
parts [5] 70/20 81/7 86/7 104/9 140/15
party [1] 151/9
Pasadena [1] 3/21
passed [1] 37/7
past [30] 33/18 43/8 43/12 54/2 54/8 81/13 110/8 110/19 111/20 112/19 115/24 116/14 117/8 119/9 119/10 125/2 145/5 153/12 157/20 160/13 161/19 163/14 163/14 163/14 163/19 195/19 202/21 204/18 210/13 211/3
patter [1] 174/6
pattern [9] 160/8 171/18 171/19 172/5 172/16 180/3 201/25 202/5 202/6
Paul [5] 14/13 15/11 56/13 56/16 228/14
paused [5] 121/21 179/10 180/8 182/3 182/3
pay [1] 147/15
peculiar [1] 156/19
penalty [1] 25/7
pending [2] 201/6 207/21
penny [2] 131/15 133/21
people [58] 23/7 23/21 24/5 24/10 42/11 44/14 45/14 47/16 58/20 83/20 84/10 117/15 121/4 125/4 125/7 125/8 130/1 131/22 132/8 132/16 133/13 133/14 133/15 134/11 135/25 137/12 143/13 143/25 148/23 152/8 152/11 157/22 161/5 172/18 197/15 197/15 198/14 199/9 199/10 200/6 200/7 200/21 202/7 202/11 202/12 202/18 203/11 203/14 203/15 204/9 206/18 206/23 211/18 214/15 215/16 216/2 216/15 217/5
people's [1] 151/7
per [1] 92/25
perceived [1] 35/12
percent [3] 72/10 101/12 101/14
percipient [1] 62/24
performed [1] 75/2
perhaps [2] 155/1 222/7
period [27] 13/7 13/10 13/23 14/14 14/19 16/17 16/21 20/4 20/5 27/1 104/5 105/5 105/5 106/19 107/6 115/4 115/5 141/7 142/12 171/6 183/3 197/19 197/20 198/20 199/4 200/11 200/15
periodically [1] 83/21
perjury [1] 25/8
permitted [1] 212/16
PERRY [2] 2/11 6/11
person [37] 25/4 41/25 42/18 50/15 67/18 78/25 79/9 87/6 93/21 94/15 103/18 108/5 109/24 129/10 132/10 132/11 138/20 139/17 139/17 140/6 159/25 160/19 161/4 163/8 165/3 165/4 166/10 167/15 167/25 177/16 182/18 188/12 189/16 200/7 211/20 215/20 222/16
personally [5] 53/19 102/7 102/11 102/17 102/20
persons [1] 42/9
perspective [1] 18/13
persuasiveness [1] 176/3
pertain [1] 123/17
pertains [1] 146/6
pertinent [14] 96/1 108/2 108/3 108/4 108/7 109/22 110/7 110/17 110/20 110/23 111/2 148/25 149/5 186/11
Peter [1] 7/6
phase [3] 151/12 151/12 164/7
phone [33] 4/6 19/7 30/20 64/24 65/15 67/3 69/1 69/2 69/10 70/17 70/22 71/4 71/18 83/5 83/15 83/16 84/18 85/4 85/5 85/24 94/20 95/20 103/10 107/25 148/22 183/25 219/7 219/8 221/5 221/10 222/1 222/2 222/22
phony [1] 138/23
photograph [1] 73/16
phrase [2] 34/19 34/20
pick [3] 76/15 93/18 204/22
picking [2] 25/14 135/2
picture [1] 106/25
piece [4] 107/11 107/23 108/1 188/17
pierce [1] 119/3
pitter [1] 174/6
pitter-patter [1] 174/6
place [5] 8/17 18/9 24/6 199/17 225/16
placed [2] 8/10 177/4
placeholder [2] 34/20 34/21
placeholders [3] 27/21 27/24 28/1
places [1] 158/2
plaintiff [3] 1/8 2/4 224/5
plaintiffs [1] 147/2
plan [2] 146/12 207/5
planning [1] 145/1
Platt [1] 7/1
played [1] 172/3
player [1] 120/5
players [2] 216/18 216/19
playing [1] 78/20
plea [16] 17/13 17/17 18/1 18/14 25/18 153/1 159/10 192/8 195/23 195/24 195/24 196/3 196/16 197/18 197/21 197/23
pleaded [2] 18/14 52/4
pleading [2] 22/8 217/20
pleadings [1] 177/11
please [24] 6/8 8/4 10/1 12/10 26/4 28/7 28/21 29/11 31/10 36/9 36/18 36/22 38/1 38/21 40/8 40/18 43/18 48/22 51/15 52/8 83/14 83/18 90/19 187/11
pled [4] 14/6 20/24 174/24 218/22
plus [2] 13/20 14/8
point [60] 14/12 15/13 25/22 26/15 27/11 27/20 30/22 35/9 35/18 37/1 49/25 50/4 51/7 51/12 60/18 62/7 62/16 74/15 76/23 78/1 78/2 78/3 79/9 82/1 82/3 82/3 82/12 83/20 85/10 86/7 92/19 105/9 112/20 116/17 130/10 130/18 130/19 144/4 147/21 147/25 155/8 156/13 156/14 160/4 165/25 179/5 180/24 180/25 181/9 185/22 191/5 191/23 195/20 202/17 208/13 214/5 214/14 214/16 216/10 222/25
pointed [2] 54/6 216/14
points [8] 7/17 17/6 78/3 151/15 214/13 216/6 226/3 226/4
policy [3] 79/6 144/13 144/15
pops [1] 94/10
portion [6] 7/12 10/6 57/4 188/4 206/3 209/16
portray [1] 106/25
posit [1] 193/17
positing [1] 119/7
position [21] 25/1 85/9 85/12 85/18 87/22 94/17 94/22 118/21 118/23 129/20 134/18 147/12 153/3 158/19 162/3 162/8 163/18 180/12 196/25 209/13 214/9
positions [2] 118/13 206/15
possess [1] 178/20
possibility [2] 162/11 203/1
possible [10] 42/23 45/3 101/7 101/10 111/15 111/16 111/16 111/17 144/4 228/18
possibly [6] 162/17 171/4 190/14 202/9 227/7 228/21
POSSINO [109] 1/10 6/5 6/16 7/6 10/18 10/24 11/6 11/8 11/21 12/13 13/3 13/4 13/8 13/22 15/25 17/2 20/8 22/19 22/20 23/5 23/8 23/20 24/8 24/10 24/11 31/8 31/16 34/11 41/11 47/15 74/15 74/19 74/23 74/23 75/1 75/6 77/16 78/6 78/8 78/24 79/4 79/8 80/1 81/8 81/13 81/15 106/22 112/11 113/3 116/7 116/17 116/23 123/4 126/16 126/23 127/8 128/4 129/6 130/15 130/24 131/16 131/20 132/23 135/24 136/1 144/9 146/12 146/18 147/17 152/3 155/19 156/1 156/3 156/10 157/13 157/23 169/12 171/7 171/13 171/14 179/16 179/19 179/20 185/23 185/25 186/4 188/10 192/4 198/25 199/4 199/6 199/8 199/10 199/16 199/18 200/5 200/11 201/4 201/15 201/21 202/15 202/22 203/19 210/9 210/12 210/14 210/17 210/18 224/19
Possino's [2] 78/7 178/15
Possino-Mendiratta [1] 24/11
Possino-Nix-Mendiratta [1] 13/3
Possino/Nix [1] 81/8
posthearing [1] 228/3
postponement [5] 21/10 21/20 22/9 22/10 37/13
postsentencing [1] 192/9
potential [4] 78/23 123/9 204/4 217/4
potentially [6] 123/8 174/22 184/25 185/6 203/24 209/4
poured [1] 129/13
practice [1] 15/18
praise [1] 193/4
precede [1] 99/17
preceded [1] 219/13
precedes [1] 33/24
predates [1] 113/4
prefatory [1] 29/16
premature [6] 35/14 41/12 50/20 80/21 111/6 127/13
preparation [1] 39/9
prepare [1] 30/1
prepared [6] 39/8 58/4 58/8 76/17 138/12

## P

prepared... [1] 138/15
preparing [3] 20/23 34/9 217/17
prerequisite [1] 226/18
presence [4] 40/11 68/21 69/1 221/23
present [19] 2/11 6/16 6/19 6/22 6/24 7/4 26/13 32/10 32/14 40/24 57/17 58/16 59/2 59/4 59/11 59/19 59/21 152/8 177/25
presented [4] 106/4 177/23 181/24 190/1
presenting [3] 62/17 62/17 178/2
PRESIDING [1] 1/5
press [2] 19/5 25/14
presume [1] 100/25
pretend [1] 114/16
pretenses [1] 192/10
pretty [4] 118/14 135/20 196/5 213/1
previously [7] 9/2 34/12 34/13 73/13 73/17 75/4 148/19
price [2] 78/14 132/8
primarily [3] 41/8 51/11 52/1
primary [2] 28/2 68/9
principal [1] 176/1
principally [1] 126/19
principals [1] 19/17
prior [50] 12/11 13/15 15/20 19/18 21/11 35/11 35/13 35/21 36/4 36/23 40/11 41/15 57/20 66/19 82/18 87/12 89/25 110/13 112/17 117/23 124/12 125/24 146/1 152/7 152/8 152/25 155/16 159/25 163/6 163/9 163/9 163/10 167/24 169/10 170/12 193/11 195/5 200/4 206/5 206/6 206/9 206/10 206/14 207/17 208/18 208/21 209/18 211/1 214/24 217/4
priorities [1] 84/9
prioritized [1] 84/10
priority [4] 94/14 95/1 113/9 113/10
prison [14] 159/11 159/16 159/17 159/19 163/10 169/16 201/2 201/15 201/22 207/6 207/11 207/13 207/22 208/1
proactive [12] 37/19 39/1 50/1 50/25 62/17 63/7 63/10 70/22 70/24 71/5 71/8 220/2
proactively [1] 64/4
probable [14] 33/21 33/22 51/23 117/12 128/7 142/10 163/7 165/20 175/25 176/5 188/25 203/15 211/14 222/22
probably [9] 13/14 14/10 44/23 46/20 50/12 53/19 83/20 127/4 164/3
probation [2] 90/3 91/24
probative [4] 94/16 190/2 190/9 195/18
probing [1] 194/1
problem [2] 134/21 218/24
proceed [1] 187/10
proceeding [1] 140/20
PROCEEDINGS [1] 1/15
proceeds [2] 137/15 138/5
process [5] 26/5 62/19 67/8 83/19 89/5
productive [3] 141/1 185/6 197/14
proffer [21] 32/12 57/14 60/3 60/5 83/8 97/21 113/21 143/17 156/1 157/13 160/16 160/17 171/3 171/8 171/13 171/17 196/12 199/19 199/20 206/11 214/25
proffered [6] 48/11 155/4 155/18 160/15 192/3 197/11
proffering [2] 21/3 39/20
proffers [25] 23/8 23/8 24/5 43/9 43/13 48/9 49/7 152/9 155/22 155/24 180/2 180/2 192/5 195/7 195/9 196/22 196/23 197/13 197/17 199/1 199/17 200/4 206/24 208/20 208/22
profit [1] 132/14
promise [1] 132/13
promote [4] 137/11 137/13 138/1 138/2
promoters [1] 133/19
promotes [1] 137/12
promoting [1] 137/7
promotion [2] 12/18 136/23
promotions [1] 116/14
prong [2] 187/21 188/14
pronounce [2] 149/14 167/6
proof [7] 21/17 30/25 31/2 37/4 38/22 181/24 191/11
propose [1] 227/18
proposed [1] 30/13
proposition [3] 79/20 148/18 176/23
prosecuted [1] 175/5
prosecution [2] 163/9 215/1
prosecutions [5] 152/11 197/14 213/21 213/23 224/19
prosecutor [1] 119/10
prosecutors [1] 197/1
protect [1] 131/22
protecting [2] 169/12 210/9
protects [1] 226/19
provable [1] 142/4
proves [1] 215/11
provide [35] 18/12 19/21 30/1 46/8 47/19 63/11 82/13 83/3 83/4 83/6 94/23 96/3 109/24 111/25 114/11 117/22 118/2 124/11 124/25 125/9 141/22 144/9 155/10 160/25 170/5 172/24 174/12 174/17 185/12 185/14 185/20 220/25 221/4 221/6 225/20
provided [52] 8/8 13/8 21/17 41/11 51/13 55/16 64/12 65/6 68/11 88/20 91/11 93/8 95/19 100/10 100/22 100/23 101/4 101/9 102/12 107/24 108/13 109/8 109/23 110/7 113/9 114/2 116/13 117/8 125/2 125/6 140/21 141/20 142/1 143/13 145/22 148/20 152/10 155/15 160/17 160/20 179/6 181/22 181/24 183/24 192/18 195/6 211/2 213/23 215/18 220/13 221/22 224/18
provides [4] 88/21 140/13 180/5 185/10
providing [10] 8/15 47/16 63/8 74/5 74/7 82/25 89/20 101/1 101/5 110/1
proximity [1] 32/17
public [8] 2/16 39/14 45/18 90/17 132/7 136/15 136/16 138/13
pull [13] 14/1 26/2 66/19 66/21 77/18 106/10 113/6 113/12 173/25 184/16 220/20 221/16 227/8
pulled [15] 65/13 65/19 65/21 66/23 66/25 69/17 69/22 70/2 70/9 72/6 76/9 76/11 76/11 182/24 187/23
pulling [6] 65/10 70/4 83/19 84/2 115/1 132/8
pump [27] 11/24 12/8 60/22 61/21 62/1 62/18 64/5 65/1 67/11 67/17 68/1 73/24 82/20 83/4 85/2 88/21 95/20 109/8 135/14 135/15 135/19 138/2 140/14 141/15 148/21 183/25 218/18
punch [1] 94/4
purport [1] 194/5
purpose [8] 8/14 8/15 29/24 30/11 46/19 47/10 47/18 215/25
purposeful [3] 120/20 120/21 219/18
purposely [2] 47/15 151/18
purposes [3] 10/6 27/3 199/20
pursuant [4] 18/14 19/6 32/12 157/13
pursue [3] 43/18 185/1 222/8
pursuing [1] 85/16
pushing [1] 136/16
put [57] 23/23 23/24 35/16 67/24 73/4 73/20 73/23 75/8 75/9 75/10 77/2 80/16 83/24 108/25 118/25 119/14 119/18 123/3 127/7 138/16 139/8 146/14 147/9 147/22 147/22 153/15 153/17 153/24 162/3 162/12 164/3 164/15 171/4 171/11 172/20 177/10 177/13 177/22 179/5 179/19 180/2 180/3 182/13 182/13 182/14 182/18 184/4 185/23 186/4 190/12 191/9 193/15 206/6 209/12 211/25 211/25 226/22
puts [3] 137/10 138/1 186/4
putting [5] 27/3 92/25 100/24 190/19 206/4
puzzling [1] 211/10

## Q

qualified [1] 224/8
qualify [1] 197/2
Quest [6] 20/2 20/2 20/14 20/15 199/13 200/15
question [69] 19/20 22/13 23/15 23/16 23/17 23/17 23/19 23/25 27/20 31/14 38/5 38/5 39/20 41/24 43/2 45/22 54/7 55/18 57/19 58/1 61/8 63/3 63/18 63/20 63/24 64/1 72/16 76/6 82/10 86/23 91/8 104/2 104/4 108/11 113/11 114/2 115/20 117/11 117/20 118/6 125/15 127/18 128/2 134/14 135/24 143/5 145/12 145/12 145/19 150/19 156/15 157/2 160/22 163/1 163/3 164/18 164/21 166/6 166/19 174/20 188/5 191/1 192/24 194/14 194/20 204/15 206/22 209/25 225/3
questioning [4] 21/11 62/22 84/13 227/18
questions [28] 10/12 15/25 21/7 24/4 30/18 46/22 46/23 47/3 51/15 52/17 58/4 58/7 59/25 76/3 89/6 89/7 97/10 116/22 117/1 118/13 121/23 146/8 149/6 149/8 154/25 192/6 209/11 216/5
quick [4] 135/6 226/3 226/4 226/4
quickly [5] 65/24 122/8 173/25 184/16 220/20
quite [2] 43/10 153/6
quote [5] 157/11 159/1 165/3 189/12 212/15
quoted [2] 178/14 178/17
quotes [1] 167/13
quoting [1] 188/20

## R

R-a [1] 165/12
radar [1] 205/21
raise [1] 90/16
raised [6] 21/10 25/2 27/9 146/10 181/9 188/6
Rajaratnam [7] 165/9 165/12 167/7 167/9 187/15 188/20 226/9
ran [2] 93/25 94/13
random [1] 21/5
range [2] 34/4 34/7
rat [2] 200/6 201/20
rather [12] 25/10 43/16 61/4 122/8 143/16 176/22 188/22 201/2 201/13 201/14 201/22 226/19
rats [1] 200/4
Rauth [1] 3/10
reach [4] 33/12 50/16 104/21 190/15
reachable [1] 103/13
reached [6] 19/13 50/18 50/25 103/14 118/15 147/21
reaching [1] 19/12
read [39] 23/13 32/18 40/1 41/9 48/3 48/5 55/8 55/12 55/15 55/18 56/4 62/15 62/23 63/1 63/12 64/7 64/11 64/21 84/25 92/18 99/20 112/5 113/18 153/3 155/5 160/14 171/10 171/16 177/13 195/17 195/24 198/18 210/11 210/14 219/24 221/15 221/15 221/16 223/22
reader [2] 153/21 154/1
reading [18] 23/18 24/5 55/5 58/11 58/19 60/4 63/1 67/6 78/1 99/16 116/11 137/16 152/25 157/11 183/22 184/3 210/15 214/9
real [3] 50/21 191/1 222/5

## R


reality [2] 37/14 172/15
really [34] 15/20 27/19 30/16 35/5 35/14 35/14 50/11 50/21 54/22 57/19 105/7 119/2 119/3 119/4 125/22 126/17 127/4 129/11 151/15 152/13 153/5 154/1 163/3 163/4 163/7 188/6 188/7 190/13 198/23 205/16 205/20 215/3 216/12 222/16
reason [16] 59/4 79/21 85/23 107/3 118/8 134/9 144/16 159/13 162/7 162/19 163/18 163/24 174/22 194/8 208/6 212/3
reasonable [13] 79/1 85/12 130/20 164/9 165/4 166/10 167/15 167/25 177/16 188/12 189/16 189/20 198/1
reasonably [3] 44/13 45/4 225/4
reasons [18] 21/14 22/18 42/4 50/15 51/4 79/22 79/23 97/24 118/20 130/23 144/1 144/12 155/18 159/22 163/22 174/18 182/7 214/22
recall [34] 9/13 9/18 10/15 13/12 15/6 16/22 16/24 17/10 17/13 26/22 30/10 36/15 53/1 55/6 58/11 58/13 60/4 60/10 60/11 66/3 67/13 71/15 71/19 72/4 74/3 74/17 91/14 91/15 91/22 104/9 106/9 173/20 208/2 214/9
recalls [1] 214/8
recap [2] 18/10 90/9
receive [1] 9/15
received [23] 5/11 8/23 10/1 10/3 12/17 19/7 28/22 29/4 33/7 35/6 37/10 52/13 52/14 52/15 149/24 149/25 150/6 150/14 175/8 181/2 181/4 181/15 219/16
receiving [2] 9/13 222/23
recent [4] 165/13 197/10 209/1 224/1
recess [4] 96/13 168/11 168/13 187/8
recite [1] 175/23
recites [1] 78/19
reckless [41] 85/16 119/17 120/22 121/12 151/14 151/14 164/14 165/1 165/6 165/18 166/12 166/14 166/17 167/17 167/20 177/15 180/11 187/17 189/13 190/3 190/21 190/22 191/12 194/8 204/25 205/1 212/11 212/12 212/18 212/19 212/21 217/11 218/2 220/16 223/4 224/15 225/3 225/3 225/10 225/10 226/20
recklessly [8] 119/15 119/16 185/15 186/16 193/1 223/7 225/19 226/7
recklessness [7] 177/18 187/13 187/22 188/6 188/24 190/17 194/7
recognize [13] 9/10 9/12 28/12 28/14 28/18 30/8 33/25 46/13 46/15 48/23 48/25 49/13 176/24
recollection [7] 13/3 13/13 17/16 48/12 57/13 59/7 227/5
recommend [1] 206/25
recommendation [2] 180/10 196/19
recommendations [1] 181/20
recommends [1] 198/10
record [14] 31/20 39/4 43/20 48/4 52/18 52/19 149/23 150/5 150/15 167/24 183/19 196/12 209/9 216/11
recorded [4] 68/22 90/25 220/2 221/24
recording [8] 55/23 65/22 67/23 67/24 83/12 84/8 100/24 101/2
recordings [16] 22/4 22/6 65/4 65/7 66/1 66/11 82/21 84/1 92/24 107/8 186/12 203/10 219/24 219/25 221/20 225/12
records [4] 45/18 45/18 93/16 133/4
RECROSS [2] 5/3 97/6
RECROSS-EXAMINATION [1] 97/6
recycled [1] 16/20
red [6] 129/2 175/11 177/4 177/10 177/22 178/18
redirect [3] 5/3 9/4 63/23
reduced [1] 159/17
reduction [1] 195/20
refer [1] 83/12
reference [14] 46/4 52/11 60/5 60/18 83/23 84/18 85/3 116/16 187/25 207/15 207/20 208/1 210/23 221/19
referenced [1] 11/1
references [6] 68/20 88/8 99/11 219/24 221/13 222/3
referencing [5] 90/15 91/9 91/9 98/1 208/13
referral [3] 11/24 12/2 17/4
referrals [1] 141/15
referring [3] 92/16 108/19 116/15
refine [1] 13/10
reflects [1] 115/25
refresh [1] 71/16
regard [4] 32/25 46/9 208/15 227/3
regarding [32] 7/21 11/24 12/1 15/20 30/22 34/11 35/11 36/23 36/25 38/10 39/21 40/7 41/1 42/1 68/8 76/4 82/1 104/10 104/16 114/3 116/13 123/22 124/12 124/17 133/9 141/15 141/16 196/23 198/4 210/6 211/3 218/10
REGIS [11] 1/10 6/5 6/16 74/14 74/19 74/23 116/7 116/23 201/4 201/15 201/20
regulatory [1] 12/7
rejected [2] 153/22 226/8
rejoinder [2] 154/13 154/21
relate [4] 38/23 38/23 126/18 127/4
related [6] 7/18 8/1 14/3 15/17 46/25 50/5
relates [3] 21/10 31/19 34/4
relation [2] 11/13 32/19
relationship [17] 22/15 22/21 23/9 78/6 117/18 126/7 131/7 134/3 155/19 159/2 159/4 175/12 179/21 200/11 200/14 202/22 211/21
relationships [3] 112/4 179/1 179/2
relatively [1] 149/16
relayed [1] 33/17
release [6] 19/5 25/15 90/4 92/1 140/19 141/4
relevance [3] 52/23 150/16 169/18
relevancy [1] 57/25
relevant [12] 8/18 27/9 52/24 53/5 57/21 57/23 95/5 119/12 126/25 155/23 203/7 223/18
reliability [2] 54/24 103/15
reliable [13] 14/18 48/16 50/9 54/22 103/5 104/1 106/16 106/18 118/16 118/24 156/24 181/21 204/19
relied [1] 175/24
reluctant [1] 21/24
rely [5] 102/2 159/1 166/25 166/25 174/2
relying [4] 114/11 173/22 220/7 223/14
remain [1] 22/5
remedy [5] 194/8 194/10 194/15 194/16 209/10
remember [16] 13/25 17/11 18/8 34/24 35/2 59/24 78/1 91/7 107/19 114/16 137/16 156/19 176/21 185/23 186/8 227/13
reminder [3] 36/5 36/10 48/18
remiss [1] 153/11
rendered [1] 112/1
reopen [1] 7/18
reopening [1] 17/22
repeat [2] 64/1 115/21
repeatedly [4] 22/7 83/16 185/9 210/17
repeating [1] 201/25
replay [1] 17/22
reply [3] 167/10 181/1 212/19
report [2] 10/17 98/22
REPORTER'S [1] 1/15
reporting [1] 201/6
reports [4] 58/9 58/14 58/20 99/2
repository [1] 26/6
represented [2] 19/9 21/22
represents [1] 43/20
request [4] 19/21 45/17 174/2 197/4
required [2] 87/3 173/13
requirement [4] 175/21 175/23 178/5 224/6
requirements [1] 109/11
requires [2] 226/12 226/17
reran [1] 49/6
reschedule [1] 227/23
research [3] 11/15 12/11 219/15
reserve [1] 164/7
resolve [1] 150/20
resources [1] 152/18
respect [12] 36/13 55/11 62/1 66/1 86/11 98/18 101/17 104/22 139/14 142/19 225/18 225/19
respond [3] 46/25 158/8 186/20
response [6] 80/4 135/19 168/10 181/13 193/6 212/6
responsive [1] 23/23
rest [10] 68/3 69/18 69/20 110/10 110/11 110/12 114/15 225/11 225/12 225/19
restate [1] 125/5
result [5] 75/17 141/1 189/20 198/15 211/13
resulted [3] 142/4 152/10 189/19
resume [1] 6/14
RESUMED [1] 97/6
Retardant [1] 172/1
retire [1] 176/13
return [3] 44/16 182/11 182/12
returning [1] 32/23
reveal [2] 172/15 214/24
revealed [4] 10/24 80/15 120/1 158/13
reversed [3] 187/18 224/5 224/11
review [22] 26/9 61/19 62/11 65/14 69/14 69/16 70/1 70/11 74/16 76/10 83/21 83/24 89/1 89/17 89/24 90/5 93/9 99/1 99/2 100/20 101/7 101/12
reviewed [15] 55/1 55/3 58/9 65/3 69/19 70/2 75/21 76/12 87/12 87/16 93/13 100/15 100/17 101/6 143/2
reviewing [5] 60/1 66/19 91/20 174/3 190/1
revocation [2] 140/19 141/4
reward [1] 155/15
rewarded [2] 160/17 167/24
Richard [3] 3/20 3/20 7/2
Rick [1] 169/15
right [120] 8/3 8/7 9/25 10/5 10/11 12/10 13/17 14/21 18/13 22/12 26/24 27/5 27/7 28/20 29/6 29/9 29/14 30/7 30/8 32/8 32/21 33/23 33/24 36/2 38/19 39/2 39/6 39/17 40/17 43/17 44/1 44/4 44/4 44/16 48/21 49/24 56/12 63/2 64/18 67/25 70/13 75/25 77/5 78/21 79/7 80/7 81/16 84/16 87/1 87/4 87/19 88/9 88/12 92/14 96/6 97/4 97/20 98/8 99/4 99/8 105/4 105/13 108/16 108/22 110/25 113/15 115/10 116/2 119/22 119/23 120/11 121/13 122/16 123/16 123/22 123/23 123/24 125/21 139/11 142/18 147/16 149/10 149/20 151/8 151/9 153/18 156/12 156/17 158/2 158/14 161/12 165/16 170/8 170/13 170/23 173/17 176/14 176/17 176/18 176/19 181/3 184/19 190/8 192/22 193/10 193/18 193/24 200/25 201/11 203/21 208/13 208/17 210/22 210/25 212/5 217/13 217/24 218/25 225/24 226/23
right-hand [14] 29/9 29/14 30/7 33/24 36/2 39/6 39/17 44/1 44/4 88/9 88/12 99/8 192/22 193/24
rim [1] 226/23

## R


ringleader [1] 222/5
risk [19] 123/6 123/25 124/1 124/3 124/8 125/12 125/13 125/15 125/19 125/20 125/22 126/1 184/6 184/7 203/3 203/4 204/8 214/16 214/19
risk-benefit [1] 124/1
risks [2] 43/25 44/15
risky [1] 184/6
rmcallahanjr [1] 3/23
roadblocks [1] 47/13
Robinson [3] 2/19 2/19 6/21
role [21] 33/15 35/5 35/10 41/8 41/13 50/21 80/20 111/7 127/14 133/14 133/14 144/6 147/2 174/11 174/11 174/12 181/13 181/14 181/22 181/23 200/17
roles [3] 132/5 132/14 132/15
roll [1] 133/24
rolling [2] 83/19 95/1
rolls [1] 201/19
room [2] 1/24 120/24
rough [1] 28/5
route [1] 138/4
RPR [1] 1/23
Rubin [2] 7/5 7/7
ruin [1] 222/7
rule [2] 214/17 228/4
run [2] 93/23 213/13
running [2] 15/19 95/4
ruse [1] 37/13


## S


S-1 [4] 138/12 138/21 138/23 216/15
S-t-a-n-e-r-t [1] 212/13
s302 [1] 202/13
Sacramento [1] 140/23
said [106] 14/1 14/16 16/25 24/20 36/5 40/23 45/19 47/18 48/14 54/11 54/13 55/1 55/11 58/8 62/4 62/13 65/10 67/25 70/19 72/6 74/18 76/23 80/11 84/14 84/25 91/13 91/16 95/7 99/1 100/17 103/3 104/22 105/10 108/13 112/3 115/7 115/9 118/17 121/5 121/6 121/21 126/10 126/22 127/24 127/25 128/10 129/12 129/20 130/23 133/15 133/24 141/2 141/7 142/14 142/23 143/1 144/3 144/20 146/13 153/10 154/14 154/21 154/22 155/3 155/20 157/19 160/4 160/15 161/4 161/9 161/19 161/20 161/21 161/24 162/20 164/4 170/23 173/12 173/21 175/21 179/10 182/4 186/14 188/11 188/23 189/13 191/24 192/14 192/17 192/17 195/24 196/4 196/10 196/15 196/24 198/17 201/3 207/13 211/23 219/15 220/1 220/5 220/25 222/15 224/11 226/9
salient [1] 120/1
same [43] 11/17 18/19 19/9 21/22 33/11 34/14 40/6 45/8 56/16 56/24 57/2 57/7 81/4 84/22 88/11 93/20 97/22 97/25 99/11 105/9 113/2 132/10 134/20 140/21 146/13 152/6 153/2 156/24 157/22 158/5 161/20 161/21 163/20 174/25 183/20 188/24 194/9 202/1 218/3 218/13 220/17 226/24 227/12
San [1] 19/7
San Francisco [1] 19/7
sand [1] 193/15
Santa [1] 4/5
SAR [3] 10/17 11/13 11/24
sat [1] 206/23
satisfied [1] 226/18
satisfy [2] 45/24 146/3
save [1] 122/2
saw [14] 60/12 60/18 72/9 72/10 101/14 128/23 131/12 163/23 219/21 219/23 220/5 220/9 220/11 220/21
say [86] 17/11 18/22 25/5 27/19 43/5 54/24 62/13 65/24 67/18 67/21 74/1 74/14 75/13 80/12 82/19 106/10 115/16 121/1 121/3 126/9 132/12 134/16 147/5 147/13 150/25 154/23 155/3 155/5 155/25 156/3 156/21 157/1 157/2 159/20 161/9 162/10 166/3 172/21 172/22 173/15 174/8 180/10 180/18 182/23 184/17 194/4 195/2 195/3 195/3 195/16 198/23 200/23 202/4 203/1 203/2 203/3 203/6 204/25 205/1 205/4 205/17 205/20 205/21 205/21 207/2 208/15 208/20 208/20 208/23 208/25 209/3 212/6 216/2 217/25 219/5 219/17 219/19 222/17 223/14 224/15 224/15 224/17 224/21 224/24 225/17 226/8
saying [45] 16/6 69/14 70/8 70/12 74/3 84/5 84/8 85/4 93/11 95/17 100/20 100/22 101/4 101/6 101/19 118/15 119/25 127/5 128/19 139/15 144/15 153/12 153/25 159/15 161/13 167/5 167/18 170/13 182/8 183/11 185/19 190/20 190/22 191/16 193/21 204/18 205/3 210/18 217/11 219/23 220/4 220/8 220/14 220/15 220/16
says [72] 29/18 29/22 31/10 32/11 32/13 33/1 35/21 36/3 36/19 47/24 49/9 52/25 73/12 74/4 74/21 75/25 78/17 78/19 79/20 79/23 86/17 90/24 90/25 92/7 98/4 98/7 98/13 99/9 99/21 100/3 124/13 135/8 153/8 154/7 155/25 156/9 157/3 157/4 157/4 161/16 161/17 169/10 170/11 173/17 173/24 174/2 177/15 181/1 184/20 184/23 184/25 185/24 196/18 197/1 201/1 201/19 206/15 206/17 210/9 214/14 215/22 216/22 216/23 217/16 219/11 219/12 219/21 220/13 221/11 221/14 221/22 222/19
sbcglobal.net [1] 3/18
scale [1] 194/21
Scarpello [2] 138/14 138/16
scenario [1] 127/2
schedule [1] 227/15
scheme [92] 11/9 11/25 13/2 13/3 16/18 25/13 25/14 42/10 51/17 60/23 60/25 61/5 61/13 61/14 61/21 62/1 62/3 62/6 62/11 62/14 62/15 62/18 63/11 64/6 64/15 65/2 65/11 67/11 67/17 68/1 73/24 78/24 79/9 79/10 82/21 83/5 85/2 88/21 95/20 107/1 109/8 119/3 120/6 123/9 124/15 132/11 133/10 135/14 135/15 136/15 136/23 136/24 136/25 137/1 137/15 138/1 138/2 138/25 139/2 139/7 139/17 139/22 139/24 140/14 140/16 144/14 144/18 144/23 148/21 154/11 156/24 157/22 158/20 159/10 161/21 162/24 171/23 172/1 172/2 172/6 172/8 175/12 179/7 180/20 180/21 181/25 183/25 184/11 186/1 209/23 218/18 222/23
schemer [1] 131/15
schemes [22] 12/8 13/23 13/24 51/17 79/5 106/23 107/2 112/10 112/10 112/15 112/16 112/19 113/3 128/20 135/20 140/3 140/8 141/16 146/22 171/8 171/14 181/17
Scheper [1] 3/5
scheperkim.com [1] 3/8
screen [1] 188/16
scrutiny [1] 173/9
SDNY [9] 31/5 31/7 192/11 195/9 196/22 197/13 197/15 198/23 198/24
SDNY's [2] 195/9 196/22
se [1] 92/25
search [5] 11/23 93/25 173/7 173/16 175/22
searches [4] 85/21 85/22 85/23 115/5
SEC [10] 25/13 31/17 32/2 32/3 32/8 32/13 135/2 135/5 135/16 187/18
second [25] 23/11 24/19 36/7 72/19 73/1 73/2 73/11 77/18 77/25 78/4 78/5 80/11 87/17 113/10 115/18 116/12 154/14 165/9 165/17 167/7 187/14 187/18 189/13 207/2 208/16
secret [1] 146/12
secretive [1] 147/4
section [13] 30/11 41/4 41/17 47/6 79/16 109/15 117/9 122/23 147/24 148/1 173/6 182/25 224/3
sections [1] 30/21
securities [6] 60/23 64/14 140/8 140/24 178/10 216/19
see [101] 16/1 31/21 32/7 39/12 39/16 40/9 47/8 48/1 60/2 60/5 65/23 66/7 66/14 66/24 68/10 68/12 68/14 68/17 68/18 68/20 69/3 69/7 70/18 72/4 72/17 72/22 73/14 77/2 80/10 88/10 88/12 88/14 88/24 89/15 89/22 90/2 90/10 90/13 90/18 90/22 91/5 92/3 92/14 92/17 92/23 92/24 93/2 93/5 93/5 97/12 97/13 98/4 98/7 98/13 99/8 99/23 100/1 100/5 100/8 101/20 103/4 114/23 116/10 118/14 120/25 122/24 122/25 123/4 123/5 123/11 123/16 123/21 124/20 126/24 128/19 133/5 135/4 139/9 139/11 147/11 147/25 150/23 153/3 153/6 157/10 157/17 162/6 167/22 169/9 178/2 178/16 187/24 192/13 196/14 210/20 210/22 210/22 210/25 220/15 221/9 227/6
seeing [4] 11/14 14/17 14/18 17/11
seek [1] 130/23
seeking [1] 198/8
seem [11] 81/22 125/11 127/23 133/23 136/13 147/13 154/4 155/9 158/1 164/17 213/7
seemed [8] 22/24 38/12 62/9 80/21 107/1 111/6 132/19 132/20
seems [12] 118/23 121/11 126/6 126/20 132/18 132/19 134/9 136/16 147/12 166/8 209/16 212/21
seen [14] 49/8 65/17 65/18 68/3 71/25 92/10 95/2 105/19 146/21 150/10 150/11 171/11 193/7 198/21
sees [1] 220/16
segue [1] 162/23
select [1] 163/12
selective [4] 152/22 155/3 155/9 155/25
selectively [3] 170/4 213/2 214/3
selectiveness [4] 153/5 153/6 214/7 214/11
self [2] 125/11 215/20
self-evident [1] 125/11
self-interested [1] 215/20
sell [2] 132/9 132/13
selling [2] 78/13 81/10
send [2] 49/3 217/15
sending [5] 29/25 46/19 47/18 169/19 211/9
sends [2] 47/7 168/21
sense [13] 35/14 40/14 91/12 136/14 149/18 151/2 153/21 160/24 163/10 166/13 168/7 182/15 189/5
sent [7] 9/18 27/16 33/6 46/16 49/1 197/6 197/8
sentence [13] 20/23 21/13 22/6 116/5 116/12 119/12 126/10 140/24 153/2 159/17 159/18 163/9 201/6
sentenced [3] 18/18 174/24 198/10
sentences [1] 163/12
sentencing [25] 9/22 18/16 18/19 18/21 18/24 20/25 21/20 21/22 25/19 60/12 153/3 180/12 181/12 193/2 196/1 196/7 196/25 197/3 198/6 198/7 200/25 201/10 201/14 207/21 214/9
sentiment [1] 15/9

## S


SENZ [19] 11/1 11/4 11/21 35/17 37/12 37/15 78/9 78/15 127/22 129/2 136/25 137/1 158/21 175/10 179/7 202/13 203/20 204/10 222/24
separate [4] 25/13 80/16 93/17 160/2
separately [4] 7/20 156/4 156/5 179/16
September [3] 25/19 26/19 186/1
serial [7] 83/23 98/4 99/14 99/25 101/19 101/20 219/11
series [6] 13/7 19/14 46/22 89/12 106/20 199/1
serious [1] 191/8
seriously [1] 124/18
serve [1] 20/23
serving [1] 159/17
session [1] 103/25
sessions [8] 145/2 156/1 160/17 171/3 171/8 171/13 171/18 214/25
set [5] 8/24 84/9 135/10 170/10 174/3
seven [34] 23/8 23/13 30/24 31/12 42/22 43/13 52/2 52/7 115/8 115/11 146/14 153/19 153/20 155/4 155/18 156/1 157/12 160/15 171/13 171/17 173/21 173/22 173/25 180/2 180/2 192/3 195/9 195/9 196/22 199/1 203/15 206/10 206/14 221/17
several [6] 16/19 18/15 48/9 49/11 79/22 159/5
severe [1] 194/11
severity [1] 209/10
shaken [1] 153/15
shall [2] 21/12 25/22
shape [1] 161/22
share [2] 50/4 133/17
shared [3] 105/6 179/1 179/3
shares [14] 10/19 12/12 12/14 12/16 117/16 127/22 129/2 144/21 145/3 158/22 175/8 175/10 179/7 222/24
sharing [1] 146/19
she [15] 59/10 81/24 82/4 82/14 82/16 110/20 111/11 111/13 111/17 121/19 124/8 163/23 179/10 182/3 182/3
she's [2] 8/10 59/12
shed [1] 154/11
sheets [1] 45/19
Sherman [47] 6/6 6/19 10/12 10/13 27/19 33/1 54/4 54/8 54/11 54/15 72/7 72/10 86/6 92/6 92/11 92/14 92/21 92/22 94/8 94/9 94/9 99/2 99/3 99/9 99/9 99/21 100/3 100/10 100/14 100/18 100/19 101/3 101/5 101/9 101/21 102/7 102/11 102/21 115/24 117/7 117/21 117/24 204/10 210/7 220/12 220/13 221/21
shielded [1] 193/25
shift [1] 51/14
shoes [1] 109/1
short [7] 14/19 31/21 51/2 134/4 168/11 225/25 226/1
shorthand [2] 29/21 207/12
shortly [1] 69/2
shot [1] 168/10
should [45] 24/21 27/12 30/17 38/15 39/16 67/19 76/20 82/15 93/23 103/3 106/2 114/14 119/6 119/7 120/10 120/13 135/9 147/6 149/1 151/4 157/22 158/13 161/2 164/18 164/19 166/5 169/22 175/13 175/16 176/18 177/23 182/5 185/2 186/15 189/23 189/24 191/14 192/14 193/19 194/16 195/3 195/12 204/23 206/22 213/17
shouldn't [4] 38/16 78/14 172/14 182/7
show [8] 31/20 67/1 75/24 105/21 106/5 112/2 141/18 174/14
showed [8] 21/14 60/15 71/17 190/13 201/9 213/6 219/10 220/14
showing [2] 188/9 200/5
shown [4] 46/5 81/7 209/9 224/7
shows [7] 32/19 47/24 52/11 169/20 197/8 210/2 214/11
shut [1] 147/22
sic [2] 16/10 164/13
side [4] 192/22 192/22 225/11 225/13
sides [2] 40/24 226/23
sight [1] 127/18
sign [4] 121/22 197/23 201/1 206/24
signal [1] 23/2
signed [5] 17/13 53/10 153/1 174/23 197/20
significance [2] 54/23 168/23
significant [4] 49/15 199/8 200/5 209/17
similar [5] 13/23 39/6 43/4 127/12 186/9
similarities [1] 176/11
similarly [4] 15/11 34/18 73/12 143/11
simply [6] 7/19 175/25 189/15 204/18 208/6 227/18
since [8] 21/3 23/5 23/13 24/1 57/21 80/11 156/22 209/4
sing [1] 24/17
single [3] 8/17 48/22 184/15
single-page [1] 48/22
sir [43] 16/16 27/6 46/14 47/22 49/14 53/12 53/14 53/22 55/21 55/22 56/7 56/10 56/21 57/13 58/15 58/22 59/9 66/15 68/14 69/4 69/25 70/3 70/7 71/21 72/9 73/15 73/19 73/25 74/7 82/1 82/2 82/18 84/4 86/10 87/13 90/6 90/12 92/5 93/10 123/12 141/19 144/3 229/6
sitting [2] 225/13 225/14
situated [1] 43/14
situation [10] 101/17 114/10 172/11 176/10 179/24 179/24 179/25 209/19 216/17 223/4
situations [2] 219/1 223/22
six [5] 13/15 84/5 115/4 195/9 196/22
six-month [1] 115/4
skip [2] 30/5 35/20
SLC [1] 10/19
sleeves [1] 133/24
slide [1] 188/16
slides [1] 186/24
sloppy [2] 120/20 213/5
Slow [1] 226/13
small [2] 28/5 180/25
sniff [1] 121/4
so [288]
sold [14] 12/17 35/6 35/7 81/9 117/16 127/22 129/1 133/6 144/21 145/3 145/3 175/6 175/6 175/6
solely [2] 51/19 189/11
some [94] 7/24 8/2 10/12 13/3 20/7 20/18 20/25 21/5 21/14 21/15 22/24 23/2 26/15 30/18 30/18 37/23 40/12 40/12 40/23 41/15 42/3 44/14 45/8 47/3 47/4 47/4 49/7 49/23 49/25 50/4 50/15 51/16 55/19 59/13 59/23 60/18 76/19 76/23 78/24 81/9 85/23 94/19 96/7 98/12 104/5 105/9 105/21 105/25 107/4 113/18 113/18 114/14 116/17 116/19 120/12 121/3 121/4 125/11 125/25 130/11 131/19 132/16 133/12 133/13 133/14 133/15 141/1 142/4 144/6 144/6 145/1 147/3 150/15 150/23 156/6 164/20 169/13 174/23 177/7 179/11 182/5 185/18 194/20 202/1 202/24 203/14 203/17 204/2 204/4 210/11 225/16 228/3 228/5 229/3
somebody [4] 104/7 104/8 142/21 186/25
somehow [2] 95/24 208/14
someone [23] 50/13 83/2 93/17 105/17 106/25 110/7 110/18 111/19 125/16 125/19 126/19 128/11 131/16 131/16 133/10 133/17 134/3 135/21 135/22 147/4 173/10 178/22 189/3
something [32] 13/21 27/14 28/5 42/9 43/4 62/4 80/20 95/8 97/12 98/24 119/17 119/25 127/12 128/24 130/24 138/8 153/17 154/16 155/2 157/3 158/12 161/6 161/8 161/9 166/16 205/16 205/22 207/7 207/14 209/6 218/19 223/16
sometime [4] 10/15 20/15 69/23 229/1
sometimes [2] 150/23 189/14
somewhat [3] 17/19 129/17 132/5
somewhere [7] 13/14 84/4 105/23 106/22 115/10 127/19 154/17
sophisticated [1] 135/20
sorry [30] 9/22 18/22 29/2 33/22 35/24 36/18 41/24 43/11 51/21 59/23 61/18 62/21 63/3 63/21 63/25 73/6 73/6 73/7 78/16 90/6 90/19 113/22 114/1 118/6 125/5 148/1 150/2 154/23 181/8 207/11
sort [32] 14/17 16/20 21/24 23/16 24/23 26/5 36/2 36/5 40/10 76/24 92/8 94/25 118/17 118/24 119/13 119/19 120/8 129/13 134/8 135/14 138/2 138/4 139/15 173/4 176/24 182/9 184/17 194/2 203/8 204/1 204/15 213/14
sound [1] 135/11
Sounded [1] 197/10
sounds [3] 53/22 67/14 182/4
source [8] 47/12 102/3 103/2 103/7 104/6 104/13 210/16 218/7
sources [1] 104/18
South [1] 3/21
Southern [4] 31/18 31/23 206/16 206/21
spawned [2] 19/12 31/14
speak [12] 12/21 57/9 71/7 83/6 90/3 91/25 102/5 103/8 106/2 142/16 143/2 203/23
speaking [7] 30/15 40/14 59/1 64/19 67/8 102/5 102/24
speaks [1] 203/24
special [37] 2/11 6/11 6/12 7/11 7/24 8/5 46/17 56/13 56/16 57/9 59/8 59/10 59/16 61/14 61/22 62/19 64/5 65/25 68/21 71/10 71/13 77/15 79/3 79/17 102/6 103/4 103/8 103/18 103/24 116/22 125/23 125/25 170/24 176/25 177/20 183/1 218/4
specialists [1] 85/19
specialized [2] 178/9 178/19
specially [2] 6/20 7/5
specific [7] 38/15 42/19 82/7 106/17 111/25 187/19 214/20
specifically [10] 23/21 42/1 43/16 44/11 44/25 47/12 50/4 116/15 146/7 165/10
speculate [1] 163/4
speculation [6] 57/17 61/8 107/12 128/12 140/1 140/4
spell [1] 48/12
spoke [10] 50/2 71/10 71/13 71/22 76/1 102/23 113/15 156/25 197/9 212/11
spoken [5] 48/7 67/7 103/3 103/4 156/4
Sport [12] 10/19 10/22 11/2 11/4 12/16 12/18 20/11 20/19 37/12 78/9 200/23 201/12
Spring [2] 1/24 2/9
squad [10] 13/19 13/22 46/18 56/23 56/24 56/24 56/25 57/1 106/21 113/2
staff [1] 32/13
stake [1] 8/9
stamp [1] 169/7
stand [11] 6/13 12/6 72/14 98/15 109/3 158/3 158/25 181/20 212/1 213/22 214/11
standard [20] 121/17 121/19 142/11 164/8 177/14 177/14 178/4 182/4 185/6 187/13 187/20 188/9 189/24 189/25 190/16 190/21

## S


standard... [4] 194/7 204/3 224/4 226/6
standards [2] 182/22 187/14
standing [1] 22/15
standpoints [1] 226/24
Stanert [6] 212/13 223/12 223/13 223/14 224/7 224/10
start [14] 15/19 19/25 49/13 77/4 84/2 88/8 88/9 88/17 110/13 115/1 136/4 187/12 198/9 226/14
started [7] 17/11 26/15 50/2 53/21 123/5 143/19 179/21
starting [2] 78/12 165/24
startling [1] 176/23
starts [9] 34/18 39/19 79/14 90/14 90/20 132/7 132/11 161/10 198/25
state [11] 6/8 57/24 150/12 159/8 160/5 164/15 187/20 224/16 225/5 225/7 225/16
stated [3] 55/6 60/4 91/3
statement [25] 25/5 42/3 45/23 67/17 67/20 74/11 75/7 75/11 91/12 102/24 104/7 105/16 114/17 159/3 161/1 172/24 173/18 174/12 179/15 181/1 183/17 204/7 208/7 211/2 214/21
statements [7] 23/7 38/11 67/11 102/3 113/9 191/9 227/10
states [17] 1/1 1/7 1/23 2/6 2/8 2/8 6/5 6/6 6/10 26/16 71/7 71/22 169/19 176/9 188/21 189/6 212/13
status [2] 127/20 128/15
statute [1] 173/18
stayed [1] 225/6
Ste [1] 4/5
Stearns [1] 74/25
step [3] 15/22 22/25 138/24
STEPHEN [2] 1/5 12/19
stepping [1] 40/19
steps [2] 11/19 50/23
still [16] 50/22 92/1 127/19 130/1 151/7 159/9 171/3 172/6 174/24 181/3 181/16 181/16 198/8 202/24 203/17 214/20
stipulated [1] 8/24
stipulation [1] 97/21
stock [34] 16/18 16/19 17/18 19/10 20/4 20/7 22/5 31/19 35/7 45/19 45/19 78/14 81/9 81/10 90/17 116/14 130/16 131/15 132/4 132/12 132/13 132/18 133/5 133/5 133/18 133/21 133/24 136/16 136/16 137/7 137/11 159/18 159/19 175/11
stocks [4] 135/3 218/15 218/17 218/23
stop [3] 49/5 197/25 198/11
stopped [1] 143/23
story [16] 9/22 21/11 21/16 21/19 22/2 46/9 56/6 131/3 131/6 131/8 161/11 161/14 182/18 182/19 185/13 185/14
Stradling [1] 3/10
strategically [1] 222/6
straw [2] 14/22 105/10
Street [6] 1/24 2/9 2/16 3/6 3/16 154/24
strengthen [1] 95/17
strengthened [2] 95/10 162/3
striking [1] 176/10
string [1] 49/10
strings [1] 132/8
stroke [1] 132/19
strong [1] 111/19
stronger [1] 213/18
strongest [2] 111/14 111/17
struck [2] 147/9 156/18
stuff [9] 75/15 157/3 171/9 171/11 171/16 217/12 217/21 219/12 225/8
style [2] 63/17 168/25
subject [43] 27/20 29/18 29/22 30/18 35/4 35/9 36/11 36/16 36/19 37/2 49/2 68/9 75/6 75/6 76/4 76/20 80/1 88/1 104/16 115/13 117/17 117/21 118/1 118/3 125/1 126/11 126/16 126/22 127/3 127/5 127/24 128/3 128/8 137/10 142/25 152/17 168/22 196/12 197/18 199/14 206/10 210/7 211/14
subjective [7] 167/19 188/11 188/22 189/6 189/7 189/9 191/3
subjectively [2] 166/24 189/3
subjects [28] 42/9 42/11 42/24 43/14 74/2 74/13 79/25 80/7 80/23 123/7 124/14 124/17 125/3 126/16 142/22 169/4 178/8 178/23 178/24 185/21 186/3 203/16 207/14 211/16 211/19 215/8 215/8 227/9
subjects' [1] 138/5
submit [1] 40/21
submitted [3] 7/25 39/21 54/10
subpar [1] 193/21
Subpoenas [1] 169/8
substance [1] 14/25
substantial [6] 39/22 153/4 160/18 192/13 195/19 197/2
succeed [1] 45/5
success [1] 79/1
successful [11] 119/11 152/11 156/22 156/23 167/24 174/16 174/19 177/21 213/20 213/23 224/19
successfully [1] 195/23
such [11] 21/15 74/1 112/9 123/9 123/10 133/10 140/6 140/6 156/20 189/14 209/10
sued [1] 32/3
suggest [1] 174/21
suggesting [1] 118/12
suggests [2] 90/16 146/18
suitable [9] 37/8 42/18 43/1 43/4 50/1 50/25 51/3 80/18 95/9
Suite [3] 3/11 3/16 3/21
summaries [4] 219/16 219/18 220/7 220/9
summarize [2] 50/24 77/17
summarizing [1] 86/19
summary [8] 46/24 51/2 65/20 65/22 83/21 83/25 196/7 220/10
supervised [4] 90/4 92/1 140/19 141/4
supervisor [14] 12/20 13/4 13/20 14/14 15/13 15/15 33/17 41/8 50/3 50/19 51/12 54/14 102/6 142/6
supervisory [1] 218/4
supplement [1] 38/22
supplemental [2] 167/10 212/19
supply [1] 148/4
support [3] 126/4 162/6 175/24
supported [3] 151/19 178/3 188/2
supporting [3] 123/17 132/1 160/23
supposed [2] 160/25 207/1
supposedly [3] 70/9 112/25 198/18
suppress [2] 176/10 217/15
suppression [3] 188/19 194/10 194/11
Supreme [2] 188/15 188/17
sure [47] 16/8 18/10 18/11 28/3 30/15 30/18 30/19 31/4 33/10 35/25 36/8 39/17 45/2 45/2 49/8 57/25 71/1 71/9 72/7 72/10 72/13 83/19 84/12 84/22 88/11 90/7 101/12 101/14 103/13 106/20 108/11 115/13 115/25 116/4 118/11 124/7 128/14 136/20 137/4 177/2 178/14 193/6 201/1 205/19 207/16 210/4 210/4
Surely [1] 61/12
surmised [2] 41/14 81/9
surmising [1] 114/21
surprising [1] 13/1
surrender [6] 9/22 20/25 21/10 22/10 37/13 192/9
surveillance [1] 45/14
suspect [1] 222/5
suspected [1] 11/24
suspicion [2] 130/5 162/22
suspicioned [2] 120/4 131/6
suspicious [3] 10/17 12/9 12/18
SVW [4] 1/9 1/9 6/4 6/6
swear [1] 226/4
Swiss [1] 199/21
switch [1] 54/4
Switzer [6] 68/9 83/23 91/1 91/2 107/3 112/12
sworn [2] 9/2 208/12
sycr.com [1] 3/13
symbol [1] 11/2


## T


T's [1] 216/23
T.M [2] 207/11 208/1
tab [9] 9/1 31/7 31/15 32/9 43/19 43/20 73/7 73/8 188/17
table [2] 6/11 202/13
tabs [3] 8/13 77/20 115/17
take [16] 11/19 25/1 27/14 60/25 89/12 96/9 129/13 142/1 154/19 165/8 167/5 168/11 195/2 199/17 203/3 209/25
taken [3] 177/9 189/12 211/12
takes [5] 107/15 132/7 133/17 136/15 203/4
taking [2] 211/13 212/3
talk [29] 13/6 16/9 16/10 16/14 16/21 17/8 20/11 25/25 28/6 29/6 36/24 42/22 54/1 64/5 65/24 119/18 119/25 156/20 158/19 161/5 161/10 164/12 179/1 179/4 204/2 217/18 217/19 217/22 218/7
talked [20] 14/15 27/22 28/3 33/10 54/1 63/6 65/24 85/1 103/18 112/17 113/13 114/4 142/20 153/19 157/25 171/18 196/1 218/4 219/21 221/25
talking [25] 25/20 36/20 50/19 58/20 72/23 74/22 77/10 79/17 80/5 115/7 146/2 148/7 151/18 155/23 155/24 157/20 157/21 157/22 159/7 162/13 171/5 180/4 218/3 218/5 218/15
talks [12] 69/5 89/19 90/14 92/6 113/24 148/3 157/24 163/7 165/2 165/10 180/2 217/11
tape [1] 67/18
target [71] 14/10 27/19 30/17 30/23 32/2 33/14 33/20 35/4 35/8 40/15 43/14 50/12 51/24 66/2 67/18 68/1 74/2 74/12 75/6 75/6 76/20 78/4 79/25 80/1 80/6 117/17 117/21 117/25 123/7 124/14 124/17 124/25 125/3 126/1 126/11 126/15 126/16 127/2 127/5 128/2 128/8 128/14 128/16 130/3 137/10 138/5 142/22 142/25 151/22 151/25 152/5 152/7 152/17 169/3 175/13 178/8 178/23 178/24 185/20 186/3 199/8 199/13 203/16 207/14 210/7 211/14 211/16 211/19 215/7 215/8 227/9
targeting [1] 32/25
targets [4] 66/2 80/23 146/16 159/15
Tarun [6] 162/11 192/1 195/5 207/6 207/13 216/4
TARWATER [118] 5/5 6/13 7/11 7/18 7/22 7/25 8/5 9/2 9/6 19/13 19/19 28/10 32/23 36/22 37/17 37/17 37/24 44/9 53/1 53/10 76/23 77/16 79/3 79/17 86/9 97/8 117/19 128/6 135/10 135/13 136/6 136/21 148/17 151/18 151/21 152/6 153/7 155/15 156/3 156/9 158/20 158/25 159/4 162/2 163/1 163/2 163/18 165/25 166/13 166/19 166/24 167/14 168/19 168/21 169/18 169/21 170/14 170/24 173/9 173/20 174/10 177/21 178/14

# T


TARWATER... [55] 180/11 182/16 183/1 185/8 185/9 188/12 189/23 191/10 192/1 192/20 194/6 194/18 195/6 195/16 195/17 196/15 197/6 197/19 198/5 198/12 199/25 200/3 201/5 203/3 203/9 204/18 205/9 206/22 207/24 209/19 211/8 211/13 212/3 212/25 213/13 213/21 214/2 214/5 214/14 215/3 215/9 215/15 217/1 217/6 217/11 219/4 219/14 220/24 221/11 223/2 223/5 223/7 224/24 225/17 227/5
Tarwater's [8] 22/7 152/3 159/6 162/1 166/9 191/3 201/23 211/4
task [1] 218/11
tasked [1] 38/25
tasking [1] 19/14
tax [6] 172/11 182/11 182/11 199/20 218/21 218/24
taxes [1] 218/16
team [2] 26/9 218/6
technical [1] 149/21
technician [1] 186/25
technique [8] 45/3 45/5 45/7 81/22 82/15 168/2 214/18 214/20
techniques [8] 44/13 44/19 44/25 45/9 79/18 109/16 109/18 111/15
telephone [4] 68/22 68/23 91/1 221/24
tell [34] 13/9 13/17 17/5 23/18 23/25 24/4 24/13 24/16 25/3 30/14 65/25 67/1 75/16 80/7 87/14 95/18 102/20 107/9 107/19 118/8 118/17 129/9 136/21 173/5 174/18 176/25 179/11 201/21 204/7 204/9 205/3 209/8 217/3 219/5
telling [11] 66/3 110/13 114/24 126/24 154/1 159/9 170/16 179/16 193/23 201/20 220/6
tells [2] 171/25 172/10
ten [7] 156/7 159/1 159/2 159/3 171/6 179/24 229/5
ten o'clock [1] 229/5
ten-year [3] 159/1 171/6 179/24
tend [4] 130/3 212/18 212/22 225/1
tended [4] 223/6 223/7 225/21 226/7
Tennessee [1] 91/25
tenor [1] 153/23
tense [1] 158/17
tension [1] 139/15
term [6] 15/1 15/3 22/20 130/8 160/6 182/20
termed [2] 82/17 151/12
terms [18] 27/24 35/1 42/19 82/7 138/18 151/17 155/2 158/11 158/17 158/17 164/9 164/23 207/8 212/10 212/25 213/7 215/2 227/12
terrible [1] 63/19
test [11] 64/17 64/21 166/8 167/18 167/21 188/11 188/11 188/22 188/22 189/5 212/24
testified [14] 9/3 22/14 37/17 41/7 72/14 117/10 195/22 195/23 196/11 196/13 196/15 196/15 211/13 215/9
testify [5] 22/19 40/20 40/22 196/14 207/24
testimony [28] 6/14 7/22 7/24 17/21 17/23 27/3 48/7 76/19 84/24 129/13 149/16 151/3 151/7 152/4 192/12 192/14 192/15 192/20 193/8 193/13 199/3 199/15 200/14 203/14 211/7 212/2 227/4 227/5
than [22] 32/16 43/14 43/16 51/22 61/4 83/3 98/20 120/15 120/19 140/4 143/17 145/2 167/19 179/3 188/22 189/19 194/4 201/2 201/13 201/14 201/22 222/23
thank [21] 10/4 28/22 41/23 52/16 53/6 68/5 97/5 149/9 149/10 151/11 186/21 187/2 209/14 216/7 216/8 225/24 228/6 228/7 228/8 229/8 229/9
that [1656]
that' [1] 56/4
that's [142] 11/7 18/19 19/1 19/2 19/12 21/9 21/25 22/6 24/1 25/5 36/2 39/23 42/14 46/16 52/10 53/14 53/19 53/21 53/25 56/3 56/6 56/12 56/18 58/18 58/22 61/17 62/10 62/13 64/16 65/12 70/24 73/7 74/4 77/8 77/9 82/24 85/24 88/1 89/11 91/24 93/15 94/23 98/4 98/9 98/9 98/17 98/20 99/10 100/16 108/22 108/23 111/15 112/12 112/20 112/24 114/25 115/8 118/4 118/6 120/8 121/14 121/21 122/3 122/12 125/22 127/23 129/15 129/16 129/17 129/18 129/19 130/7 130/20 133/14 134/16 135/7 136/8 137/12 138/22 140/1 141/25 144/16 145/2 147/24 153/5 155/7 155/24 158/18 159/11 160/10 160/11 161/3 161/15 162/18 163/24 164/11 164/25 165/9 165/13 166/7 167/3 167/22 170/4 170/13 172/25 177/3 183/18 185/8 185/17 190/5 190/7 190/11 193/9 194/2 194/10 194/22 196/7 196/19 201/11 201/17 201/21 202/20 206/2 207/7 207/14 208/3 208/20 209/9 210/6 210/23 215/9 216/2 217/8 222/19 223/9 223/13 223/18 226/8 226/22 226/23 227/1 227/1
their [30] 13/25 22/20 23/6 69/25 80/8 108/5 130/16 131/22 132/1 132/1 132/5 132/14 132/15 133/9 133/14 138/6 146/12 146/19 146/21 168/10 170/17 178/24 179/20 188/23 190/11 192/21 211/19 217/23 222/11 225/6
them [68] 15/5 25/5 26/9 26/13 43/15 47/3 47/4 49/8 52/4 52/11 57/23 58/11 66/21 81/10 82/20 82/25 83/4 85/23 94/2 100/20 104/15 104/16 104/20 104/21 106/2 107/1 112/20 113/18 113/18 118/14 118/18 132/6 133/17 133/18 133/24 134/7 141/22 142/25 144/21 144/22 145/3 150/9 151/23 152/5 156/5 156/7 162/7 164/20 164/20 171/25 172/10 175/11 178/12 180/18 181/4 193/2 200/21 200/22 200/22 201/2 201/18 202/18 202/19 204/9 216/12 216/16 217/22 220/10
themselves [1] 220/9
then [145] 11/5 12/16 13/17 14/6 14/19 14/21 16/20 20/5 20/9 20/17 20/18 24/11 33/2 39/23 40/1 40/5 42/8 42/8 47/5 51/12 54/18 57/23 58/20 60/21 62/1 65/20 68/25 69/1 71/22 72/17 72/23 75/21 76/12 76/21 76/22 78/17 78/18 80/7 80/10 83/6 83/11 83/12 83/14 89/12 90/23 90/25 91/23 92/6 94/14 95/21 98/12 99/14 99/20 99/20 99/25 107/24 113/9 114/23 119/4 120/25 121/6 125/2 126/24 128/3 128/13 131/6 132/7 133/25 133/25 134/14 134/18 136/19 138/16 140/10 141/7 142/19 144/23 148/14 150/25 152/6 154/10 154/11 154/13 155/1 155/12 156/2 156/23 157/3 157/4 157/19 161/10 161/20 162/3 162/6 163/11 164/8 165/6 165/6 165/21 166/16 167/16 168/23 169/10 169/12 169/13 171/16 171/24 172/6 172/9 172/20 175/18 179/4 179/14 179/19 180/1 180/5 180/9 180/22 180/24 182/10 184/5 186/19 190/19 193/6 200/19 202/12 202/18 203/21 204/9 208/23 210/8 213/25 214/1 214/13 217/19 218/1 219/3 219/25 220/16 221/4 221/11 222/1 225/3 227/22 228/3
then-lawyer [1] 39/23
Theodore [1] 48/12
theories [1] 150/24
theory [1] 93/23
there [143] 7/21 8/12 12/21 12/22 13/14 14/19 18/15 21/11 21/14 24/11 26/11 30/10 32/5 35/20 37/20 38/14 38/24 42/8 53/4 54/24 55/7 57/11 65/20 67/9 68/19 68/20 72/17 72/21 75/24 76/19 78/2 80/7 81/11 83/22 83/24 83/25 84/4 84/10 85/3 85/5 85/6 85/8 85/10 98/12 99/16 105/7 106/22 110/13 110/24 111/3 112/15 112/18 112/20 114/14 121/1 121/8 123/22 123/23 123/24 126/3 126/4 126/12 126/17 126/25 129/6 130/11 130/19 134/10 139/10 139/17 140/16 141/1 141/3 141/5 141/16 144/7 144/12 144/14 146/2 149/12 151/13 151/15 152/22 157/19 158/4 158/6 158/15 159/3 159/4 161/6 164/3 164/24 165/6 166/7 167/23 170/14 171/14 172/25 173/17 184/10 185/18 187/25 189/22 191/24 192/15 194/7 194/17 194/19 194/23 194/25 195/23 197/23 197/23 197/25 199/2 200/13 203/15 203/16 204/8 206/15 207/12 210/11 211/14 211/24 212/7 212/15 212/21 213/7 213/8 213/25 214/18 214/20 215/6 216/16 217/24 218/14 218/14 218/18 219/8 219/20 220/22 224/1 224/14
there in [1] 220/22
there's [48] 27/21 33/1 40/23 47/6 49/16 53/3 57/16 60/6 60/18 88/13 89/12 92/12 92/13 92/20 92/21 106/20 109/18 110/18 113/20 113/23 114/2 115/13 120/24 121/1 121/7 125/23 126/20 129/18 133/15 133/25 154/17 159/22 160/7 165/1 174/14 189/6 190/9 193/11 193/12 193/14 194/4 196/12 199/17 202/14 210/9 211/18 225/4 226/25
thereafter [1] 69/2
therefore [7] 150/11 172/14 178/3 190/21 190/22 211/15 214/10
these [99] 23/21 23/22 24/10 25/4 27/24 28/19 28/21 29/11 29/25 30/19 40/12 42/10 43/8 43/22 47/18 57/22 58/4 58/19 70/13 75/3 83/17 85/13 85/13 85/19 86/11 88/5 94/1 94/20 107/2 108/15 108/16 108/16 109/16 109/17 112/10 112/10 112/11 112/14 112/16 112/18 117/13 117/15 120/9 120/12 125/7 125/11 128/20 132/4 140/3 144/6 144/7 153/19 154/5 154/10 156/13 156/20 158/13 158/15 159/14 161/5 161/24 162/5 162/9 163/8 163/21 164/19 164/21 165/21 166/10 169/18 169/21 174/7 175/5 176/4 177/12 179/10 179/11 180/6 181/2 182/2 189/24 198/19 199/10 200/21 201/22 202/5 202/6 206/18 207/7 211/16 213/10 213/14 213/15 214/3 214/15 216/2 216/19 217/5 219/16
they [176] 11/17 12/8 13/24 14/16 14/18 14/18 14/19 14/20 15/19 15/24 16/1 16/2 17/5 17/6 19/13 20/8 20/20 20/20 22/17 22/21 23/14 24/12 26/7 26/9 26/12 28/4 40/15 42/25 45/11 45/12 47/16 54/21 59/12 64/21 64/23 65/4 65/8 65/13 66/22 68/25 70/6 78/5 83/20 84/6 85/11 88/9 90/3 90/16 93/21 94/2 94/3 94/3 94/10 94/13 94/15 94/23 95/4 104/13 104/13 105/5 105/8 106/15 110/9 113/17 114/2 119/3 123/17 125/7 126/11 126/12 127/21 127/23 129/1 129/3 130/15 130/15 131/21 131/22 131/24 133/12 133/18 133/18 133/19 133/20 133/22 133/23 135/10 135/11 136/1 136/2 136/3 136/3 140/23 141/22 142/21 142/25 144/7 144/7 146/4 146/14 146/15 146/15 147/4 147/9 147/10 147/18 150/14 150/15 152/5 152/18 153/21 156/6 156/9 156/14 156/15 157/1 157/25 158/19 159/1 159/1 159/24 160/4 160/5 160/6 165/22 169/20 171/25 172/16 173/15 175/11 175/13 175/16 176/5 179/2 179/17 188/23 188/23 190/14 190/24 191/4 192/23 192/25 193/13 193/14 193/19 194/5 195/3 196/23 197/10 200/23 206/15 206/17 206/18 207/2 208/23 209/17 214/23

# T


they... [19] 215/8 215/14 215/15 215/16 215/24 215/25 216/1 216/1 216/2 216/2 216/3 216/4 216/16 218/15 220/17 222/8 222/17 226/21 227/9
they'll [3] 95/3 134/7 214/16
they're [22] 12/7 45/3 45/4 70/4 82/25 98/23 118/18 118/18 123/7 132/5 133/10 134/4 157/20 159/24 170/16 181/3 189/2 191/5 191/16 193/21 216/16 226/4
they've [5] 25/5 111/20 192/14 192/17 193/19
thing [37] 18/7 21/15 23/12 26/1 27/21 43/23 71/8 76/9 76/14 81/11 98/4 111/16 129/12 133/25 135/6 146/9 151/5 154/15 156/18 157/24 162/21 165/5 168/9 168/16 172/2 174/8 177/17 178/18 183/20 184/4 186/17 188/24 195/18 211/11 218/3 222/21 226/24
things [41] 23/4 49/6 72/6 93/20 94/22 109/21 112/4 112/9 120/10 120/13 129/8 130/14 136/12 136/22 137/6 139/13 146/20 153/8 161/24 164/19 164/21 166/5 170/2 170/3 187/5 191/3 191/18 192/21 192/22 193/1 193/23 202/4 202/17 209/20 211/25 212/7 212/8 213/14 213/15 220/24 221/1
think [145] 7/10 8/12 13/5 13/20 19/20 21/4 23/4 40/19 45/4 48/17 49/22 51/22 52/24 53/4 54/6 54/11 56/11 58/22 59/14 62/4 72/12 75/12 78/18 78/19 83/12 86/1 86/22 95/10 95/12 101/11 103/22 104/11 104/13 106/2 107/18 111/5 114/2 115/19 115/20 120/9 120/23 121/12 122/20 124/6 125/19 125/21 127/1 127/21 130/24 131/24 132/21 141/5 142/18 142/23 144/25 145/10 145/20 146/10 147/5 149/5 149/15 149/18 150/14 150/15 150/25 151/15 151/17 152/12 152/24 153/7 154/3 154/20 155/14 155/24 159/12 159/15 159/22 160/21 162/19 163/24 164/1 164/5 164/6 164/11 164/17 165/23 166/11 166/23 167/23 167/25 169/20 169/23 170/13 170/23 173/19 174/15 174/18 176/17 176/18 176/22 179/11 180/10 182/5 186/10 188/5 188/7 189/2 190/11 190/14 191/1 191/4 191/14 191/15 191/22 191/22 193/19 194/22 194/23 195/1 196/4 196/7 198/19 201/2 203/2 204/23 204/24 205/13 205/15 208/5 209/12 209/18 210/2 210/25 212/5 212/25 213/5 213/18 214/7 214/11 215/2 220/22 221/7 223/3 226/25 228/2
thinking [7] 131/14 154/5 156/3 166/7 205/17 213/15 224/13
thinks [1] 206/3
third [13] 32/24 36/1 39/18 101/13 174/1 188/17 219/23 220/14 220/22 221/18 221/18 221/21 227/3
this [383]
thorough [4] 26/12 101/24 103/3 188/8
those [91] 8/1 8/18 13/21 15/8 20/13 20/20 21/6 23/7 23/8 23/18 28/1 28/18 44/12 46/23 49/3 49/14 50/5 50/15 55/3 55/13 55/15 55/24 58/9 58/13 58/14 62/5 64/11 65/4 65/7 65/8 72/9 89/17 92/18 93/9 94/22 95/3 95/3 100/14 102/17 111/3 111/17 115/2 117/1 127/25 128/1 131/22 133/17 137/21 138/4 141/20 143/2 145/8 147/2 152/8 153/8 153/20 154/8 155/1 155/17 155/17 155/23 160/16 160/17 164/5 167/13 170/6 171/21 176/7 177/13 185/5 193/1 195/9 196/9 196/23 197/5 197/14 199/23 200/6 202/11 206/13 206/23 206/23 212/23 213/3 213/11 213/19 216/5 220/11 220/12 223/21 227/19
though [15] 66/24 70/8 70/9 70/10 94/20 101/3 101/18 154/4 166/21 173/20 174/23 194/1 221/12 221/12 225/1
thought [32] 17/21 28/3 35/3 43/8 44/15 53/19 76/24 94/16 95/4 103/25 105/8 112/5 117/16 127/7 129/3 130/19 131/24 146/13 146/15 153/20 154/14 158/7 166/9 171/12 175/20 193/3 196/5 196/15 196/17 203/13 205/25 213/7
thoughts [5] 34/15 50/5 50/5 55/16 150/24
three [22] 22/15 28/21 29/12 29/13 29/13 49/11 96/8 100/14 100/19 100/20 121/4 137/25 160/2 163/12 212/8 212/23 219/1 219/20 219/21 222/2 224/16 226/3
through [37] 12/11 17/3 17/4 25/18 34/10 35/13 36/11 41/8 41/21 43/8 43/12 43/20 50/22 51/18 74/23 75/24 78/8 87/14 87/15 88/16 100/18 133/4 137/6 140/19 140/23 141/24 148/9 149/22 149/25 188/4 209/20 211/20 215/10 216/3 216/4 216/12 219/10
throughout [3] 143/23 214/7 221/13
throwing [1] 193/5
thrown [1] 176/14
thrust [1] 163/17
thus [1] 194/11
tickets [3] 14/23 105/12 105/18
Ticktock [3] 29/19 29/20 29/21
till [1] 228/15
time [107] 9/14 9/24 11/7 12/20 13/7 13/10 13/21 15/21 16/17 16/21 16/22 19/10 20/4 20/22 22/5 22/24 27/1 30/16 37/9 37/10 37/14 39/21 41/19 54/16 56/13 56/19 56/25 57/3 57/21 58/4 58/8 58/13 60/10 61/16 62/12 62/19 64/6 66/3 69/19 71/25 73/18 77/5 83/11 83/13 84/2 103/11 103/14 105/5 105/5 107/10 107/15 107/20 108/10 109/4 110/2 111/7 112/11 113/5 113/15 115/5 119/18 127/20 128/6 128/21 130/11 130/12 132/14 132/22 133/14 137/2 137/3 138/19 140/25 142/12 143/19 143/20 146/13 152/6 153/2 154/19 156/10 156/20 163/20 169/4 174/25 176/13 176/14 180/7 186/19 197/19 197/20 198/5 198/20 199/4 199/12 199/21 200/15 201/23 202/12 202/13 202/15 203/9 207/8 222/6 228/5 228/13 229/3
timeline [3] 18/12 198/24 201/8
times [11] 16/19 42/22 94/15 155/4 155/19 157/12 160/2 160/15 163/2 192/3 197/11
timing [1] 12/18
tips [2] 181/2 181/16
tired [1] 227/24
titled [1] 221/21
TM [1] 169/16
today [3] 150/20 204/11 209/20
together [11] 17/7 22/17 22/22 59/13 76/25 77/3 107/2 129/4 131/25 177/13 179/17
told [36] 13/19 13/21 14/8 14/11 14/13 14/22 14/24 19/8 19/24 54/14 54/20 61/17 63/13 83/22 105/2 106/9 108/12 113/14 118/23 119/7 130/1 135/13 142/25 143/24 172/16 172/19 173/11 175/16 177/14 179/9 179/19 180/17 182/2 201/14 206/25 214/3
tomorrow [6] 228/10 228/10 228/12 228/14 228/24 229/1
tons [1] 115/14
too [11] 23/3 45/3 74/24 117/17 151/25 184/6 194/22 200/20 207/2 227/22 228/13
took [4] 43/2 111/8 117/5 138/12
tool [1] 214/21
top [16] 31/22 32/9 40/8 47/23 49/9 72/25 81/15 86/17 92/8 99/9 128/1 128/3 128/11 152/6 185/17 198/23
topic [3] 33/8 99/9 101/3
Torrance [1] 2/20
totally [3] 24/25 37/19 201/16
towards [1] 213/16
track [4] 27/17 41/10 48/18 63/3
trading [5] 11/1 12/9 17/12 45/19 165/14
traditional [6] 79/18 82/15 109/16 109/18 168/2 214/18
training [4] 105/20 105/24 131/19 173/10
transactions [1] 216/11
transcript [6] 1/15 66/11 83/15 84/7 91/16 182/25
transcripts [8] 65/6 65/14 67/2 69/15 85/13 85/24 221/12 221/13
transfer [4] 11/14 133/16 134/12 146/19
transferred [2] 10/19 12/15
transferring [1] 158/22
transpiring [1] 105/6
treat [2] 26/17 26/23
treatment [1] 21/23
trial [4] 7/7 14/6 228/20 228/20
tried [13] 14/23 15/24 45/5 47/14 105/11 105/17 109/15 129/11 154/4 181/13 193/13 193/15 226/8
trigger [1] 155/2
triggered [2] 130/11 156/8
triple [1] 49/6
triple-checked [1] 49/6
trolling [9] 15/1 15/4 15/9 55/12 55/14 55/20 55/24 114/18 114/19
trouble [2] 107/4 154/7
truck [1] 139/4
true [17] 41/25 64/4 111/18 111/21 120/19 129/17 131/10 131/12 134/19 138/22 184/15 184/18 185/21 199/2 204/7 214/23 223/20
truly [1] 118/20
trust [10] 14/20 26/12 79/24 80/1 80/6 80/8 131/19 178/7 178/8 178/12
trusted [8] 38/12 43/13 131/16 132/22 136/5 215/1 215/22 215/22
trusting [1] 132/20
trustworthiness [2] 54/24 103/15
trustworthy [8] 50/10 54/22 103/5 104/1 106/16 106/19 130/2 181/21
truth [14] 46/8 114/24 135/13 165/2 165/7 165/18 166/12 167/21 191/9 191/13 193/23 213/16 218/2 220/6
truthful [6] 74/8 74/10 166/20 166/20 166/24 181/21
truths [1] 151/19
try [13] 8/15 12/8 19/25 27/17 48/11 50/14 74/10 134/16 155/1 197/7 203/22 204/16 211/11
trying [28] 27/25 41/21 44/12 45/12 45/16 57/23 64/21 65/1 70/3 86/14 90/16 106/7 106/24 109/14 118/4 121/10 121/11 126/9 136/12 140/5 143/22 145/18 162/18 194/18 207/3 212/4 213/16 213/17
Tuesday [2] 68/21 221/23
turn [16] 19/13 28/9 30/6 33/23 68/5 68/15 72/17 85/24 89/19 90/8 99/7 122/11 154/24 197/16 210/3 212/12
turned [3] 85/12 201/12 214/23
turning [5] 18/5 30/5 31/15 46/24 48/21
twisted [1] 218/19
two [43] 7/16 12/14 23/4 26/6 31/7 32/9 64/13 65/10 73/8 75/25 78/3 84/5 88/23 92/11 92/18 93/4 115/3 115/4 115/11 130/13 135/18 137/24 151/15 159/22 159/23 164/5 164/7 164/17 167/13 169/7 172/7 197/17 199/9 199/17 209/21 214/13 219/21 220/9 220/9 226/3 227/12 227/16 227/19
two-paged [1] 92/11
type [19] 86/18 94/9 98/13 99/11 105/20 140/3 160/18 160/19 164/24 165/22 165/24

## T

type... [8] 166/1 202/1 204/15 212/20 222/5 222/9 226/11 226/17
types [5] 44/14 98/12 136/22 212/23 216/19
typically [2] 98/19 98/24

## U

U.C [1] 80/6
U.S [13] 14/5 26/10 32/1 54/3 83/7 141/22 180/15 213/13 217/23 223/12 223/15 225/15 226/8
ulterior [1] 105/7
ultimate [2] 8/21 41/17
ultimately [10] 22/10 46/4 51/18 51/25 118/13 127/13 169/5 169/23 206/4 211/12
unbeknownst [1] 37/11
unclear [3] 23/12 208/4 208/6
uncorroborated [1] 181/3
uncover [1] 163/15
under [20] 11/5 25/7 29/22 33/2 37/13 60/7 60/10 92/1 141/8 142/10 142/14 142/25 187/13 192/8 192/9 197/2 197/20 200/20 203/17 222/18
undercover [2] 129/10 177/22
undercut [1] 194/2
underlying [1] 146/5
undermines [1] 155/17
understand [16] 70/3 72/16 76/16 93/11 102/25 115/19 115/22 126/7 126/21 126/25 139/13 140/5 194/3 202/16 207/15 208/5
understanding [8] 16/6 18/2 59/1 76/25 84/17 104/23 112/3 138/15
understood [8] 13/24 20/3 20/7 35/11 78/11 124/4 198/15 208/21
Underwood [4] 176/9 176/19 176/20 176/21
uneventfully [1] 127/9
unfolding [1] 22/2
Unfortunately [1] 209/5
uninterrupted [1] 179/24
unique [2] 97/16 176/22
UNITED [15] 1/1 1/7 1/23 2/6 2/8 2/8 6/4 6/6 6/10 26/16 71/7 71/22 169/19 176/9 212/13
Universal [3] 31/19 32/20 171/23
unknown [1] 169/16
unless [5] 40/23 110/12 195/16 211/11 216/5
unlike [5] 79/5 153/16 173/7 173/15 179/8
unlikely [2] 45/4 80/6
unload [1] 133/25
unreasonable [3] 185/4 188/12 203/2
unrelated [1] 186/1
unreliable [11] 51/5 51/7 55/1 55/4 55/8 104/24 105/8 112/2 112/8 112/25 161/22
unsuccessful [1] 120/4
unsuccessfully [1] 155/6
unsuitable [1] 37/19
until [2] 21/1 22/10
untrustworthy [9] 51/6 51/7 55/1 55/4 55/8 104/24 112/2 112/8 112/25
up [83] 13/5 14/5 18/8 19/14 23/7 23/10 25/19 26/25 28/4 30/15 44/23 47/24 51/18 53/21 60/15 76/15 84/1 85/13 85/24 89/13 93/19 102/10 102/11 102/13 102/14 102/21 105/21 106/18 107/15 108/11 111/23 116/22 119/13 120/6 128/4 128/21 132/8 133/22 133/24 133/25 135/7 135/8 135/10 136/4 139/13 140/14 140/23 141/18 147/22 147/22 147/22 152/9 158/24 171/14 171/16 171/21 171/22 172/8 172/17 176/14 180/5 180/20 180/21 180/22 180/22 180/25 184/1 187/23 191/25 197/8 197/20 198/20 200/22 201/1 201/2 201/19 201/20 206/4 206/24 207/7 217/12 217/23 221/18
upend [1] 125/20
upfront [3] 24/20 107/18 112/4
upon [4] 11/14 37/16 185/8 211/4
upper [1] 97/13
upset [2] 9/20 184/11
upshot [1] 104/11
us [12] 6/10 13/11 19/24 25/18 30/3 36/8 135/23 161/11 187/6 200/25 201/3 201/13
USAO [3] 29/9 32/11 39/24
use [33] 37/2 38/3 38/16 75/10 78/21 81/19 88/8 105/11 110/3 111/15 129/10 130/7 133/18 134/7 136/25 143/23 147/8 153/11 161/23 173/13 179/12 182/5 182/7 182/17 182/22 184/6 205/5 214/23 216/21 217/1 217/2 221/8 224/15
used [24] 26/1 48/15 55/4 67/11 78/22 79/10 82/15 130/24 132/21 134/6 140/22 149/1 156/22 157/1 160/7 160/22 175/13 183/4 197/11 205/5 205/8 214/21 222/20 225/22
useful [4] 82/6 82/25 153/13 196/23
usefulness [1] 147/23
uses [1] 137/21
using [16] 37/24 38/7 43/24 47/16 75/9 79/18 109/16 109/17 120/5 134/9 168/2 184/7 184/11 184/24 210/13 217/5
usually [1] 49/11
utilize [1] 185/5
utilized [1] 54/21
Uyeda [9] 2/15 6/15 39/14 168/16 170/23 171/11 171/16 171/18 177/14

## V

vacuum [2] 145/21 195/1
vague [1] 82/9
Vaguely [2] 53/22 59/9
valid [1] 212/17
valuable [3] 133/16 145/1 153/4
value [1] 98/24
valued [1] 23/10
variety [1] 144/1
various [3] 86/7 137/6 140/15
vehicle [1] 216/22
veracity [1] 191/12
version [1] 43/21
versus [2] 6/5 6/6
very [51] 9/25 10/11 13/19 22/24 31/22 32/9 40/25 43/23 45/15 45/16 48/6 50/11 51/9 53/6 63/2 65/23 68/15 71/18 80/5 81/22 96/10 104/3 106/21 107/5 112/9 113/2 117/14 132/20 150/17 151/20 155/2 155/18 155/22 162/4 163/11 170/21 171/22 173/25 175/20 184/9 184/16 186/6 186/21 208/3 214/20 216/9 218/4 219/5 220/20 222/14 226/1
via [1] 68/23
viable [2] 81/22 213/4
view [19] 9/8 14/8 14/9 27/12 50/9 50/23 51/2 54/18 54/19 76/16 105/6 110/1 110/17 110/20 110/23 120/22 163/21 166/25 191/3
viewed [4] 50/10 51/9 130/3 184/25
viewing [1] 45/2
virtually [1] 8/24
volume [4] 5/14 8/16 52/13 52/15
voluminous [1] 94/13
voluntarily [13] 31/25 56/1 70/24 82/19 83/3 95/18 116/21 148/20 183/23 186/12 200/22 221/3 221/8
voluntary [2] 109/7 135/12
volunteer [1] 199/6
volunteered [1] 186/2

## W

Wait [1] 87/17
waiver [3] 7/1 7/4 7/6
walk [1] 121/5
walked [1] 85/1
wall [1] 130/17
Walter [5] 59/16 68/21 71/13 103/19 218/9
want [50] 34/2 36/7 40/6 45/2 48/19 49/5 71/15 76/14 76/15 88/11 97/9 101/24 102/2 102/3 103/2 107/3 110/3 110/6 111/13 111/14 113/7 114/23 116/4 121/7 121/25 127/19 130/7 133/12 133/17 138/6 143/2 143/16 147/25 153/14 161/23 164/17 166/2 166/3 166/4 166/11 166/11 168/9 170/8 173/4 193/2 193/24 222/7 225/25 227/15 228/16
wanted [27] 7/17 28/3 33/9 43/7 49/8 64/17 70/10 111/12 134/5 138/18 138/19 151/15 152/23 160/23 164/6 164/21 212/9 212/12 212/23 213/2 214/5 214/13 214/16 216/6 221/2 221/3 222/13
wanting [1] 195/4
wants [3] 16/10 158/21 174/15
warrant [5] 161/14 173/16 175/22 188/19 212/16
warrants [1] 173/7
was [573]
wasn't [46] 23/10 27/14 38/14 59/4 62/16 68/24 78/15 85/8 106/11 112/4 112/20 120/19 120/20 120/20 121/1 127/24 128/2 128/3 130/2 131/12 134/19 139/9 141/8 142/13 142/14 146/25 152/13 152/15 154/9 155/4 155/12 155/12 155/21 155/21 156/16 157/19 169/5 172/21 193/10 198/19 199/3 203/8 203/19 209/21 212/25 218/10
wastebasket [4] 120/24 120/25 121/4 121/7
water [3] 4/4 129/14 139/4
way [51] 11/20 14/5 23/14 35/16 40/13 46/6 46/20 51/16 56/16 59/13 61/11 61/23 63/10 75/13 76/7 78/21 84/1 91/19 93/24 101/17 105/14 109/10 118/6 120/13 120/22 120/23 127/5 128/4 130/20 138/7 140/23 141/25 144/8 144/24 147/17 153/7 153/24 160/14 169/18 170/20 175/19 181/15 184/14 189/3 201/4 209/7 210/11 210/14 216/11 223/9 225/4
ways [5] 47/13 125/25 135/18 152/13 177/7
we [224] 7/8 7/10 9/23 10/18 10/20 11/15 11/23 13/1 13/6 19/6 19/21 21/4 24/21 25/1 25/8 25/9 25/19 25/20 26/25 27/18 27/22 27/23 28/3 28/5 30/2 30/15 30/19 30/19 32/15 33/9 33/10 33/10 33/15 33/15 33/15 33/16 33/18 33/19 34/15 35/3 35/5 35/8 35/9 35/24 36/12 36/25 37/1 38/13 38/15 38/16 39/6 39/13 40/15 41/8 41/13 41/14 41/20 43/7 43/8 43/15 44/12 44/14 44/15 49/5 49/6 49/7 50/9 50/14 50/20 50/22 51/2 51/14 51/23 51/23 52/18 54/1 57/7 63/6 63/6 63/9 63/9 70/4 71/17 72/17 72/23 73/11 73/11 75/23 79/21 79/21 80/19 80/20 81/8 81/9 84/10 85/24 86/5 87/14 88/8 88/8 90/8 91/7 100/18 101/18 103/18 107/3 108/15 109/17 109/17 109/18 110/11 111/5 111/7 111/10 111/15 113/9 114/3 114/15 116/5 116/18 117/11 117/14 117/14 117/15 117/16 117/16 117/17 119/2 119/17 120/9 121/15 121/24 122/9 125/24 126/11 126/22 126/23 127/12 127/13 128/14 129/3 129/25 130/1 130/3 130/17 130/17 130/18 130/18 130/18 130/19 131/7 131/12 136/8 136/25 137/6 137/7 143/22 143/23 144/9 144/10 147/14 149/22 150/18 151/4 152/5 152/20 154/2 156/14 157/21 157/21 158/3 162/25 163/2 164/11 165/21 165/24 168/6 170/24 172/14 176/17 176/18 179/12 180/3 180/10 181/2 181/4

## W


we... [38] 181/17 182/5 182/6 182/7 184/5 184/7 185/21 186/25 188/7 192/5 193/7 194/14 195/12 203/2 203/14 203/14 203/20 203/21 204/11 204/11 208/2 208/15 210/5 211/18 211/19 211/21 211/25 212/22 219/10 219/21 220/20 221/7 221/8 224/15 224/22 225/17 228/23 228/25
we'd [5] 8/1 35/10 105/10 130/19 130/20
we'll [14] 14/1 66/12 77/18 78/4 91/16 97/20 105/13 106/9 123/4 168/11 186/19 227/16 227/23 228/4
we're [27] 17/20 19/21 21/3 27/11 40/21 44/12 45/8 72/24 77/10 88/11 99/25 115/7 140/12 141/8 142/20 151/17 159/7 162/1 173/6 181/19 183/11 193/18 200/7 216/10 223/3 225/8 227/24
we've [16] 15/22 28/9 37/20 47/13 74/22 108/12 109/15 122/12 132/2 156/23 159/2 168/11 181/15 198/21 199/2 221/25
WEDNESDAY [3] 1/17 6/1 97/1
week [3] 143/1 228/19 228/20
Weichert [2] 21/22 39/23
weigh [2] 174/14 194/21
weighing [1] 27/14
weight [1] 191/10
well [137] 8/14 8/23 10/11 15/6 21/6 21/16 24/23 29/10 34/10 38/14 39/13 40/25 43/6 44/20 45/15 45/16 48/6 49/19 50/2 53/2 53/6 54/20 55/5 57/19 58/3 61/10 62/11 62/16 63/2 63/6 64/23 65/5 65/24 67/6 69/16 71/17 71/22 72/2 72/17 73/12 73/21 74/11 75/8 75/9 75/10 82/9 84/9 91/16 92/20 94/9 96/1 102/15 104/11 106/11 107/5 107/14 108/12 109/14 110/16 111/23 112/3 112/9 113/18 114/17 115/20 116/21 117/10 118/14 120/25 123/2 125/11 126/22 128/2 134/18 135/7 137/25 138/14 140/5 140/25 143/4 144/23 147/5 147/19 150/5 150/17 150/22 152/21 155/20 156/9 157/20 158/3 159/22 161/3 162/1 163/24 164/5 165/21 166/8 167/22 175/18 176/4 176/23 177/5 182/22 183/9 184/12 186/16 186/25 191/6 192/25 193/9 195/8 196/10 198/18 200/10 201/21 202/20 203/12 208/3 208/12 208/19 208/24 210/1 210/3 211/20 211/23 214/14 220/20 221/10 221/11 222/14 222/15 222/17 222/25 225/4 227/22 228/25
went [22] 13/6 16/24 32/1 50/9 50/22 75/17 76/1 100/18 140/19 142/21 169/16 185/15 201/22 207/6 207/11 207/13 207/22 208/1 209/20 217/20 219/10 225/5
were [123] 7/8 11/9 11/16 11/17 12/17 12/24 17/2 17/6 18/15 20/20 24/1 25/19 25/20 26/25 30/15 33/4 40/13 40/24 42/8 42/11 45/9 47/3 47/4 47/16 51/16 51/18 51/23 51/25 52/11 53/23 55/3 55/4 55/4 56/24 57/7 58/20 63/6 64/14 64/21 66/12 67/11 69/6 69/9 69/11 69/15 70/19 72/23 74/5 74/8 78/13 80/23 85/10 85/11 85/22 85/22 87/20 94/15 94/22 101/18 102/5 103/19 104/13 105/5 114/10 115/6 118/16 123/13 126/4 126/9 129/8 129/25 130/1 130/15 130/17 130/17 130/18 133/1 134/11 142/25 144/12 146/4 146/15 146/16 146/19 146/22 147/10 152/8 153/10 153/21 154/5 156/3 156/14 156/15 157/21 157/22 162/6 166/10 176/7 177/12 180/3 184/3 190/10 195/9 196/23 197/14 198/14 202/11 203/10 203/15 203/15 203/16 203/20 206/17 213/8 215/6 215/14 215/15 215/16 216/1 218/15 220/10 220/17 227/8
weren't [11] 28/4 58/16 120/1 128/14 143/24 144/5 144/9 147/4 206/16 206/18 215/24
West [1] 3/6
WESTERN [1] 1/3
Westwood [2] 56/11 57/6
what [324]
what's [15] 50/23 68/15 78/1 83/24 88/8 94/4 94/6 94/7 108/10 109/1 110/22 173/3 174/8 204/19 219/17
whatever [8] 8/22 27/8 27/8 45/14 62/4 107/3 114/8 195/20
whatsoever [1] 194/4
when [114] 10/13 10/16 16/22 16/25 17/10 17/11 19/25 20/22 23/11 23/22 24/16 24/20 26/19 26/21 26/22 27/16 33/6 44/25 45/2 47/2 50/2 51/8 53/15 53/17 53/21 54/10 55/25 57/8 58/16 59/21 59/24 60/12 60/15 63/6 66/25 67/21 67/25 69/11 72/1 72/4 72/23 74/23 75/3 76/11 76/17 78/14 79/3 80/5 82/19 84/25 86/19 91/23 99/16 102/5 102/19 106/4 106/24 108/7 113/12 115/5 128/10 128/23 135/7 138/3 142/20 151/22 154/16 154/24 156/21 158/15 159/17 163/13 168/21 171/10 172/6 172/6 172/10 176/13 176/17 177/15 177/20 178/21 178/21 179/1 179/4 179/23 180/1 180/4 180/14 181/23 187/23 192/1 196/15 197/23 198/10 200/8 200/16 200/22 200/25 208/10 208/19 210/7 212/17 216/14 216/21 219/8 219/15 220/1 220/5 220/11 220/14 220/16 223/14 228/13
where [85] 7/8 8/17 11/17 12/14 13/7 19/2 27/18 30/2 35/24 37/2 38/15 42/21 44/10 47/15 49/9 53/20 59/24 71/17 72/19 78/12 79/17 84/25 85/24 89/19 90/6 90/14 91/16 91/24 93/17 95/1 97/21 98/13 99/5 100/22 101/9 106/5 106/6 109/7 112/15 112/18 112/23 112/23 112/25 113/8 113/17 114/19 120/8 121/15 123/7 124/25 127/11 129/8 130/18 136/2 141/7 146/14 147/22 147/24 147/24 148/3 155/7 165/8 165/19 170/4 170/11 173/21 175/20 176/9 182/6 185/17 185/24 186/5 187/25 188/24 189/17 193/7 194/23 211/2 211/18 216/10 216/17 220/12 223/22 226/9 227/9
where's [1] 119/20
whether [75] 11/20 12/21 12/22 13/11 15/6 18/5 27/23 30/23 32/5 33/13 35/3 35/17 36/23 37/2 37/8 38/24 38/25 41/3 50/1 50/25 58/1 76/20 78/3 78/22 82/5 82/14 102/13 103/4 103/25 109/22 109/24 110/7 110/8 110/18 110/22 110/24 110/25 111/1 111/3 111/18 111/20 114/21 117/24 117/25 118/1 118/25 121/17 123/3 124/1 142/21 145/6 145/14 149/1 151/13 152/9 156/14 159/7 159/14 161/2 164/9 164/13 164/14 164/15 168/1 169/22 174/14 183/4 189/3 190/4 212/10 213/4 214/1 224/10 225/22 226/21
which [62] 10/19 10/20 12/13 16/11 18/19 20/10 20/18 21/21 29/13 32/19 47/7 49/19 62/7 63/13 67/18 68/16 75/13 87/3 88/5 94/21 99/11 99/21 101/13 104/9 107/3 113/7 115/16 122/14 124/18 126/16 133/6 136/24 141/18 141/20 146/11 162/4 164/7 171/4 171/6 171/18 173/13 182/3 184/3 187/15 187/21 188/5 188/6 188/16 190/13 191/5 195/13 197/6 200/15 210/9 210/15 210/16 211/10 219/11 219/16 221/4 224/8 226/6
while [9] 22/3 45/8 151/6 172/3 179/5 192/8 195/25 198/7 199/5
who [75] 6/16 6/19 6/24 8/8 12/24 14/13 15/22 19/13 21/22 22/23 30/17 42/9 42/24 43/14 48/8 51/16 52/20 56/17 59/8 59/11 64/13 68/11 78/20 79/5 79/7 79/8 81/10 90/4 92/1 95/23 103/24 104/8 123/7 125/19 127/21 129/5 132/7 132/11 132/18 133/1 133/1 133/15 134/10 134/24 134/25 135/21 138/12 138/14 138/18 138/19 138/20 139/2 139/18 145/3 146/4 148/18 152/8 159/24 159/25 160/1 162/15 162/20 175/21 178/22 198/14 199/22 203/15 206/23 209/22 217/18 217/19 218/8 218/20 218/20 218/20
who's [3] 40/2 79/4 160/25
whole [19] 17/22 53/2 56/6 92/2 131/6 131/7 132/1 133/13 153/23 154/3 161/11 161/14 168/9 181/14 184/11 186/17 199/19 200/17 204/5
wholehearted [2] 181/22 192/18
whom [1] 203/17
why [110] 9/18 21/6 21/13 23/2 25/11 30/14 38/4 39/8 39/8 39/22 41/16 42/4 42/16 42/17 42/21 42/25 43/2 43/2 43/3 43/5 44/12 44/20 45/8 49/3 49/15 54/19 78/14 80/15 80/17 80/25 81/3 81/18 81/19 94/23 95/8 117/5 117/20 117/22 118/2 118/17 120/2 120/3 125/15 126/25 128/3 128/16 129/9 129/9 130/23 131/11 131/15 132/25 133/3 133/4 133/20 133/22 134/1 134/22 135/22 136/8 141/5 144/1 145/22 146/3 147/4 151/20 151/22 153/14 155/12 156/20 157/2 157/2 159/6 159/11 159/13 159/16 161/7 162/3 162/7 162/12 162/13 162/18 162/19 163/4 163/12 163/23 171/6 171/7 171/14 173/6 174/18 174/20 182/7 190/13 194/8 198/18 198/19 205/14 206/18 208/3 208/19 214/21 214/22 215/3 219/14 219/14 219/22 220/25 227/6 228/25
wide [2] 184/22 216/1
will [12] 8/19 10/8 17/24 25/12 31/9 32/10 63/23 149/16 155/2 196/25 217/25 227/4
willfully [1] 121/10
willing [7] 22/24 97/25 119/9 181/20 185/23 202/23 221/8
Wilner [32] 9/13 18/20 19/2 19/6 19/8 19/12 37/18 38/10 38/15 38/25 39/4 39/15 39/19 39/21 39/22 40/6 40/10 40/20 135/8 153/9 161/22 172/13 172/19 192/10 192/16 192/17 196/24 198/8 198/10 201/14 206/25 207/1
Wilner's [7] 38/17 39/18 52/19 52/21 180/9 181/1 197/22
WILSON [7] 1/5 83/14 83/18 117/5 122/21 136/21 145/24
wire [7] 13/15 29/16 29/19 34/3 51/18 51/19 174/4
wires [1] 52/1
wiretap [52] 12/25 26/17 26/23 27/4 27/9 30/10 33/13 41/17 42/3 43/21 45/25 47/1 53/15 53/17 53/23 76/22 77/10 82/16 108/18 108/19 109/11 109/19 110/18 111/4 114/4 119/3 119/13 121/19 130/9 130/12 131/13 150/13 151/20 161/2 162/4 170/18 173/17 174/15 188/9 189/21 190/3 192/2 194/11 201/19 203/9 203/16 203/18 203/25 207/4 216/4 216/21 225/23
wiretaps [5] 173/7 173/13 176/25 216/13 216/20
wise [2] 175/20 176/7
wish [7] 165/5 165/23 166/16 168/1 177/17 212/1 212/6
wishes [1] 40/21
withhold [1] 177/16
withholds [1] 165/4
within [4] 19/4 31/21 86/20 87/5
without [20] 27/14 51/10 83/8 83/8 83/9 85/1 91/9 91/9 114/12 119/3 145/25 148/20 169/16 183/23 207/6 207/11 207/13 207/22 208/1 216/20

## W


witness [17] 6/13 8/14 9/1 9/2 18/2 28/8 48/3 55/16 57/17 62/22 62/23 62/24 76/23 85/15 150/10 150/10 183/5
witness's [2] 76/16 150/12
witnesses [4] 5/3 25/7 63/19 149/12
won't [4] 154/24 156/23 204/19 204/25
WOO [4] 2/11 6/11 192/19 213/24
word [22] 34/18 34/19 34/20 44/18 75/9 75/10 75/11 110/3 130/7 130/24 132/21 157/17 158/16 204/14 204/17 204/19 204/21 204/22 204/23 204/24 205/5 205/8
wording [2] 214/7 214/8
words [45] 15/8 15/9 23/20 42/2 42/21 55/3 55/4 55/7 55/15 62/6 75/3 76/19 93/18 119/20 120/8 121/9 127/21 127/23 131/2 132/6 132/14 143/16 146/17 153/16 154/1 157/18 158/16 159/13 164/2 164/14 168/19 175/20 176/7 176/14 177/9 189/5 191/19 193/25 202/11 205/15 206/18 213/14 217/17 219/17 223/21
work [9] 44/13 75/1 93/22 105/13 128/4 131/22 133/18 133/19 133/20
worked [9] 74/14 74/19 89/5 116/17 116/18 129/4 147/18 209/4 224/17
working [9] 27/11 30/3 59/10 59/13 84/6 103/20 105/17 138/3 186/23
works [3] 172/17 228/11 229/2
world [1] 120/7
worse [1] 183/20
worst [1] 139/16
worth [3] 67/19 95/11 222/24
worthy [2] 157/1 164/1
would [236]
wouldn't [66] 9/6 16/17 20/13 23/2 29/6 30/5 31/6 31/15 32/9 32/23 33/23 39/3 39/5 39/22 42/4 43/1 43/3 43/19 43/25 44/16 46/12 47/6 47/23 48/21 50/13 60/14 69/21 72/15 76/22 79/24 80/17 81/4 82/17 86/16 95/8 95/9 102/2 107/22 107/25 108/4 111/18 119/2 120/9 131/15 132/25 133/6 133/20 133/22 133/23 134/10 145/10 147/4 153/13 154/22 159/20 163/4 163/23 169/14 172/21 188/13 193/25 202/23 204/10 205/1 222/11 223/14
wow [2] 171/12 221/7
write [2] 48/13 185/15
writes [3] 23/14 77/16 77/17
writing [8] 44/10 53/21 69/11 86/19 109/4 109/5 116/2 201/23
written [2] 176/7 180/13
wrong [4] 73/5 120/23 136/17 203/4
wrote [5] 21/19 30/14 54/16 72/11 75/3


## Y


yeah [39] 15/13 55/2 59/7 68/19 72/12 73/2 75/8 75/12 77/13 78/19 92/21 95/13 95/15 98/24 103/1 105/23 106/2 114/25 117/4 120/18 122/9 126/2 138/11 138/22 138/25 139/1 148/11 149/13 151/4 151/8 157/8 167/12 169/8 187/6 208/9 208/10 211/2 223/18 229/4
year [7] 13/12 18/18 159/1 171/6 172/10 179/24 183/3
years [18] 13/20 13/21 14/9 22/15 120/7 120/7 126/23 156/7 159/2 159/3 159/5 172/7 172/18 178/25 179/18 195/5 212/1 224/16
yes [181] 7/10 7/15 10/2 10/10 15/2 16/16 19/24 20/24 21/18 22/1 22/16 23/1 24/3 25/24 26/14 27/6 28/23 30/1 33/22 35/1 37/6 39/11 41/5 42/6 42/7 42/13 42/15 43/6 45/21 46/14 47/20 47/22 48/2 48/11 49/14 50/7 51/21 51/21 52/6 53/12 53/14 53/18 53/22 56/3 56/7 56/10 57/5 57/13 58/7 58/15 58/22 59/9 59/17 60/25 63/25 64/2 64/8 64/20 65/9 66/5 66/10 66/15 66/17 66/21 68/14 69/4 69/25 70/2 70/7 70/15 70/23 71/3 71/6 72/5 72/9 73/15 73/19 74/4 74/7 74/10 75/19 76/4 76/4 77/12 78/16 80/24 81/6 81/14 81/17 84/4 85/10 85/14 85/17 86/10 87/11 89/11 90/11 92/18 94/12 94/25 95/11 97/15 98/6 98/14 98/19 99/13 99/24 100/6 100/13 101/16 102/1 102/19 103/13 103/17 104/5 108/2 108/20 109/12 110/10 111/22 112/12 116/4 122/5 122/17 123/12 124/24 125/14 125/14 126/14 127/1 128/22 129/17 129/23 129/24 130/14 131/1 131/4 131/18 132/24 134/13 134/21 137/18 139/3 140/9 141/3 144/16 145/18 146/23 147/7 148/14 149/4 149/5 150/3 152/1 157/21 160/11 160/14 165/15 167/2 167/4 167/20 167/21 168/15 170/9 186/14 187/11 189/10 195/15 201/8 204/6 207/19 207/22 209/4 211/6 218/22 220/12 220/13 220/19 221/21 227/2 229/6
yet [7] 13/2 19/10 36/6 128/14 139/24 181/18 218/6
Yocca [1] 3/10
York [15] 24/15 31/19 32/1 48/8 49/19 152/21 153/10 157/1 160/2 161/21 171/20 172/4 197/1 206/16 206/21
you [875]
you'd [7] 45/24 48/7 50/17 73/17 96/1 104/10 183/22
you'll [3] 30/13 90/2 93/5
you're [47] 18/5 45/2 63/18 67/21 67/21 67/22 67/24 70/8 70/11 80/5 84/5 84/8 88/16 89/6 93/11 94/21 99/16 100/20 101/4 109/3 109/4 112/24 116/2 116/11 119/7 121/11 121/11 125/21 128/19 131/14 133/5 139/15 151/9 161/13 161/17 167/5 167/18 176/17 177/15 179/23 203/21 205/3 210/22 210/25 216/21 217/17 220/4
you've [12] 12/24 23/25 25/17 34/19 40/13 50/18 72/13 87/15 108/12 129/20 209/12 226/22
your [422]
yourself [5] 45/24 45/24 176/8 217/24 219/22


## Z


zero [2] 79/1 79/2