UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HONORABLE STEPHEN V. WILSON, DISTRICT JUDGE PRESIDING

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CR 2013-00048-SVW |
| | ) | CR 2013-00062-SVW |
| | ) | |
| REGIS POSSINO, et al., | ) | PAGES 1 - 86 |
| | ) | |
| Defendants. | ) | |
| | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

THURSDAY, FEBRUARY 6, 2014

**EVIDENTIARY HEARING (CONTINUED)**

DEBORAH K. GACKLE, CSR, RPR
United States Courthouse
312 North Spring Street, Room 402A
Los Angeles, California 90012
(213) 620-1149

**APPEARANCES OF COUNSEL:**

**For the Plaintiff:**

ANDRÉ BIROTTE, JR.
UNITED STATES ATTORNEY
BY: JAMES BOWMAN
BY: MARK AVEIS
ASSISTANT UNITED STATES ATTORNEYS
1400 United States Courthouse
312 North Spring Street
Los Angeles, California 90012

ALSO PRESENT: FBI SPECIAL AGENT PERRY WOO

**For the Defendants:**

Jonathan Aminoff
Jennifer J Uyeda
Federal Public Defenders Office
321 East 2nd Street
Los Angeles, CA 90012
213-894-7524

Edward Robinson
Edward Robinson Law Offices
21515 Hawthorne Blvd #665
Torrance, CA 90503
(310) 316-9333

\- - - - -

(APPEARANCES CONTINUED):

**For the Defendants:**

Marc S Harris
Scheper Kim and Harris LLP
601 West 5th Street 12th Floor
Los Angeles, CA 90071-2025
213-613-4655
Fax: 213-613-4656
Email: mharris@scheperkim.com

Jason DeBretteville
Bradley Marrett
Stradling Yocca Carlson & Rauth
660 Newport Center Drive Suite 1600
Newport Beach, CA 92660
949-725-4094
Fax: 949-823-5094
Email: jdebretteville@sycr.com

Amy E Jacks
Amy E Jacks Law Offices
315 East 8th Street, Suite 801
Los Angeles, CA 90014
213-489-9025
Fax: 213-489-9027
Email: amyejacks@sbcglobal.net

Richard M Callahan, Jr
Richard M Callahan, Jr Law Offices
225 South Lake Avenue Suite 300
Pasadena, CA 91101
626-202-4060
Fax: 626-794-4676
Email: rmcallahanjr@earthlink.net

///

**(APPEARANCES CONTINUED):**

Daniel Saunders
Nathan Joseph Hochman
Bingham McCutchen LLP
The Water Garden North
1601 Cloverfield Blvd Ste 2050
Santa Monica, CA 90404-4082
Phone Number: (310) 255-9025
e-mail: nathan.hochman@bingham.com
daniel.saunders@bingham.com

- - - -

# I N D E X


| GOVERNMENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| KOEPKE, CHARLES | -- | 22(D) | | |
| | | 71(H) | 74 | |


# E X H I B I T S


Defense Exhibit 31 RECEIVED: 73

**LOS ANGELES, CALIFORNIA; THURSDAY, FEBRUARY 6, 2014; 10:10 A.M.**

-- -- --

THE CLERK: Calling item No. 1 and 2, CR 13-48-SVW, United States of America versus Regis Possino, et al., and CR 13-62-SVW, United States of America versus Sherman Mazur, et al.

Counsel, please state your appearances.

MR. BOWMAN: Good morning, Your Honor. Jim Bowman and Mark Aveis on behalf of the United States of America. Also with us at counsel table is case agent FBI Special Agent Perry Woo; FBI Special Agent Charles Koepke, whom the defense has asked to call as a witness here today, is also present in the courtroom, Your Honor.

MR. HOCHMAN: Good morning, Your Honor. Nathan Hochman especially appearing for defendant, Sherman Mazur, who is present in custody, along with Marc Harris, who is present as well.

MR. DeBRETTEVILLE: Good morning, Your Honor. Jason DeBretteville appearing on behalf of Ari Kaplan, who is present, on bond. Also with me is Bradley Marrett.

MS. UYEDA: Good morning, Your Honor. Jennifer Uyeda and John Aminoff on behalf of Regis Possino, who is present, in custody.

MR. ROBINSON: Your Honor, Edward Robinson for Colin

Nix. He is present in court, in custody.

MS. JACKS: Good morning, Your Honor. Amy Jacks for Curtis Platt. He has filed a waiver of appearance.

MR. CALLAHAN: Your Honor, good morning. Richard Callahan for Dwight Brunoehler. He is not present. A waiver is on file. Also standing in for Dale Rubin on behalf of Peter Dunn in the Possino case. He also has a waiver on file.

MR. HOCHMAN: Your Honor, before we turn to the minimization part of this hearing, I had two very brief things to do to conclude, sort of, the *Franks* part of the hearing. The first is I've given you Exhibit 31, Your Honor, which was the red and black copy showing what a marked-up --

THE COURT: I think we have it.

MR. HOCHMAN: I would like to move it into evidence.

THE COURT: Oh, I see. It's in evidence.

MR. HOCHMAN: Thank you, Your Honor.

(Defense Exhibit 31 received in evidence.)

MR. HOCHMAN: And the second thing was -- I want to share -- if the court will indulge me one thought that -- it answers two of the court's questions from yesterday, and the two questions were why Mendiratta revealed, and not Mazur, and then how do we evaluate the credibility of Special Agent Tarwater.

The thought is this, Your Honor --

MR. BOWMAN: Your Honor, if we're going to reopen

argument on the issues that were argued extensively yesterday, then I think both sides should have another opportunity to go into that. I think --

THE COURT: I'll give you that opportunity.

MR. BOWMAN: Okay.

MR. HOCHMAN: Thank you, Your Honor.

Because, Your Honor, you asked the right questions, I believe, and I was struggling to reconcile a few of the things that we learned at the hearing yesterday, because what we learned at the hearing yesterday for the first time is that Special Agent Tarwater had not two reasons as to why he didn't use Mr. Mazur but four.

The two reasons that he had revealed, Your Honor, in the proffer that the government made to this court -- it's a proffer, Your Honor, that they gave to the court -- they give two reasons why Mr. -- and again, they don't do this by way of declaration from Agent Tarwater, but they do this by way of a proffer; and they state basically that -- and I highlighted the area -- "Other federal agents had advised Agent Tarwater that Defendant Mazur could not be trusted because, among other things, those agents believed that Mazur had made statements to law enforcement officers in order to troll or fish for information about whether he, his accomplices or his competitors were targets."

Your Honor, after I got this, I sent a series of

emails to Mr. Bowman, and I said, Can you please either give us a declaration or let us know who these other agents are so we can follow up on it before the hearing.

Mr. Bowman says, Thank you for your interrogatories, but Mr. Tarwater will be available at the hearing; you can hear from him live.

When we heard from Mr. Tarwater live, he didn't just give two reasons -- the fact that he had gotten information that Mr. Mazur was unreliable or untrustworthy, and the trolling and fishing information -- but he gave two very other important reasons. The first reason was that Mr. Mazur was No. 1. He was the one that the FBI wanted forever, and that's one of the reasons we didn't want to trade down and try and cooperate him; and, two, he gave the additional example of the Laker tickets bribe, that he had tried to bribe a special agent with Laker tickets.

And so I went home last night, and I thought to myself why does this not make sense, and here is the answer, Your Honor: If they were investigating Mr. Mazur and Mr. Possino from 2000 to 2004, four years of investigation, they view him as the No. 1 guy in the district, and they were unsuccessful, they weren't even able to bring charges at the probable cause level.

Then what happens? Mr. Mazur walks in, in 2006, to the FBI, without an attorney, on the record. We have the

entire file, and we have Mr. Mazur's statements. And what is missing from those statements, Your Honor, is any question related to supposedly this investigation from 2000 to 2004, where Mr. Mazur is apparently the No. 1 target. That's impossible, Your Honor.

There's no way the FBI is that negligent, that poor in its duties that when it has the actual target live without an attorney sitting in its offices repeatedly that it's not going to ask one question about what happened in the 2000 to 2004 investigation unless he's not the No. 1 target, Your Honor. Certainly after 2000 and 2004, he is no longer the No. 1 target, or they would have asked one question.

But it's even worse than that. If, in fact, Mr. Mazur bribed -- allegedly bribed --

THE COURT: What questions did they ask, if any, in the interview? My recollection is -- and I have to review the interview -- is that it was basically the 302, that is, the two 302s that Agent Tarwater said he read.

MR. HOCHMAN: Yes.

THE COURT: It's Mazur basically talking, not being asked too much.

MR. HOCHMAN: Correct, Your Honor. I mean, one assumes that they're asking questions about the $25 million pump and dump scheme. Mr. Mazur --

THE COURT: Your point is why didn't they ask Mazur

about other schemes that he had been involved with that they -- that caused them to think he was the --

MR. HOCHMAN: No. 1 guy. A four-year investigation, Your Honor, that apparently went nowhere. He comes in the office, on the record, without an attorney, and they don't ask one question? Not one? That's unbelievable, Your Honor, unless he is not the No. 1 guy.

THE COURT: What does the -- what do the other pages of the file reveal, if anything, about what questions the FBI asked Mazur? In other words, there were 20 or 21 pages before the interview --

MR. HOCHMAN: Yes, Your Honor --

THE COURT: -- that he didn't -- he said he didn't read. Is there anything in there that's revealing?

MR. HOCHMAN: Not one thing, Your Honor. In other words, the FBI, if they had -- if they really did have this other investigation, somehow -- and remember, we're talking the same L.A. office, we're not talking New York versus L.A., this is the same L.A. office. They don't ask him one question, Your Honor.

In fact, Mr. Mazur volunteers some more information about a counterfeit aircrafts part scheme that he also was aware of. Mr. Mazur provides information about certain lawyers that were involved in fraudulent -- the fraudulent pump and dump scheme, beyond the convicted felons and his former

associate, and there is not one scintilla of evidence in all that 54 pages of file that they asked him one question about anything that preceded it, and you here you supposedly have the No. 1 guy in the district in front of you on the record without an attorney. Impossible, Your Honor.

But it's even more impossible than this. Special Agent Tarwater said, Oh, and Mr. Goldman says -- you know, is another reason not to use Mazur as a cooperator, that he tried to bribe the agent, the very agent he is dealing with, with Laker tickets.

THE COURT: Is that Beltran?

MR. HOCHMAN: Right --

MR. AVEIS: Bertrand.

MR. HOCHMAN: Bertrand.

Now, if you have the No. 1 guy that you've been trying to get for four years and you were unsuccessful, and the No. 1 guy comes in and does something stupid enough to bribe the very agent with Laker tickets, No. 1, you would record it somewhere in the FBI's files if that is true, and it's not recorded in any file; but, two, and more importantly, you'd do a whole investigation to try and nail Mr. Mazur for the bribery allegations because you were unsuccessful on everything else. He's given to you this in a lap -- in your lap.

THE COURT: But I mean --

MR. HOCHMAN: And what I'm saying, Your Honor --

THE COURT: -- why would you -- why would you not use him if you thought he was valuable except for that bribe? Let's assume he did do the bribe. Why would that necessarily remove him as a suitable cooperator? I mean, it's not the worst thing in the world.

MR. HOCHMAN: Oh, clearly not, Your Honor. And obviously it didn't result in any charges or anything else. But my point to you is, Special Agent Tarwater is asking you to say to the court, Believe me, and here's why I didn't reveal to Judge Fischer all the information about Mazur, because I thought he would be an awful cooperator, and he was No. 1.

And what I'm saying to you, Your Honor, if that's true, then there's certain things indicia that would back up Special Agent Tarwater, and every indicia shows that that wasn't true, that Special Agent Tarwater has come onto the stand and for the first time told you this, because, Your Honor, he doesn't put it in his proffer. He didn't say, The reason I didn't use Mr. Mazur is that he was No. 1 in the district, and we didn't want to trade down. Your Honor seized on that, saying, Well, that kind of makes sense. You don't want to trade down.

It's not in his proffer to the court, and his only evidence of it is supposedly Special Agent Goldman, his supervisor, saying that he is the No. 1 guy based on an earlier investigation, but every indicia shows that that is just not

true, Your Honor.

THE COURT: All right.

MR. HOCHMAN: And so, Your Honor, where I would go with this is as follows: When you're trying to then evaluate why Mazur is not included along with Mendiratta and evaluate Special Agent Tarwater's credibility. Again, we have to also factor in the fact that he, as we pointed out, provide a false statement to Mr. Bowman when they were dealing with the cooperation.

When we're dealing -- that is Exhibit 19.

When we're dealing with the cooperation, he basically tells Mr. Bowman that Mr. Mazur had never given any information about Mr. Possino or any of the target subjects, which he admits based, on his review of those two 302s back in 2006, is false. I finally got him to admit that was a false statement he made to Mr. Bowman.

So now when you're evaluating, Your Honor, why the Mazur cooperation does not show up for Judge Fischer to evaluate, you have to factor in all these issues. Because, remember, on Mendiratta, they said that there's three -- in addition to other things, there's three reasons they didn't use Mendiratta: No. 1, Mendiratta was committing a crime at the same time he is under a cooperation agreement. That doesn't apply to Mr. Mazur. He is cooperating and providing information and wasn't charged with anything.

Two, they said Mr. Mendiratta hid his association with Regis Possino during the entire proffer sessions. Here, we know for a fact that Mr. Mazur didn't hide his association with Possino; he admitted it on the record to the FBI. Yet the only thing he hid about that is when he talked to Agent -- excuse me -- Mr. Bowman -- when he talked to Mr. Bowman, he lied. He uttered a false statement to Mr. Bowman on this.

THE COURT: I get the --

MR. HOCHMAN: This all goes to his credibility, Your Honor.

THE COURT: I'm not going to decide this matter today, but nevertheless, if you want to rebut the argument, you can do so. You'll have a better opportunity to do it at a later time.

MR. BOWMAN: Does that mean, Your Honor, that you'll be asking for additional briefing on this?

THE COURT: Yes. But I'm going to be very -- very pointed about how I want the briefing to be done because the -- as we discussed yesterday, the issue could be decided depending upon how you frame the issue, and that's something I want further input from.

In other words, what is the issue? We've talked about it. In other words, you've said that as long as the agent had a good-faith belief that there was no -- that there was necessity for the warrant, any omissions, material or

otherwise, are remedied or overcome by that state of mind; and the defense has a different view.

And I've been trying to determine what the cases say, and I think I would benefit from a briefing from the government and the defense, and I'll issue a minute order, which -- just be a paragraph or two, which will make it as clear as I can what I'm after, because the parties understand the record and the implications of the evidence and testimony. I mean, that you all have in mind. It's a question of how you argue those facts in light of the issue, and so framing the issue, to me, is very important.

MR. BOWMAN: The framing the issue, Your Honor, or additional legal research in terms of what is required to show --

THE COURT: Yeah, in legal -- what I anticipate is one section of the brief dealing with how the issue is to be decided based upon the authorities, and then I would suggest that the parties then support their view of the hearing, the evidence, with their position regarding what the issue is. And perhaps if either side feels it appropriate, they could argue alternatively that even if the issue is not the way I think it is, that the court still ought to find in my favor.

MR. BOWMAN: Your Honor, I had two additional questions on that: One, because it will be, I think, driven largely by the testimony, we would ask that whatever deadline

is set for that briefing be far enough out that we can obtain a transcript.

THE COURT: Yes, I agree with you. I would like to see that myself.

So, Deborah, when do you think you could --

THE COURT REPORTER: I think I can have that in two weeks, Your Honor.

THE COURT: Two weeks?

THE COURT REPORTER: Uh-huh.

THE COURT: Okay. Two weeks. So I'll set it out far enough so that you have a transcript.

MR. BOWMAN: Thank you, Your Honor.

And one other question I had was: Look, all of the arguments yesterday focused on Agent Tarwater's state of mind, on reckless, deliberate. The court made some comments about materiality. The court indicated that its tentative view is that the omitted information, if recklessly or deliberately so, would have been material.

THE COURT: Well, I'm inclined to think, and again, that depends somewhat on how you frame the issue. In other words, if the issue is did the agent try to deceive the judge, that's one way of looking at materiality. In that sense, I would be inclined, at least at this point, to think that it was.

If the issue is did the agent deceive the judge --

did the agent have a good-faith belief that there was necessity, notwithstanding some omissions, then it might be analyzed differently. That's why I started out by saying that I think the court has to have a clear direction as to how to filter all this evidence; otherwise, it's not going to be -- it's not going to be a clear decision.

And so what I'm striving for is to be able to make whatever position I have clear so that if the matter is reviewed by one side or the other, there's no -- there's no question about what I did, right or wrong.

MR. BOWMAN: We certainly agree, Your Honor.

THE COURT: Yeah.

MR. BOWMAN: And one -- even just commenting on what the court just said, that if there was a deceptive -- intentionally deceptive or recklessly deceptive omission from the issuing judge, the court would view that fact as material.

I would even note that -- although that would essentially conflate again the two prongs because then it's the omission that becomes -- the fact of the omission that becomes material as opposed to the omitted material. I think that there's a lot more to say about materiality and --

THE COURT: Well, then, you know, then we can -- you can brief that. I mean, and I'd appreciate that, because if you think that's relevant, then, I mean, I won't necessarily limit you to the issue that I have in mind, but in any event,

if you wanted to say something in response to -- you're better off saving it because I might not focus on it if we have a lag period between now and the -- and he'll probably repeat it in his briefs. So you'll have it, you know, before you to deal with.

MR. BOWMAN: Very well, Your Honor. I'll resist the urge because I'd like --

THE COURT: Yeah. You know what, I am undecided as we are positioned now. I'm undecided because, principally, I have to find out what I have to decide. I don't know what to decide, so how can I decide it?

MR. BOWMAN: Very well, Your Honor.

THE COURT: I mean, I know generally what I have to decide, but I don't know how I'm supposed to go through the steps. I'm not in the dark because I know there are different ways of looking at it, but I want to have your input as to how you think I should look at it.

And, like I said, you could even argue alternatively that even if you -- even if the court concludes that my methodology is not the one adopted by the court, you can still find a way to find in my favor.

MR. BOWMAN: Yes, Your Honor.

THE COURT: So that's -- let's go to this minimization.

MR. BOWMAN: Yes, Your Honor.

MR. DeBRETTEVILLE: Your Honor, before we call Agent Koepke to the stand, I just thought it might be helpful to position what we're trying to accomplish today.

THE COURT: Okay.

MR. DeBRETTEVILLE: The court's heard a lot, and this is a slightly different topic. We really have two points we hope to establish through the testimony of Agent Koepke. First, that --

THE COURT: You're Mr. Aminoff, are you?

MR. DeBRETTEVILLE: I'm Mr. DeBretteville. I'm sorry.

THE COURT: You're Mr. who?

MR. DeBRETTEVILLE: DeBretteville. Counsel for Mr. Kaplan.

THE COURT: Oh, okay. Sorry.

MR. DeBRETTEVILLE: Sure. So the first issue we have is that we believe that -- well, first, a lot of data has been filed with the court. We are going to accept the data as presented by the government as accurate.

Our first concern is that that data establishes that the government, with regularity, with surprising regularity, recorded calls that were outside the scope of their authority, and that comes up in the context of minimization.

The second point that we --

THE COURT: The government recorded calls outside of

what?

MR. DeBRETTEVILLE: The scope of the authority granted by Judge Fischer.

The second issue has to do with a more fundamental problem, which is the standard of pertinence, how the government defined the scope of its authority for purposes of determining which calls it could intercept and which calls it had to minimize, and we hope to address both of those topics through the agent.

Unless the court has questions about --

THE COURT: So basically, you're attacking minimization as to both prongs, the plan and the execution?

MR. DeBRETTEVILLE: Exactly, Your Honor.

THE COURT: Okay.

MR. DeBRETTEVILLE: So without belaboring those points, I'd like to call Agent Koepke to the stand.

THE COURT: All right.

THE CLERK: Will the witness please step forward and stand behind the court reporter.

Please raise your right hand.

(Witness sworn.)

THE WITNESS: I do.

THE CLERK: Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS: Charles Koepke, K-o-e-p-k-e.

MR. BOWMAN: And, Your Honor, for the court's benefit, I would note that a declaration was filed from Agent Koepke on January 24th. A courtesy copy has been provided to the court, and the government would proffer that declaration as his direct testimony.

THE COURT: All right. Then that is received.

**CHARLES KOEPKE; GOVERNMENT'S WITNESS, SWORN, TESTIFIED:**

**DIRECT EXAMINATION BY DECLARATION**

**CROSS-EXAMINATION**

BY MR. DeBRETTEVILLE:

Q. Agent Koepke, what was your role with respect to the implementation of the wiretap in this case?

A. I was one of the case agents assigned to the case, primarily in a secondary role to Agent Tarwater.

Q. Were you involved in intercepting communications?

A. Yes.

Q. Did you receive a memorandum from the U.S. Attorney's office that provided to you instructions on how to operate the wire?

A. Yes.

Q. And that was this memo I'm putting in front of you on your screen, dated June 23; is that correct?

A. One of the memos, yes.

THE COURT: Is that an exhibit to be marked?

MR. DeBRETTEVILLE: Yes, Your Honor. It was filed, I believe, as Exhibit A to Mr. Kaplan's opposition. The docket number appears in the top. Document 387-1.

Q. I want to direct your attention to this one portion of this memorandum on page eight -- I'm sorry -- yes, page eight. This memorandum instructed you and told you that you are obligated to implement procedures that were meant to reduce to the smallest number -- smallest feasible number the interception of innocent calls with innocent persons; is that correct --

A. Yes.

Q. And you were instructed that courts generally regard intercepting wire communications as they regard any other search warrant; is that right?

A. Yes.

Q. And that meant that you were authorized to conduct a limited search and a limited seizure of evidence?

A. Yes.

Q. Okay. And specifically, "The court order in this case impose limits to what may be intercepted; namely, pertinent communications by the target subjects regarding the target offenses"; is that right?

A. Yes.

Q. Okay. And then the memo explains what minimization is. It says, "Minimization, therefore, essentially means to stop

listening and recording the conversation when the conversation is not pertinent," right?

A. Yes.

Q. And then it goes on to say that "When the conversation is in a language in which the monitor is fluent, presumably English, this must be done at the time of the call"; is that right?

A. Yes.

Q. Okay. And you understood those instructions?

A. Yes.

Q. Then later on in the memo, it goes on and explains how that minimization procedure is supposed to work. So we have on page nine, it says, "You should listen to the beginning of each communication only so long as is necessary to determine the nature of the communication, and, in any case, no longer than two minutes."

Did you understand that instruction?

A. Yes.

Q. And it explains that "If the communication is pertinent, that is, within the scope of our authorization, hereinafter criminal communications, obviously you may continue to intercept the call."

And then underscored is the final instruction that I want to direct your attention to, "If you determine that the communication is not a criminal communication, or is

privileged, turn off the listening recording device."

Did you understand that instruction?

A. Yes.

Q. Now, at the government's request, you went into your VoiceBox database, and we'll explain to the court what that is in a moment, and extracted certain data sets to reflect, or at least explore, what minimization actually was done; is that correct?

A. Yeah, it was just certain data was pulled for the purpose of minimization, yes.

Q. Okay. So I want to put that table up for you from your declaration.

It has, I guess, one, two, three, four, five, six, seven, eight, nine, ten -- ten categories of data, correct?

A. Correct.

Q. Okay. And before we get into parsing some of that data, I promise we won't go through every category. But I want to try and focus our attention, and I want to use some statements by the government in their opposition to our motion to help focus our attention on what data we ought to pay attention to in helping the court analyze what minimization actually was done.

So I want to remove this for a moment, I'm going to put up two lines from the government's briefing in this case.

The government has said, first, "Finally in assessing the adequacy of minimization, the reviewing court generally

should not consider calls lasting less than two minutes."

And in the second sentence, the government said, "Only nonpertinent calls over two minutes are relevant to the court's inquiry when assessing the adequacy of minimization."

So what I want to do now is go back to your table and figure out which numbers correspond to this category "Nonpertinent Calls Over Two Minutes."

Okay?

A. Okay.

Q. So if we go back to your declaration and your table -- I'll try and zoom in a little bit. It's a bit hard to read -- I see three from the bottom, there's a category, Pertinent Calls Over Two Minutes.

Now, is that the category that captures what we just described from the government's briefing, "Nonpertinent Calls Over Two Minutes"?

A. Your finger was pointing --

Q. I'm sorry. We have, Pertinent Calls Over Two Minutes.

Does that correspond to what I just read?

A. "Nonpertinent Calls Over Two Minutes"?

Q. I'm sorry. "Nonpertinent Calls Over Two Minutes."

A. The "Nonpertinent Calls Over Two Minutes" you're pointing at there, yes.

Q. Okay. Sorry. My apologies.

So we're talking about this category, "Nonpertinent

Calls Over Two Minutes"?

A. Yes.

Q. And if we refer back to your instructions, the reason why that two-minute mark is meaningful is that's the maximum length of time you can listen to a call in order to determine whether or not the call, the subject matter of the discussion, falls within the scope of your authority, right?

A. I wouldn't say it's the maximum, but it's generally the guideline we use, yes.

Q. It's not the maximum?

A. No.

Q. Let's go back to your instructions again.

First sentence, "You should listen to the beginning of each communication only so long as is necessary to determine the nature of the communication and, in any case, no longer than two minutes."

Is that not a maximum, sir?

A. That sentence taken out of context or with the rest of it combined?

Q. I'm asking you a question: Does that state the maximum time you can listen to the beginning of each call?

A. That sentence states that, yes.

Q. I think what you're trying to get at is that if at the end of the two minutes, the call is not pertinent, and you think it might be -- you have reason to believe it might become

pertinent, you can spot check the call, right?
A. No. I was actually referring to a paragraph, I believe, on the next page.
Q. Okay. Let's go ahead and tell your full story.
What paragraph are you referring to?
A. Right there where it starts with "The above instructions," it says that "If experience shows that conversations between certain people are invariably innocent, interception should be ended sooner" --
THE COURT: Hold it.
THE WITNESS: Oh, I'm sorry.
THE COURT: I get it. Go ahead.
BY MR. DeBRETTEVILLE:
Q. I think what we're getting at, Agent Koepke, is that, for example, if Mr. Kaplan is talking on a regular basis to his lawyer, you would immediately know it's a privileged communication, and, therefore, the maximum would not be two minutes, it might be ten seconds?
A. Certainly.
Q. Okay. I think we can move on then. Let's go back to your table.
So I think we've made clear now that "Nonpertinent Calls Over Two Minutes" is the category referenced by the government in its opposition. We have 695 calls that fit in this category for Mr. Mazur, and we have 243 calls for

Mr. Kaplan. So I did the math in my head here. We have 938 calls that were over two minutes that were marked "Nonpertinent" by the monitoring agent at the time of interception.

A. Correct.

Q. Okay. And if you want to know how often agents failed to minimize at all, not whether they minimized partially or properly, but how often they completely failed to minimize calls lasting more than two minutes.

We go down to the category in bold at the bottom of your table, and that's 459 calls that were nonpertinent, longer than two minutes, and not minimized at all, right?

A. Those are calls that were not minimized at all, correct?

Q. So we have 459 for Mr. Mazur, and we have 111 for Mr. Kaplan. That is 570, right?

A. Yes.

Q. Okay. So of the nonpertinent calls over two minutes, at which there were 938, 570 were not minimized at all?

A. Correct.

Q. And so if the agents were doing their job in accordance with their instructions, all of those 570 calls would have stopped at two minutes and then either been spot-checked or not monitored at all after that point; is that correct?

A. No, I don't agree with that.

Q. So you're saying that you were entitled to continue

recording calls that were not pertinent after two minutes?

A. In certain instances, as I was referencing earlier, we didn't quite get to it, that depending on the participants of the call, the two-minute guideline might be stretched. You had one waited ten seconds. If it's people that we know that are communicating that are relevant to the subject scheme, then it could be past that two-minute mark.

Q. You're saying is, that even though your instructions unequivocally state that you're not supposed to listen for more than two minutes, you're allowed to do what exactly?

So we have the sentence here, and we looked at before, where you said, "You should listen to the beginning of each communication as long as is necessary, but in no instance no longer than two minutes."

You're modifying that instruction some way?

A. No. The memo itself modifies that instruction.

Q. And please direct the court's attention to where it does. It's the next page?

A. Yeah, the paragraph we were looking at before.

THE COURT: Which paragraph is that now? Read that paragraph.

THE WITNESS: "The above instructions regarding the number of minutes a permissible interception will vary once experience has been gained. If experience shows that conversations between certain people are invariably innocent,

a pattern of innocence, interception of such conversations should be ended sooner.

"Indeed, if the conversation of a particular individual is determined to never be criminal, such communication should not be recorded, listened to or even spot monitored once such an individual has been identified as a party to the communication.

"On the other hand, if experience shows that other individuals usually discuss criminal activities or makes innocent conversation with discussion of criminal activity, a pattern of criminality, a longer interception period may be justified."

BY MR. DeBRETTEVILLE:

Q. And you read that as modifying not the initial two-minute period -- as modifying the initial two-minute period?

A. Yes.

Q. That's not meant to modify how much you can spot-check after the two-minute period?

A. Both.

Q. Both. So essentially the two-minute period is completely ephemeral. You can now record as much as you want, as long as you think the people involved somehow fit within some sort of a pattern of criminality?

THE COURT: I'm not understanding it that way. The way I'm understanding it, you can pursue it, is that in these

instructions, generally, if it's an innocent conversation, that is, not involving the scheme, he's to listen in no longer than two minutes, and then he can perhaps spot-check thereafter.

But what he's -- what the agent is saying is that if experience shows that the speakers in the conversation often speak in innocent ways at the beginning, but then move to discussion about the -- discussions about the scheme, then he can -- he's not bound by that two-minute limitation, and he can, with some discretion, listen beyond that.

Is that what you're saying?

THE WITNESS: Yes.

MR. DeBRETTEVILLE: I think we're on the same page then.

THE COURT: Yeah.

MR. DeBRETTEVILLE: Thank you, Agent.

THE WITNESS: Okay.

BY MR. DeBRETTEVILLE:

Q. Let's go back to your declaration. This last category of nonpertinent, two minutes, nonminimized, that means that these calls were longer than two minutes and were not minimized at all, correct?

A. Correct.

Q. And whether or not the two-minute barrier was expanded in to reflect the issues that the court has described to you and which you've adopted, the call ultimately was not pertinent at

all, according to the intercepting agent?
A. It was ultimately marked "Nonpertinent," correct.
Q. Okay. So if we wanted to know what percentage of calls fit within this category, how many calls in the nonpertinent-call-over-two-minute bucket were not minimized at all, it would divide the total number of calls over two minutes that were not pertinent by this number below, correct?
A. Yes.
Q. Okay. So if we do that math, proffer this, you get a 60 percent number. If you take the total number of calls over two minutes that were nonpertinent, and we divide by the total number of calls that were not minimized, we get 60 percent.
On the same page?
A. Yes.
Q. But we have a little bit of a problem here, okay, and it's going back to your data, and that problem comes from the following fact: You got these numbers from the database called VoiceBox, correct?
A. Correct.
Q. And VoiceBox is the electronic system you used to intercept calls?
A. Yes.
Q. And it also is the system that captures the classifications that the monitoring agents use in the course of listening to the calls, correct?

A. Yes.

Q. So if I'm a monitoring agent, I'm part of your team, I listen to a call, I press a button to record it, and I ultimately decide it's pertinent or not, so continue recording or stop, and designate the call as being pertinent or nonpertinent, correct?

A. Correct.

Q. Now, one of the problems we have is that this number of 570 excludes from it a certain number of calls that actually were marked by the intercepting agents as "Pertinent," that you then change, at a later date, to being non- -- I'm sorry -- as marked as being "Nonpertinent," that you've later changed to say "Pertinent"; isn't that right?

A. Yes.

Q. Okay. And what happened was, is that you and Agent Tarwater --

THE COURT: I'm not following that.

MR. DeBRETTEVILLE: Sure.

THE COURT: And I'm having trouble understanding you. You speak a little quickly.

MR. DeBRETTEVILLE: I'm sorry, Your Honor.

THE COURT: So start that again.

MR. DeBRETTEVILLE: Sure.

Q. So this data comes from the database. This is a raw, unmodified extraction of the numbers in the database.

A. Correct.
Q. Okay. What happened at a later date, as you and Agent Tarwater prepared for indictment, is you went back into VoiceBox and you listened to some nonpertinent calls that were longer than two minutes, that were not minimized, in preparation for indictment, correct? You went and listened to them?
A. Yeah. I'm not sure if they were minimized or not, but we did listen to certain calls over two minutes that were not --
Q. Okay. And if they were over two minutes, and had not been minimized, quite possibly, those recordings shouldn't even exist. The agent should have stopped recording after two minutes when he determined that it was nonpertinent, correct?
A. Again, it depends on the call.
Q. Okay. But you went back in and listened to them anyway, right?
A. To some of them.
Q. Okay. When you decided that the intercepting agent's determination of nonpertinence was incorrect, you changed the data in VoiceBox to read "Pertinent," didn't you?
A. We changed the designation so we could identify those calls for potential use in our prosecution, yes.
Q. Because you wanted to use those nonpertinent calls in preparing for indictment, you changed the intercepting agent's designation of "Nonpertinent" to "Pertinent"; isn't that

correct?
A. Yes, we changed the designation.
Q. And when you changed that designation in VoiceBox, you destroyed the record of what the intercepting agent designated at the time of interception, didn't you?
A. No.
Q. That record is gone.
A. No.
Q. Are you aware that the defense have asked for the original records from VoiceBox?
MR. BOWMAN: Your Honor, that assumes facts in evidence, and I think it's incorrect.
THE COURT: Well, I mean, I don't know that he was asked, so you can bring that up later, but I -- were you ever asked to produce these records?
THE WITNESS: I was asked to provide certain records. These are the records we pulled. I'm not exactly sure what you're getting at.
BY MR. DeBRETTEVILLE:
Q. Again, Agent Koepke, in your declaration, you attempt to estimate how many calls were impacted, how many calls over two minutes that were not minimized, that were impacted by your efforts by Agent -- your effort and Agent Tarwater's effort to change these designations. You had to estimate it, correct?
A. Yes.

Q. And you couldn't use the actual VoiceBox designations to determine what, in fact, the monitoring agents did at the time, could you?

A. No. We could have.

Q. So why do you have to estimate it?

A. Because of the voluminous nature of the task of identifying each call that would have been changed.

Q. So you simply forewent the task of going into VoiceBox and seeing how many times you and Agent Tarwater changed the monitoring agent's designation from "Pertinent" to "Nonpertinent."

A. We would have to look at every call that was identified as either "Pertinent" or "Nonpertinent," and the history that's within the VoiceBox system of when and how they were designated to identify calls that were changed.

Q. So the bottom line is, as we sit here today, we do not know which calls in the database you changed from "Nonpertinent" to "Pertinent," do we?

A. No, not specifically.

Q. Now, to be fair, I understand that you and Mr. Bowman feel that there are an additional set of calls that should come out of that 570 number.

Your view is that there were certain calls that were only partially recorded, and that because they were only partially recorded, no duty to minimize obtained with respect

to those calls; is that right?
A. Yes, I believe that's correct.
Q. And so you counted up two -- you spent the time to actually count up how many calls of this set were only partially recorded, and you came up with the number of 298 total calls that were partially recorded, right?
A. Well, I did not, but we as the government FBI did, yes.
Q. Collectively?
A. Yes.
Q. Okay. So if we give you credit for that, we say, Well, gosh, you know, you didn't -- your agents didn't, you know, quite follow procedure, and they didn't record the calls fully, so we really ought not to be faulted for failing to minimize those, and we pulled those out of the 570, we take them out of the equation, your failure rate goes down from 60 percent to 42.5 percent, correct?
A. No, I wouldn't call it a "failure rate."
Q. I'm sure you wouldn't, but the math speaks for itself, right? It's 42.5 percent?
A. I'll take your word for it. I don't have a calculator, so.
Q. Okay. So even if we give -- we ignore the fact that you and Agent Tarwater went back into VoiceBox and changed the monitoring agent's determinations at the time of interception from "Nonpertinent" to "Pertinent," and even if we give you

credit for the 298 nonrecorded or partially recorded calls, we're still talking about 272 out of the 640 were not minimized at all.

A. Correct.

Q. There's another category we haven't talked about yet, but I want to draw your and the court's attention to in your table. And that table is Unknown Unclassified Calls, and there's some 5,300- or -400-odd calls in this category.

Those were calls where the intercepting agent at the time did not designate the call as pertinent or nonpertinent in VoiceBox, correct?

A. Correct.

Q. And of that set, there's a subset that you were able to identify that are over two minutes. And that says, down here there is about, what is that, 1,040 total calls that were over two minutes that the intercepting agent did not bother to designate as being pertinent or nonpertinent, correct?

A. They were not designated, correct.

Q. Okay. Was there any kind of quality control effort to ensure that the monitoring agents were actually abiding by the minimization obligations?

A. The minimization memo was presented to -- there was a meeting before the wiretap went up, and the minimization memo was then presented to -- a minimization meeting prior to the wiretap, where agents that were going to be monitoring calls

attended, were given the memo that we've looked at. We're given a presentation by the AUSAs on the case regarding minimization, regarding monitoring calls. Agents that weren't at that meeting were given a copy of that memo to review prior to doing any shifts on the wire.

Q. On an ongoing basis, on a rolling basis, you would report to your fellow agents and to Mr. Bowman regarding pertinent calls, correct?

THE COURT: Mr. whom?

MR. DeBRETTEVILLE: To Mr. Bowman.

Q. Agent Koepke, on a regular basis, if he found a pertinent call, you would draw that to the attention to supervising agent on the government, correct?

A. In certain instances, yes.

Q. What I'm asking is, was there any flip side effort to identify when agents were improperly intercepting nonpertinent calls?

A. Agent Tarwater and I would review, to the extent possible, calls that were being recorded. And if it came to our attention, then we -- I don't recall any specific instances, but if it had come to our attention, we would have talked to the monitors involved.

Q. Can you explain to this court how it is that you -- it escaped your attention that some 5,000 calls were not even designated as "Pertinent" or "Nonpertinent" by the monitoring

agent?
A. There's a distinction between calls as used here and a recording that has actual audio to it. The majority of those unknown and unclassified calls didn't have any actual audio, which is why the majority of them were not classified.
Q. Well, let's just -- let's limit it. You've got 19 -- or, I'm sorry, 1,040 that are over two minutes. Did you ever check and see, ask the agents, Why aren't you determining whether these calls are pertinent or nonpertinent on these calls?
A. Again, that is the call duration is over two minutes. It doesn't necessarily mean that there was a recording over two minutes.
Q. So you're saying to this court that you went and checked these unknown calls and determined that all of them were not actually recorded?
A. I don't believe that's what I said.
Q. Okay. Well, I'm asking you, why did you allow such a large volume of calls to be undesignated?
A. These calls -- again, the majority of these calls didn't have any actual audio. So at the time, there was no reason to designate them as pertinent or nonpertinent, there was no actual audio file or anything that was recorded.
Q. But does your declaration describe what percentage of these unknown calls have no audio?
A. No.

Q. So we're just going to take your word for it that the majority of these unknown calls had no audio, and, therefore, you had no minimization obligation?

A. Could you say that again?

Q. Well, I'm trying -- see, you're telling the court that we should ignore these 5,000 calls here and these 1,000 calls here because --

THE COURT: When you say "here" and "here," I mean, you know --

MR. DeBRETTEVILLE: I'm sorry.

THE COURT: -- no one is going to know what you're talking about, and what you're doing, you're looking at this chart.

What exhibit is this chart?

MR. DeBRETTEVILLE: This chart has not been made an exhibit today, I can make it one now.

THE COURT: Well, I mean --

MR. DeBRETTEVILLE: It's on record as an exhibit to --

THE COURT: Let's make it an exhibit because you're referring to it extensively.

MR. DeBRETTEVILLE: Sure. I'd like to mark Mr. Koepke's entire declaration as Exhibit A to this minimization hearing.

THE COURT: And we're looking at the --

MR. DeBRETTEVILLE: And I think to help perhaps to address the court's concern --

THE COURT: One second. We have -- this is B.

MR. DeBRETTEVILLE: This is B.

THE COURT: And what you're doing, which may be confusing to someone reviewing the record, is that you're roughly adding the numbers from Mazur and Kaplan together, and there's not always an exact number. For example, you're talking about unknown/unclassified calls, and you say that's 5,000. Well, it's really like 4,300. So the record is jumbled. You should refer, perhaps, to one column and one defendant, then we would know what column you're referring to.

MR. DeBRETTEVILLE: You're right, Your Honor. I think to make it easier, what I could do, because the columns don't -- the rows don't line up precisely with the line numbers, and I'll enumerate each row so we can talk about the same row. So there's one, two -- I'll go ahead and do this.

Q. So -- and mindful of the court's admonition, I want to direct your attention, Agent Koepke, to -- just -- we'll just focus on the calls that were two minutes to keep things simple.

Line 9 depicts unknown, unclassified calls over two minutes. And that I can say is precisely 1,040 calls collectively, correct?

A. Correct.

Q. Do we know, as we sit here today, how many of those calls

have full audio?

THE COURT: I can't -- I'm -- your words are just dropping off.

MR. DeBRETTEVILLE: I'm sorry, Your Honor.

THE COURT: I can't hear you.

BY MR. DeBRETTEVILLE:

Q. Do we know, as we sit here today, how many, if any, of those 1,040 calls were fully recorded or partially recorded?

A. Do we know is it in the declaration?

Q. Do you know?

A. Not offhand. I have that information.

Q. Did you put that information in the declaration?

A. I did not.

Q. So just in keeping with that, if we assume, perhaps wrongfully, according to you, that those calls could not -- were not minimized -- let me just back up.

Can you minimize a call if you don't make a pertinence determination?

A. Certainly.

Q. So if you don't decide whether or not a call is pertinent, you can still abide by your minimization obligations?

A. Yes.

Q. Please explain how you can do that.

A. When you record a call in the VoiceBox system, you're basically pressing a button, it's not like that, but you press

a button, you're recording the call. You press another button to minimize that call.

The monitor in realtime is making that determination whether or not they believe they should minimize that call based on the criteria of the order, the affidavit, and the minimization memo.

Q. Let me stop you right there.

A. Sure.

Q. So what you just described is that a monitoring agent has decided whether or not a call is pertinent, and in accordance with that determination has decided whether or not he is authorized to continue recording, right?

A. Correct.

Q. Okay. So you have to, at least in your head, decide whether or not a call is pertinent in order to minimize properly.

A. To minimize properly, yes.

Q. Okay. And here, we have no record of whether the monitoring agent made that determination in his head, because the monitoring agents in each of these calls failed to designate whether or not the call was pertinent or nonpertinent, correct?

A. Correct.

Q. And just to look at the volume of the problem here, Your Honor -- Agent Koepke, I'll represent to the court that if we

just look at the calls over two minutes, we have 63 percent of the volume was marked "Pertinent" by the monitoring agent's invoice box, 18 percent was marked "Nonpertinent," and 19 percent was marked "Unknown."

That's a pretty large slice, isn't it?

A. Which is a large slice?

Q. Nineteen percent.

A. Are you asking me if 19 percent is a large slice --

Q. Is that significant portion of the calls?

A. The calls over two minutes?

Q. Yes.

A. Yeah, 20 percent is a significant amount of calls over two minutes.

Q. And if notwithstanding your representation to the court that some portion of those 1,040 calls were not fully recorded, if we add those 1,040 calls back into our math, we're now at a rate of 81 percent of the calls that are over two minutes, including the unknown calls, that were not designated as pertinent or nonpertinent, were not minimized.

Do you follow me there?

A. I'm sorry. What's the question?

Q. If we assume that the unknown calls were not minimized properly because the --

THE COURT: Why are you going through this math with him? I mean, what is the point? This is your argument. I

mean, these are the facts, aren't they?

MR. DeBRETTEVILLE: They are the facts, Your Honor. I'll move on.

THE COURT: I mean, I'm -- you know, what's the point? I mean, what I'm getting from this is that with regard to the unknown calls, a determination couldn't be made because they weren't recorded or something of that sort; is that it?

THE WITNESS: Some of the calls were not actually recorded, correct.

THE COURT: And then with regard to the pertinent calls that were -- well, let me put it this way: With regard to the nonpertinent calls that were over two minutes, your position is that, under the guidance, there was a basis for continuing to listen to those?

THE WITNESS: There could have been in some instances.

THE COURT: So, I mean, no one seems to be disputing these facts.

MR. DeBRETTEVILLE: Your Honor, I think that's largely correct. I think right now I'm going to make a transmission where I think we get to the disputed point, if I may.

Q. So underlying -- the court just asked you that whether, in some instances, this continued recording over two minutes could be justified based on the monitoring instructions, correct?

A. Correct.

Q. And the court has previously extracted from you testimony establishing that that might be appropriate where there was a pattern of target subjects or engaging innocent conversation at the beginning of a call, and then later transitioning to engaging in pertinent conversations, correct?

A. Correct.

Q. Have you made any effort to determine how many of those calls over two minutes fall within that category?

A. Fall within the category of?

Q. Of calls where the first two minutes were innocent, but they were being engaged in by targets who exhibited a pattern of engaging in innocent conversation that later turned criminal.

A. No. That would assume knowledge of what the monitors knew at the time.

Q. So, again, although you might be able to excuse some calls over two minutes that were nonpertinent, you made no effort to determine whether any of the calls in that category, any of the 570, actually followed within that description?

A. We made an effort to identify calls within that category based on our review, not whether or not they looked like they were pertinent or whether or not that we believed that they looked like they were pertinent.

Q. You've gone back now, but you made no effort to actually

listen to the calls and determine whether they follow this pattern of an innocent conversation for two minutes, followed by criminal conversations by targeted subjects, have you?

THE COURT: What was the last thing you said.

MR. DeBRETTEVILLE: I understand the agent to be saying that we shouldn't see the 570 as a collection of failed calls because some of them might fit within the court's description of calls where there are individuals who are targeted subjects, who are engaging in innocent conversation for two minutes, but show a pattern of then later turning to pertinent conversations.

THE COURT: So the question is, did this witness ever review that category of calls to determine whether, in fact, it met that category of innocent calls that historically developed into calls involving criminal activity? That's the question?

THE WITNESS: Yeah. That analysis was not done.

THE COURT: That was not done.

MR. DeBRETTEVILLE: Thank you.

Q. So I want to then turn to a more substantive conversation to get away from sort of this myopic focus on data points.

You worked with or -- and/or reviewed Agent Choate's declaration in this matter, didn't you, Agent Koepke?

A. Correct.

Q. One of the calls that she discusses as -- and defends as being pertinent in her declaration was a call between

Mr. Kaplan and his father-in-law.

Do you recall that conversation?

A. I do.

Q. Okay.

MR. DeBRETTEVILLE: I'm going to put and mark as -- I guess we're on Exhibit C?

Is that correct, Mr. Bowman? I'm on Exhibit C?

MR. BOWMAN: Yes.

MR. DeBRETTEVILLE: As Exhibit C. There's a copy of it in the binder in front of you, but I'm going to try and use the Elmo here, a transcript of that call.

Q. Now, would you please look at the -- I'll zoom out for you so you can see more of it.

Explain to the court why, in your mind, it was appropriate for the monitoring agent to continue to monitor this call past the two-minute mark.

THE COURT: We're not -- I'm looking at this exhibit. I'm only up to a minute and 15 seconds.

MR. DeBRETTEVILLE: I'm trying to leave the resolution and it's incapable of seeing. The whole page stops at 158.

THE WITNESS: So, I'm sorry, what was the question?

BY MR. DeBRETTEVILLE:

Q. Please identify for Judge Wilson what it is about the content of this conversation or its participants that, in your

mind, made it appropriate to continue monitoring after the first two minutes?

MR. BOWMAN: Your Honor, I would object. I'm not sure what the relevance of Agent Koepke's understanding of the pertinence or nonpertinence of this call is two-and-a-half years after someone --

THE COURT: What?

MR. BOWMAN: I'm not -- I don't understand the relevance of what Agent Koepke may think about the pertinence of this call when the monitor at the time made the decision to minimize or not minimize.

MR. DeBRETTEVILLE: I can explain, Your Honor.

THE COURT: All right. Then go -- let's get the questions out. We can deal with the relevance later.

Go ahead.

MR. BOWMAN: Yes, Your Honor.

BY MR. DeBRETTEVILLE:

Q. Agent Koepke, just as to position ourselves, this is a call that the government has maintained fits within the appropriate pertinent standard. It was defended by Agent Choate as fitting within your pertinent standards.

So what I'm asking you is, what is in either the first two minutes of this call that makes it pertinent or what makes it fall within your description of those rare breed of calls that are innocent but are likely to turn to being

criminal?
A. Well, looking at this -- the transcript that was done of the call --
Q. Yes.
A. -- there's certain words in here, there's certain conversations that they're having, looks like Ari references, Ari Kaplan references, a natural gas deal. Generally when they're talking about deals they're talking about market manipulation deals. That was our understanding.
Q. Could you please direct the court's attention to what line, what exact statement that you think makes this call fall within your pertinent standard.
A. They're not numbered, but the 56 second mark, it looks like there is a statement that they're looking at a natural gas deal. Again, at a minute-34, looks like there's a statement regarding a deal; natural gas again is mentioned; a large dollar amount is mentioned.
Q. I want to try and reverse engineer -- help explain to the court -- what your pertinent standard was that makes the mention, any mention of the word "deal" entitle you to intercept and record in full the conversation.
Where is it in the -- well, are you aware of some submission to Judge Fischer that told her or informed her that the government was going to intercept and record in full any conversation in which any of the target subjects mentioned a

deal?
A. Can you say that one more time?
Q. Do you believe Judge Fischer authorized you to intercept any conversation where anyone mentions the word "deal"?
A. No.
Q. So what is it about the use of the word "deal" in the context of this conversation that makes it fit within your pertinent standard?
A. Again, as I just testified, in the conversations that they were having, the term "deal" often replied -- often referred to companies that were the targets of market manipulations.
Q. So, in your view, any time you saw the word "deal" or heard someone say the word "deal" in a conversation, you were entitled to intercept that call in full?
A. No, that's not what I said.
Q. Then I'll ask you again, what is it about the use of the word "deal" in this conversation --
THE COURT: Let me interrupt for a moment. I need some clarification because we were dealing with the first application for wiretap, up till now. Kaplan is not a part of that wiretap, correct?
MR. DeBRETTEVILLE: That's correct, Your Honor.
THE COURT: So now you're relying on a different wiretap application.
MR. DeBRETTEVILLE: That's correct, Your Honor. All

the data that we've been talking about reflects intercepts made not pursuant to the application that the court has directed its attention to so far but an application that came several months later. I believe the first one is in March? June?

Yeah. The first application you were discussing yesterday and this morning is the March affidavit.

THE COURT: Right.

MR. DeBRETTEVILLE: The first application that sought a tap of Mr. Mazur and Kaplan's phone lines was in June of the same year.

THE COURT: So was the application regarding the wiretap of Kaplan and Mazur similar in style to the March 2011 application? In other words, substancewise or in terms of what the agents were telling the judge they think they would find?

THE WITNESS: Yes, they were.

THE COURT: And so you were thinking the application generally told the judge that you believed Mazur and Kaplan were involved in the same kind of scheme that the March 2011 application described?

THE WITNESS: Correct, the same kind of --

THE COURT: And so when you see the word "deal," you're thinking deal is a company that they're going to put into play?

THE WITNESS: Correct.

THE COURT: I see.

BY MR. DeBRETTEVILLE:

Q. Just to be clear, I think it's going to be helpful to the court, when you transition from the early wiretaps to the wiretap that focused on Mr. Kaplan and Mr. Mazur, the scheme that was brought to the attention of Judge Fischer was a scheme targeting a company called GenMed; is that correct?

A. Correct.

Q. And that scheme generally entailed -- well, one thing that differed about the June application from the March application, is the June application did not identify any false statements, correct?

THE COURT: I'm not following that.

MR. DeBRETTEVILLE: Well, there are material differences in how the government established probable cause between the June affidavit and the March affidavit. For example, in connection with the taps for the Possino and Nix lines, Judge Fischer was asked for, and Judge Fischer granted, an order finding probable cause for securities fraud offenses. No such finding was made in connection with the June affidavit.

That affidavit simply asked for a P.C. finding as to wire fraud, and it described -- and unlike the March application, did not allege false statements. Instead what it said was there's been a campaign targeting GenMed that there's been promotional activity engaged in by Mr. Possino and Mr. Nix. We believe there may be some kind of stock

manipulative trades going on. We haven't found any evidence of that, but we think it must be going on.

We also think that it must be Mr. Kaplan, and so we need this new wiretap to find out how Mr. Kaplan is using brokers to either park shares or otherwise forward or promote the GenMed stock scheme.

THE COURT: In other words, your position is that the June 2000 application is limited to suspicious stock trades in that stock -- what did you call it?

MR. DeBRETTEVILLE: In GenMed.

THE COURT: GenMed.

MR. DeBRETTEVILLE: That is not --

THE COURT: That's your -- the premise for your questions. And then, therefore, you are arguing that he had no right to listen in to conversations about things other than that stock.

MR. DeBRETTEVILLE: Yes. Or what I would like Agent Koepke to do is to explain what it was in that affidavit that makes him feel entitled to intercept a call between my client and his father-in-law discussing oil and gas leases. Not brokerage account transactions, not public securities, not publicity campaigns, but oil and gas leases.

THE COURT: Well -- all right. You can do that.

I mean, you've already answered. Do you have any further answer in that regard?

THE WITNESS: No, I don't think.

BY MR. DeBRETTEVILLE:

Q. I just want to make clear that, in your mind, the mere mention of the word "deal" by a target on the line, in your mind, makes that call subject to interception; is that correct?

A. I wouldn't say the mere mention of that, but it is one of the factors.

Q. What more is in this call that, in your mind, makes it an appropriate subject of interception?

A. Again, in addition to the word "deal," some of the topics that they're talking about, particularly natural gas, this was covered in one of the previous declarations, but certain industries are more attractively used or more attractively targeted for market manipulation schemes.

Q. Well, I'm sorry, but did you disclose to Judge Fischer at any time that your investigation had wrapped into its scope of oil and gas investigations?

A. I don't think I specifically mentioned oil and gas, no.

Q. Well, what is it about Judge Fischer's order that makes you feel that you were entitled to intercept any conversation about oil and gas and the word "deal"?

A. Part of the order was we were attempting to establish the extent and scope of the conspiracy of the scheme that would include other deals that were potentially being undertaken.

Q. So, in your mind, the fact that the order described your

investigation into any other deal that might happen meant that you could intercept or record in full any conversation by the target subjects about any business-related matters, right? That's the bottom line.
A. No.
Q. Again, then, if oil and gas -- well, what industries outside the scope? If oil and gas fits within it, are there any industries that are outside the scope of your authorization?
A. Off the top of my head, I don't know.
Q. So again, then, any conversation about any industry using the word "deal," in your mind, fell from the scope of your authority to intercept calls?
A. No, I don't believe that's correct.
Q. Well, what is special about oil and gas deals?
A. It's one of the industries that -- and, again, I don't know what this monitor at the time was thinking, but it's one of the industries that I am familiar based on my training and experience that is commonly sought after for market manipulation deals.
Q. Is manufacturing one of those industries?
A. General manufacturing?
Q. Manufacturing.
A. Not generally, no.
Q. What about manufacturing generic drugs?

A. Pharmaceuticals is commonly -- is one of those industries.

Q. Did you ever try and parse for Judge Fischer your argument now that you had probable cause to search and intercept all conversations about business with respect to certain industries?

A. Can you say that one more time?

Q. Your submission to Judge Fischer talks about GenMed, a pharmaceutical company, correct?

A. Correct.

Q. Does it talk about any other industry?

A. I don't recall -- I don't have it in front of me.

Do you have a copy of it?

Q. We can get you a copy.

You're asking for the June affidavit?

A. Yeah, that's what we're talking about here.

MR. DeBRETTEVILLE: Just to accelerate things, I'll proffer for the court.

Q. That affidavit does not in any -- at any point say to the court, We understand your order to authorize us to intercept calls, any business-related call with respect to certain industries that are the frequent target of pump and dump schemes, does it?

THE COURT: I can't hear what you're saying.

MR. DeBRETTEVILLE: I'm sorry.

THE COURT: You know, I don't want to be personally

critical, but here's the situation: I don't have to strain to hear you. You've got to adjust to me.

MR. DeBRETTEVILLE: Yes, Your Honor.

THE COURT: You don't speak clearly. So try and speak clearly. If you have some inherent problem speaking, I apologize in advance, but if you can correct your speech, do it.

MR. DeBRETTEVILLE: I will, Your Honor.

MR. BOWMAN: I'd like to address --

THE COURT: You swallow all your words, and I lose the last five words of everything you ask.

MR. DeBRETTEVILLE: My apologies, Your Honor. I'm sorry.

MR. BOWMAN: Your Honor, I would respond to defense counsel's proffer that the affidavit for -- the first June affidavit for these telephone lines discusses that they are serial manipulators, they do multiple deals. I would note --

THE COURT: You don't have to argue. I mean, what's the point? Let him answer the questions.

MR. BOWMAN: Very well, Your Honor. He was --

THE COURT: Let's let him answer the questions, and then you can tell me your view of it later on. I'm trying to allow the parties to develop the evidence as they want.

Go ahead.

///

BY MR. DeBRETTEVILLE:

Q. Agent Koepke, I'll let Mr. Bowman question you about what the contents of the affidavit are. I just want to focus on your understanding of those contents.

Is it is your testimony to the court that you understood Judge Fischer's order to authorize you to intercept any conversation that mentions the word "deal" as long as that conversation regarded certain industries that, in your experience, are frequently the target of pump and dump schemes?

A. No, I don't believe that was what I said.

Q. Let's try again. You've told the court that it was okay for the intercepting agent to intercept those calls. You told the court this call fits within the definition of pertinence that you understood, that it fits within the scope of the authority granted to you by Judge Fischer, correct?

A. Correct.

Q. And the reason for that is that in this call, one of the participants mentions the word "deal," and because it regards oil and gas leases, correct?

A. Correct.

Q. And you've explained to the court that you understand that to make this call fall within the scope of your authority, because you understood Judge Fischer to authorize you to intercept calls about deals that occur in industries such as oil and gas, that you think are often the topic or the subject

of pump and dump schemes, correct?
A. No. The order authorizes us to gather evidence, information regarding the scope and extent of the scheme of the conspiracy. Part of that would include what deals were being manipulated.
Q. I guess what I'm struggling with, Agent Koepke, is what is outside the scope of your authority? What can't you intercept? If this is within the definition of pertinence, what is outside that definition? What type of call regarding a "deal" would be outside the scope of your authorization?
A. I'd have to see an example. I don't know how to answer that.
Q. Well, let's stick with this for one more second, we'll move on to another.
This call is between Mr. Kaplan and his father-in-law about oil and gas leases in Oklahoma, correct?
A. Correct.
Q. It has nothing to do with trading and securities, correct?
A. I don't believe so, no.
Q. It has nothing to do with the promotional campaign targeting a publicly-traded security, correct?
A. Say that one more time.
Q. It has nothing to do with a promotional campaign as that word is used in your affidavit or in Agent Tarwater's affidavit?

A. I don't believe so.
Q. Okay. It has nothing to do with the parking of shares at some brokerage account?
A. No.
Q. It has nothing to do with cross-trading?
THE COURT: You know something, you've made the point.
MR. DeBRETTEVILLE: Okay.
THE COURT: I've read it. I've listened to your questions. I think I understand your position. You can argue it later. Let's move to something else.
MR. DeBRETTEVILLE: Your Honor, I just want to wrap up by pointing out one other call. I won't belabor it to the extent we've gone over this call. Just to get the agent on the same page, this is another one of the calls that Agent Choate defended as being within the scope of pertinence as applied by the monitoring agents.
Q. And this is the call by -- that was intercepted by Agent Hale; is that correct? Is that what this designation means?
A. He is not an agent but Analyst Hale, yes.
Q. And, again, this is one of the calls that when the parties were litigating about what the scope of your authority was, this is a call that was defended by Agent Choate as falling within the scope of your authority, correct?
A. I don't recall that particular defense, but there was

numerous calls that were --

MR. DeBRETTEVILLE: I'll proffer this is one of those calls, Your Honor.

Q. And you'll see at the notation the agent made, and he wrote, "Exact nature of conversation was unclear. Call was recorded because they were discussing an investment."

THE COURT: Just one moment.

MR. DeBRETTEVILLE: And I'll mark this as Exhibit -- I believe we're on D now.

THE COURT: What is the rest of it? Is there more or just that one page?

MR. DeBRETTEVILLE: That's it, Your Honor. I can offer to the court as Exhibit E --

THE COURT: It just stops at "at." Is that the end of it?

MR. DeBRETTEVILLE: It just ends there.

THE COURT: Okay. I've read it.

MR. DeBRETTEVILLE: I just want to -- bear in mind, the notation as to why the monitoring agent thought it was pertinent, he noted that was because they were discussing investment. But I don't want to limit you, Agent Koepke, to just that. We have a transcript that I'll mark as Exhibit E of the entire call. I'll zoom out. And I promise the court this is the last call I'm going to --

THE COURT: Move it up so I can see the rest of it.

Is that the end of it, 208?

MR. DeBRETTEVILLE: No, Your Honor, but the entire call is ten minutes and 45 seconds in length.

THE COURT: I think you were just focused on the first two minutes.

MR. DeBRETTEVILLE: Yes, Your Honor. Again, I want to ask the same question, which is -- and just to back up for a second.

It's very difficult to assess what happened in this case given the volume of calls. And so what I'm trying to do is establish -- given the volume of calls.

And so what I'm trying to do is point out two calls that the government has asserted fit within the standard of pertinence, which I believe mapped the outer limits of what they understand the scope of their authority to reach.

Q. And so in the second call, Agent Koepke, what is it about the first two minutes that, in your mind, makes this call fit within the standard of pertinence that the monitoring agents applied in this case?

A. The listed with the timestamps here, I don't see anything in the first two minutes.

THE COURT: What?

THE WITNESS: I'm sorry. Within the timestamps that are on here, again, I'm not familiar with this document, but the timestamps here, there's nothing I see in the first two

minutes that fall within the scope OF pertinence.

BY MR. DeBRETTEVILLE:

Q. All right. You've described to Judge Wilson a species of call where the first two minutes have completely innocent content, but you felt you were still authorized to continue monitoring.

Is this one of those calls?

A. I don't know if that's what the monitor believed or not.

Q. What do you believe sitting here today?

A. Sitting here today, I know that Saif Mansour who was an investment banker who had been approached by Ari Kaplan and Sherman Mazur to potentially find investors or to invest themselves in the company Seesmart which was one of the companies that was a target of a market manipulation campaign.

Q. Okay. Well, you have a binder in front of you that has this entire transcript in front of you.

A. Yes.

Q. Okay. Exhibit E.

Is there anything else in the remainder of that call that pulls this conversation within the standard of pertinence that you applied in the course of your investigation?

A. On the next page, starting at 223, it looks like there is a conversation where Ari Kaplan references and LED deal, also mentions Leading Edge, which was another company that was the target of a market manipulation campaign.

Q. Let's start with 223; is that correct?
A. Yes.
Q. Okay. Let me see if I can zoom in a bit. What are LEDs?
THE COURT: Are you showing exhibits on the binder from -- on the screen from your binder of exhibits?
MR. DeBRETTEVILLE: Yes, Your Honor.
THE COURT: And so let's mark these things as we go. Otherwise, the record will be unclear.
MR. DeBRETTEVILLE: This is Exhibit E, Your Honor.
THE COURT: E?
MR. DeBRETTEVILLE: Yes.
THE COURT: Okay.
BY MR. DeBRETTEVILLE:
Q. You mentioned that 223, there's a line from Ari Kaplan that says, "Yeah, yeah, things have been really good. Like we're working on this LED deal that's got -- it's really talking" -- "taking up about, I don't know, 95 percent. Well, 90 percent of my time, um."
Is that what you're referring to?
A. Yes.
Q. Okay. What is an LED deal, to your understanding?
A. In this context, they were working primarily on Seesmart, which, as I mentioned, was one of the companies --
THE COURT: What?
THE WITNESS: I'm sorry. The context here is that

one of the deals they were working on at the time was Seesmart. It was a company that manufactured --

THE COURT: Seesmart?

THE DEFENDANT: Seesmart, S-e-e-s-m-a-r-t.

It was a company that manufactured LED lighting.

BY MR. DeBRETTEVILLE:

Q. So, again, what is it about the content of this statement that ties to a promotional campaign, a publicly-traded stock that is being manipulated, any of the elements of a pump and dump scheme as described to Judge Fischer?

A. Seesmart was one of those companies that a promotional campaign and a pump and dump scheme had been executed on.

Q. Again, what is it about the content of this conversation that relates to a pump and dump scheme? What criminal conduct is being referenced here?

A. In that line right there, there's no criminal conduct being discussed. He is referencing Seesmart.

Q. Is there anything else in the remainder of the call where Mr. Kaplan or Mr. Mansour do anything or describe anything that relates in any way to any of the criminal aspects of the scheme that you presented to Judge Fischer?

A. You want me to read the rest of this?

Q. Please.

A. I didn't finish reading it, but, in general, it looks like they're discussing an investment. I'm pulling some of that

from what I know about Saif Mansour, but it looks like they're discussing investments and possible financing for both Seesmart and this other company, Leading Edge.

Q. You would agree with the monitoring agent's designation that because this relates to an investment, it falls within your pertinent standard, it falls within the scope of the authority granted by Judge Fischer?

A. Not solely based on that, no.

Q. What other information?

A. Based on that, it's an investment in these companies that we had evidence to believe were being used for market manipulation campaigns.

Q. Okay. So to be clear, just to wrap this up, in your view, any conversation about any of the business involving any company that might be the target of a pump and dump scheme is within the scope of your authority, correct?

A. For the most part, I believe that's true.

Q. So if Mr. Kaplan and Mr. Mansour are discussing the installation of LEDs at the Civic Center here in Downtown, that would fall within the scope of your authorization, as long as those LEDs came from Seesmart?

A. It depends on the context. Because, again, here in the situation, oftentimes what will happen is they'll take these developments, these financing, they'll use them in promotional materials and press releases as part of the promotion campaign.

So developments at the company, yes, are relevant to what's happening with the promotion campaign.

Q. Is there anything in this call that relates to a pump and dump scheme?

A. Yeah. I think they're discussing obtaining financing for a company that they're trying to do a pump and dump scheme for.

Q. Can you please point the court --

THE COURT: I've read it, and I -- I mean, if he is believed, I tend to think that's what it says.

MR. DeBRETTEVILLE: Your Honor, I would proffer the court that there's nothing in this call --

THE COURT: I read it, and he's said that they're discussing a company that was on their radar for being involved in a pump and dump scheme. He recognizes LEDs as being the product of this company. He sees in the phone call they're talking about financing. His mindset is this relates to what he believed his license was under the affidavit.

I'll have to look at the affidavit and what he says, but what he just testified to sounds reasonable to me.

MR. DeBRETTEVILLE: That's fair, Your Honor.

I'll turn it over -- the witness over to --

THE COURT: Did you have anything you want to develop from him or just -- you just want to argue the point, you can -- there's no point in examining him if you know what you're going to argue on minimization unless there's something

you want to get from him.

MR. BOWMAN: Your Honor, there are a few things that I wanted to clarify.

THE COURT: All right. Then go ahead.

MR. BOWMAN: Let me see if I can -- I just want to review my notes and see if there are things I can simply argue based on the -- I know Mr. Harris may have --

MR. HARRIS: I have two questions.

THE COURT: All right. Then go ahead.

**CROSS-EXAMINATION**

BY MR. HARRIS:

Q. Agent Koepke, you testified that regarding this pattern of criminality exception to the two-minute limitation, and I think you testified that you weren't able to quantify how many calls were continued past two minutes based on that pattern of criminality exception; is that correct?

A. Yeah. That would require knowledge of the monitoring agent's intent at the time.

Q. Is it fair to say that if the call fell within that exception, that is, that they were -- an initial phase of nonpertinent discussions but then it became pertinent, that that call would be designated as pertinent by the monitoring agent?

A. If the -- I'm sorry. Could you just say it one more time?

Q. Yes. My understanding of this exception to the two-minute

limitation that you described is that there's certain calls that within two minutes might not seem pertinent, but there are indications that they're going to become pertinent, and so the call is monitored for that purpose; is that right?

A. Correct.

Q. And in those cases, would the call then, after it's completed, be designated as "Pertinent" by the agent?

A. Not necessarily. If the conversation, for instance, never turned to a pertinent subject matter, the call might be marked "Nonpertinent."

Q. Even though there was something about that call that established a pattern of criminality in the mind of the monitoring agent?

THE COURT: Now, that is not what I've heard so far. You can follow up on it. What he said is that if there had been some pattern of speakers starting out speaking innocently, but then the conversation became involved with the scope of the crimes he was investigating, he felt he had license under those circumstances to listen more than two minutes, correct?

THE WITNESS: Yeah.

THE COURT: And then, now the question becomes, if you, under that circumstance, listen for more than two minutes, and let's say you listen for ten minutes, and unlike other calls, the speakers never did get into a discussion about criminal activity, as you anticipated, would you -- would that

call be designated in your index as a "Pertinent" call or a "Nonpertinent" call?

THE WITNESS: It would depend on the --

THE COURT: Isn't that the question?

MR. HARRIS: Yes, Your Honor.

THE WITNESS: I would assume it would probably be marked as "Nonpertinent" since there was no actual pertinent discussion that was made.

BY MR. HARRIS:

Q. And do you have any way to estimate how many such calls fell into the category that the judge has described?

A. I don't believe so.

Q. Do you have any idea whether any such during the course of this interception on the Mazur or Kaplan lines?

A. That the monitoring agent believed fell within this exception we're talking about?

Q. Yes.

A. Not specifically.

MR. HARRIS: No further questions.

THE COURT: Okay.

Anything from you, Mr. Bowman?

MR. BOWMAN: Yes, Your Honor. I probably have about 10 to 15 minutes, with the court's permission.

THE COURT: Well, we have someone in custody here.

Where are the marshals?

THE CLERK: Yes, Your Honor. They have the custody here.

THE COURT: Could you hold on for another ten minutes or so, or do you -- are you in --

THE CLERK: We have your other hearing here as well.

THE COURT: Yeah. Okay.

Ten minutes did you say?

MR. BOWMAN: I'll try to keep it short.

THE COURT: Yeah. Okay. Go ahead.

**REDIRECT EXAMINATION**

BY MR. BOWMAN:

Q. Agent Koepke, good morning.

A. Good morning.

Q. I just want to walk through briefly how this interception works to make sure that we understand a few things because I think there's some terms that may get missed.

When a call comes in, can a monitor record the call without -- monitor the call without it being recorded?

A. No.

Q. And if a call comes in, and it's a 30-minute phone call, and it's not monitored, is that reflected in your chart still as a call over two minutes?

A. Yes. That's based on the duration of the call.

Q. Were there times where calls would come in that would never actually be monitored or recorded?

A. Sure.
Q. Why would that be?
A. First of all, we weren't monitoring 24/7. We had time periods that we were monitoring calls. So calls outside of that time period would not be recorded. Also, if there were multiple, we were up on at one point, I think it was 11 lines, if there were multiple calls at one time, they might not have all been able to be recorded.
THE COURT: Where is that on the chart? Can you show me what you're referring to on the chart? Which line? The chart that the defense was using.
MR. BOWMAN: This is Agent Koepke's declaration, Your Honor, in his declaration.
Q. So, for example, Agent Koepke, looking at the first line here, intercepted calls. That includes a lot of calls that don't have any audio in the system; is that right?
A. It does.
Q. They were never monitored or recorded?
A. Correct.
Q. And looking at calls over two minutes, that would include calls that were never monitored or recorded?
A. Correct.
Q. And looking at this duration, you see over two minutes, over --
THE COURT: Is there any record of calls that came in

that weren't monitored?

MR. BOWMAN: That's what I'm getting to.

THE COURT: Okay. Okay.

BY MR. BOWMAN:

Q. For example, Agent Koepke, the focus on your cross-examination from Mr. DeBretteville was nonpertinent, over two minutes, nonminimized.

Do you see that?

A. Yes.

Q. When it says over two minutes, does that mean it was recorded and monitored for over two minutes?

A. No. That's based on the call duration in VoiceBox.

Q. So can you explain to me if there's a say a 30-minute phone call, is it possible that that call could be recorded for a minute?

A. Yes.

Q. Or 30 seconds?

A. Yes.

Q. So in that instance, the call duration in the system would be 30 minutes but the actual recording monitoring would be 30 seconds?

A. It's possible, yes.

Q. And was there an effort made to look at these calls here, the 459 calls and the 111 calls, and find out how many actually had audio?

A. There was, yes.
Q. And how many actually were recorded for over two minutes?
A. Yes.
Q. And in your declaration, is that -- are those calls reduced out in your declaration?
A. They are.
Q. So looking at your declaration, how many on Mr. Kaplan's telephone had no audio of that subset, nonpert, not minimized?
A. There were approximately 26 calls on Defendant Kaplan's line that did not have any audio whatsoever, and approximately 117 on Mazur's line that did not have any audio.
Q. And I've heard defense counsel say before that that means the agents didn't bother to record them. Is that your understanding, that the agents just screwed up the recording?
A. No. I mean, it's not possible to screw up the recording. If they're monitoring it, it's being recorded. What that means is that the VoiceBox system labeled this call as having audio and having to monitor assign which was the parameters we used to try to identify --
THE COURT: Had what? Had no --
THE WITNESS: Sorry. Had a monitor assigned to it. It's a filter that we used in VoiceBox to try to identify actual calls. Unfortunately, certain of those calls still were blank, did not have actual audio in them.
///

BY MR. BOWMAN:
Q. And you -- by definition, you can't minimize a call you didn't hear; is that right?
A. Yes.
Q. And there's 117 calls on Mr. Mazur's telephone out of that subgroup that we looked at that had no audio; is that right?
A. Yes.
Q. Now, how many were less than two minutes out of that subgroup?
A. There was 39 calls on Kaplan's line and 116 on Mazur's line that were in the subset but had less than two minutes of actual audio on them.
Q. So, Agent Koepke, going back to the chart on the previous page, this line here at the bottom, "Nonpertinent, over two minutes, not minimized," when you take into account the calls that actually were listened to by monitoring agents for over two minutes, did you try to figure out how many that actually resulted in which were nonpertinent, nonminimized?
A. Yes.
Q. And in your declaration, do you see what your conclusion was, how many calls on Mr. Kaplan's phone were recorded for over two minutes, nonpertinent, and never minimized by the monitor?
A. Yeah. The calls that actually had audio over two minutes on Kaplan's line was approximately 46 calls, and the same

number was -- or the same category was 226, the same category was 226 calls on Mazur's line.

Q. So 46 calls on Kaplan's phone, 226 on Mr. Mazur's phone. Looking back, the total number of nonpertinent calls, how many nonpertinent calls on each line?

A. I'm sorry, the total nonpertinent calls?

Q. Total nonpertinent calls.

A. It was approximately 4,602 nonpertinent calls on Mazur's line, and approximately 1,576 nonpertinent calls on Kaplan's line.

Q. Now, Agent Koepke, when -- I just want to make sure I understand, because I think the terms got muddled a little bit. When does minimization happen? For example, when can a monitoring agent minimize during a call?

A. They can minimize any time during the recording of the call.

Q. And how do they do that?

A. There's a button, is a bad way to put it, but there's a button, a selection that they make while recording the call that then minimizes the call so audio is not listened to and not being recorded.

Q. And when do they designate in the system if a call is pertinent or nonpertinent? How do they do that?

A. There's another box area that they designate, they choose between pertinent or nonpertinent.

Q. And when is that typically done?
A. It could be done any time when it's identified during the call. In many cases, it's done after the call, because during the call the monitors are trying to type up a synopsis.
Q. So let me ask you this question: If I'm a monitoring agent and I'm listening to a call at two minutes that I think is pertinent, can I keep listening, is your understanding?
A. Yes.
Q. How about three minutes?
A. Yes.
Q. Ten minutes?
A. Of a pertinent call, yes.
Q. Now, is it possible at the end of a call to reassess your views on that call?
A. Sure.
Q. And decide that everything you just heard you thought was pertinent may actually not be pertinent?
A. It's possible.
Q. What could cause a monitoring agent to reconsider?
A. Facts that came out at the end of the conversation, or if they were just unclear on what they were listening to, or they thought it was pertinent, but then top of a conversation revealed that it was actually nonpertinent.
Q. Were case agents also sometimes in the monitoring room to consults with monitoring agents?

A. Yes.
Q. And so that would result in a call over ten minutes, nonpertinent, never minimized; is that right?
A. In that instance, yes.
Q. In that instance, did the monitor make a mistake based on the minimization memo?
A. I would say no.
MR. BOWMAN: Now, last thing, Your Honor, because it seems the court definitely understood Agent Koepke's description of that particular call.
Q. I want to get to the reclassification that you testified about on cross-examination.
Is the only purpose in your mind of a pertinence or nonpertinence determination for a call for minimization purposes?
A. No.
Q. What's your --
THE COURT: Say that again.
MR. BOWMAN: I'm sorry, Your Honor.
Q. Agent Koepke, is the only purpose of the pertinence or nonpertinence determination for minimization purposes?
A. No.
Q. How is the pertinence/nonpertinence designation useful in the case?
A. It's also useful to identify relevant calls for the

purposes of the investigation, for information for preparation for indictment or trial.
Q. Are you able to run filters that will extract all pertinent calls?
A. Yes.
Q. In fact, were all the calls in this case produced to the defense based on pertinent or nonpertinent?
A. I believe that's how they were produced.
Q. Now, you testified you went back and looked at particular calls to identify which were relevant maybe to the case; is that right?
A. Yes.
Q. Why did you do that?
A. We had a large volume of calls. We needed to be familiar with the evidence that we had, the calls that we had to identify the calls that would be useful for our investigation and for potential prosecution.
Q. And so what did you do if you found a call marked as nonpertinent that you thought was, in fact, relevant?
A. In some instances, we would change that to a pertinent designation so we would be able to go back, and when we ran our pertinent filters, that call would come up.
Q. And be produced to the defense as a pertinent call?
A. It would be produced as a pertinent call, yes.
Q. When you were doing that, did it cross your mind that that

might affect the numbers later for determining the reasonableness of minimization?
A. No.
Q. Were you trying to skew the numbers related to minimization in any way?
A. No.
Q. In fact, when you realized that the numbers for minimization had been affected by that reclassification, what did you do?
A. We attempted to identify the number of calls that had been recharacterized in this fashion.
Q. And did you tell me as soon as you realized that?
A. Yes.
Q. And did we tell the defense?
A. Yes.
Q. And were you able to figure out approximately how many calls may have been affected by the reclassification?
A. Yeah. Based on a comparison to reports that we had generated and the numbers that had been in some of the prior affidavits and interim reports, we were able to compare the new number of pertinent calls to the number of calls in those reports to roughly estimate how many had been changed.
Q. How many, approximately, had been changed?
A. I don't recall exactly. I believe it was on the order of less than 100.

Q. And is it possible, as you testified, to actually figure out which specific calls were changed?
A. It would be, yes.
Q. Did you talk, in fact, with people from the VoiceBox company and FBI to figure out if that was possible?
A. Yes.
Q. How long would it take to do that?
A. It would take a substantial amount of time and effort.
Q. Weeks?
A. Or longer.

MR. BOWMAN: And, Your Honor, I'd make a proffer that I have -- I offered to Mr. DeBretteville to undergo that search, to say if you want us to figure out the impact of the reclassification, we'll do that. If you want us to find each call that was changed, we will do that, but the number is, based on what we can determine, is minimal. It's 50 to 70 calls, and we'll stipulate that those calls were changed. And he told me that given the small number of calls, they didn't need us to undertake that effort.

I made that proffer --

THE COURT: Are you finished?

MR. BOWMAN: I am done, Your Honor.

THE COURT: All right.

Any further examination? Because I have to go to another case.

MR. DeBRETTEVILLE: No, Your Honor.

THE COURT: Okay.

Thank you, Agent.

THE WITNESS: Thank you, Your Honor.

THE COURT: All right. Let's have a brief recess and get to the other -- and I'll issue an order directing your further briefing.

MR. BOWMAN: Thank you, Your Honor.

MR. DeBRETTEVILLE: Your Honor, can I make one brief point about this before we go, very briefly?

THE COURT: Yes.

MR. DeBRETTEVILLE: The fundamental point that may have been lost in the cross-examination format that I was trying to make, is that if Your Honor issued a search warrant for a business, that search warrant would be focused on the criminal aspects of that business.

Mr. Kaplan was CFO of Seesmart, a whole legitimate enterprise that continues to exist, and the fundamental problem I want to put before Your Honor is that the government treated the wiretap as authority to intercept any call involving any business that, in their view, was somehow implicated by a potential scheme, and that breadth was not within the scope of the authority granted by Judge Fischer. And even if it was, that breadth exceeds the protections imposed by Title 3 and the Constitution. That is just the one point I wanted to make.

THE COURT: Okay.

MR. HARRIS: Is it the court's understanding that we'll be back to argue this or...

THE COURT: No. I'd rather see it briefed, and then if I need further argument, I'll ask for it.

MR. BOWMAN: Your Honor, do you anticipate asking for additional briefing on minimization as well?

THE COURT: Maybe. I'm not sure. But certainly on the other --

MR. BOWMAN: Thank you, Your Honor.

MR. DeBRETTEVILLE: Thank you, Your Honor.

MR. HARRIS: Thank you, Your Honor.

(Proceedings concluded at 12:00 p.m.)

- - - - -

C E R T I F I C A T E

I hereby certify that pursuant to Section 753, Title 18, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: March 18, 2014

/S/________________________

Deborah K. Gackle
CSR No. 7106

## $

$25 [1] 10/23

## -

-400-odd [1] 39/8

## /

/S [1] 87/12

## 1

1,000 [1] 42/6
1,040 [6] 39/15 41/7 43/22 44/8 46/15 46/16
1,576 [1] 79/9
10 [1] 73/23
100 [1] 83/25
10:10 [1] 6/1
11 [1] 75/6
111 [2] 29/14 76/24
1149 [1] 1/25
116 [1] 78/10
117 [2] 77/11 78/5
12:00 [1] 86/13
12th [1] 3/6
13-48-SVW [1] 6/4
1400 [1] 2/8
15 [2] 50/18 73/23
158 [1] 50/21
1600 [1] 3/11
1601 [1] 4/5
18 [3] 46/3 87/4 87/10
19 [4] 14/10 41/6 46/3 46/8

## 2

20 [2] 11/10 46/12
2000 [5] 9/20 10/3 10/9 10/11 56/8
2004 [4] 9/20 10/3 10/10 10/11
2006 [2] 9/24 14/14
2011 [2] 54/12 54/18
2013-00048-SVW [1] 1/9
2013-00062-SVW [1] 1/9
2014 [3] 1/17 6/1 87/10
2025 [1] 3/6
2050 [1] 4/5
208 [1] 65/1
21 [1] 11/10
213 [1] 1/25
213-489-9025 [1] 3/17
213-489-9027 [1] 3/17
213-613-4655 [1] 3/7
213-613-4656 [1] 3/7
213-894-7524 [1] 2/17
21515 [1] 2/20
22 [1] 5/5
223 [3] 66/22 67/1 67/14
225 [1] 3/21
226 [3] 79/1 79/2 79/3
23 [1] 22/23
24/7 [1] 75/3
243 [1] 28/25
24th [1] 22/4
255-9025 [1] 4/6
26 [1] 77/9
272 [1] 39/2
298 [2] 38/5 39/1
2nd [1] 2/16

## 3

30 [3] 76/17 76/20 76/20
30-minute [2] 74/20 76/13
300 [1] 3/21
302 [1] 10/17
302s [2] 10/18 14/14
31 [3] 5/12 7/11 7/17
310 [2] 2/21 4/6
312 [2] 1/24 2/9
315 [1] 3/16
316-9333 [1] 2/21
321 [1] 2/16
34 [1] 52/15
387-1 [1] 23/3
39 [1] 78/10

## 4

4,300 [1] 43/10
4,602 [1] 79/8
402A [1] 1/24
4060 [1] 3/22
4082 [1] 4/5
4094 [1] 3/12
42.5 [2] 38/16 38/19
45 [1] 65/3
459 [3] 29/11 29/14 76/24
46 [2] 78/25 79/3
4655 [1] 3/7
4656 [1] 3/7
4676 [1] 3/22

## 5

5,000 [3] 40/24 42/6 43/10
5,300 [1] 39/8
50 [1] 84/16
5094 [1] 3/13
54 [1] 12/2
56 [1] 52/13
570 [8] 29/15 29/18 29/21 34/9 37/22 38/14 48/20 49/6
5th [1] 3/6

## 6

60 [3] 33/9 33/12 38/15
601 [1] 3/6
620-1149 [1] 1/25
626-202-4060 [1] 3/22
626-794-4676 [1] 3/22
63 [1] 46/1
640 [1] 39/2
660 [1] 3/11
665 [1] 2/20
695 [1] 28/24

## 7

70 [1] 84/16
71 [1] 5/6
7106 [1] 87/13
73 [1] 5/12
74 [1] 5/6
7524 [1] 2/17
753 [1] 87/3

## 8

801 [1] 3/16
81 [1] 46/17
86 [1] 1/10
8th [1] 3/16

## 9

90 [1] 67/18
90012 [3] 1/24 2/9 2/17
90014 [1] 3/16
90071-2025 [1] 3/6
9025 [2] 3/17 4/6
9027 [1] 3/17
90404-4082 [1] 4/5
90503 [1] 2/20
91101 [1] 3/21
92660 [1] 3/12
9333 [1] 2/21
938 [2] 29/1 29/18
949-725-4094 [1] 3/12
949-823-5094 [1] 3/13
95 [1] 67/17

## A

A.M [1] 6/1
abide [1] 44/21
abiding [1] 39/20
able [10] 9/22 18/7 39/13 48/17 71/14 75/8 82/3 82/21 83/16 83/20
about [64] 8/23 10/9 10/23 11/1 11/9 11/22 11/23 12/2 13/10 14/13 15/5 15/18 15/23 17/15 18/10 18/21 21/10 26/25 32/7 32/7 39/2 39/5 39/15 42/12 43/9 43/16 50/24 51/9 52/8 52/8 53/6 53/16 54/1 55/9 56/15 57/11 57/19 57/21 58/3 58/11 58/15 58/25 59/4 59/7 59/10 59/15 61/2 61/24 62/16 63/22 65/16 67/17 68/7 68/13 69/1 69/14 70/16 72/11 72/24 73/16 73/22 80/9 81/12 85/10
above [3] 28/6 30/22 87/6
above-entitled [1] 87/6
accelerate [1] 59/16
accept [1] 20/18
accomplices [1] 8/23
accomplish [1] 20/3
accordance [2] 29/20 45/10
according [2] 33/1 44/15
account [3] 56/21 63/3 78/15
accurate [1] 20/19
activities [1] 31/9
activity [4] 31/10 49/15 55/24 72/25
actual [11] 10/7 37/1 41/3 41/4 41/20 41/22 73/7 76/20 77/23 77/24 78/12
actually [19] 25/7 25/21 28/2 34/9 38/4 39/20 41/15 47/8 48/20 48/25 74/25 76/24 77/2 78/16 78/17 78/24 80/17 80/23 84/1
add [1] 46/16
adding [1] 43/7
addition [2] 14/21 57/10
additional [6] 9/14 15/16 16/13 16/23 37/21 86/7
address [3] 21/8 43/2 60/9
adequacy [2] 25/25 26/4
adjust [1] 60/2
admit [1] 14/15
admits [1] 14/14
admitted [1] 15/4
admonition [1] 43/18
adopted [2] 19/20 32/25
advance [1] 60/6
advised [1] 8/19
affect [1] 83/1
affected [2] 83/8 83/17
affidavit [16] 45/5 54/6 55/15 55/15 55/19 55/20 56/18 59/14 59/18 60/15 60/16 61/3 62/24 62/25 70/17 70/18
affidavits [1] 83/20
after [12] 8/25 10/11 16/7 29/23 30/1 31/18 35/12 51/1 51/6 58/19 72/6 80/3
again [28] 8/16 14/6 17/19 18/18 27/12 34/22 35/14 36/20 41/10 41/19 42/4 48/17 52/15 52/16 53/9 53/16 57/10 58/6 58/11 58/16 61/11 63/21 65/6 65/24 68/7 68/13 69/22 81/18
agent [96]
Agent Choate [1] 51/21
Agent Koepke [1] 56/18
agent's [7] 35/18 35/24 37/10 38/24 46/2 69/4 71/18
agents [25] 8/19 8/21 9/2 22/14 29/6 29/20 33/24 34/10 37/2 38/11 39/20 39/25 40/3 40/7 40/16 41/8 45/20 54/14 63/17 65/18

A

agents... [5] 77/13 77/14 78/16 80/24 80/25
agree [4] 17/3 18/11 29/24 69/4
agreement [1] 14/23
ahead [8] 28/4 28/12 43/17 51/15 60/24 71/4 71/9 74/9
aircrafts [1] 11/22
al [3] 1/10 6/5 6/7
all [35] 12/1 13/10 14/2 14/19 15/9 16/9 17/13 18/5 21/17 22/7 29/7 29/12 29/13 29/18 29/21 29/23 32/21 33/1 33/6 39/3 41/14 51/13 53/25 56/23 59/3 60/10 66/3 71/4 71/9 75/3 75/8 82/3 82/6 84/23 85/5
allegations [1] 12/22
allege [1] 55/22
allegedly [1] 10/14
allow [2] 41/17 60/23
allowed [1] 30/10
along [2] 6/17 14/5
already [1] 56/24
also [14] 2/11 6/10 6/13 6/21 7/6 7/7 11/22 14/6 33/23 56/3 66/23 75/5 80/24 81/25
alternatively [2] 16/21 19/18
although [2] 18/17 48/17
always [1] 43/8
am [3] 19/8 58/18 84/22
AMERICA [4] 1/7 6/5 6/6 6/10
Aminoff [3] 2/15 6/23 20/9
among [1] 8/20
amount [3] 46/12 52/17 84/8
Amy [3] 3/15 3/15 7/2
amyejacks [1] 3/18
analysis [1] 49/16
Analyst [1] 63/20
analyze [1] 25/21
analyzed [1] 18/3
and/or [1] 49/21
ANDRÉ [1] 2/6
ANGELES [7] 1/16 1/24 2/9 2/17 3/6 3/16 6/1
another [10] 8/2 12/8 39/5 45/1 62/14 63/15 66/24 74/3 79/24 84/25
answer [5] 9/18 56/25 60/19 60/21 62/11
answered [1] 56/24
answers [1] 7/20
anticipate [2] 16/15 86/6
anticipated [1] 72/25
any [61] 10/2 10/15 12/20 13/7 14/12 14/13 15/25 18/25 23/13 24/15 27/15 39/19 40/5 40/15 40/20 41/4 41/20 44/7 48/8 48/19 48/19 52/20 52/24 52/25 53/4 53/12 55/10 56/1 56/24 57/16 57/20 58/1 58/2 58/3 58/8 58/11 58/11 59/10 59/18 59/18 59/20 61/7 68/9 68/20 68/20 69/14 69/14 69/14 73/10 73/13 73/13 75/16 75/25 77/10 77/11 79/15 80/2 83/5 84/24 85/20 85/20
anyone [1] 53/4
anything [14] 11/9 11/14 12/3 13/7 14/25 41/22 65/20 66/19 68/18 68/19 68/19 70/3 70/22 73/21
anyway [1] 35/15
apologies [2] 26/24 60/12
apologize [1] 60/6
apparently [2] 10/4 11/4
appearance [1] 7/3
appearances [4] 2/1 3/1 4/1 6/8
appearing [2] 6/16 6/20
appears [1] 23/3
application [15] 53/20 53/24 54/2 54/3 54/5 54/8 54/11 54/13 54/16 54/19 55/9 55/9 55/10 55/22 56/8
applied [3] 63/16 65/19 66/21
apply [1] 14/24
appreciate [1] 18/23
approached [1] 66/11
appropriate [6] 16/20 48/3 50/15 51/1 51/20 57/9
approximately [7] 77/9 77/10 78/25 79/8 79/9 83/16 83/23
are [57] 9/2 16/1 19/9 19/15 20/9 20/18 23/6 26/3 28/5 28/8 29/13 30/5 30/6 30/25 36/9 36/17 37/21 39/14 41/7 41/9 44/2 46/8 46/17 46/24 47/1 47/2 49/8 49/8 49/9 51/25 51/25 52/22 55/13 56/14 57/13 58/7 58/8 59/21 60/16 61/3 61/9 61/25 65/24 67/3 67/4 69/18 70/1 71/2 71/6 72/2 73/25 74/4 77/4 77/6 80/4 82/3 84/21
area [2] 8/19 79/24
aren't [2] 41/8 47/1
argue [9] 16/9 16/20 19/18 60/18 63/10 70/23 70/25 71/6 86/3
argued [1] 8/1
arguing [1] 56/14
argument [5] 8/1 15/12 46/25 59/2 86/5
arguments [1] 17/14
Ari [6] 6/20 52/6 52/7 66/11 66/23 67/14
as [98]
ask [12] 10/9 10/15 10/25 11/5 11/19 16/25 41/8 53/16 60/11 65/7 80/5 86/5
asked [13] 6/13 8/7 10/12 10/21 11/10 12/2 36/9 36/14 36/15 36/16 47/23 55/17 55/20
asking [10] 10/23 13/8 15/16 27/20 40/15 41/17 46/8 51/22 59/14 86/6
aspects [2] 68/20 85/16
asserted [1] 65/13
assess [1] 65/9
assessing [2] 25/24 26/4
assign [1] 77/18
assigned [2] 22/14 77/21
ASSISTANT [1] 2/8
associate [1] 12/1
association [2] 15/1 15/3
assume [5] 13/3 44/14 46/22 48/15 73/6
assumes [2] 10/23 36/11
at [88]
attacking [1] 21/11
attempt [1] 36/20
attempted [1] 83/10
attempting [1] 57/22
attended [1] 40/1
attention [15] 23/4 24/24 25/18 25/20 25/20 30/17 39/6 40/12 40/20 40/21 40/24 43/19 52/10 54/3 55/5
attorney [5] 2/6 9/25 10/8 11/5 12/5
Attorney's [1] 22/18
ATTORNEYS [1] 2/8
attractively [2] 57/13 57/13
audio [18] 41/3 41/4 41/20 41/22 41/24 42/2 44/1 75/16 76/25 77/8 77/10 77/11 77/17 77/24 78/6 78/12 78/24 79/20
AUSAs [1] 40/2
authorities [1] 16/17
authority [15] 20/22 21/2 21/6 27/7 58/13 61/15 61/22 62/7 63/22 63/24 65/15 69/7 69/16 85/20 85/23
authorization [4] 24/20 58/9 62/10 69/20
authorize [3] 59/19 61/6 61/23
authorized [4] 23/16 45/12 53/3 66/5
authorizes [1] 62/2
available [1] 9/5
AVEIS [2] 2/7 6/10
Avenue [1] 3/21
aware [3] 11/23 36/9 52/22
away [1] 49/20
awful [1] 13/11

B

back [21] 13/13 14/14 26/5 26/10 27/3 27/12 28/20 32/18 33/16 35/3 35/15 38/23 44/16 46/16 48/25 65/7 78/13 79/4 82/9 82/21 86/3
bad [1] 79/18
banker [1] 66/11
barrier [1] 32/23
based [17] 13/24 14/14 16/17 45/5 47/25 48/22 58/18 69/8 69/10 71/7 71/15 74/23 76/12 81/5 82/7 83/18 84/16
basically [6] 8/18 10/17 10/20 14/11 21/11 44/25
basis [5] 28/15 40/6 40/6 40/11 47/13
be [74] 8/20 9/5 13/11 15/16 15/17 15/18 15/19 16/6 16/16 16/24 17/1 17/23 18/2 18/5 18/6 18/7 20/2 21/23 22/25 23/20 24/6 27/25 28/8 28/17 28/18 30/4 30/7 31/2 31/4 31/5 31/11 37/20 38/13 39/25 41/18 43/5 47/6 47/17 47/25 48/3 48/17 49/5 55/2 55/2 55/25 56/2 56/3 59/25 62/9 67/8 69/13 69/15 71/22 72/7 72/9 73/1 73/6 74/25 75/2 75/5 75/8 76/14 76/20 76/20 80/2 80/17 82/14 82/16 82/21 82/23 82/24 84/3 85/15 86/3
Beach [1] 3/12
bear [1] 64/18
became [2] 71/21 72/17
because [38] 8/7 8/9 8/20 12/22 13/10 13/16 14/19 15/18 16/7 16/24 18/18 18/23 19/2 19/7 19/9 19/15 35/23 37/6 37/24 42/7 42/20 43/14 45/19 46/23 47/6 49/7 53/19 61/18 61/23 64/6 64/20 69/5 69/22 74/15 79/12 80/3 81/8 84/24
become [2] 27/25 72/3
becomes [3] 18/19 18/19 72/21
been [28] 11/1 12/15 16/3 17/18 20/17 22/4 29/22 30/24 31/6 35/10 37/7 42/15 47/15 54/1 55/23 55/24 66/11 67/15 68/12 72/16 75/8 83/8 83/10 83/17 83/19 83/22 83/23 85/13
before [12] 7/8 9/3 11/10 19/4 20/1 25/16 30/12 30/19 39/23 77/12 85/10 85/19
beginning [6] 24/13 27/13 27/21 30/12 32/6 48/5
behalf [4] 6/10 6/20 6/23 7/6
behind [1] 21/19
being [21] 10/20 34/5 34/11 34/12 39/17 40/19 48/12 49/25 51/25 57/24 62/4 63/16 68/9 68/15 68/17 69/11 70/13 70/14 74/18 77/16 79/21
belabor [1] 63/13
belaboring [1] 21/15
belief [2] 15/24 18/1
believe [24] 8/8 13/9 20/17 23/2 27/25 28/2 38/2 41/16 45/4 53/3 54/4 55/25 58/14 61/10 62/19 63/1 64/9 65/14 66/9 69/11 69/17 73/12 82/8 83/24
believed [7] 8/21 48/23 54/17 66/8 70/9 70/17 73/15
below [1] 33/7
Beltran [1] 12/11
benefit [2] 16/4 22/3
Bertrand [2] 12/13 12/14
better [2] 15/13 19/1
between [9] 19/3 28/7 30/25 41/2 49/25 55/15 56/19 62/15 79/25
beyond [2] 11/25 32/9
binder [4] 50/10 66/15 67/4 67/5
Bingham [1] 4/4
bingham.com [2] 4/6 4/7
BIROTTE [1] 2/6
bit [5] 26/11 26/11 33/15 67/3 79/12
black [1] 7/12

## B

blank [1] 77/24
Blvd [2] 2/20 4/5
bold [1] 29/10
bond [1] 6/21
both [6] 8/2 21/8 21/12 31/19 31/20 69/2
bother [2] 39/16 77/13
bottom [5] 26/12 29/10 37/16 58/4 78/14
bound [1] 32/8
BOWMAN [16] 2/7 6/9 9/1 9/4 14/8 14/12 14/16 15/6 15/6 15/7 37/20 40/7 40/10 50/7 61/2 73/21
box [2] 46/3 79/24
Bradley [2] 3/10 6/21
breadth [2] 85/22 85/24
breed [1] 51/24
bribe [6] 9/15 9/15 12/9 12/17 13/2 13/3
bribed [2] 10/14 10/14
bribery [1] 12/21
brief [5] 7/9 16/16 18/23 85/5 85/9
briefed [1] 86/4
briefing [8] 15/16 15/18 16/4 17/1 25/23 26/15 85/7 86/7
briefly [2] 74/14 85/10
briefs [1] 19/4
bring [2] 9/22 36/14
brokerage [2] 56/21 63/3
brokers [1] 56/5
brought [1] 55/5
Brunoehler [1] 7/5
bucket [1] 33/5
business [7] 58/3 59/4 59/20 69/14 85/15 85/16 85/21
business-related [2] 58/3 59/20
but [64] 8/12 8/17 9/5 9/10 10/13 12/6 12/20 12/24 13/8 13/25 15/12 15/17 18/25 19/14 19/16 25/17 27/8 29/8 30/13 32/4 32/6 33/15 35/8 35/15 36/14 38/7 38/18 39/5 40/21 41/23 44/25 48/11 48/25 49/10 50/10 51/25 52/13 54/3 56/2 56/22 57/6 57/12 57/15 58/17 60/1 60/6 63/20 63/25 64/21 65/2 65/24 66/5 68/24 69/1 70/19 71/21 72/2 72/17 76/20 78/11 79/18 80/22 84/15 86/8
button [6] 34/3 44/25 45/1 45/1 79/18 79/19

## C

CA [7] 2/17 2/20 3/6 3/12 3/16 3/21 4/5
calculator [1] 38/20
CALIFORNIA [5] 1/2 1/16 1/24 2/9 6/1
call [111]
Callahan [3] 3/20 3/20 7/5
called [2] 33/17 55/6
Calling [1] 6/4
calls [166]
came [6] 38/5 40/19 54/3 69/21 75/25 80/20
campaign [9] 55/23 62/20 62/23 66/14 66/25 68/8 68/12 69/25 70/2
campaigns [2] 56/22 69/12
can [55] 9/1 9/3 9/5 15/13 16/6 17/1 17/6 18/22 18/23 19/11 19/20 27/5 27/21 28/1 28/20 31/17 31/21 31/25 32/3 32/8 32/9 36/14 40/23 42/16 43/16 43/22 44/17 44/21 44/23 50/13 51/12 51/14 53/2 56/23 59/6 59/13 60/6 60/22 63/10 64/12 64/25 67/3 70/7 70/24 71/5 71/6 72/15 74/17 75/9 76/13 79/13 79/15 80/7 84/16 85/9
can't [5] 44/2 44/5 59/23 62/7 78/2
captures [2] 26/14 33/23
Carlson [1] 3/11
case [17] 6/11 7/7 22/13 22/14 22/14 23/19 24/15 25/23 27/15 40/2 65/10 65/19 80/24 81/24 82/6 82/10 84/25
cases [3] 16/3 72/6 80/3
categories [1] 25/14
category [21] 25/17 26/6 26/12 26/14 26/25 28/23 28/25 29/10 32/18 33/4 39/5 39/8 48/9 48/10 48/19 48/21 49/13 49/14 73/11 79/1 79/1
cause [5] 9/23 55/14 55/18 59/3 80/19
caused [1] 11/2
Center [2] 3/11 69/19
CENTRAL [1] 1/2
certain [20] 11/23 13/13 25/6 25/9 28/8 30/2 30/25 34/9 35/9 36/16 37/23 40/14 52/5 52/5 57/12 59/4 59/20 61/8 72/1 77/23
certainly [5] 10/11 18/11 28/19 44/19 86/8
certify [1] 87/3
CFO [1] 85/17
change [3] 34/11 36/24 82/20
changed [16] 34/12 35/19 35/21 35/24 36/2 36/3 37/7 37/9 37/15 37/17 38/23 83/22 83/23 84/2 84/15 84/17
charged [1] 14/25
charges [2] 9/22 13/7
CHARLES [4] 5/5 6/12 22/1 22/8
chart [8] 42/13 42/14 42/15 74/21 75/9 75/10 75/11 78/13
check [4] 28/1 31/17 32/3 41/7
checked [2] 29/22 41/13
Choate [3] 51/21 63/15 63/23
Choate's [1] 49/21
choose [1] 79/24
circumstance [1] 72/22
circumstances [1] 72/19
Civic [1] 69/19
clarification [1] 53/19
clarify [1] 71/3
classifications [1] 33/24
classified [1] 41/5
clear [8] 16/6 18/4 18/6 18/8 28/22 55/2 57/3 69/13
clearly [3] 13/6 60/4 60/5
client [1] 56/20
Cloverfield [1] 4/5
Code [1] 87/4
Colin [1] 6/25
collection [1] 49/6
collectively [2] 38/8 43/23
column [2] 43/11 43/12
columns [1] 43/14
combined [1] 27/19
come [5] 13/15 37/21 40/21 74/24 82/22
comes [7] 11/4 12/17 20/23 33/16 34/24 74/17 74/20
commenting [1] 18/13
comments [1] 17/15
committing [1] 14/22
commonly [2] 58/19 59/1
communicating [1] 30/6
communication [11] 24/14 24/15 24/19 24/25 24/25 27/14 27/15 28/17 30/13 31/5 31/7
communications [4] 22/16 23/13 23/21 24/21
companies [5] 53/11 66/14 67/23 68/11 69/10
company [14] 54/22 55/6 59/8 66/13 66/24 68/2 68/5 69/3 69/15 70/1 70/6 70/13 70/15 84/5
compare [1] 83/20
comparison [1] 83/18
competitors [1] 8/24
completed [1] 72/7
completely [3] 29/8 31/20 66/4
concern [2] 20/20 43/2
conclude [1] 7/10
concluded [1] 86/13
concludes [1] 19/19
conclusion [1] 78/20
conduct [3] 23/16 68/14 68/16
Conference [1] 87/8
conflate [1] 18/18
conformance [1] 87/7
confusing [1] 43/6
connection [2] 55/16 55/19
consider [1] 26/1
conspiracy [2] 57/23 62/4
Constitution [1] 85/25
consults [1] 80/25
content [4] 50/25 66/5 68/7 68/13
contents [2] 61/3 61/4
context [6] 20/23 27/18 53/7 67/22 67/25 69/22
continue [7] 24/21 29/25 34/4 45/12 50/15 51/1 66/5
continued [5] 1/19 3/1 4/1 47/24 71/15
continues [1] 85/18
continuing [1] 47/14
control [1] 39/19
conversation [34] 24/1 24/1 24/4 31/3 31/10 32/1 32/5 48/4 48/13 49/2 49/9 49/19 50/2 50/25 52/21 52/25 53/4 53/7 53/13 53/17 57/20 58/2 58/11 61/7 61/8 64/5 66/20 66/23 68/13 69/14 72/8 72/17 80/20 80/22
conversations [10] 28/7 30/25 31/1 48/6 49/3 49/11 52/6 53/9 56/15 59/4
convicted [1] 11/25
cooperate [1] 9/14
cooperating [1] 14/24
cooperation [4] 14/9 14/11 14/18 14/23
cooperator [3] 12/8 13/4 13/11
copy [6] 7/12 22/4 40/4 50/9 59/12 59/13
correct [78] 10/22 22/23 23/10 25/8 25/14 25/15 29/5 29/13 29/19 29/23 32/21 32/22 33/2 33/7 33/18 33/19 33/25 34/6 34/7 35/1 35/6 35/13 36/1 36/24 38/2 38/16 39/4 39/11 39/12 39/17 39/18 40/8 40/13 43/23 43/24 45/13 45/22 45/23 47/9 47/20 47/25 48/1 48/6 48/7 49/23 50/7 53/21 53/22 53/25 54/20 54/24 55/6 55/7 55/11 57/5 58/14 59/8 59/9 60/6 61/15 61/16 61/19 61/20 62/1 62/16 62/17 62/18 62/21 63/19 63/24 67/1 69/16 71/16 72/5 72/19 75/19 75/22 87/5
correspond [2] 26/6 26/19
could [22] 8/20 15/19 16/20 17/5 19/18 21/7 30/7 35/21 37/3 37/4 42/4 43/14 44/15 47/15 47/24 52/10 58/2 71/24 74/3 76/14 80/2 80/19
couldn't [2] 37/1 47/6
counsel [5] 2/1 6/8 6/11 20/13 77/12
counsel's [1] 60/15
count [1] 38/4
counted [1] 38/3
counterfeit [1] 11/22
course [3] 33/24 66/21 73/13
court [46] 1/1 7/1 7/19 8/14 8/15 13/9 13/22 16/22 17/15 17/16 18/4 18/14 18/16 19/19 19/20 20/18 21/10 21/19 22/5 23/19 25/5 25/21 25/25 32/24 40/23 41/13 42/5 45/25 46/14 47/23 48/2 50/14 52/19 54/2 55/3 59/17 59/19 61/5 61/11 61/13 61/21 64/13 64/23 70/7 70/11 81/9
court's [12] 7/20 20/5 22/2 26/4 30/17 39/6 43/2 43/18 49/7 52/10 73/23 86/2
courtesy [1] 22/4
Courthouse [2] 1/23 2/8
courtroom [1] 6/14
courts [1] 23/12
covered [1] 57/12

## C


CR [4] 1/9 1/9 6/4 6/6
CR 13-62-SVW [1] 6/6
credibility [3] 7/22 14/6 15/9
credit [2] 38/10 39/1
crime [1] 14/22
crimes [1] 72/18
criminal [14] 24/21 24/25 31/4 31/9 31/10 48/14 49/3 49/15 52/1 68/14 68/16 68/20 72/25 85/16
criminality [5] 31/11 31/23 71/13 71/16 72/12
criteria [1] 45/5
critical [1] 60/1
cross [8] 5/3 22/10 63/5 71/10 76/6 81/12 82/25 85/13
cross-examination [5] 22/10 71/10 76/6 81/12 85/13
cross-trading [1] 63/5
CSR [2] 1/23 87/13
Curtis [1] 7/3
custody [5] 6/17 6/24 7/1 73/24 74/1


## D


Dale [1] 7/6
Daniel [1] 4/3
daniel.saunders [1] 4/7
dark [1] 19/15
data [13] 20/17 20/18 20/20 25/6 25/9 25/14 25/16 25/20 33/16 34/24 35/20 49/20 54/1
database [5] 25/5 33/17 34/24 34/25 37/17
date [3] 34/11 35/2 87/10
dated [1] 22/23
deadline [1] 16/25
deal [26] 19/4 51/14 52/7 52/15 52/16 52/20 53/1 53/4 53/6 53/10 53/12 53/13 53/17 54/21 54/22 57/4 57/10 57/21 58/1 58/12 61/7 61/18 62/9 66/23 67/16 67/21
dealing [6] 12/9 14/8 14/10 14/11 16/16 53/19
deals [9] 52/8 52/9 57/24 58/15 58/20 60/17 61/24 62/4 68/1
DEBORAH [3] 1/23 17/5 87/13
DeBretteville [6] 3/10 6/20 20/10 20/13 76/6 84/12
deceive [2] 17/21 17/25
deceptive [3] 18/14 18/15 18/15
decide [9] 15/11 19/10 19/11 19/11 19/14 34/4 44/20 45/14 80/16
decided [5] 15/19 16/17 35/18 45/10 45/11
decision [2] 18/6 51/10
declaration [21] 8/17 9/2 22/3 22/5 22/9 25/12 26/10 32/18 36/20 41/23 42/23 44/9 44/12 49/22 49/25 75/12 75/13 77/4 77/5 77/7 78/20
declarations [1] 57/12
defendant [4] 6/16 8/20 43/12 77/9
Defendants [3] 1/11 2/13 3/3
defended [3] 51/20 63/16 63/23
Defenders [1] 2/16
defends [1] 49/24
defense [13] 5/12 6/12 7/17 16/2 16/5 36/9 60/14 63/25 75/11 77/12 82/7 82/23 83/14
defined [1] 21/6
definitely [1] 81/9
definition [4] 61/13 62/8 62/9 78/2
deliberate [1] 17/15
deliberately [1] 17/17
depend [1] 73/3
depending [2] 15/19 30/3
depends [3] 17/20 35/14 69/22
depicts [1] 43/21
describe [2] 41/23 68/19
described [10] 26/15 32/24 45/9 54/19 55/21 57/25 66/3 68/10 72/1 73/11
description [4] 48/20 49/8 51/24 81/10
designate [7] 34/5 39/10 39/17 41/21 45/21 79/22 79/24
designated [8] 36/4 37/14 39/18 40/25 46/18 71/22 72/7 73/1
designation [9] 35/21 35/25 36/2 36/3 37/10 63/19 69/4 81/23 82/21
designations [2] 36/24 37/1
destroyed [1] 36/4
determination [8] 35/19 44/18 45/3 45/11 45/19 47/6 81/14 81/21
determinations [1] 38/24
determine [11] 16/3 24/14 24/24 27/5 27/14 37/2 48/8 48/19 49/1 49/13 84/16
determined [3] 31/4 35/13 41/14
determining [3] 21/7 41/8 83/1
develop [2] 60/23 70/22
developed [1] 49/14
developments [2] 69/24 70/1
device [1] 25/1
did [42] 10/15 11/16 13/3 17/21 17/25 18/1 18/10 22/18 24/17 25/2 29/1 35/9 37/2 38/7 38/7 39/10 39/16 41/7 41/17 44/12 44/13 49/12 55/10 55/22 56/9 57/15 59/2 70/22 72/24 74/7 77/10 77/11 77/24 78/17 81/5 82/13 82/18 82/25 83/9 83/12 83/14 84/4
didn't [26] 8/11 9/7 9/13 10/25 11/13 11/13 13/7 13/9 13/17 13/18 13/19 14/21 15/3 30/3 35/20 36/5 38/11 38/11 38/12 41/4 41/19 49/22 68/24 77/13 78/3 84/18
differed [1] 55/9
differences [1] 55/14
different [4] 16/2 19/15 20/6 53/23
differently [1] 18/3
difficult [1] 65/9
direct [8] 5/3 22/6 22/9 23/4 24/24 30/17 43/19 52/10
directed [1] 54/2
directing [1] 85/6
direction [1] 18/4
disclose [1] 57/15
discretion [1] 32/9
discuss [1] 31/9
discussed [2] 15/19 68/17
discusses [2] 49/24 60/16
discussing [9] 54/5 56/20 64/6 64/20 68/25 69/2 69/18 70/5 70/13
discussion [5] 27/6 31/10 32/7 72/24 73/8
discussions [2] 32/7 71/21
disputed [1] 47/21
disputing [1] 47/17
distinction [1] 41/2
district [6] 1/1 1/2 1/5 9/21 12/4 13/19
divide [2] 33/6 33/11
DIVISION [1] 1/3
do [62] 7/10 7/22 8/16 8/17 11/8 12/20 13/3 15/13 15/13 17/5 21/4 21/22 26/5 30/10 33/9 37/5 37/16 37/18 43/14 43/17 43/25 44/7 44/9 44/10 44/23 46/20 50/2 50/3 53/3 56/18 56/23 56/24 59/12 60/6 60/17 62/18 62/20 62/23 63/2 63/5 65/10 65/12 66/9 68/19 70/6 73/10 73/13 74/4 76/8 78/20 79/17 79/17 79/22 79/23 79/23 82/13 82/18 83/9 84/7 84/14 84/15 86/6
docket [1] 23/2
document [2] 23/3 65/24
does [15] 9/18 11/8 12/17 14/18 15/15 26/19 27/20 30/17 41/23 59/10 59/18 59/22 75/17 76/10 79/13
doesn't [3] 13/17 14/23 41/11
doing [5] 29/20 40/5 42/12 43/5 82/25
dollar [1] 52/17
don't [39] 8/16 11/5 11/19 13/20 19/10 19/14 29/24 36/13 38/20 40/20 41/16 43/15 43/15 44/17 44/20 51/8 57/1 57/18 58/10 58/14 58/16 59/11 59/11 59/25 60/1 60/4 60/18 61/10 62/11 62/19 63/1 63/25 64/21 65/20 66/8 67/17 73/12 75/16 83/24
done [11] 15/18 24/6 25/7 25/21 49/16 49/17 52/2 80/1 80/2 80/3 84/22
down [6] 9/13 13/19 13/21 29/10 38/15 39/14
Downtown [1] 69/19
draw [2] 39/6 40/12
Drive [1] 3/11
driven [1] 16/24
dropping [1] 44/3
drugs [1] 58/25
dump [12] 10/24 11/25 59/21 61/9 62/1 68/10 68/12 68/14 69/15 70/4 70/6 70/14
Dunn [1] 7/7
duration [5] 41/10 74/23 75/23 76/12 76/19
during [6] 15/2 73/13 79/14 79/15 80/2 80/3
duties [1] 10/7
duty [1] 37/25
Dwight [1] 7/5


## E


e-mail [1] 4/6
each [9] 24/13 27/14 27/21 30/13 37/7 43/16 45/20 79/5 84/14
earlier [2] 13/24 30/2
early [1] 55/3
earthlink.net [1] 3/23
easier [1] 43/14
East [2] 2/16 3/16
Edge [2] 66/24 69/3
Edward [3] 2/19 2/19 6/25
effort [11] 36/23 36/23 39/19 40/15 48/8 48/18 48/21 48/25 76/23 84/8 84/19
efforts [1] 36/23
eight [3] 23/5 23/5 25/14
either [6] 9/1 16/20 29/22 37/13 51/22 56/5
electronic [1] 33/20
elements [1] 68/9
Elmo [1] 50/11
else [5] 12/22 13/7 63/11 66/19 68/18
Email [4] 3/8 3/13 3/18 3/23
emails [1] 9/1
end [5] 27/23 64/14 65/1 80/13 80/20
ended [2] 28/9 31/2
ends [1] 64/16
enforcement [1] 8/22
engaged [2] 48/12 55/24
engaging [4] 48/4 48/6 48/13 49/9
engineer [1] 52/18
English [1] 24/6
enough [3] 12/17 17/1 17/11
ensure [1] 39/20
entailed [1] 55/8
enterprise [1] 85/18
entire [6] 10/1 15/2 42/23 64/23 65/2 66/16
entitle [1] 52/20
entitled [5] 29/25 53/14 56/19 57/20 87/6
enumerate [1] 43/16
ephemeral [1] 31/21
equation [1] 38/15
escaped [1] 40/24
especially [1] 6/16
essentially [3] 18/18 23/25 31/20
establish [3] 20/7 57/22 65/11
established [2] 55/14 72/12
establishes [1] 20/20
establishing [1] 48/3

## E


estimate [5] 36/21 36/24 37/5 73/10 83/22
et [3] 1/10 6/5 6/7
et al [1] 6/7
evaluate [4] 7/22 14/4 14/5 14/19
evaluating [1] 14/17
even [17] 9/22 10/13 12/6 16/21 18/13 18/17 19/18 19/19 19/19 30/8 31/5 35/11 38/22 38/25 40/24 72/11 85/23
event [1] 18/25
ever [4] 36/14 41/7 49/12 59/2
every [4] 13/14 13/25 25/17 37/12
everything [3] 12/22 60/11 80/16
evidence [15] 7/14 7/15 7/17 12/1 13/23 16/8 16/19 18/5 23/17 36/12 56/1 60/23 62/2 69/11 82/15
EVIDENTIARY [1] 1/19
exact [3] 43/8 52/11 64/5
exactly [4] 21/13 30/10 36/17 83/24
examination [8] 22/9 22/10 71/10 74/10 76/6 81/12 84/24 85/13
examining [1] 70/24
example [8] 9/14 28/15 43/8 55/16 62/11 75/14 76/5 79/13
exceeds [1] 85/24
except [1] 13/2
exception [5] 71/13 71/16 71/20 71/25 73/16
excludes [1] 34/9
excuse [2] 15/6 48/17
executed [1] 68/12
execution [1] 21/12
exhibit [20] 5/12 7/11 7/17 14/10 22/25 23/2 42/14 42/16 42/18 42/20 42/23 50/6 50/7 50/9 50/17 64/8 64/13 64/22 66/18 67/9
Exhibit A [2] 23/2 42/23
Exhibit C [2] 50/6 50/9
Exhibit E [3] 64/13 64/22 67/9
exhibited [1] 48/12
exhibits [2] 67/4 67/5
exist [2] 35/12 85/18
expanded [1] 32/23
experience [7] 28/7 30/24 30/24 31/8 32/5 58/19 61/9
explain [8] 25/5 40/23 44/23 50/14 51/12 52/18 56/18 76/13
explained [1] 61/21
explains [3] 23/24 24/11 24/19
explore [1] 25/7
extensively [2] 8/1 42/21
extent [4] 40/18 57/23 62/3 63/14
extract [1] 82/3
extracted [2] 25/6 48/2
extraction [1] 34/25


## F


fact [16] 9/8 10/13 11/21 14/7 15/3 18/16 18/19 33/17 37/2 38/22 49/13 57/25 82/6 82/19 83/7 84/4
factor [2] 14/7 14/19
factors [1] 57/7
facts [6] 16/10 36/11 47/1 47/2 47/18 80/20
failed [4] 29/6 29/8 45/20 49/6
failing [1] 38/13
failure [2] 38/15 38/17
fair [3] 37/20 70/20 71/19
faith [2] 15/24 18/1
fall [7] 48/9 48/10 51/24 52/11 61/22 66/1 69/20
falling [1] 63/23
falls [3] 27/6 69/5 69/6
false [6] 14/7 14/15 14/15 15/7 55/10 55/22
familiar [3] 58/18 65/24 82/14
far [4] 17/1 17/10 54/3 72/14
fashion [1] 83/11
father [3] 50/1 56/20 62/15
father-in-law [3] 50/1 56/20 62/15
faulted [1] 38/13
favor [2] 16/22 19/21
Fax [4] 3/7 3/13 3/17 3/22
FBI [11] 2/11 6/11 6/12 9/12 9/25 10/6 11/9 11/16 15/4 38/7 84/5
FBI's [1] 12/19
feasible [1] 23/8
FEBRUARY [2] 1/17 6/1
federal [2] 2/16 8/19
feel [3] 37/20 56/19 57/20
feels [1] 16/20
fell [4] 58/12 71/19 73/11 73/15
fellow [1] 40/7
felons [1] 11/25
felt [2] 66/5 72/18
few [3] 8/8 71/2 74/15
figure [6] 26/6 78/17 83/16 84/1 84/5 84/13
file [7] 7/6 7/7 10/1 11/9 12/2 12/20 41/22
filed [4] 7/3 20/18 22/3 23/1
files [1] 12/19
filter [2] 18/5 77/22
filters [2] 82/3 82/22
final [1] 24/23
finally [2] 14/15 25/24
financing [4] 69/2 69/24 70/5 70/16
find [9] 16/22 19/10 19/21 19/21 54/14 56/4 66/12 76/24 84/14
finding [3] 55/18 55/19 55/20
finger [1] 26/17
finish [1] 68/24
finished [1] 84/21
first [25] 7/11 8/10 9/11 13/16 20/8 20/16 20/17 20/20 25/24 27/13 48/11 51/2 51/23 53/19 54/4 54/5 54/8 60/15 65/5 65/17 65/21 65/25 66/4 75/3 75/14
Fischer [17] 13/10 14/18 21/3 52/23 53/3 55/5 55/17 55/17 57/15 59/2 59/7 61/15 61/23 68/10 68/21 69/7 85/23
Fischer's [2] 57/19 61/6
fish [1] 8/22
fishing [1] 9/10
fit [7] 28/24 31/22 33/4 49/7 53/7 65/13 65/17
fits [4] 51/19 58/7 61/13 61/14
fitting [1] 51/21
five [2] 25/13 60/11
flip [1] 40/15
Floor [1] 3/6
fluent [1] 24/5
focus [7] 19/2 25/18 25/19 43/20 49/20 61/3 76/5
focused [4] 17/14 55/4 65/4 85/15
follow [5] 9/3 38/12 46/20 49/1 72/15
followed [2] 48/20 49/2
following [3] 33/17 34/17 55/12
follows [1] 14/4
foregoing [1] 87/4
forever [1] 9/12
forewent [1] 37/8
format [2] 85/13 87/7
former [1] 11/25
forward [2] 21/18 56/5
found [3] 40/11 56/1 82/18
four [5] 8/12 9/20 11/3 12/16 25/13
four-year [1] 11/3
frame [2] 15/20 17/20
framing [2] 16/10 16/12
Franks [1] 7/10
fraud [2] 55/18 55/21
fraudulent [2] 11/24 11/24
frequent [1] 59/21
frequently [1] 61/9
front [6] 12/4 22/22 50/10 59/11 66/15 66/16
full [7] 21/24 28/4 44/1 52/21 52/24 53/14 58/2
fully [3] 38/12 44/8 46/15
fundamental [3] 21/4 85/12 85/18
further [6] 15/21 56/25 73/19 84/24 85/7 86/5


## G


GACKLE [2] 1/23 87/13
gained [1] 30/24
Garden [1] 4/4
gas [15] 52/7 52/14 52/16 56/20 56/22 57/11 57/17 57/18 57/21 58/6 58/7 58/15 61/19 61/25 62/16
gather [1] 62/2
gave [3] 8/15 9/10 9/14
general [2] 58/22 68/24
generally [9] 19/13 23/12 25/25 27/8 32/1 52/7 54/17 55/8 58/24
generated [1] 83/19
generic [1] 58/25
GenMed [6] 55/6 55/23 56/6 56/10 56/11 59/7
get [18] 12/16 15/8 25/16 27/23 28/12 30/3 33/9 33/12 47/21 49/20 51/13 59/13 63/14 71/1 72/24 74/16 81/11 85/6
getting [4] 28/14 36/18 47/5 76/2
give [7] 8/4 8/15 9/1 9/8 38/10 38/22 38/25
given [9] 7/11 12/23 14/12 40/1 40/2 40/4 65/10 65/11 84/18
go [24] 8/2 14/3 19/14 19/23 25/17 26/5 26/10 27/12 28/4 28/12 28/20 29/10 32/18 43/17 51/13 51/15 60/24 67/7 71/4 71/9 74/9 82/21 84/24 85/10
goes [4] 15/9 24/4 24/11 38/15
going [26] 7/25 10/9 15/11 15/17 18/5 18/6 20/18 25/22 33/16 37/8 39/25 42/1 42/11 46/24 47/20 50/5 50/10 52/24 54/22 55/2 56/1 56/2 64/24 70/25 72/3 78/13
Goldman [2] 12/7 13/23
gone [3] 36/7 48/25 63/14
good [11] 6/9 6/15 6/19 6/22 7/2 7/4 15/24 18/1 67/15 74/12 74/13
good-faith [2] 15/24 18/1
gosh [1] 38/11
got [7] 8/25 14/15 33/17 41/6 60/2 67/16 79/12
gotten [1] 9/8
government [18] 8/14 16/4 20/19 20/21 20/25 21/6 22/5 25/19 25/24 26/2 28/24 38/7 40/13 51/19 52/24 55/14 65/13 85/19
government's [5] 5/3 22/8 25/4 25/23 26/15
granted [5] 21/3 55/17 61/15 69/7 85/23
guess [3] 25/13 50/6 62/6
guidance [1] 47/13
guideline [2] 27/9 30/4
guy [7] 9/21 11/3 11/7 12/4 12/15 12/17 13/24


## H


had [46] 7/9 8/11 8/13 8/19 8/21 9/8 9/15 11/1 11/16 14/12 15/24 16/23 17/13 21/8 30/4 35/10 36/24 40/21 42/2 42/3 56/14 57/16 59/3 66/11 68/12 69/11 72/15 72/18 75/3 76/25 77/8 77/20 77/20 77/21 78/6 78/11 78/24 82/14 82/15 82/15 83/8 83/10 83/18 83/19 83/22 83/23
Hale [2] 63/19 63/20
half [1] 51/5

## H


hand [2] 21/20 31/8
happen [3] 58/1 69/23 79/13
happened [4] 10/9 34/15 35/2 65/9
happening [1] 70/2
happens [1] 9/24
hard [1] 26/11
Harris [4] 3/5 3/5 6/17 71/7
has [31] 6/12 7/3 7/7 10/7 13/15 16/2 18/4 20/17 21/4 21/10 22/4 25/13 25/24 30/24 31/6 32/24 41/3 42/15 45/9 45/11 48/2 51/19 54/2 62/18 62/20 62/23 63/2 63/5 65/13 66/15 73/11
have [91]
haven't [2] 39/5 56/1
having [5] 34/19 52/6 53/10 77/17 77/18
Hawthorne [1] 2/20
he [69] 7/1 7/3 7/5 7/7 8/11 8/13 8/23 9/7 9/8 9/10 9/12 9/14 9/15 10/11 10/18 11/1 11/2 11/4 11/7 11/13 11/13 11/13 11/22 12/8 12/9 13/2 13/3 13/11 13/11 13/17 13/17 13/18 13/24 14/7 14/11 14/13 14/16 14/23 14/24 15/4 15/5 15/5 15/6 15/6 15/7 32/3 32/7 32/8 35/13 36/13 40/11 45/11 56/14 60/20 63/20 64/4 64/20 68/17 70/8 70/14 70/15 70/17 70/18 70/19 72/15 72/18 72/18 72/18 84/18
he'll [1] 19/3
he's [6] 10/10 12/23 32/2 32/4 32/8 70/12
head [4] 29/1 45/14 45/19 58/10
hear [5] 9/5 44/5 59/23 60/2 78/3
heard [6] 9/7 20/5 53/13 72/14 77/12 80/16
hearing [10] 1/19 7/9 7/10 8/9 8/10 9/3 9/5 16/18 42/24 74/5
held [1] 87/6
help [3] 25/19 43/1 52/18
helpful [2] 20/2 55/2
helping [1] 25/21
her [3] 49/25 52/23 52/23
here [36] 6/13 9/18 12/3 15/2 29/1 30/11 33/15 37/16 39/14 41/2 42/6 42/6 42/8 42/8 43/25 44/7 45/18 45/24 50/11 52/5 59/15 65/20 65/24 65/25 66/9 66/10 67/25 68/15 69/19 69/22 73/24 74/2 74/5 75/15 76/23 78/14
here's [2] 13/9 60/1
hereby [1] 87/3
hereinafter [1] 24/20
hid [2] 15/1 15/5
hide [1] 15/3
highlighted [1] 8/18
him [15] 9/6 9/14 9/21 11/19 12/2 13/2 13/4 14/15 46/25 56/19 60/19 60/21 70/23 70/24 71/1
his [21] 8/23 8/23 11/25 13/17 13/22 13/22 13/23 14/14 15/1 15/3 15/9 19/4 22/6 28/15 45/19 50/1 56/20 62/15 70/16 70/17 75/13
historically [1] 49/14
history [1] 37/13
Hochman [2] 4/3 6/16
hold [2] 28/10 74/3
home [1] 9/17
Honor [97]
HONORABLE [1] 1/5
hope [2] 20/7 21/8
how [49] 7/22 15/18 15/20 16/9 16/16 17/20 18/4 19/11 19/14 19/16 21/5 22/19 24/11 29/6 29/8 31/17 33/4 36/21 36/21 37/9 37/14 38/4 40/23 43/25 44/7 44/23 48/8 55/14 56/4 62/11 71/14 73/10 74/14 76/24 77/2 77/7 78/8 78/17 78/21 79/4 79/17 79/23 80/9 81/23 82/8 83/16 83/22 83/23 84/7
huh [1] 17/9


## I


I'd [8] 18/23 19/7 21/16 42/22 60/9 62/11 84/11 86/4
I'll [23] 8/4 16/5 17/10 19/6 26/11 38/20 43/16 43/17 45/25 47/3 50/12 53/16 59/16 61/2 64/2 64/8 64/22 64/23 70/18 70/21 74/8 85/6 86/5
I'm [71] 12/25 13/12 15/11 15/17 16/7 17/19 18/7 19/9 19/14 19/15 20/10 20/10 22/22 23/5 25/22 26/18 26/21 27/20 28/11 31/24 31/25 34/2 34/2 34/11 34/17 34/19 34/21 35/8 36/17 38/18 40/15 41/7 41/17 42/5 42/10 44/2 44/4 46/21 47/4 47/5 47/20 50/5 50/7 50/10 50/17 50/18 50/19 50/22 51/3 51/8 51/22 55/12 57/15 59/24 60/12 60/22 62/6 64/24 65/10 65/12 65/23 65/24 67/25 68/25 71/24 76/2 79/6 80/5 80/6 81/19 86/8
I've [8] 7/11 16/3 63/9 63/9 64/17 70/8 72/14 77/12
idea [1] 73/13
identified [3] 31/6 37/12 80/2
identify [13] 35/21 37/15 39/14 40/16 48/21 50/24 55/10 77/19 77/22 81/25 82/10 82/16 83/10
identifying [1] 37/7
if [94]
ignore [2] 38/22 42/6
immediately [1] 28/16
impact [1] 84/13
impacted [2] 36/21 36/22
implement [1] 23/7
implementation [1] 22/13
implicated [1] 85/21
implications [1] 16/8
important [2] 9/11 16/11
importantly [1] 12/20
impose [1] 23/20
imposed [1] 85/24
impossible [3] 10/5 12/5 12/6
improperly [1] 40/16
in [253]
incapable [1] 50/20
inclined [2] 17/19 17/23
include [3] 57/24 62/4 75/20
included [1] 14/5
includes [1] 75/15
including [1] 46/18
incorrect [2] 35/19 36/12
Indeed [1] 31/3
index [1] 73/1
indicated [1] 17/16
indications [1] 72/3
indicia [3] 13/13 13/14 13/25
indictment [4] 35/3 35/6 35/24 82/2
individual [2] 31/4 31/6
individuals [2] 31/9 49/8
indulge [1] 7/19
industries [11] 57/13 58/6 58/8 58/16 58/18 58/21 59/1 59/5 59/21 61/8 61/24
industry [2] 58/11 59/10
information [14] 8/23 9/8 9/10 11/21 11/23 13/10 14/12 14/25 17/17 44/11 44/12 62/3 69/9 82/1
informed [1] 52/23
inherent [1] 60/5
initial [3] 31/14 31/15 71/20
innocence [1] 31/1
innocent [15] 23/9 23/9 28/8 30/25 31/10 32/1 32/6 48/4 48/11 48/13 49/2 49/9 49/14 51/25 66/4
innocently [1] 72/16
input [2] 15/21 19/16
inquiry [1] 26/4
installation [1] 69/19
instance [5] 30/13 72/8 76/19 81/4 81/5
instances [6] 30/2 40/14 40/20 47/16 47/24 82/20
Instead [1] 55/22
instructed [2] 23/6 23/12
instruction [5] 24/17 24/23 25/2 30/15 30/16
instructions [10] 22/19 24/9 27/3 27/12 28/6 29/21 30/8 30/22 32/1 47/25
intent [1] 71/18
intentionally [1] 18/15
intercept [18] 21/7 24/22 33/21 52/21 52/24 53/3 53/14 56/19 57/20 58/2 58/13 59/3 59/19 61/6 61/12 61/24 62/7 85/20
intercepted [3] 23/20 63/18 75/15
intercepting [11] 22/16 23/13 33/1 34/10 35/18 35/24 36/4 39/9 39/16 40/16 61/12
interception [12] 23/9 28/8 29/4 30/23 31/1 31/11 36/5 38/24 57/5 57/9 73/14 74/14
intercepts [1] 54/1
interim [1] 83/20
interrogatories [1] 9/4
interrupt [1] 53/18
interview [3] 10/16 10/17 11/11
into [15] 7/14 8/3 25/4 25/16 35/3 37/8 38/23 46/16 49/15 54/23 57/16 58/1 72/24 73/11 78/15
invariably [2] 28/8 30/25
invest [1] 66/12
investigating [2] 9/19 72/18
investigation [12] 9/20 10/3 10/10 11/3 11/17 12/21 13/25 57/16 58/1 66/21 82/1 82/16
investigations [1] 57/17
investment [6] 64/6 64/21 66/11 68/25 69/5 69/10
investments [1] 69/2
investors [1] 66/12
invoice [1] 46/3
involved [8] 11/1 11/24 22/16 31/22 40/22 54/18 70/13 72/17
involving [4] 32/2 49/15 69/14 85/20
is [266]
isn't [4] 34/13 35/25 46/5 73/4
issue [17] 15/19 15/20 15/22 16/5 16/10 16/10 16/12 16/16 16/19 16/21 17/20 17/21 17/25 18/25 20/16 21/4 85/6
issued [1] 85/14
issues [3] 8/1 14/19 32/24
issuing [1] 18/16
it [181]
it's [47] 7/15 8/14 10/8 10/13 10/20 12/6 12/19 13/4 13/22 16/9 18/5 18/6 18/18 26/11 27/8 27/8 27/10 28/16 30/5 30/18 32/1 33/15 34/4 36/12 38/19 42/18 43/10 44/25 50/20 55/2 58/16 58/17 65/9 67/16 69/10 72/6 74/20 74/21 76/22 77/15 77/16 77/22 80/2 80/3 80/18 81/25 84/16
item [1] 6/4
its [8] 10/7 10/8 17/16 21/6 28/24 50/25 54/2 57/16
itself [2] 30/16 38/18


## J


Jacks [3] 3/15 3/15 7/2
JAMES [1] 2/7
January [1] 22/4
Jason [2] 3/10 6/19
jdebretteville [1] 3/13
Jennifer [2] 2/15 6/22
Jim [1] 6/9
job [1] 29/20
John [1] 6/23

J

Jonathan [1] 2/15
Joseph [1] 4/3
JR [3] 2/6 3/20 3/20
judge [28] 1/5 13/10 14/18 17/21 17/25 18/16 21/3 50/24 52/23 53/3 54/14 54/17 55/5 55/17 55/17 57/15 57/19 59/2 59/7 61/6 61/15 61/23 66/3 68/10 68/21 69/7 73/11 85/23
Judge Wilson [2] 50/24 66/3
Judicial [1] 87/7
jumbled [1] 43/11
June [10] 22/23 54/4 54/9 55/9 55/10 55/15 55/19 56/8 59/14 60/15
just [48] 9/7 13/25 16/5 18/13 18/14 20/2 25/9 26/14 26/19 41/6 42/1 43/19 43/19 44/2 44/14 44/16 45/9 45/24 46/1 47/23 51/18 53/9 55/2 57/3 59/16 61/3 63/12 63/14 64/7 64/11 64/14 64/16 64/18 64/22 65/4 65/7 69/13 70/19 70/23 70/23 71/5 71/24 74/14 77/14 79/11 80/16 80/21 85/25
justified [2] 31/12 47/25

K

K-o-e-p-k-e [1] 22/1
Kaplan [22] 6/20 20/14 28/15 29/1 29/15 43/7 50/1 52/7 53/20 54/12 54/17 55/4 56/3 56/4 62/15 66/11 66/23 67/14 68/19 69/18 73/14 85/17
Kaplan's [9] 23/2 54/9 77/7 77/9 78/10 78/21 78/25 79/3 79/9
keep [3] 43/20 74/8 80/7
keeping [1] 44/14
Kim [1] 3/5
kind [5] 13/20 39/19 54/18 54/20 55/25
knew [1] 48/15
know [37] 9/2 12/7 15/3 18/22 19/4 19/8 19/10 19/13 19/14 19/15 28/16 29/6 30/5 33/3 36/13 37/17 38/11 38/11 42/9 42/11 43/12 43/25 44/7 44/9 44/10 47/4 58/10 58/17 59/25 62/11 63/6 66/8 66/10 67/17 69/1 70/24 71/7
knowledge [2] 48/15 71/17
KOEPKE [29] 5/5 6/12 20/2 20/7 21/16 22/1 22/4 22/8 22/12 28/14 36/20 40/11 43/19 45/25 49/22 51/9 51/18 56/18 61/2 62/6 64/21 65/16 71/12 74/12 75/14 76/5 78/13 79/11 81/20
Koepke's [4] 42/23 51/4 75/12 81/9

L

L.A [3] 11/18 11/18 11/19
labeled [1] 77/17
lag [1] 19/2
Lake [1] 3/21
Laker [4] 9/15 9/16 12/10 12/18
language [1] 24/5
lap [2] 12/23 12/23
large [6] 41/18 46/5 46/6 46/8 52/16 82/14
largely [2] 16/25 47/20
last [7] 9/17 21/24 32/18 49/4 60/11 64/24 81/8
lasting [2] 26/1 29/9
later [14] 15/14 24/11 34/11 34/12 35/2 36/14 48/5 48/13 49/10 51/14 54/4 60/22 63/11 83/1
law [7] 2/19 3/15 3/20 8/22 50/1 56/20 62/15
lawyer [1] 28/16
lawyers [1] 11/23
Leading [2] 66/24 69/3
learned [2] 8/9 8/10
leases [4] 56/20 56/22 61/19 62/16
least [3] 17/23 25/7 45/14
leave [1] 50/19
LED [4] 66/23 67/16 67/21 68/5
LEDs [4] 67/3 69/19 69/21 70/14
legal [2] 16/13 16/15
legitimate [1] 85/17
length [2] 27/4 65/3
less [4] 26/1 78/8 78/11 83/25
let [11] 9/2 44/16 45/7 47/11 53/18 60/19 60/21 61/2 67/3 71/5 80/5
let's [18] 13/3 19/23 27/12 28/4 28/20 32/18 41/6 41/6 42/20 51/13 60/21 61/11 62/13 63/11 67/1 67/7 72/23 85/5
level [1] 9/23
license [2] 70/17 72/18
lied [1] 15/7
light [1] 16/10
lighting [1] 68/5
like [19] 7/14 17/3 19/7 19/18 21/16 42/22 43/10 44/25 48/22 48/24 52/6 52/14 52/15 56/17 60/9 66/22 67/15 68/24 69/1
likely [1] 51/25
limit [3] 18/25 41/6 64/21
limitation [3] 32/8 71/13 72/1
limited [3] 23/17 23/17 56/8
limits [2] 23/20 65/14
line [21] 37/16 43/15 43/15 43/21 52/11 57/4 58/4 67/14 68/16 75/10 75/14 77/10 77/11 78/10 78/11 78/14 78/25 79/2 79/5 79/9 79/10
lines [6] 25/23 54/9 55/17 60/16 73/14 75/6
listed [1] 65/20
listen [16] 24/13 27/5 27/13 27/21 30/9 30/12 32/2 32/9 34/3 35/9 47/14 49/1 56/15 72/19 72/22 72/23
listened [7] 31/5 35/4 35/6 35/15 63/9 78/16 79/20
listening [6] 24/1 25/1 33/25 80/6 80/7 80/21
litigating [1] 63/22
little [4] 26/11 33/15 34/20 79/12
live [3] 9/6 9/7 10/7
LLP [2] 3/5 4/4
long [8] 15/23 24/14 27/14 30/13 31/21 61/7 69/20 84/7
longer [10] 10/11 24/15 27/15 29/11 30/14 31/11 32/2 32/20 35/5 84/10
look [8] 17/13 19/17 37/12 45/24 46/1 50/12 70/18 76/23
looked [6] 30/11 40/1 48/22 48/24 78/6 82/9
looking [13] 17/22 19/16 30/19 42/12 42/25 50/17 52/2 52/14 75/14 75/20 75/23 77/7 79/4
looks [6] 52/6 52/13 52/15 66/22 68/24 69/1
LOS [7] 1/16 1/24 2/9 2/17 3/6 3/16 6/1
LOS ANGELES [1] 6/1
lose [1] 60/10
lost [1] 85/13
lot [4] 18/21 20/5 20/17 75/15

M

made [21] 8/14 8/21 14/16 17/15 28/22 42/15 45/19 47/6 48/8 48/18 48/21 48/25 51/1 51/10 54/1 55/19 63/6 64/4 73/8 76/23 84/20
mail [1] 4/6
maintained [1] 51/19
majority [4] 41/3 41/5 41/19 42/2
make [18] 9/18 16/6 18/7 42/16 42/20 43/14 44/17 47/20 57/3 61/22 74/15 79/11 79/19 81/5 84/11 85/9 85/14 85/25
makes [12] 13/20 31/9 51/23 51/24 52/11 52/19 53/7 56/19 57/5 57/8 57/19 65/17
making [1] 45/3
manipulated [2] 62/5 68/9
manipulation [6] 52/9 57/14 58/20 66/14 66/25 69/12
manipulations [1] 53/11
manipulative [1] 56/1
manipulators [1] 60/17
Mansour [4] 66/10 68/19 69/1 69/18
manufactured [2] 68/2 68/5
manufacturing [4] 58/21 58/22 58/23 58/25
many [21] 33/4 36/21 36/21 37/9 38/4 43/25 44/7 48/8 71/14 73/10 76/24 77/2 77/7 78/8 78/17 78/21 79/4 80/3 83/16 83/22 83/23
mapped [1] 65/14
Marc [2] 3/5 6/17
March [8] 54/4 54/6 54/12 54/18 55/9 55/15 55/21 87/10
mark [11] 2/7 6/10 27/4 30/7 42/22 50/5 50/16 52/13 64/8 64/22 67/7
marked [12] 7/12 22/25 29/2 33/2 34/10 34/12 46/2 46/3 46/4 72/9 73/7 82/18
marked-up [1] 7/12
market [7] 52/8 53/11 57/14 58/19 66/14 66/25 69/11
Marrett [2] 3/10 6/21
marshals [1] 73/25
material [6] 15/25 17/18 18/16 18/20 18/20 55/13
materiality [3] 17/16 17/22 18/21
materials [1] 69/25
math [5] 29/1 33/9 38/18 46/16 46/24
matter [6] 15/11 18/8 27/6 49/22 72/9 87/6
matters [1] 58/3
maximum [6] 27/4 27/8 27/10 27/17 27/20 28/17
may [12] 23/20 24/21 31/11 43/5 47/22 51/9 55/25 71/7 74/16 80/17 83/17 85/12
maybe [2] 82/10 86/8
Mazur [36] 6/6 6/16 7/21 8/12 8/20 8/21 9/9 9/11 9/19 9/24 10/4 10/14 10/20 10/24 10/25 11/10 11/21 11/23 12/8 12/21 13/10 13/18 14/5 14/12 14/18 14/24 15/3 28/25 29/14 43/7 54/9 54/12 54/17 55/4 66/12 73/14
Mazur's [7] 10/1 77/11 78/5 78/10 79/2 79/3 79/8
McCutchen [1] 4/4
me [23] 6/21 7/19 13/9 15/6 16/10 44/16 45/7 46/8 46/20 47/11 53/18 59/11 60/2 60/22 67/3 68/22 70/19 71/5 75/10 76/13 80/5 83/12 84/18
mean [22] 10/22 12/24 13/4 15/15 16/8 18/23 18/24 19/13 36/13 41/11 42/8 42/17 46/25 47/1 47/4 47/5 47/17 56/24 60/18 70/8 76/10 77/15
meaningful [1] 27/4
means [5] 23/25 32/19 63/19 77/12 77/16
meant [4] 23/7 23/16 31/17 58/1
meeting [3] 39/23 39/24 40/4
memo [10] 22/22 23/24 24/11 30/16 39/22 39/23 40/1 40/4 45/6 81/6
memorandum [3] 22/18 23/5 23/6
memos [1] 22/24
Mendiratta [6] 7/21 14/5 14/20 14/22 14/22 15/1
mention [4] 52/20 52/20 57/4 57/6
mentioned [6] 52/16 52/17 52/25 57/18 67/14 67/23
mentions [4] 53/4 61/7 61/18 66/24
mere [2] 57/3 57/6
met [1] 49/14
methodology [1] 19/20
mharris [1] 3/8
might [16] 18/2 19/2 20/2 27/25 27/25 28/18 30/4 48/3 48/17 49/7 58/1 69/15 72/2 72/9 75/7 83/1
million [1] 10/23

## M


mind [16] 16/1 16/9 17/14 18/25 50/14 51/1 57/3 57/5 57/8 57/25 58/12 64/18 65/17 72/12 81/13 82/25
mindful [1] 43/18
mindset [1] 70/16
minimal [1] 84/16
minimization [30] 7/9 19/24 20/23 21/12 23/24 23/25 24/12 25/7 25/10 25/21 25/25 26/4 39/21 39/22 39/23 39/24 40/3 42/3 42/24 44/21 45/6 70/25 79/13 81/6 81/14 81/21 83/2 83/5 83/8 86/7
minimize [15] 21/8 29/7 29/8 37/25 38/13 44/17 45/2 45/4 45/15 45/17 51/11 51/11 78/2 79/14 79/15
minimized [19] 29/7 29/12 29/13 29/18 32/20 33/5 33/12 35/5 35/8 35/11 36/22 39/2 44/16 46/19 46/22 77/8 78/15 78/22 81/3
minimizes [1] 79/20
minute [19] 16/5 27/4 30/4 30/7 31/14 31/15 31/18 31/20 32/8 32/23 33/5 50/16 50/18 52/15 71/13 71/25 74/20 76/13 76/15
minute-34 [1] 52/15
minutes [86] 24/16 26/1 26/3 26/7 26/13 26/16 26/18 26/20 26/21 26/22 27/1 27/16 27/24 28/18 28/23 29/2 29/9 29/12 29/17 29/22 30/1 30/10 30/14 30/23 32/3 32/19 32/20 33/6 33/11 35/5 35/9 35/10 35/13 36/22 39/14 39/16 41/7 41/10 41/12 43/20 43/22 46/1 46/10 46/13 46/17 47/12 47/24 48/9 48/11 48/18 49/2 49/10 51/2 51/23 65/3 65/5 65/17 65/21 66/1 66/4 71/15 72/2 72/19 72/22 72/23 73/23 74/3 74/7 74/22 75/20 75/23 76/7 76/10 76/11 76/20 77/2 78/8 78/11 78/15 78/17 78/22 78/24 80/6 80/9 80/11 81/2
missed [1] 74/16
missing [1] 10/2
mistake [1] 81/5
modifies [1] 30/16
modify [1] 31/17
modifying [3] 30/15 31/14 31/15
moment [4] 25/6 25/22 53/18 64/7
Monica [1] 4/5
monitor [12] 24/5 45/3 50/15 51/10 58/17 66/8 74/17 74/18 77/18 77/21 78/23 81/5
monitored [9] 29/23 31/6 72/4 74/21 74/25 75/18 75/21 76/1 76/11
monitoring [36] 29/3 33/24 34/2 37/2 37/10 38/24 39/20 39/25 40/3 40/25 45/9 45/19 45/20 46/2 47/25 50/15 51/1 63/17 64/19 65/18 66/6 69/4 71/17 71/22 72/13 73/15 75/3 75/4 76/20 77/16 78/16 79/14 80/5 80/19 80/24 80/25
monitors [3] 40/22 48/15 80/4
months [1] 54/3
more [20] 11/21 12/6 12/20 18/21 21/4 29/9 30/9 49/19 50/13 53/2 57/8 57/13 57/13 59/6 62/13 62/22 64/10 71/24 72/19 72/22
morning [9] 6/9 6/15 6/19 6/22 7/2 7/4 54/6 74/12 74/13
most [1] 69/17
motion [1] 25/19
move [7] 7/14 28/20 32/6 47/3 62/14 63/11 64/25
Mr [6] 8/16 14/16 20/9 20/12 54/9 78/5
Mr. [64] 8/12 9/1 9/4 9/5 9/7 9/9 9/11 9/19 9/20 9/24 10/1 10/4 10/14 10/24 11/21 11/23 12/7 12/21 13/18 14/8 14/12 14/12 14/13 14/24 15/1 15/3 15/6 15/6 15/7 20/10 20/14 23/2 28/15 28/25 29/1 29/14 29/15 37/20 40/7 40/9 40/10 42/23 50/1 50/7 55/4 55/4 55/24 55/25 56/3 56/4 61/2 62/15 68/19 68/19 69/18 69/18 71/7 73/21 76/6 77/7 78/21 79/3 84/12 85/17
Mr. Bowman [13] 9/1 9/4 14/8 14/12 15/6 15/6 15/7 37/20 40/7 40/10 50/7 61/2 73/21
Mr. DeBretteville [3] 20/10 76/6 84/12
Mr. Goldman [1] 12/7
Mr. Harris [1] 71/7
Mr. Kaplan [12] 20/14 28/15 29/1 29/15 50/1 55/4 56/3 56/4 62/15 68/19 69/18 85/17
Mr. Kaplan's [3] 23/2 77/7 78/21
Mr. Koepke's [1] 42/23
Mr. Mansour [2] 68/19 69/18
Mr. Mazur [18] 8/12 9/9 9/11 9/19 9/24 10/4 10/14 10/24 11/21 11/23 12/21 13/18 14/12 14/24 15/3 28/25 29/14 55/4
Mr. Mazur's [2] 10/1 79/3
Mr. Mendiratta [1] 15/1
Mr. Nix [1] 55/25
Mr. Possino [3] 9/20 14/13 55/24
Mr. Tarwater [2] 9/5 9/7
Mr. whom [1] 40/9
much [3] 10/21 31/17 31/21
muddled [1] 79/12
multiple [3] 60/17 75/6 75/7
must [3] 24/6 56/2 56/3
my [14] 10/16 13/8 16/22 19/19 19/21 26/24 29/1 56/19 58/10 58/18 60/12 67/18 71/6 71/25
myopic [1] 49/20
myself [2] 9/18 17/4


## N


nail [1] 12/21
name [2] 21/24 21/24
namely [1] 23/20
Nathan [2] 4/3 6/15
nathan.hochman [1] 4/6
natural [4] 52/7 52/14 52/16 57/11
nature [4] 24/15 27/15 37/6 64/5
necessarily [4] 13/3 18/24 41/11 72/8
necessary [3] 24/14 27/14 30/13
necessity [2] 15/25 18/2
need [4] 53/18 56/4 84/19 86/5
needed [1] 82/14
negligent [1] 10/6
never [9] 14/12 31/4 72/8 72/24 74/25 75/18 75/21 78/22 81/3
nevertheless [1] 15/12
new [3] 11/18 56/4 83/20
Newport [2] 3/11 3/12
next [3] 28/3 30/18 66/22
night [1] 9/17
nine [2] 24/13 25/14
Nineteen [1] 46/7
Nix [3] 7/1 55/16 55/25
no [68] 1/9 6/4 10/4 10/6 10/11 15/24 18/9 18/9 24/15 27/11 27/15 28/2 29/24 30/13 30/14 30/16 32/2 36/6 36/8 37/4 37/19 37/25 38/17 41/20 41/21 41/24 41/25 42/2 42/3 42/11 45/18 47/17 48/15 48/18 48/25 53/5 53/15 55/19 56/14 57/1 57/18 58/5 58/14 58/24 61/10 62/2 62/19 63/4 65/2 68/16 69/8 70/24 73/7 73/19 74/19 76/12 77/8 77/15 77/20 78/6 81/7 81/16 81/22 83/3 83/6 85/1 86/4 87/13
No. [14] 9/12 9/21 10/10 10/12 11/3 11/7 12/4 12/15 12/17 12/18 13/11 13/18 13/24 14/22
No. 1 [14] 9/12 9/21 10/10 10/12 11/3 11/7 12/4 12/15 12/17 12/18 13/11 13/18 13/24 14/22
non [1] 34/11
nonminimized [3] 32/19 76/7 78/18
nonpert [1] 77/8
nonpertinence [5] 35/19 51/5 81/14 81/21 81/23
nonpertinent [56] 26/3 26/7 26/15 26/20 26/21 26/22 26/25 28/22 29/3 29/11 29/17 32/19 33/2 33/5 33/11 34/6 34/12 35/4 35/13 35/23 35/25 37/11 37/13 37/18 38/25 39/10 39/17 40/16 40/25 41/9 41/21 45/22 46/3 46/19 47/12 48/18 71/21 72/10 73/2 73/7 76/6 78/14 78/18 78/22 79/4 79/5 79/6 79/7 79/8 79/9 79/23 79/25 80/23 81/3 82/7 82/19
nonpertinent-call-over-two-minute [1] 33/5
nonrecorded [1] 39/1
North [3] 1/24 2/9 4/4
not [138]
notation [2] 64/4 64/19
note [3] 18/17 22/3 60/17
noted [1] 64/20
notes [1] 71/6
nothing [7] 62/18 62/20 62/23 63/2 63/5 65/25 70/11
notwithstanding [2] 18/2 46/14
now [28] 12/15 14/17 19/3 19/9 25/4 26/5 26/14 28/22 30/20 31/21 34/8 37/20 42/16 46/16 47/20 48/25 50/12 53/20 53/23 59/3 64/9 72/14 72/21 78/8 79/11 80/13 81/8 82/9
nowhere [1] 11/4
number [22] 4/6 23/3 23/8 23/8 30/23 33/6 33/7 33/10 33/10 33/12 34/8 34/9 37/22 38/5 43/8 79/1 79/4 83/10 83/21 83/21 84/15 84/18
numbered [1] 52/13
numbers [9] 26/6 33/17 34/25 43/7 43/16 83/1 83/4 83/7 83/19
numerous [1] 64/1


## O


object [1] 51/3
obligated [1] 23/7
obligation [1] 42/3
obligations [2] 39/21 44/21
obtain [1] 17/1
obtained [1] 37/25
obtaining [1] 70/5
obviously [2] 13/7 24/21
occur [1] 61/24
odd [1] 39/8
off [4] 19/2 25/1 44/3 58/10
offenses [2] 23/22 55/18
offer [1] 64/13
offered [1] 84/12
offhand [1] 44/11
office [5] 2/16 11/5 11/18 11/19 22/19
officers [1] 8/22
offices [4] 2/19 3/15 3/20 10/8
often [6] 29/6 29/8 32/5 53/10 53/10 61/25
oftentimes [1] 69/23
Oh [5] 7/15 12/7 13/6 20/15 28/11
oil [11] 56/20 56/22 57/17 57/18 57/21 58/6 58/7 58/15 61/19 61/25 62/16
okay [50] 8/5 17/10 20/4 20/15 21/14 23/19 23/24 24/9 25/11 25/16 26/8 26/9 26/24 28/4 28/20 29/6 29/17 32/16 33/3 33/9 33/15 34/15 35/2 35/10 35/15 35/18 38/10 38/22 39/19 41/17 45/14 45/18 50/4 61/11 63/2 63/8 64/17 66/15 66/18 67/3 67/12 67/21 69/13 73/20 74/6 74/9 76/3 76/3 85/2 86/1
Oklahoma [1] 62/16
omission [3] 18/15 18/19 18/19
omissions [2] 15/25 18/2
omitted [2] 17/17 18/20
on [123]

## O


once [2] 30/23 31/6
one [62] 7/19 9/12 9/13 10/9 10/12 10/22 11/6 11/6 11/15 11/19 12/1 12/2 16/16 16/24 17/13 17/22 18/9 18/13 19/20 22/14 22/24 23/4 25/13 30/5 34/8 42/11 42/16 43/3 43/11 43/11 43/17 47/17 49/24 53/2 54/4 55/8 57/6 57/12 58/16 58/17 58/21 59/1 59/6 61/17 62/13 62/22 63/13 63/15 63/21 64/2 64/7 64/11 66/7 66/13 67/23 68/1 68/11 71/24 75/6 75/7 85/9 85/25
ongoing [1] 40/6
only [11] 13/22 15/5 24/14 26/3 27/14 37/24 37/24 38/4 50/18 81/13 81/20
onto [1] 13/15
operate [1] 22/19
opportunity [3] 8/2 8/4 15/13
opposed [1] 18/20
opposition [3] 23/2 25/19 28/24
or [94]
order [15] 8/22 16/5 23/19 27/5 45/5 45/15 55/18 57/19 57/22 57/25 59/19 61/6 62/2 83/24 85/6
original [1] 36/9
other [31] 8/19 8/20 9/2 9/10 11/1 11/8 11/10 11/15 11/17 14/21 15/22 15/23 17/13 17/20 18/9 23/13 31/8 31/8 54/13 56/7 56/15 57/24 58/1 59/10 63/13 69/3 69/9 72/23 74/5 85/6 86/9
otherwise [4] 16/1 18/5 56/5 67/8
ought [3] 16/22 25/20 38/13
our [13] 20/20 24/20 25/18 25/19 25/20 35/22 40/19 40/21 46/16 48/22 52/9 82/16 82/21
ourselves [1] 51/18
out [28] 14/7 17/1 17/10 18/3 19/10 26/6 27/18 37/21 38/14 38/14 39/2 50/12 51/14 56/4 63/13 64/23 65/12 72/16 76/24 77/5 78/5 78/8 78/17 80/20 83/16 84/2 84/5 84/13
outer [1] 65/14
outside [8] 20/22 20/25 58/7 58/8 62/7 62/8 62/10 75/4
over [48] 26/3 26/7 26/13 26/16 26/18 26/20 26/21 26/22 27/1 28/23 29/2 29/17 33/5 33/6 33/10 35/9 35/10 36/21 39/14 39/15 41/7 41/10 41/11 43/21 46/1 46/10 46/12 46/17 47/12 47/24 48/9 48/18 63/14 70/21 70/21 74/22 75/20 75/23 75/24 76/6 76/10 76/11 77/2 78/14 78/16 78/22 78/24 81/2
overcome [1] 16/1


## P


P.C [1] 55/20
p.m [1] 86/13
page [13] 23/5 23/5 24/13 28/3 30/18 32/12 33/13 50/20 63/15 64/11 66/22 78/14 87/6
pages [4] 1/10 11/8 11/10 12/2
paragraph [6] 16/6 28/2 28/5 30/19 30/20 30/21
parameters [1] 77/18
park [1] 56/5
parking [1] 63/2
parse [1] 59/2
parsing [1] 25/16
part [9] 7/9 7/10 11/22 34/2 53/20 57/22 62/4 69/17 69/25
partially [7] 29/7 37/24 37/25 38/5 38/6 39/1 44/8
participants [3] 30/3 50/25 61/18
particular [4] 31/3 63/25 81/10 82/9
particularly [1] 57/11
parties [4] 16/7 16/18 60/23 63/21
party [1] 31/7
Pasadena [1] 3/21
past [3] 30/7 50/16 71/15
pattern [11] 31/1 31/11 31/23 48/4 48/12 49/2 49/10 71/12 71/15 72/12 72/16
pay [1] 25/20
people [5] 28/8 30/5 30/25 31/22 84/4
percent [14] 33/10 33/12 38/15 38/16 38/19 46/1 46/3 46/4 46/7 46/8 46/12 46/17 67/17 67/18
percentage [2] 33/3 41/23
perhaps [5] 16/20 32/3 43/1 43/11 44/14
period [7] 19/3 31/11 31/15 31/15 31/18 31/20 75/5
periods [1] 75/4
permissible [1] 30/23
permission [1] 73/23
PERRY [2] 2/11 6/11
personally [1] 59/25
persons [1] 23/9
pertinence [14] 21/5 44/18 51/5 51/9 61/13 62/8 63/16 65/14 65/18 66/1 66/20 81/13 81/20 81/23
pertinence/nonpertinence [1] 81/23
pertinent [69] 23/20 24/2 24/19 26/12 26/18 27/24 28/1 30/1 32/25 33/7 34/4 34/5 34/10 34/13 35/20 35/25 37/10 37/13 37/18 38/25 39/10 39/17 40/7 40/11 40/25 41/9 41/21 44/20 45/10 45/15 45/21 46/2 46/19 47/10 48/6 48/23 48/24 49/11 49/25 51/20 51/21 51/23 52/12 52/19 53/8 64/20 69/6 71/21 71/22 72/2 72/3 72/7 72/9 73/1 73/7 79/23 79/25 80/7 80/12 80/17 80/17 80/22 82/4 82/7 82/20 82/22 82/23 82/24 83/21
Peter [1] 7/7
pharmaceutical [1] 59/8
Pharmaceuticals [1] 59/1
phase [1] 71/20
phone [8] 4/6 54/9 70/15 74/20 76/14 78/21 79/3 79/3
Plaintiff [2] 1/8 2/4
plan [1] 21/12
Platt [1] 7/3
play [1] 54/23
please [13] 6/8 9/1 21/18 21/20 21/23 21/24 30/17 44/23 50/12 50/24 52/10 68/23 70/7
point [19] 10/25 13/8 17/23 20/24 29/23 46/25 47/5 47/21 59/18 60/19 63/7 65/12 70/7 70/23 70/24 75/6 85/10 85/12 85/25
pointed [2] 14/7 15/18
pointing [3] 26/17 26/22 63/13
points [3] 20/6 21/16 49/20
poor [1] 10/6
portion [3] 23/4 46/9 46/15
position [7] 16/19 18/8 20/3 47/13 51/18 56/7 63/10
positioned [1] 19/9
possible [9] 40/18 69/2 76/14 76/22 77/15 80/13 80/18 84/1 84/5
possibly [1] 35/11
POSSINO [10] 1/10 6/5 6/23 7/7 9/20 14/13 15/2 15/4 55/16 55/24
potential [3] 35/22 82/17 85/22
potentially [2] 57/24 66/12
preceded [1] 12/3
precisely [2] 43/15 43/22
premise [1] 56/13
preparation [2] 35/6 82/1
prepared [1] 35/3
preparing [1] 35/24
present [8] 2/11 6/13 6/17 6/17 6/21 6/23 7/1 7/5
presentation [1] 40/2
presented [4] 20/19 39/22 39/24 68/21
PRESIDING [1] 1/5
press [4] 34/3 44/25 45/1 69/25
pressing [1] 44/25
presumably [1] 24/5
pretty [1] 46/5
previous [2] 57/12 78/13
previously [1] 48/2
primarily [2] 22/15 67/22
principally [1] 19/9
prior [3] 39/24 40/4 83/19
privileged [2] 25/1 28/16
probable [4] 9/23 55/14 55/18 59/3
probably [3] 19/3 73/6 73/22
problem [6] 21/5 33/15 33/16 45/24 60/5 85/18
problems [1] 34/8
procedure [2] 24/12 38/12
procedures [1] 23/7
proceedings [3] 1/15 86/13 87/5
produce [1] 36/15
produced [4] 82/6 82/8 82/23 82/24
product [1] 70/15
proffer [14] 8/14 8/15 8/18 13/17 13/22 15/2 22/5 33/9 59/17 60/15 64/2 70/10 84/11 84/20
promise [2] 25/17 64/23
promote [1] 56/5
promotion [2] 69/25 70/2
promotional [6] 55/24 62/20 62/23 68/8 68/11 69/24
prongs [2] 18/18 21/12
properly [4] 29/8 45/16 45/17 46/23
prosecution [2] 35/22 82/17
protections [1] 85/24
provide [2] 14/7 36/16
provided [2] 22/4 22/19
provides [1] 11/23
providing [1] 14/24
public [2] 2/16 56/21
publicity [1] 56/22
publicly [2] 62/21 68/8
publicly-traded [2] 62/21 68/8
pulled [3] 25/9 36/17 38/14
pulling [1] 68/25
pulls [1] 66/20
pump [12] 10/24 11/24 59/21 61/9 62/1 68/9 68/12 68/14 69/15 70/3 70/6 70/14
purpose [4] 25/9 72/4 81/13 81/20
purposes [4] 21/6 81/15 81/21 82/1
pursuant [2] 54/2 87/3
pursue [1] 31/25
put [9] 13/17 25/11 25/23 44/12 47/11 50/5 54/22 79/18 85/19
putting [1] 22/22


## Q


quality [1] 39/19
quantify [1] 71/14
question [19] 10/2 10/9 10/12 11/6 11/19 12/2 16/9 17/13 18/10 27/20 46/21 49/12 49/15 50/22 61/2 65/7 72/21 73/4 80/5
questions [15] 7/20 7/21 8/7 10/15 10/23 11/9 16/24 21/10 51/14 56/14 60/19 60/21 63/10 71/8 73/19
quickly [1] 34/20
quite [3] 30/3 35/11 38/12


## R


radar [1] 70/13
raise [1] 21/20
ran [1] 82/21
rare [1] 51/24

## R


rate [3] 38/15 38/17 46/17
rather [1] 86/4
Rauth [1] 3/11
raw [1] 34/24
reach [1] 65/15
read [12] 10/18 11/14 26/11 26/19 30/20 31/14 35/20 63/9 64/17 68/22 70/8 70/12
reading [1] 68/24
realized [2] 83/7 83/12
really [6] 11/16 20/6 38/13 43/10 67/15 67/16
realtime [1] 45/3
reason [7] 9/11 12/8 13/18 27/3 27/25 41/20 61/17
reasonable [1] 70/19
reasonableness [1] 83/2
reasons [7] 8/11 8/13 8/16 9/8 9/11 9/13 14/21
reassess [1] 80/13
rebut [1] 15/12
recall [5] 40/20 50/2 59/11 63/25 83/24
receive [1] 22/18
received [3] 5/12 7/17 22/7
recess [1] 85/5
recharacterized [1] 83/11
reckless [1] 17/15
recklessly [2] 17/17 18/15
reclassification [4] 81/11 83/8 83/17 84/14
recognizes [1] 70/14
recollection [1] 10/16
reconcile [1] 8/8
reconsider [1] 80/19
record [24] 9/25 11/5 12/4 12/18 15/4 16/7 21/25 31/21 34/3 36/4 36/7 38/12 42/18 43/6 43/10 44/24 45/18 52/21 52/24 58/2 67/8 74/17 75/25 77/13
recorded [30] 12/20 20/22 20/25 31/5 37/24 37/25 38/5 38/6 39/1 40/19 41/15 41/22 44/8 44/8 46/15 47/7 47/9 64/6 74/18 74/25 75/5 75/8 75/18 75/21 76/11 76/14 77/2 77/16 78/21 79/21
recording [15] 24/1 25/1 30/1 34/4 35/12 41/3 41/11 45/1 45/12 47/24 76/20 77/14 77/15 79/15 79/19
recordings [1] 35/11
records [4] 36/10 36/15 36/16 36/17
RECROSS [1] 5/3
red [1] 7/12
REDIRECT [2] 5/3 74/10
reduce [1] 23/7
reduced [1] 77/5
refer [2] 27/3 43/11
referenced [2] 28/23 68/15
references [3] 52/6 52/7 66/23
referencing [2] 30/2 68/17
referred [1] 53/10
referring [6] 28/2 28/5 42/21 43/12 67/19 75/10
reflect [2] 25/6 32/24
reflected [1] 74/21
reflects [1] 54/1
regard [6] 23/12 23/13 47/5 47/10 47/11 56/25
regarded [1] 61/8
regarding [11] 16/19 23/21 30/22 40/2 40/3 40/7 52/16 54/11 62/3 62/9 71/12
regards [1] 61/18
REGIS [4] 1/10 6/5 6/23 15/2
regular [2] 28/15 40/11
regularity [2] 20/21 20/21
regulations [1] 87/7
related [4] 10/3 58/3 59/20 83/4
relates [5] 68/14 68/20 69/5 79/3 79/16
releases [1] 69/25
relevance [3] 51/4 51/9 51/14
relevant [7] 18/24 26/3 30/6 70/1 81/25 82/10 82/19
relying [1] 53/23
remainder [2] 66/19 68/18
remedied [1] 16/1
remember [2] 11/17 14/20
remove [2] 13/4 25/22
reopen [1] 7/25
repeat [1] 19/3
repeatedly [1] 10/8
replied [1] 53/10
report [1] 40/6
reported [1] 87/5
reporter [1] 21/19
REPORTER'S [1] 1/15
reports [3] 83/18 83/20 83/22
represent [1] 45/25
representation [1] 46/14
request [1] 25/4
require [1] 71/17
required [1] 16/13
research [1] 16/13
resist [1] 19/6
resolution [1] 50/20
respect [4] 22/12 37/25 59/4 59/20
respond [1] 60/14
response [1] 19/1
rest [4] 27/18 64/10 64/25 68/22
result [2] 13/7 81/2
resulted [1] 78/18
reveal [2] 11/9 13/9
revealed [3] 7/21 8/13 80/23
revealing [1] 11/14
reverse [1] 52/18
review [7] 10/16 14/14 40/4 40/18 48/22 49/13 71/6
reviewed [2] 18/9 49/21
reviewing [2] 25/25 43/6
Richard [3] 3/20 3/20 7/4
right [42] 8/7 12/12 14/2 18/10 21/17 21/20 22/7 23/14 23/22 24/2 24/7 27/7 28/1 28/6 29/12 29/15 34/13 35/16 38/1 38/6 38/19 43/13 45/7 45/12 47/20 51/13 54/7 56/15 56/23 58/3 66/3 68/16 71/4 71/9 72/4 75/16 78/3 78/6 81/3 82/11 84/23 85/5
rmcallahanjr [1] 3/23
Robinson [3] 2/19 2/19 6/25
role [2] 22/12 22/15
rolling [1] 40/6
room [2] 1/24 80/24
roughly [2] 43/7 83/22
row [2] 43/16 43/17
rows [1] 43/15
RPR [1] 1/23
Rubin [1] 7/6
run [1] 82/3


## S


S-e-e-s-m-a-r-t [1] 68/4
said [19] 9/1 10/18 11/13 12/7 14/20 15/1 15/23 18/14 19/18 25/24 26/2 30/12 41/16 49/4 53/15 55/23 61/10 70/12 72/15
Saif [2] 66/10 69/1
same [14] 11/18 11/19 14/23 32/12 33/13 43/17 54/10 54/18 54/20 63/15 65/7 78/25 79/1 79/1
Santa [1] 4/5
Saunders [1] 4/3
saving [1] 19/2
saw [1] 53/12
say [28] 13/9 13/17 16/3 18/21 19/1 24/4 27/8 34/13 38/10 42/4 42/8 43/9 43/22 53/2 53/13 57/6 59/6 59/18 62/22 71/19 71/24 72/23 74/7 76/13 77/12 81/7 81/18 84/13
saying [12] 12/25 13/12 13/20 13/24 18/3 29/25 30/8 32/4 32/10 41/13 49/6 59/23
says [10] 9/4 12/7 23/25 24/13 28/7 39/14 67/15 70/9 70/18 76/10
sbcglobal.net [1] 3/18
scheme [22] 10/24 11/22 11/25 30/6 32/2 32/7 54/18 55/4 55/5 55/8 56/6 57/23 62/3 68/10 68/12 68/14 68/20 69/15 70/4 70/6 70/14 85/22
schemes [5] 11/1 57/14 59/22 61/9 62/1
Scheper [1] 3/5
scheperkim.com [1] 3/8
scintilla [1] 12/1
scope [25] 20/22 21/2 21/6 24/20 27/7 57/16 57/23 58/7 58/8 58/12 61/14 61/22 62/3 62/7 62/10 63/16 63/22 63/24 65/15 66/1 69/6 69/16 69/20 72/17 85/22
screen [2] 22/23 67/5
screw [1] 77/15
screwed [1] 77/14
search [6] 23/14 23/17 59/3 84/13 85/14 85/15
seated [1] 21/23
second [9] 7/18 20/24 21/4 26/2 43/3 52/13 62/13 65/8 65/16
secondary [1] 22/15
seconds [6] 28/18 30/5 50/18 65/3 76/17 76/21
section [2] 16/16 87/3
securities [3] 55/18 56/21 62/18
security [1] 62/21
see [21] 7/15 17/4 26/12 41/8 42/5 49/6 50/13 54/21 54/25 62/11 64/4 64/25 65/20 65/25 67/3 71/5 71/6 75/23 76/8 78/20 86/4
seeing [2] 37/9 50/20
seem [1] 72/2
seems [2] 47/17 81/9
sees [1] 70/15
Seesmart [10] 66/13 67/22 68/1 68/3 68/4 68/11 68/17 69/2 69/21 85/17
seized [1] 13/19
seizure [1] 23/17
selection [1] 79/19
sense [3] 9/18 13/20 17/22
sent [1] 8/25
sentence [5] 26/2 27/13 27/18 27/22 30/11
serial [1] 60/17
series [1] 8/25
sessions [1] 15/2
set [5] 17/1 17/10 37/21 38/4 39/13
sets [1] 25/6
seven [1] 25/14
several [1] 54/3
share [1] 7/19
shares [2] 56/5 63/2
she [1] 49/24
Sherman [3] 6/6 6/16 66/12
shifts [1] 40/5
short [1] 74/8
should [14] 8/2 19/17 24/13 26/1 27/13 28/8 30/12 31/2 31/5 35/12 37/21 42/6 43/11 45/4
shouldn't [2] 35/11 49/6
show [4] 14/18 16/14 49/10 75/9
showing [2] 7/12 67/4
shows [6] 13/14 13/25 28/7 30/24 31/8 32/5
side [3] 16/20 18/9 40/15
sides [1] 8/2
significant [2] 46/9 46/12

**S**

similar [1] 54/12
simple [1] 43/20
simply [3] 37/8 55/20 71/6
since [1] 73/7
sir [1] 27/17
sit [3] 37/16 43/25 44/7
sitting [3] 10/8 66/9 66/10
situation [2] 60/1 69/23
six [1] 25/13
skew [1] 83/4
slice [3] 46/5 46/6 46/8
slightly [1] 20/6
small [1] 84/18
smallest [2] 23/8 23/8
so [107]
solely [1] 69/8
some [29] 11/21 17/15 18/2 25/16 25/18 30/15 31/22 32/9 35/4 35/17 39/7 40/24 46/15 47/8 47/15 47/24 48/17 49/7 52/22 53/19 55/25 57/10 60/5 63/3 68/25 72/16 74/16 82/20 83/19
somehow [3] 11/17 31/22 85/21
someone [4] 43/6 51/6 53/13 73/24
something [8] 12/17 15/20 19/1 47/7 63/6 63/11 70/25 72/11
sometimes [1] 80/24
somewhat [1] 17/20
somewhere [1] 12/19
soon [1] 83/12
sooner [2] 28/9 31/2
sorry [23] 20/11 20/15 23/5 26/18 26/21 26/24 28/11 34/11 34/21 41/7 42/10 44/4 46/21 50/22 57/15 59/24 60/13 65/23 67/25 71/24 77/21 79/6 81/19
sort [4] 7/10 31/22 47/7 49/20
sought [2] 54/8 58/19
sounds [1] 70/19
South [1] 3/21
speak [4] 32/6 34/20 60/4 60/5
speakers [3] 32/5 72/16 72/24
speaking [2] 60/5 72/16
speaks [1] 38/18
special [13] 2/11 6/11 6/12 7/22 8/11 9/15 12/6 13/8 13/14 13/15 13/23 14/6 58/15
species [1] 66/3
specific [2] 40/20 84/2
specifically [4] 23/19 37/19 57/18 73/18
speech [1] 60/6
spell [1] 21/24
spent [1] 38/3
spot [5] 28/1 29/22 31/5 31/17 32/3
spot-check [2] 31/17 32/3
spot-checked [1] 29/22
Spring [2] 1/24 2/9
stand [4] 13/16 20/2 21/16 21/19
standard [9] 21/5 51/20 52/12 52/19 53/8 65/13 65/18 66/20 69/6
standards [1] 51/21
standing [1] 7/6
start [2] 34/22 67/1
started [1] 18/3
starting [2] 66/22 72/16
starts [1] 28/6
state [7] 6/8 8/18 16/1 17/14 21/24 27/20 30/9
statement [7] 14/8 14/15 15/7 52/11 52/14 52/15 68/7
statements [6] 8/21 10/1 10/2 25/18 55/10 55/22
states [12] 1/1 1/7 1/23 2/6 2/8 2/8 6/5 6/6 6/10 27/22 87/4 87/8
Ste [1] 4/5
stenographically [1] 87/5
step [1] 21/18
STEPHEN [1] 1/5
steps [1] 19/15
stick [1] 62/13
still [7] 16/22 19/20 39/2 44/21 66/5 74/21 77/23
stipulate [1] 84/17
stock [6] 55/25 56/6 56/8 56/9 56/16 68/8
stop [3] 23/25 34/5 45/7
stopped [2] 29/22 35/12
stops [2] 50/20 64/14
story [1] 28/4
Stradling [1] 3/11
strain [1] 60/1
Street [5] 1/24 2/9 2/16 3/6 3/16
stretched [1] 30/4
striving [1] 18/7
struggling [2] 8/8 62/6
stupid [1] 12/17
style [1] 54/12
subgroup [2] 78/6 78/9
subject [6] 27/6 30/6 57/5 57/9 61/25 72/9
subjects [7] 14/13 23/21 48/4 49/3 49/9 52/25 58/3
submission [2] 52/23 59/7
subset [3] 39/13 77/8 78/11
substancewise [1] 54/13
substantial [1] 84/8
substantive [1] 49/19
such [8] 31/1 31/4 31/6 41/17 55/19 61/24 73/10 73/13
suggest [1] 16/17
suitable [1] 13/4
Suite [3] 3/11 3/16 3/21
supervising [1] 40/12
supervisor [1] 13/24
support [1] 16/18
supposed [3] 19/14 24/12 30/9
supposedly [3] 10/3 12/3 13/23
sure [14] 20/16 34/18 34/23 35/8 36/17 38/18 42/22 45/8 51/4 74/15 75/1 79/11 80/15 86/8
surprising [1] 20/21
suspicious [1] 56/8
SVW [4] 1/9 1/9 6/4 6/6
swallow [1] 60/10
sworn [2] 21/21 22/8
sycr.com [1] 3/13
synopsis [1] 80/4
system [8] 33/20 33/23 37/14 44/24 75/16 76/19 77/17 79/22

**T**

table [8] 6/11 25/11 26/5 26/10 28/21 29/11 39/6 39/7
take [8] 33/10 38/14 38/20 42/1 69/23 78/15 84/7 84/8
taken [1] 27/18
taking [1] 67/17
talk [3] 43/16 59/10 84/4
talked [5] 15/5 15/6 15/22 39/5 40/21
talking [16] 10/20 11/17 11/18 26/25 28/15 39/2 42/12 43/9 52/8 52/8 54/1 57/11 59/15 67/17 70/16 73/16
talks [1] 59/7
tap [1] 54/9
taps [1] 55/16
target [16] 10/4 10/7 10/10 10/12 14/13 23/21 23/21 48/4 52/25 57/4 58/3 59/21 61/9 66/14 66/25 69/15
targeted [3] 49/3 49/9 57/14
targeting [3] 55/6 55/23 62/21
targets [3] 8/24 48/12 53/11
Tarwater [17] 7/23 8/11 8/17 8/19 9/5 9/7 10/18 12/7 13/8 13/14 13/15 22/15 34/16 35/3 37/9 38/23 40/18
Tarwater's [4] 14/6 17/14 36/23 62/24
task [2] 37/6 37/8
team [1] 34/2
telephone [3] 60/16 77/8 78/5
tell [4] 28/4 60/22 83/12 83/14
telling [2] 42/5 54/14
tells [1] 14/12
ten [10] 25/14 25/14 28/18 30/5 65/3 72/23 74/3 74/7 80/11 81/2
tend [1] 70/9
tentative [1] 17/16
term [1] 53/10
terms [4] 16/13 54/13 74/16 79/12
testified [8] 22/8 53/9 70/19 71/12 71/14 81/11 82/9 84/1
testimony [6] 16/8 16/25 20/7 22/6 48/2 61/5
than [18] 10/13 12/6 24/15 26/1 27/16 29/9 29/12 30/10 30/14 32/2 32/20 35/5 56/15 72/19 72/22 78/8 78/11 83/25
Thank [12] 7/16 8/6 9/4 17/12 32/15 49/18 85/3 85/4 85/8 86/10 86/11 86/12
that [574]
that's [37] 9/12 10/4 11/6 11/14 13/12 15/20 17/22 18/3 18/24 19/23 27/4 29/11 31/17 37/13 38/2 41/16 43/9 46/5 47/19 49/15 53/15 53/22 53/25 56/13 58/4 58/14 59/15 64/12 66/8 67/16 69/17 70/9 70/20 74/23 76/2 76/12 82/8
their [9] 16/18 16/19 20/22 25/19 29/20 29/21 65/15 70/13 85/21
them [13] 11/2 35/7 35/15 35/17 38/14 41/5 41/14 41/21 49/7 69/24 77/13 77/24 78/12
themselves [1] 66/13
then [47] 7/22 8/2 9/24 13/13 14/4 16/17 16/18 18/2 18/18 18/22 18/22 18/24 22/7 23/24 24/4 24/11 24/23 28/20 29/22 30/6 32/3 32/6 32/7 32/13 34/11 39/24 40/20 43/12 47/10 48/5 49/10 49/19 51/13 53/16 56/14 58/6 58/11 60/22 71/4 71/9 71/21 72/6 72/17 72/21 79/20 80/22 86/4
there [53] 11/10 11/14 11/14 12/1 15/24 15/24 18/1 18/14 19/15 26/23 28/6 29/18 37/21 37/23 39/15 39/19 39/22 40/15 41/11 41/20 41/21 45/7 46/20 47/13 47/15 48/3 49/8 52/14 55/13 55/25 58/7 63/25 64/10 64/16 66/19 66/22 68/16 68/18 70/3 71/2 71/6 72/2 72/11 72/15 73/7 74/24 75/5 75/7 75/25 76/23 77/1 77/9 78/10
there's [33] 10/6 13/13 14/20 14/21 18/9 18/9 18/21 26/12 39/5 39/7 39/13 41/2 43/8 43/17 50/9 52/5 52/5 52/15 55/23 55/23 65/25 67/14 68/16 70/11 70/24 70/25 72/1 74/16 76/13 78/5 79/18 79/18 79/24
thereafter [1] 32/3
therefore [4] 23/25 28/17 42/2 56/14
these [26] 9/2 14/19 31/25 32/19 33/17 36/15 36/17 36/24 41/9 41/9 41/14 41/19 41/19 41/24 42/2 42/6 42/6 45/20 47/1 47/18 60/16 67/7 69/10 69/23 69/24 76/23
they [72] 8/15 8/15 8/16 8/17 8/18 9/19 9/21 9/21 9/22 10/12 10/15 10/25 11/1 11/5 11/16 11/16 11/19 12/2 14/8 14/20 14/21 15/1 16/20 23/13 29/7 29/8 35/8 35/10 37/14 37/24 38/12 39/18 45/4 45/4 47/1 47/2 47/7 48/12 48/22 48/22 48/23 48/24 49/1 53/9 54/14 54/14 54/15 60/16 60/17 60/23 64/6 64/20 65/15 67/22 68/1 71/20 74/1 75/7 75/18 77/6 79/15 79/17 79/19 79/22 79/23 79/24 79/24 80/21 80/21 80/21 82/8 84/18

## T


they'll [2] 69/23 69/24
they're [16] 10/23 52/6 52/8 52/8 52/13 52/14 54/22 57/11 68/25 69/1 70/5 70/6 70/12 70/15 72/3 77/16
thing [7] 7/18 11/15 13/5 15/5 49/4 55/8 81/8
things [13] 7/9 8/8 8/21 13/13 14/21 43/20 56/15 59/16 67/7 67/15 71/2 71/6 74/15
think [46] 7/13 8/2 8/3 11/2 16/4 16/21 16/24 17/5 17/6 17/19 17/23 18/4 18/20 18/24 19/17 27/23 27/24 28/14 28/20 28/22 31/22 32/12 36/12 43/1 43/14 47/19 47/20 47/21 51/9 52/11 54/14 55/2 56/2 56/3 57/1 57/18 61/25 63/10 65/4 70/5 70/9 71/13 74/16 75/6 79/12 80/6
thinking [3] 54/16 54/22 58/17
this [126]
those [39] 8/21 10/2 14/14 16/9 21/8 21/15 24/9 29/13 29/21 35/11 35/21 35/23 38/1 38/14 38/14 39/9 41/3 43/25 44/8 44/15 46/15 46/16 47/14 48/8 51/24 58/21 59/1 61/4 61/12 64/2 66/7 68/11 69/21 72/6 72/18 77/4 77/23 83/21 84/17
though [2] 30/8 72/11
thought [10] 7/19 7/24 9/17 13/2 13/11 20/2 64/19 80/16 80/22 82/19
three [5] 14/20 14/21 25/13 26/12 80/9
through [6] 19/14 20/7 21/9 25/17 46/24 74/14
THURSDAY [2] 1/17 6/1
tickets [4] 9/15 9/16 12/10 12/18
ties [1] 68/8
till [1] 53/20
time [32] 8/10 13/16 14/23 15/14 24/6 27/5 27/21 29/3 36/5 37/2 38/3 38/24 39/10 41/20 48/16 51/10 53/2 53/12 57/16 58/17 59/6 62/22 67/18 68/1 71/18 71/24 75/3 75/5 75/7 79/15 80/2 84/8
times [2] 37/9 74/24
timestamps [3] 65/20 65/23 65/25
Title [2] 85/24 87/4
Title 18 [1] 87/4
today [9] 6/13 15/12 20/3 37/16 42/16 43/25 44/7 66/9 66/10
together [1] 43/7
told [7] 13/16 23/6 52/23 54/17 61/11 61/12 84/18
too [1] 10/21
top [3] 23/3 58/10 80/22
topic [2] 20/6 61/25
topics [2] 21/8 57/10
Torrance [1] 2/20
total [8] 33/6 33/10 33/11 38/6 39/15 79/4 79/6 79/7
trade [3] 9/13 13/19 13/21
traded [2] 62/21 68/8
trades [2] 56/1 56/8
trading [2] 62/18 63/5
training [1] 58/18
transactions [1] 56/21
transcript [9] 1/15 17/2 17/11 50/11 52/2 64/22 66/16 87/5 87/6
transition [1] 55/3
transitioning [1] 48/5
transmission [1] 47/21
treated [1] 85/19
trial [1] 82/2
tried [2] 9/15 12/8
troll [1] 8/22
trolling [1] 9/10
trouble [1] 34/19
true [6] 12/19 13/13 13/15 14/1 69/17 87/4
trusted [1] 8/20
try [14] 9/13 12/21 17/21 25/17 26/11 59/10 52/18 59/2 60/4 61/11 74/8 77/19 77/22 78/17
trying [14] 12/16 14/4 16/3 20/3 27/23 42/5 50/19 60/22 65/10 65/12 70/6 80/4 83/4 85/14
turn [5] 7/8 25/1 49/19 51/25 70/21
turned [2] 48/13 72/9
turning [1] 49/10
two [116]
two-and-a-half [1] 51/5
two-minute [12] 27/4 30/4 30/7 31/14 31/15 31/18 31/20 32/8 32/23 50/16 71/13 71/25
type [2] 62/9 80/4
typically [1] 80/1


## U


U.S [1] 22/18
Uh [1] 17/9
Uh-huh [1] 17/9
ultimately [3] 32/25 33/2 34/4
um [1] 67/18
unbelievable [1] 11/6
unclassified [4] 39/7 41/4 43/9 43/21
unclear [3] 64/5 67/8 80/21
undecided [2] 19/8 19/9
under [5] 14/23 47/13 70/17 72/18 72/22
undergo [1] 84/12
underlying [1] 47/23
underscored [1] 24/23
understand [12] 16/7 24/17 25/2 37/20 49/5 51/8 59/19 61/21 63/10 65/15 74/15 79/12
understanding [11] 31/24 31/25 34/19 51/4 52/9 61/4 67/21 71/25 77/14 80/7 86/2
understood [5] 24/9 61/6 61/14 61/23 81/9
undertake [1] 84/19
undertaken [1] 57/24
undesignated [1] 41/18
unequivocally [1] 30/9
Unfortunately [1] 77/23
UNITED [11] 1/1 1/7 1/23 2/6 2/8 2/8 6/5 6/6 6/10 87/4 87/8
unknown [11] 39/7 41/4 41/14 41/24 42/2 43/9 43/21 46/4 46/18 46/22 47/6
unknown/unclassified [1] 43/9
unless [4] 10/10 11/7 21/10 70/25
unlike [2] 55/21 72/23
unmodified [1] 34/25
unreliable [1] 9/9
unsuccessful [3] 9/22 12/16 12/22
untrustworthy [1] 9/9
up [27] 7/12 9/3 13/13 14/18 20/23 25/11 25/23 36/14 38/3 38/4 38/5 39/23 43/15 44/16 50/18 53/20 63/13 64/25 65/7 67/17 69/13 72/15 75/6 77/14 77/15 80/4 82/22
upon [2] 15/20 16/17
urge [1] 19/7
us [8] 6/11 9/1 9/2 59/19 62/2 84/13 84/14 84/19
use [15] 8/12 12/8 13/1 13/18 14/21 25/18 27/9 33/24 35/22 35/23 37/1 50/10 53/6 53/16 69/24
used [7] 33/20 41/2 57/13 62/24 69/11 77/18 77/22
useful [3] 81/23 81/25 82/16
using [3] 56/4 58/11 75/11
usually [1] 31/9
uttered [1] 15/7
Uyeda [2] 2/15 6/22


## V


valuable [1] 13/2
vary [1] 30/23
versus [3] 6/5 6/6 11/18
very [12] 7/9 9/10 12/9 12/18 15/17 15/17 16/11 19/6 19/12 60/20 65/9 85/10
view [10] 9/21 16/2 16/18 17/16 18/16 37/23 53/12 60/22 69/13 85/21
views [1] 80/14
VoiceBox [17] 25/5 33/18 33/20 35/4 35/20 36/3 36/10 37/1 37/8 37/14 38/23 39/11 44/24 76/12 77/17 77/22 84/4
volume [6] 41/18 45/24 46/2 65/10 65/11 82/14
voluminous [1] 37/6
volunteers [1] 11/21


## W


waited [1] 30/5
waiver [3] 7/3 7/5 7/7
walk [1] 74/14
walks [1] 9/24
want [40] 7/18 9/13 13/19 13/21 15/12 15/18 15/20 19/16 23/4 24/24 25/11 25/17 25/18 25/22 26/5 29/6 31/21 39/6 43/18 49/19 52/18 57/3 59/25 60/23 61/3 63/12 64/18 64/21 65/6 68/22 70/22 70/23 71/1 71/5 74/14 79/11 81/11 84/13 84/14 85/19
wanted [6] 9/12 19/1 33/3 35/23 71/3 85/25
warrant [4] 15/25 23/14 85/14 85/15
was [132]
wasn't [2] 13/15 14/25
Water [1] 4/4
way [14] 8/16 8/17 10/6 16/21 17/22 19/21 30/15 31/24 31/25 47/11 68/20 73/10 79/18 83/5
ways [2] 19/16 32/6
we [134]
we'll [6] 25/5 43/19 62/13 84/14 84/17 86/3
we're [20] 7/25 11/17 11/18 14/10 14/11 20/3 26/25 28/14 32/12 39/2 40/1 42/1 42/25 46/16 50/6 50/17 59/15 64/9 67/16 73/16
we've [5] 15/22 28/22 40/1 54/1 63/14
weeks [4] 17/7 17/8 17/10 84/9
well [32] 6/18 13/20 17/19 18/22 19/6 19/12 20/17 36/13 38/7 38/10 41/6 41/17 42/5 42/17 43/10 47/11 52/2 52/22 55/8 55/13 56/23 57/15 57/19 58/6 58/15 60/20 62/13 66/15 67/17 73/24 74/5 86/7
went [10] 9/17 11/4 25/4 35/3 35/6 35/15 38/23 39/23 41/13 82/9
were [128]
weren't [6] 9/22 40/3 47/7 71/14 75/3 76/1
West [1] 3/6
WESTERN [1] 1/3
what [137]
what's [5] 46/21 47/4 60/18 70/1 81/17
whatever [2] 16/25 18/8
whatsoever [1] 77/10
when [37] 9/7 10/7 14/4 14/8 14/10 14/11 14/17 15/5 15/6 17/5 24/1 24/4 26/4 35/13 35/18 36/3 37/14 40/16 42/8 44/24 51/10 52/7 54/21 55/3 63/21 74/17 76/10 78/15 79/11 79/13 79/13 79/22 80/1 80/2 82/21 82/25 83/7
where [19] 10/4 14/3 28/6 30/12 30/17 39/9 39/25 47/21 48/3 48/11 49/8 52/22 53/4 66/4 66/23 68/18 73/25 74/24 75/9
whether [19] 8/23 27/5 29/7 32/23 41/8 44/20 45/4 45/10 45/11 45/15 45/18 45/21 47/23 48/19 48/22 48/23 49/1 49/13 73/13
which [27] 7/11 14/13 16/5 16/6 21/5 21/7 21/7 24/5 26/6 29/18 30/20 32/25 37/17 41/5 43/5 46/6 52/25 65/7 65/14 66/13 66/24 67/23 75/10 77/18 78/18 82/10 84/2

## W


while [1] 79/19
who [11] 6/16 6/17 6/20 6/23 9/2 20/12 48/12 49/8 49/9 66/10 66/11
whole [3] 12/21 50/20 85/17
whom [2] 6/12 40/9
why [22] 7/21 8/11 8/16 9/18 10/25 13/1 13/1 13/3 13/9 14/5 14/17 18/3 27/3 37/5 41/5 41/8 41/17 46/24 50/14 64/19 75/2 82/13
will [11] 7/19 9/5 16/6 16/24 21/18 30/23 60/8 67/8 69/23 82/3 84/15
WILSON [3] 1/5 50/24 66/3
wire [4] 22/20 23/13 40/5 55/21
wiretap [10] 22/13 39/23 39/25 53/20 53/21 53/24 54/12 55/4 56/4 85/20
wiretaps [1] 55/3
within [35] 24/20 27/7 31/22 33/4 37/14 48/9 48/10 48/20 48/21 49/7 51/19 51/21 51/24 52/12 53/7 58/7 61/13 61/14 61/22 62/8 63/16 63/24 65/13 65/18 65/23 66/1 66/20 69/5 69/6 69/16 69/20 71/19 72/2 73/15 85/22
without [7] 9/25 10/7 11/5 12/4 21/15 74/18 74/18
witness [6] 6/13 21/18 21/21 22/8 49/12 70/21
WITNESSES [1] 5/3
won't [3] 18/24 25/17 63/13
WOO [2] 2/11 6/12
word [16] 38/20 42/1 52/20 53/4 53/6 53/12 53/13 53/17 54/21 57/4 57/10 57/21 58/12 61/7 61/18 62/24
words [11] 11/10 11/16 15/22 15/23 17/21 44/2 52/5 54/13 56/7 60/10 60/11
work [1] 24/12
worked [1] 49/21
working [3] 67/16 67/22 68/1
works [1] 74/15
world [1] 13/5
worse [1] 10/13
worst [1] 13/5
would [70] 7/14 10/12 12/18 13/1 13/1 13/3 13/11 13/13 14/3 16/4 16/17 16/25 17/3 17/18 17/23 18/16 18/17 18/17 22/3 22/5 28/16 28/17 29/21 33/6 37/7 37/12 40/6 40/12 40/18 40/21 43/12 48/15 50/12 51/3 54/14 56/17 57/23 60/14 60/17 62/4 62/9 69/4 69/20 70/10 71/17 71/22 72/6 72/25 72/25 73/3 73/6 73/6 74/24 74/24 75/2 75/5 75/20 76/19 76/20 81/2 81/7 82/16 82/20 82/21 82/22 82/24 84/3 84/7 84/8 85/15
wouldn't [4] 27/8 38/17 38/18 57/6
wrap [2] 63/12 69/13
wrapped [1] 57/16
wrong [1] 18/10
wrongfully [1] 44/15
wrote [1] 64/5


## Y


yeah [20] 16/15 18/12 19/8 25/9 30/19 32/14 35/8 46/12 49/16 54/5 59/15 67/15 67/15 70/5 71/17 72/20 74/6 74/9 78/24 83/18
year [2] 11/3 54/10
years [3] 9/20 12/16 51/6
yes [85] 10/19 11/12 15/17 17/3 19/22 19/25 22/17 22/21 22/24 23/1 23/5 23/11 23/15 23/18 23/23 24/3 24/8 24/10 24/18 25/3 25/10 26/23 27/2 27/9 27/22 29/16 31/16 32/11 33/8 33/14 33/22 34/1 34/14 35/22 36/2 36/25 38/2 38/7 38/9 40/14 44/22 45/17 46/11 50/8 51/16 52/4 54/15 56/17 60/3 63/20 65/6 66/17 67/2 67/6 67/11 67/20 70/1 71/25 73/5 73/17 73/22 74/1 74/23 76/9 76/16 76/18 76/22 77/1 77/3 78/4 78/7 78/19 80/8 80/10 80/12 81/1 81/4 82/5 82/12 82/24 83/13 83/15 84/3 84/6 85/11
yesterday [7] 7/20 8/1 8/9 8/10 15/19 17/14 54/6
yet [2] 15/4 39/5
Yocca [1] 3/11
York [1] 11/18
you [312]
you'd [1] 12/20
you'll [4] 15/13 15/15 19/4 64/4
you're [35] 14/4 14/17 19/1 20/9 20/12 21/11 26/22 27/23 29/25 30/8 30/9 30/10 30/15 32/10 36/18 41/13 42/5 42/11 42/12 42/12 42/20 43/5 43/6 43/8 43/12 43/13 44/24 45/1 53/23 54/22 59/14 59/23 67/19 70/25 75/10
you've [12] 12/15 15/23 32/25 34/12 41/6 48/25 56/24 60/2 61/11 61/21 63/6 66/3
your [206]


## Z


zoom [4] 26/11 50/12 64/23 67/3